No. 25-11393

# In the United States Court of Appeals for the Fifth Circuit

*IN RE*: CHARLES JOHNSON

On Petition for a Writ of Mandamus

**RESPONSE TO PETITION FOR WRIT OF MANDAMUS**

WILL THOMPSON
DLA PIPER LLP (US)
State Bar No. 24094981
will.thompson1@us.dlapiper.com
1900 N. Pearl Street
Dallas, Texas 75201
Telephone: (406) 546-5587

*Counsel for Respondents Point Bridge Capital, LLC & Hal Lambert*

## CERTIFICATE OF INTERESTED PERSONS

Undersigned counsel certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1. **Charles Johnson** is the petitioner.

2. **Michael J. Wynne, James L. Turner, and Cameron Powell of Gregor Wynne Arney, PLLC** are counsel for petitioner.

3. Petitioner's former counsel in the district court are: **Bernard Kleinman** of the **Law Office of Bernard V. Kleinman PLLC**; **Devon Judy Sanders**, **Joshua Smith Rhodes,** and **Michael A. Lehmann** of the Federal Public Defenders' Office; and **Lawrence J. Friedman** and **William Carter Boisvert** of **Friedman & Feiger, LLP**.

4. **Point Bridge Capital, LLC** and **Hal Lambert** are respondents.

5. **Will Thompson** of **DLA Piper, LLP** is counsel for respondents.

6. **Adam Douglas Farrell** and **Jeffrey J. Ansley** of **Vedder Price PC** are court-appointed receivers.

For purposes of Rule 26.1, the undersigned certifies that Point Bridge Capital, LLC has no parent corporation and no publicly held corporations owns 10% or more of its stock.

i

Dated: January 6, 2026

Respectfully submitted,

/s/ *Will Thompson*

WILL THOMPSON

*Counsel for Respondents Point Bridge Capital, LLC & Hal Lambert*

# TABLE OF CONTENTS

Certificate of Interested Persons ................................................................i

Table of Authorities.................................................................................v

Introduction.............................................................................................1

Background..............................................................................................5

    A.    Professional provocateur Charles Johnson runs an extortion racket...........................................................................5

    B.    Point Bridge and Lambert sue Johnson, who chooses to proceed *pro se* after he rendered his counsel's representation "unreasonably difficult." .....................................6

    C.    Johnson flouts basic discovery requests.....................................8

    D.    Johnson defies the district court's discovery order and refuses to cooperate with court-ordered mediation. ...................9

    E.    Johnson again violates the district court's discovery order, so the district court strikes his pleadings. .....................11

    F.    In related litigation, the Southern District of New York enters a default judgment against Johnson for similar discovery abuses and "racist tirades." ..........................12

    G.    Respondents win a $71 million judgment against Johnson. ................................................................................13

    H.    Johnson refuses to cooperate with post-judgment discovery and attempts to dissipate his assets. ........................14

    I.    At his deposition, Johnson evades questions, mocks the prospect of contempt, and steals court property................16

    J.    The district court finally holds Johnson in contempt. ..............18

    K.    The district court recalls Johnson, who continues to evade discovery… ....................................................................21

Argument ............................................................................. 23

    Johnson's mandamus petition should be denied. ................................. 23

        A.    Johnson has not demonstrated a clear and
              indisputable right to relief. ........................................ 24

            1.  The district court rightly jailed Johnson for contempt. ....... 24

            2.  Johnson's counterarguments fail. ........................................ 28

        B.    Johnson has adequate alternative remedies. ........................ 33

        C.    Mandamus would not be appropriate under the
              circumstances. ........................................................... 36

Conclusion .......................................................................... 38

Certificate of Compliance

Certificate of Service

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Airlines, Inc. v. Allied Pilots Ass'n,*
  228 F.3d 574 (5th Cir. 2000) ................................................................. 31

*In re Avantel, S.A.,*
  343 F.3d 311 (5th Cir. 2003) ................................................................. 38

*In re Bradley,*
  588 F.3d 254 (5th Cir. 2009) ......................................................... 25, 28

*In re Bryant,*
  745 F. App'x 215 (5th Cir. 2018) .......................................................... 39

*Carter v. Local 556, Transp. Workers Union of Am.,*
  156 F.4th 459 (2025) ............................................................................. 30

*Cheney v. U.S. Dist. Ct. for D.C.,*
  542 U.S. 367 (2004) ........................................................................ 24, 38

*In re Chesson,*
  897 F.2d 156 (5th Cir. 1990) ................................................................. 36

*Cointreau Corp. v. Pura Vida Tequila Co.,*
  2013 WL 12125990 (N.D. Tex. Jan. 9, 2013) ..................................... 35

*Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.,*
  84 F.3d 367 (10th Cir. 1996) ................................................................. 36

*Donaldson v. Ducote,*
  112 F. App'x 329 (5th Cir. 2004) .......................................................... 29

*Farguson v. MBank Houston, N.A.,*
  808 F.2d 358 (5th Cir. 1986) ................................................................. 27

*Hicks ex rel. Feiock v. Feiock,*
  485 U.S. 624 (1988) ............................................................................... 27

*Fuller v. Donahoo,*
    95 F.3d 52 (5th Cir. 1996) ................................................. 35

*In re Gee,*
    941 F.3d 153 (5th Cir. 2019) ......................................... 37, 38

*In re Gibson,*
    423 F. App'x 385 (5th Cir. 2011) ....................................... 34

*In re Gravel,*
    6 F.4th 503 (2d Cir. 2021) ............................................ 31, 32

*GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.,*
    445 U.S. 375 (1980) ..................................................... 26

*In re Hipp, Inc.,*
    5 F.3d 109 (5th Cir. 1993) .............................................. 30

*Kingsley v. Hendrickson,*
    576 U.S. 389 (2015) ..................................................... 29

*In re Kleberg County,*
    86 F. App'x 29 (5th Cir. 2004) .......................................... 37

*Kleiner v. First Nat'l Bank of Atlanta,*
    751 F.2d 1193 (11th Cir. 1985) .......................................... 26

*Lance v. Plummer,*
    353 F.2d 585 (1965) ..................................................... 29

*Leonard v. Martin,*
    38 F.4th 481 (5th Cir. 2022) ............................................ 24

*McComb v. Jacksonville Paper Co.,*
    336 U.S. 187 (1949) .................................................. 30, 31

*N.Y. State Rifle & Pistol Ass'n v. City of N.Y.,*
    590 U.S. 336 (2020) ..................................................... 32

*NLRB v. Aquabrom, Div. of Great Lakes Chem. Corp.,*
    862 F.2d 100 (6th Cir. 1988) ............................................ 35

*In re Occidental Petroleum Corp.*,
  217 F.3d 293 (5th Cir. 2000) .............................................................. 24

*In re Parish*,
  81 F.4th 403 (5th Cir. 2023) .............................................................. 33

*PlayNation Play Sys., Inc. v. Velex Corp.*,
  939 F.3d 1205 (11th Cir. 2019) .......................................................... 26

*Price v. Porter*,
  351 F. App'x 925 (5th Cir. 2009).......................................................... 27

*In re Ramirez*,
  605 F. App'x 361 (5th Cir. 2015).......................................................... 34

*SEC v. Wolfson*,
  309 B.R. 612 (D. Utah 2004)................................................................ 35

*Segner v. Sinclair Oil & Gas Co.*,
  2012 WL 12885056 (N.D. Tex. Nov. 9, 2012) ..................................... 35

*In re Stone*,
  940 F.3d 1332 (D.C. Cir. 2019) .......................................................... 34

*Taggart v. Lorenzen*,
  587 U.S. 554 (2019)............................................................................ 24

*Tesoro Refin. & Mktg. Co. v. FERC*,
  552 F.3d 868 (D.C. Cir. 2009) ........................................................... 34

*Topletz v. Skinner*,
  7 F.4th 284 (5th Cir. 2021) ................................................................ 28

*Trueblood v. Wash. State Dep't of Soc. & Health Servs.*,
  2016 WL 4384861 (W.D. Wash. Aug. 17, 2021) ........................... 33,34

*In re U.S. Abatement Corp.*,
  39 F.3d 563 (5th Cir. 1994)................................................................ 36

*United States v. Leon*,
  468 U.S. 897 (1984)..................................................................... 28, 29

vii

*Walker v. City of Birmingham*,
  388 U.S. 307 (1967)........................................................................26

*Whitney Bank v. SMI Companies Glob., Inc.*,
  949 F.3d 196 (5th Cir. 2020)...........................................................29

*Wilkins v. Gaddy*,
  559 U.S. 34 (2010).....................................................................28,29

**Statute**

18 U.S.C. § 401 ...............................................................................33

**Rules**

Fed. R. Civ. P. 54(b)........................................................................33

Fed. R. Civ. P. 59(e)........................................................................33

Fed. R. Civ. P. 60(b)........................................................................33

Fed. R. Civ. P. 62(a)........................................................................14

Fed. R. Civ. P. 69(a)(2) ...................................................................14

5th Cir. R. 27.5 ...............................................................................36

**Other Authorities**

Charles Johnson, *"Clear and Present Danger" to American
  Interests: Why I Leaked J.D. Vance's Text Messages* (Aug.
  7, 2024), tinyurl.com/bddbey2j .........................................................5

Charles Johnson, *"It's About Israel": Zionist Criminal
  Misbehavior Created Zohran Mamdani … And Nick
  Fuentes* (Nov. 5, 2025), tinyurl.com/426m4tkn. ..................................5

Charles Johnson, *Looks Like We're Going to the Fifth Circuit!*
  (Sep. 4, 2025), tinyurl.com/3yadb9te...........................................14,15

Charles Johnson, *Notes on the State of Israel and Reflections
  on My Texas Court Case and Juneteeth* (June 19, 2025),
  tinyurl.com/yw84sec4 .....................................................................12

# INTRODUCTION

Charles Johnson's mandamus petition is the culmination of a year-long campaign to flout court orders, mock the judicial process, and convert defiance into spectacle—while doing everything possible to avoid compliance with basic discovery obligations and to place his assets beyond the reach of a lawful judgment.

From the outset, Johnson has treated this litigation not as a forum governed by rules, but as a stage. He has repeatedly announced—on social media and under oath—that he does not intend to comply with court orders; that he prefers incarceration to compliance; and that jail would be useful to him as a form of publicity. Johnson "wanted to go to jail in Texas," he continually claimed, "because obviously it would get a lot of attention," and he hoped for a "sweet mugshot."

The petition portrays the district judge as precipitous and punitive. The record shows the opposite. Over months of proceedings, the judge bent over backwards to avoid jailing Johnson. He warned Johnson repeatedly—after no less than five show-cause orders—that continued defiance would leave the court with no choice but contempt. He encouraged Johnson again and again to retain counsel. He exercised

restraint when sanctions were plainly warranted, delayed coercive measures long after most courts would have imposed them, and convened further hearings after Johnson was jailed, explicitly stating that he did not want Johnson confined over the holidays and wanted to give him every opportunity to purge his contempt and return to his family. Likewise, plaintiffs' counsel told Johnson, "I do not want you to go to jail" for contempt and offered to narrow the scope of post-judgment discovery to avoid potential contempt proceedings.

None of that appears in Johnson's petition. Nor does the petition acknowledge that the district court appointed receivers to assist with compliance, or that they spent hours attempting to elicit straightforward asset information from Johnson—only to report back to the court that he remained evasive and inconsistent. Nor does the petition mention the existence of a lengthy December 16 hearing, where the judge explored whether Johnson had purged his contempt—only to conclude, based on the receivers' testimony and Johnson's own admissions, that he had not.

The petition is also silent about Johnson's conduct outside the courtroom. While claiming a lack of sophistication, Johnson attempted to surreptitiously sell more than $1 million in stock and stash the proceeds

in a shell company, despite the existence of an order barring him from selling his assets. And while professing inability to comply with post-judgment discovery, he publicly boasted that plaintiffs would "never find" most of his assets and that it was his "responsibility" to waste their resources.

Nor was such outrageous conduct unique to this case. In related litigation in New York, another federal court entered default judgment against Johnson for similar abuses, finding that he had "openly and repeatedly flouted" discovery orders and that the record was "littered with [his] false statements, half-truths, and misrepresentations—to say nothing of his overtly racist tirades against his adversaries and their counsel."

Against that backdrop, this case is not close—certainly not close enough for mandamus. Mandamus is an extraordinary remedy reserved for clear and indisputable errors. Here there is no error at all. Civil contempt was plainly warranted. Johnson violated clear court orders, repeatedly, deliberately, and openly. His intermittent or performative gestures and evasive non-answers to discovery requests fall far short of the compliance that the law requires. Conditioning a discovery sanction

on "good faith" compliance with the court's orders is commonplace. It does not transform warranted civil contempt into criminal punishment, violate due process, or come close to the sort of judicial usurpation that mandamus exists to correct.

Nor is mandamus available where, as here, alternative remedies abound. The boiled-down premise of Johnson's petition is that the purge condition is unclear. If that were true—and it is not—the obvious remedy would have been to seek clarification from the district court. Johnson never did. He did not move to clarify or reconsider. He did not propose concrete steps toward compliance or ask the court to bless them. Instead, he feigned an inability to retain counsel for purposes of assisting compliance with the court's orders, and then promptly retained counsel to avoid compliance by asking this Court to intervene on an incomplete, one-sided record. That alone defeats mandamus.

In the end, this petition asks the Court for extraordinary intervention on behalf of a litigant who has spent months inviting the very result he now bemoans. Mandamus relief cannot reward such calculated defiance. And granting relief here would send the wrong message—not just to Johnson, but to litigants watching—that a party

may flout court orders, dare a court to act, and then ask an appellate court to undo the consequences. The Court should deny the petition.

## BACKGROUND

### A.     Professional provocateur Charles Johnson runs an extortion racket.

Charles Johnson is, by his own account, an Internet "troll." App.163. He operates by spinning yarns online about supposed foreign infiltration of American government and business. *See* App.163; App.176–180. To that end, Johnson frequently accuses (without evidence) prominent politicians and business leaders of being foreign assets. App.163. Johnson has claimed that Vice President J.D. Vance "works for foreign powers," Charles Johnson, *"Clear and Present Danger" to American Interests: Why I Leaked J.D. Vance's Text Messages* (Aug. 7, 2024), tinyurl.com/bddbey2j, and "Zionist" landlords in New York City are an "oligarchy whose rents are protected by the [Israeli Defense Force's] espionage operations," Charles Johnson, *"It's About Israel": Zionist Criminal Misbehavior Created Zohran Mamdani … And Nick Fuentes* (Nov. 5, 2025), tinyurl.com/426m4tkn.

Earlier in his career, Johnson was a journalist and a low-level confidential source for the FBI. App.176, App.184. But Johnson's

penchant for pushing unsubstantiated allegations soon led to his ouster

from both the press and the ranks of FBI cooperators. App.176; App.185–

86. By the end of 2021, the FBI had officially terminated Johnson's status

as a confidential source. App.185.

That didn't stop Johnson from continuing to tout his supposed

status as a "federal operative" to threaten government reprisal to induce

counterparties into sham investments or extract unduly favorable

returns from existing ventures. App.164. For this scheme, Johnson

proudly branded himself "the new [Jeffrey] Epstein." App.189–90.

### B.   Point Bridge and Lambert sue Johnson, who chooses to proceed *pro se* after he rendered his counsel's representation "unreasonably difficult."

Respondents Point Bridge Capital LLC and Hal Lambert, Point

Bridge's founder and principal, are just two of the many victims of

Johnson's extortionate scheme. *See* App.218. In short, Johnson made a

relatively small investment in a special-purpose investment vehicle that

Point Bridge created, then tried to coerce Lambert and others into giving

him a much larger share by, among other things, claiming that he was

"with the Defense Department" and so could ensure the company

received no government contracts, and threatening to use his government

ties to invoke an SEC investigation. *See* App.203–10. When Lambert refused to give in to this scheme, Johnson defamed him as "a front for a lot of the Russian activity," associated with the "Russian mob world," and a sexual predator. App.212–13.

In October 2024, Point Bridge and Lambert sued Johnson under the Racketeer Influenced and Corrupt Organizations Act, claiming that his repeated extortionate demands constituted a pattern of racketeering activity. App.223–30. Johnson, through counsel, answered.

Within a few months, Johnson's second set of lawyers moved to withdraw in part because Johnson rendered representation "unreasonably difficult." App.257. The district court set a hearing on the motion "[b]ecause the withdraw w[ould] leave [Johnson] to proceed pro se." App.261. At the hearing, the district court granted the withdrawal upon Johnson's consent, then—on five separate occasions—encouraged Johnson to get a lawyer, App.529, 543, 546–49, 556, including by directing Johnson to the Tarrant County Bar Association and law schools to find pro bono representation, App.549,556. Johnson declined.

### C.    Johnson flouts basic discovery requests.

In late January 2025, plaintiffs served Johnson with requests for production relating to their civil RICO claims. App.322. Johnson's response was blatantly deficient. Despite using numerous email, messaging, and social media accounts, he produced a single PDF of mostly duplicative emails, stripped of metadata and attachments, exported from a single email account. App.273. Plaintiffs moved to compel adequate discovery responses. He later claimed one of the few emails he produced was "likely hacked" by plaintiffs and later refused to "answer[] any questions about it." App.1673

The district court set a hearing on the motion. In an email to the district court's "proposed orders" address, Johnson objected that a "debilitating medical condition" prevented him from attending in person. App.426, 514. He did not mention that in the prior month he had traveled repeatedly and posted pictures of his trips on social media. App.426–31. Then, without further explanation, Johnson showed up at the hearing.

The district judge displayed commendable patience at the hearing. He assured Johnson that he would accommodate any medical disabilities. App.531–32. He again encouraged Johnson to obtain counsel. App.529,

543, 546–49, 556. And he told Johnson that despite "what is possibly emerging as a pattern" of disobeying litigation rules, he would "give [Johnson] some time to respond" to discovery. App.535–36.

But the judge ultimately reminded Johnson that—pro se or not—he has "an obligation to comply with the rules" and that failure to do so could lead to contempt sanctions. App.535. So the court ordered Johnson to respond to plaintiffs' requests for production. App.521–22.

### D.    Johnson defies the district court's discovery order and refuses to cooperate with court-ordered mediation.

Johnson did not comply with the court's discovery order. Ignoring correspondence from plaintiffs' counsel, Johnson took to social media where he told his audience that it would be "an honor to pay sanctions for expressing my viewpoint" and that he "wanted" the district judge "to be adverse to me to create the impression that it was me against the system." App.574. Losing the case, Johnson said, would make him "an American legend." *Id.*

Around the same time, the district court learned that Johnson—despite saying he would do so at the prior show-cause hearing—had failed to pay his portion of the fee for court-ordered mediation. The Court

set a show-cause hearing to address the mediation issue and Johnson's discovery-order noncompliance. App.567, 578.

At the hearing, Johnson's only excuse for not producing responsive documents was that the requests were overbroad. *See* App.568. The district court reminded him that he could object to discovery but nonetheless has "an obligation, under the rules, pro se or not, to produce documents that are responsive. You don't just get to say, No, these are too broad, I'm not giving anything." App.1934. The judge admonished Johnson to "pick up the phone and call [plaintiffs' counsel] if you have a problem with a [discovery] request," but "[g]oing on your Substack or live chat and complaining doesn't really advance the ball." App.1935–36.

The district judge found Johnson to have defied his order and warned that he could jail Johnson for contempt. App.1944. But the judge told Johnson that he was "trying to be very kind and patient" in light of Johnson's pro se status. App.1945. So the court merely ordered Johnson to turn over his devices to a third-party discovery vendor to conduct a search for and produce all responsive, nonprivileged documents. App.580–81, 1946–47. That, however, would be Johnson's "last warning." App.1945.

10

### E.    Johnson again violates the district court's discovery order, so the district court strikes his pleadings.

Johnson didn't heed that warning. He had one week to surrender his devices to a third-party discovery vendor. App.580–81. But Johnson refused even to tell plaintiffs' counsel his whereabouts, let alone cooperate with the third-party vendor. App.613–15. Johnson did, however, continue to post about the litigation on social media. App.615–17.

This resulted in another show-cause hearing—the second in just over a month. *See* App.635. The district court began by *sua sponte* appointing two Federal Public Defenders to represent Johnson "for any criminal … aspects of this case." App.638. Johnson then admitted that he had not complied with the court's order. App.640. Although Johnson now complained that he could not afford e-discovery, the district court admonished Johnson for "taking it upon [him]self to make that decision without coming and telling" the court. *Id.*

Despite recognizing that Johnson appears to do "nothing but flaunt the Court's orders," the district judge expressed concern that jailing him for contempt would simply fulfill Johnson's wish "to be seen as a martyr."

App.594, 596. That left the court "with no other choice than to strike [Johnson's] pleadings." App.597; *see also* App.627 (order).

The next day, Johnson took to social media to mock the district court's refusal to jail him: "In my more romantic delusions I think that there's a long history of people who were jailed leaving jail and becoming prime minister. Why not someone leaving prison and becoming president? And why not me?" Charles Johnson, *Notes on the State of Israel and Reflections on My Texas Court Case and Juneteeth* (June 19, 2025), tinyurl.com/yw84sec4.

### F. In related litigation, the Southern District of New York enters a default judgment against Johnson for similar discovery abuses and "racist tirades."

Johnson's abusive behavior was not unique to the Northern District of Texas. For several years, Johnson engaged in similar shenanigans in New York litigation relating to claims that he co-founded Clearview AI, a company for which Lambert served on the board. *See* App.1961. Fed up with Johnson's misconduct, the court fined him $10,000 and directed entry of default judgment against him. *Id.* "Throughout these proceedings," the court explained, Johnson "has openly and repeatedly flouted this Court's orders, including orders regarding discovery," and

"the record in this case is littered with [Johnson's] false statements, half-truths, and misrepresentations—to say nothing of his overtly racist tirades against his adversaries and their counsel." *Id.*

### G. Respondents win a $71 million judgment against Johnson.

Back in Texas, the parties proceeded to a jury trial on damages. Before the jury, Johnson continued to his antics, performatively examining himself as a witness. *See, e.g.*, App.816. The district judge was forced to repeatedly ask Johnson "to refrain from interrupting me, [and] interrupting the witnesses. App.761. Despite Johnson's mocking conduct, the judge reiterated that he did "not want to have to hold [Johnson] in contempt." App.762. ("I want you to be able to put on what defense that you'd like to put on within reason.").

The jury's verdict, once trebled under RICO, was $71 million. App.922. Upon entering judgment, the court also ordered Johnson to refrain from dissipating or conveying his assets. App.918–19.

Johnson has appealed that judgment. *See Point Bridge Cap., LLC v. Johnson*, No. 25-10919 (5th Cir.). After paying the docketing fee, Johnson bragged on his Substack that "[n]ot too many people get to go to the Fifth Circuit pro se," that he "took the LSAT and got a ridiculous high

score," and that he was "representing [him]self because what's more American than taking on criminals by yourself? Call me John Wayne, why don't you?" Charles Johnson, *Looks Like We're Going to the Fifth Circuit!* (Sep. 4, 2025), tinyurl.com/3yadb9te.

**H.    Johnson refuses to cooperate with post-judgment discovery and attempts to dissipate his assets.**

After the 30-day automatic stay of the judgment expired, *see* Fed. R. Civ. P. 62(a), plaintiffs initiated standard post-judgment discovery to identify Johnson's assets, *see* Fed. R. Civ. P. 69(a)(2); *see* App.1037–39. Plaintiffs, for example, asked Johnson to sit for a deposition. When Johnson refused, plaintiffs' counsel asked Johnson whether he would attend "[i]f the court compelled your deposition," and Johnson responded: "You can try but yeah, it's not going to happen" and "Remember, Mr. Thompson, I wanted to go to jail during this trial and I still do." App.987. In response, plaintiffs' counsel said, "*I do not want you to go to jail*," and proposed that a document production "may obviate or delay the need for a deposition." App.2017 (emphasis in the original).

Later that day, Johnson doubled down on social media:

It was super awkward today but I had to politely inform Mr. Thompson that I wasn't going to be going to a deposition and that he had to preserve his records for the suit.

> I don't know how many times I have to tell please *[sic]* that I
> wanted to go to jail in Texas because obviously it would get a
> lot of attention about what's going on. Incidentally it would
> make me a folk hero and ain't nobody ever used the phrase
> folk hero and Charles Johnson in the same sentence.

*Looks Like We're Going to the Fifth Circuit!, supra.*

At the same time Johnson was ignoring interrogatories and dodging a deposition, he was also trying to sell over $1 million in stock holdings in knowing violation of the district court's asset-preservation order. Specifically, on September 15, 2025, Johnson executed a "Stock Transfer Agreement" to sell his shares in a genetics company back to the company, with the proceeds going to a newly formed LLC registered to a Wyoming address associated with shell companies used to obscure financial transactions. *See* App.1986–87. When the company learned of the court's judgment and preservation order, Johnson told the company (falsely) that "the Fifth Circuit automatically stays enforcement of a Judgement [*sic*]." App.1987. The company balked again, so Johnson introduced them to a lawyer he had retained to advise on the sale. App.2035.

The district court, upon learning from plaintiffs of Johnson's discovery evasion and efforts to hide assets, scheduled another show cause hearing. *See* App.965. The court began by again encouraging

Johnson to obtain counsel and pointing him to pro bono resources. App.927. After hearing from plaintiffs' counsel, the court gave Johnson an opportunity to be heard, and Johnson began by affirming that he "ha[s] no intention whatsoever of sitting for discovery or harassment." App.937. The court reminded Johnson that post-judgment discovery was not "harassing behavior" but rather "just lawyers doing what they're supposed to do." *Id.* Johnson responded that he had "no objection to eventually going to Johnson County Jail and highlighting the abuses here. In fact, I would welcome it." App.938.

Despite Johnson openly "welcom[ing]" jail, the district court decided to order Johnson to sit for a deposition in the court's jury room, to serve complete responses to plaintiffs' post-judgment interrogatories, and to produce at the deposition all documents responsive to plaintiffs' post-judgment requests for production. App.945,1026. The court twice more encouraged Johnson to obtain a lawyer. App.946,953.

## I. At his deposition, Johnson evades questions, mocks the prospect of contempt, and steals court property.

Johnson physically appeared for his deposition but served no interrogatory responses and produced no documents. *See* App.1101–02. At the outset, Johnson announced he would provide only "minimal

16

consent," "not complete information," and "the least amount of information possible." App.1102–03; App.1624–25,1723–24.

Over the course of five hours, Johnson engaged in obvious evasions and outright refusals, confirmed that his attempted stock sale was intended to place the proceeds "beyond the reach" of the plaintiffs, App.1823, and mocked the prospect of being jailed for contempt. The following excerpt is of a piece with the rest of the transcript:

> Q: Testifying here today under oath, will you identify all those accounts [that Johnson claimed to have been set up for him]?
>
> A: No, I will not.
>
> Q: You refuse to?
>
> A: I refuse to because I've not been given permission to do so.
>
> Q: Will you identify who would be the person that would give you permission to identify that information?
>
> A: I will not.
>
> Q: You're aware that Judge Pittman previously disagreed that you can refuse to answer these type of questions?
>
> A: The judge can do whatever he sees fit. But I will not participate in that.
>
> Q: Will you go to jail rather than identify those people?
>
> A: No, I won't end up going to jail. But that's funny.
>
> Q: Would you rather?

A: It would be great if I went to jail because I would get the mug shot and that's what I want. But unfortunately, I will not end up going to jail. Regret—regrettably, I should say. More likely than not what will happen is Judge Pittman will push it into the future and then I'll have to come back to Fort Worth and eat a bunch of food I shouldn't and then fly back.

\*\*\*

Q: So you could stay here the rest of the day and answer all the questions?

A: I could, but I want to provoke a confrontation. That would be cool.

Q: What type of confrontation do you mean?

A: Well, I want to provoke getting a—getting that mugshot. That would be great, because then it would highlight what's going on here, and that would also be useful. It would elevate me in what was going on. But probably it won't happen like that. They'll probably just—probably have to do a night or two in jail and whatever. That's fine. It's not a big deal. That's why I didn't wear my contacts. But yeah, it's fine.

App.1744–46.

At the end of the deposition, Johnson took from the jury room a Tarrant County Bar Association mug and four water bottles. App.1047.

## J.    The district court finally holds Johnson in contempt.

Johnson's recalcitrance prompted plaintiffs to move for a receivership and the district court to set yet another show cause hearing. *See* App.1407. The day before the hearing, Johnson posted on his Substack, "If I have to go to jail, well, I have to go to jail" and a picture of

himself holding a Tarrant County Bar Association mug, captioned "My mug shot at last!" Charles Johnson, *"Persevere and Become"* (Nov. 19, 2025), tinyurl.com/yc344akn.

The district court opened the show cause hearing by appointing a Federal Public Defender as standby counsel for Johnson at the hearing. App.1421. The court then, with Johnson's agreement, granted the receivership motion, assuring Johnson that the receivers were "there not only to determine what assets you have" but also to protect "any assets that would not be subject to the judgment." App.1428–29.

When it came time for Johnson to speak, the court asked if he would like to speak with the Public Defender first. Johnson declined, affirming that he "d[id]n't need her services." App.1432.

The court first addressed Johnson allegedly taking the water and mug from the jury room at his deposition and found Johnson's claim that he had been given permission by courtroom staff not credible. App.1438–39. The court expressed disappointment that Johnson had again "ma[d]e a joke of" court proceedings and imposed a $1,000 fine. App.1439.

The court then turned to Johnson's (non)compliance with written discovery. The court asked Johnson, "Did you bring any documents with

you [to the deposition]?" and Johnson responded, "I did not." App.1444.

That, the court says, was "absolutely noncompliant," which left the court

with "no other choice but to hold you in contempt for failure to comply

with the ordered post-judgment discovery and providing those

documents." *Id.*

Turning to Johnson's conduct at the deposition, the court decided,

"[o]ut of an abundance of caution," to call Johnson to the witness stand

to give him "one last opportunity to comply" by answering questions

about his assets. App.1433. Johnson again confirmed that he was

"refusing to allow [standby counsel] to act as his attorney," App.1447,

then refused, on six separate occasions, to answer the questions:

- "You're refusing to answer the question; is that correct? I am, Your Honor." App.1450–51.

- "So you're refusing to answer the question … ? Correct, Your Honor." App.1455.

- "[I am n]ot going to disclose." App.1455.

- "I decline to answer the question." App.1456–57.

- "What is the name of the government handler [who purportedly set up an LLC for Johnson]? I refuse to answer the question." App.1460.

- "What government agency is conducting the operation [that purportedly requires Johnson to sell his stock]? I won't discuss that." App.1467.

After Johnson stepped down, the court found Johnson to be in contempt of court and remanded him to the custody of the Johnson County Jail until "such time as her purges himself of his contempt." App.1473.

Johnson's standby counsel, despite repeatedly being rejected by Johnson, asked the court to clarify how Johnson would purge his contempt. App.1473–74. The court responded that all he needed to do was "contact someone and tell them when he's ready to answer the questions"—to simply "provid[e] notice." App.1474.

### K. The district court recalls Johnson, who continues to evade discovery.

After Johnson's father submitted a letter identifying some of Johnson's assets in the vaguest of terms, the court recalled Johnson for a hearing on December 16, 2025, to determine whether he had purged his contempt. (Johnson omits this hearing entirely from his mandamus petition.) The morning of the hearing, the receivers conducted a multi-hour interview of Johnson, their second such interview since he had been detained. App.1494–95,2124.

At the hearing, the court again admonished Johnson to get a lawyer. App.1493. Johnson refused, stating that it "seems like a lot of

good-ole-boy stuff going on in Texas" and claiming that he couldn't afford a lawyer, App.1499—never mind that he hired counsel the next week to file this mandamus petition, and that he had counsel working on his behalf a couple months earlier to handle his secret attempts to sell stock for over $1 million.

The receivers updated the court on their multi-hour meetings with Johnson, explaining that "at times it felt as though Mr. Johnson was being evasive" because he was "unable, and what appeared to be unwilling, to provide information" and instead "simply referred to his Government handler for more information." App.1495. The receivers also reported "a number of inconsistencies with regard to digital currencies," among other "discordant" answers that Johnson provided. App.1495, 1568.

Stating that it "would hate for a father to be away from their . . . daughter on the Christmas holidays" and that it "did want to take this effort to see if we could get him to purge himself," the district court, receivers, and plaintiffs' counsel then proceeded to ask Johnson questions about his assets. App.1563. Johnson's answers were repeatedly evasive and downright bizarre. For example, he claimed that instead of being

paid for his information he provided to law enforcement, the FBI "forg[ave] taxes that I owed." App.1506. On questioning about his Bitcoin holdings, he repeatedly answered, "I don't know," "I don't think so," or "it's possible," prompting the district court to intervene. After yet another qualified response, the district court asked, "Do you ever give a direct response," and Johnson answered, "No." App.1547. Johnson's evasive answers vexed the court because Johnson previously admitted to having a safety deposit box "somewhere" containing a hard drive with "a lot of Bitcoin on it"—Bitcoin that he said "never touched the internet," had been "mined," and would be "impossible to . . . forensically trace." App.1415.

In short, rather than, "simple, direct responses," Johnson persisted in "spinning [his] yarns and conspiracy theories." App.1505. The court thus concluded that Johnson had not purged his contempt.

## ARGUMENT

## Johnson's mandamus petition should be denied.

A party seeking mandamus must show (1) a "clear and indisputable" right to the writ; (2) that he had no adequate alternative remedy; and (3) that issuing the writ "is appropriate under the

circumstances." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004) (citation omitted). Johnson has not shown any of these elements.

## A. Johnson has not demonstrated a clear and indisputable right to relief.

A party seeking mandamus "must do more than prove merely that the court erred." *In re Occidental Petroleum Corp.*, 217 F.3d 293, 295 (5th Cir. 2000). Rather, he "must show a clear abuse of discretion that produces patently erroneous results" or "exceptional circumstances amounting to a judicial usurpation of power." *Leonard v. Martin*, 38 F.4th 481, 489 (5th Cir. 2022) (cleaned up). Johnson hasn't show any error at all, let alone cleared this exceptionally high bar.

### 1. The district court rightly jailed Johnson for contempt.

**a.** Civil contempt is warranted where (1) a court order was in effect, (2) that order required certain conduct by the respondent, and (3) the respondent violated that order. *In re Bradley*, 588 F.3d 254, 264 (5th Cir. 2009). The last element is satisfied "if there is no objectively reasonable basis for concluding" that the contemnor's actions were lawful. *Taggart v. Lorenzen*, 587 U.S. 554, 557 (2019).

Holding Johnson in contempt easily satisfied this standard. He does not dispute that there was an order in effect or that it required specific

conduct. Nor could he. The Court's November 10 order required Johnson to "serve complete, verified responses to Plaintiffs' post-judgment interrogatories within **five days** of this order" and "produce all documents responsive to Plaintiffs' post-judgment requests for production at the deposition on **November 17, 2025.**" App.1026 (emphasis in original). Nor can he seriously dispute that he did not comply. At the show cause hearing, Johnson admitted that he neither served responses to the interrogatories nor brought a single document to the deposition, and he flatly refused several of the court's questions regarding his assets. *See supra* at 18–21. There is "no objectively reasonable basis" for thinking that counts as compliance. *Taggart*, 587 U.S. at 557.

**b.** Johnson's excuses fail. He protests (at 5) that "[n]ot all of the questions" at the deposition or show cause hearing "were relevant." That's wrong on its own terms—questions about Johnson's government contracting work, for example, were relevant since that's how Johnson received income. *See* App.1454. But even if Johnson's relevance objections were sound, the answer would be "orderly review, either by [the district court] or by a higher court," not thumbing his nose at the

court's order. *Walker v. City of Birmingham*, 388 U.S. 307, 314 (1967) (citation omitted); *see GTE Sylvania, Inc. v. Consumers Union of U.S., Inc.*, 445 U.S. 375, 386 (1980). Permitting litigants to defy court orders that they think incorrect would "cripple orderly processes of trial and appeal on which enforcement of the law depends." *Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1208 (11th Cir. 1985).

Johnson complains that he did answer some post-judgment questions. *See* Pet. 5. That too is both wrong and irrelevant. It's wrong because many of the answers Johnson gave were so obviously evasive as to be no answer at all. *See, e.g.*, App.1450–51 (claiming the existence of an unknown number of "government trust[s]" set up for Johnson's "operation[s]" but refusing to identify the name of the person who "set them up on [Johnson's] behalf").[1]

---

[1] On January 6, 2026, the receivers filed a "Notice in Response to Petition for Writ of Mandamus" on the district court docket. App.2122–25. The receivers provided the "notice to identify relevant actions, much of which was omitted by Petitioner in his Petition, taken by the district court to provide Johnson with the opportunity to purge his contempt by providing the critical information needed to efficiently identify and secure." App.2125. After spending five hours interviewing Johnson, the receivers noted "their view that Johnson continued to evade questions regarding his assets." App.2124.

Regardless, making merely "some efforts" to comply with a court order is no defense to contempt. *PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205, 1214 (11th Cir. 2019).

Johnson also repeatedly invokes his pro se status, "but *pro se* litigants are not exempt from compliance with the relevant rules of procedure." *Price v. Porter*, 351 F. App'x 925, 926 (5th Cir. 2009); *see also Farguson v. MBank Houston, N.A.*, 808 F.2d 358, 359 (5th Cir. 1986). Allowing Johnson to use his pro se status as a shield would be especially inappropriate here. Johnson chose not to hire a lawyer. He could have afforded one, as shown by his counseled attempt to sell his stock and his counseled mandamus petition. But he chose to proceed pro se for the same reason he repeatedly defied the court's orders: he hoped it would make him a "legend" or "John Wayne"-like figure to his followers. Having made that choice, Johnson must live with the consequences.

**c.** The district court did not need to afford Johnson constitutional criminal procedures because this is paradigmatic civil contempt. Johnson "stands committed unless and until he performs the affirmative act required by the court's order." *Hicks ex rel. Feiock v. Feiock*, 485 U.S. 624, 632 (1988) (citation omitted); *see also Bradley*, 588 F.3d at 263 (civil

27

contempt is "conditional and coercive"). It does not matter that the court's order mentioned Johnson's "repeated failure[s]" to engage in post-judgment discovery. *Contra* Pet. 16–17. So long as the imprisonment is remedial, it is civil even if motivated "in part by a desire to punish" past noncompliance. *Topletz v. Skinner*, 7 F.4th 284, 295 & n.12 (5th Cir. 2021); *see also Hicks*, 485 U.S. at 635 (holding classification of contempt does not "turn simply on what the[] underlying purposes are perceived to be").

The district court's contempt order was proper.

## 2.    Johnson's counterarguments fail.

**a.**  Johnson is wrong (at 15–18) that every contempt conditioned on "good faith" compliance with a court order is criminal. Johnson says that because the district court "retains unlimited discretion to conclude that he has not acted with sufficient 'good faith,'" his imprisonment is effectively unconditional and thus criminal. Pet. 17; *see Hicks*, 485 U.S. at 632. Johnson's argument thus rests on the premise that a good-faith standard is impossible to satisfy.

That premise is false. Countless legal doctrines use a good-faith standard without unleashing "unlimited" judicial discretion. For

example, courts recognize "good faith" exceptions to the Fourth Amendment exclusionary rule, *United States v. Leon*, 468 U.S. 897, 924–25 (1984), and Eighth Amendment excessive-force claims, *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010), and they assess whether contractual counterparties performed in good faith, *Whitney Bank v. SMI Companies Glob., Inc.*, 949 F.3d 196, 210–13 (5th Cir. 2020). Yet none of these doctrines are blank checks written to a court's "unlimited discretion." Pet. 17; *see, e.g.*, *Donaldson v. Ducote*, 112 F. App'x 329, 331 (5th Cir. 2004) (de novo review of good-faith finding). The good-faith requirement here is no different.

Nor is good faith an "inherently subjective standard." *Contra* Pet. 28. "Good faith" can and often does mean "objectively reasonable." *Leon*, 468 U.S. at 922; *accord Kingsley v. Hendrickson*, 576 U.S. 389, 399 (2015). Johnson offers no reason for thinking it means anything different here.

Unsurprisingly, then, this Court has endorsed the use of a good-faith standard in contempt proceedings. It has instructed lower courts to "consider good faith, or lack thereof" when assessing civil contempt, *Carter v. Local 556, Transp. Workers Union of Am.*, 156 F.4th 459, 502 (2025) (cleaned up), has modified a sanctions order to last until

the contemnor could "satisfy the trial court that he … would in good faith thereafter comply with the terms of the order," *Lance v. Plummer*, 353 F.2d 585, 592 (1965), and has held that a state court's decision to condition contempt on a "genuine effort" to comply with a discovery order is not inconsistent with clearly established law. *Topletz*, 7 F.4th at 298.

**b.** Johnson is also wrong that the district court's order is too vague to comply with due process. Pet. 18–24. A court "need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000). Rather, whether an order is sufficiently specific depends on "the context in which it was issued." *In re Hipp, Inc.*, 5 F.3d 109, 112 (5th Cir. 1993) (citation omitted). When there's "a proclivity for unlawful conduct," the court's order can be quite broad—say, "You shall not violate section X of the law Y." *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 192 (1949).

That's the case here. Setting aside his complaint about the current contempt order, Johnson does not dispute that he repeatedly flouted court orders, including discovery orders, in this case (and in the Southern District of New York for that matter). To the contrary, Johnson made a

show of his disobedience to his online followers—it was a badge of honor, making him a "legend." Given Johnson's penchant for contumacy, the district court was well within its discretion to require Johnson's good-faith compliance with discovery without specifying every document to be produced or question to be answered. Anything less merely would have fed Johnson's "program of experimentation with disobedience of the law." *Id.*

*In re Gravel*, 6 F.4th 503 (2d Cir. 2021), doesn't say otherwise. *Contra* Pet. 22–23. The lines Johnson quotes—that "an order must be sufficiently clear to erase all doubt" about what conduct is prohibited, and "[a]mbiguity determined strictly from the words of the order itself" must favor the contemnor—do not exist in the Second Circuit's opinion. Nor, as best as respondents can tell, does it exist in *any* judicial opinion. And whoever (or whatever) wrote it apparently missed the Supreme Courts' clear holding to the contrary: "[W]here as here the aim is remedial and not punitive, there can be no complaint that the burden of any uncertainty in the decree is on respondent's shoulders." *McComb*, 336 U.S. at 193.

Regardless, *Gravel* is plainly distinguishable. The order there precluded creditors from disputing that the debtors were "current … in any other proceeding," which the Second Circuit read not to include the contemnor's "out-of-court" effort to obtain additional mortgage fees. 6 F.4th at 508, 512–13. Unlike the narrow, tightly worded order in *Gravel*, the district court's order here is broad and its requirement unambiguous: participate in discovery in good faith.

**c.** Complying with that order is not "impossible." *Contra* Pet. 24–25. Johnson argues otherwise only by mischaracterizing the order as requiring him to produce specific records. *See* Pet. 25. It does not. As the district court said, Johnson can purge his contempt by saying (and meaning) that he is "ready to answer the questions, both at the deposition and the interrogatory and produce the documents. If he's ready to do that, and he purges himself, he can get out of jail." App.1474. No one expects Johnson to access his bank statements from jail. But they do expect him to give straight answers about what bank accounts he has and how he earns income.

**d.** Johnson's complaints about the $1,000 fine for stealing court property do not change the lawfulness of his contempt. The fine has been

32

paid, App.148, and Johnson does not seek a refund, *see* Pet. 30, so the issue is moot, *see N.Y. State Rifle & Pistol Ass'n v. City of N.Y.*, 590 U.S. 336, 339 (2020). Regardless, fining Johnson for stealing property from the court's own jury room was well within its power to punish by contempt the "[m]isbehavior of any person in its presence." 18 U.S.C. § 401.

*     *     *

The district court rightly jailed Johnson for contempt. That's true under any standard of review. But it's doubly true since Johnson wants a writ of mandamus, which "will not issue to correct a duty that is to any degree debatable." *In re Parish*, 81 F.4th 403, 409 (5th Cir. 2023) (citation omitted).

### B.    Johnson has adequate alternative remedies.

Johnson's mandamus petition also fails because he has not shown he lacks "other adequate means to attain the relief requested." *In re Parish*, 81 F.4th 403, 409 (5th Cir. 2023) (cleaned up). Specifically, Johnson could have asked the district court to reconsider or clarify, or he could have appealed the contempt order and moved to expedite. He did none of that.

**1.** Johnson concedes (at 14) that he could have asked the district court to reconsider the contempt order. *See* Fed. R. Civ. P. 54(b), 59(e), 60(b). Contempt orders may be reconsidered like any other. *See, e.g.*, *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 2016 WL 4384861, at *1 (W.D. Wash. Aug. 17, 2021). Given the "availability of a motion to reconsider," Johnson's failure to file one before seeking mandamus dooms his petition. *In re Stone*, 940 F.3d 1332, 1341 (D.C. Cir. 2019); *see also In re Ramirez*, 605 F. App'x 361, 363 (5th Cir. 2015) (denying mandamus because petitioner had "a motion for reconsideration …pending with the district court").

Johnson insists (at 14–15) that reconsideration was not an option because the district judge was not "likely" to grant that relief. But where there is "a possibility" that a court "will grant the motion," that is "reason alone" to deny mandamus, *In re Gibson*, 423 F. App'x 385, 389 (5th Cir. 2011), because the petitioner has not shown that relief in the district court would "be futile." *In re Stone*, 940 F.3d at 1341. Johnson's has not even attempted to meet the futility standard. *Cf. Tesoro Refin. & Mktg. Co. v. FERC*, 552 F.3d 868, 874 (D.C. Cir. 2009) ("futility exception" applies only when such remedies would be "clearly useless" (cleaned up)).

Regardless, Johnson offers "no reason to believe that the District Court would not fairly consider" his motion. *In re Stone*, 940 F.3d at 1341. The district judge has been more than *fair* by repeatedly encouraging Johnson to obtain counsel, appointing receivers to assist with asset disclosure, and recalling him after confinement in the hope that he could purge his contempt and return to his family before the holidays. Nor is there any reason, as Johnson suggests (at 14–15), that reconsideration would leave in place the "'good faith' standard" he challenges. The whole point of a reconsideration motion would be to raise his legal challenges to the good-faith purge condition.

**2.** Johnson has another obvious way to seek relief: moving to clarify the contempt order. Courts routinely grant clarification motions, *see, e.g.*, *Cointreau Corp. v. Pura Vida Tequila Co.*, 2013 WL 12125990, at *1, *3 (N.D. Tex. Jan. 9, 2013) (granting such a motion); *Segner v. Sinclair Oil & Gas Co.*, 2012 WL 12885056, at *1–2 (N.D. Tex. Nov. 9, 2012) (same), including in the context of contempt orders. *See NLRB v. Aquabrom, Div. of Great Lakes Chem. Corp.*, 862 F.2d 100, 100 (6th Cir. 1988) (mem.); *SEC v. Wolfson*, 309 B.R. 612, 623–626 (D. Utah 2004).

Indeed, clarifying the contempt order is precisely what Johnson now asks this Court to order the district court do to. Pet. 30–31. But having failed to make that request to the district court first, mandamus is "not appropriate." *See Fuller v. Donahoo*, 95 F.3d 52, 52 (5th Cir. 1996) (unpublished) (noting prior order denying mandamus because petitioner could have "fil[ed] a motion in the district court requesting clarification of the sanction order").

**3.** Johnson also could have sought an emergency appeal of the contempt order. "[C]ivil contempt order[s]" are "'final' for purposes of appeal" when "(1) a finding of contempt is issued, and (2) an appropriate sanction is imposed." *In re U.S. Abatement Corp.*, 39 F.3d 563, 567 (5th Cir. 1994); *see also, e.g.*, *Consumers Gas & Oil, Inc. v. Farmland Indus., Inc.*, 84 F.3d 367, 370 (10th Cir. 1996). Johnson does not dispute that both conditions are satisfied here. Instead, he complains (at 15) that "direct appeal" would take too long while ignoring entirely that he could ask for an expedited appeal. *See* 5th Cir. R. 27.5. Had he done so, this Court would have the benefit of the full record that lays bare Johnson's recalcitrant behavior rather than the "limited" one that accompanies this "mandamus" review. *In re Chesson*, 897 F.2d 156, 159 (5th Cir. 1990).

**C. Mandamus would not be appropriate under the circumstances.**

Even if Johnson had satisfied the first two prerequisites for issuance of the writ, the Court should still deny relief because mandamus is not "appropriate under the circumstances." *Cheney*, 542 U.S. at 381.

Johnson has repeatedly defied court orders and made a mockery of the litigation below. Thus, even if this Court sees something amiss in the contempt sanctions, it should exercise "restraint" and permit the district judge to reevaluate the sanctions in the first instance. *In re Kleberg County*, 86 F. App'x 29, 33 (5th Cir. 2004). The judge "has in good faith handled a delicate" and—to put it mildly—challenging situation involving a litigant who has repeatedly hindered orderly litigation. *Id.* The Court can "trust" the judge to reevaluate the contempt order in light of this Court's guidance. *Id.* Doing so would align with longstanding "Fifth Circuit precedent instruct[ing] that mandamus need not issue when a panel is confident that the district court will reconsider its determination in light of the appropriate legal standard." *In re Avantel, S.A.*, 343 F.3d 311, 324 (5th Cir. 2003).

Mandamus would be particularly inappropriate because the district court never had a chance to address the arguments that Johnson

advances. *See In re Gee*, 941 F.3d 153, 170 (5th Cir. 2019). So even if the Court finds that mandamus would otherwise be appropriate, it should deny the petition and "giv[e] the [district court] the opportunity for further consideration" on an expedited basis. *In re Bryant*, 745 F. App'x 215, 222 (5th Cir. 2018).

Johnson offers no reason mandamus *is* appropriate. He largely recycles his theories of how the district court erred. *See* Pet. 27–29. But that does not suffice for mandamus. *See, e.g.*, *Gee*, 941 F.3d at 170. Nor is mandamus appropriate merely because Johnson "faces ongoing deprivation of his fundamental liberty interest." Pet. 27. Everyone confined for contempt faces the same thing. Confinement for contempt is not an automatic ticket to mandamus.

Finally, Johnson insists (at 28) that mandamus is appropriate because this Court can ignore the "complex factual disputes" and fix any errors "through straightforward remedial action." It is no surprise that Johnson wants this Court to avert its eyes from the facts. Those facts reveal how the district court, faced with unyielding non-compliance and theatrics, has patiently and diligently tried to maintain a semblance of order. Those facts, in other words, show why mandamus is unwarranted.

## CONCLUSION

The Court should deny Johnson's petition.

Dated: January 6, 2026                    Respectfully submitted,

                                          /s/ *Will Thompson*
                                          WILL THOMPSON
                                          DLA PIPER LLP (US)
                                          State Bar No. 24094981
                                          will.thompson1@us.dlapiper.com
                                          1900 N. Pearl Street
                                          Dallas, Texas 75201
                                          Telephone: (406) 546-5587

                                          *Counsel for Respondents Point*
                                          *Bridge Capital, LLC &*
                                          *Hal Lambert*

## CERTIFICATE OF COMPLIANCE

This response complies with Federal Rules of Appellate Procedure 21(d) and 32(c)(2) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font and contains 7646 words excluding the sections listed in Rule 32(f) based on Microsoft Word's "Word Count" function.

*/s/ Will Thompson*

## CERTIFICATE OF SERVICE

I certify that on January 6, 2026, I electronically filed this document with the Clerk of the Court using the CM/ECF System, which will send notice to all registered CM/ECF users.

*/s/ Will Thompson*