# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

POINT BRIDGE CAPITAL, LLC,
ET AL.,

     Plaintiffs,

v.                                            No. 4:24-cv-00988-P

CHARLES JOHNSON,

     Defendant.

## ORDER DENYING MOTION TO APPEAR VIRTUALLY AND TO SHOW CAUSE

Before the Court is Defendant's Motion to Conduct the Court Ordered Scheduling Conference Virtually. ECF No. 16. The Court's Order for the Parties to conduct a scheduling conference requires the Parties to meet in person, not to create a burden on either party but, rather, because it has found that more fruitful conversations are held when the Parties are physically present. While the Court appreciates the experience of the attorneys in this case, the Court requires an in-person meeting for all litigants before it. Additionally, the Court notes that had Defendant obtained Local Counsel, as the Court has repeatedly ordered him to do, then there would be no travel burden for Counsel. Therefore, Defendant's Motion is **DENIED**.

Furthermore, because it appears that Defendant has chosen to simply ignore the Court's explicit order to get local counsel and to do so on or before 5:00 p.m., December 13, 2024, it is **ORDERED** that Defendant's Counsel appear **at 8:00 a.m., Thursday, December 19, 2024**, in the fourth-floor courtroom of the Eldon B. Mahon United States Courthouse prepared to **SHOW CAUSE** for, among other things, failing to comply with the Court's Orders.

In addition, since Counsel for both Parties will be present, the Court **ORDERS** that Counsel meet in the Court's jury room immediately following the hearing and conduct the required in-person conference.

**SO ORDERED** on this **16th day of December 2024.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

App.003

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| Point Bridge Capital, LLC, | § | |
| Hal Lambert | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Case No. 4:24-cv-00988-P |
| | § | |
| Charles Johnson, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
<u>DEFENDANT'S MOTION TO DISMISS</u>**

## <u>TABLE OF CONTENTS</u>

<u>**Page**</u>

STATEMENT OF THE CASE ........................................................................................1

ARGUMENT AND AUTHORITIES ...........................................................................4

I.     Defendant waived his venue argument by failing to raise it in his answer to the First Amended Complaint. ..................................................................................4

II.    This Court Has Personal Jurisdiction over Defendant. .......................................4

       A.    Legal Standard ...........................................................................................4

       B.    Defendant purposefully availed himself of Texas. ...................................5

             1.    Defendant perpetuated substantial parts of the conspiracy while he was residing in Texas—and the falsehood-riddled declaration he submitted cannot overcome the unambiguous facts to the contrary. ...........5

       C.    Defendant purposely directed his conspiratorial and tortious conduct at Texas and, specifically, Fort Worth. .......................................................8

       D.    Personal jurisdiction is in the interest of substantial justice. .................14

III.    Venue is proper in the Northern District of Texas. ...........................................15

CONCLUSION ..........................................................................................................17

CERTIFICATE OF SERVICE ...................................................................................18

App.006

# **TABLE OF AUTHORITIES**

**Page**

## **Cases**

*Admar Int'l, Inc. v. Eastrock, L.L.C.*,
   18 F.4th 783 (5th Cir. 2021) ...............................................................................5, 13

*Amarillo Medical Specialists, LLP v. AKOS MD IPA, LLC*,
   No. 2:23-cv-026-Z, 2023 WL 11926442 (N.D. Tex. June 30, 2023) ..................................3, 10

*Bear Stearns Cos. Inc. v. Lavalle*,
   No. Civ.A. 300CV1900-D, 2001 WL 406217 (N.D. Tex. 2001) ...........................................16

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985)...........................................................................................13

*Cent. Freight Lines Inc. v. APA Transport Corp.*,
   322 F.3d 376 (5th Cir. 2003) ................................................................................5

*Daniel v. Am. Bd. of Emergency Med.*,
   428 F.3d 408 (2d Cir. 2005)................................................................................15

*Dupree v. Valero Energy Corp.*,
   No. 03-cv-834, 2003 WL 22466234 (E.D. La. Oct. 29, 2003)................................................14

*Feline Instincts, LLC v. Feline Future Cat Food Co.*,
   No. 4:09-cv-644-Y, 2010 WL 4942188 (N.D. Tex. Dec. 6, 2010).........................................14

*First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*,
   703 F.3d 742 (5th Cir. 2012) ................................................................................5

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
   592 U.S. 351 (2021)............................................................................................2

*Founders Ins. Co. v. Billy's Bar & Grill, LLC*,
   No. 3:18-cv-00367-M, 2019 WL 5425478 (N.D. Tex. Oct. 23, 2019).............................14, 15

*Freudensprung v. Offshore Technical Servs., Inc*,
   379 F.3d 327 (5th Cir. 2004) ................................................................................5

*Ice Melon, LLC v. Morgan*,
   No. 4:19-cv-1291, 2020 WL 12863808 (S.D. Tex. Jan. 14, 2020).........................................16

*Johnson v. TheHuffingtonPost.com, Inc.*,
   21 F.4th 314 (5th Cir. 2021) ................................................................................7

App.007

*Kwik-Kopy Corp. v. Byers*,
37 F. App'x 90 (5th Cir. 2002) ............................................................................13

*Latshaw v. Johnston*,
167 F.3d 208 (5th Cir. 1999) .........................................................................5, 13

*Munz v. Schreiber*,
No. 14-17-00687-CV, 2019 WL 1768590 (Tex. App.—Houston [14th Dist.]
Apr. 23, 2019, no pet.) ........................................................................................12

*National Computer Ltd. v. Tower Indus., Inc.*,
708 F. Supp. 281 (N.D. Cal. 1989) .......................................................................8

*NDX Advisors, Inc. v. Advisory Fin. Consultants, Inc.*,
No. 11-cv-0517, 2011 WL 2200623 (N.D. Ill. June 6, 2011).............................15

*Nissho Iwai Am. Corp. v. M/V KYVERNITIS*,
No. 96-cv-2241, 1998 WL 2853 (E.D. La. Jan. 5, 1998) ......................................3

*Paz v. Brush Engineered Materials, Inc.*,
445 F.3d 809 (5th Cir. 2006) ................................................................................5

*Pulley v. Ground Effects Landscaping*,
No. 1:18-cv-0452, 2019 WL 2565278 (W.D. Tex. Apr. 5, 2019) .......................12

*Revell v. Lidov*,
317 F.3d 467 (5th Cir. 2002) ..............................................................................13

*Rogers v. McDorman*,
521 F.3d 381 (5th Cir. 2008) ................................................................................4

*Sangha v. Navig8 ShipManagement Private Ltd.*,
882 F.3d 96 (5th Cir. 2018) ...........................................................................12, 13

*Schoot v. United States*,
664 F. Supp. 293 (N.D. Ill. 1987) .........................................................................9

*Sergio Estrada Rivera Auto Corp. v. Kim*,
717 F. Supp. 969 (D.P.R. 1989)............................................................................8

*Stampley v. RCNI Freight, LLC*,
No. 3:23-cv-1625-B, 2023 WL 5333273 (N.D. Tex. Aug. 18, 2023) ............14, 15

*Tabletop Media, LLC v. Citizen Sys. Am. Corp.*,
No. 3:16-cv-1304-C, 2016 WL 11522083 (N.D. Tex. Sept. 21, 2016) ...........15, 16

*Textron, Inc. v. Maloney-Crawford Tank and Mfg. Co.*,
252 F. Supp. 362 (S.D. Tex. 1966) .......................................................................4

App.008

*Trois v. AppelTreeAuctionCtr., Inc.*,
    882 F.3d 485 (5th Cir. 2018) ..................................................3, 5, 10

*Warren Chevrolet, Inc. v. Qatato*,
    No. 03-17-00298-CV, 2018 WL 6729855 (Tex. App.—Austin [3rd Dist.] Dec.
    21, 2018, no pet.) ..................................................................................12

*Weber Aircraft, L.L.C. v. Krishnamurthy*,
    No. 4:12-cv-0666, 2013 WL 1898280 (E.D. Tex. Apr. 12, 2013) ........................8, 9

*Williamsondickie Mfg. Co. v. M/V Heinrich J*,
    762 F. Supp. 2d 1023 (S.D. Tex. 2011) ..................................................3, 4

*Woodfield v. Bowman*,
    193 F.3d 354 (5th Cir. 1999) ........................................................4

*X Corp. v. Media Matters for Am.*,
    No. 4:23-CV-01175-O, 2024 WL 4001803 (N.D. Tex. Aug. 29, 2024) ........................11, 12

## Rules / Statutes

18 U.S.C. § 1965 ..........................................................................14

28 U.S.C. § 1391(b)(2) ..........................................................14, 15, 16

RICO ........................................................................................1

Rule 12(b) ................................................................................4

## Other Authorities

5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure
    § 1352 (3d ed. 2004) ........................................................................3

14D Wright & Miller, Fed. Prac. & Proc. § 3806 (4th ed.) ........................................16

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") submit this Memorandum of Law in opposition to Defendant Charles Johnson's ("Defendant" or "Johnson") motion to dismiss for lack of personal jurisdiction and improper venue or, alternatively, to transfer venue to the Eastern District of Virginia, dkt. 15. The motion to dismiss relies on a false and perjurious affidavit, raises no defect in exercising personal jurisdiction in Texas, and poses no obstacle to venue in the Northern District of Texas.[1] The motion should be denied.

## STATEMENT OF THE CASE

Plaintiffs, residents of Fort Worth, Texas, bring this case alleging that Defendant and his co-conspirator have engaged in a RICO conspiracy involving fraud and extortion, which Defendant furthered by making vile and defamatory statements about Mr. Lambert. Defendant falsely portrays himself as an intelligence agent or asset of U.S. government agencies. His purpose: to exploit connections he claims to have with the defense and intelligence sectors—industries that depend on government contracts—and to pressure companies or investors into giving him favorable investment terms or equity. Defendant's method is twofold: he promises access to government contracts on one hand and threatens to unleash audits, investigations, or other regulatory action if his demands are not met. Plaintiffs are among the victims of this scheme, which Defendant has been perpetrating since at least 2020. (First Amended Complaint ("Am. Compl."), dkt. 4 ¶¶ 108–111).

Defendant did not adequately preserve, and thus waived, his venue argument when submitting his perfunctory four-page answer, which contained fifteen boilerplate affirmative

---

[1] In further support of the arguments in this Memorandum of Law, Plaintiffs submit the Declarations of Will Thompson, Ex. 1 ("Thompson Decl."), and Hal Lambert, Ex. 2 ("Lambert Decl."), along with accompanying exhibits.

App.010

defenses. He outright failed to even mention venue in the answer. The Court can easily dispose of this unpreserved argument without reaching the merits.

Even on the merits, all of Defendant's arguments fail. In his Declaration in Support of the motion to dismiss, signed under penalty of perjury, Defendant asserts that "[a]t all times relevant herein, I was not a resident of the State of Texas," and "[a]t all times relevant herein, all actions taken by me, as related to the transactions set forth in the First Amended Complaint, I was not residing in, nor was I present in, nor was I transacting business in the State of Texas." (Dkt. 14-2 ¶¶ 5–6).

<u>These statements are false and perjurious</u>: At the time the alleged conspiracy began, Defendant was a Texas resident, and he has maintained substantial ties to the state. In 2022, he voted in Texas and appears to remain an active registered voter in Montgomery County. His 2024 political contributions list his address in Conroe, Texas. And between 2019 and 2022, Defendant filed multiple lawsuits in the Fifth Circuit where he described himself as a "resident of Texas" and "domiciled in Montgomery County, Texas." His own public statements further confirm these ties. Given these connections, Defendant cannot argue with a straight face that his contacts with Texas are "random," "fortuitous," or "attenuated." Together with these records, the First Amended Complaint's allegations place him squarely within Texas when the events in question occurred. Exercising jurisdiction under these circumstances is neither unreasonable nor inconsistent with principles of due process.[2]

---

[2]  Previously, Johnson twice sued Mr. Lambert and Point Bridge in the Eastern District of Virginia, asserting claims that somewhat overlap with the present litigation. The court granted two motions to dismiss for lack of personal jurisdiction, finding that Johnson failed to show that Mr. Lambert or Point Bridge "conduct[ed] business in the Eastern District of Virginia and" failed to establish that defendants' conduct connects them to the forum in a meaningful way." (Exs. P & Q, Appx. 113-126)

Moreover, Plaintiffs' allegations also arise out of Defendant purposefully directing his activities at Texas in meaningful ways. *See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 359 (2021). In obtaining investment in a Point Bridge special-purpose investment vehicle ("SPV") and later attempting to push Mr. Lambert out of the venture through improper means, Defendant participated in at least one in-person meeting in Fort Worth at Winslow's Wine Cafe with Mr. Lambert and co-conspirator Gator Greenwill. (Am. Compl. ¶ 137; Lambert Decl. ¶ 3, Appx. 128). Defendant also telephoned and sent multiple emails to Mr. Lambert and Point Bridge knowing they resided in Texas, and—to perpetuate the scheme—falsely accused Mr. Lambert of engaging in sexual misconduct and money laundering in Texas, specifically mentioning Mr. Lambert's Fort Worth residence. Such conduct certainly constitutes "purposeful availment" of Texas under Fifth Circuit caselaw where "even a single phone call" will suffice to establish personal jurisdiction. *See Amarillo Medical Specialists, LLP v. AKOS MD IPA, LLC*, No. 2:23-cv-026-Z, 2023 WL 11926442, at *2 (N.D. Tex. June 30, 2023) (quoting *Trois v. AppelTreeAuctionCtr., Inc.*, 882 F.3d 485, 491 (5th Cir. 2018). Finally, on the basis of Plaintiff's RICO claim, the minimum-contacts analysis is satisfied because Defendant "allegedly committed mail and wire fraud through misrepresentations made via phone to the plaintiff 'whom he knew to be in Texas.'" *Energium Health v. Gabali*, No. 3:21-cv-2951-S, 2023 WL 6202043, at *4 (N.D. Tex. Sept. 22, 2023) (internal quotations omitted).

Last, venue is proper in the Northern District for all the reasons why the Court has personal jurisdiction over Defendant. Plaintiffs have alleged that Defendant's communications and conduct were directed to this District and that their claims derive directly from such communications and conduct, which is enough to establish venue here. *See Trois*, 882 F.3d at 494.

App.012

## ARGUMENT AND AUTHORITIES

**I.    Defendant waived his venue argument by failing to raise it in his answer to the First Amended Complaint.**

As an initial matter, Defendant did not preserve his venue argument in his Answer. To be sure, "[c]ourts generally permit a Rule 12(b)(6) motion to be filed after the answer," but only "if the defense was included as an affirmative defense in the original answer." *Dynamic Robotic Sols., Inc. v. Simwon Tech, Inc.*, No. 1:23-cv-0070-DAE, 2024 WL 3404804, at *6 (W.D. Tex. July 10, 2024). That's because "certain affirmative defenses like personal jurisdiction and venue . . . may be waived by a defendant." *Dillon v. Rogers*, 596 F.3d 260, 271 (5th Cir. 2010). And the "Federal Rules require an affirmative defense to be pleaded; failure to plead such a defense constitutes a waiver." *Woodfield v. Bowman*, 193 F.3d 354, 362 (5th Cir. 1999).

In their First Amended Complaint, Plaintiffs described in detail why venue is proper in the Northern District of Texas. (*See* Am. Compl. ¶¶ 20-22). But in his Answer, Defendant didn't even deny Plaintiffs' position; he instead claimed to "[l]ack[ ] sufficient knowledge to neither admit no deny the allegations, and/or calls [sic] for a legal conclusion for which [he] lacks the knowledge to answer." (Dkt. 8 at ¶ 2). And he didn't raise a venue challenge as an affirmative defense. He thus waived the argument, and the Court should deny the venue aspect of his motion on that basis alone.

**II.    This Court Has Personal Jurisdiction over Defendant.**

**A.    Legal Standard**

A federal court's "exercise of personal jurisdiction over a nonresident defendant must comport with both federal due-process requirements and the long-arm statute of Texas." *Trois*, 882 F.3d at 488 (citing *Paz v. Brush Engineered Materials, Inc.*, 445 F.3d 809, 812 (5th Cir. 2006)). But "[b]ecause Texas's long-arm statute extends to the limits of federal constitutional due

App.013

process," a court can assert personal jurisdiction over a non-resident so long as doing so would not

violate due process. *Id.* (citing *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999)). As "a

matter of due process, courts may exercise personal jurisdiction over a nonresident defendant only

if (1) that defendant has purposefully availed himself of the benefits and protections of the forum

state by establishing minimum contacts with the forum state; and (2) the exercise of jurisdiction

does not offend traditional notions of fair play and substantial justice." *Admar Int'l, Inc. v.

Eastrock, L.L.C.*, 18 F.4th 783, 786 (5th Cir. 2021) (cleaned up).

A party seeking to assert jurisdiction need only "present sufficient facts to make out a *prima

facie* case supporting jurisdiction." *Trois*, 882 F.3d at 488 (citing *Cent. Freight Lines Inc. v. APA

Transport Corp.*, 322 F.3d 376, 380 (5th Cir. 2003)). In determining whether a *prima facie* case

for jurisdiction exists, "this Court must accept as true [the Plaintiff's] uncontroverted allegations,

and resolve in [its] favor all conflicts between the [jurisdictional] facts contained in the parties'

affidavits and other documentation." *First Inv. Corp. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d

742, 746 (5th Cir. 2012) (quoting *Freudensprung v. Offshore Technical Servs., Inc*, 379 F.3d 327,

343 (5th Cir. 2004) (alteration in the original).

### B.    Defendant purposefully availed himself of Texas.

#### 1.    Defendant perpetuated substantial parts of the conspiracy while he was residing in Texas—and the falsehood-riddled declaration he submitted cannot overcome the unambiguous facts to the contrary.

Defendant's supporting brief asserts that he has "absolutely no personal or business ties to,

not only the Northern District of Texas, but also, the State of Texas." (Dkt. 15 at 4). In his

Declaration in Support of the motion, signed under penalty of perjury, Defendant asserts that "[a]t

all times relevant herein, I was not a resident of the State of Texas" and "[a]t all times relevant

herein, all actions taken by me, as related to the transactions set forth in the Amended Complaint,

App.014

I was not residing in, nor was I present in, nor was I transacting business in the State of Texas."

(Doc. 14-2 ¶¶ 5-6).

These assertions are false, contradicted by Defendant's own statements, court filings, government records, and even the cases he cites. At the time he is alleged to have organized and carried out the RICO shake-down conspiracy in the present case, Defendant filed numerous business and legal filings in Texas, as well as in other jurisdictions, claiming to be a Texas resident:

- According to Defendant's FEC disclosures, in at least eight political donations made between September 19, 2019 and September 22, 2021, he listed his address as Conroe, Texas. (Ex. A, Appx. 007-08).

- On January 16, 2020, Defendant sued Verizon Media in the Southern District of Texas. The lawsuit took issue with a January 19, 2019 article describing Defendant as a Holocaust denier based on his statement that he agreed with a prominent Holocaust denier "about Auschwitz and the gas chambers not being real." According to that complaint, "Plaintiff Johnson is a natural person and is domiciled in Montgomery County, Texas." (Ex. B, Appx. 010, *Johnson v. Verizon CMP Holdings, LLC*, 4:20-cv-00179, dkt. 1 at 1 (S.D. Tex) (Jan. 16, 2020).

- On April 9, 2020, Defendant amended his complaint against Verizon, reiterating that he was a resident of Montgomery Texas. (Ex. C, Appx. 016).

- The court dismissed the case for lack of jurisdiction, and Defendant on appeal described himself as a "resident of Texas," including in his July 2022 petition for certiorari to the U.S. Supreme Court. (*Johnson v. The HuffingtonPost.com, Inc.*, 2022 WL 2987282, at *3).

- Defendant's supporting brief even cites the Fifth Circuit's decision upholding dismissal of his lawsuit against the Huffington Post—**that he filed in Texas.** (Dkt. 15 at 11 (citing *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314 (5th Cir. 2021))). The decision notes that "**Johnson based jurisdiction on his Texas citizenship**." 21 F.4th. at 316 (emphasis added).

- On September 12, 2020, Defendant wrote on Substack: "I had a child, divorced, and **moved to** the one place where I felt happiest as a child — **Texas, specifically Montgomery County** . . . . I found my home and my people, at last. My neighbors have taught me that we Texans don't run from a fight. Not at the Alamo. Not now. Texas, like America, is a state of mind." (Ex. D, Appx. 029-30 (emphasis added)).

- On October 6, 2020, after having begun perpetrating the conspiracy, Defendant texted Mr. Lambert that he was "[a]t the Worthington [Renaissance Hotel in **Fort Worth, Texas**] working." (Ex. E, Appx. 036).

App.015

- Defendant describes himself as the CEO of Traitwell Inc. on his X, LinkedIn, and Substack bios. As recently as December 11, 2024, he posted on X, "I'm currently CEO of @traitwell." (Ex. F, Appx. 038). On October 12, 2020, Our Perfect Score, Inc. d/b/a Traitwell, Inc. filed an application for recognition as a foreign for-profit corporation to the Texas Secretary of State's office. The application listed the company's principal office address as The Woodlands, Texas. (Ex. G, Appx. 040). Traitwell's LinkedIn page lists the same city as its location. (Ex. H, Appx. 043).

- On March 4, 2022, Defendant wrote on his Substack blog, "I am a California and Massachusetts refugee really **but I am also a Texas resident** . . . and **I voted in the Republican Primary** in early voting. . . . It was my first time voting in Texas." (Ex. I, Appx. 048 (emphasis added)).

- On April 22, 2022, Defendant emailed Mr. Lambert and other Clearview AI, Inc. board members a draft complaint, which the First Amended Complaint described in paragraphs 117 and 118. Defendant's draft complaint stated that "**Charles Johnson is a citizen and resident of Texas**." (Ex. J., Appx. 059) (emphasis added).

- On September 28, 2022, Defendant personally filed an Application for Registration of a Foreign Limited Liability Company for Metis Funding LLC. The application listed both Metis Funding's principle place of business and Defendant's registered-agent address as Conroe, Texas. (Ex. L, Appx. 082).

- On October 25, 2022, Defendant wrote a Substack blog describing Representative Dan Crenshaw, who represents Texas's Second Congressional District, as "my Congressman." (Ex. M, Appx. 085).

- On November 6, 2022, Defendant wrote a Substack blog referring to "my adopted Texas." (Ex. N, Appx. 104).

- On January 11, 2024, Defendant contributed $264 to Missouri State Representative Sarah Unsicker's campaign and listed Conroe, Texas as his personal address in disclosures to the Missouri Ethics Commission. (Ex. O, Appx. 111).

- On an August 18, 2024 X Space, Defendant said, "I was living in Texas at the time [immediately prior to the Russia-Ukraine war], so just got in my car and I drove, you know, to Northern Virginia. And I've been here basically six weeks before the Ukraine war broke out." (Am. Compl. ¶ 116 & Ex. 1 to Am. Compl.). The Russia-Ukraine War began on or around February 24, 2022.

This evidence leaves no doubt that Defendant's motion is based in large part on provable falsehoods he submitted under the penalty of perjury. Courts have sanctioned parties for similar conduct. *See, e.g.*, *Sergio Estrada Rivera Auto Corp. v. Kim*, 717 F. Supp. 969, 974–76 (D.P.R. 1989) (imposing sanctions for falsehoods and omissions in an affidavit filed in support of a motion

7

to dismiss for lack of personal jurisdiction); *National Computer Ltd. v. Tower Indus., Inc.*, 708 F. Supp. 281, 284 (N.D. Cal. 1989) (imposing sanctions for falsehoods contained in an affidavit offered in support of a motion to dismiss for lack of venue).

And regardless whether Defendant actually resides in Virginia, under the relevant jurisdictional inquiry, "[t]he fact that Defendant[] moved from Texas does not deprive the Court of personal jurisdiction." *Weber Aircraft, L.L.C. v. Krishnamurthy*, No. 4:12-cv-666, 2013 WL 1898280, at *6 (E.D. Tex. Apr. 12, 2013), *report and recommendation adopted*, No. 4:12-cv-666, 2013 WL 1898267 (E.D. Tex. May 7, 2013). In that case, "[t]he Court reject[ed] Defendants' notion that simply moving out of state somehow severs their connection to Texas." *Id.*; *see also Schoot v. United States*, 664 F. Supp. 293, 295 (N.D. Ill. 1987) ("The fact that [defendant] has since moved out of state does not insulate him from the long arm jurisdiction of the state of Illinois for acts that took place while he lived and worked in the state. Therefore, it is clear that this Court has personal jurisdiction over [him].").

### C. Defendant purposely directed his conspiratorial and tortious conduct at Texas and, specifically, Fort Worth.

Defendant's supporting brief incorrectly claims that Plaintiffs' allegations are limited to "statements . . . posted on a passive website" that "were not at all directed toward Texas, and did not involve Texas in any way." (*E.g.*, dkt. 15 at 16). Defendant ignores that Plaintiffs' core allegations do not rely on Defendant's social-media postings. Rather, the First Amended Complaint is replete with allegations that Defendant affirmatively reached into Texas and/or knew that the effects of his conduct would be felt in Texas:

- Traveled to Fort Worth, where he participated in a meeting with his co-conspirator and Plaintiffs at Winslow's Wine Cafe to perpetuate the conspiracy, (Am. Compl. ¶ 137; Lambert Decl. at ¶ 3, Appx. 128);

- Contacted Plaintiffs numerous times via phone and email knowing that they were based in Fort Worth, (Am. Compl. ¶¶ 148, 151, 154, 173, 213; Lambert Decl. ¶¶ 5–6, Appx. 129);

- Tried to initiate a proxy fight to remove Mr. Lambert from the Clearview SPV based on his false allegations that Mr. Lambert was corrupt and engaged in "disqualifying" conduct towards "female founders," (Am. Compl. ¶¶ 154, 155); and

- Defamed Plaintiffs by accusing Mr. Lambert and Point Bridge of being a front for the "Russian mafia" and "Israeli influences," (Am. Compl. ¶¶ 188–89).

Further, unlike in cases where personal jurisdiction was deemed lacking because the defendant did know that the effects of his conduct would be felt in the forum state, Plaintiffs have pointed to many statements where Defendant expressly recognized that Mr. Lambert is a Fort Worth resident with deep connections to Texas:

- Defendant falsely claimed that Defendant "assaulted some women at parties in Austin." (Am. Compl. ¶ 21).

- In January 2022, Defendant texted venture capitalist Gary Lauder and noted that Mr. Lambert was "someone based in Texas" (Am. Compl. ¶ 121).

- Defendant claimed Mr. Lambert is a "dirty player in Fort Worth, maybe a front for the cartels" (Am. Compl. ¶ 173).

- Defendant said that, "Hal [Lambert] is very much tied in with the Russian world, particularly in the Russian and the COVID world, particularly operating in Texas." (Am. Compl. ¶¶ 21, 173).

- Defendant wrote that Mr. Lambert was a "fraudulent Texas businessman." (Am. Compl. ¶ 213).

- Defendant said, "Hal is very much, you know, tied in with the, with the Russian world, particularly in the Russian and Likud world, particularly operating in Texas." (Am. Comp. Ex. 1).

Taken altogether, Defendant cannot characterize this litigation's ties to Texas as random or fortuitous. Indeed, Defendant's contacts with Texas far exceed the "minimum contacts" necessary under Fifth Circuit law because just a "single phone call" phone with a Texas resident is sufficient to establish personal jurisdiction when the contents of the phone call form the basis of

App.018

a plaintiff's cause of action. *Amarillo Medical Specialists*, 2023 WL 11926442, at *2. There, the defendant argued there was no personal jurisdiction because its "only interactions with Plaintiffs and contacts with Texas were through three telephone calls between Plaintiffs and representatives of [the defendant] in Florida." *Id.* (internal quotations omitted). The court rejected that argument, noting that a defendant "should have reasonably anticipated being haled into Texas court as a result of reaching out to Texas via phone in order to garner business and make specific representations." *Id.* (quoting *Trois*, 882 F.3d at 491); *see also Trois*, 882 F.3d at 491(finding personal jurisdiction over out-of-state defendant on the basis of phone calls that the defendant's president made to a Texas plaintiff). Here, Plaintiffs claims are based on, among other things, statements Defendant made at the meeting in Fort Worth at Winslow's Wine Cafe and in his phone calls and emails to Plaintiffs, who are Fort Worth residents. Defendant's availment of Texas and Fort Worth goes far beyond the contacts that the defendants in *Amarillo Medical Specialists* and *Trois* had with Texas, which were nonetheless sufficient to assert personal jurisdiction in the state.

A recent Northern District case further illustrates the jurisdictional analysis in light of the Defendant's (false) declaration saying neither he nor this suit have any connection to Texas. In *X Corp. v. Media Matters for Am.*, No. 4:23-CV-1175, 2024 WL 4001803 (N.D. Tex. Aug. 29, 2024), a defendant published an internet article that did not specifically mention Texas, but referenced companies (*e.g.*, Oracle and AT&T) that reside in Texas. The defendant's affidavit stated that he "was not aware of any connection—and continue[s] to believe the articles have no connection— to Texas, Texas residents, Texas users of X, or X's alleged operations in Texas." *Id.* at *4 (brackets in the original). Yet the affidavit did not "disclaim that [the defendant] knew Oracle and AT&T were based in Texas," and the court ultimately concluded that he "targeted his conduct at Texas."

Like the defendant in *X Corp.*, Defendant's declaration in this case never "disclaims" that he knew that the Plaintiffs are residents of Texas. *See id.* Nor could he—Defendant met with Plaintiffs in Fort Worth, (Am. Compl. ¶ 137; Lambert Decl. ¶ 3, Appx. 128); Defendant texted Mr. Lambert that he was at the Worthington Hotel in Fort Worth (which is near Plaintiffs' offices), (Ex. E, Appx. 036, Lambert Decl. ¶ 4, Appx. 129); Defendant called and texted Mr. Lambert's cell phone, which has a Texas area code, (Lambert Decl. ¶¶ 5–6, Appx. 129); and Defendant specifically mentioned Mr. Lambert's Texas connections when defaming him (*e.g.*, Am. Compl. ¶¶ 21, 173, 213). Armed with this knowledge, Defendant cannot seriously dispute that he "targeted his conduct at Texas" under the reasoning in *X Corp.* 2024 WL 4001803, at *4. "Because Defendant . . . 'purposefully directed [his] activities' at Texas, and Plaintiff[s'] claims against [Defendant] are 'deriving from, or [are] connected with' those activities, specific jurisdiction exists." *Id.* (quoting *Sangha v. Navig8 ShipManagement Private Ltd.*, 882 F.3d 96, 102 (5th Cir. 2018)).

Personal jurisdiction is also appropriate on the basis of RICO jurisdiction. Section 1965(a) provides that RICO claims may be brought in any federal district "in which [the defendant] resides, is found, has an agent, or transacts his affairs." 18 U.S.C. § 1965(a). "[M]any district courts" in the Fifth Circuit, including the Northern District, "have construed § 1965(a)'s 'transacts his affairs' language to require traditional minimum contacts analysis under the state's long arm statute." *Energium*, 2023 WL 6202043, at *4 (internal quotation marks omitted) (collecting cases). And the minimum-contacts analysis is deemed satisfied, and personal jurisdiction conferred, "over RICO defendants where one defendant allegedly committed mail and wire fraud through misrepresentations made via phone to the plaintiff 'whom he knew to be in Texas.'" *Id.* (quoting *ESPOT, Inc. v. MyVue Media, LLC*, 492 F. Supp. 3d 672, 691 (E.D. Tex. 2020).

App.020

For example, "a defendant who was 'a willing participant on a conference call' and who 'actively engaged in conversation' in which he made specific representations regarding his business to an individual that he knew to be in Texas had the requisite contacts with Texas to establish specific jurisdiction with respect to fraud." *ESPOT, Inc.*, 492 F. Supp. 3d at 689 (quoting *Trois*, 882 F.3d at 491); *see also Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) ("When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment.").

Similar to RICO allegations that withstood personal-jurisdiction challenges in *Energium Health* and *ESPOT*, the First Amended Complaint in this case "alleges that [Defendant] committed . . . wire fraud" involving "invest[ments] . . . in furtherance of the alleged scheme to defraud Plaintiff[s] . . . by directing these intentional acts at Plaintiff[s], 'whom he knew to be in Texas[.]'" *Energium Health*, 2023 WL 6202043, at *4 (quoting *ESPOT, Inc.*, 492 F. Supp. 3d at 691. Plaintiffs have thus "alleged sufficient contacts between [Defendant] and Texas to make a prima facie showing that he is subject to personal jurisdiction in this Court for Plaintiff[s'] RICO claim." *Id.*

And when a court has personal jurisdiction over the defendant on one claim, it can exercise pendent personal jurisdiction over the same defendant on all other claims arising out of the same nucleus of operative facts. *See Rolls-Royce Corp. v. Heros, Inc.*, 576 F. Supp. 2d 765, 783–84 (citing *United States v. Botefuhr*, 309 F.3d 1263, 1272–73 (10th Cir. 2002)). The First Amended Complaint alleges that the breach-of-contact and defamation claims stem directly from the RICO shakedown scheme, so the Court should exercise pendent jurisdiction over Defendant on these state law claims.

App.021

Defendant's submissions effectively ignore all of the above-cited conduct and legal authority. Instead of addressing Plaintiffs' core allegations that he affirmatively reached into Texas to carry out the conspiracy, Defendant artificially attempts to limit the scope of his conduct to "posting information on a passive website that can be accessed from any state." (Dkt. 15 at 10-11). Again, Plaintiffs do not rely on Defendant's social-media postings as the sole (or even primary) basis for asserting personal jurisdiction.

Defendant relies on a host of unpublished cases, mostly from Texas state courts, where the most compelling basis for asserting jurisdiction was simply that the plaintiff was a resident of Texas. And none of the Defendant's cited authority is remotely on point with the facts in the present case. *See Pulley v. Ground Effects Landscaping*, No. 1:18-cv-0452, 2019 WL 2565278, at *6 (W.D. Tex. Apr. 5, 2019), *report and recommendation adopted*, No. 1:18-cv-452, 2019 WL 2565250 (W.D. Tex. May 14, 2019) (resolving a dispute concerning a property in Alaska; the Alaska defendant contacted the plaintiff via an Alaska phone number; the plaintiff *may have been a resident of Alaska*, not Texas; and the basis for jurisdiction were emails that the plaintiff *may* have "opened . . . while he was in Texas"); *Munz v. Schreiber*, No. 14-17-00687-CV, 2019 WL 1768590, at *7 (Tex. App.—Houston [14th Dist.] Apr. 23, 2019, no pet.) (mem. op.) (observing that defendant in breach-of-contract case was resident of Nevada, that contract-provided truck was to be delivered to Nevada, and that all modifications to truck would occur in Nevada); *Warren Chevrolet, Inc. v. Qatato*, No. 03-17-00298-CV, 2018 WL 6729855, at *3 (Tex. App.—Austin [3rd Dist.] Dec. 21, 2018, no pet.) (mem. op.) (noting that plaintiff argued *general jurisdiction* over Iowa car dealer on the basis of the defendant's contract with a third-party vendor in Texas "that manage[d] the information systems and websites for all GM dealers").

App.022

In sum, the events described in the First Amended Complaint show that Defendant has purposefully availed himself of the benefits and protections of doing business in Texas. *See Latshaw v. Johnston*, 167 F.3d 208, 214 (5th Cir. 1999) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)). He therefore has sufficient minimum contacts with Texas to permit the Court to exercise personal jurisdiction over him.

### D.   Personal jurisdiction is in the interest of substantial justice.

Because Plaintiffs have carried their burden of establishing purposeful availment, the Court need only find that exercising personal jurisdiction in Texas comports with "substantial justice." *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002). Defendant "must make a 'compelling case'" against jurisdiction once Plaintiffs identify the requisite minimum contacts. *Sangha*, 882 F.3d at 102 (quoting *Burger King Corp.*, 471 U.S. at 477). In doing so, Defendant must show that the exercise of jurisdiction "would prove unfair or unreasonable." *Admar*, 18 F.4th at 786.

Defendant cannot show that the exercise of personal jurisdiction is unjust—let alone make a compelling case to that effect. The "inquiry into fairness captures the reasonableness of hauling a defendant from his home state before the court of a sister state; in the main a pragmatic account of reasonable expectations—if you are going to pick a fight in Texas, it is reasonable to expect that it be settled there." *Revell*, 317 F.3d at 476. "Even a defendant's single act aimed at the forum can support specific personal jurisdiction if that act gives rise to the cause of action asserted." *Frankl v. Netopia, Inc.*, No. 3:05-cv-1757-B, 2007 WL 9712232, at *5 (N.D. Tex. Mar. 26, 2007) (citing *Kwik Copy Corp. v. Byers*, 37 F. App'x 90, 2002 WL 1021889, at *5 (5th Cir. 2002) (per curiam)).

A defendant who repeatedly pressures a Fort Worth company (Plaintiff Point Bridge) partly through defaming its Fort Worth resident owner (Mr. Lambert)—as Defendant did when he said that Mr. Lambert was a "front" and "very much . . . tied in with the . . . Russian world, particularly in the Russian and the covid world, particularly operating in **Texas**"—and when he accused Mr.

14

Lambert of having "sexually [ ] assaulted some women at parties in **Austin**"—cannot claim surprise at being held to answer for his conduct in Texas. (Am. Compl. ¶ 21 (brackets in the original; emphasis added)).

### III.   Venue is proper in the Northern District of Texas.

If the Court were inclined to consider Defendant's waived venue challenge, it should still reject this argument. Venue is proper "under 28 U.S.C. § 1391(b)(2) because a substantial part of the events described herein occurred within the district" and "is further proper in this district pursuant to 18 U.S.C. § 1965 . . . because[Defendant] is subject to personal jurisdiction in this district." (Am. Compl. ¶ 22). Plaintiff has properly alleged that "'substantial' activities took place in [the Northern District]." *Feline Instincts, LLC v. Feline Future Cat Food Co.*, No. 4:09-cv-644-Y, 2010 WL 4942188, at *4 (N.D. Tex. Dec. 6, 2010) (citation and internal quotations omitted). "Courts have provided the plaintiff with the benefit of the doubt when determining the governing facts," *Dupree v. Valero Energy Corp.*, No. 03-cv-834, 2003 WL 22466234, at *1 (E.D. La. Oct. 29, 2003), and "tend to liberally construe the 'substantial part of the events' option for proper venue," *Founders Ins. Co. v. Billy's Bar & Grill, LLC*, No. 3:18-cv-367, 2019 WL 5425478, at *6 (N.D. Tex. Oct. 23, 2019).

Defendant's venue argument essentially rehashes his jurisdictional arguments. He misconstrues the federal venue rules in his (erroneous) focus on conduct that he purportedly engaged in within Virginia. "The question is not whether a substantial part of the events took place elsewhere; rather, the question is whether 'a substantial part of the events or omissions giving rise to the claim occurred' in this judicial district." *Stampley v. RCNI Freight, LLC*, No. 3:23-cv-1625, 2023 WL 5333273, at *1 n.2 (N.D. Tex. Aug. 18, 2023) (quoting 28 U.S.C. § 1391(b)(2)). "[V]enue may be proper in a judicial district even if a substantial part of the events or omissions giving rise to the claim occurred elsewhere." *Id.* (citation omitted). Because § 1391(b)(2)

15

"contemplates that venue can be appropriate in more than one district," it "does not restrict venue to the district in which the 'most substantial' events or omissions giving rise to a claim occurred." *Id.* (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432 (2d Cir. 2005)); *accord NDX Advisors, Inc. v. Advisory Fin. Consultants, Inc.*, No. 11-cv-517, 2011 WL 2200623, at *2 (N.D. Ill. June 6, 2011).

Regardless, Plaintiffs have alleged several connections to the Northern District. For example, Plaintiffs alleged that Defendant intentionally perpetrated a shakedown conspiracy against a Texas business (Point Bridge) and then defamed the principal of that Texas business (Mr. Lambert) when they would not comply with Defendant's demands. And to further the conspiracy, Defendant personally met with Plaintiffs in Fort Worth along with his co-conspirator. (*See, e.g.*, Am. Comp. ¶ 137; Lambert Decl. ¶ 3). Such allegations alone defeat any argument that venue is improper because this case lacks a connection to Texas generally.

Likewise, Defendant's well-documented communications directed to the Northern District also support venue. "[C]ommunications to the district can constitute a substantial part of the events giving rise to a plaintiff's claims, if the claims derive directly from those communications." *Founders Ins. Co.*, 2019 WL 5425478, at *6 (citation omitted). "This includes telephone communications and electronic transmissions." *Id.* Venue is proper in the Northern District because Plaintiffs have alleged (a) that Defendant's "communications [were] directed into [the Northern District]," and (b) that Plaintiffs' claims derive directly from those communications. *Tabletop Media, LLC v. Citizen Sys. Am. Corp.*, No. 3:16-cv-1304-C, 2016 WL 11522083, at *2-3 (N.D. Tex. Sept. 21, 2016).

Defendant's venue argument relies primarily on *Ice Melon, LLC v. Morgan*, No. 4:19-cv-1291, 2020 WL 12863808 (S.D. Tex. Jan. 14, 2020), a magistrate's report and

recommendation to which no other court has cited. *Ice Melon* is inapposite because the Court's analysis focused on emails that the defendant sent and whether they "were fortuitously opened in Texas." *Id.* at *4; *see also id.* at *3-4 (internal quotations omitted) (collecting cases for the proposition that "courts are reluctant to find jurisdiction based only on emails . . . because reliance on . . . email can no longer reliably prove purposeful availment, given the fact that technology now permits an individual anywhere in the world to be reached by . . . a single e-mail address") (ellipses in the original). What's more, both the plaintiff and defendant in *Ice Melon* were "citizens of Mexico, not Texas," and they met "twice in Mexico and never in Texas." *Id.* at *4. Here, by contrast, Defendant met with Mr. Lambert, a Fort Worth resident, in Fort Worth and in furtherance of the conspiracy. (Am. Compl. ¶ 137).

Finally, to the extent that the personal-jurisdiction and venue inquiries overlap, if "the defendant is amenable to personal jurisdiction under the relevant jurisdictional statute and the constitutional minimum contacts analysis, then . . . venue is proper because a substantial part of the claim arose in the forum district." 14D Wright & Miller, Fed. Prac. & Proc. § 3806 (4th ed.) (citing, *inter alia*, *Bear Stearns Cos. Inc. v. Lavalle*, No. Civ.A. 300CV1900, 2001 WL 406217, at *5 (N.D. Tex. 2001)). If a "defendant's contacts satisfy personal jurisdiction," then they would "ipso facto show that the claim is sufficiently related to the forum to justify venue under Section 1391(b)(2)." *Id.* Defendant cannot argue otherwise.

## CONCLUSION

The Court should deny Defendant's Motion to Dismiss in its entirety. To the extent that the Court believes that further factual development of the record would be appropriate, Plaintiffs request that the Court order the parties to engage in targeted jurisdictional discovery, which will further show that Defendant's declaration is false and perjurious. But no such discovery is necessary based on the current record.

App.026

Dated: December 23, 2024                     Respectfully submitted,

                                             **QUINN EMANUEL URQUHART &**
                                             **SULLIVAN LLP**

                                  By:        */s/ Will Thompson*
                                             Will Thompson
                                             State Bar No. 24094981
                                             willthompson@quinnemanuel.com
                                             3100 McKinnon St., Ste. 1125
                                             Dallas, Texas 75201
                                             Telephone: (469) 902-3600
                                             Facsimile: (469) 902-3610

                            **ATTORNEY FOR PLAINTIFFS**

                            **CERTIFICATE OF SERVICE**

I hereby certify that on December 23, 2024 I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel of record by a manner authorized by the Federal Rules of Civil Procedure.

                                  */s/ Will Thompson*
                                  Will Thompson

App.027

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| Point Bridge Capital, LLC, | § | |
| Hal Lambert | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Case No. 4:24-cv-00988-P |
| | § | |
| Charles Johnson, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS**

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") submit this Appendix
in Support of its Response in Opposition to Defendant's Motion to Dismiss.

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| 1 | Declaration of Will Thompson, dated December 23, 2024. | Appx. 001 – Appx. 005 |
| A | Copy of an Federal Election Commission report of individual contributions with Charles Johnson listed under the "Contributor name" and listing the employer as "TRAITWELL." | Appx. 006 – Appx. 008 |
| B | Copy of "Plaintiff's Original Complaint" in the matter *Johnson v. Verizon CMP Holdings, LLC*, 4:20-cv-00179, dkt. 1 (S.D. Tex) | Appx. 009 – Appx. 014 |
| C | Copy of "Plaintiff's First Amended Complaint" in the matter *Johnson v. Verizon CMP Holdings, LLC*, 4:20-cv-00179, dkt. 1 (S.D. Tex. | Appx. 015 – Appx. 024 |
| D | Copy of a Substack article titled *Why I Am Suing BuzzFeed's Ryan Mac For Libel Over Peter Thiel Story* with the author listed as Charles Johnson and dated September 12, 2020 | Appx. 025 – Appx. 034 |
| E | Copy of a text message between Charles Johnson and Hal Lambert from October 6, 2020. | Appx. 035 – Appx. 036 |

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| F | Copy of a post on X from https://x.com/JohnsonThought1/status/1866982588222410858. | Appx. 037 – Appx. 038 |
| G | Copy of an "Application for Registration of a Foreign For-Profit Corporation from the Texas Secretary of State for the entity named "Our Perfect Score, Inc. | Appx. 039 – Appx. 041 |
| H | Copy of the LinkedIn page for Traitwell. | Appx. 042 – Appx. 045 |
| I | Copy of a Substack article titled The Artful Return of the Bushes with the author listed as Charles Johnson and dated May 4, 2022 | Appx. 046 – Appx. 056 |
| J | Copy of a draft complaint that Charles Johnson emailed to Hal Lambert. | Appx. 057 – Appx. 079 |
| K | Intentionally Left Blank | Appx. 080 |
| L | Copy of "Application for Registration of a Foreign For-Profit Corporation from the Texas Secretary of State for the entity named "Metis Funding LLC." | Appx. 081 – Appx. 083 |
| M | Copy of a Substack article titled *Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An FBI Counterintelligence Investigation* with the author listed as Charles Johnson and dated October 25, 2022 | Appx. 084 – Appx. 098 |
| N | Copy of a Substack article tiled *Go Ahead and Quit Twitter: You'll Live Without Your Addiction — And Maybe Be Happier,* with the author listed as Charles Johnson and dated Nov. 5, 2022 | Appx. 099 – Appx. 109 |
| O | Copy of a report from the Missouri Ethics Commission showing that a Charles Johnson in Conroe, Texas 77384 donated $264.12 to the Unsicker for Missouri Ethics Committee | Appx. 110 – Appx. 111 |
| P | Copy of the order granting Hal Lambert and Point Bridge Capital's motion to dismiss the lawsuit that Charles Johnson for, among other things, lack of personal jurisdiction in the matter 1:23-cv-01485, E.D. Va., dkt. 8, entered on April 2, 2024 | Appx. 112 – Appx. 118 |

App.030

| Exhibit No. | Description | Appendix Page Range |
|:---:|:---|:---|
| **Q** | Copy of the order granting Hal Lambert and Point Bridge Capital's second motion to dismiss the lawsuit that Charles Johnson for, among other things, lack of personal jurisdiction in the matter 1:23-cv-01485, E.D. Va., entered on September 17, 2024 | Appx. 119 – Appx. 126 |
| **2** | Declaration of Hal Lambert, dated December 23, 2024 | Appx. 127 – Appx. 129 |

Dated: December 23, 2024          Respectfully submitted,

                                           **QUINN EMANUEL URQUHART & SULLIVAN LLP**

By:       */s/ Will Thompson*
                   Will Thompson
                   State Bar No. 24094981
                   willthompson@quinnemanuel.com
                   3100 McKinnon St., Ste. 1125
                   Dallas, Texas 75201
                   Telephone: (469) 902-3600
                   Facsimile: (469) 902-3610

                                     **ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on this day December 23, 2024 via the Court's CM/ECF system to all counsel of record.

                                         */s/ Will Thompson*
                                         Will Thompson

App.031

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

**<u>DECLARATION OF WILL THOMPSON</u>**

I, Will Thompson, declare as follows. I am an attorney admitted to the State Bar of Texas and this Court and a partner at the law firm of Quinn Emanuel Urquhart and Sullivan LLP. I am attorney of record for the plaintiffs in the above captioned action. I am over the age of twenty-one years and am not a party to this action. I have personal knowledge of the facts set forth in this declaration.  I declare under penalty of perjury that the facts stated in this document are true and correct.

1.      Exhibit A attached hereto is a true and correct copy of an Federal Election Commission report of individual contributions with Charles Johnson listed under the "Contributor name" and listing the employer as "TRAITWELL."

2.      Exhibit B attached hereto is a true and correct copy of  "Plaintiff's Original Complaint" in the matter *Johnson v. Verizon CMP Holdings, LLC*, 4:20-cv-00179, dkt. 1 (S.D. Tex).

3.      Exhibit C attached hereto is a true and correct copy of "Plaintiff's First Amended Complaint" in the matter *Johnson v. Verizon CMP Holdings, LLC*, 4:20-cv-00179, dkt. 1 (S.D. Tex

1

4.      Exhibit D attached hereto is a true and correct copy of a Substack article titled *Why I Am Suing BuzzFeed's Ryan Mac For Libel Over Peter Thiel Story* with the author listed as Charles Johnson and dated September 12, 2020.

5.      Exhibit E attached hereto is what appears to be a true and correct copy of a text message between Charles Johnson and Hal Lambert from October 6, 2020. (*See* Declaration of Hal Lambert at ¶ 7).

6.      Exhibit F attached hereto is a true and correct copy of a post on X from https://x.com/JohnsonThought1/status/1866982588222410858.

7.      Exhibit G attached hereto is a true and correct copy of an "Application for Registration of a Foreign For-Profit Corporation from the Texas Secretary of State for the entity named "Our Perfect Score, Inc..

8.      Exhibit H attached hereto is a true and correct copy of the LinkedIn page for Traitwell.

9.      Exhibit I attached hereto is a true and correct copy of a Substack article titled The Artful Return of the Bushes with the author listed as Charles Johnson and dated May 4, 2022.

10.      Exhibit J attached hereto is what appears to be a true and correct copy of a draft complaint that Charles Johnson emailed to Hal Lambert. (*See* Declaration of Hal Lambert at ¶ 8).

11.      Exhibit L attached hereto is a true and correct copy of "Application for Registration of a Foreign For-Profit Corporation from the Texas Secretary of State for the entity named "Metis Funding LLC."

12.      Exhibit M attached hereto is a true and correct copy of a Substack article titled *Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence*

*and Chabad, Deserves An FBI Counterintelligence Investigation* with the author listed as Charles Johnson and dated October 25, 2022.

13.    Exhibit N attached hereto is a true and correct copy of a Substack article tiled *Go Ahead and Quit Twitter: You'll Live Without Your Addiction — And Maybe Be Happier,* with the author listed as Charles Johnson and dated Nov. 5, 2022.

14.    Exhibit O attached hereto is a true and correct copy of a report from the Missouri Ethics Commission showing that a Charles Johnson in Conroe, Texas 77384 donated $264.12 to the Unsicker for Missouri committee.

15.    Exhibit P attached hereto is a true and correct copy of the order granting Hal Lambert and Point Bridge Capital's motion to dismiss the lawsuit that Charles Johnson for, among other things, lack of personal jurisdiction in the matter 1:23-cv-01485, E.D. Va., dkt. 8, entered on April 2, 2024.

16.    Exhibit Q attached hereto is a true and correct copy of the order granting Hal Lambert and Point Bridge Capital's second motion to dismiss the lawsuit that Charles Johnson for, among other things, lack of personal jurisdiction in the matter 1:23-cv-01485, E.D. Va., entered on September 17, 2024.

My name is Will Thompson, my date of birth is November 20, 1982, and my address is 3100 McKinnon St, Suite 1125, Dallas, TX 75201, and USA. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on the 23rd day of August 2024.


                                        ___*/s/ Will Thompson*_____
                                                Will Thompson

4

# Exhibit A

 An official website of the United States government

Here's how you know

This site is in beta, visit FEC.gov                    An official website of the United States Government 

 **Federal Election Commission**
U N I T E D   S T A T E S   — o f —   A M E R I C A

Home [/]  ›  Campaign finance data  ›  Browse data  ›  Individual contributions

# Individual contributions

Viewing  **9**  filtered results for:     Reset filters

"Charles Johnson"        "77384"

| Contributor name | Recipient | State | Employer | Receipt date | Amount |
|---|---|---|---|---|---|
| JOHNSON, CHARLES | WHITEHOUSE FOR SENATE | TX | TRAITWELL | 09/22/2021 | $250.00 |
| JOHNSON, CHARLES | ALEXANDRIA OCASIO-CORTEZ FOR CONGRESS | TX | TRAITWELL | 09/22/2021 | $250.00 |
| JOHNSON, CHARLES | ANNA PAULINA LUNA FOR CONGRESS | TX | SELF | 08/14/2020 | $500.00 |
| JOHNSON, CHARLES CARLISLE | CONSERVATIVE CATTLEMAN'S POLITICAL ACTION COMMITTEE | TX | STEALTH STARTUP | 03/02/2020 | $5,000.00 |
| JOHNSON, CHARLES CARLISLE | THOMAS MASSIE FOR CONGRESS | TX | STEALTH STARTUP | 02/06/2020 | $2,800.00 |
| JOHNSON, CHARLES CARLISLE | CLINT MORGAN FOR CONGRESS | TX | STEALTH STARTUP | 11/27/2019 | $2,800.00 |
| JOHNSON, CHARLES | KING FOR CONGRESS | TX | SELF | 09/25/2019 | $2,800.00 |

| Contributor name | Recipient | State | Employer | Receipt date | Amount | |
|---|---|---|---|---|---|---|
| JOHNSON, CHARLES | KOBACH FOR SENATE | TX | SELF | 09/15/2019 | $2,800.00 | |
| JOHNSON, CHARLES | KOBACH FOR SENATE | TX | SELF | 09/15/2019 | $2,800.00 | |

Results per page: 30

Showing 1 to 9 of 9 entries

# Exhibit B

Case 4:25-cv-00179   Document 16-1   Filed on 01/16/26 in TXSD   Page 41 of 5
Case 4:25-cv-00179   Document 16-1   Filed on 01/16/26   Date Filed: 01/06/2026
Case 4:24-cv-00988-P   Document 28   Filed 12/23/24   Page 13 of 132   PageID 294

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:19-CV-01413-KOB |
| VERIZON CMP HOLDINGS, LLC, | ) | |
| HUFFPOST.COM, INC., and ANDY | ) | **JURY DEMANDED** |
| CAMPBELL, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S ORIGINAL COMPLAINT

---

COMES NOW, CHARLES JOHNSON ("***Johnson***") and hereby asserts his Original Complaint against Defendants VERIZON CMP HOLDINGS, LLC ("***Verizon Media***"), HUFFPOST.COM, INC. ("***Huffpost***"), and ANDY CAMPBELL ("***Campbell***" and, together with Verizon Media and Huffpost, the ***"Defendants"***) and would respectfully show the Court as follows:

## I.    PARTIES

1.    Plaintiff Johnson is a natural person and is domiciled in Montgomery County, Texas. He may be served through the undersigned counsel of record.

2.    Defendant Verizon Media is a Delaware limited liability company. It is wholly owned by Verizon Communications, Inc., which is a Delaware corporation with its principal place of business in New York. It may be served with process through its registered agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201-3136.

3.      Defendant Huffpost is a Delaware corporation with its principal place of business located at 770 Broadway, New York, New York.  It may be served with process through the Texas Secretary of State at that address.

4.      Defendant Campbell is a natural person and is domiciled in New York.  He may be served with process at his place of employment at 770 Broadway, New York, New York through the Texas Secretary of State.

## II.      JURISDICTION AND VENUE

5.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties and the amount in controversy exceeds $75,000.00 for all claims pleaded by Plaintiff.

6.      This Court has personal jurisdiction over the Defendants because, at the time the Article was published and the causes of action herein accrued, Johnson resided in Texas and the tort complained of herein was committed in whole or in part in Texas.  Moreover, Defendant Verizon Media is subject to the general jurisdiction of Texas courts because it has systematic and continuing contacts with Texas because it maintains offices in Texas and transactions substantial business in Texas.  Finally, Defendant Huffpost is subject to the general jurisdiction of Texas courts because it has systematic and continuing contacts with Texas by procuring subscriptions to its publication in Texas and delivering said subscriptions in Texas.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events giving rise to the causes of action occurred in this District and the Defendants are subject to the Court's personal jurisdiction in this District.

2

## III.   FACTS

1.      The framers of the Constitution wanted to ensure that the First Amendment would protect a free press so that no state action could ever inhibit or limit the free dissemination of information to the people of the Republic for which the Constitution stands.  It is a noble ambition that is distinctively American and sets the standard for the rest of the world.

2.      But the First Amendment does not just protect a free press – it also protects the freedom of speech of every American, whether or not they have access to the power of the mainstream media to trumpet their views.  Ironically, however, state action is not the greatest contemporary threat to free speech.  It is rather the "free press".

3.      This is because publicly stating a fact or giving an opinion must be self-censored to ensure that one does not risk being labeled by the press with a loathsome term that brings with it stigma and ostracization that could result in losing a career, public scorn and humiliation, and even the risk of physical harm.  Once these labels are given—in this digital age—they are permanent and scar a reputation for indefinite duration with a simple internet search.

4.      For many years, there were few of these loathsome labels that Americans dreaded more than "racist".  However, new terms have arisen that carry an equally chilling effect on free speech and equally devastating assault on one's reputation.

5.      The terms "white nationalist", "holocaust denier", and "white supremacist" are the new buzz terms used to describe a myriad of person on the political right who may have views that diverge from mainstream politics.  While there are some who truly espouse view of a "whites only" nation, view whites as superior, or who truly deny that atrocities were committed against Jewish people during the Second World War, these terms are often misapplied to persons who not only reject such views but, in fact, abhor those beliefs.

3

Case: 25-11393   Document: 16-1   Page: 44   Date Filed: 01/06/2026
Case 4:25-cv-00179   Document 1-1   Filed on 03/16/20 in TXSD   Page 4 of 5
Case 4:24-cv-00988-P   Document 28   Filed 12/23/24   Page 16 of 132   PageID 297

6.      Plaintiff Charles Johnson is one such person.  Johnson is undeniably involved with conservative political causes.  He absolutely believes that there was a systematic campaign to commit atrocities against Jewish people during the Second World War.  He absolutely does not believe that America should be a nation only for white people.  Nor does he believe that white people are "superior" to other races of human beings.  In fact, he has a child who is non-white.

7.      Nevertheless, on February 17, 2019, the notoriously left-leaning *The Huffington Post* ran a hit job on Johnson, with a headline that read "2 GOP Lawmakers Host Chuck Johnson, Holocaust-Denying White Nationalist" (the "***Article***").  *See* https://www.huffpost.com/entry/gop-reps-host-chuck-johnson-holocaust-denying-white-nationalist_n_5c40944be4b0a8dbe16e670a.

8.      The Article went on to suggest that Johnson was a white supremacist and claimed that Johnson was "widely known" as a white nationalist.  It also suggested that Johnson was anti-Semitic.

9.      The Article was authored by Campbell and published by Campbell, Verizon Media, and Huffpost.

10.      As a result of these false statements of fact of and concerning Johnson, his reputation has been damaged and he has suffered actual damages and reputational injury in excess of $1,000,000.00.

## IV.   CAUSES OF ACTION

### COUNT I

#### Libel

11.      Plaintiff realleges all of the preceding allegations as if fully stated herein.

12.      Defendants published false statements of fact of and concerning Plaintiff. Defendants acted with negligence as well as actual malice and/or reckless disregard for the truth

the false statements of fact.  Alternatively, Defendants are strictly liable for the defamatory Article.

The false statements of fact were defamatory of Plaintiff and caused reputational injury.  The false

statements also caused Plaintiff actual damages and mental anguish.

13.     Plaintiff further seeks exemplary damages because Defendants' actions were

committed with actual malice and/or reckless disregard for the truth.

14.     All conditions precedent to Plaintiff's ability to maintain this suit have occurred.

## V.      JURY DEMAND

Plaintiff demands a trial by jury.

## VI.     PRAYER FOR RELIEF

Such other and further relief as the Court may deem just and proper.


Respectfully submitted,

CAMARA & SIBLEY LLP


/s/ Joseph D. Sibley_____
Joseph D. Sibley
State Bar No. 24047203
sibley@camarasibley.com
Camara & Sibley LLP
4400 Post Oak Pkwy.
Suite 2700
Houston, Texas 77027
Telephone: (713) 966-6789
Fax: (713) 583-1131

**ATTORNEYS FOR PLAINTIFF**

# Exhibit C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CHARLES JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:20-cv-00179 |
| THEHUFFINGTONPOST.COM, INC.,, | ) | |
| | ) | **JURY DEMANDED** |
| Defendants. | ) | |
| | ) | |
| | ) | |

---

## PLAINTIFF'S FIRST AMENDED COMPLAINT

---

COMES NOW, CHARLES JOHNSON ("***Johnson***" or "***Plaintiff***")  and hereby asserts his

First Amended Complaint against Defendant THEHUFFINGTONPOST.COM, INC. ("***Huffpost***"

or "***Defendant***")[1] and would respectfully show the Court as follows:

## I.    PARTIES

1.    Plaintiff Johnson is a natural person and is domiciled in Montgomery County,

Texas.  He may be served through the undersigned counsel of record.

2.    Defendant Huffpost is a Delaware corporation with its principal place of business

located at 770 Broadway, New York, New York.  It may be served with process through the Texas

Secretary of State at that address and has previously appeared in this case through counsel.

---

[1] The Defendant was previously misnamed as "HuffPost.com, Inc." in Plaintiff's Original Complaint.  In addition, former Defendants Verizon CMP Holdings, LLC and Andy Campbell were dismissed by stipulation.

## II.   JURISDICTION AND VENUE

3.      This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332.  There is complete diversity between the parties and the amount in controversy exceeds $75,000.00 for all claims pleaded by Plaintiff.

4.      Defendant regularly conducted its online publishing and other business through its website in Texas through www.HuffPost.com (the "***Website***") and derives substantial revenue from its subscription, sales, and advertising by servicing the Texas market through the Website and the Article complained of herein was published on the same Website.  Moreover, by publishing "news" stories on its Website, Defendant attracts subscribers, advertisers, and customers who purchase merchandise and services.  Defendant offers paid subscriptions to Texas residents and tracks the location and activities of Texas residents on the Website thereby enabling targeted advertising to Texas residents that generate substantial revenue for Defendant.  Defendant sells merchandise and services on the Website to Texas residents and generates substantial profits from these sales.  Defendant has actually entered into contracts for subscriptions to its online subscription services with Texas residents through its Website.  Defendant has actually entered into contracts with advertisers in Texas to advertise on its Website and/or ran advertisements on its Website geared to the Texas market.  Defendant has actually sold merchandise and services through its Website to Texas residents.  These are sufficient minimum contacts with Texas from which the conduct complained of arises because the article was published on the same Website the HuffPost offers and obtains paid subscriptions to Texas residents, targets paid advertising toward Texas residents, and offers and sells merchandise and services to Texas residents.  Based on this conduct, Defendant has purposefully availed itself of the privileges of doing business in Texas

App. 048

through online publishing, marketing, and sales to Texas residents and to exercise jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice.

5.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events giving rise to the causes of action occurred in this District and the Defendants are subject to the Court's personal jurisdiction in this District.

## III.  FACTS

1.      The framers of the Constitution wanted to ensure that the First Amendment would protect a free press so that no state action could ever inhibit or limit the free dissemination of information to the people of the Republic for which the Constitution stands.  It is a noble ambition that is distinctively American and sets the standard for the rest of the world.

2.      But the First Amendment does not just protect a free press – it also protects the freedom of speech of every American, whether or not they have access to the power of the mainstream media to trumpet their views.  Ironically, however, state action is not the greatest contemporary threat to free speech.  It is rather the "free press".

3.      This is because publicly stating a fact or giving an opinion must be self-censored to ensure that one does not risk being labeled by the press with a loathsome term that brings with it stigma and ostracization that could result in losing a career, public scorn and humiliation, and even the risk of physical harm.  Once these labels are given—in this digital age—they are permanent and scar a reputation for indefinite duration with a simple internet search.

4.      For many years, there were few of these loathsome labels that Americans dreaded more than "racist" or a similar term.  However, new terms have arisen that carry an equally chilling effect on free speech and equally devastating assault on one's reputation.

3

5.     The terms "white nationalist", "Holocaust denier", and "white supremacist" are the new buzz terms used to describe a myriad of person on the political right who may have views that diverge from mainstream politics.  While there are some who truly espouse view of a "whites only" nation, view whites as superior, or who truly deny that atrocities were committed against Jewish people during the Second World War, these terms are often misapplied to persons who not only reject such views but, in fact, abhor those beliefs.

6.     Plaintiff Charles Johnson is one such person.  Johnson is admittedly involved with conservative political causes.  He also absolutely believes that there was a systematic campaign to commit atrocities against Jewish people during the Second World War.  He absolutely does not believe that America should be a nation only for white people.  Nor does he believe that white people are "superior" to other races of human beings.  In fact, he has a child who is non-white.  He does not promote genocide or promote DNA sequencing or genetic research for the purpose of harming non-whites or Jews.

7.     Nevertheless, on February 17, 2019, the notoriously left-leaning *The Huffington Post* , by and through its reporters, editors, and agents, ran a hit job on Johnson, published on Defendant's website www.HuffPost.com, with a headline that read "2 GOP Lawmakers Host Chuck   Johnson,   Holocaust-Denying   White   Nationalist"   (the   "***Article***").   *See* https://www.huffpost.com/entry/gop-reps-host-chuck-johnson-holocaust-denying-white-nationalist_n_5c40944be4b0a8dbe16e670a.  The Article was published by Defendant HuffPost on its website www.HuffPost.com.

8.     The Article discusses attempts by Johnson and other persons that Article describes as white supremacists, white nationalists, Neo-Nazis, anti-Semites, and Holocaust deniers to utilize DNA sequencing and genetics to effectuate their agendas.  Although there are some statements

4

made in the Article that are attributed to third-party sources, Johnson does not complain regarding the truth or falsity of those statements, although they are relevant in ascertaining the overall gists of the Article.

9.      Specifically, the Article makes the following factual claims without attributing the claims to any third-party sources:

> Two Republican congressmen met with noted Holocaust denier and white nationalist Chuck Johnson to discuss "DNA sequencing," less than a day after the House voted to disavow white supremacy and white nationalism[.]

> [Johnson] also questions how many Jewish people were killed in the Holocaust, ran a crowdfunding site for white supremacists and neo-Nazis, said "anti-racist is anti-white," was kicked off Twitter for threatening to "take out" a Black Lives Matter activist and suggested an Amtrak crash was caused by the engineer's sexuality.

10.     These statements (which Johnson denies the truth of), read in light of and in juxtaposition to the headline that calls Johnson a "Holocaust-Denying White Nationalist", clearly make the factual truth claim that Johnson is a white supremacist, a white nationalist, a Neo-Nazi, anti-Semitic, and a Holocaust denier that threatens violence against non-whites and Jews and financially supports white supremacists and Nazis. This is false. Moreover, these statements, the headline, the overall gist, tone, tenor, surrounding circumstances of the Article of the whole, and the juxtaposition of the statements therein create the specific defamatory gist by implication and innuendo that Johnson (in furtherance of his evil beliefs) is involved in some type of scheme—either individually, or together with other white supremacists, white nationalists, Neo-Nazis, anti-Semites, and Holocaust deniers, or both—to use DNA and genetic sequencing to do harm to non-whites and/or Jews in ways that include, but are not limited to, influencing legislators. A reasonable reader could further conclude that the Article suggests that machinations of state-sponsored "genocide" against non-whites and/or Jews are being orchestrated by a bona fide Nazi and white supremacist – Charles Johnson.

5

11.     These are not matters of opinion – these are verifiable truth claims that Johnson is involved in attempts to utilize DNA sequencing to do harm to non-whites and/or Jews.  This is sensationalized by the Article's alarmist tone that other white supremacists, white nationalists, Neo-Nazis, anti-Semites, and Holocaust deniers have become "obsessed with genetics".  This is completely false and Johnson's meeting with legislators had nothing to do with non-whites or Jews or the DNA or genetics of those people groups.  There was no plot for genocide against non-whites and/or Jews or utilization of DNA or genetic technology to their detriment.  The ridiculous impression created by the Article is maliciously false and is the result of the purposeful omission by the Defendant of facts that, if disclosed, would have made clear that Johnson's meeting with the lawmakers had nothing to do with white supremacy, white nationalism, anti-Semitism, Holocaust denial, or the DNA or genetics of non-white and/or Jewish people.

12.     In fact, it was not until the Article that there was any "controversy" surrounding Johnson's involvement with DNA sequencing, genetics, or meetings with the legislators at issue in the Article.  Nothing was brought to the public fore until the Article.  Johnson does not have a pervasive fame or notoriety or even a limited fame or notoriety on right-wing causes.  This is disclosed by the Article itself which repeatedly recites that the prominent figures discussed in the Article were *unaware* of any supposed controversies surrounding Johnson or his viewpoints.

13.     HuffPost, by and through its agents, acted with actual malice and/or reckless disregard for the truth of these factual assertions, gists, and innuendo in the following ways:

a.  Defendant failed to contact Johnson prior to publication to verify the factual claims.  This is because Defendant's notoriously left-leaning political agenda caused it to turn a blind eye to the truth of the fact claims made and be willfully ignorant to the truth of the fact claims made.

6

b.   Defendant made no attempt to investigate or disclose what was discussed in Johnson's meeting with legislators, made no attempt to confirm whether white supremacist or anti-Semitic ideas were discussed in the meeting, and made no attempt to determine whether the DNA sequencing at issue were in relation to race or ethnicity as falsely suggested by the Article.

c.   Defendant had an injurious motive toward Johnson to reach the false conclusions as evidence by Defendant's repeated attacks on supporters of right-wing or Republican political causes and, more specifically, on Johnson individually.

d.   Defendant has, in essence, admitted its error, negligence, and actual malice by, on January 24, 2020, publishing the following clarification of the Article:

> UPDATE: Jan. 24, 2020 — A year after publication, Johnson's lawyers sent HuffPost a letter in which they assert Johnson "believes that there was a systematic campaign to commit atrocities against Jewish people during the Second World War, that he believes that America should not be a nation only for white people, that he does not believe that white people are 'superior' to other races of human beings, and that he is not anti-Semitic."

14.   These facts demonstrate that Defendant did not exercise elementary journalistic ethics and guidelines by contacting Plaintiff prior to publication, did not otherwise verify the false gist of the Article, and had an injurious motive that caused it to turn a blind eye to the truth.  Only with a threat of a lawsuit did Defendant partially correct its defamatory gist.

15.   As a result of these malicious false statements of fact of and concerning Johnson, his reputation has been damaged and he has suffered actual damages and reputational injury in excess of $1,000,000.00.

## IV.   CAUSES OF ACTION

### COUNT I

### Libel (*per se* and *per quod*)

16.   Plaintiff realleges all of the preceding allegations as if fully stated herein.

17.     Defendant published false statements of fact of and concerning Plaintiff, who is not a general purpose or limited purpose public figure.  Defendant acted with negligence as well as actual malice and/or reckless disregard for the truth the false statements of fact.  Alternatively, Defendant is strictly liable for the defamatory Article.  The false statements of fact were defamatory of Plaintiff and caused reputational injury *per se* because they injured Plaintiff in his occupation.  The false statements also caused Plaintiff actual damages and mental anguish.

18.     Plaintiff further seeks exemplary damages because Defendant's actions were committed with actual malice and/or reckless disregard for the truth.

19.     Defendant is vicariously liable for the actions of its reporters, editors, and other agents that contributed to the libelous conduct.

20.     All conditions precedent to Plaintiff's ability to maintain this suit have occurred.

## V.     JURY DEMAND

Plaintiff demands a trial by jury.

## VI.     PRAYER FOR RELIEF

Such other and further relief as the Court may deem just and proper.

Respectfully submitted,

CAMARA & SIBLEY LLP

/s/ Joseph D. Sibley_____
Joseph D. Sibley
State Bar No. 24047203
sibley@camarasibley.com
Camara & Sibley LLP

8

4400 Post Oak Pkwy.
Suite 2700
Houston, Texas 77027
Telephone: (713) 966-6789
Fax: (713) 583-1131

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been filed on this 9th day of April, 2020,

pursuant to the electronic filing requirements of the United States District Court for the Southern

District of Texas, which provide for service on counsel of record in accordance with the electronic

filing protocols in place.

_/s/ Joseph D. Sibley_
Joseph D. Sibley

9

# Exhibit D

# Why I Am Suing BuzzFeed's Ryan Mac For Libel Over Peter Thiel Story

It's important for fake journalists to be exposed for the frauds they are so real journalists might thrive.



**CHARLES JOHNSON**
SEP 12, 2020

♡ 6       💬 3       🔁                                                                    Sha

Once upon a time I thought I might be a journalist but I have put aside the childish notion that people actually care about what's true.

When I was younger and dumber I set about winning every award that the professio offered. And I won them. One after another, award ceremony after award ceremony Why did I do that? Well, I thought prestige could make me feel whole but like a lot things we chase when we are young, I made a lot of mistakes in focus.

I broke real stories and was even profiled by its leading lights. I met 'em all — Rupe Murdoch, David Carr, Roger Ailes, Tucker Carlson, Andrew Breitbart, Conrad Blac to name drop a few. I became friendly with billionaires and congressmen, ambassac and foreign diplomats.

I was that wunderkind but now I am neither a wunder nor a kind. And whiz kid bot lives—and sound—a lot better than whiz man. There is white in my red beard now aches in body parts which I didn't even know could ache.

What drove me from the profession? Nastiness — and poverty. I got attacked, lied about, and threatened by lesser talents. I learned that the way to live a full life is to a quiet life. I discovered what all public people who take positions do: ***They will atta your family to get to you.*** And you will lose for the same reason that the many can

destroy the few: there are more of them and they won't fight fair. *The truth will only s*
*you free if you're allowed to tell it. And the truth will only set YOU free, not your audience.*
Your audience can just easily become a mob. When you're allowed to tell the truth y
won't want to. You'll prefer instead to just move on and spend your efforts on
something beautiful instead, something that matters, something personal.

The media and social media have a cardinal sin: their business model. Engagement
enragement. They [need sacrifices and repetitional destruction](). This is how they ma
bucks and why they give zero fucks if they hurt anyone. They are in the business of
telling you who is a hero and who is a villain and there is no appeal except possibly
a jury of your peers.

The corporate press is designed and optimized to sell advertising and not to tell you
the truth. At its most frivolous, it produces empty calories. At its worst it needs
witches to feed itself. Only a witch would say that they weren't a witch, don't you
know. Let's drag him on Twitter where he can't respond. Seems fair!

Never mind that what I wrote all those years ago on Twitter isn't even controversial
but prophetic: I pointed how #BlackLivesMatter was interested in spreading lies ab
police shootings to justify riots and destruction. Yes, I pointed that out *five years ago*
You, too, can predict that social media censorship will become one of the biggest
issues. But you will be dismissed as crazy. That is, before, you are proven correct an
not acknowledged. Like [Cassandra]() you will suffer if you predict the future and no o
listens. Like [Semmelweis]() you will be ignored even when you have the cure.

An editor at Vanity Fair once put it to me simply: **journalism is simply about the**
**journalist's next job**. If in the process of getting a better job they can help you they
will; if they need to hurt you, well, they'll do that, too.

It won't matter if you win lawsuits against them. I won [high six figure settlement]() fr
Gawker, which was, in point of fact, [a laundry service for Russian intelligence](). Inde
the same billionaire who bankrolled Gawker's legal bills is now barred under [the ve]()

bipartisan Russian sanctions passed under President Trump. Are we not supposed pay attention Gawker founder Nick Denton's sojourn to Switzerland — where said Russian billionaire lives — after he was bankrupted by Hulk Hogan, Peter Thiel and yours truly?

Perhaps you will learn how much the journalist world and the intelligence world an the technology world are really just about one thing: power, at any price and at all costs. You can donate to Jewish organizations, be supported by Jewish leaders, back Jewish candidates, do business with Jews, have Jewish friends, even a Jewish girlfriend. None of it matters when the journalists will just lie about you. They will unperson you. And you are supposed to accept it, as if they, not you, are the author your fate. They'll call you a "troll," lie about you "shitting on the floor" because the think it's funny to hurt your reputation. These aren't good people and someone nee to hold them account.

Logic fails when you confront this sort of hatred. If I am a hater of the Jews, which am not, I'm apparently pretty bad at it, backing the most pro-Jewish president ever. provide my bona fides: Do I have to go back in time and kill Baby Hitler? Or will a second circumcision do? Somehow I feel as if nothing I can do save bring lawsuits change the behavior of fake journalists. Engaging them is enriching them and more importantly, pretending that they deserve respect. They need to be punished. But he

You can sue discredited publications. In most cases they'll settle before it gets to co These victories are fun but you never get the satisfaction of your day in court. In oth cases you take them to court with the money you won from the previous settlement On and on, we go! This is the work. This is the fate I have. OK then.

The fake journalists are getting desperate while their business models fall apart. Fo some, this collapse coincides with their own lives falling apart. For others they neve had their lives quite together in the first place. For others they live off of rich paren or spouses, especially the ones who lust after the prestige game. You can't eat presti buy a house with it, or pay your kid's school fees.

So they turn to envy and resentment, especially of the rich. Some of these fake journalists develop behaviors that can only be described as stalking. They call it a "beat" as if they were going to beat you.

This is what is happening at BuzzFeed where even their editor departs for a job at t New York Times. This time, Ben Smith is smearing other prophets but not before publishing the discredited dossier at BuzzFeed. I was to learn fake journalists fail u especially if they "report" whatever their establishment sources tell them. This is brutal, ugly, gross stuff.

I really resisted the temptation to sue the media but enough is enough.

At the request of family and friends and my medical travails — I was losing my sigh — I chose a few years ago to live a quieter life—to avoid participation in public affa except when duty and necessity requires it. I don't have many of the views in my thirties I had in my twenties. This is called personal growth.

There are no profiles anymore. I seek to live a quiet life and do what I can for my country and my family, just as I always have. As a canceled person I have more or le accepted that the public conversation isn't for nerds like me. Not when there are people hunting us for sport. I chose to spend my time around the great, beautiful, noble.

Some days I wonder if backing Trump was worth it and then I remember why I supported him. No, it wasn't because I believed he'd usher in some sort of white nationalist Xanadu. I backed Donald Trump because I believed him when he said h bring peace to the world and that he would end wars rather than begin them. In tha crucial task he has not fallen down.

A lot has happened to the country and to me since I helped elect Trump president against all odds. I had a child, divorced, and moved to the one place where I felt

12/22/24, 9:06 PM     Case: 25-11393     Document 16-1     Page: 61     Date Filed: 01/06/2026
why i am suing BuzzFeed's Ryan Mac For Defamation - Charles Johnson

Case 4:24-cv-00988-P     Document 28     Filed 12/23/24     Page 33 of 132     PageID 314

happiest as a child — Texas, specifically Montgomery County, the most pro-Trump
county in America.

Like a lot of people with nothing to lose and nowhere else to go I found my home a
my people, at last. My neighbors have taught me that we Texans don't run from a fig
Not at the Alamo. Not now. Texas, like America, is a [state of mind](#).

I fight now because the lies have set from muck to concrete and because I am no
longer fighting just for myself. I am fighting for America, for a responsible press, fo
the First Amendment. I am fighting for my friends and family and for the sort of
country I want my daughter to grow up in.

I always give my opponents an opportunity to do the right thing. I have repeatedly
informed BuzzFeed to leave me alone if they cannot get basic facts about me correc
They have continued so now we have to escalate it.

This stalking began in 2017 when Mac [falsely reported in Forbes](#) that I threatened a
Black Lives Matter activist. I did no such thing and what's more no one at Twitter
knows why I was suspended from Twitter. (For what it's worth: This lack of knowle
includes the CEO of Twitter, Jack Dorsey, who I have talked to about my suspensio

In [yesterday's article](#) on Peter Thiel dinner guests — really — BuzzFeed libels me y
again, claiming I am a Holocaust denier. I am not, nor have ever been, nor do credil
Jewish organizations like the Simon Wiesenthal Center believe me to be one.

Make no mistake this attack on Peter Thiel was a long time coming after Thiel and
backed Trump in 2016.

But it's also an attack on American security, something we ought to take very
seriously. It's also sadly not Mac's first such attempt. Publications which repeatedly
behave without regard to the facts need to be shut down, especially if they endange
public safety and lack a business model. If the fake press can controversialize or sm

entrepreneurs and investors they'll deter investment and attention in the key areas essential for American safety and prosperity.

Most recently Mac worked with criminal hackers to smear Clearview, a facial recognition, which has been instrumental in rescuing children from pedophiles. Th is no moral difference — and perhaps no legal difference — between Julian Assang publishing stolen information and BuzzFeed doxxing Clearview's customers in an attempt to intimidate them away from using that technology.

First Mac falsely claimed that Clearview's technology doesn't work and that it was lying about its number of users. In fact the technology works so well that it's all the rage among law enforcement officers.

Mac also doesn't behave like a normal journalist. He has disrespected off the record comments with Elon Musk, comments which led Musk to be sued. He skirted by having to be deposed in that case but Musk rightly called him a "fucking asshole."

I have a different term for Mac: reputational arsonist.

Mac is busy setting fires again. He attacks me professionally and calls me a "notori far right troll," whatever that is. I am an investor and entrepreneur.

This time I am attacked in a driveby, set to coincide with Thiel's comments on Palantir, a company working to secure American liberty, ahead of its initial public offering.

(Full disclosure: I am not an investor but an admirer of Palantir. Peter and I haven't spoken in months. We do not agree on much — I support the President but those disagreements are private — just as the dinner parties he and I have had over the years. I won't litigate them here or anywhere.)

At no point did Ryan Mac or Rosie Gray reach out to me or my attorneys for comme This is odd as both of them have contact information for my attorneys Ron Colema

12/22/24, 9:06 PM          Case: 25-11393          Document 16-1          Page: 63          Date Filed: 01/06/2026
Why I am Suing BuzzFeed's Ryan Mac For Defamation - Unz Review

Case 4:24-cv-00988-P          Document 28          Filed 12/23/24          Page 35 of 132          PageID 316

and Joe Sibley which I have given to both of them many times. This is how I know i
was malicious.

Gray did once reach out to on the Holocaust denial matter. She was rebuked by Ron
Here's what Ron said and which Gray included.

> Johnson's lawyer described the issue of anti-Semitism as "a red herring and
> defamatory." Coleman said Johnson isn't a Holocaust denier and has "warm and
> mutually respectful relationships with Jews, including activists on Jewish issues
> innumerable Jews from Holocaust survivor families." Johnson, the lawyer said,
> expressed regret over missing the Irving dinner "out of respect for friends who h
> invited him, a common courtesy," and described Irving's work as "multifaceted."

Do you really think I would work so hard to help find work for an Orthodox Jewish
attorney if I hated Jews? Go and ask Ron Coleman. Or any of the other Jews who kr
me and love me.

My other attorney, Joe Sibley, forced Mac to print a correction in yet another article
about my views. I shouldn't have to keep doing this.

Mac has also wrongly stated that I attended the Inauguration in 2017. In fact I was
celebrating the birth of my daughter.

The journalistic lack of standards continue emerge quickly.

- In one case BuzzFeed claims I introduced Peter Thiel to FCC chairman, Ajit Pa
  have never met Pai and could not place him. I have told Ryan Mac this before,
  many times. I simply do not know Pai. I have zero interest in the
  telecommunications industry. It seems too boring.

- In still another BuzzFeed credits reporting of Joe Bernstein but Bernstein hasn
  worked at BuzzFeed in over a year and told me he doesn't deserve the credit.

- In yet another case they rely on a source who I fired for getting a story wrong which culminated in bankrupting a website. This is, by the way, after I paid all the legal bills and the settlement associated with her mistake. Since then I have realized how important it is for journalism to be undertaken with care, attention to detail. We have too many fake journalistic outlets. These outlets do violence the real journalists among us.

Real journalists present both sides. They have a sense of perspective. They don't pri malicious lies.

I'd prefer we have more real journalists and I'm very interested in funding and help them. Those journalists who've worked with me at the Wall Street Journal, New Yo Times, and elsewhere know that they have my total respect. I support efforts to rest the cannibalization of the music and news business by the tech companies. I suppo everything we can do to make these serious journalists better off.

I am fundamentally opposed to hatred masquerading as journalism, to witch hunts faking being investigations.

If I am going to be treated as witch when I am not a witch I am going to have to lea how to start casting spells — and filing lawsuits. They may yet burn me alive but they'll have to work for it.

After all I am already in [one lawsuit with the Huffington Post](). Why not another wit BuzzFeed?

Charles Johnson,

charlescarlislejohnson@gmail.com

September 12, 2020

 **6 Likes**

## Discussion about this post

Comments | Restacks

Write a comment...

**Dwight Sauter** Sep 13, 2020

Charles Johnson, thank you for the backstory. This explains so much about the person and motiv
behind the Steel Dossier. So much has been put into perspective. I'm sharing this.

♡ LIKE     💬 REPLY     ⬆ SHARE

**Battle Boy** Sep 13, 2020

My god, in true journalist fashion, you never get to the point in a direct way. Lost interest after th
paragraph while you were whining about your career and patting yourself on the back.

♡ LIKE     💬 REPLY     ⬆ SHARE

**1 more comment...**

© 2024 Charles Johnson · Privacy · Terms · Collection notice

Substack is the home for great culture

# Exhibit E



# Exhibit F

12/22/24, 9:09 PM

Case: 25-11393 Document: 16-1 Page: 60 Date Filed: 01/06/2026

(1) Charles Johnson's Thoughts & Adventures on X: "I am currently CEO of @traitwell and I have backing to purchase it." / X

Case 4:24-cv-00988-P        Document 28        Filed 12/23/24        Page 41 of 132        PageID 322

𝕏

| | |
|---|---|
| 🏠 | Home |
| 🔍 | Explore |
| 🔔 | Notifications |
| ✉️ | Messages |
| | Grok |
| 👥 | Communities |
| 𝕏 | Premium |
| 👤 | Profile |
| ⚫ | More |

Post

🔍 Search

**Charles Johnson's Thoughts & Adventures** @JohnsonThought1 · Dec 11 ···
I have sent an email to $me CEO @annewoj23 offering to purchase 23&me.

Not a joke.

🇺🇸

💬 17      🔁 12      ♡ 172      📊 86K      🔖      ⬆️

**Charles Johnson's Thoughts & Adventures** @JohnsonThought1 · Dec 11 ···
I'll update accordingly and release the email if I don't hear back from her.

💬 3      🔁 1      ♡ 24      📊 4.3K      🔖      ⬆️

← Post

I'm currently CEO of @traitwell and I have backing to purchase it.

4:05 PM · Dec 11, 2024 · **8,277** Views

💬 3      🔁 1      ♡ 30      🔖 2      ⬆️

Post your reply                                              Reply

**Charles Johnson's Thoughts & Adventures** @JohnsonThought1 · Dec 11 ···
This @traitwell post gives you a sense of how we're bringing AI to genomics.
charlesjohnson.substack.com/p/beadle-ai-fo…

💬 1      🔁 1      ♡ 8      📊 6.2K      🔖      ⬆️

**NPC** 🤖 @NPC012345678910 · Dec 12 ···
Not even 600 followers 😭😭😭 tears mate

💬      🔁      ♡ 1      📊 26      🔖      ⬆️

**J Rapp** @1takeitzjake · Dec 12 ···
those backers must have deep pockets cause $me reported having 126M cash at of end of Q3

💬      🔁      ♡      📊 123      🔖      ⬆️

**Relevant peo**

**Charles Joh**
@JohnsonTh
Subscribe to
for the realm
Traitwell.co
DMs open. (

**What's happe**

Bucc
LIVE

Trending in United Sta
**Guatemala**
75.3K posts

American actors · Tren
**#VeryScaryPeople**
3,153 posts

Politics · Trending
**Greenland**
Trending with Panam
14.9K posts

Show more

Terms of Service    Priv
Accessibility    Ads inf

# Exhibit G

| Form 301 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $750 | <br>**Application for Registration of a Foreign For-Profit Corporation** | **Filed in the Office of the Secretary of State of Texas**<br>**Filing #: 803793109 10/12/2020**<br>**Document #: 1001236100002**<br>**Image Generated Electronically for Web Filing** |

1. The entity is a foreign for-profit corporation. The name of the entity is :

## Our Perfect Score, Inc.

2A. The name of the corporation in its jurisdiction of formation does not contain the word "corporation," "company," "incorporated," or "limited" (or an abbreviation thereof). The name of the corporation with the word or abbreviation which it elects to add for use in Texas is:

2B. If the corporate name is not available in Texas, then set forth the name under which the corporation will qualify and transact business in Texas:

## Traitwell, Inc.

3. Its federal employer identification number is: **852949243**

☐ Federal employer identification number is not available at this time.

4. It is incorporated under the laws of: **DELAWARE, USA** and the date of its formation in that jurisdiction is: **9/9/2020**

5. As of the date of filing, the undersigned certifies that the foreign corporation currently exists as a valid corporation under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the corporation that it proposes to pursue in the transaction of business in Texas are set forth below. The entity also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is organized.

## Our business sells DNA sequencing services, counseling services, and genomic apps.

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is: **10/13/2020**

8. The principal office address of the corporation is:

## 8301 New Trails Drive Suite 110, The Woodlands, TX, USA 77381

☐ 9A. The initial registered agent is an organization by the name of:

☑ 9B. The initial registered agent is an individual resident of the state whose name is:

## Dorothy    Morgan

☑ 9C. The business address of the registered agent and the registered office address is:

**3536 HWY6 #236    Sugar Land  TX  77478**

## Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

10. The corporation hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11. The name and address of each person on the board of directors is:

| | |
|---|---|
| Director 1: | **Dorothy    Morgan** |
| Address: | **3536 HWY 6 #236    Sugar Land  TX, USA  77478** |
| Director 2: | **Charles    Johnson** |
| Address: | **3720 College Park Drive   Apt 7206  Conroe  TX, USA  77384** |

## Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

## Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: **October 12, 2020**          **Dorothy Morgan**

Signature and title of authorized person on behalf of the foreign entity

**FILING OFFICE COPY**

# Exhibit H





Dorothy, Gavan, and Premkumar

Show all people highlights →

🟧 **PREMIUM**

**Insights on Traitwell** ❓

**Total employees**

Dec 2022    Jun 2023    Dec 2023    Jun 2024    Dec 2024

▼ **0%**
Total headcount growth
6 months

🕐 **3.4 years**
Median tenure

**Unlock more organization insights**

Access employee, hiring, and job opening insights with Premium

**Retry Premium Free**



About                  Accessibility       Talent Solutions      ❓ **Questions?**        Select Language

Professional          Careers             Marketing                Visit our Help          [English (English)]
Community                                 Solutions                Center.
Policies

Privacy & Terms       Ad Choices          Advertising           ⚙️ **Manage your
▾                                                                account and
                                                                 privacy**
Sales Solutions       Mobile              Small Business           Go to your Settings.

Safety Center                                                   🛡️ **Recommendation
                                                                 transparency**
                                                                 Learn more about
                                                                 Recommended
                                                                 Content.

LinkedIn Corporation © 2024

**Pages people also viewed**



**Pipio**
Software Development
11,640 followers

+ Follow

**Roc Search**
Staffing and Recruiting
172,496 followers

+ Follow

**DApp360 Workforce**
Blockchain Services
496 followers

+ Follow

https://www.linkedin.com/company/traitwell/

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 48 of 132    PageID 329



# Exhibit I

# The Artful Return of The Bushes?

Are Democrats taking back law & order from the Republicans? An assessment of Joe Biden's plans

 **CHARLES JOHNSON**
MAR 04, 2022



♡ 4          💬 4          ↻                                                                 Sha



The once and future natural aristocracy: George P. Bush and George H.W. Bush

*"I have said that Texas is a state of mind, but I think it is more than that. It is a mystique closely approximating a religion. And this is true to the extent that people either passionate love Texas or passionately hate it and, as in other religions, few people dare to inspect it for fear of losing their bearings in mystery or paradox. But I think there will be little quarrel with my feeling that Texas is one thing. For all its enormous range of space, climate, and physica appearance, and for all the internal squabbles, contentions, and strivings, Texas has a tight cohesiveness perhaps stronger than any other section of America. Rich, poor, Panhandle, G city, country, Texas is the obsession, the proper study, and the passionate possession of all Texans." — John Steinbeck*

I am a California and Massachusetts refugee really but I am also a Texas resident —
you have to be born a Texan as you are born a Hawaiian and you don't become one
simply by moving there — and I voted in the Republican Primary in early voting. (I
split my time between Northern Virginia, Southern California, and the Houston
suburbs and I was born and raised in the Boston area. I make the circuit between m
business and family ties.)

It was my first time voting in Texas and truthfully I had forgotten I was registered t
vote at all but my friend checked and sure enough, I had apparently filled out the
material and curiously enough I am a registered Republican. Who knew? Be careful
what forms you fill out kids. Did you know I'm also an organ donor? I sure didn't!
(How soon before we donate our DNA before we die?)

Today I identify mostly as an Independent. I really do try to back the candidate I th
is best — somebody has to — and I'll do that again come the general election.

So with that in mind I voted against Congressman Dan Crenshaw — who I will exp
in a subsequent post as a total compromised fraud — and for George P. Bush who w
be in a run off with Ken Paxton for Texas Attorney General. I don't know if there's
some sort of law of the universe that Johnsons back Bushes but here I was voting fo
him.

For what it's worth I suspect he's more of his grandfather's son than his father's. Jel
low energy we know well. I think he will very likely be president someday and I thir
he will use the office of Attorney General to do unto the tech companies what Tedd
Roosevelt did onto the trusts. In this way Bush is a true inheritor of the Roosevelt
mantle, unlike say, Attorney General turned U.S. Senator Josh Hawley who sued
Google when he was Missouri's attorney general.

I also voted for and backed my friend, Clint Morgan, who ran for Texas Criminal Co
of Appeals, and whose defeat against Abbott-backed but nonentity Scott Walker

makes me really wonder about the Republican Party's bona fides on law and order. (More of that, down below.)

When it comes to Paxton I confess that I like him a bit — I once took him out for dinner — but I do think that the mounting ethics and criminal charges he's facing disqualifying. Paxton is a little too mobbed up, I'm afraid, to be a serious figure in Texas politics. What's more I'm not a fan of people overstaying their welcome.

Paxton cultivated me pretty hard as a would be donor but he lost me when he asked for a bribe in his office over looking the state capitol. I demurred and I have since spoken to the FBI about it. Apparently I'm not alone and I'm reliably informed that Paxton will be indicted or arrested on federal corruption charges ahead of the runof May.

Paxton owes much of his successes to being on the same ticket at Greg Abbott who without a doubt one of the most cleverly crooked politicians I have ever encountere Whereas Abbott is clever and subtle Paxton is loutish and obvious. He was nearly defeated by a Democrat in 2018. When he attended a Republican Attorney General Association event he blew a bunch of money on clothes and nice things. It smacked desperation.

A good friend laid out how George P. Bush was going to ultimately win the GOP primary a year or so ago. His understanding of the hidden politics of Texas was nothing short of extraordinary. He told me that among the more powerful interest groups in Texas is the construction industry and with good reason. (Dallas and Houston metro areas come in No. 1 and No. 2 respectively for new real estate construction in the nation.)

Historically the construction industry backs the Republicans while the trial lawyers back the Democrats. The construction industry has fought with the trial lawyers an appears to have the upper hand. One of the architects of that battle was constructio magnate Richard Weekley of Texans for Lawsuit Reform who backed Eva Guzman t

the tune of millions of dollars. Weekley's support of Guzman was a defection from
Paxton who he likely knew wasn't going to make it. Weekley no doubt wanted to block
Bush from the office.

Texas has a lot of land which it will happily sell you very, very cheaply. Land and
natural resource extraction fund a lot of Texas's government as there is no state
income tax. The Trump tax bill made it impossible to deduct your state and local tax
against your federal taxes and so a lot of Americans picked up and moved to states
without income taxes. The coronavirus accelerated this trend with remote work.

Cheap housing makes it easier to have a large family so many people move from all
over the country to do just that. It also makes it easy to launder lots of dirty cash. Add
to that Texas's status as a border state and you have lots of people coming and going
looking for work and willing to work for cheap.

You aren't allowed to talk about how the construction industry is very much propped
up by the cartels or how a lack of zoning might make this more possible. You tend to
think of Miami for that sort of thing. There's a lot of Texas's economy that is propped
up by Latin Americans and others hiding out in the Houston and Dallas suburbs.

There is, a slight problem with the Texas dream — hurricanes — and the construction
industry likes its federal welfare money once a hurricane rolls through. George P. Bush
stood up to these cretins — what Bush called "liberal deadbeat mayors" — and saw to
it that the minimal amount of federal money was stolen by them. This was, I think, a
correct decision though it was deeply unpopular at the time. That's what leadership
looks like. It's long overdue.

Governor of Massachusetts Calvin Coolidge inspects the militia during the Boston Police Strike of 1919.

Are Democrats taking the issue of law and order from the GOP? That's the sort of question I find myself wrestling with and wondering about.

In my darker moments I wonder if the Republicans were ever really law and order, at least since Calvin Coolidge, who argued rightly that there was no right to strike against the common good. For what it's worth I favor this approach too and would extend it to all public sector workers.

It must be made honorable once more to be a cop and cops have to act honorably. Biden is right: we can keep our liberties and our safety. It's not a false choice. These are difficult things to keep straight but then statesmanship is an art not a science.

A very good friend of mine — Clint Morgan — is a prosecutor in Harris County. Boy does he have stories upon stories about all the criming going down in H-Town. Nev

forget that my adopted city gave the world the blessed martyr George Floyd, who li[l]
St. Paul, traveled the land with his gospel before meeting his untimely end.

Clint is the sort of person that makes you proud to be an American, having worked
way up from poverty in redneck Missouri to being one of the best prosecutors in
Texas. In the spirit of full disclosure I am a donor to Clint's campaign and I would [g]
him my kidney if he asked (though preferably after we exhausted all other options).

Indeed Morgan was altogether too qualified for the position. His lackluster oppone[nt]
Scott Walker, was not. He is an embarrassment who rarely shows up to write opinio[ns]
and he was endorsed by *The Houston Chronicle*. He won because Governor Abbott's
political machine backed him and for no other reason. As if to add insult to Abbott
appointed Walker's equally unimpressive son to a judgeship as well. Abbott backed
family Walker back in the days when Abbott and Perry fashioned themselves
reformers on criminal justice but really let out a whole bunch of criminals who are
plaguing our streets today. We live with that Koch- and Soros-backed insanity.

With 2024 in view, Abbott is now campaigning as Law & Order type. Spare us, Greg[.]
Abbott is a compromise candidate of the Chamber of Commerce and the mob but I
repeat myself. His biography includes the tell of having worked for Bracewell &
Giuliani way back when.

I am committed to ending his political career though I can't quite bring myself to v[ote]
for Beto. *What am I to do? Why did you have to be so cringe, Beto? Why?*



Governor Abbott with Paxton's alleged mistress.

I think Biden's State of the Union confirms that the Democrats are no longer in fav of Defund the Police party but the fund the police party. That was a cynical weapon

get votes. Did you really think Joe Biden of [crack bill fame](#) was against the police anyway? After all, all the criminals around Trump were in favor of criminal justice reform, weren't they?

It's clear now that the Biden government is planning to use the "please think of the children" attack on Big Tech. *The Wall Street Journal* makes it explicit with a story to about how TikTok harms American children.

They're right to because Big Tech — Facebook, Snapchat, Clubhouse, and TikTok - a Chinese-backed social experiment weaponized against the youths of the West.

We have explored some of the Likud ties of Facebook through Sheryl Sandberg and will soon address its covert Chinese backing through Founders Fund. Snapchat also owes its existence to Chinese-Australian immigrant Jeremy Liew, who we are told v forced to quit Lightspeed Ventures over his odd China ties. (There's apparently a cleaning house that's taking place throughout Silicon Valley.)

And Tik Tok is, of course, explicitly Chinese, and that's why Congressman Gaetz, alone in his party, called for it to be banned. (Gaetz hasn't gotten the memo that you only supposed to talk about being anti-China not actually be anti-China.)



**Matt Gaetz**
@mattgaetz

Aged well.

>  **Rep. Matt Gaetz**  @RepMattGaetz
>
> TikTok is a Chinese dual-use surveillance system that is going to aid in their development of facial recognition.
>
> I hope we get to a place where our country will ban it.

4:10 AM · Aug 1, 2020

**4,029** Likes    **727** Retweets

Rather than take on the problem head on, President Donald Trump elected to gift TikTok to his political allies — Oracle and Walmart. It didn't take and now we have new president.

His wife, Dr. Jill Biden, invited Frances Haugen to the State of the Union. We've tal at length about Haugen is a construct of the deep state and why that's a good thing.

Her presence at the State of The Union confirms it. The Brits give out OBEs and w give State of the Union invites. I should know, having once been a guest of my frien Congressman Matt Gaetz.

And yes, I will say the quiet part aloud. I do favor more censorship of foreigners infecting our social media environment. I want to block publications like BuzzFeed and Huffington Post from publishing in the US, especially if they have foreign mon backing them. I should have some good news on that front soon.

Let me be clear to the Silicon Valley investors and mobsters trying to be good boys girls and invest accordingly. I am your ticket out of jail.



It's time for some de-oligarachization!

Step right up and help us make America great again!

## Discussion about this post

**Comments**     Restacks

Write a comment...

**John McNally** Mar 5, 2022

Great piece

♡ LIKE (1)     💬 REPLY     ⬆ SHARE

**Esteban** Mar 4, 2022

After George W I have no interest in any more Bushes. Jeb's son may manage a career in Texas w
the family has tons of favors to call in, and which is for all intents and purposes a one party state
now,) but I suspect he'll find that his brand is much too toxic nationally. Even George HW was no
terribly popular and he barely squeaked in after the particularly sleazy Clinton years.

♡ LIKE (1)     💬 REPLY     ⬆ SHARE

**2 more comments...**

© 2024 Charles Johnson · Privacy · Terms · Collection notice
Substack is the home for great culture

# Exhibit J

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - )
)
Charles Johnson, individually, and as trustee for )
Kawruh Trust, E.B. White Trust, and Xavier Capital )
Trust, )
)    Index No.
Plaintiff, )
)
vs )
)
Hoan Ton-That, Richard Schwartz, )
and Hal Lambert, )
)
Defendants. )
)

**VERIFIED COMPLAINT**

Plaintiff Charles Johnson (hereinafter "Plaintiff" or "Johnson"), brings this action against Defendants Hoan Ton-That ("Ton-That") and Richard Schwartz ("Schwartz") (Ton-That and Schwartz, collectively, are defined as "Defendants") (Plaintiff and Defendants collectively are the "Parties") for breach of fiduciary duties owed to shareholders of a close corporation, breach of contract, breach of the implied duty of good faith and fair dealing, fraud, constructive fraud, fraudulent inducement, declaratory relief, and equitable accounting, and a cause of action aiding and abetting cause of action against Hal Lambert ("Lambert" or the "Aiding and Abetting Defendant"), and alleges as follows:

**Nature of the Action**

1.    This case arises out of a joint venture to commercialize cutting edge facial recognition technology through a startup company.  Not content to be one-third owners with Johnson, Ton-That and Schwartz engaged in a multi-step conspiracy to steal Johnson's interest in the company owning the facial recognition technology.  They did so even though Johnson, while

only a minority owner, was in fact the sine qua non to the company's success due to his relationships in the venture industry and intelligence communities.

### THE PARTIES, JURISDICTION, AND VENUE

2.      Charles Johnson is a citizen and resident of Texas. Plaintiff brings this action on behalf of himself individually, and on behalf of trusts, Kawruh Trust, E.B. White Trust, and Xavier Capital Trust, for which Plaintiff is a trustee and in which Plaintiff's shares of the Company are held (the "Holding Trusts"). The Holding Trusts are based in California.

3.      Clearview AI, Inc., is a Delaware corporation, which was formerly doing business as SmartCheckr, LLC ("SmartCheckr"), a now-defunct New York limited liability company (hereinafter the "Company"). SmartCheckr was wound down, and its assets and shares transferred to Clearview pursuant to the Wind-Down and Transfer Agreement (the "Agreement") attached hereto as Exhibit A.

4.      Upon information and belief, Defendant Hoan Ton-That is a citizen and resident of New York. Upon information and belief, Ton-That and Schwarz are the majority owners and have a controlling interest in the Company.

5.      Upon information and belief, Defendant Richard Schwartz is a citizen of New York. Upon information and belief, Ton-That and Schwartz are the majority owners and have a controlling interest in the Company.

6.      Upon information and belief, Defendant Hal Lambert is a citizen of Fort Worth, Texas. Upon information and belief, Lambert is a minority shareholder and director of the Company.

App. 090

7.     This action arises out of the Agreement in which the Parties consented to be governed by the laws of the state of New York. (Exhibit A, ¶ 8).

8.     This Court has jurisdiction over Defendants pursuant to CPLR §§ 301 and 302 because Defendants, upon information and belief, are domiciled in the state of New York. NY CPLR §§ 301, 302.

9.     Venue for this action is proper in the County of New York pursuant to CPLR 503 because Defendants, upon information and belief, are residents of New York County, and a substantial part of events or omissions giving rise to this action occurred New York County. NY CPLR § 503(a).

## STATEMENT OF FACTS

### *Johnson, Ton-That, and Schwartz co-founded the Company*

10.     In or around May 2016, the relationship between and among Johnson and Ton-That began when Johnson, knowing of Ton-That's skills in the technology and intelligence fields, contacted him to discuss founding a facial recognition technology company.

11.     On or about July 23, 2016, Johnson introduced Ton-That to Schwartz, a communications consultant and former deputy mayor of New York City. Johnson, Ton-That, and Schwartz met several times to discuss applications of facial recognition technology, including potential law enforcement applications.

12.     On or about February 24, 2017, Johnson, Ton-That, and Schwartz reached an agreement to co-found the Company. Johnson, Ton-That, and Schwartz jointly formed the Company with the objective of becoming a leader in the field of facial recognition technology by engaging with strategic contacts in law enforcement agencies.

US_ACTIVE\121248945\V-1

13.     Ownership of the Company was initially divided one-third each for Johnson, Ton-That, and Schwartz. Johnson presided over the Company as Co-President and Chief Strategic Officer, with Ton-That as Chief Executive Officer, and Schwartz as Co-President and Chief Operating Officer.

14.     From on or about February 24, 2017 until on or about November 24, 2018, the Parties jointly worked together to enhance the value of their venture, create intellectual property, and pursue business development opportunities together.

15.     As the only three shareholders in the Company, Johnson, Ton-That, and Schwartz were shareholders of a close corporation engaging in a joint venture.

16.     The Parties mutually contributed to the Company by combining financial resources and property, contributing effort, skill, and/or knowledge, and exercising joint control over the Company. The Parties contemplated the sharing of profits and losses.

17.     During this period, Johnson owned shares and played a key role in creating the Company. Johnson performed responsibilities as a co-founder, including but not limited to raising money for the enterprise, recruiting talent, and making key policy and management decisions.

18.     Johnson, a confidential informant for the FBI, provided significant value to the Company through his relationships with the intelligence committee and access to law enforcement

19.     Johnson introduced Robert Marling, Hal Lambert, and several other people to Ton-That who became investors in the Company. Both Lambert and Marling went on to be investors and board members of the Company.

20.     Building on a fifteen year relationship with Peter Thiel, a renowned technology investor, Johnson procured crucial funding from him in order to start the venture's operations.

Since the initial investment, Ton-That has repeatedly used the fact of Thiel's investment to raise money while denying Johnson's role.

21.    Ton-That hired Johnson's former employees and reached out to Johnson for advice on key management decisions.

22.    Johnson funded Company trips, including housing, meals, and other miscellaneous costs.

### *SmartCheckr Wind-Down and Stock Transfer to Clearview AI Inc.*

23.    In 2018, Ton-That and Schwartz took the first step in their multi-part conspiracy to divest Johnson of ownership in the Company.  The Defendants took advantage of Johnson, who was facing serious emotional, mental, and financial pressure due to the breakdown of his marriage and subsequent divorce.  Hiding the fact from Johnson, Ton-That and Schwartz transformed SmartCheckr into Clearview AI by transferring to Clearview— for no consideration— all of SmartCheckr's assets, including the cutting edge facial recognition technology.

24.    At the outset, Ton-That and Schwartz tried to completely exclude Johnson from business dealings by attempting to buy out Johnson's equity ownership in the Company.  These attempts failed after Johnson threatened litigation. The Defendants then shifted tactics by pressuring Johnson to accept the new arrangement, and providing Johnson with some ownership in the Company and

*Step One* – Fraudulently induce Johnson into the Agreement

25.    On or about November 24, 2018, the Parties entered into the Agreement in which "SmartCheckr, LLC [was] dissolved with immediate effect and its affairs wound up." (Exhibit A).

US_ACTIVE\121248945\V-1

26.     The Agreement reduced Johnson's ownership from a third to ten percent. (Exhibit

A ¶ 2). Johnson agreed to accept "common stock of the Company, at $0.01 per Share, equal to ten

percent (10%) of the *current fully-diluted equity* of the Company." (the Plaintiff's Shares) (Exhibit

A, ¶ 2) (emphasis added).

27.     In consideration for this reduction of over two thirds of Johnson's equity and for

the fact that "Johnson has provided good and valuable advisory services to the Company," the

Agreement provided Johnson with the right to receive a sales commission of ten percent (10%)

"to the extent Johnson introduces the Company to potential customers with whom the Company

was not previously in contact, and such introduction leads, in fact, to a sale of Company software

or services." ("Sales Commission") (Exhibit A, ¶ 5), Company's software and/or services are

hereby defined as the "Product".

28.     Defendants, upon information and belief, induced Johnson to enter into the

Agreement with the then-present knowledge and intent to block Johnson's right to realize Sales

Commissions.

29.     The Agreement included a restrictive covenant in which the Parties agreed that they

would not make or assist any statement criticizing "the reputation, business or character of the

Company, or any of its … agents or employees." (Exhibit A ¶ 4.b).  Defendants recognized that

any breach of such covenant "would cause materials and irreparable harm to the Company."

(Exhibit A ¶ 4.e).

30.     Defendants materially breached this term by spreading misinformation about

Johnson and, as one example, denying his involvement in the Company to the New York Times.

[[Defendants' statements disparaging Johnson were published on by Kashmir Hill of the New York

Times on March 18, 2021. Hill's tweet publishing Ton-That's statement is attached hereto as Exhibit B.]]

31.    In reliance on the Agreement and as directed by Ton-That, Johnson set up the Holding Trusts to hold his interest in the Company. Johnson was under the impression that pursuant to the Agreement, Ton-That would transfer Johnson's shares into the Holding Trusts.

32.    The Agreement included a coercive restrictive covenant in which Johnson could not disclose the existence of the Agreement, his indirect ownership in the Company, or his prior provision of services to the Company (the "Confidentiality Term"). (Exhibit A ¶ 4.b). Upon information and belief, the purpose was to interfere with Johnson's ability to sell the product

33.    Upon information and belief, Defendants induced Johnson to execute the Agreement with the then-present intent to publicly spread false information denying Johnson's involvement in the Company, frustrating Johnson's ability to sell the Product; and did not disclose their then-present intent to later amend the Company's bylaws providing breach of the Agreement, specifically the Confidentiality Term, as grounds to buyback Johnson's shares.

34.    Any counterparty exercising due diligence would need to know the relationship of the sales person for the Company, especially concerning a high-risk transaction involving intelligence technology.

    *Step Two* – Frustrate Johnson's rights under the Agreement

35.    Since the execution of the Agreement, Johnson has dedicated significant effort to seeking out buyers for the Product. Johnson has connected the Company with numerous qualified buyers and sales representatives interested in contracting for or marketing the Product.

36.     Johnson also initiated contact with valuable investors interested in providing funding and reputable support for the Company.

37.     Ton-That and Schwartz blocked Johnson's ability to sell the Product for Sales Commissions by unjustifiably refusing to pursue negotiations with any of the potential buyers that Johnson introduced.

38.     Ton-That informed Hal Lambert, a major investor in the Company, that Ton-That refused to do business with any potential counterparties Johnson introduced.

39.     Johnson introduced the Company to potential customers on the following occasions:

a.  On or about February 2019, Johnson introduced Ton-That to Jessica Garrison, former head of the Republican Attorney General's Association, whom Ton-That hired as part of a marketing strategy for contract procurement to travel to hundreds of law enforcement agencies around the country to demonstrate the Product. Garrison has procured dozens of contracts for the Product from law enforcement agencies and was publicly recognized for such successes.

b.  On or about May 2019, Johnson introduced the Product to the CIA through a friend and colleague, who himself was a former CIA officer.  After Johnson made the introduction, Defendants concealed and lied to the CIA about their relationship with Johnson, and the CIA passed on the contract for the Product.

c.  On or about August 1, 2019, the Sheriff of Montgomery County, Texas contacted Johnson, who introduced the Sheriff to Ton-That and Schwartz.  Since Johnson

App. 096

facilitated the contact between the Sheriff and the Company, the Sheriff has served

as an advocate for the product and assisted with procuring numerous contracts.

d.  On or about December 26, 2019, Johnson met with members of the Indonesian

intelligence committee.  Johnson connected Ton-That with these individuals, but -

That neglected to follow-up with these contacts.

e.  On or about January 19, 2020, Johnson initiated contact with a representative from

the Department of Defense.

f.  On or about January 27, 2020, Johnson proposed to Ton-That that the Company

hire Johnson's colleague, Dan Colascione, a former software programmer who had

worked with technology companies such as Facebook, Google, and Snapchat.

After meeting with the programmer, Ton-That opined that the programmer would

be a great fit to work with the Company, but nevertheless refused to take any

follow-up actions.

g.  On or about January 29, 2020, Johnson negotiated with his colleague, a former FBI

agent with extensive ties to law enforcement in the Middle East, Asia, and France,

to engage his help with Product sales.  After Ton-That and Schwartz met with the

agent several times, there was no follow-up on negotiations with the agent despite

several follow-up attempts by Johnson and his colleague.

h.  In or about March 2020, Ton-That also ignored Johnson's colleague, Gator J.

Greenwill, who along with Johnson, would provide valuable connections to the

intelligence community and the venture capital community.

US_ACTIVE\121248945\V-1

i.   On or about April or May 2020, Congressman Matt Gaetz contacted Johnson stating that he had communicated with the former Director of National Intelligence, who informed Gaetz that both Ton-That and Schwartz denied Johnson's involvement with the Company.

40.   There is no good faith explanation for Defendants refusing to consider Johnson's proposed counterparties as Defendants continued to pursue contracts for the Product. The only realistic explanation is that Defendants engaged in a purposeful and malicious mission to prevent Johnson from realizing his rightfully owed Sales Commissions pursuant to the Agreement, and designed to compensate Johnson for his lost equity.

41.   Ton-That and Schwartz purposely derailed the efforts set forth in ¶ [39] by ignoring further negotiations and denying Johnson's involvement with the Company. In doing so, Ton-That and Schwartz, as majority shareholders, breached their fiduciary duty to Johnson, a minority shareholder, by impeding his ability to earn Sales Commissions.

42.   Additionally, Defendants continuously circulated false information about Johnson to the press and lied about Johnson's role with the Company to further hinder Johnson's ability to sell the Product. Ton-That made several statements to reporters denying Johnson's involvement with Clearview, including but not limited to

a.   On or about January 31, 2020, Kashmir Hill from the New York Times reached out to Johnson and Johnson's counsel about an interview. Hill was informed from sources that Johnson had co-founded the Company, but that Johnson no longer had a relationship with the Company.

  b. On or about April 2020, Ton-That had told investigative journalist, Luke O'Brien, that Johnson had no relationship with the company, and O'Brien published this as "fact" in the HuffPost on April 9, 2020.

  c. On or about May 2021 Jessica La Masurier of France 24 informed Johnson that Ton-That informed her that Johnson had no involvement with the Company.

43. Ton-That also instructed Company employees to cut off public communications with Johnson.

44. On many occasions Johnson importuned Defendants to let him correct the false statements they made about him. Defendant's denied Johnson's requests in bad faith.

45. Johnson sought guidance from the Company's public relations and legal team, who refused to advise Johnson.

46. Upon information and belief, Defendants learned that Johnson communicated with press in or about February 2021.

*Step Three* – Force Johnson into a Buyout

47. Defendants amended the Company's Certificate of Incorporation numerous times as the Parties' relationship deteriorated.

  a. On or about June 14, 2019, an Amended and Restated Certificate of Incorporation of the Company was filed with the Delaware Secretary of State.

  b. On or about July 20, 2020, the Second Amended and Restated Certificate of Incorporated was filed.

11

App. 099

     c.   On or about September 21, 2020, an amended Second Amended and Restated Certificate of Incorporation was filed providing if the Buyback term is triggered, common stock would be bought at 50% fair market value.

     d.   On or about March 3, 2021, a further amended Second Amended and Restated Certificate of Incorporation was filed providing that Buyback would be at an even lesser, 20% fair market value and could be triggered by a breach of the Confidentiality Term – this was the first Certificate of Incorporation which provided breach of confidentiality as a basis for Buyback.

     e.   On or about July 21, 2021, the Second Amended and Restated Certificate of Incorporation was amended to change the number of shares of Common and Preferred Stock.

48.     Upon information and belief, prior to the March 3, 2021 amendment described in ¶ [47(d)], Defendants became aware that Johnson had communicated with the press.

49.     Defendants then pointed to a New York Times Magazine story published on March 18, 2021 as the basis to buyout Johnson at the artificially low price of 20% fair market value.

50.     On or about May 21, 2021, without notice or a meeting, the Defendants conspired to deprive Johnson of his equity interest by passing a resolution— with board members Robert Marling and representative from Liberty City Ventures— who signed the Resolution to "buy back" Johnson's shares of Common Stock (the "Buyback Resolution"). The Buyback Resolution is attached hereto as Exhibit B.

51.     Despite Johnson's 158,682 shares having a fair market value of $1,432,898.46, priced at $9.03 per share, the Buyback Resolution only called for the Company to buy Johnson's shares for twenty percent (20% of the aggregate fair market value) (See Exhibit B, ¶ 2).

52.     On or about October 9, 2021, Johnson was notified of the Buyback Resolution ("Notice").

53.     Defendants voted on the Buyback Resolution to force Johnson out of the Company based on the amended Certificate of Incorporation. Defendants amended the Certificate of Incorporation after frustrating Johnson's rights under the Agreement – the amendment providing that breach of confidentiality was grounds for a buyout solely served as an excuse to unlawfully steal Johnson's remaining shares.

54.     Moreover, the Confidentiality Term frustrates a material purpose of the Agreement, namely, to compensate Johnson through Sales Commissions for his surrender of a vast amount of his equity.

55.     Spreading the lie that Johnson had no relationship with the Company and restraining Johnson from correcting these statements undermined Johnson's ability to sell the Product and bring in revenue for the Company.

56.     Johnson's breach of the Confidentiality Term was justified as Defendants opened the door by spreading multiple lies about Johnson to the press, substantially impairing Johnson's reputation and rights under the Agreement.

57.     Defendants also acted in furtherance of their own, personal motives and against the interest of the Company by sabotaging Johnson's ability to bring in revenue and additional investors.

13

58.    Defendants used the Confidentiality Term to thwart Defendants' obligations and Johnson's rights under the Agreement, which after amending the Certificate of Incorporation, Defendants used as a pretext to engage in an unlawful grab of Johnson's shares.

**FIRST CAUSE OF ACTION (Breach of Fiduciary Duties Owed to Minority Shareholders of a Close Corporation) (Against Ton-That and Schwartz)**

59.    Plaintiff repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

60.    As majority shareholders of a closely-held corporation, Ton-That and Schwartz owed fiduciary duties to Johnson.

61.    Ton-That and Schwartz, both individually and acting in concert as majority shareholders of the Company, dominated and controlled the Company, and as such, owed fiduciary duties of good faith and reasonable care to Johnson.

62.    Johnson, Ton-That, and Schwartz were joint venturers with respect to the Company, and, as such, owed fiduciary duties to the others, including to the Company.

63.    Johnson placed trust and confidence in Ton-That and Schwartz, and a relationship of trust and confidence arose between and among them.

64.    Defendants breached their fiduciary duties owed to Johnson, a minority shareholder of the joint venture close corporation, by purposely ignoring sales opportunities for the sole purpose of preventing Johnson from realizing his Sales Commission rights.

65.    Defendants also breached their fiduciary duties owed to Johnson by passing the Buyback Resolution to buyback Johnson's minority shares at a deflated price.

US_ACTIVE\121248945\V-1

66.     Defendants' bad faith actions constitute a breach of fiduciary duty, which entitles Johnson to recover from Defendants any benefits that they received as the result of those malevolent acts.

### SECOND CAUSE OF ACTION (Breach of Wind-Down/ Buyback Agreement)

67.     Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

68.     The Parties had a contract, namely, the Agreement between Johnson and the Defendants, which prevented the Parties from publicly criticizing one another or the Company.

69.     The restrictive covenant bound Defendants to not make any statement or communication "to any third party which impugns or attacks, or is otherwise critical of the reputation, business or character of the Company, or any of its respective directors, officers, representatives, agents or employees." (Exhibit A ¶ 4(b)). Johnson is a shareholder and authorized sales representative of the Company, making him a "representative[], agent[] or employee[]" of the Company. *Id.*

70.     Upon information and belief, Defendants' publicly criticized Johnson and denied his involvement with in the Company to the New York Times reporter, who later published a statement from Ton-That saying "Johnson was not a founder and never had an operational role" with the Company.

71.     Upon information and belief, Ton-That told investigative journalist, Luke O'Brien, that Johnson had no relationship with the company. O'Brien published this as "fact" in the HuffPost on April 9, 2020, stating "[p]eople involved with Clearview appear to have gone to great lengths to conceal their links to the company and each other. Johnson, for instance, does not appear

on any of the incorporation documents and has left little public trace of his association with Ton-That beyond a Facebook post."

72.     Upon information and belief, Ton-That also told Jessica La Masurier of France 24 that her that Johnson had no involvement with the Company.

73.     Defendants breached this covenant by publicly criticizing Johnson and denying his involvement with the Company, which breach by the terms of the Agreement cause material and irreparable harm.

74.     Due to Defendants' breach, Johnson is entitled to compensatory and consequential damages in an amount to be determined at trial, as well as any other injunctive or other appropriate equitable relief.  *See* Exhibit A ¶ 4(e).

**THIRD CAUSE OF ACTION (Breach of the Duty of Good Faith and Fair Dealing)**

75.     Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

76.     An obligation of good faith and fair dealing was an implied term of the Agreement.

77.     The implied covenant of good faith and fair dealing is consistent with the express terms of the Agreement.

78.     Defendants materially breached the duty of good faith and fair dealing under the Agreement by knowingly and substantially impairing Johnson's ability and rights under the Agreement, including but not limited to the right to earn Sales Commissions as compensation for Johnson's lost equity. Defendants arbitrarily refused to negotiate with Johnson's counterparties, knowingly spread false information denying Johnsons' role with the Company, and concealed their

intent to amend the bylaws to provide breach of the Agreement as grounds to buyback Johnson's shares

79.     As a result of said breaches, Johnson has been damaged in an amount to be determined at trial, but in an amount no less the amount of Johnson's equity that Defendants unlawfully grabbed.

80.     By reason of the material breaches and fraudulent conduct by Ton-That and Schwartz, the Agreement should be rescinded as unenforceable, and Johnson should be relieved of any obligations and restrictive covenants under the Agreement, including but not limited to the Confidentiality Term and stock transfer.

## FOURTH CAUSE OF ACTION (Fraud, Constructive Fraud and Fraudulent Inducement of the Wind- Down/ Buyback Agreement)

81.     Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

82.     In or around November 2018, Defendants made misrepresentations of material fact to Johnson, as well as omissions of materials facts concerning their then-present intentions not to abide by the terms of the Agreement.

83.     Defendants failed to disclose their then-present material intention to block Johnson's sales efforts at every juncture and restrain Johnson's ability to realize his Sales Commission.

84.     Defendants held themselves out as entering into the Agreement in the best interest of the Company, but upon information and belief, Defendants' intended for the Agreement to initiate their scheme to seize Johnson's equity for their own selfish and malevolent interests.

85.    Defendants did not disclose their then-present intention to buy Johnson's shares at a deflated purchase price.

86.    Defendants failed to disclose material fact that the purpose of the Confidentiality Term was to prevent Johnson from correcting Defendants' false public statements concealing Johnson's role with the Company, and if Johnson did speak out, Defendants' intent was to buyback Plaintiff's shares.

87.    Despite Defendants' promises and representations reflected in the Agreement, they had no intention of complying with such terms.

88.    Defendants acted with scienter in that they knew the misrepresentations were false, and they intended for the misrepresentations to mislead Johnson.

89.    The misrepresentations to Johnson were material, and Johnson justifiably relied upon those misrepresentations when entering into the Agreement.

90.    Johnson has standing to assert this cause of action, because the misrepresentations made by Defendants were made to Johnson both personally and in his capacity as a shareholder of the Company, with the expectation that Johnson would rely on those misrepresentations. When Johnson relied on those misrepresentations, he did so with the understanding he would be compensated for his lost equity with the ability to earn Sales Commissions. As a result of the reliance and Defendants malevolent conduct, Johnson suffered actual pecuniary injury in the loss of his equity as well as the inability to receive Sales Commissions.

91.    Johnson's reliance was justifiable, *inter alia*, because the representations were consistent with the implied covenant of good faith and fair dealing and the written terms of the Agreement.

92.     To the extent Johnson is not adequately compensated at law, Johnson is entitled to rescission of the Agreement which was procured by way of Defendants' fraud.

93.     Defendants knowingly and intentionally made false material misrepresentations, material omissions or otherwise perpetrated a fraudulent scheme by trick, device and deception calculated to injure Johnson, and which did cause Johnson pecuniary harm.

94.     Defendants each knew of their respective roles in the illegal and fraudulent activity at the time of the Agreement and until the Buyout Resolution, and each substantially assisted the fraudulent acts of each other and the Company.

95.     Defendants aided and abetted each other's fraud and therefore are jointly and severally liable for damages resulting from the fraud.

96.     Defendants each agreed to participate in fraudulent acts and at least one Defendant commits acts in furtherance of the common fraudulent scheme, and those overt acts caused damages to Johnson in Johnson's ability to exercise his right to earn Sales Commission. By reason of their concerted efforts to defraud Johnson, Defendants are jointly and severally liability for the damages caused to Johnson.

## FIFTH CAUSE OF ACTION (Equitable Accounting)

97.     Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

98.     The Parties had a mutual and confidential relationship as part of their joint venture in facial recognition technology.

99.     Johnson's equity is subject to a purchase price at fair market value, and there is a dispute as to the purchase price and value of the Company's common stock.

US_ACTIVE\121248945\V-1

App. 107

100.    Johnson lacks an adequate remedy at law.

101.    Johnson is entitled to an accounting.

**SIXTH CAUSE OF ACTION (Declaratory Relief voiding the Agreement)**

102.    Johnson is entitled to a declaration that the Agreement and subsequent Buyback Resolution are unenforceable because in both, Defendants valued Johnson's shares at an artificially delated purchase price.

103.    Johnson is entitled to declaratory relief placing the Parties in the same positions they were in before the Agreement executed, including but not limited to providing Johnson's with his previously held one-third equity in the Company.

**SEVENTH CAUSE OF ACTION (Aiding and Abetting Breach of Fiduciary Duty) (Against Lambert)**

104.    Johnson repeats and realleges all other paragraphs of this complaint as if fully set forth herein.

105.    Lambert knowingly conspired, induced, aided, abetted, participated in, substantially assisted and/or received the benefits of the breaches of fiduciary duty of good faith and fair dealing by Ton-That and Schwartz. Amongst other acts, Lambert substantially assisted the Defendants' breach, Lambert voted to unlawfully buyout Johnson's shares.

106.    [FACTS RE LAMBERT AIDING AND ABETTING]

107.    As a result of said breach, Johnson has been damaged in an amount to be determined at trial, but in an amount no less the amount of Johnson's equity that Defendants unlawfully grabbed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants, awarding him:

Rescission of the Agreement procured by Defendants' fraudulent consideration so that Parties are restored to their positions prior to the execution of void and unenforceable Agreement, Buyback Resolution and Notice, and prior to Defendants' breach of fiduciary duties;

Declaratory judgement that Plaintiff owns 33.3% or one third of all non-diluted Clearview AI Inc. common stock to place Plaintiff in the position he was in before the execution of the fraudulent Agreement, executed in furtherance of Defendants' breach of fiduciary duties and fraudulent scheme to take over the Company and force Plaintiff out of the Company;

Compensatory damages in an amount to be determined at trial on, *inter alia,* causes of action for: breach of fiduciary duty (Count I), breach of contract (Count II), breach of the duty of good faith and fair dealing (Count III), fraud or constructive fraud (Count IV), and any other damages as appropriate;

An accounting requiring Defendants provide Plaintiff the opportunity to inspect the books and records of Clearview AI Inc. as well as of Defendants as individual shareholders and board members, and of companies owned controlled by Defendants which received, directly or indirectly, monies emanating from Clearview AI Inc.;

Punitive damages in an amount to be determined at trial against all Defendants jointly and severally;

The costs and disbursements of this action, including attorney's fees; and

Such other and further relief as may be just and proper.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

## <u>VERIFICATION</u>

Charles C. Johnson, being duly sworn, deposes and says:

      I, Charles Johnson, am the Plaintiff in the above-entitled action.  I have read the foregoing

complaint and know the contents thereof.  The same are true to my knowledge, except as to matters

therein stated to be alleged upon information and belief and as to those matters, I believe them to

be true.

Sworn to before me this
      ____day of _____,2022

                         _____

                                Charles C. Johnson

_____
               Notary Public

App. 110

# Exhibit K

## [intentionally left blank]

# Exhibit L

| Form 304 | | |
|---|---|---|
| Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>FAX: 512/463-5709<br><br>Filing Fee: $750 | <br>**Application for Registration of a Foreign Limited Liability Company** | **Filed in the Office of the Secretary of State of Texas Filing #: 804748261 09/28/2022 Document #: 1181890060002 Image Generated Electronically for Web Filing** |

1. The entity is a foreign limited liability company. The name of the entity is :

## Metis Funding LLC

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited liability company" or "limited company"  (or an abbreviation thereof). The name of the entity with the word or abbreviation which it elects to add for use in Texas is:

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:

3. Its federal employer identification number is:  **85347164**
☐Federal employer identification number information is not available at this time.

4. It is organized under the laws of:  **MISSOURI, USA**
and the date of its formation in that jurisdiction is:  **10/15/2020**

5. As of the date of filing, the undersigned certifies that the foreign limited liability company currently exists as a valid limited liability company under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the limited liability company that it proposes to pursue in the transaction of business in Texas are set forth below. The entity also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is organized.

## Start-ups

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the foreign entity first transacted business in Texas is: **09/27/2022**

8.The principal office address of the limited liability company is:

## 3720 College Park Blvd, Conroe, TX, USA 77384

☐9A. The initial registered agent is an organization by the name of:

☑9B. The initial registered agent is an individual resident of the state whose name is:

## Charles    Johnson

☑9C. The business address of the registered agent and the registered office address is:

**3720 College Park Blvd    Conroe  TX  77384**

<center>**Consent of Registered Agent**</center>

☐ A. A copy of the consent of Registered Agent is attached.

<center>**OR**</center>

☑ B. The consent of the registered agent is maintained by the entity.

10. The entity hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11. The name and address of each governing person is:

| NAME OF GOVERNING PERSON (Enter the name of either an individual or an organization, but not both:) |
| --- |
| IF INDIVIDUAL |
| **Charles Johnson** |
| OR |
| IF ORGANIZATION |
| |
| ADDRESS OF GOVERNING PERSON : |
| **3720 College Park Blvd    Conroe  TX, USA  77384** |

<center>**Supplemental Provisions / Information**</center>

[The attached addendum, if any, is incorporated herein by reference.]

<center>**Effectiveness of Filing**</center>

☐ A. This document becomes effective when the document is filed by the secretary of state.

<center>**OR**</center>

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **September 29, 2022**

<center>**Execution**</center>

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: **September 28, 2022**        **Charles Johnson**

Signature and title of authorized person on behalf of the foreign entity

**FILING OFFICE COPY**

App. 114

# Exhibit M

12/22/24, 9:16 PM    Case: 25-11393   Document 16-1   Page: 116   Date Filed: 01/06/2026 Chabad, Deserves An F...


Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 88 of 132    PageID 369

# Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An FBI Counterintelligence Investigation

What do you do when your congressman is compromised by a foreign power?

OCT 25, 2022

♡ 4      💬 2      ↻                                                      Sha



Not how you treat the flag, Dan!

A previous post outlined foreign intelligence operations running on U.S. soil throu history. We might then ask if any such foreign intelligence operations are running i the United States today and if so, which countries might be running those operatio

12/22/24, 9:16 PM
Case: 25-1393 Document: 16-1 Page: 117 Date Filed: 01/06/2026 Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Intelligence-Tied Chabad, Deserves An F...

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 89 of 132    PageID 370

I submit to you that they are. In fact, quite a number of these intelligence operation are running here and that one of their beneficiaries may soon be chairman of the House Homeland Security committee. And if I had to bet, I suspect that my congressman Dan Crenshaw will get the gavel — if only because he, like McCarthy, compromised by foreign intelligence operating in the United States. Of course, McCarthy [wouldn't be the first Speaker to be so compromised](#).

Thanks for reading Charles Johnson's Thoughts
and Adventures! Subscribe for free to receive
new posts and support my work.

| Type your email... | Subscribe |
|---|---|

Like Kevin McCarthy who uses cash from Chinese agent Peter Kuo to pay off his w with a no-show job at the Republican Party after his affair became public knowledg it has emerged that Crenshaw does much the same thing. "Rep. Dan Crenshaw's campaign has paid a small agency that employs his wife hundreds of thousands of dollars since 2020, according to Federal Election Commission (FEC) records review by the Daily Caller," [goes the story](#), but it doesn't really address the larger question what PinkCilantro really is and who its real beneficiaries are. Let me spell it out for you.

---

*Pink Cilantro is a Chabad-tied, Ukrainian-connected Israeli influence operation masquerading as a consulting firm. What such a firm has to do with Congressman Crensha Kinzinger is extremely disturbing.*

---

This is particularly interesting as Congressman Adam Kinzinger — one of the key Republican participants on the January 6th committee — and Congressman Dan

12/22/24, 9:16 PM    Case: 25-1393    Document 16-1    Page: 118    Date Filed: 01/06/2026 Dan Crenshaw with Close Personal and Financial Ties To Israel ... | Chabad, Deserves An F...

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 90 of 132    PageID 371

Crenshaw have both paid over $1m to this "consulting" firm connected to Crenshaw's wife Tara Blake.

The firm, Pink Cilantro, doesn't even have a website and only has two political clients — Crenshaw and Adam Kinzinger. Baysa Benshushan told the Daily Caller that "Kinzinger sought us out due to Crenshaw's impressive branding. Pink Cilantro developed Crenshaw's brand and Kinzinger wanted an agency that could develop the [sic] brand."

Totally normal stuff you guys. Why does Kinzinger need a "brand" person anyway? Why — exactly — is Dan Crenshaw, who has no children, publishing a children's book on cancel culture? The merch, always the merch...

Naturally Pink Cilantro also received $60K in PPP Loans. Its proprietor, Baysa Benshushan, has strong ties to Israeli intelligence. She's even married to an Israeli defense officer who purportedly rescued Jews during a Texas hurricane.

Chabad even wrote it up.

> With Basya serving as a coordinator—fielding phone calls and using social media to find people in need—Tomer and Mishiko, both former soldiers in the Israeli Defense Forces, drove to Meyerland, an area hit hard by the storm and the center of Houston's Jewish community. They continued searching for and rescuing people until three in the morning. The next day, they set out again at 8 a.m.

OK.

It's extremely difficult to find much of anything about Tomer online. According to Basya her husband is a "contractor." He is rarely in pictures posted by his family members.

Benshushan's parents — Victor and Devorah Grinshtein — are heavily involved with Chabad Lubavitch of Texas. They've sponsored dinners. This sort of thing doesn't

12/22/24, 9:16 PM    Case: 25-11393    Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to the Israeli Intelligence Mossad-Chabad, Deserves An F...

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 91 of 132    PageID 372

come cheap.

Returning to Basya — you think there's anything unusual about her? Well, in the first 8 minutes of this podcast, "The Patient Hustler" we learn that her father came from Ukraine, to Ithaca, NY and then to Houston, Texas. Her parents are Jewish and both went to Ivy League schools; they were "part of the computer revolution" servicing Enron, Exxon, Shell by getting personal computers for each employee (sounds like PROMIS stuff).

According to Benshushan, her father Victor was a mathematician that worked on IT for these companies—all of which eventually ended up with the Chinese and Russians but we can't just say that was his fault. Right? Right? Their company was purchased General Electric, and then they moved to Tzfat, Israel—one of the four holy cities for Jews according to Chabad — in the mid-1990s and they became Orthodox Jews. As does. She spent her formative years living in Israel before marrying an Israeli.

12/22/24, 9:16 PM                    Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israel, Netanyahu, and Chabad, Deserves An F…

Case 4:24-cv-00988-P      Document 28     Filed 12/23/24      Page 92 of 132      PageID 373

 XVAND



## Victor Grinshtein

President and co-founder

"The twenty-first century business person doesn't have time to deal with IT. We make information technology as simple as flipping a switch."

Victor Grinshtein loves when things work the way they are supposed to. He is passionate about helping business owners optimize their operations with world class information technology.

- Co-founded Xvand Technology Corporation in 2000.
- In 1982, he founded Microcomputer Power, Inc., which became one of the leading system integrators for Fortune 500 companies and government agencies in Texas. By 1995, Microcomputer Power had $80 million in annual revenue.
- In May 1995, he merged the company with AmeriData/GE Capital Information Technology (GE CITS) to improve customer service coverage nationally and internationally.
- He stayed with GE CITS until June of 1998. Using General Electric's resources, the south Texas region's annual revenue grew to $180 million and became the most profitable

Does this man and his daughter pose a security risk for Congressman Dan Crenshaw?

Hm, you see something strange about this? What was that about Crenshaw being owned by the Ukrainian Jewish mafia? How dare you question his patriotism while calls for us to be in endless wars!

The numbers paint the picture as they always do. Crenshaw's donors — if they can called that — are really victims of an elaborate fraud — a "patient hustle," to borrow phrase from Benshushan. He has consistently and repeatedly targeted the elderly. (I top industry is "retired," according to Open Secrets.) Just how many of these retiree

12/22/24, 9:16 PM    Case: 25-11393    Document: 16-1    Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Mossad, Deserves An F...    Date Filed: 01/06/2026

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 93 of 132    PageID 374

were exploited it's hard to say. Could Benshushan be running an Israeli op using retirees' money and Crenshaw's brand?

Shane Goldmacher of the *New York Times*, has written a very compelling analysis "[How a Deceptive Campaign Fund-Raising Ensnares Older People](#)."

> Exploiting the diminishing capacity of older people for cash extends far beyond politics. There is an [entire initiative](#) at the Justice Department devoted to elder abuse, and the F.B.I.'s Internet Crime Complaint Center reported nearly [$1 billion in losses for those 60 and older](#) in 2020.

What did Crenshaw spend the money on? Well, [he spent $144,000 on an epic lagoon party with drones and a Blink 182 tribute band](#). That epic lagoon was owned by none other than Israeli entrepreneur Uri Man.

12/22/24, 9:16 PM    Case: 25-11393    Document 16-1    Page: 122    Date Filed: 01/06/2026 Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israel, Leveraged Doxxed Jihad, Deserves An F...

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 94 of 132    PageID 375



49 likes

**uriman** Signed a deal with Steve Wynn today in Las Vegas. Building the largest Crystal Lagoon in the USA 🇺🇸

View 1 comment

March 17, 2017

 uriman

12/22/24, 9:16 PM        Case: 25-11393   Document:16-1    Page: 123   Date Filed: 01/06/2026 ...Financial Ties...Intelligence...ad, Deserves An F...

Case 4:24-cv-00988-P        Document 28      Filed 12/23/24       Page 95 of 132        PageID 376



Uri Man with accused Chinese agent Steve Wynn.

Man brags on his Instagram about his ties with the Coast Guard, a group which happens to be promoted by the Homeland security committee.

While Crenshaw decries fellow GOPers as "performance artists" he puts on quite a show, a show which oozes high level production values. Totally normal for politicia

It's all produced by Benshusan (and Benny Johnson). You can read her assessment o the op ad work here. She calls it the "Crenshaw case study." (For whatever reason th link isn't working. Here it is. https://drive.google.com/file/d/1x6uAYCaVktc_43SFCoRN0ojWK8Z8tRu1/view )

What does Likud get for its money? It gets Dan Crenshaw threatening young men f opposing Israeli treatment of the U.S.S. Liberty and invective targeting anyone who supports Afghanistan withdrawal as an "idiot" or "stupid."

We might even ask if the Crenshaw-Israeli op goes back to the fake fight between h and Pete Davidson of NBC's Saturday Night Live. Journalist Amee Vanderpool prob the ridiculousness of that made for TV encounter.

Say, isn't NBC where Israeli spy nonofficial cover Jake Novak worked? Wasn't he implicated in the Matt Gaetz espionage matter? Oh. He was, wasn't he?

12/22/24, 9:16 PM    Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israel, Intelligence, and Jihad, Deserves An F...

Case: 25-11393    Document 16-1    Page: 124    Date Filed: 01/06/2026

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 96 of 132    PageID 377



Fake and creepy

Whenever insider trading arises the question becomes is this how the assets are compensated? That certainly seems what Senator Richard Burr was up to. Burr, who retiring as chairman of the Senate intelligence committee, was under investigation insider trading. The DOJ closed that investigation but apparently the matter is still intense enough for Congresswoman Abigail Spanberger to request to Congress that be banned—only to be rejected by the congressional leadership.

---

*Spanberger is a CIA operative-turned-congresswoman. She clearly knows that insider tradi*
*how operatives of foreign countries are rewarded for their services.*

---

Having met Dan Crenshaw, this seems to me the most credible explanation. He not only beat the market but he was one of the top performers in all of Congress. How he do it? And may we, his constituents, join his fund? (Mast is interesting there too Given he's basically the Republican in West Palm Beach, he destroyed the market. Weird right?)

12/22/24, 9:16 PM    Case: 25-11393    Document: 16-1    Page: 125    Date Filed: 01/06/2026

Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israel, Deserves An F...

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 97 of 132    PageID 378





Crenshaw On Stock Trades: THEY DON'T PAY US ENOUGH TO LIVE | Breaking Po...

All of this happens because we've allowed Navy SEALs to become super Americans
the popular consciousness.

You can't ask any questions of their behavior lest you be seen as unpatriotic. In fact
one of my friends asked Crenshaw about some of the allegations that he wasn't as
impressive as he lets people believe. Rather than take the question as an earnest
expression, Crenshaw started yelling and screaming at my friend. This isn't normal
behavior, to put it mildly. You can see the same haughty and arrogant behavior on
display when Charlie Kirk and Dan Crenshaw debated America's involvement in
Afghanistan. Why can't we have clarity on what we do abroad Dan?

But we *should* be asking questions about all of our elected officials and soldiers. We
should be asking what the costs are of what we ask them to do. We shouldn't reward
them with committee chairmanships.

Crenshaw said that anyone who supported the "over the horizon" plan that Preside
Biden favored didn't know what they were talking about. "They love the slogan 'no

12/22/24, 9:16 PM          Case: 25-11393     Document 16-1     Page: 127     Date Filed: 01/06/2026 Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israel and the Mujahedin of Abad, Deserves An F...

Case 4:24-cv-00988-P          Document 28          Filed 12/23/24          Page 99 of 132          PageID 380

more endless wars,'" [Crenshaw said at the time](). "We made foreign policy based on emotional slogan, and it has made America less safe, not more safe."

But Biden's policy has proven spectacularly effective and culminated in the death of Qaeda's architect — from a drone strike.

Investigative journalist Matt Cole has done a lot of good work on how the Navy SEALs were compromised. Navy SEALs I've known talk often about how often the Chinese and the Israelis try to get them to betray their country, sometimes with great effect. Cole's book, *Code Over Country: The Tragedy and Corruption of SEAL Team Six,* details how it happens.

This perhaps to be expected when you declare yourself "Super American" or when you pretend to be a hero when really all you did was get yourself blown up.

But hey, it's a hustle—and a living.

Until it's exposed.



We deserve better.

12/22/24, 9:16 PM

Case: 25-11393 Document 16-1 Page: 128 Date Filed: 01/06/2026

Why My Congressman Dan Crenshaw With Close Personal And Financial Ties To Intelligence And Israel Is Bad, Deserves An F...

Case 4:24-cv-00988-P   Document 28   Filed 12/23/24   Page 100 of 132   PageID 381



Thanks for reading Charles Johnson's Thoughts and Adventures! Subscribe for free to receive new posts and support my work.

| Type your email... | Subscribe |

 4 Likes

## Discussion about this post

Comments    Restacks

Write a comment...

**John McNally**  Oct 25, 2022

Bang on the money, but I suspect only scratching the surface.

♡ LIKE (1)    💬 REPLY    ⬆ SHARE

| 1 reply

**1 more comment...**

© 2024 Charles Johnson · <u>Privacy</u> · <u>Terms</u> · <u>Collection notice</u>
<u>Substack</u> is the home for great culture

# Exhibit N

# Go Ahead and Quit Twitter: You'll Live Without Your Addiction — And Maybe Be Happier

Why subscriptions and not ads are a better way to live your life

 **CHARLES JOHNSON**
NOV 05, 2022

♡ 1    💬    🔄                                                          Sha



"Breakfast Table Political Argument," 1948

12/22/24, 9:17 PM
Case: 25-11393 Go Ahead and Quit Twitter, You'll Live Without Your Addiction - Ited: May/06/2026er
Case 4:24-cv-00988-P     Document 28     Filed 12/23/24     Page 104 of 132     PageID 385

Thanks for reading Charles Johnson's Thoughts and Adventures! Subscribe for free to receive new posts and support my work.

| Type your email... | Subscribe |

Dear Journalists,

Allow me to be the first to tell you that no one cares about Twitter nearly as much as you do.

You have an addiction and this is an intervention if you want it to be. I love you and want you to cover the real news.

If you need help, I can assign you something. Like say, the coming cobalt war in the Democratic Republic of Congo — a war that seems inevitable now we've banned M and his Chinese allies from buying cobalt from miners who use child labor?

You won't do that, of course. No, you want to talk about Twitter. OK then.

Many of you have reached out to me about Twitter now that Elon Musk and his foreign backers have purchased it. You've texted me. You've called me. You hope th I'll complain about Musk and how I'm still banned or something. I'm disappointing you because I don't seem to care. Well... what if I told you that I really don't?

I get it. I make good copy. It's why you used the text messages I leaked between mys and that weird aide-de-camp Jared Birchall. (Shades of Howard Hughes, eh? What's with the Mormon connection? "Choose the right" Jared!)

Who do you think leaked those texts to the *Washington Post* and *Wall Street Journal*? Hmmm? Could it have been Charles Johnson that helped the FBI on the whole Mus giving the shady Russian poker player $5.7B with no strings attached? I don't know Seems like a mystery...

12/22/24, 9:17 PM                Case: 25-11393      Go Ahead and Quit Twitter, You'll Live Without Your Addiction • Charles May 6, 2026 S04der

Case 4:24-cv-00988-P        Document 28        Filed 12/23/24        Page 105 of 132        PageID 386

Just doing my part! No need to thank me for posting up against the tech people tied into foreign intelligence and the Chinese mob.

Did you know that there are foreign spies at Twitter? And that those foreign spies probably — right now in fact — reading your direct messages?

Do you feel safer knowing that Twitter is purportedly relying on coders from the very Chinese-backed Tesla — a company under investigation for killing people with its self-driving?

****

But hey, you've reached out and so here I am. You've got what you always sought — attention. Better grab a hold of it while you still have it! It's fleeting, as seemingly everyone's attention these days is.

Say, you guys deified Steve Jobs at one point too. Didn't he have that whole saying about how [you should try to shave time off the booting up times for the Apple product](#)? He reasoned (supposedly) that, at scale, when you make it easier for people boot up their computers, you collectively give everyone more time on this lovely planet. Now what should we think of people who systematically waste everyone's time? Are they killing people? Hmm...

As you know I was the first person banned for life from Twitter. I even sued over it and I lost (sadly).

Of course it was wrong that they banned me, but honestly, but I'm very happy that did. What's that old saw from Churchill? About a blessing in disguise being very well disguised? Well, thank God for working in mysterious ways.

Being banned from Twitter is the best thing that ever happened to me. In fact my cancellation, such as it was, gave me much needed time to reflect, to think, and to

build the sort of empathy that so many in our society, especially our faux tech elite, seem to lack.

I'm a work in progress — we all are — but the first step to fixing the problem is admitting you have a problem. So let's admit it together.

Many of you are addicts. You know it and I know it.

You make excuses for why you spend so much time on the platform. "It's helping m career!" you say. "I only use it for news!" you promise. All addicts lie to themselves you are no different.

You are wasting your life on Twitter. You are giving up your focus. You are giving u your happiness. You are allowing yourself to be programmed by someone else. Mus being stupid, even tells you what he's going to do to you.

Elon Musk clearly didn't want to pay the full $44 billion his consortium spent on Twitter so there's a case to be made that his Twitter addiction wound up costing hi billions of dollars. What has it cost you? Precious time with your family? Blowing a deadline for work? Your piece of mind? The loss of a friendship? Wasting your elite private school education so that you can tweet about what teenagers are doing on TikTok?

Maybe you are better off without it!



When was the last time you read a book?

Allowing others to affect you emotionally is, I suppose, what the great American experiment is all about.

In a way, the huckster and the hustler are as embedded in this country as the con m I wouldn't have it any other way but there are many, especially in Musk's (and my) adopted Texas, that are all hat and no cattle. Yes, yes, he's gotten us into space. So what? This is America. We sell the dream, baby.

Of course that's really what advertising is all about — selling the ~~scheme~~ dream. It' my contention that clickbait is ruining America and it's why I sued the Huffington Post (now owned by BuzzFeed). My case is pending before the Supreme Court. If it works, it'll make it way easier to sue fake media properties. It may just change the economics of online advertising. No need to thank me. Just doing my part. Some of helped bankrupt Gawker and we were just getting started!

Anyway, journalist Jacob Silverman makes a very compelling point about Twitter on the podcast "[Tech Won't Save Us](#)." I highly recommend Paris Marx's work, for what worth. It's pretty compelling stuff and I dare not ignore it.

Silverman argues that Twitter has helped Saudi intelligence hunt down and disappear Saudi dissidents. Saudi Arabia remains a major investor in Twitter.

A Saudi spy told me that Musk talked to him about taking Tesla private. I reported on it, of course.



Being anti-Musk has probably cost me millions of dollars but hey, <u>millions for defe</u> <u>but not one cent for tribute</u>. I was told by an investor that he loved my work but tha he couldn't back me for being anti-Elon. (But I'm not anti-Elon; I'm pro-American.)

I don't really think that the world should work the way that Twitter advertises. Advertising leads to addiction.



All for the likes, baby

And ultimately to exploitation.

12/22/24, 9:17 PM    Go Ahead and Quit Twitter! You'll Live Without Your Addiction – Heck, Maybe Be Happier

Case: 25-11393    Document 16-1    Page: 138    Date Filed: 01/06/2026

Case 4:24-cv-00988-P    Document 28    Filed 12/23/24    Page 110 of 132    PageID 391



Not everyone should be accessible all the time, not every thought should be aired, n
every billionaire wish should be fulfilled…

Twitter is a battlefield, not a business. And maybe, just maybe, you're not a journali
but a narcissist.



12/22/24, 9:17 PM          Go Ahead and Quit Twitter You'll Live Without Your Addiction - Here's Maybe Be Happier

Case: 25-11393          Document 16-1          Page: 139          Date Filed: 01/06/2026
Case 4:24-cv-00988-P          Document 28          Filed 12/23/24          Page 111 of 132          PageID 392

Look at yourselves deep in the mirror and see what they do on Twitter.

Watch how your peers behave on Tuesday and think back to how journalists behave before 2008 on Election Day.

We deserve better than your instant takes. You deserve better than our criticisms of your work. We both deserve a better public conversation.

Thanks for reading Charles Johnson's Thoughts and Adventures! Subscribe for free to receive new posts and support my work.

| Type your email... | Subscribe |

---

 1 Like

## Discussion about this post

Comments          Restacks

Write a comment...

---

© 2024 Charles Johnson · Privacy · Terms · Collection notice
Substack is the home for great culture

# Exhibit O

## MISSOURI ETHICS COMMISSION
### CONTRIBUTIONS RECEIVED - SUPPLEMENTAL

OFFICE USE ONLY

| NAME OF COMMITTEE | DATE |
|---|---|
| Unsicker For Missouri | 4/14/2024 |

### INSTRUCTIONS

**PURPOSE:** The purpose of the Contributions Received supplement is to provide a printed outline for attaching additional pages to Form CD1 (Contributions Received). This form should be used as additional space for reporting persons contributing more than $100 and for committee contributions. This form may be reproduced as needed.

Total all itemized contributions at the bottom of the page and carry to item 7 (Subtotal: Itemized Contributions From Any Attached Pages) on Form CD-1.

If further information is needed concerning reporting itemized expenditures, see Form CD-1 Instructions.

| A. ITEMIZED CONTRIBUTIONS RECEIVED FROM COMMITTEES REGARDLESS OF THE AMOUNT, OR FROM PERSONS GIVING MORE THAN $100 TO A COMMITTEE. 3. NAME, ADDRESS AND OCCUPATION (LIST COMMITTEES FIRST) | 4. DATE RECEIVED AGGREGATE TO DATE | 5. AMOUNT RECEIVED (CHECK IF MONETARY OR IN-KIND) |
|---|---|---|
| NAME: ADDRESS: Beth Mufson CITY / STATE: 205 Brookwood Avenue Easton MD 21601 EMPLOYER: Self employed -- Puzzle Maker COMMITTEE: | 2/3/2024 $ 30.00 | $ 30.00 ☑ MONETARY ☐ IN-KIND |
| NAME: ADDRESS: Raj Rana CITY / STATE: 1310 Alma Ave Apt W313 Walnut Creek CA 94596 EMPLOYER: Chevron -- IT Engineer COMMITTEE: | 2/13/2024 $ 100.00 | $ 100.00 ☑ MONETARY ☐ IN-KIND |
| NAME: ADDRESS: Matthew Russell CITY / STATE: 3665 Kaweonui Rd Princeville HI 96722 EMPLOYER: Self -- Maintenance COMMITTEE: | 2/26/2024 $ 100.00 | $ 100.00 ☑ MONETARY ☐ IN-KIND |
| NAME: ADDRESS: Justin White CITY / STATE: 112004 Faber Lane Chaska MN 55318 EMPLOYER: Employed?soon! Hehe -- B2B Sales COMMITTEE: | 3/8/2024 $ 1,000.00 | $ 250.00 ☑ MONETARY ☐ IN-KIND |
| NAME: ADDRESS: Elbert Williams CITY / STATE: 304 W Old Watson Rd Saint Louis MO 63119 EMPLOYER: Retired -- Retired COMMITTEE: | 3/14/2024 $ 25.00 | $ 25.00 ☑ MONETARY ☐ IN-KIND |
| NAME: ADDRESS: Patricia Norwood CITY / STATE: 31 Encino Ave San Antonio TX 78209 EMPLOYER: Self -- Physician COMMITTEE: | 3/18/2024 $ 25.00 | $ 25.00 ☑ MONETARY ☐ IN-KIND |
| NAME: ADDRESS: Dana Smith CITY / STATE: 119 Willow Lake Drive Fairhope AL 36532 EMPLOYER: Self -- Sales COMMITTEE: | 3/26/2024 $ 50.00 | $ 50.00 ☑ MONETARY ☐ IN-KIND |
| NAME: ADDRESS: Charles Johnson CITY / STATE: US Passport Conroe TX 77384 EMPLOYER: Self -- Self COMMITTEE: | 1/11/2024 $ 264.12 | $ 264.12 ☐ MONETARY ☑ IN-KIND |

| TOTAL: ITEMIZED CONTRIBUTIONS | -- |
|---|---|

**(CARRY TO ITEM 7 "SUBTOTAL: ITEMIZED CONTRIBUTIONS FROM ANY ATTACHED PAGES" ON FORM CD-1)**

# Exhibit P

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHARLES C. JOHNSON,
                    Plaintiff,

        v.                                          No: 1:23-cv-01485 (MSN/WEF)

HAL LAMBERT,
POINT BRIDGE CAPITAL,
                    Defendants.

## ORDER

Plaintiff Charles C. Johnson filed a complaint *pro se* against Defendants Hal Lambert and

Point Bridge Capital alleging breach of contract and fraudulent misrepresentation (Count I) and

unjust enrichment (Count II). Both counts allegedly relate to the "launch" of Umbra Lab Inc.

("Umbra Lab"). Plaintiff alleges he helped raise funds for Defendants to invest in Umbra Lab from

his network of investors and was subsequently barred from working with Umbra Lab. Plaintiff

further alleges to have suffered public embarrassment with his investment network due to

Defendants' conduct.

Before the Court is Defendants' Motion to Dismiss for Lack of Personal Jurisdiction,

Improper Venue, Failure to State a Claim, and Failure to Timely Serve the Complaint,[1] Or, in the

Alternative, Motion to Transfer Venue. ECF 3 ("Motion"). The motion has been fully briefed and

the Court finds that oral argument will not materially aid the decisional process. Upon

---

[1] Fed. R. Civ. P. 4(m) stipulates that "[i]f a defendant is not served within 90 days after the complaint is filed, the court – on motion or on its own after notice to the plaintiff – must dismiss the action without prejudice against the defendant or order that service be made within a specified time." Plaintiff filed his complaint on October 31, 2023. Defendant Lambert was served with a Summons on January 31, 2024, more than ninety days after the complaint was filed. Defendant Point Bridge Capital was also not served, and no summons directed to Point Bridge Capital has been requested. Plaintiff does not dispute this in his opposition brief. Furthermore, given that Plaintiff has not shown good cause for untimely service or failure to serve Defendant Point Bridge Capital, this also serves as a valid basis for dismissal.

consideration of the pleadings and for the reasons set forth below, the Court will **GRANT** the Motion.

Defendants argue that the Court lacks personal jurisdiction over them, that venue is not proper in this district, that Plaintiff failed to state a claim upon which relief can be granted, and that Plaintiff failed to timely serve the complaint. In the alternative, Defendants seek transfer of venue. The Court finds that the motion can be resolved on personal jurisdiction grounds, and therefore it need not address the other issues.[2]

Under Fed. R. Civ. 12(b)(2), "the Court may dismiss a case for lack of personal jurisdiction." *Selke v. Germanwings GmbH*, 261 F. Supp. 3d 645, 651 (E.D. Va. 2017). "When a court rules on personal jurisdiction without an evidentiary hearing, the plaintiff must make a *prima facie* showing of a sufficient jurisdictional basis to survive the challenge." *Id*. "In such circumstances, a court must view all the relevant allegations in the light most favorable to the plaintiff and draw all reasonable inferences for the existence of jurisdiction." *Id*. at 651-52.

---

[2] To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009). A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Nevertheless, a plaintiff must make more than bald accusations or mere speculation; "naked assertions devoid of further factual enhancement," and "a formulaic recitation of the elements of a cause of action" are insufficient under Rule 12(b)(6). *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). When considering a motion under Rule 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). A complaint by a *pro se* plaintiff should be liberally construed. *Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir. 1978). But the Court's "task is not to discern the unexpressed intent of the plaintiff." *Laber v. Harvey*, 438 F.3d 404, 413 n.3 (4th Cir. 2006). In the body of his complaint, Plaintiff fails to state any facts that point to the existence of a valid contract or agreement between Defendants and him. Furthermore, even though Plaintiff alleges that he began working with Defendants on November 23, 2020, ECF 1 ("Compl.") ¶ 9, he does not allege that this action was undertaken pursuant to a contract with either Defendant. In his "First Claim for Relief," Plaintiff does allege that "Defendants entered into an express written and oral contract with Plaintiff whereby access to his network of investors was predicated on his participation in the company's operations." *Id*. ¶ 25. However, Plaintiff fails to allege any of the essential elements of an oral or written contract such as what the material terms were, what the purpose of the agreement was, or the required performance expected under the agreement. Plaintiff also does not attach said contract to his complaint. As such, Plaintiff also fails to point to any specific provision of the contract or agreement that was breached. In light of these pleading failures, the Court notes that in its current form, Plaintiff's complaint fails to adequately state a claim upon which relief can be granted. *See* Fed. R. Civ. 12(b)(6).

Defendants argue that the Court lacks personal jurisdiction over them because they "do not transact any business or perform any services in Virginia and do not contract to supply any service or things in Virginia." ECF 4 ("Def. Mem.") at 7. Defendants further argue that they "do not own, use, or possess real property in Virginia and have no employees or any other presence in Virginia . . . [and] have not purposefully availed themselves in any way of the laws of Virginia." *Id*. Lastly, Defendants argue that "all the dealings between Plaintiff and Defendants with respect to the matters addressed in the Complaint took place in Texas during a time when all of the parties were residents of Texas."[3] *Id*. at 8.

In response, Plaintiff argues that Defendant Lambert "entered into [the] contract explicitly because of Plaintiff's ability to generate business in the Eastern District of Virginia." Opp. at 3. Plaintiff further alleges that following an oral contract between him and Defendant Lambert, he "immediately began meeting individuals within the Eastern District of Virginia to generate business," resulting in Defendants "benefiting from [Plaintiff's] actions within the Eastern District of Virginia," and he was "often joined by Defendant Lambert in person, during which the events referenced in the Complaint occurred." *Id*. Defendants have the better argument.

An analysis of personal jurisdiction is a two-step process that consists of both a statutory and constitutional component. *See Benton v. Home Max Realty, Inc*., 2024 WL 346490, at *3 (E.D. Va. Jan. 30, 2024). Because Defendants are not residents of Virginia, this Court "may only exercise jurisdiction if Plaintiff can establish (1) that Defendants' contacts with Virginia satisfy the Virginia long-arm statute, Va. Code Ann. § 8.01-328.1, and (2) that the statutory assertion of jurisdiction is consistent with the Due Process Clause of the Constitution." *Id*. Under the Virginia's long arm

---

[3] This fact is supported by Plaintiff's own assertion that "[o]n or about November 21, 2021, [he] signed a lease for his tenancy in a townhouse located [in] . . . Reston, Virginia." ECF 6 ("Opp.") at 2. This is approximately a year after "Plaintiff began working with Lambert and Point Bridge Capital [] to launch Umbra Lab, Inc" on November 23, 2020. Compl. ¶ 9.

statute, this Court may exercise personal jurisdiction over a defendant "when the cause of action arises from defendant transacting any business in this Commonwealth or contracting to supply services or things in this Commonwealth." *Netstyle Corp. v. Pie Headwear, LLC*, 2023 WL 9376775, at *2 (E.D. Va. Dec. 13, 2023) (cleaned up). Furthermore, this Court may also exercise personal jurisdiction over defendants, "who act[] directly or by an agent, as to a cause of action arising from . . . transacting any business in this Commonwealth or . . .causing tortious injury by an act or omission in this Commonwealth . . ." *Newbauer v. Jackson Hewitt Tax Serv. Inc.*, 2019 WL 1398172, at *6 (E.D. Va. Mar. 28, 2019) (cleaned up). Aside from Plaintiff's allegation that he is "domiciled in Fairfax County," Compl. ¶ 1, his complaint fails to identify any other act or omission on the part of either Defendant that took place in Virginia. Therefore, Virginia's long-arm statute does not reach Defendants' alleged conduct underlying Plaintiff's claims.

"To satisfy the constitutional due process requirement [of personal jurisdiction], a defendant must have sufficient 'minimum contacts' with the forum such that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Consulting Engineers Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009) (quoting *Int'l Shoe Co. v. State of Wash.*, 326 U.S. 310, 316 (1945)). "The minimum contacts test requires the plaintiff to show that the defendant 'purposefully directed his activities at the residents of the forum' and that the plaintiff's cause of action 'arises out of those activities.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz.*, 471 U.S. 462, 472 (1985)). "This test is designed to ensure that the defendant is not haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts," and it "protects a defendant from having to defend himself in a forum where he should not have anticipated being sued." *Id.*

The Fourth Circuit "has synthesized the due process requirements for asserting specific personal jurisdiction [into] a three part test."[4] *Id.* at 278. The Court considers "(1) the extent to which the defendant[s] purposefully availed [themselves] of the privilege of conducting activities in the State; (2) whether the plaintiff's claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir. 2002)). "If, and only if . . . the plaintiff has satisfied th[e] first prong of the test for specific jurisdiction need [the court] move on to a consideration of prongs two and three." *Consulting Engineers Corp.*, 561 F.3d at 278.

As relevant here, it is well-established that, under the first prong of the test, "[t]he proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant[s]' conduct connects [them] to the forum in a meaningful way." *McNeil v. Biaggi Prods., LLC*, 2017 WL 2625069, at *7 (E.D. Va. June 16, 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)). In other words, "[a]lthough the place that the plaintiff feels the alleged injury is plainly relevant to the inquiry, it must ultimately be accompanied by the defendant[s]' own contacts with the state if jurisdiction over the defendant[s] is to be upheld." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 143 (4th Cir. 2020) (cleaned up). "[T]he purposeful availment prong of the personal jurisdiction analysis can be met if [] defendant[s]' intentional conduct in the [forum] state was calculated to cause injury to the plaintiff in the forum state," but "mere injury to a forum resident [is] not a sufficient connection to the forum."[5] *Foster Made, LLC v. Foster*, 2018

---

[4] "A court may exercise general or specific personal jurisdiction." *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 188 (4th Cir. 2016). Plaintiff does not allege that this court has general personal jurisdiction over the Defendants.
[5] Plaintiff alleges to be a citizen of Reston, Virginia domiciled in Fairfax County, Virginia. Compl. ¶ 1.

WL 4693810, at *3 n.6 (E.D. Va. Sept. 28, 2018); *Gillison v. Lead Express, Inc*., 2017 WL 1197821, at *14 (E.D. Va. Mar. 30, 2017).

Plaintiff introduces in his opposition brief the fact that "Defendants, although domiciled in Texas and Delaware, conduct business in the Eastern District of Virginia through their direct, private investments in satellite technology which is then sold to the Department of Defense and other agencies." Opp. at 3. Plaintiff, however, "may not introduce new allegations or new facts in an opposition to a defendant's motion to dismiss." *Hooker v. Disbrow*, 2017 WL 1377696, at *4 (E.D. Va. Apr. 13, 2017). Nevertheless, the Court notes that in his complaint, Plaintiff alleges to be the nexus between Defendants and the Department of Defense and other federal agencies "in order [for Defendants] to obtain lucrative contacts." Compl. ¶ 10. Moreover, "the plaintiff cannot be the only link between the defendant[s] and the forum. Rather, it is the defendant[s]' conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over [them]." *Walden*, 571 U.S. at 285. Plaintiff's vague allegation is insufficient to establish personal jurisdiction given that his "showing of personal jurisdiction must be based on specific facts set forth in the record." *Edwards v. Schwartz*, 378 F. Supp. 3d 468, 493 (W.D. Va. 2019).

For these reasons, this Court lacks personal jurisdiction over the non-resident Defendants. Accordingly, Defendants' Motion to Dismiss (ECF 3) is **GRANTED**, and it is hereby

**ORDERED** that this civil action is **DISMISSED WITHOUT PREJUDICE.**[6]

The Clerk is directed to forward copies of this Order to counsel of record and plaintiff *pro se* and close this civil action.

|  | /s/ |
|---|---|
| Alexandria, Virginia | Hon. Michael S. Nachmanoff |
| April 2, 2024 | United States District Judge |

---

[6] Because the Court has dismissed the complaint, it will not consider Defendants' request to transfer venue.

# Exhibit Q

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

CHARLES C. JOHNSON
                *Plaintiff,*

        v.                                            No. 1:24-cv-1124-MSN-IDD

HAL LAMBERT and POINT BRIDGE
CAPITAL,
                *Defendants.*

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants' Unopposed Motion to Dismiss Plaintiff's Complaint (ECF 5). This is the second time this case has been brought before this Court. In the first case, Plaintiff Charles C. Johnson filed a *pro se* complaint against Defendants Hal Lambert and Point Bridge Capital alleging breach of contract and fraudulent misrepresentation (Count I) and unjust enrichment (Count II) relating to the "launch" of Umbra Lab Inc. ("Umbra Lab"). *Johnson v. Lambert, et al.*, Case No. 1:23-cv-01485-MSN-WEF (the "2023 Case"). This Court granted Defendants' Motion to Dismiss for lack of personal jurisdiction over the non-resident Defendants. *See* 2023 Case, Dkt. 8 (Order, E.D. Va. April 2, 2024) ("2023 Order"). The present Complaint (ECF 1) contains the same core allegations against the same Defendants. Plaintiff alleges new facts which purport to bolster his personal jurisdiction argument, but these additional facts are materially similar to those already rejected by this Court. Plaintiff does not get a second bite at the apple. Because Plaintiff is collaterally estopped from re-litigating the issue of personal jurisdiction in this Court, this Court once again grants Defendants' Motion to Dismiss.

# I.    BACKGROUND

## A.    The 2023 Case

In October 2023, Plaintiff filed a complaint *pro se* against Defendants Hal Lambert and Point Bridge Capital. *See* 2023 Case, ECF 1 (the "2023 Compl."). Plaintiff alleged that he worked with Defendants to launch Umbra Lab, and then used his network of investors to help Defendants raise funds for the project. *See* 2023 Compl. at ¶¶ 8-10. Plaintiff claims that Defendants subsequently barred him from working with Umbra Lab, prompting his suit for breach of contract and fraudulent misrepresentation (Count I) and unjust enrichment (Count II). *Id.* at ¶¶ 24-30. Defendants moved to dismiss Plaintiff's complaint on the grounds that "Defendants, who both are Texas residents and citizens, have no contacts with the Commonwealth of Virginia that would allow this court to exercise personal jurisdiction over them and, further, all of the alleged acts giving rise to the Plaintiff's claims took place in Texas." 2023 Case, ECF 3 at 2.

This Court agreed with Defendants and dismissed the case for lack of personal jurisdiction. *See* 2023 Order at 2. The Court undertook the required two-step personal jurisdiction analysis. *Id.* at 3. First, the Court found that Virginia's long-arm statute does not reach Defendants' alleged conduct because Plaintiff's "complaint fails to identify any … act or omission on the part of either Defendant that took place in Virginia." *Id.* Second, the Court analyzed the constitutional due process requirement of personal jurisdiction and found that Plaintiff failed to establish that "defendant[s]' conduct connects [them] to the forum in a meaningful way." *Id.* at 5 (quoting *McNeil v. Biaggi Prods., LLC*, 2017 WL 2625069, at *7 (E.D. Va. June 16, 2017)). The Court found that Plaintiff could "not be the only link between the defendant[s] and the forum. Rather it is the defendant[s]' conduct that must form the necessary connection with the forum State that is

the basis for its jurisdiction over [them]." *Id.* at 6 (quoting *Walden v. Fiore*, 571 U.S. 277, 285 (2014)). Accordingly, this Court dismissed the action without prejudice. *Id.*

## B.    The 2024 Case

Curiously, Plaintiff declined to seek leave to amend to the complaint in the same matter,[1] and instead filed a <u>new</u> complaint in June 2024, alleging the same material facts and claims. *Johnson v. Lambert, et al.*, Case No. 1:23-cv-01124-MSN-IDD, ECF 1 (the "2024 Compl."). Plaintiff alleged several new facts about activities that purportedly took place in Virginia in an effort to establish personal jurisdiction. For example, Plaintiff asserted:

- Johnson "from his home and office in Reston, Virginia . . . consults to U.S. Federal Government agencies located, *inter alia*, in Alexandria, Arlington, Chantilly, Manassas, and McLean, Virginia." 2024 Compl. at ¶ 8.

- Point Bridge Capital is "a Texas-based company that provides investments to U.S. Federal Government agencies located *inter alia*, in Alexandria, Arlington, Chantilly, Manassas, and McLean, Virginia." 2024 Compl. at ¶ 9.

- "Between 2016 and 2023, Lambert [CEO of Point Bridge] made numerous trips to Virginia to conduct the investment business of Point Bridge Capital, including trips to support his investments in technologies sold to U.S. Federal Government agencies located in Northern Virginia." 2024 Compl. at ¶ 10.

- "Johnson facilitated meetings between said investors and Defendants, including in-person meetings with Lambert and Johnson, investors, and potential customers in locations such as Reston, Chantilly, and McLean, Virginia." 2024 Compl. at ¶ 12.

- "While Defendants were based in Texas, Johnson continued his efforts from his home and offices in Reston, Virginia to assure the growth and success of Umbra Labs." 2024 Compl. at ¶ 13.

But, as explained below, these facts are materially similar to those which this Court already rejected. Thus, once again, Defendants moved to dismiss the 2024 Complaint on July 30, 2024. *See* 2024 Case, ECF 5 ("MTD"). Plaintiff's opposition was due August 20, 2024, but no such

---

[1] This Court dismissed the 2023 Case without prejudice. *See* 2023 Order at 6.

opposition was filed. Although Plaintiff did not challenge Defendants' motion, this Court "nevertheless has an obligation to review the motion[] to ensure that dismissal is proper." *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416 n.3 (4th Cir. 2014). This Court has undertaken such a review and once again will grant Defendants' motion.

### 1. This Court Cannot Exercise Personal Jurisdiction Over the Defendants Under Principles of Collateral Estoppel

This Court already dismissed Plaintiff's action on the basis that neither Defendant was subject to personal jurisdiction in this Court. *See generally* 2023 Order. "Collateral estoppel serves to foreclose the relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate." *Zeno v. United States*, 451 Fed. Appx. 268, 271 (4th Cir. 2011) (cleaned up) (citing *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 326 (4th Cir. 2004)). Collateral estoppel applies where "(1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding." *Id.* Here, all five factors foreclose this Court from relitigating the issue of personal jurisdiction.

First, the issue or facts are identical to the ones previously litigated. The two counts contained in the 2024 Complaint are identical to the two counts in the 2023 Complaint: (I) breach of contract and fraudulent misrepresentation; and (II) unjust enrichment. Furthermore, the issue at hand in both Complaints is the same: whether Defendants are subject to this Court's personal jurisdiction as to those claims. As such, the 2024 Complaint presents the same issue. *See Zeno*,

451 F. Appx. At 271 (finding that after a 2007 suit was dismissed because "it did not have personal jurisdiction over the individual defendants," when the same Plaintiff filed suit two years later against "the same individual defendants and again filed in the District of Maryland . . . the issues [were] identical").

Plaintiff's additional factual allegations, described above, do not change this analysis because they are materially similar to those which this Court already rejected. *See, e.g., Hegedus v. Nationstar Mortg., LLC*, 2018 WL 1461747, at *3 (W.D. Va. Mar. 23, 2018) (holding that collateral estoppel applies "despite the new factual allegations" when it does not alter the legal issues in a material way). For instance, in Plaintiff's 2023 Complaint, he alleged that he served as the nexus between Defendants and federal agencies "in order [for Defendants] to obtain lucrative contacts." 2023 Compl. at ¶ 10. And this Court found that "the plaintiff cannot be the only link between the defendant[s] and the forum." 2024 Order at 6 (quoting *Walden*, 571 U.S. at 285). Then in Plaintiff's 2024 Complaint, he alleges that Plaintiff "facilitated meetings between said investors and Defendants, including in-person meetings with Lambert and Johnson, investors, and potential customers in locations such as Reston, Chantilly, and McLean, Virginia." 2024 Compl. at ¶ 12. But this allegation, and most of the other "new" allegations, restate the same claim about Plaintiff serving as the "nexus" between Defendants and investors, which this Court rejected as grounds for personal jurisdiction. *See* 2024 Order at 5 ("The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant[s]' conduct connects [them] to the forum in a meaningful way." (quoting *McNeil*, 2017 WL 2625069, at *7). Plaintiff also adds the new allegation that "[b]etween 2016 and 2023, Lambert made numerous trips to Virginia to conduct the investment business of Point Bridge Capital." 2024 Compl. at ¶ 10. But this conclusory allegation is devoid of a factual basis. *See* 2024 Case, ECF 6, Ex. 2 (Declaration of Hal Lambert),

¶ 17 ("I have never traveled to Virginia to conduct the investment business of Point Bridge Capital."). As such, this allegation does not constitute a new material fact. This Court therefore finds that the issue or facts are identical to the ones previously litigated by this Court.

Second, the issue or fact was actually resolved in the prior proceeding. This Court resolved the question of personal jurisdiction in the 2023 Case. *See* 2023 Order at 6 ("For these reasons, this Court lacks personal jurisdiction over the nonresident Defendants.").

Third, this Court's determination that there was no personal jurisdiction was critical and necessary to the judgment in the 2023 Case. *See Zeno* 461 Fed. Appx. at 272 ("A district court may not adjudicate a dispute over which it lacks personal jurisdiction.").

Fourth, this Court's judgment that the Court lacked personal jurisdiction was final and valid. *See Shelton v. Crookshank*, 742 Fed. Appx. 782, 783 n.1 (4th Cir. 2018) (dismissal for lack of personal jurisdiction is final and appealable where the plaintiff cannot correct the jurisdictional defect by amendment). Plaintiff did not file a timely motion under Fed. R. Civ. P. 59 or 60, nor did he appeal the order to the Fourth Circuit.

Fifth and final, Plaintiff had a full and fair opportunity to litigate the issue of personal jurisdiction in the 2023 Case. Defendants raised the question of personal jurisdiction in their motion to dismiss, Plaintiff responded to the jurisdictional arguments in his opposition, and this Court considered and rejected Plaintiff's arguments. *See Zeno*, 461 Fed. Appx. at 272 (finding that where "[t]he court considered and rejected [Plaintiff's] contentions . . . the issues were fully litigated").

For these reasons, the Court will dismiss Plaintiff's Complaint.[2]

---

[2] The Court need not address Defendants' remaining arguments that (1) even without the benefit of collateral estoppel, this action must be dismissed for lack of personal jurisdiction; (2) there is no proper basis for venue in this district; and (3) the complaint fails to state any claim upon which relief can be granted. *See generally* MTD. The Court has reviewed and agrees with Defendants' arguments.

## II.    CONCLUSION

Because Plaintiff is collaterally estopped from relitigating the previously decided issue of

personal jurisdiction, the Court will grant Defendants' Motion to Dismiss and dismiss Plaintiff's

Complaint.

Accordingly, it is hereby

**ORDERED** that Defendants' Motion to Dismiss (ECF 5) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's claims against Defendants are **DISMISSED** with prejudice.

**IT IS SO ORDERED.**

<div style="text-align: right;">
/s/
_____
Michael S. Nachmanoff
United States District Judge
</div>

September 17, 2024
Alexandria, Virginia

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

## <u>DECLARATION OF HAL LAMBERT</u>

1.      I, Hal Lambert, declare that I am over 18 years old and have personal knowledge of the facts set forth below. I respectfully submit this declaration in connection with the above-captioned matter.

2.      I am a resident of Tarrant County, Texas. I am an investor and the founder of one the premier venture capital firms in Texas, Point Bridge Capital, the other plaintiff in the above-captioned litigation.

3.      I attended a meeting with Charles Johnson and Gator Greenwill at Winslow's Wine Cafe in Fort Worth, Texas. At the meeting, Greenwill and Johnson told me that Greenwill was associated with the CIA. They also told me that Greenwill could help secure government contracts and fundraise for early-stage companies. And they suggested that, based on their government affiliations, they could conversely make it difficult for companies to obtain government contacts, which would have a correspondingly harmful impact on fundraising. When I participated in the meeting, Johnson knew that I was associated with Clearview AI, Inc. and Umbra Lab., Inc., which is now Umbra Space.

1

4.    On October 6, 2020, Johnson texted me that he was "[a]t the Worthington [Renaissance Hotel in Ft. Worth, TX] working." The Worthington is located right next to Point Bridge's offices.

5.    Johnson has called, emailed, and texted me many times. He called and texted me on my phone, which has an area code (214) corresponding to the DFW metroplex.

6.    In conversations that I had with Johnson, I mentioned that I was longtime resident of Fort Worth and that Point Bridge had its offices in Fort Worth.

7.    I have reviewed the document that is listed as Exhibit E to the declaration of Will Thompson. The document is a true and correct copy of a text message between me and Charles Johnson.

8.    I have reviewed the document that is listed as Exhibit J to the declaration of Will Thompson. This is a true and correct copy of a document that Charles Johnson sent to me.

I declare under penalty of perjury that the foregoing is true and correct.

DATED December 23, 2024.

Hal Lambert

# EXHIBIT 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| Point Bridge Capital, LLC, | § | |
| Hal Lambert | § | |
| | § | Case No. 4:24-cv-0988-P |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| Charles Johnson, | § | |
| | § | |
| *Defendant.* | § | |

### PLAINTIFFS' SECOND AMENDED COMPLAINT[1]

Point Bridge Capital, LLC ("Point Bridge"), a Fort Worth, Texas headquartered entity, and Hal Lambert ("Lambert"), a resident of Tarrant County, Texas (together, "Plaintiffs") bring this lawsuit against Charles Johnson ("Defendant" or "Johnson").

### NEED FOR ACTION

1.      Since at least 2020, Charles Johnson has been running a fraud and extortion scheme under which he and his RICO co-conspirator, Gator Greenwill, falsely present themselves as intelligence agents or assets of U.S. government agencies. Johnson and Greenwill seek investments in upstart technology companies operating in the defense and intelligence sectors, which heavily rely on government contracts. If a company or investor doesn't give in to their demands for equity or favorable investment terms, Johnson and Greenwill threaten to sabotage the companies' contracts or funding under the guise of their purported status as government agents. Johnson has wrongfully succeeded in profiting from and gaining interests in these cutting-edge technology companies using this shakedown scheme.

---

[1] Plaintiffs submit this Second Amended Complaint at the direction of the Court's Order of January 6, 2025, ECF Nos. 31, 32.

2.      Johnson started his fraudulent and extortive criminal enterprise after his once-promising career in mainstream conservative journalism fell through due to publishing several unsubstantiated pieces. Embracing his "reputation as a peddler of disinformation"[2] and proud of his "patented trolling techniques,"[3] Johnson ended up posting almost exclusively on his own sites and forums such as Substack, Reddit, and X, where he denied the Holocaust and accused hundreds of prominent politicians, businessmen, and activists of being spies or assets of foreign governments.

3.      At some point, Johnson's conduct attracted the attention of the Federal Bureau of Investigation. Johnson then began providing information to the FBI as a confidential informant.

4.      Johnson touted his FBI contacts to inflate his purported status as an intelligence "asset" to insinuate (and later, fabricate) relationships with senior U.S. security and law enforcement officials and agencies.

5.      Despite no longer serving as an FBI informant, Johnson continues to deceptively describe himself as a "federal operative." He often implies or explicitly states that he speaks on behalf of law enforcement and intelligence agencies when making his false claims. Johnson then joined forces with his co-conspirator Greenwill, who likewise deceptively described himself as a CIA affiliate.

6.      Together with Greenwill, Johnson has threatened to use his claimed ties with federal law enforcement to induce baseless investigations, lawsuits and regulatory actions, and to spread

---

[2] Kashmir Hill, *Your Face is Not Your Own*, N.Y. Times Magazine (Mar. 18, 2021), https://www.nytimes.com/interactive/2021/03/18/magazine/facial-recognition-clearview-ai.html.

[3] Madeleine Aggeler, *Here's How an Alt-Right Troll Auditions for Survivor*, The Cut (Feb. 27, 2018), https://www.thecut.com/2018/02/chuck-johnson-alt-right-troll-auditions-for-survivor.html.

App.163

false and damaging allegations about individuals' supposed ties to foreign governments, in order to extort money from them.

7.    Johnson and Greenwill falsely claim affiliation with, and support from, the U.S. law enforcement and intelligence communities in their effort to induce businessmen to invest with them either by promising government contracts or threatening Internal Revenue Service audits, Securities and Exchange Commission investigations, or other sanctions, which neither law enforcement nor intelligence services are lawfully permitted to threaten or promise, to say nothing about people like Johnson and Greenwill who pretend to be associated with those agencies.

8.    Johnson and Greenwill repeatedly schemed to induce counterparties into sham or shoddy investments—or to extract unduly favorable returns from existing ventures—by using Johnson's supposed status as a "federal operative" to fraudulently promise government contracts or fraudulently threatening government reprisal.

9.    Plaintiffs Point Bridge and Hal Lambert are among the victims of this years-long criminal enterprise, which continues to this day.

10.    Mr. Lambert, Point Bridge's founder and principal, first met Johnson in 2016, when Johnson contacted him with an unsolicited offer to help raise money for a political candidate.

11.    Plaintiffs became ensnared in Johnson's RICO conspiracy in 2020 when Mr. Lambert personally met with Johnson and Greenwill in Fort Worth, Texas. During that initial meeting at Winslow's Wine Cafe, Johnson and Greenwill told Mr. Lambert about their government connections and said that Greenwill was associated with the CIA and could help Point Bridge and Mr. Lambert secure government contracts and funding for companies in which they invested—a tactic that Johnson has referred to as the "Carrot." Conversely, Johnson and Greenwill communicated that they could use their influence to interfere and stymie such companies' chances

3

of securing government contracts and funding—which according to Johnson was the "Stick." During this meeting, Johnson and Greenwill knew that Plaintiffs were affiliated with Clearview AI and Umbra Space. Clearview AI is an American facial recognition company providing software primarily to law enforcement and other government agencies. Umbra Space is a satellite imaging company with significant government contracts. Clearview AI and Umbra Space fit the types of companies that Johnson and Greenwill have suggested that their status as government agents or assets could either help or hurt.

12.    In November 2020—following the meeting in Fort Worth where Johnson and Greenwill not so subtly threatened Plaintiffs—Point Bridge agreed to a cash investment from Johnson and accorded him a minority stake in a special-purpose investment vehicle ("SPV") for Umbra Space.

13.    Soon thereafter, Johnson and Greenwill began pressuring Plaintiffs to violate their fiduciary duties, and take Johnson's side, in a dispute between Johnson and Clearview AI, on whose board Mr. Lambert served and in which Point Bridge is an investor.

14.    After Mr. Lambert, Point Bridge, and its portfolios companies refused to do Johnson and Greenwill's bidding, Johnson—referring to his supposed work on behalf of the U.S. government—tried to intimidate and deceive Mr. Lambert's colleagues, Point Bridge's investors, and the public to extort Plaintiffs. Johnson even went so far as to file frivolous litigation in federal court. In these actions, Johnson falsely claimed that the U.S. government was supporting, directing, and even instigating his tortious and illegal actions.

15.    Johnson's conduct in litigation he filed in the Southern District of New York, *Johnson v. Clearview AI, Inc.*, No. 1:23-cv-024, exposes the frivolity of his legal actions and his willingness to mislead federal courts. In the *Clearview AI* matter, Judge Katherine Polk Failla

recently noted in a January 16, 2025 order that Johnson falsely told the court that agents of the Department of Homeland Security were instructing him to withhold discoverable material. Johnson was lying—which the judge herself uncovered after taking the extraordinary step of contacting DHS directly to identify the purported agents that were in communication with Johnson. It turns out that the "agents" Johnson identified do not exist.[4]

16.    Johnson's deception has apparently extended to the present litigation by making his social media postings, which Plaintiffs' pleadings cite, unavailable. Since the filing of Plaintiffs' First Amended Complaint, ECF No. 4, and after Judge Failla ordered Johnson to explain his failures to comply with court orders related to his social media posting, Johnson deleted his account on X, making his previous posts unavailable. Johnson falsely proclaimed to the public that Elon

---

[4] Judge Failla wrote:

> [A]t both the January 8 and January 13 conferences, Plaintiff advised the Court that he had taken, and refrained from taking, certain actions at the direction of federal law enforcement agents. More particularly, Plaintiff advised the Court that he had been instructed not to produce any additional discovery in this case by two agents working for the Department of Homeland Security ("DHS").
>
> The Court obtained the consent of the parties to speak with the agents, identified as "Alexander Rodriguez" and "Alexander Fletcher," and received purported contact information for one of the agents from Plaintiff's counsel. However, with the assistance of the United States Attorney's Office for the Southern District of New York, the Court has reached out to DHS to obtain additional information regarding these agents. As relevant here, the Court has been advised that DHS can locate no Special Agent with those names, in HSI or in any other division of DHS, and, indeed, the DHS can locate no employee named Alexander Fletcher.

*Johnson v. Clearview AI, Inc.*, No. 1:23-cv-02441, ECF No. 68 at 5 (S.D.N.Y. Jan. 16, 2025).

App.166

Musk, working with Point Bridge and Mr. Lambert, banned his X account.[5] However, Johnson's own posted screenshots show he deactivated the account himself and he currently has the ability to "restore" the account. Whether Johnson deactivated the account to impede discovery and make prosecution of this matter more difficult is not yet clear.

17.    And after a different frivolous lawsuit against Point Bridge and Mr. Lambert was dismissed by a Virginia federal court, Johnson undertook retaliatory defamation campaign against Mr. Lambert where he made knowingly false claims that Mr. Lambert engaged in sexual harassment, engaged in fraud, and was a "front" for hostile foreign governments and criminal enterprises.

18.    Johnson's escalating misconduct against former business counterparties, including Plaintiffs, fits with the threats that he made in 2020 and requires federal court intervention.

19.    Plaintiffs seek appropriate relief under 18 U.S.C. § 1962(c), including an injunction against Johnson's involvement in the criminal enterprises and restrictions against his predatory business activities and criminal schemes, treble damages, and attorney's fees and costs.

20.    Point Bridge also seek damages for Johnson's breach of a subscription agreement, and Mr. Lambert individually seeks damages and other relief against Johnson for defaming him.

### SUBJECT MATTER JURISDICTION

21.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 based on the federal Racketeering and Corrupt Organizations Act ("RICO") claims. And the Court has supplemental jurisdiction over Plaintiffs' causes of action for defamation and breach of

---

[5] Charles Johnson, *How Elon Musk Is Working With Foreign Governments and Compromised Attorneys To Promote Lawfare Against Me and Silence My Voice ... and Now He Has Now Deleted My Twitter Account, Substack* (Dec. 30, 2024), https://charlesjohnson.substack.com/p/how-elon-musk-is-working-with-foreign (last visited Jan. 21, 2025).

App.167

contract under 28 U.S.C. § 1367(a) based on a subscription agreement that Johnson signed in November 2022—an agreement that was a product and fruit of the RICO conspiracy.

22.    The Court also has subject matter jurisdiction because complete diversity of citizenship exists between the parties and the amount in controversy exceeds $75,000, exclusive of costs and interest. 28 U.S.C. § 1332(a). For jurisdictional purposes, Plaintiffs are citizens of Texas and, upon information and belief, Johnson is a citizen of Virginia. But knowing with confidence Johnson's citizenship for jurisdictional purposes is difficult thanks to the conflicting and likely perjurious statements he has made about his state of residence, including statements he provided in a sworn declaration to this Court in December 2024. Such statements are discussed in greater detail in the "Parties" section below. [6]

## PERSONAL JURISDICTION AND VENUE

23.    Johnson perpetrated the RICO conspiracy through acts he committed while physically within the state of Texas. Those acts included a meeting in or around February 2020 where Johnson and his co-conspirator, Greenwill, met with Mr. Lambert in Fort Worth. In that meeting, which occurred at Winslow's Wine Cafe, just west of downtown Fort Worth, Johnson and Greenwill told Mr. Lambert that Greenwill was associated with the CIA and could help secure government contracts and fundraise for early-stage companies. Conversely, they emphasized that, based on their government affiliations, they could make it difficult for companies to obtain government contacts, which would have a correspondingly harmful impact on fundraising and the

---

[6] Johnson has given conflicting information about his residence. He claims in court filings in this case to be a resident of Virginia. Yet he has also claimed, "I intend to move back to California" in early 2025. Charles Johnson, *On The Road Again . . . And Revising My Kamala Harris Model*, Substack (Nov. 4, 2024), https://charlesjohnson.substack.com/p/on-the-road-again-and-revising-my. Johnson has never offered tangible proof such as a lease or utility bill showing that he intends to reside indefinitely in Virginia, California, or some other state.

companies' overall success. When Johnson met Mr. Lambert for the lunch meeting in Fort Worth, he knew that Mr. Lambert resided in Fort Worth and that Point Bridge was based in Fort Worth. Johnson also knew that Mr. Lambert was associated with Clearview AI and Umbra Lab, which is now Umbra Space—both early-stage companies that rely heavily on government contracts and fundraising.

24.     What's more, for a substantial part of the conspiracy—at least through summer 2022 and likely later—Johnson was a Texas resident. During that time, he voted in Texas and listed his Texas residence in campaign donations, among other things. And he knew full well while orchestrating the conspiracy and engaging in tortious conduct that the target of his conspiracy and his defamatory statements was a longtime Texas resident. For example, Johnson publicly announced on X that Mr. Lambert was a "front" for Russian money in Texas: "[I]n the case of Hal, you know, Hal is very much, you know, tied in with the, with the Russian world, particularly in the Russian and the covid world, particularly operating in Texas." Johnson also accused Mr. Lambert on that platform of having "sexually [ ] assaulted some women at parties in Austin." Johnson's defamatory statements thus specifically referenced Mr. Lambert's purported activities in Texas—where he knew Mr. Lambert resides and where Mr. Lambert is likely to suffer harm. In no universe can Johnson argue that he could not have anticipated answering for his conduct in a Texas courtroom.

25.     Texas's exercise of jurisdiction over Johnson is reasonable because he has committed intentional torts against Mr. Lambert, and Texas has a special interest in tortfeasors who target its citizens from outside the state and harm its citizens while residing within its borders.

App.169

26.    This Court thus has personal jurisdiction over Johnson that comports with Texas' long-arm statute, Title 2, Chapter 17 of the Texas Civil Practice and Remedies Code, and the United States Constitution.

27.    Venue is proper in the Northern District of Texas under 28 U.S.C. § 1391(b)(2) because a substantial part of the events described herein occurred within the district. Among other things, Johnson's liability arises here and he intended for the harm to be felt here. Venue is further proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391 because Johnson is subject to personal jurisdiction in this district.

## PARTIES

### A.    Plaintiffs Point Bridge Capital and Hal Lambert

28.    Point Bridge is a Delaware LLC with its principal place of business in Fort Worth. Point Bridge provides high-net-worth individuals customized investment management advice across all asset classes. All members of Point Bridge are Texas citizens.

29.    Hal Lambert is a resident of Tarrant County, Texas. He is an investor and respected member of the community. He runs several businesses and is involved in non-profit organizations. He is the founder of one of Texas' premier venture capital firms and responsible for many successful high-profile investments. He is also an active philanthropist supporting educational, environmental, public safety, and law enforcement causes, among others.[7]

30.    Mr. Lambert has been married to his wife for 29 years. They share two daughters.

31.    For decades, Mr. Lambert has held high-level roles at some of the most respected investment firms in the world. Mr. Lambert spent around 15 years managing portfolios at Credit

---

[7] To be clear, none of the allegations in this Complaint should be read as a statement or admission, whether express or implied, that Lambert is anything other than a private person for purposes of the law, or that he is a public figure or a limited-purpose public figure.

App.170

Suisse and J.P. Morgan. He was a director at Credit Suisse, where he advised and managed client assets exceeding $1 billion. For J.P. Morgan, Mr. Lambert headed discretionary portfolio management for the Southwest and Western regions of the United States. Mr. Lambert was also a credit analyst for the Texas-based Bass Family, where he focused on convertible bond arbitrage.

32.    Mr. Lambert is active in conservative politics. He served on the Inaugural Committee for President Donald Trump and worked as a National Finance Chair for Ted Cruz's 2016 presidential campaign. He was the Finance Chair for the Texas GOP and has raised funds for several candidates in federal and state campaigns in Texas.

33.    In 2013, Mr. Lambert founded Point Bridge, which provides high-net-worth individuals customized investment management advice across all asset classes. In conjunction with his work at Point Bridge, Mr. Lambert created the "MAGA ETF," a publicly traded exchange fund, and the Politically Responsible Investing Strategy, a trademarked approach to investing in companies that share a Republican political ideology.

**B.    Defendant Charles Johnson**

34.    Johnson was a Texas resident from 2019 until at least late 2022 or early 2023 when he purportedly moved to Virginia. Johnson was thus a Texas resident in 2020 when he executed the Subscription Agreement with Point Bridge, which he later breached. And he was a Texas resident in or around February 2020 when he and Greenwill falsely presented themselves as agents of the federal government when they met for lunch with Plaintiffs in Fort Worth.

35.    Johnson documented his Texas residency in his own public statements, government records, and court filings. According to Johnson's FEC disclosures, in at least eight political donations made between September 19, 2019 and September 22, 2021 (when the conspiracy was ongoing) he listed his address as Conroe, Texas.

36.    On January 16, 2020, Johnson sued Verizon Media in the Southern District of Texas. In his complaint, he took issue with an article describing him as a Holocaust denier based on his statement that he agreed with a prominent Holocaust denier "about Auschwitz and the gas chambers not being real." As he admited in that complaint, "Plaintiff Johnson is a natural person and is domiciled in Montgomery County, Texas."[8]

37.    On April 9, 2020, Johnson amended his complaint against Verizon, reiterating that he was a resident of Montgomery County, Texas.[9]

38.    The court dismissed the case for lack of jurisdiction, and Johnson on appeal described himself as a "resident of Texas," including in his July 2022 petition for certiorari to the U.S. Supreme Court.[10]

39.    In this case, Johnson cited the Fifth Circuit's decision upholding dismissal of his lawsuit against the Huffington Post—a lawsuit he filed in Texas. ECF No. 15 at 11 (citing *Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314 (5th Cir. 2021)). The decision notes that "Johnson based jurisdiction on his Texas citizenship."[11]

40.    On September 12, 2020, Johnson wrote on Substack, "I had a child, divorced, and moved to the one place where I felt happiest as a child—Texas, specifically Montgomery County."

---

[8] *Johnson v. Verizon CMP Holdings, LLC*, 4:20-cv-179, ECF No. 1, at ¶ 1 (S.D. Tex. Jan. 16, 2020).

[9] *Johnson v. Verizon CMP Holdings, LLC*, 4:20-cv-179, ECF No. 25, at ¶ 1 (S.D. Tex. Jan. 16, 2020).

[10] Pet. for Writ. of Cert. at 5, *Johnson v. The HuffingtonPost.com, Inc.*, No. 22-82, 2022 WL 2987282, at *3 (U.S. July 26, 2022).

[11] *Johnson*, 21 F.4th at 316.

App.172

He added, "I found my home and my people, at last. My neighbors have taught me that we Texans don't run from a fight. Not at the Alamo. Not now. Texas, like America, is a state of mind."[12]

41.    On March 4, 2022, Johnson wrote on his Substack blog, "I am a California and Massachusetts refugee really but I am also a Texas resident . . . and I voted in the Republican Primary in early voting. . . . It was my first time voting in Texas."[13] Election records confirm that Johnson voted in the Texas Republican primary on March 1, 2022.

42.    On April 22, 2022, Johnson emailed Mr. Lambert and other Clearview AI board members a draft complaint for filing in the Southern District of New York, which stated, "Charles Johnson is a citizen and resident of Texas."

43.    On October 25, 2022, Johnson wrote a Substack article describing Representative Dan Crenshaw, who represents Texas's Second Congressional District, as "my Congressman."[14]

44.    On November 6, 2022, Johnson wrote in a Substack article about "my adopted Texas."[15]

---

[12] Charles Johnson, *Why I Am Suing BuzzFeed's Ryan Mac For Libel Over Peter Thiel Story*, Substack (Sept. 12, 2022), https://charlesjohnson.substack.com/p/why-i-am-suing-buzzfeeds-ryan-mac?utm_source=publication-search.

[13] Charles Johnson, *The Artful Return of The Bushes?*, Substack (Mar. 4, 2022), https://charlesjohnson.substack.com/p/the-artful-return-of-the-bushes?utm_source=publication-search.

[14] Charles Johnson, *Why My Congressman Dan Crenshaw, With Close Personal and Financial Ties to Israeli Intelligence and Chabad, Deserves An FBI Counterintelligence Investigation*, Substack (Oct. 24, 2022), https://charlesjohnson.substack.com/p/why-my-congressman-dan-crenshaw-with ?utm_source=publication-search.

[15] Charles Johnson, *Go Ahead and Quit Twitter: You'll Live Without Your Addiction—And Maybe Be Happier*, Substack (Nov. 6, 2022), https://charlesjohnson.substack.com/p/go-ahead-and-quit-twitter-youll-live.

App.173

45.    In a May 28, 2023 X Space, Johnson described himself as a Texas home and business owner who is still allowed to vote in Texas because, while he is no longer a "full time" resident, he is only out of the state on assignment by the federal government:

> I have a home in Texas, have invested in several businesses in Texas. I believe I'm still a Texas voter, because technically, I was forced to move to D.C. by the U.S. government or Northern Virginia by the U.S. government. So I think I'm still technically allowed to vote there. But I'd have to double check there . . . . I love Texas. It's a great state. . . . You know, Texas is a special place in my heart. And if I could figure out a way to live there full time, I would.[16]

46.    On an October 29, 2024 X Space, Johnson said "I lived in Texas for a long time."[17]

47.    On January 11, 2024, Johnson contributed $264 to Missouri State Representative Sarah Unsicker's campaign and listed Conroe, Texas as his personal address in disclosures to the Missouri Election Committee.

48.    Johnson is still registered to vote in Montgomery County, Texas.

49.    Johnson has made conflicting statements about his Texas residency timeline. For example, on an August 18, 2024 X Space in which he made defamatory comments about Mr. Lambert, he said, "I was living in Texas at the time [immediately prior to the Russia-Ukraine war], so just got in my car and I drove, you know, to Northern Virginia. And I've been here basically six weeks before the Ukraine war broke out."[18] The Russia Ukraine War began around February 24, 2022. While this comment acknowledges Johnson lived in Texas, the early 2022 date conflicts

---

[16] @JohnsonThought1, *Kissinger at 100 and Israeli-American Relations*, X (May 28, 2023), https://twitter.com/JohnsonThought1/status/1662647529551413248 (last visited Oct. 16, 2024).

[17] @JohnsonThought1, *Kamala Will Win the 2024 Election and Donald Trump Is Helping Her*, X Space (Oct. 29, 2024, 10:38 p.m.).

[18] @JohnnsonThought1, *Donald Trump Doesn't Want to Win. Also Cleveland Rocks*, X Space (Aug 18, 2024, 2:31 a.m.), https://x.com/JohnsonThought1/status/1825026842849423596.

App.174

with his other statements between March and November 2022 where he claimed to be a current Texas resident and his voting in the March 1, 2022 Texas Republican primary.

50.    Not only was Johnson a Texas resident while he was perpetrating the RICO conspiracy, but he has also conducted business in Texas to the present day, including business directly related to his breach of contract and RICO conspiracy.

51.    On October 6, 2020, a few months after Johnson and his co-conspirator Greenwill met with Mr. Lambert at Winslow's Wine Cafe in Fort Worth, Johnson texted Mr. Lambert that he was "[a]t the Worthington [Renaissance Hotel in Fort Worth, Texas] working."

52.    Johnson describes himself as the CEO of Traitwell Inc. on his LinkedIn and Substack bios. As recently as December 11, 2024, he posted on X, "I'm currently CEO of @traitwell."

53.    On October 12, 2020, Our Perfect Score, Inc. d/b/a Traitwell, Inc. filed an application for recognition as a foreign for-profit corporation with the Texas Secretary of State. The application listed the company's principal office address as The Woodlands, Texas. Traitwell's LinkedIn page lists the same city as its headquarters.

54.    On March 12, 2023, Johnson wrote that Traitwell "picked a local Texas bank—Woodforest! and I have never looked back."[19]

55.    On September 28, 2022, Johnson personally filed an application for registration of a foreign limited liability company for Metis Funding LLC with the Texas Secretary of State. The application listed both Metis Funding's principle place of business and Johnson's registered-agent address as Conroe, Texas.

---

[19] Charles Johnson, *Our Silicon Valley Bank Run Moment: Give Peter Thiel A Parade And A Medal of Freedom*, Substack (Mar. 12, 2023), https://charlesjohnson.substack.com/p/our-silicon-valley-bank-run-moment.

App.175

56.     On an August 13, 2024 X Space, Johnson stated, "I have a lot of business interests in California and Texas."[20]

## STATEMENT OF FACTS

**A.      Johnson initially presents himself as an online troll combatting the "Deep State."**

57.     Johnson once had a promising career in conservative journalism, writing for online publications including *Breitbart* and the *Daily Caller*.

58.     In 2013, after he lied to his editors and published unsubstantiated stories, his freelancing arrangement with the *Daily Caller* was terminated. Johnson started his own publication, GotNews, in 2014.

59.     Johnson became a pariah within conservative journalism. By the time Johnson's journalism career failed in the mid-2010s, he had built a reputation as "the most hated man on the internet."[21] A 2014 *Washington Examiner* article noted that Johnson "is described as a joke, toxic and derailed. Not by liberals but by others in Right-leaning media and the blogosphere."[22] The article shared quotes from fellow-conservative journalists, including former colleagues, sharing their unfavorable opinions of him:

- He is an "activist, not a journalist . . . [a]nd a very sloppy activist considering all the facts he gets wrong";

---

[20] @JohnsonThought1, *Does Trump want to lose?!*, X Space (Aug. 13, 2024 10:08 p.m.).

[21] *'Most Hated Man on the Internet' Found in Fresno*, ABC30 Action News (Jan. 2, 2015), https://abc30.com/charles-c-johnson-most-hated-man-on-the-internet-ferguson-darren-wilson/459968/https://abc30.com/charles-c-johnson-most-hated-man-on-the-internet-ferguson-darren-wilson/459968/ (last visited Oct. 16, 2024).

[22] Eddie Scarry, *Media Conservatives Won't Claim Derisive Blogger Charles Johnson*, Washington Examiner (Dec. 10, 2014, 9:10 p.m.), https://www.washingtonexaminer.com/politics/607827/media-conservatives-wont-claim-derisive-blogger-charles-johnson/ (last visited Oct. 16, 2024).

App.176

- "If the liberals at Salon or MSNBC were to create a caricature of a conservative reporter, it would be Charles Johnson"; and

- "[I]t wasn't long before I realized that he's completely [nuts]."[23]

60.     On August 12, 2017, GotNews falsely accused a Michigan man of being responsible for the vehicular murder at the alt-right "Unite the Right" rally in Charlottesville, Virginia, describing the man, who was not even in the state of Virginia at the time of the murder, as a "Terrorist" and an "Anti-Trump, Open Borders Druggie." This person sued GotNews and Johnson in his personal capacity for defamation. The complaint survived a motion to dismiss.[24] GotNews declared bankruptcy in 2018 and the case was settled.

61.     Based on this type of defamatory reporting, Johnson is called a "peddler of disinformation" and an "alt-right uber-troll."[25]

62.     Despite his failing career, Johnson leveraged the connections he had developed as a journalist to meet prominent politicians and businessmen.

63.     Johnson's poor reputation was not known far beyond narrow professional circles in political journalism. Prior to 2017, Johnson primarily used the nickname "Chuck" in his controversial reporting and on his social media. Then, after Donald Trump became president, he began exclusively using "Charles." There are well over 50 Charles Johnsons on Wikipedia

---

[23] *Id.*

[24] *Vangheluwe v. GotNews, LLC*, 365 F. Supp. 836, 839 (E.D. Mich. 2019).

[25] Ben Shapiro, *Conservatives Oust Bigotry, and the Left Only Slams Them for It*, National Review (Aug. 28, 2018, 6:30 a.m.), https://www.nationalreview.com/2018/08/conservatives-oust-bigotry-left-only-criticizes-them-for-it/.

including prominent Republican donors and political bloggers, which made his unsavory writings and associations difficult to learn about based on cursory Google searches.[26]

64.    Johnson aggressively asked acquaintances to introduce him to others in business and politics. Many people who have met Johnson, including Mr. Lambert, would frequently receive unsolicited text introductions from Johnson to other people of note. Out of a desire to be polite and avoid conflict, few contradicted Johnson's claims on these text threads.

65.    During this time, Johnson collaborated with neo-Nazi hacker Andrew "Weev" Auernheimer,[27] who was convicted of violating the Computer Fraud and Abuse Act, 18 U.S.C. § 1030.[28]

66.    In 2017, Johnson and then-Congressman Dana Rohrbacher (CA-48) met with Wikileaks editor Julian Assange in the Ecuadorian Embassy in London. Assange was then under investigation for allegedly facilitating Russian interference in the 2016 U.S. presidential election. Johnson then refused to cooperate with the Senate Intelligence Committee, which was investigating allegations of Russian collusion in the same election, when it requested "documents and emails about any contacts he has had with Russian agents."[29]

---

[26] Wikipedia: Charles Johnson, https://en.wikipedia.org/wiki/Charles_Johnson (last visited Jan. 21, 2024).

[27] Michael Miller, *Controversial Blogger, Infamous Hacker Team Up to Release Remaining Planned Parenthood Videos*, The Washington Post (Oct. 23, 2015, 5:18 a.m.), https://www.washingtonpost.com/news/morning-mix/wp/2015/10/23/controversial-blogger-infamous-hacker-team-up-to-release-remaining-planned-parenthood-videos/.

[28] Auernheimer's conviction was overturned on appeal for improper venue. *See United States v. Auernheimer*, 748 F. 3d 525 (3d Cir. 2014).

[29]*See* Michael Isikoff, *'Alt-Right' Figure Who Set Up Assange Meeting Refuses to Cooperate with Senate Intel Probe*, Yahoo! News (August 28, 2017), https://www.yahoo.com/news/alt-right-figure-set-assange-meeting-refuses-cooperate-senate-intel-probe-172020121.html.

67.    In addition to Assange and Auernheimer, Johnson championed other criminal defendants championed by opponents of U.S. intelligence agencies, such as Silk Road founder Ross Ulbricht.[30]

68.    Johnson's early business ventures included Freestartr, which was designed to circumvent financial deplatforming, and Bitcoin mining company Castar Capital.

69.    When Johnson was involved with the facial-recognition app SmartChekr in 2017, it was designed to serve as an "opposition research" tool. In 2021, the *New York Times* reported that "Johnson believes that giving this superpower only to the police is frightening."[31]

70.    Johnson's writings, political activism, and associations during this period are inconsistent with that of a "federal operative" working on behalf of federal law enforcement and intelligence agencies, which he now claims to have been doing throughout this entire period.

71.    At times Johnson has tried to claim that his "activism" was actually conducted on behalf of intelligence services.

72.    On October 2, 2024, he posted on X, "The Russian Jew criminals who ran the Mueller inquiry mistook my kindness for Assange as evidence of me joining Putin. Naughty Jews with their MSNBC contracts, naughty naughty. I'm so spe**CIA**l [he capitalized the letters 'CIA' in 'special'] visiting all the people for Uncle Sam. (emphasis in the original).[32]

---

[30] *See* Charles Johnson, *A Twitter Road to Redemption? My Open Letter to @Jack and @JoeRogan*, VDare.com (March 13, 2019), https://www.vdare-archive.com/articles/charles-johnson-a-twitter-road-to-redemption-my-open-letter-to-jack-and-joerogan.html.
[31] *See* Hill, *Your Face is Not Your Own*, New York Times Magazine.

[32] @JohnsonThought1, X, (Oct. 2, 2024, 10:17 p.m.), https://x.com/JohnsonThought1/status/1841663904428032280 (emphasis added) (last visited Oct. 16, 2024).

App.179

73.    On October 4, 2024, Johnson claimed his past Holocaust denial was actually part of an elaborate sting operation: "One might even wonder if the operation was to deny the Holocaust so as to identify the Nazi network in the United States and if my Nazi compromised family members might have provided such a way in."[33]

74.    Johnson's admission that he engaged in Holocaust denial contradicts his claim in past litigation that the Huffington Post libeled him when it called him a Holocaust denier.[34]

**B.    Johnson flip-flops and begins falsely claiming he's a government agent.**

75.    In 2017, Johnson shared that he was helping marijuana growers facing banking problems use cryptocurrency, claiming to have amassed tens of millions of dollars in Bitcoin. In late 2017, he told acquaintances he had run into legal problems because of that.

76.    Beginning in late 2019, Johnson has repeatedly claimed to be affiliated with or an agent or operative of a variety of U.S. law enforcement and intelligence agencies, sometimes identifying specific agencies, other times referring generically to the "government," "Uncle Sam," or the "Deep State."[35]

---

[33]  @JohnsonThought1, X, (Oct. 4, 2024, 4:19 p.m.), https://x.com/JohnsonThought1/status/184229 8801572487382 (last visited Oct. 16, 2024).

[34]  *See Johnson v. TheHuffingtonPost.com, Inc.*, 21 F.4th 314, 316 (5th Cir. 2021) (noting "Charles Johnson says the Huffington Post libeled him by calling him a white nationalist and a Holocaust denier" and upholding dismissal of Johnson's libel action for lack of personal jurisdiction.).

[35] The term "Deep State" is typically used pejoratively to describe civil service employees of the intelligence agencies acting independently of elected officials. *See* Amanda Taub & Max Fisher, *As Leaks Multiply, Fears of a 'Deep State' in America*, N.Y. Times (Feb. 16, 2017), https://www.nytimes.com/2017/02/16/world/americas/deep-state-leaks-trump.html. Johnson now embraces this term and uses it to describe himself and the government agencies he claims to work with.

App.180

77.    In October 31, 2023 and June 28, 2024 lawsuits he filed *pro se* against Point Bridge and Mr. Lambert in the U.S. District Court for the Eastern District of Virginia, Johnson described himself as a "federal operative."[36]

78.    In 2020, when the Huffington Post reported on Johnson's involvement with Clearview, Johnson "pretended to be an undercover U.S. intelligence operative who'd been recruited out of high school. 'Would prefer being kept out of whatever you are doing . . . [n]early got me killed by a foreign government last time.'" [37]

79.    In a July 19, 2021 Substack post, Johnson wrote: "The Israelis have targeted me for serving my country and its government."[38]

80.    In an August 9, 2023 Substack post, Johnson claimed, "[M]y character [was] assassinated by the foreign-funded press when I was serving my country in an undercover capacity—yes, really . . . ."[39]

---

[36] Compl. ¶ 8, ECF No. 1, *Johnson v. Lambert*, Nos. 1:23-cv-1485 (*Johnson II*) (E.D. Va. Oct. 31, 2023), 1:24-cv-1124 (*Johnson III*) (E.D. Va. Jun. 28, 2024).

[37] Luke O'Brien, *The Far-Right Helped Create the World's Most Powerful Facial Recognition Technology*, *The Huffington Post* (Apr. 9, 2020), https://www.huffpost.com/entry/clearview-ai-facial-recognition-alt-right_n_5e7d028bc5b6cb08a92a5c48.

[38] Charles Johnson, *A Jeffrey Epstein in Every Pocket*, Substack (July 19, 2021), https://charlesjohnson.substack.com/p/a-jeffrey-epstein-in-every-pocket.

[39] Charles Johnson, *About Richard Hanania, Please Don't Shoot the Help! Letter to Young Radicals, Middle Aged Influencers, and Aging Tech Oligarchs*, Substack (Aug. 9, 2023), https://charlesjohnson.substack.com/p/about-richard-hanania-please-dont.

App.181

81.    In an August 1, 2024 Substack post, Johnson asserted, "I have known the NSA [National Security Agency] types a lot earlier than I have publicly discussed, especially when they spotted me when I participated in various nerd pursuits in the greater Boston and L.A. areas."[40]

82.    In an August 15, 2024 X Space, Johnson said, "I have had a relationship with the [FBI] and the NSA since I was 17 years old. I'm now 35 years old. Couldn't vote, right? Couldn't join the military without permission. But, you know, I ended up having a relationship with both of these three letter agencies and through blood."[41]

83.    On October 16, 2024, Johnson posted on X that "I got recruited while in high school and later college. I have had many handlers, including Jeffrey Epstein and Johnathan Buma" and that "[m]y core reason for not talking about this stuff is that I was running active counterintelligence operations."[42]

84.    It is a federal felony to falsely claim to be a government agent or to impersonate a federal officer.[43] The law does not require one to specify his exact position or agency, as "[i]t is the false pretense of Federal authority that is the mischief to be cured."[44]

---

[40] Charles Johnson, *"The Quiet Conflict": The FBI vs. the CIA/NSA on the Steele Dossier*, Substack (Aug. 1, 2024), https://charlesjohnson.substack.com/p/the-quiet-conflict-the-fbi-vs-the.

[41] @JohnsonThought1, *Why they attack Fuentes what he gets right and what he gets wrong*, X Space, (Aug. 15, 2024), https://charlesjohnson.substack.com/p/the-quiet-conflict-the-fbi-vs-the (last visited Oct. 16, 2024).

[42] @JohnsonThought1, X (Sept. 16, 2024, 10:21 p.m.), https://x.com/JohnsonThought1/status/1835866690770366946 (last visited Oct. 16, 2024).

[43] *See* 18 U.S.C. § 912.

[44] *United States v. Barnow*, 239 U.S. 74, 78 (1915).

85.     Texas Penal Code § 37.11 prohibits "impersonat[ing] a public servant with intent to induce another to submit to the person's pretended official authority or to rely on the person's pretended official acts."

86.     On October 19, 2023, *Business Insider* reported that Johnson was a confidential human source ("CHS") for FBI Special Agent Jonathan Buma.[45]

87.     The U.S. Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources define a CHS as "[a]ny individual who is believed to be providing useful and credible information to the FBI for any authorized information collection activity, and from whom the FBI expects or intends to obtain additional useful and credible information in the future, and whose identity, information, or relationship with the FBI warrants confidential handling."[46]

88.     FBI guidelines require a CHS's handler to admonish the source that he or she "is not an employee of [the U.S. government] and may not represent himself or herself as such, except under circumstances where the CHS has previously been, and continues to be, otherwise employed by the [government]." The FBI handler then "must document in the CHS's . . . file (via the CHS admonishment form) that the additional admonishments have been provided and that the CHS acknowledged receipt and understanding of the admonishments."[47]

---

[45] Mattathias Schwartz, *Exclusive: Tech Billionaire Peter Thiel Was an FBI Informant*, Business Insider (Oct. 19, 2023), https://archive.is/7bIln.

[46] Office of the Attorney Gen., U.S. Dep't of Justice, *The Attorney General's Guidelines Regarding the Use of FBI Confidential Human Sources* § I.B.7. (2020), *available at* https://www.justice.gov/oip/foia-library/foia-processed/general_topics/ag_guidelines_FBI_human_confidential_sources_2/dl?inline.

[47] Directorate of Intelligence, Fed. Bureau of Investigation, *Confidential Human Source Policy Guide* at 43 (May 21, 2019), *available at* https://vault.fbi.gov/confidential-human-source-policy-guide-1018pg/confidential-human-source-policy-guide-1018pg-part-01-of-01/view.

App.183

89.    Another former informant was convicted of false impersonation of an FBI agent under 18 U.S.C. § 912. The former informant told police officers conducting a traffic stop that "he was a federal agent who investigated corrupt police officers," and that "he was going to take down their information and request an investigation." The officers contacted an FBI agent to confirm the former informant's account; the agent told them that the former informant "had worked previously as an FBI source and provided information to the agency." At trial, the agent testified "that FBI sources are not FBI employees or agents, and are made aware of this fact before they start."[48]

90.    In affirming the conviction, the First Circuit agreed with the district court's observation that "[a]nyone can call the FBI at any time. . . . That does not make those folks informants, much less, paid sources, and even more so, special agents."[49]

91.    Johnson described his work as an informant as if he were the heroic protagonist in a spy novel. In an October 19, 2023 Substack post, he wrote:

> I did this work at great expense, both financial and stress, and I enjoyed every bit of it. Family members of mine had served in the intelligence community and as undercovers and I suppose you could say I wanted to prove my mettle. To be honest I like the danger of it. I want to change the world for the better even if it means that doing so might mean I am no longer in it. I live for this work.[50]

---

[48] *United States v. Vázquez-Rosario*, 45 F.4th 565, 568 (1st Cir. 2022).
[49] *Id.* at 573.

[50] Charles Johnson, *On My Extracurricular Activities, the Business Insider Thiel Story, and Founders Fund*, Substack (Oct. 19, 2023), https://charlesjohnson.substack.com/p/on-my-extracurricular-activities.

App.184

92.     On September 21, 2024, Johnson posted on X, "I have done some extremely interesting and altogether dangerous things on behalf of this country. And I intend to keep doing them until the very end."[51]

93.     The FBI terminated Johnson's CHS status sometime in 2021. According to one of Johnson's close associates, Jordan Arthur Bloom, this occurred in November 2021.[52]

94.     In a sworn statement to the Senate Judiciary Committee, Buma claimed that the FBI told him to "to discontinue reporting from this source"—that is, Johnson—because his superiors were concerned about Johnson's "inappropriate comments on social media."[53]

95.     By Buma's own account, his association with Johnson troubled the FBI and led in part to his superiors sidelining him from counterintelligence operations.[54]

96.     On November 13, 2023, the FBI executed a search warrant on Buma's residence. According to Buma's lawyer, he was under suspicion for unauthorized removal of classified documents and national-defense documents.[55]

97.     On September 24, 2024, Bloom posted a September 19, 2024 letter from the U.S. Department of Justice Office of Professional Responsibility to Buma's attorney dismissing

---

[51] @JohnsonThought1, X (Sept. 21, 2024, 11:35 p.m.), https://twitter.com/JohnsonThought1/status/1837697234428625346 (last visited Oct. 16, 2024).

[52] J. Arthur Bloom, *The Targeting of Special Agent Johnathan Buma*, Substack (Oct. 9, 2024), https://arthuriana.substack.com/p/the-targeting-of-special-agent-johnathan.

[53] S. Comm. On the Judiciary at 16 (July 15, 2023) (statement of Jonathan C. Buma, FBI Senior Special Agent), https://www.documentcloud.org/documents/23909892-kirkpatrick-buma-2023-08-14.

[54] *Id.* at 13–14.

[55] Dan Friedman, *FBI Raids Home of Prominent Bureau Whistleblower*, Mother Jones (Nov. 14, 2023), https://www.motherjones.com/politics/2023/11/fbi-raids-buma-whistleblower-giuliani/ (last visited Oct. 16, 2024).

App.185

Buma's employment claims against the agency. According to the letter, "in November 2023, the FBI searched [Buma's] residence, suspended his security clearance, and placed him on indefinite suspension from duty."[56]

98.    On October 7, 2024, Bloom confirmed that he was in touch with Buma, posting on X: "Special Agent Buma has given me permission to share some of the zersetzung-style [psychological warfare] targeting and retaliation he has experienced since deciding to become a whistleblower, piece later this week."[57]

99.    On September 23, 2024, Johnson hosted an X Space titled "The collapse of the FBI, sensors, Nick Fuentes and power," where he acknowledged that FBI leadership did not accept the information he gave to Buma. Rather than admitting that he had in fact provided false information to the FBI, Johnson concocted an elaborate conspiracy of "dirty FBI agents" who supposedly undermined him:

> I think the other big issue too is that the confidential informant system is deeply corrupt and deeply fucked up . . . because I've had things entered into the files that I sent that were the opposite of what I put in the fucking system, which makes me very upset, because it makes me look incompetent, and I hate looking incompetent, and so I ended up getting in all this trouble for, you know, basically putting things into the system that were wrong. And what ended up happening is I started writing the reports for Jonathan Buma and for others. And you know what I'm hopeful now is that a lot of the dirty FBI agents can be helpful, can really, like, clean themselves up, but really, at this stage … a lot of us who are, like, mistreated by the FBI

---

[56] J. Arthur Bloom, *Special Agent Johnathan Buma's Whistleblower Retaliation Complaint Was Shot Down Last Week*, Substack (Sept. 24, 2024), https://arthuriana.substack.com/p/special-agent-johnathan-bumas-whistleblower. The letter itself is available at https://arthuriana.substack.com/api /v1/file/adf03ed0-94c7-4467-b5ef-0906349c1486.pdf (last visited Oct. 16, 2024).

[57] @j_arthur_bloom, X (Oct. 7, 2024, 2:58 p.m.), https://x.com/j_arthur_bloom/status/ 1843365248692302207 (last visited Oct. 16, 2024).

or by the Department of Homeland Security or whatever, we should
be recompensed in a serious way.[58]

100. At times, Johnson is more candid about his limited role as a former informant. On an
August 15, 2024 X Space, he said, "I was the federal informant for a long time, although
occasionally I'll talk to the Feds now, but I was officially closed out as a federal informant,
whatever."[59]

101. Despite these occasional moments of candor, Johnson continued to claim to speak on
behalf of the FBI well past 2021.

102. On September 11, 2024, Johnson found himself in a contentious online exchange
with conservative commentator and former Donald Trump speechwriter Darren Beattie. After
Beattie mocked Johnson's false claims of CIA involvement, Johnson suggested that the agency
would shut down his publication: "You'll see Darren routinely do the work of the Russian Jewish
Mafia until his publication is turned off. Won't be long now."[60] Beattie sarcastically responded,
"[a]re your imaginary friends in the CIA coming after me[?] . . . This is terrible! Save me. If I
invest in one of your dogshit companies will you tell your imaginary girlfriends in the CIA to leave
me alone?"[61]

---

[58] Ex. 1 at I-G. The Space was originally hosted at https://x.com/JohnsonThought1/status/
1838080187046482109, but Johnson later acknowledged deleting it. *See* @JohnsonThought1, X
(Sept. 24, 2024, 11:38 a.m.), https://x.com/JohnsonThought1/status/1838603979518869927.

[59] *Id.*

[60] @JohnsonThought1, X (Sept. 11, 2024, 8:35 a.m.), https://x.com/JohnsonThought1/status/
1833846754141200696 (last visited Oct. 16, 2024).

[61] @DarrenJBeattie, X (Sept. 11, 2024, 8:42 a.m.), https://x.com/DarrenJBeattie/status/
1833848669826588866 (last visited Oct. 16, 2024).

103.   Johnson responded by posting a visitor's pass to the U.S. State Department (on September 9, Johnson posted on X that he was meeting with "state officials") and asked, "Would they even let you in the building my treasonous friend? Or did you lose that privilege when you got the Russian wife and the shekels?"[62]



104.   Of course, neither a State Department visitor's pass nor "occasionally" talking "to the feds" make someone a "federal operative" or agent.

105.   On October 8, 2024, Johnson once again claimed to be "working closely" with another government intelligence agency, the National Geospatial Intelligence Agency.[63] When

---

[62]   @JohnsonThought1, X (Sept. 11, 2024, 8:49 a.m.), https://x.com/JohnsonThought1/status/1838603979518869927 (last visited Oct. 16, 2024).

[63]   @JohnsonThought1, X (October 8, 2024, 6:27 p.m.), https://x.com/JohnsonThought1/status/1843780168042852627 (last visited Oct. 16, 2024).

Beattie replied, "lol no you're not," Johnson replied: "But I am Darren."[64] Johnson again stated that he "worked closely with those trying to clean up the NGA" in an October 19, 2024 X post.[65]

106.  On October 9, 2024, Johnson further taunted Beattie claiming "Off to my 9 o'clock with the State Department."[66]

107.  On October 10, 2024, when another "X" user asked Johnson, "do you really work at the state department?," Johnson replied, "I work with a number of government agencies."[67]

**C.    Johnson weaponizes false claims about his government ties to defraud and extort.**

108.  Johnson's false claims of government authority are not limited to mere self-aggrandizing. He freely volunteers that he makes these claims to pressure and threaten others into investing in his pet projects and contributing to his own business interests.

109.  Johnson favorably compares himself to the late businessman and sex offender Jeffrey Epstein. Epstein purportedly made business investments on behalf of the CIA by extorting "compromised billionaires."

110.  On an August 18, 2024 X Space, Johnson said, "I know this is gonna sound very fucked up and kind of weird, but I think I'm supposed to be, you know, the new Epstein" in that

---

[64] @JohnsonThought1, X (October 9, 2024, 8:13 p.m.), https://x.com/JohnsonThought1/status/1844169427455180943 (last visited Oct. 16, 2024).

[65] @JohnsonThought1, X (October 19, 2024, 7:27 p.m.), https://x.com/JohnsonThought1/status/1847781660819075233 (last visited Oct. 16, 2024).

[66] @JohnsonThought1, X (Oct. 9, 2024, 8:13 p.m.), https://x.com/JohnsonThought1/status/1844169427455180943 (last visited Oct. 16, 2024).

[67] @JohnsonThought1, X (Oct, 10, 2024, 1:38 a.m.), https://x.com/JohnsonThought1/status/1844251220460044636 (last visited Oct. 16, 2024).

App.189

both he and Epstein were "kind of private sector, kind of public sector, that are very good at, like, investing in new technologies as they were coming out."[68]

111.  On August 20, 2024, Johnson wrote, "I suspect my methods are not unlike those of Jeffrey Epstein" because "Epstein offered compromised billionaires . . . an off-ramp" from legal troubles by investing in U.S. government-favored companies.[69]

112.  In that same Substack post, Johnson described himself as the "good cop" who gives wealthy individuals an opportunity to do what he says or face more serious consequences from the government: "If you get a message from me and you're a wealthy person, you should probably pay attention. I'm the good cop. What comes after me is not so nice."[70] He continued:

> To borrow a phrase from *The Departed*'s Staff Sergeant Sean Dignam in one of his best moments: 'Hey a—hole, he can't help you! I know what you are, okay? I know what you are and I know what you are not. I'm the best friend you have on the face of this earth, and I'm gonna help you understand something, you punk.' Dignam's methods, like mine, were a bit extreme but altogether necessary. And lest you forget the culminating scene of The Departed, it's Dignam that finally wins out and delivers on his promise.[71]

In the final scene of *The Departed*, Dingam shoots and kills a corrupt police officer.

---

[68] @JohnnsonThought1, *Donald Trump Doesn't Want to Win. Also Cleveland Rocks*, X Space (Aug 18, 2024, 2:31 a.m.), https://x.com/JohnsonThought1/status/1825026842849423596.

[69] Charles Johnson, *Carl's Lesson: What the SEC Fine Should Teach Other Compromised Billionaires*, Substack (Aug. 20, 2024), https://charlesjohnson.substack.com/p/carls-lesson-what-the-sec-fine-should (last visited Oct. 16, 2024).

[70] *Id.*

[71] *Id.*

App.190

113.  On September 2, 2024, Johnson linked to an article about him on the Substack Blog

called Tech Intel Stack from his X account[72]

114.  Tech Intel Stack posted an August 19, 2024 interview with Johnson. In the interview,

Johnson explained how he and his co-conspirators made threats to businessmen:

> [A] lot of companies are supporting governments, right? A lot of them, a lot
> of the ones that are valuable. At some stage, the US government comes in
> and takes over, and I am involved in that process of identifying the
> companies that are targets for takeover, and also involved in the process of
> putting a stake through the heart of companies that are not useful.
>
> . . . .
>
> Yeah. So what happens a lot of the time is that people get in trouble with
> the US government for whatever, a whole lot of reasons…. And what
> happens is they're sent to me by people connected to the government or
> people who are, you know, wanting to clean them up in any meaningful
> way. … But in general, there's a whole process by which a lot of these
> people get recruited and … get sort of repurposed for Uncle Sam, and so I
> spend a lot of time on that process.
>
> . . . .
>
> And then sometimes, you know, the US government will ask me to invest
> in a company that's compromised in some meaningful way, as a way of,
> like, keeping tabs on the company as an investor. So, I've done a lot of that
> over the years as well.[73]

115.  Johnson also threatened "consequences" for people unless they invest in the

technology he tells them to, because he works "very closely with different three letter agencies":

> [S]ometimes what you can do with front men is you can say, 'Hey, I know you're
> a front man, you should work with us and be helpful to us. **And if you're not,
> there's going to be a series of consequences for that behavior.'** … [A] lot of

---

[72] @JohnsonThought1, X (Sept. 2, 2024, 1:01 p.m.), https://x.com/JohnsonThought1/status/
1830652366334706097 (last visited Oct. 16, 2024).

[73] Jacob Cantwell, *Elon Musk's X Suspends Chuck Johnson for Not Being Enough of a Troll*,
Substack (Sept. 2, 2024), https://techintelstack.substack.com/p/elon-musks-x-suspends-chuck-
johnson.

what we'll do is we'll go and we'll try to recruit people that are fronts. And you'll see a lot of the time people get in trouble, and then they become very charitable, right? . . . [A] lot of what I do is I sort of go to these guys and say, 'Listen, you know, you should be helpful to Uncle Sam. He's been pretty good to you. You should invest in technology that Uncle Sam likes. And I happen to know what a lot of that technology is, **because I work very closely with different three letter agencies** that are interested in certain types of technology.'[74]

116.  When asked to clarify what those "consequences" were, Johnson said "they get a target letter from the DOJ, or they start to have IRS issues, or suddenly their credit cards don't work."[75]

117.  Johnson further suggested that these "consequences" included his leaks to the media and his own tweets and blog posts, noting his adversaries "don't like, you know, **their business being written about, say by you or me,** or by the *New York Times* or the *Wall Street Journal* or whatever. You know, **they want to have their reputation intact**."[76] Johnson added, "And so if you start talking about, you know, what they're investing in, and you start detailing, you know, a lot of the problems that these guys have, that becomes kind of more helpful as well."[77]

118.  On Johnson's since-deleted September 23, 2024 X Space, he made clear that if people ignored his "don't fuck with me" threats, he could get them indicted, and through his "relationships with the intelligence community," they could face IRS audits:

> I'm like, listen, I warned you. I said, like, don't try to cheat me. Don't try to fuck me. . . . [W]hat's happened now is that there's so many different players that have tried to fuck me, and what ends up happening is then they get indicted, or, like, their car doesn't work, or, you know, like a whole slew of things start to happen to them. And frankly, it's kind of fun.

---

[74] *Id.* (emphasis added).

[75] *Id.*

[76] *Id.* (emphasis added).

[77] *Id.*

App.192

. . . .

Yeah, I mean, this is, this is kind of it in the main I think, by the way, what I try to do, I also have the ability to protect people, and I will go with people, and I will write a memo to myself, and I'll screenshot it, and I know, by the way, I'm like, right near the NSA campus today in Baltimore, and I'm going to be there tomorrow too.

. . . .

I've had issues with the IRS in different ways, but because I have my relationships with the intelligence community, I would just call up the intelligence community and be like, 'Hey, you asked me to do this stuff. I try to pay my taxes the best I can. I think I'm doing it correctly. What do you think?' And what ends up happening a lot of the time is that what happened when I was audited is that the IRS shut down my audit. Actually, the IRS did an audit, and then they were like, trying to figure things out, and then the intelligence community shut down my audit.[78]

119.  In a November 9, 2023 "X" Space titled "Peter Thiel and me in The Atlantic," Johnson claimed that to get "right with the deep state," Thiel would have to invest in "technology that was in the national interest" including "my company."[79]

**D.    Johnson teams up with Greenwill to perpetrate the RICO conspiracy.**

120.  Impersonating a federal officer to extort and defraud the Plaintiffs violates federal and state laws on its own. The RICO conspiracy began when Johnson teamed up with his RICO-Conspirator Greenwill to further these acts of fraud and extortion.

121.  Greenwill controls several businesses. He is the founder of GKG Capital Management, Eldar Capital,. He also runs Gator Automotive, a full-service auto repair shop in Carbondale, Illinois; Central States Crane and Hoist, specializing in overhead-crane services in

---

[78] Ex. 1 at I-G.

[79] Ex. 1 at I-B, @JohnsonThought1, *Peter Thiel and me in The Atlantic*, X Space, (Nov. 9, 2023, 10:34 p.m.), https://x.com/JohnsonThought1/status /1722820033414332675.

App.193

Tulsa, Oklahoma; and Machinery Service and Design, a Milwaukee-based manufacturer of hydraulic cylinder repair equipment.

122.  Greenwill also describes himself as the founder if Metis Capital, which was incorporated in the state of Missouri on September 29, 2020. Johnson serves as the Texas registered agent of Metis Funding, which was also incorporated in Missouri on October 12, 2020. Based on information and belief these companies are linked as part of the RICO enterprise.

123.  From December 2010 to at least March 2018, Greenwill was the co-owner of Stratus Building Solutions of Kansas LLC, a commercial-cleaning firm that claimed to manage the cleaning of more than two million square feet of commercial real estate in Kansas City and its surrounding areas.

124.  In 2012, Greenwill and Stratus were sued for civil RICO violations, with mail and wire fraud as the predicate crimes, in the U.S. District Court for the Eastern District of Missouri.

125.  The complaint alleged that Greenwill and his co-defendants lured the plaintiffs (primarily Hispanics and other ethnic minorities) into purchasing commercial-cleaning franchises by making false promises about the profitability and support they would receive.

126.  The district court ultimately ordered the case into arbitration without reaching the merits.[80]

127.  Greenwill works closely with Johnson and, like Johnson, frequently portrays himself as speaking for federal law enforcement agencies in their attempts to fraudulently secure investments from their targets via extortionate demands.

---

[80] *Torres v. Simpatico, Inc.*, 995 F. Supp. 2d 1057, 1060 (E.D. Mo. 2014).

128.  Greenwill and Johnson have several investment funds in which they both have interests. They have presented themselves as both being affiliated with the intelligence community to solicit investment from Plaintiff's network of investors.

129.  In an August 19, 2024 interview, Johnson described Greenwill as "my business partner" and that "he and I do a lot of assessing together. Sometimes we'll be sent by specific countries. You know, or I'll be sent by allied countries."

130.  Johnson added that Greenwill contributed to their joint effort to "clean up" targeted businesses because he has more influence with the government, or "headquarters":

> I meet with a lot of people who are problematic, and I try to put them on the straight and narrow path. I try to explain to them why what they're doing is wrong in some cases, or figure out exactly what they're up to. And, you know, I have people that help me on some of that, as well. My business partner helps me on that a lot. He's kind of more headquarters-oriented.

> [T]he way I look at it really simply is that I have this relationship with the U.S. government, with elements of it, different aspects of it. My colleague Gator . . . he also has a relationship with them. And a lot of what we do is we go and we try to clean people up, while we also try to invest in technology companies that are helpful to making America stronger, safer, healthier place to live in.[81]

131.  Johnson further agreed with the description that Greenwill was the "bad cop" pressuring his targets to comply or suffer government retaliation: "That's right, me and Gator, and there are other people as well that act as a bad cop a lot of the time."[82]

---

[81] Jacob Cantwell, *Elon Musk's X Suspends Chuck Johnson for Not Being Enough of a Troll*, Substack (Sept. 2, 2024), https://techintelstack.substack.com/p/elon-musks-x-suspends-chuck-johnson.

[82] *Id.*

**E.  Johnson and Greenwill's RICO Shakedown Scheme extorts and defrauds Clearview AI and Point Bridge.**

132.  In 2016, Johnson became part owner of the facial-recognition company SmartChekr, which was designed to use its technology for "extreme opposition research" on political candidates.

133.  In 2018, SmartChekr's other owners, Hoan Ton-That and Richard Schwartz, wound down SmartChekr and transferred the technology to Clearview AI, Inc., which they founded primarily to provide facial-recognition technology to law enforcement and other government agencies.

134.  As part of the wind-down agreement, Johnson received equity in Clearview and a 10% sales commission on the gross revenue received by Clearview that he originated.

135.  The agreement also included strong non-disclosure provisions like the following:

> [A]t no time during the Restricted Period shall the Individuals or affiliates of the Individuals (including, in the case of Johnson, the Transferee) make, or cause or assist any other person to make any statement or other communication to any third party which impugns or attacks, or is otherwise critical of, the reputation, business or character of the Company, or any of its respective directors, officers, representatives, agents or employees.

136.  After the formation of Clearview, Mr. Lambert became a Clearview investor and Board member.

137.  In February 2020, Johnson and Greenwill met with Ton-That and Schwartz for dinner in New York City. Greenwill presented himself as having a CIA affiliation and said he could help with raising funds and government contracting.

138.  Soon after that meeting, Greenwill sent a due diligence form to Clearview, claiming he had lined up investors interested in providing capital to Clearview. Completing and returning

App.196

the form would have given Greenwill access to sensitive business information such as salaries, employee and contractor names, and information about government investigations and lawsuits.

139.  Clearview did not return the form to Greenwill after its executives became wary of his involvement with Johnson.

140.  In the fall of 2020, Clearview removed Johnson's access to its app, which was supposed to be limited to law enforcement officers. Johnson then started threatening the company.

141.  In March 2021, Securiport—an aviation security contractor—began contract negotiations with Clearview. Johnson had introduced Securiport to Clearview and would have received a contract-guaranteed commission. Johnson warned that the CIA would act against the company if it did not contract with Securiport.

142.  On April 8, 2021, Johnson sent an email to Mr. Lambert, Schwartz, and Ton-That with the subject "Strong apologies re Clearview." Even though he had previously claimed to have long been a government operative, he acknowledged that "you are absolutely right to limit the product to only responsible people and governments. I was wrong."

143.  Despite this superficially conciliatory tone, the email came immediately after Johnson's previous threats of CIA sanctions against the company. Echoing those threats, he cautioned, "You were introduced to . . . Gator Greenwill (CIA friendly) . . . for a reason. We need to hug the US government very closely. My fear for you is that you'll be crushed by the global forces arrayed against you. In the next bit you'll be contacted by the FBI about the Clearview hack and the role UAE played in it."[83] All three recipients of that email interpreted Johnson's claim to "fear for you" as a threat—sign with Securiport, or Johnson and Greenwill would convince the CIA to retaliate against them and Clearview.

---

[83] *Id.*

144.  In this email, Johnson repeatedly portrayed himself as a government operative close to the Biden Administration:

> I'm working with our friends in the government a lot these days and want to do my part to help our country recover from the Trump years. I deeply regret the role I played in helping Trump be reelected. [sic] The role of foreign intelligence agencies in coopting our system of government these past four years is extremely disturbing to me and I am doing my part in seeing it done right. . . .
>
> I also have been working with others with deep state ties who want to invest in Clearview.
>
> I strongly encourage you to get closer to the US government and to relocate the company to Northern Virginia. This is bigger than all of us. It will require all of us to come together to help the country.[84]

145.  Johnson had previously claimed that "I came mostly to Northern Virginia because of the Ukraine war. I got a call from people around the president, and so they, they asked me to move to Northern Virginia. Because of Ukraine conflict."[85]

146.  On April 21, 2021, Johnson sent another email to Mr. Lambert, Schwartz, and Ton-That. He recommended "firing" the company's current consultants and lawyers, including well-known First Amendment lawyer Floyd Abrams: "The deep state doesn't trust Floyd Abrams. . . . He has an Israeli wife and he argued the Pentagon Papers for goodness sake. Daniel Ellsberg is widely thought to have been an Israeli spy."

---

[84] *Id.*

[85] Ex. 1 at I-F.

147.  Once again, Johnson used the passive voice to suggest he was delivering a message from the U.S. Government:

> You also need to make national security argument loudly and emphatically or you will be defeated. This has been related to me often and emphatically.

> The current view is that you aren't sophisticated enough to understand the geopolitical problems Clearview is facing. I am trying at the highest levels of the government to help you but you seem not to get the message. Why? Is there anything you need to help you understand the gravity of what's going on?

148.  On August 11, 2021, Greenwill dined with Schwartz in New York City. Greenwill reiterated that he could raise money for Clearview, but seemed more interested in gaining intelligence about the company.

149.  On January 26, 2022, Johnson sent an unsolicited text message to venture capitalist Gary Lauder, a Clearview investor and advisor. He told Lauder, "I hope you guys aren't backing Hal Lambert."

150.  Lauder did not know who Mr. Lambert was. Johnson described him as "someone based in Texas. I don't think Hoan [Ton-That] is going to survive for much longer either." When Lauder asked for explanation, Johnson texted, "Time for changes at Clearview" based on "[f]raud, mostly. Have to change the leadership. Won't be permitted to operate as it has been."

151.  Johnson urged Lauder to back an undisclosed takeover: "There's an offer to acquire the company and have more responsible hands on the tech." Johnson refused to identify these "hands," but said that the U.S. and U.K. governments "did not trust" Clearview leadership and that "people in the Biden administration" were "unhappy."

152.  When Lauder asked for anyone in the intelligence community to corroborate Johnson's allegations about Mr. Lambert and Clearview, Johnson introduced him to Terry

App.199

Dunmire, whom Johnson claimed would back him up. Johnson did not disclose that Greenwill and Dunmire were close business associates.

153.  Based on his conversations with Dunmire, Lauder told Johnson he did not consider Johnson's claims to be credible.

154.  Johnson's false accusations of fraud and false claims that the government would sanction Clearview for its ties to Mr. Lambert were designed to build support for his takeover attempt of the company.

155.  On April 17, 2022, Johnson emailed Mr. Lambert, Schwartz, and Ton-That describing a "carrot and stick" approach to his gaining control of Clearview. Johnson's "stick" was a lawsuit he planned to file against the company. "The carrot is an acquisition offer and/or more capital. Otherwise, my deep state lawyers will file this in court in about a week and I'll be sending a copy of it to the media. (They'll be some light edits.)"

156.  Johnson attached to the email a draft complaint, which stated: "In or about March 2020, Ton-That also ignored Johnson's colleague, Gator J. Greenwill, who along with Johnson, would provide valuable connections to the intelligence community."

157.  A year later, Johnson sued Clearview, Ton That, and Schwartz for breach of contract and unjust enrichment in the Southern District of New York.

158.  The complaint alleged that "Johnson, who was also a confidential informant for the FBI, provided significant value to SmartCheckr through his relationships with the intelligence committee and law enforcement."

159.  Over the course of the litigation, Johnson was repeatedly admonished by Judge Katherine Polk Failla and his own attorneys to stop posting harassing messages about the defendants and defense counsel.

App.200

160.  On July 12, 2023, Judge Failla wrote that "The Court is concerned about . . . whether it is [Johnson's] intent to use his social media platform to intimidate defense counsel or otherwise interfere with this suit."[86]

161.  After Johnson's counsel again failed to prevent him from harassing the defendants and their attorneys online, on November 16, 2023, Judge Failla stated: "The Court remains dismayed by Plaintiff's continued public posting about Defense counsel, Defendants, and this litigation generally; Plaintiff's counsel's apparent inability to impress upon Plaintiff the impropriety of his actions; and the amount of attention that Plaintiff's behavior has required from this Court."[87]

162.  On May 20, 2024, the Court granted the defendants' motion to dismiss three of Johnson's four claims.[88] The remaining breach-of-contract claim against Clearview stemmed from a disputed commission.

163.  On July 5, 2024, Clearview, Schwartz, and Ton-That filed a counterclaim against Johnson for breach of contract.[89]

164.  Johnson repeatedly claimed his lawsuit against Clearview was brought on behalf and in coordination with the U.S. Government:

---

[86] Memo Endorsement at 2, ECF No. 22, *Johnson I* (July 12, 2023).

[87] Memo Endorsement at 2, ECF No. 39, *Johnson I* (Nov. 16, 2023).

[88] Opinion & Order at 2, 26, ECF No. 40, *Johnson I* (May 20, 2024).

[89] Defs.' First Am. Answer to Am. Compl. and Countercls. at 17–18, ECF 50, *Johnson v. Clearview AI. Inc.*, No. 1:23-cv-2441 (S.D.N.Y. July 5, 2024).

App.201

- On October 17, 2023, he posted on X, "You guys realize that the governments are lining up to run Clearview once it has responsible management right?"[90]

- Discussing his lawsuit against Mr. Lambert and Clearview in an August 7, 2024 X Space, he said, "I'm in two lawsuits. One is with Clearview AI, which the US government encouraged me to do."[91]

- Discussing the same lawsuit in a March 26, 2024 Substack post, Johnson stated, "The cleaning up of these startup companies is going to be one of the big projects for counterintelligence going forward."[92]

- In a July 9, 2024 Substack post about hiring a new attorney, Johnson described the case as exposing Jewish criminals on behalf of the government: "The clandestine work I have done exposing criminal syndicates who hide behind the tragedy of the Jewish people speaks for itself and is well known to the law enforcement and intelligence communities of many countries. I'm proud of that work though I oftentimes don't get to talk about it. Do I have specific beef with criminal Jews and their accomplices? You're damn right I do."[93]

- On September 16, 2024 Johnson posted on X a link to a press release titled "Justice Department Announces Five Cases Tied to Disruptive Technology Strike Force," adding, "This doesn't have to be your fate, Hoan Ton-That."[94]

---

[90]  @JohnsonThought1, X (Oct. 7, 2023, 6:33 p.m.), https://x.com/JohnsonThought1/status/1714409216805573119 (last visited Oct. 16, 2024).

[91] @JohnsonThought1, *Dangerous! Why I sent my texts … Vance to the Washington Post*, X Space (Aug. 7, 2024, 1:05 p.m.), https://x.com/JohnsonThought1/status/1821231218773708816; *see* Ex. 1 at I-D (last visited Oct. 16, 2024) .

[92]  Charles Johnson, *"The Ukrainians Are Obsessed with Clearview": Time Magazine Correspondent on the Facial Recognition Company Battlefield Deployment*, Substack (Mar. 26, 2024), https://charlesjohnson.substack.com/p/the-ukrainians-are-obsessed-with.

[93] Charles Johnson, *A Quick Professional Update on The Clearview.AI Lawsuit*, Substack (July 9, 2024), https://charlesjohnson.substack.com/p/a-quick-professional-update-on-the.

[94]@JohnsonThought1, X (Sept. 16, 2024, 6:33 p.m.), https://x.com/JohnsonThought1/status/1835809170173657518 (last visited Oct. 16, 2024).

**App.202**

- On September 18, 2024, Johnson posted on X, "|This is coming for you, Hoan" while quote-tweeting a post about the French criminal charges against Telegram CEO Pavel Durov.[95]

165.  On January 16, 2025, the court in the Southern District of New York dismissed all of Johnson's remaining claims "after confirming with [Johnson] and his counsel that [Johnson] wishes to do so." Clearview AI's counterclaim remains pending. In that matter, Johnson refused to participate in discovery, claiming that purported DHS agents "Alexander Rodriguez" and "Alexander Fletcher" told him not to produce documents to the defendants. Doubting his claims, Judge Failla took the extraordinary step of contacting DHS to assess their veracity. Not surprisingly, DHS said that no agents with those names existed, and the court ordered Johnson and his counsel to submit an *ex parte*, *in camera* letter summarizing the steps they would take to comply with his discovery obligations.[96]

### F.    Johnson and Greenwill's RICO Shakedown Scheme extorts and defrauds Umbra Space and Point Bridge, which was perpetrated through acts committed in Texas.

166.  In the spring of 2020, Point Bridge Capital began due diligence for an investment in Umbra Lab, Inc. (now Umbra Space), a Synthetic-aperture radar satellite company founded in 2013 and based in Santa Barbara California. Mr. Lambert arranged a visit to Umbra headquarters and met with their founders and toured their facilities. Point Bridge agreed to co-lead a Series A round of Umbra shares.

167.  During this timeframe, Johnson introduced Mr. Lambert to Greenwill at a meeting at Winslow's Wine Cafe in Fort Worth. At the meeting, Greenwill and Johnson told Mr. Lambert that Greenwill was associated with the CIA. They also told Mr. Lambert that Greenwill could help

---

[95]    @JohnsonThought1, X (Sept. 18, 2024, 12:21 p.m.), https://x.com/JohnsonThought1/status/1836440471029326228 (last visited Oct. 16, 2024).
[96] *Johnson v. Clearview AI, Inc.*, No. 1:23-cv-02441, ECF No. 68 at 5 (S.D.N.Y. Jan. 16, 2025).

App.203

secure government contracts and fundraise for early-stage companies. And they suggested that, based on their government affiliations, they could conversely make it difficult for companies to obtain government contacts, which would have a correspondingly harmful impact on fundraising. Johnson knew before this lunch meeting in Fort Worth that Mr. Lambert was from Fort Worth and that Mr. Lambert was associated with Clearview and Umbra.

168.  In the summer of 2020 Point Bridge and Umbra signed a term sheet. Point Bridge created a Special Purpose Vehicle called Point Bridge Capital VC, LP ("Point Bridge SPV") and served as the General Partner to facilitate limited partner investments in the SPV. Point Bridge SPV invested approximately $10,250,000 into Umbra.

169.  In November 2020, near the close of the Series A, Johnson invested $200,000 into Point Bridge SPV, less than two percent of its investment in Umbra. The investment was funded by venture capitalist Cyan Bannister. Johnson invested as a limited partner in the Point Bridge SPV, which Point Bridge created and in which Point Bridge served as General Partner. Throughout this process, Johnson communicated multiple times with Plaintiffs—communications that included calls to their Fort Worth telephone numbers and mailings that were sent to Texas.

170.  Johnson and Point Bridge signed a subscription agreement detailing the terms of his investment in the Point Bridge SPV. The agreement expressly provided that Johnson had no control over the SPV or Umbra:

> Lack of Control. Subject to the implementation of the investment limitations described in the Fund Agreement, the General Partner has complete discretion in managing the Fund's portfolio. The Subscriber will not make or participate in decisions with respect to the management, disposition or other realization of any investment made by the Fund or other decisions regarding the Fund's business and affairs.

App.204

171.  The agreement includes a robust confidentiality provision: "The information provided in connection with the fund is confidential and proprietary"; the subscriber "has agreed not to disclose or use any of the information provided in connection with the fund except for the purpose of evaluating an investment in the fund" and has "agree[d] not to distribute that information to any other person or entity."

**G.    After Johnson's shakedown attempt, he retaliates while claiming CIA and FBI support for his threats and frivolous lawsuits.**

172.  In the summer of 2021, Point Bridge began raising money for an additional round of funding for Umbra. Johnson learned of this and demanded as much as $100 million in Umbra shares.

173.  On June 17, 2021, Johnson introduced Greenwill to Umbra executive Gabe Dominocielo as someone with CIA ties. Dominocielo is a resident of Austin, Texas. They met in person shortly thereafter in or around Austin. During the meeting in Austin, Greenwill claimed that he and Johnson could raise $100 million for Umbra through his fund, Butler Capital.

174.  In July 2021, after it became clear that Johnson's demand for $100 million in Umbra shares would not be met, Johnson told Dominicello that he was "with the Defense Department," that he would ensure Umbra secured no government contracts, and that he would destroy the company. The executive cut off contact with Johnson after that.

175.  In November 2021, Johnson asked Point Bridge, through a communication to Mr. Lambert, if they were "doing the SPV together." Mr. Lambert, on behalf of Point Bridge, responded by asking if he was joking.

176. On October 14, 2023, Johnson asked Point Bridge for money in a conciliatory-sounding email. Despite this tone, Johnson falsely described Umbra as if he had a part in its founding, calling it as "a great and important company that we have launched," commenting

App.205

that he was "proud that so many people share our original vision," and claiming that was "responsible for this company's launch and success." He then asked for binding arbitration.

177.  On October 16, 2023, Mr. Lambert responded for Point Bridge. While noting that the email contained "some very odd claims," Mr. Lambert offered to discuss the issue by phone.

178.  Three days later, Johnson emailed Point Bridge, through Mr. Lambert, a link to a tweet thread about Johnson's involvement as an FBI informant and about claims that Peter Thiel was also a CHS. Johnson added, "This might also help you do the right thing."

179.  The tweet thread included an American Revolution "Join or Die" image and Johnson's ultimatum "[t]o the rest of Silicon Valley, especially the bits controlled by [Israel Prime Minister] Bibi [Netanyahu]: Enough of the blacklists. Enough of the grifting. Enough of the bullshit."[97]

180.  The thread concluded with a link to Johnson's Substack article about his supposed work as an FBI CHS and his relationship with Thiel. He bragged in the article about how he supposedly had facilitated leaks to the press and how he can foment government pressure:

> Johnathan Buma and I stopped Elon Musk from giving billions in inflated stock to Igor Kurganov, a Russian poker player backed by the Chinese mob. We leaked that information to then *Wall Street Journal* reporter Rob Copeland though he left out the Chinese mob stuff. The news of Elon Musk's ties to the Ukrainian mob and to Russian intelligence has made me convinced we did not do enough. Founders Fund has continued to back a series of con men rather than be a responsible venture firm, including leading a round into Neuralink. Either Peter Thiel is unable or unwilling to fix this problem at Founders Fund. I'd love to chat with the SEC about being a whistleblower here.[98]

---

[97]  @JohnsonThought1, X (Oct. 19, 2023, 9:50 a.m.), https://x.com/JohnsonThought1/status/1715002544085475474 (last visited Oct. 16, 2024).

[98]  Charles Johnson, *On My Extracurricular Activities, the Business Insider Thiel Story, and Founders Fund*, Substack (Oct. 19, 2023), https://charlesjohnson.substack.com/p/on-my-extracurricular-activities.

App.206

181.  Mr. Lambert and Point Bridge interpreted Johnson's communications as a threat and foreshadowing the harm Johnson would try to inflict should they refuse to comply his demands.

182.  Johnson followed up with Mr. Lambert on October 22 by threatening to "escalate things." Mr. Lambert responded by suggesting that their lawyers discuss the matter.

183.  That same day, Johnson again threatened Point Bridge via Mr. Lambert: "I have already been in touch with law enforcement about your behavior. I want to be very clear with you that you were given a chance to do the right thing."[99]

184.  Johnson's comments about colluding with law enforcement and the media against Thiel, Founders Fund, and Musk were structured as a threat to Mr. Lambert that if he did not accede to Johnson's demands, Johnson would engage in a similar strategy against Point Bridge.

185.  On October 23, 2024, Johnson emailed forty limited partners of Point Bridge's Umbra SPV, including Texas-based partners, stating that he planned to sue Mr. Lambert: "Many of you know me already but a few of you I haven't yet met. I am a 50 percent owner of the carry in the Umbra SPVs. . . . As many of you know, I introduced Hal to Umbra and created the opportunity for the SPV."[100] None of Johnson's statements were true.

186.  In that email, Johnson made vague personal allegations: "Discovery will bring the facts to the fore and highlight his history of this type of behavior as well as other personal conduct on Hal's behalf which is disqualifying, including toward female founders."[101]

---

[99] *Id.*

[100] *Id.*

[101] *Id.*

187.  Johnson further accused Mr. Lambert of "leading the witnesses" and warned that "outreach could complicate matters with respect to individual investors and draw any of them deeper into this litigation." He invited the investors to "avoid that risk" by "prevail[ing] upon [Lambert]." He then "apologize[d] in advance for any discovery efforts that you all may be affected by."[102]

188.  Johnson also declared, "I've also spoken to law enforcement. (You might have already read about my work)," and linked to a Substack article discussing Johnson's status as an FBI informant.[103]

189.  In short, Johnson falsely and illegally claimed government authority and threatened law enforcement action to extort funds from Point Bridge and Umbra. He escalated these threats after filing his lawsuits against Mr. Lambert, lawsuits he claimed he filed at the instigation of the U.S. government.

190.  On October 18, 2023, Johnson posted a screenshot of his planned lawsuit on X:

> After many attempts to resolve this matter amicably I will be suing @MAGAindex [Lambert's X handle] for breach of contract over how he cheated me on the @umbraspace SPV on Monday. Hal Lambert is a big time DeSantis guy and a Clearview board member. I've notified investors and now I'm informing you . . . . More to come. Chatting with the SEC and others as well.[104]

---

[102] *Id.*

[103] *Id.*

[104] @JohnsonThought1, X (Oct. 28, 2023, 12:59 p.m.), https://x.com/JohnsonThought1/status/1718311532235514062 (last visited Oct. 16, 2024).

App.208



191.  On October 31, 2023, Johnson filed a *pro se* lawsuit against Point Bridge and Mr.
Lambert for breach of contract, fraudulent misrepresentation, and unjust enrichment in the U.S.
District Court for the Eastern District of Virginia. The complaint noted that Mr. Lambert and Point
Bridge were based in Texas, thus demonstrating Johnson's knowledge about their Texas residency.

192.  As noted above, Johnson described himself as a "federal operative" in the lawsuit.

193.  The lawsuit contained many other claims based on Johnson's purported government
authority:

- He had an "an extensive network of investors, allowing [Point Bridge and
  Lambert] to avoid the entanglements of Silicon Valley investors who would
  be unable to pass security reviews by the United States Department of

App.209

Defense and/or other Federal agencies in order to obtain lucrative contacts."[105]

- Umbra was "dependent on personnel working with the company who had significant contacts with the United States Intelligence Community, Department of Defense, and/or other Federal agencies."[106]

- Without [Johnson]'s participation. Umbra Labs has been unable to capitalize on opportunities in the market for Federal Government contracts because the company lacks Plaintiff's contacts and expertise."[107]

**H.    Johnson defames Mr. Lambert after he refuses to comply with Johnson's RICO Shakedown Scheme.**

194.  On November 5, 2023, Johnson hosted an X Space titled "Sorry not sorry your Israeli op just blew up," where he discussed his lawsuit against Point Bridge and Mr. Lambert.[108]

195.  Johnson implied that the U.S. government ("Uncle Sam") was supporting his lawsuit because it sought to "clean up" Lambert's purported Russian ties:

> Lambert's gotten very close to the Russians. And we're sort of going to clean up a lot of the American space industry over the next few months. I think what you'll see over time, is the degree to which a lot of these fronts be they Emirati be they, be they Chinese be they Russian, be they Israeli, be they Chinese are going to get cleaned up by Uncle Sam and Cousin Nigel [*i.e.*, the U.K. government].[109]

196.  On November 20, 2023, Johnson hosted another X Space titled "Counterintel and OpenAI," where he implied that Umbra investors were running a "mob bank."[110] Johnson was

---

[105] *Johnson v. Lambert*, ECF 1 at ¶ 10, No. 1:23-cv-1485 (E.D. Va. Oct. 31, 2023).

[106] *Id.* at ¶ 11.

[107] *Id.* at ¶ 19.

[108] Ex. 1 at I-A, @JohnsonThought1, *Sorry not sorry your Israeli op just blew up*, X Space (Nov. 5, 2023, 10:24 p.m.), https://x.com/JohnsonThought1/status/1721367964207743077.

[109] *Id.*

[110] *Id.*

referring to Mr. Lambert (who has no connection to any "mob bank"). Johnson further suggested

that Mr. Lambert and others invested in Umbra as a deal to avoid SEC enforcement:

> A way to think about this is how do we get people who are compromised, who are mobsters who are whatever, who have cash, that want to develop products and things that are in the national interest. And you know what … sometimes you see this with people who get hit with the SEC notices, then they suddenly become super philanthropic. Sometimes you see it with people who invest, they seemingly are going about their life doing their thing. And they're running like a mob bank, and then suddenly they become investors in … I don't know, satellite technology, or in you know, so and so on and so on. Right. So that's real life. That's how these things like really work.[111]

197.  Johnson continued to claim in this X Space that his lawsuits against Point Bridge and

Clearview were blessed by the U.S. government and "deep state" to "clean up" these companies:

> There's this sense in which like, a lot of people go on to the boards of these companies, from the security services, or from the U.S. 'Deep State,' and they kind of spy on these companies to see if the company really needs to be cleaned up, if it needs to be shut down, if the CEO needs to change, you know, all that good stuff. And in some cases, you'll see lawsuits, right. I'm currently in two such lawsuits right now. Where they, the US government, you know, tries to use proxies as a way of cleaning up these companies. You know, in my case, it's a facial recognition company. And the other one is a is a satellite company. Now, one of the reasons, you know, these things sort of happen, the way they're happening now, and the reason people are talking about them much more openly, is the days in which like the so called 'Deep State' was like way quieter.[112]

198.  On April 2, 2024, the Eastern District of Virginia dismissed Johnson's first

lawsuit.[113]

---

[111] Ex. 1 at I-C, @JohnsonThought1, *Counterintel and Open AI*, X Space (Nov. 20, 2023, 9:06 p.m.), https://x.com/JohnsonThought1/status/1726784235485434110.

[112] *Id.*

[113] *Johnson v. Lambert*, ECF No. 8, No. 1:23-cv-1485 (E.D. Va. Apr. 2, 2024).

199.  Almost three months later, Johnson filed a new complaint in the Eastern District of Virginia raising the same claims as in his original complaint.[114]

200.  Johnson repeatedly claimed that he had coordinated with the federal government and intelligence agencies in refiling his dismissed lawsuit.

201.  On August 7, 2024, Johnson hosted an X Space titled "Dangerous! Why I sent my texts with J.D. Vance to the Washington Post." In that Space, Johnson claimed, "I got a call . . . from some CIA connections telling me that they'd like me to sue Hal Lambert."[115] Upon information and belief, these "CIA connections" referenced Greenwill.

202.  Johnson also claimed that his lawsuit was funded by the U.S. and unspecified "allied" governments: "I have effectively infinite money to litigate these matters. So you know this happens when the US government likes you, and . . . allied governments wanting to fund your legal defenses. So you know, I can basically go for forever."[116]

203.  Johnson falsely accused Mr. Lambert of sexual impropriety in this Space, stating,

- "Yeah, I mean, he grabs the tits of younger women that don't belong to him. He gets drunk, he causes trouble."

- "We do know that he likes to grope women that aren't his, you know, aren't his to grope."

These statements are false. Mr. Lambert is a happily married father and family man and does not "grope" or "grab the tits" of other women. Johnson's accusation that Mr. Lambert groped women

---

[114] Compl., ECF No. 1, *Johnson III* (Jun. 28, 2024).

[115] Ex. 1 at I-D, @JohnsonThought1, *Dangerous! Why I Sent My Texts … Vance to the Washington Post*, (Aug. 7, 2024, 1:05p.m.), https://x.com/JohnsonThought1/status/ 1821231218773708816.

[116] *Id.*

without their consent amounts to falsely accusing him of both a serious crime and serious sexual misconduct.

204.    During the same X Space, Johnson falsely stated that Mr. Lambert was engaged in illegal financial activities, including acting as a front for "cartels" and "compromised cash," and noted Mr. Lambert's connection to Texas. Among the false statements Johnson broadcast to the world were:

- Lambert is a "front for a lot of the Russian activity and a lot of the compromised cash";

- Lambert is "the kind of dirty player in Fort Worth, maybe a front for the cartels"

- "I knew that Lambert had a lot of connections with naughty players, like from foreign governments and whatnot"; and

- "Hal is very much tied in with the Russian world, particularly in the Russian and the COVID world, particularly operating in Texas." These statements are entirely untrue and have no factual basis. Lambert has never had any involvement with Russian money, criminal organizations, or illegal financial activities.

205.    These statements are entirely untrue and have no factual basis. Mr. Lambert has never had any involvement with Russian money, criminal organizations, or illegal financial activities.

206.    On August 18, 2024, Johnson posted another X Space, titled "Donald Trump doesn't want to Win. Also Cleveland Rocks." According to X, 2.8 thousand users listened to this Space and 3,440 users viewed the tweet containing it.

207.    In this X Space, Johnson falsely claimed that Mr. Lambert "sexually has assaulted some women at parties in Austin."

208.    This accusation is entirely false and fabricated and without any factual basis.

209.    By broadcasting these false accusations on a global platform like Twitter, Johnson ensured that the defamatory statements reached a wide audience, causing significant harm to Mr. Lambert's personal and professional reputation. The false allegations were made with the clear

intent to damage Mr. Lambert's standing in the community, leading to emotional distress and a deterioration in both personal and professional relationships. To further exacerbate the harm, these false statements remain accessible to anyone on the internet, continuing to damage Mr. Lambert's reputation and subjecting Mr. Lambert to ongoing public scorn.

210.  Accusing Mr. Lambert of sexually assaulting women is plainly accusing him of committing a serious crime and serious sexual misconduct.

211.  During the same X Space, Johnson continued to falsely accuse Mr. Lambert of engaging in illegal financial activities:

- Johnson falsely claimed that Mr. Lambert "was involved with a lot of taking a lot of Israeli money, another kind of dirty money, into the Cruz super PAC in 2016 that he ran."

- Johnson falsely claimed that Mr. Lambert was a "front for the Russian world" and associated with the "Russian mob world."

- Johnson falsely claimed that there was "dirty money around [Lambert]."

- Johnson falsely claimed that Mr. Lambert "was going to bring in all this dirty Russian money."

212.  These statements are entirely untrue and have no basis in fact. Mr. Lambert has never had any involvement with "Russian money," criminal organizations, or any illegal financial activities or illegal foreign campaign contributions.

213.  By broadcasting these false and malicious statements to a global audience on X, Johnson acted with actual malice, intending to paint Mr. Lambert as a corrupt individual and to undermine Mr. Lambert's credibility and integrity. The baseless allegations about Mr. Lambert's involvement with Russian money not only falsely accuse him of criminal activity but also impugn his integrity as a reputable investor. And these defamatory statements remain publicly accessible

on the internet, perpetuating the damage to Mr. Lambert's reputation and subjecting Mr. Lambert

to ongoing harm.

214.  Accusing Mr. Lambert of involvement of being a "front" for the "mob world" and

using "dirty money" is effectively accusing him of the crime of money laundering and adversely

reflects on his fitness to conduct his business or trade.

215.  During this X Space, Johnson acknowledged that he had no evidence for these

allegations and prefaced his false statements by saying:

- "By the way, people want to impress me. Help me do a lot of research on Hal Lambert";

- "I want to know kind of more about him"; and

- "If I could have some whistleblowers there, that would be quite helpful."

216.  These statements further show that Johnson acted with malice. At best, Johnson

baselessly thought someone could come forward validating his claims. At worst, Johnson was

inviting his supporters to help him fabricate further false allegations.

217.  In the August 19, 2024 Substack interview with Tech Intel Stack, Johnson claimed

that his "partner" (Greenwill) and "a few business associates" forced Mr. Lambert and Point

Bridge to "invest" in certain ventures favored by the co-conspirators after the company was

targeted by the IRS or SEC:

> In the Hal Lambert lawsuit, over Umbra. We would get people who
> . . . had like dirty money, and we would try to get them to invest in
> things like new satellite technology or whatever. In some cases, they
> would get in trouble with Uncle Sam. So . . . I meet with a lot of
> people that are in trouble with the IRS, or the SEC, or whatever, and
> I try to get them to be more helpful to [the] United States.[117]

---

[117] Cantwell, *Elon Musk's X Suspends Chuck Johnson for Not Being Enough of a Troll*, Substack.

218.    In this interview, Johnson described his relationship with Lambert as an 'op':

> And what Hal didn't know is that I had a lot of connections with the
> US government, and that there was an op being run, and the op was
> to get a lot of dirty money to be used for a lot of the American tech
> industry, and the basic events to take over these companies are to
> trap the money in these deals.[118]

219.    The interviewer then asked Johnson: "When you say trap the money in the deal . . .
do you mean take over the vehicle that invest[s] in the company?" Johnson agreed:

> That's right. So one way to think about … Umbra [is that] Hal has no
> real say in the day to day operations of [U]mbra, and so there's all
> this money that's been invested in [U]mbra, but how will those guys
> ever get liquid? Under what terms do they get liquid? How many of
> them were investing because they're tied in with Russian mafia, or
> they're tied in with the Israelis, or maybe someone was forced to do
> it. There's all these questions there that you might ask. Each investor
> is a little different, but the company is doing quite well. It has, I think,
> nine or 10 satellites up in space, and what I'm going to be doing is
> basically suing to cleanup … Hal's involvement in the company. …
> [T]here's a long history of Hal being a predatory and bad actor. And
> so this lawsuit[']s an opportunity to clean a lot of that up … .

220.    Johnson further explained that by suing Mr. Lambert, "we're cleaning up the satellite
industry from the Russian and Israeli influences."[119]

221.    On August 26, 2024, Mr. Lambert contacted Johnson via email requesting that
Johnson correct and retract the false and defamatory statements described above. Mr. Lambert
wrote:

> Charles, it's been brought to my attention that on your X Spaces you
> accused me of having sexually assaulted women at parties in Austin;
> getting drunk and causing trouble, that I am a front for Russian money
> and interests and other dirty money; and that I may be a front for drug
> cartels.

---

[118] *Id.*

[119] *Id.*

He then provided links, which included the date and location of the defamatory statements, and continued:

> These are lies and the fact you ask your deranged fans to "research" me and find a 'whistleblower' shows me that you know they are lies and you are fishing for someone to make up these lies. I am a married man with a family and these lies undermine my family and business relationships. Stop lying about me and correct the record.

222.  That evening, Johnson responded by email: "Hal, Sue me."

223.  On August 29, 2024, Johnson posted screenshots of Mr. Lambert's request for a correction publicly on X and added,

> Hal Lambert, who started the MAGA ETF, should not have fraud against me in business nor mistreated lady founders nor taken money from foreign fronts as he cheated me out of Clearview and Umbra equity. I [heart emoji] discovery @MAGAindex!" [@MAGAIndex is Lambert's X handle].
>
> By the way, I'm currently suing Hal.

According to X, 1,716 users viewed this post.

224.  In addition to repeating his false allegations of money laundering for "foreign fronts," Johnson additionally accused Mr. Lambert of having "committed fraud against me in business." This is false. Mr. Lambert has engaged honestly with Johnson and all others he has done business with.

225.  Accusing Mr. Lambert of "fraud against me in business" is accusing him of committing a serious crime and adversely reflects on his fitness to conduct his business.

226.  On September 17, 2024, the Eastern District of Virginia dismissed Johnson's second lawsuit, this time with prejudice.[120]

---

[120] Mem. Op. & Order, ECF No. 8, *Johnson III* (Sept. 17, 2024).

App.217

I.    **Johnson extorts other investors through his RICO Shakedown Scheme.**

227.  Point Bridge is aware of many other businessmen who have faced similar forms of extortion, harassment, and fraud from Johnson and his co-conspirators. Johnson has openly bragged about his conduct.

228.  In the Substack interview with Tech Intel Stack, Johnson described meeting with tech investor Robert Freidland: "like, I'm the friendly face that talks to them before they get in trouble with the more or less friendly faces." He claims that he told Friedland:

> "[N]ice to meet you, Robert. So nice to have dinner with you," whatever. "Let's talk." So we talk for like, five, six hours. And then I say, "look, here's what's going to happen if you continue on the course of action that you're on . . . the US government is not going to allow you to bring . . . your goods into the United States." Or . . . "you're going to pay a higher tax." Or I sort of create these scenarios, or I tell them those scenarios, that others have for them, and I sort of try to give them off ramps so they can . . . keep their money, and they can be patriotic and helpful to the United States.

229.  Johnson engaged in the same pattern with Austin-based venture capitalist Joe Lonsdale.

230.  In August 2024, Johnson circulated a text conversation he had with Lonsdale. In these messages, Johnson told Lonsdale was under investigation by the FBI, implicitly threatened Lonsdale for not being "on the right side of Uncle Sam," and promised to help Lonsdale "get . . . right with them."

231.  Johnson then warned that his "community" was also targeting Musk and Thiel and reiterated that he was "leaving a door open" to save Lonsdale from the FBI. Johnson cautioned Lonsdale that he shouldn't "dismiss [this offer] in an arrogant kind of way."

232.  After Lonsdale ignored him, Johnson began threatening the Austin-based businessman with a law enforcement investigation.

233. In a Substack post, Johnson called for Lonsdale to be "shut down by the feds" and announced: "In the coming days I'll be releasing my conversations with Joe Lonsdale and explaining why he's uniquely a problem. I'll be chatting with journalists to see if they'll be responsible enough to cover that fraud. If not, I'll publish it here."[121]

234. In the Tech Intel Stack interview, Johnson claimed he had sent "a number of negative articles about Joe Lonsdale . . . to the FBI field office" and to Lonsdale's "limited partners."[122]

235. On April 30, 2024, Johnson threatened Mike Benz, a former State Department official and conservative commentator critical of the U.S. intelligence agencies: "It's time to turn yourself in, Mike."[123]

236. On October 2, 2024, Benz explained that he had "never met [Johnson], never interacted with him, and he somehow got my personal cell number and threatened me one morning with a text message out of nowhere that I would soon be thrown in prison."[124]

237. On November 7, 2023, Johnson wrote on his Substack Blog about a "rumor" that Home Depot co-founder Bernie Marcus funded Benz:

---

[121] Charles Johnson, *The Joe Lonsdale Hustle Needs To Be Shut Down By The Feds*, Substack (Aug. 21, 2024), https://charlesjohnson.substack.com/p/the-joe-lonsdale-hustle-needs-to.

[122] Cantwell, *Elon Musk's X Suspends Chuck Johnson for Not Being Enough of a Troll*, Substack.

[123] @MikeBenzCyber, X (Oct. 1, 2024, 2:25 p.m.), https://x.com/MikeBenzCyber/status/1841182727971700812 (last visited Oct. 16, 2024).

[124] *Id.*

> The rumor is that Benz is funded by the Chisraeli network around
> Bernie Marcus. Marcus, of Home Depot fame, is where consumer
> goods from China, mob labor and Jewish finance meet. He is a big
> Netanyahu supporter as [is] his ally and consigliere Steve Hantler
> who doles out the funding.[125]

238.   Acting on this "rumor," on October 2, 2024, Johnson threatened Marcus and his

family office advisor, Hantler. Johnson demanded that Marcus "shut down" Benz or be held

"personally responsible." Johnson purported to make this demand on behalf of "The American

Deep State."[126]

239.   That same day, Johnson tweeted at Benz, "You are going to prison traitor," and

falsely accused him of marrying a "Hungarian prostitute."[127]

240.   Also on that day, Johnson texted Hantler, claiming to be working on behalf of the

"intelligence community" to prevent them from donating to Benz. Johnson then posted a

screenshot of the exchange on X.

Johnson:   It's time to stop funding Mike Benz

Hantler:   What did Mike do or not do?

Johnson:   He's targeting the intelligence community. Can't be allowed. We know about
           the Hungarian prostitute spy wife. Lots of other problems.

Hantler:   I will look into this.

---

[125]  Charles Johnson, *On Constructs and Their Unmasking*, Substack (Nov. 7, 2023),
https://charlesjohnson.substack.com/p/on-constructs-and-their-unmasking.

[126]  @JohnsonThought1, X (Oct. 1, 2024, 3:24 a.m.), https://x.com/JohnsonThought1/status/
1841016255471337891 (last visited Oct. 16, 2024).

[127]  @JohnsonThought1, X (Oct. 1, 2024, 4:22 p.m.), https://x.com/JohnsonThought1/status/
1841212036300066990 (last visited Oct. 16, 2024).

Johnson:  Please do my community is asking me to get involved.[128]

**J.      Johnson defames Mr. Lambert again after receiving the complaint in this action.**

241.  On October 16, 2024, Point Bridge filed this action against Johnson.

242.  Over the next few days, Johnson reiterated his false claims about Mr. Lambert committing fraud, being backed by hostile foreign governments and criminal enterprises, and engaging in sexual impropriety.

243.  On October 16, 2024, Johnson posted on X, "Looks like elicitation by Mr. Lambert who is credibly accused of fraud with the MAGA ETF."[129] In a separate post that day, Johnson described the Point Bridge lawsuit as "a Quinn Emmanuel lawsuit from someone who is credibly accused of fraud by multiple founders."[130]

244.  On October 17, 2024, Johnson posted on X, "I welcome the opportunity to hold accountable a *foreign-backed, foreign-funded criminal defamation ring* which has targeted me in a frivolous lawsuit filed by a *fraudulent Texas businessman*."[131]

---

[128]  @JohnsonThought1, X (Oct. 1, 2024, 4:34 p.m.), https://x.com/JohnsonThought1/status/1841215069163512279 (last visited Oct. 16, 2024).

[129]  @JohnsonThought1, X (Oct. 16, 2024, 6:07 p.m.), https://x.com/JohnsonThought1/status/1846674431889813748 (last visited Oct. 16, 2024).

[130]  @JohnsonThought1, X (Oct. 16, 2024, 5:02 p.m.), https://x.com/JohnsonThought1/status/1846657939370577984 (last visited Oct. 16, 2024).

[131]  @JohnsonThought1, X (Oct. 17, 2024, 11:52 a.m.), https://x.com/JohnsonThought1/status/1846942320869908682 (emphasis added) (last visited Oct. 16, 2024).

245.  Also on October 17, 2024, Johnson posted on X, "Curious, curious that Hal Lambert did not mention my reporting about his lecherous behavior with female founders of companies[.]"[132]

246.  On October 17, 2024, Johnson posted a Substack article entitled, "Last Gasp of A Criminal Syndicate: Why I Welcome The Lawfare Attacks Against Me: To be libeled by the Israeli-backed defamation squad is an honor indeed," discussing this lawsuit. It included several false claims about Mr. Lambert:

- "I welcome the opportunity to hold accountable a foreign-backed, foreign-funded criminal defamation ring which has targeted me in a frivolous lawsuit filed by a fraudulent Texas businessman with whom I used to associate."

- "I have amassed quite a lot of evidence of Mr. Lambert's involvement with hostile foreign intelligence."

- "Mr. Lambert is a frequent target of law enforcement."[133]

247.  On October 23, 2024, Johnson posted a Substack article titled, "Best Birthday Yet! A Foreign Compromised Millionaire is Backing a Frivolous Lawsuit Against Me: Why I don't submit to foreign-compromised bullies."[134] In this article, Johnson accused Mr. Lambert of committing "fraud," engaging in "womanizing, and being "rather lecherous" "despite being married."

---

[132] @JohnsonThought1, X (Oct. 17, 2024, 12:18 a.m.), https://x.com/JohnsonThought1/status/1846767761411788856 (last visited Oct. 16, 2024).

[133] Charles Johnson, *"Last Gasp of a Criminal Syndicate": Why I Welcome the Lawfare Against Me*, Substack (Oct. 17, 2024), https://charlesjohnson.substack.com/p/last-gasp-of-a-criminal-syndicate.

[134] Charles Johnson, *Best Birthday Yet! A Foreign Compromised Millionaire is Backing a Frivolous Lawsuit Against Me*, Substack (Oct. 23, 2024), https://charlesjohnson.substack.com/p/best-birthday-yet-a-foreign-compromised.

App.222

248. On October 23, 2024, Johnson posted two messages in an X thread, stating: "Do we still have that file about how Hal Lambert was a front for various foreign governments fam? Do we @bugbombz?" The anonymous X account "@bugbombz" frequently reposts and interacts with Johnson's content, indicating that Johnson is conspiring with others to amplify false claims that Mr. Lambert is "compromised," whom he relies on to help him further extort and defraud Mr. Lambert and Point Bridge.

249. All these statements are false. Mr. Lambert is a faithful husband and father. Neither Mr. Lambert, MAGA ETF, nor any of its accused counterparts has not been credibly accused of fraud by anyone and is in good standing with all regulatory authorities. Mr. Lambert has no backing or relationships with foreign governments. The only "criminal defamation ring" that Mr. Lambert has ever had any association with was his past acquaintance with Johnson and Greenwill.

## CAUSES OF ACTION

### Count I: Civil RICO, 18 U.S.C. § 1962(c) (By All Plaintiffs)

250. Plaintiffs reallege each and every allegation set forth in the foregoing paragraphs by reference herein.

251. 18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

252. Defendant Johnson is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(d).

253. Point Bridge is a "person" within the meaning of 18 U.S.C. § 1961(3) because it is an entity capable of holding legal or beneficial interest in property.

254.  Johnson and Greenwill constituted the RICO Enterprise ("Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), because they associated for the common purpose of profiting off the scheme to shake down and extort Point Bridge and other investors.

255.  The Enterprise has an ongoing organization with an ascertainable structure and functions as a continuing unit with separate roles and responsibilities.

256.  Johnson violated 18 U.S.C. § 1961(1) by engaging in a pattern of "racketeering activity," including the following predicate crimes:

- **Wire Fraud (18 U.S.C § 1343):** As detailed above, Johnson and co-conspirator used interstate wire communications, including text messages, emails, and social media posts, as part of a scheme to further the RICO Shakedown Scheme by defrauding others out of money via false and fraudulent claims that Johnson was a government agent or had connections to government agencies and would use his status as a government agent or government connections to instigate sham law enforcement actions against his targets, including investigations, audits, and lawsuits, or else would publicize knowingly false claims of corruption and/or associations with foreign governments and the Mafia, if they did not give money to the Enterprise. Johnson knew that these wire communications would be transported interstate and knowingly and willfully initiated and participated in the RICO Shakedown Scheme.

- **Hobbs Act Extortion (18 U.S.C. § 1951):** As part of the RICO Shakedown Scheme, Johnson and his co-conspirators repeatedly attempted to portray themselves as having government authority in order to threaten their targets into giving money to the Enterprise.[135] These threats were wrongful and included, *inter alia*, threats to initiate sham government investigations, audits, and other law enforcement actions based on Johnson's knowingly false claims of corruption and/or associations with foreign governments and the Mafia and threats to publicize these knowingly false claims. No law enforcement or intelligence official would have authority to make such claims or threats.

- **Theft under Texas Penal Code Title 7, Chapter 31**[136]: As part of the RICO Shakedown Scheme, Johnson and his co-conspirators appropriated or attempted to

---

[135] *See Evans v. United States*, 504 U.S. 255, 269 (1992) (noting that "extortion was understood as a wrongful taking under a false pretense of official right" and that Hobbs Act is far broader than this conception). The Hobbs Act also prohibits public officials from using the "coercive element" of "the public office itself" to demand money. *Id.* at 266.

[136] *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 410 (2003) (holding "state extortion offense for purposes of RICO" is "similar" to Hobbs Act).

App.224

appropriate money from their targets by means of deception and coercion, including by the false claim that Johnson was a government agent and would use his government connections to instigate sham law enforcement actions against his targets, including investigations, audits, and lawsuits, as well as wrongful threats that Johnson would publicize knowingly false claims of corruption and/or associations with foreign governments and the Mafia.

257.    Johnson conducted and/or participated in the conduct of the Enterprises affairs, directly or indirectly, through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(c). He participated in the operation or management of the Enterprise by, among other things:

- Establishing a partnership with Greenwill whereby he and Greenwill falsely claimed to speak for federal law enforcement agencies in their attempts to fraudulently secure investments from and make extortionate demands on their targets;

- Selecting the entities and people that the Enterprise would target as part of the RICO Shakedown Scheme;

- Selecting the methods, means and strategies employed to further the RICO Shakedown Scheme;

- Coordinating communications between himself and his co-conspirators; and

- Making and publicizing threats to further the RICO Shakedown Scheme.

258.  Johnson engaged in a scheme or artifice to defraud Point Bridge out of money by means of false or fraudulent pretenses, representations, or promises, including but not limited to claiming government authority to threaten law enforcement action unless funds were shifted to entities controlled by the Enterprise, and publicizing knowingly false allegations of corruption and ties to foreign governments and the Mafia when monies were not paid to the Enterprise. Johnson has no such authority, and it would be unlawful for someone who had such authority to make these promises or threats.

259.    It was reasonably foreseeable that, in furtherance of the scheme to defraud, interstate wire communications would be used, and interstate wire communications were in fact

used. Over a period of at least three years, Johnson caused to be transmitted by means of wire communication in interstate commerce numerous communications that were designed to defraud Plaintiffs, including but not limited to:

- The November 2020 wire transfer of $200,000 into Point Bridge through venture capitalist Cyan Bannister;

- The January 26, 2022 text messages to Gary Lauder signaling a government-endorsed takeover of Clearview; and

- Emails and texts sent from Johnson and Greenwill to Point Bridge, Lambert, and Point Bridge's SPV limited partners making extortionate demands and threatening retaliation by the government and leaks to the press about false and fraudulent claims.

260.  Plaintiffs were directly injured and suffered damages to their business and property as a result of the predicate acts Johnson committed, including, among other things, legal fees, harm to business relationships, monetary losses, and damage to reputation and goodwill.

261.  The acts of racketeering activity referred to in the previous paragraphs constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5). The acts alleged were related to each other by virtue of common participants, similarly situated victims, a common method of commission, and the common purpose of attempting to obtain investment and interests in the target companies mentioned herein.

262.  There were multiple victims and targets of the Enterprise's scheme, including Mr. Lambert, Point Bridge, Umbra Space, and Clearview. And Johnson has bragged about engaging in similar illegal conduct with his co-conspirator Greenwill to Robert Friedland and Joe Lonsdale.

263.  Johnson has perpetrated the RICO Shakedown Scheme over the course of at least three years. As described herein, relevant communications took place over the course of several years, beginning in 2021 and extending to the present day.

App.226

264.  Absent judicial intervention, Johnson will continue perpetrating the Enterprise's shakedown scheme to the detriment of Plaintiffs and others.

265.  The Enterprise's conduct thus constitutes both a close-ended and open-ended pattern of racketeering conduct.

266.  As a direct and proximate result of Johnson's violations of 18 U.S.C. § 1962(c), Plaintiffs have been damaged in their business and property in an amount to be proven at trial, including, among other things, fees spent defending against extortion attempts, harm with investors, and business reputation. Because Point Bridge relies on its ability to raise capital for future ventures and investment, the RICO Shakedown Scheme has impaired the company's ability to maximize returns and deploy capital.

267.  As a result of Johnson's violation of 18 U.S.C. §§ 1962(c) and 1964(c), Plaintiffs are entitled to treble damages and the costs of suit, including reasonable attorney's fees.

### Count II: Conspiracy to Commit Civil RICO Violations, 18 U.S.C. § 1962(d) (By All Plaintiffs)

268.  Plaintiffs repeat and re-allege, as if fully set forth herein, the allegations of the foregoing paragraphs.

269.  18 U.S.C. § 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [the RICO provision]."

270.  Defendant Johnson is a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(d).

271.  Point Bridge is a "person" within the meaning of 18 U.S.C. § 1961(3) because it is an entity capable of holding legal or beneficial interest in property.

272.  Mr. Lambert is a "person" within the meaning of 18 U.S.C. § 1961(3).

App.227

273. Johnson and Greenwill constituted the Enterprise, as that term is defined in 18 U.S.C. § 1961(4), associated for the common purpose of profiting off the RICO Shakedown Scheme to shake down and extort Point Bridge and other investors.

274. The Enterprise has an ongoing organization with an ascertainable structure and functions as a continuing unit with separate roles and responsibilities.

275. Johnson and his co-conspirators also violated 18 U.S.C. § 1962(d) by willfully, knowingly, and unlawfully conspiring, combining, confederating, and agreeing together to participate in the RICO Shakedown Scheme to defraud and extort Point Bridge and other targets, in violation of 18 U.S.C. § 1962(d).

276. Johnson specifically intended and foresaw that the Enterprise would engage in, and conduct activities that affected, interstate commerce, as described above.

277. There were multiple victims and targets of the Enterprise's scheme, including Point Bridge, Umbra Space, and Clearview.

278. Johnson has perpetrated the RICO Shakedown Scheme over the course of at least three years and will continue the Shakedown Scheme in the future to the detriment of Plaintiffs and others absent judicial intervention.

279. Plaintiffs were injured in their business and property as a direct result of Johnson and his co-conspirators' violations of 18 U.S.C. § 1962(d), by, among other things, reductions in investment and other capital, monetary damages, fees spent defending against extortion attempts, damage to relationships with investors, and damage to its reputation, none of which would have happened but for the Enterprise RICO Shakedown Scheme. Because Point Bridge relies on the ability to raise capital for future ventures and investment, the RICO Shakedown Scheme has impaired the company's ability to maximize returns and deploy capital.

App.228

280.  As a result of Johnson's violation of 18 U.S.C. §§ 1962(d), Plaintiffs are entitled to three-fold its damages and the costs of suit, including reasonable attorney's fees.

**Count III: Breach of Contract (By Point Bridge)**

281.  Plaintiff Point Bridge repeats and re-alleges, as if fully set forth herein, the allegations of the foregoing paragraphs.

282.  The Subscription Agreement constituted a valid and enforceable contract between Point Bridge and Johnson.

283.  Under the terms of the contract, Johnson "agreed not to disclose or use any of the information provided in connection with the fund except for the purpose of evaluating an investment in the fund," and he further "agree[d] not to distribute that information to any other person or entity."

284.  Point Bridge has complied with all terms of the contract.

285.  Johnson violated his duty by discussing the operations of the SPV and Umbra on many occasions, including on:

- His October 18, 2023 X post;

- His November 22, 2023 X Space;

- His August 7, 2024 X space;

- His August 18, 2024 X Space; and

- His August 19, 2024 Substack Interview.

286.  Johnson's breaches have proximately caused damage to Point Bridge by, among other things, undermining Point Bridge's investments and its ability to obtain future funding.

287.  Point Bridge has suffered and continues to suffer significant damages as set forth fully and specifically in this Complaint.

App.229

288.  Due to Johnson's breach of the contract, Point Bridge is entitled to judgment against him for an amount to be determined at trial, plus default interest, plus Point Bridge's attorney's fees and costs incurred in enforcing its rights under the contract, both under the express terms of the contract and pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code ("Chapter 38"). *See* Tex. Civ. Prac. & Rem. Code. §§ 38.001, 38.002.

## Counts IV-XI: Defamation (By Lambert)

289.  Plaintiff Lambert repeats and re-alleges, as if fully set forth herein, the allegations of the foregoing paragraphs.

290.  The defamation claims against Johnson are:

| Count | Date | Medium | Description |
|-------|------|--------|-------------|
| IV | August 7, 2024 | X | Complaint ¶¶ 170-173 |
| V | August 18, 2024 | X | Complaint ¶¶ 175-184 |
| VI | August 29, 2024 | X | Complaint ¶¶ 192-194 |
| VII | October 16, 2024 | X | Complaint ¶ 212 |
| VII | October 17, 2024 | X | Complaint ¶ 213 |
| IX | October 17, 2024 | X | Complaint ¶ 215 |
| X | October 17, 2024 | Substack | Complaint ¶ 215 |
| XI | October 23, 2024 | Substack | Complaint ¶ 216 |

291.  Defendant Johnson's false and defamatory statements, described above, constitute defamation under Texas law.

292.  Johnson's false and defamatory statements, individually and collectively, are defamatory *per se*. "Accusing someone of a crime, of having a foul or loathsome disease, or of

App.230

engaging in serious sexual misconduct are examples of defamation per se. Remarks that adversely reflect on a person's fitness to conduct his or her business or trade are also deemed defamatory per se."[137] Damages to Mr. Lambert are thus presumed as a matter of law.[138]

293.  Johnson published the false and defamatory statements, individually and collectively, without privilege and with actual malice, that is, with actual knowledge of falsity or a reckless disregard for truth or falsity.

294.  Johnson intentionally and recklessly published the false and defamatory statements.

295.  Johnson's false and defamatory Statements, individually and collectively, have exposed Mr. Lambert to hatred, contempt, ridicule, and/or obloquy and/or caused him to be shunned or avoided and/or have a tendency to injure him in his occupation.

296.  Johnson has not corrected or retracted the false and defamatory statements, even after Mr. Lambert asked for a correction to mitigate damages.

297.  Johnson published the false and defamatory statements without conducting a reasonable investigation, knowing them to be baseless. Acknowledging this, Johnson expressly invited his followers to "research" or become "whistleblowers" to support his unfounded allegations.

298.  Johnson knew and foresaw that one probable consequence of publishing the false and defamatory statements was that those statements would be republished by others, and thanks to Johnson's many followers liking and re-sharing the statements on X, the foreseeable republication has in fact occurred, further amplifying and spreading the false and defamatory statements.

---

[137] *In re Lipsky*, 460 S.W. 3d 579, 596 (Tex. 2015).

[138] *Id.*

299. Johnson's false and defamatory statements directly and proximately caused substantial and permanent damage to Mr. Lambert.

300. Johnson's false and defamatory statements include statements that charged Mr. Lambert with crimes, imputed to Mr. Lambert want of chastity, and/or by natural consequence caused him actual damage. By way of example of such damages, Mr. Lambert is a prominent venture capitalist who raises capital from third party investors. Johnson's statements may have an adverse impact on the fund. As another example, Johnson's false accusation that Mr. Lambert is a money launderer for Russia may interfere with the ability of his government-contracting companies, including Umbra and Clearview AI, to transact business with the U.S. Department of Defense. These contracts are worth billions. Johnson's liability could easily exceed $10 million in actual damages, with a multiple of that in punitive damages.

## DEMAND FOR JURY TRIAL

301.  Plaintiffs demand a jury trial on all triable matters.

## PRAYER FOR RELIEF

302.  As a direct and proximate result of each of the above acts, Plaintiffs have suffered damage. They hereby seek all legal and equitable relief to which they are entitled, including the following:

- All actual damages resulting from Defendant Johnson's actions;

- Treble damages under RICO;

- All presumed and special damages as are allowed by law and, as applicable, to be proven at trial;

- An award of punitive and exemplary damages in such amount as may be awarded at trial;

- An Order requiring Johnson to retract the false and defamatory statements described herein, and a permanent injunction barring Johnson from rebroadcasting them;

- Injunctive and/or declaratory relief as deemed appropriate by the Court;

- Judgment for costs of the suit incurred, including attorney's fees, including under Chapter 38 of the Texas Civil Practice and Remedies Code;

- Interest on all such amounts permitted by law; and

- Such further legal and equitable relief as this court may deem proper.

Dated: January 21, 2025

Respectfully submitted,

/s/ *Will Thompson*
Will Thompson

**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
Will Thompson
State Bar No. 24094981
willthompson@quinnemanuel.com
3100 McKinnon St., Ste. 1125
Dallas, Texas 75201
Telephone: (469) 902-3600
Facsimile: (469) 902-3610

**COUNSEL FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2025, I filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas. I hereby certify that I have served the document on all counsel of record by a manner authorized by the Federal Rules of Civil Procedure.

/s/ *Will Thompson*
Will Thompson

App.233

# EXHIBIT 1

## PARTIAL TRANSCRIPTS OF JOHNSON'S "X" SPACES

### I-A. "Sorry not sorry your Israeli op just blew up"

November 5, 2023, available at https://x.com/JohnsonThought1/status/1721367964207743077,

0:07:49-0:08:46

**Charles Johnson**: On a personal note, I sued this guy, Hal Lambert, Hal Lambert and I started this SPV to do investing in a synthetic aperture radar satellite system. And I'll have more to say on that in the future. But Lambert's gotten very close to the Russians. And we're sort of going to clean up a lot of the American space industry over the next few months. I think what you'll see over time, is the degree to which a lot of these fronts be they Emirati be they be the Chinese made a Russian be the Israeli be the Chinese are going to get cleaned up by Uncle Sam and cousin Nigel. And then it gets all to the good. I also think it's gonna be interesting to see how the Mormon world works on this, because there's been a lot of approaches recently by the kind of Mormon deep state, that doesn't really have patience for the Chinese or the Russians or others kind of moving into their space. So I think that that's pretty encouraging to see the Mormons break, as they're breaking.

### I-B. "Peter Thiel and me in The Atlantic"

November 9, 2023,  https://x.com/JohnsonThought1/status /1722820033414332675.

0:10:43-0:11:33

**Charles Johnson:** Okay, so there's this line in the [Mattathias] Schwartz piece. 'Johnson told Insider told insider, he introduced Thiel to Buma then exposed him because Johnson felt betrayed that Thiel did not invest in Johnson's own startups, which he had expected to do in the exchange.' In fact, one of the conditions I made of helping Peter get right with the Deep State was that he and

1

Founders Fund would actually begin working on technology that was in the national interest, not just my company, but other companies as well. And that they would actually do rigorous due diligence on companies that they were funding. Unfortunately, that's not really the case, they've been funding a lot of like, Israeli connected or Russian connected, companies like Neuralink, which is a Musk property, which we can get into people are curious about that. Probably won't be talking too much about Musk in this piece.

**I-C "Counterintel and Open AI,"**

November 20, 2023,  https://x.com/JohnsonThought1/status/1721367964207743077

0:17:44- 0:19:57

And the same thing is true of the United States, right, there are a group of families, like group of interests that exist in state after state, they really run these states, and really make decisions about how the state will operate and who will be in charge and all of that stuff. So when we kind of think about this, more and more as time goes on, and as we kind of engage more and more in this kind of in these kinds of decisions, you know, a way to think about this is how do we get people who are compromised, who are mobsters who or whatever, who have cash, that want to develop products and things that are in the national interest. And you know what, sometimes you see this with people get hit with the SEC notices, then they suddenly become super philanthropic. Sometimes you see it with people who invest, they seemingly are going about their life doing their thing. And they're running like a mob bank, and then suddenly they become investors, and I don't know, satellite technology, or in you know, so and so on and so on. Right. So that's real life. That's how these things like really work. And I think a way to think about this the way I've kind of come to think about this over the years is that the deep state and the mob intersect in all these like exquisite, interesting ways. And in some cases, they even intermarry, and there's lots of ways that

2

App.236

this sort of happens. I can call it a mob Intel pairing. And there's a lot more of that in the world than you would think. Right where she has the money. He has the political connections, Bada bing, bada boom, they're kids, they have kids, and it's sort of like that's sort of how that how that kind of works.

0:27:10-0:29:40

Now, Sam [Altman] had on his board at OpenAI, he had somebody by the name of Will Hurd, Will Hurd was a congressman or Republican congressman, who spoke fluent Urdu. And it was a very interesting figure, black man, I think he's a, he's like half black or something to that effect, representing the district along the Texas border, and Will Hurd sort of left office in part because that district is very kind of it's like a marginal district, it's like slightly Democrats some years later, Republican other years. Anyway, he left Congress, and he went and sort of tried to make some money for himself before running for president. And one of the things he did was he joined the board of OpenAI. And that, you know, he sort of was on the board, but he was also spying on it. And he ultimately left the board, God only knows what he kind of learned along the way. But there's this sense in which like, a lot of people go on to the boards of these companies, from the security services, or from the U.S. Deep State, and they kind of spy on these companies to see if the company really needs to be cleaned up, if it needs to be shut down, if the CEO needs to change, you know, all that good stuff. And in some cases, you'll see lawsuits, right. I'm currently in two such lawsuits right now. Where they, the US government, you know, tries to use proxies as a way of cleaning up these companies. You know, in my case, it's a facial recognition company. And the other one is a is a satellite company. Now, one of the reasons, you know, these things sort of happen, the way they're happening now, and the reason people are talking about them much more openly, is the days in which like the so-called Deep State was like way quieter. Those days are

3

kind of like not quite working anymore. Right? For many of us who grew up like who are millennials are Zoomers, God forbid, you kind of grew up in a world in which like, you had a phone around you what your most hormonal periods of your life. There's all this paper trail on you. And in the parlance of like U.S. Deep State, they call it 'ubiquitous technical surveillance.' Basically, all of us have cell phones around us, all of us have all these things in our home all around us at all times. And these things are very much engaged in different ways, you know, in our, in our homes, and they're very much like a big part of like, the world that we that we live in. And so that's kind of how to think about this.

**I-D  "Dangerous! Why I sent my texts.... Vance to the Washington Post"**

August 7, 2024 https://x.com/JohnsonThought1/status/1821231218773708816

**2:42:04 -2:50:13**

**X User:**[1] Can you talk about your lawsuits again, like against like Clearview and Hal Lambert?

**Charles Johnson**: Yeah, I can. Long story short is I'm in two lawsuits. One is with Clearview AI, which the US government encouraged me to do both of these lawsuits, and both of them are kind of moving their way through the court system. I've been winning. I think both of them, I've been doing pretty well. I have something new to report on, the how Lambert lawsuit soon as concerning satellite technology. But yeah, it'll be, it'll be interesting when it all finally comes out. You know which will happen. There's a court date set, there's a trial date set for the Clearview AI, lawsuit in December, which I'm looking forward to. And yeah, in general, I'm pretty happy about how things are progressing in both of those cases.

---

[1] The "X user" is a listener to Johnson's Space, who asked about the lawsuit. When replaying a Space, X does not give the name or username of the speakers other than the Host (in this case, Charles Johnson).

**X User**: And I guess, like, why? Why would the government be interested in pushing you on that? Like, why would the deep state want you to sue Hal Lambert and Clearview?

**Charles Johnson**: Oh, in the case of, I mean, Hal is a front for a lot of the Russian activity and a lot of the compromised cash. He was involved in the 2016 efforts with Ted Cruz. And how is the kind of dirty player in Fort Worth, maybe a front for the cartels that part, we're not totally sure of. We do know that he likes to grope women that aren't his, you know, aren't his to grope and, you know, it's it, yeah, so that's kind of fun. What can I say about that? I mean, it is, it is what it is. And then on the Clearview front, you know, I'm represented by Bernie Kleinman. Bernie Kleinman is the, you know, pro-American, Jewish CIA guy who is involved representing Khalid Sheik Mohammed back in the day. And Kleinman is a pretty good lawyer. People can look him up. I was represented previously by Alston Bird, but with changes in the UK, I thought it was a bad idea to be represented by the Tory law firm. And, yeah, I mean, I'll probably win both suits for what it's worth.

**X User**: And their stake in the game is like, basically that Hal Lambert is this, you know, unsavory character, and he has ties that are. . .

**Charles Johnson**: no Lambert. Lambert, Lambert, basically, yeah, so Lambert and I formed an SPV together where we'd split the carry on it. I knew that Lambert had a lot of connections with naughty players, like from foreign governments and whatnot, and so I allowed him to basically raise money from that network. He then tried to cheat me out of the SPV. I recommended that he not do that. He proceeded to try to do it. And then I got a call about a week later from some CIA connections telling me that they'd like me to sue Hal Lambert. So then I set about suing Hal Lambert. And Umbra, the company that I'm an investor in, the question is, how much of the economics of the company do I own? And that's a kind of interesting question, one that's going to

5

be resolved by the courts. So I either own, you know, $5 or $6 million worth of the stock, or I own something approximating, like 100 million plus of it, so we shall see.

**X User**: And that's part of, like, the same suit, or is that, like, a separate cause of it? Like, that's a separate cause of action, that's, that's in the lawsuit?

**Charles Johnson**: Yeah, that's in the lawsuit, or against Hal Lambert, and that'll come out more publicly as time goes on. Yeah, I'm grateful that you actually followed it and are paying attention to it, because a lot of people aren't paying attention to it. It's, it's kind of critically important, like, who owns the satellites that operate in Ukraine and elsewhere. And in the case of Hal, you know, Hal is very much, you know, tied in with the, with the Russian world, particularly in the Russian and Likud world, particularly operating in Texas. And, you know, there's photos of how going to Malta, meeting with strange people there. So, yeah, that's going to be a kind of interesting angle as time goes on.

**X user:** But I assume that might not come out explicitly in the lawsuit, right? Like your lawyers are going to protect, like, what evidence is presented?

**Charles Johnson**: I don't know what will come out explicitly in the lawsuit. I'm not sure it could. I don't know. Yeah, I intend to bring it out, and I intend to there's a journalist that wants to sit down and interview me for both suits, and I'll go through both of them and explain what really happened. And you know, I'm not really worried about either lawsuit. I seem to be winning in both cases. So

**X User:** Got it. And then if I know journalists were interested in reaching out to you, is that something that you'd be amenable to?

**Charles Johnson**: Sure? I mean, my DMs are open. I mean, it sort of depends on the context, and if I've given the story to somebody else, and it also depends on the types of work that people have done before. You know, I find that some people are not very capable at reporting these things

App.240

straight, or actually work for other countries, or whatever. So sometimes I don't really engage on it, but anything I say publicly, feel free to quote or use or whatever. Things are oftentimes more complicated, but I can't necessarily give the full story on everything, because sometimes they're active operations, as is the case with on the Umbra thing. I think it's kind of more I think when the Ukraine war ends, which I think will be sooner rather than later. You know, my general sense is that when the Ukraine war ends, a lot of these things are going to get shaped in different ways. So and then there's also the aspect of certain foreign governments are backers of some of these companies that are allied with the U.S., but not necessarily hardcore allied, and maybe they'll pay me to go away. And that's certainly an aspect of this as well, well,

**X User:** Because it's like, because Umbra itself is, like, one of the more successful of the defense tech like startups, right? Like they're still working?

**Charles Johnson**: Correct. And a big reason it's and a big reason it's one of the more successful ones, is because the involvement of your involvement of yours truly. So yeah, I'm quite proud of the role I played in cleaning up Umbra and moving Umbra into a position where it could be used in its, uh, offensive and defensive capabilities.

**X User**: And the only risk is this Hal Lambert I'm just, I've seen Hal Lambert on Fox News, and I just, I'm curious, like, what kind of guy this guy is.


**I-E "Why they attack Fuentes what he gets right and what he gets wrong",**

Aug. 15, 2024,  https://x.com/JohnsonThought1/status/1824287854584836479

0:35:36-0:37:27

"You know, what does it mean to be a fed? I'm not trying to be a dick about this. I'm generally people mean different things about it when they ask about it, when they talk about it. Right now,

you know, I have had a relationship with the Federal Bureau of Investigations and the NSA since I was 17 years old. I'm now 35 years old. Couldn't vote, right? Couldn't join the military without permission. But, you know, I ended up having a relationship with both of these three letter agencies and through blood. You know, I had a relationship with the CIA and the Office of Naval Intelligence, you know, which I didn't choose. You know, you exist in the context in which you reside. Right? What do you think you fell out of a coconut tree? So my point generally, is that for a lot of us, Uncle Sam knocks on the door and you say, 'All right, come on in. Uncle Sam, like, you know you want a coffee or something?' and they come to you and they ask you for help. And if you're smart or you're weird or you're interesting or whatever, they knock on your door a lot of a lot more frequently. And if you aren't super keen and super good at paying your taxes. Maybe you answer their door a little more frequently, like I did, you know, late at various stages of my life. So I don't think it's snitching. Snitching, quote, unquote. Now ask yourself, why certain countries that were involved in, say, maybe causing January 6, why they don't want people to actually be helpful to law enforcement and getting to the bottom of what was going on on January 6, and ask yourself this other question, which is, how many of the Feds actually are compromised and work for foreign governments? And I suspect the answer is quite a lot. And when you kind of look at a Charles McGonigal, I mean, we could go down the list of all these counterintelligence people for years who've worked either for the Israelis, officially or de facto, the Russians, this way or that. I mean, it's the thing you notice."

**I-F "Donald Trump Doesn't Want to Win. Also Cleveland Rocks".**

August 18, 2024, https://x.com/JohnsonThought1/status/1825026842849423596

0:14:03-0:16:20

8

App.242

**Charles Johnson**: I have a lot of relationships with US government, and they, they tell me to, like, look at certain things, and I take people out to dinner when I live in, you know, when I'm in Northern Virginia, which I genuinely really hate, like, just being blunt about it, it has, it says, its virtues, but basically, I don't like the HOA style of Northern Virginia and Fairfax County, where everyone has the same haircut and like, jogs and drives the same color car and like, fucks the same type of woman. It's just the whole place feels very awkward to me. I'm just not into it. And there's not it's not very entrepreneurial, and everyone makes, like, 15 grand a month, you know, being a lobbyist. Or they make, like, $125,000 a year, as, like, you know, whatever, working in some government office or whatever. So I came, I came mostly to Northern Virginia because of the Ukraine war. I got a call from people around the president, and so they, they asked me to move to Northern Virginia. Because of Ukraine conflict. So I didn't have a good enough excuse. I was living in Texas at the time, so just got in my car and I drove, you know, to Northern Virginia. And I've been here basically six weeks before the Ukraine war broke out. And I, you know, it's interesting. I get to meet a lot of people the State Department. I get to meet people the Department of Energy, you know.

**X User**: And they ask you, like, hey, like, these people are dangerous?  You should meet with them. Tell us if they're actually, like a risk?

**Charles Johnson**: I think that, I know this is gonna sound very fucked up and kind of weird, but I think I'm supposed to be, you know, the new Epstein. So I think Epstein was, like, involved in doing a lot of technology and new technology development. And there's always been these, like, figures who are, like, kind of private sector, kind of public sector, that are very good at, like, investing in new technologies as they were coming out. And so, you know, I think that that's kind of what I'm supposed to be doing. And, you know, I this guy Scott today that I met with, you know, the the, yeah, the Department of Energy, the Department of Transportation, they're all, like, super into E bikes. But, you know, basically the Chinese are the ones who manufacture all the E bikes, and we can't be having that. So now we have to kind of come up with an American alternative.

9

1:29:21-1:32:08

**Charles Johnson**: You know, the company Umbra that I backed was a satellite company. I'm suing one of the guys who did the SPV with me, because he's a front for the Russian world and, sort of the Russian mob world. His name is Hal Lambert. By the way, if people want to impress me, help me do a lot of research on how Lambert, because there's a lot of, like, dirty money around Hal that's been going on. The US government asked me to do it, SPV with Hal Lambert, because they knew that he was going to bring in all this dirty Russian money. So I'm now suing him in federal court in Virginia, and I've been winning, you know, I've actually been representing myself. I, I was going to hire a lawyer, but I actually like, just wrote out the complaint and I gave it to a lawyer friend of mine who's in the Intel world, and he's like, 'dude, just file this yourself.' Like, you don't even need to hire a lawyer. And I was like, 'okay' so I filed it, and the judge has, like, agreed with me on a number of things there. And, you know, Thiel was, or, excuse me, , Hal Lambert was kind of dodging process servers and all this other stuff, which was kind of crazy, but, um, but, yeah, so I'm suing him, and I'm suing, uh, Hoan Thon That and clear view. And I've been that one. I'm represented by Bernie Kleinman, who was the same attorney who represented Dan Bilzerian's father Paul Bilzerian, as well as represented Khalid Sheik Mohammed. So I have that in common with yeah, I have a lawyer in common with them. And anyway, but yeah,

**X User**: What kind of research would you want?

**Charles Johnson**. I want to know all about his financial interests? I want to know kind of more about him. I know that he's I know that he sexually has assaulted some women at parties in Austin, so if I could have some whistleblowers there, that would be quite helpful. I also know that, you know, he was involved with a lot of taking a lot of Israeli money, another kind of dirty money, into the Cruz super PAC in 2016 that he ran. I know that he's been very friendly with Sergio Gor, and that he went with Sergio Gor to Malta, of all places. So I know I'm going to win the lawsuit. You know, it's just sort of a question of, like, how badly am I going to win. But yeah, so I'm a backer of this company, Umbra, which is a synthetic aperture radar

App.244

satellite company, and, you know, put it, put a bunch of money into that company, and it's been used, you know, in the Ukraine effort and in other parts, you know, other sort of conflicts around the world. There's sort of more that I know and have sort of figured out about Umbra than I could maybe talk about in a public space, that all of which is very good about the technology, but, but, yeah, I think it's, it's a very interesting kind of company, how it operates and, and how it's useful to the US intelligence community and to that of our allies. And of course, so I'm grateful, in a way, that that, that the Umbra satellites could go up on this, on the on, you know, on the SpaceX rockets.

I-G. "The collapse of the FBI, sensors, Nick Fuentes and power"

11

September 23, 2024. https://x.com/JohnsonThought1/status/1838080187046482109 (Deleted)

Johnson later acknowledged deleting it. See @JohnsonThought1, X (Sept. 24, 2024, 11:38 a.m.),

https://x.com/JohnsonThought1/status/1838603979518869927.



0:46:38- 0:58:35

**Charles Johnson**: Now, one of the compromised FBI agents I met said, you know,' we can't figure

out what's going on with you. We can't figure out what's going on with you. Because what seems

to be happening is that there's all these famous people that you know, and there's all these like,

politicians, billionaires, and you just order them around.' And I'm like, 'Uh huh. Like, doesn't

everybody do that? Like, don't you?' And what sort of happened was they didn't quite understand

what was going on. Now, I think some of it comes from my family Navy connections, some of it

comes from the CIA connection. Some of it comes from the Russian connections. But it is true

that I have a kind of imperious nature. I'm usually right about things, and I've also protected a lot

of people over the years, because I'll learn things that they don't necessarily know, things that

might come after them or hurt them, or I might pick up on something, and I'll usually just call them

12

App.246

and be like, 'Hey, this is what's up', like these are and I just do this. I do it because I like it when people do it for me, and I do it because it's also like, I think the right thing to do. And but what's interesting about it is that most very rich people and most powerful people are not used to people just helping them without any expectation of anything in return, and so it freaks them out. And you build a friendship or an alliance that way. And so I have all these networks of people all around the country, increasingly around the world, in very different walks of life, in different communities. I try to have Matt Gaetz, one time said that there are no four corners to the Charles Johnson empire. And I think he was trying to make fun of me, but I'll take it, you know, like, if there's somebody I need to reach in the world that can usually reach them pretty quickly. Now anyway, why do I bring all this up? Well, one of the things I talked a lot about with NSA friends and with other friends is that, like a lot of our children, are getting targeted in different ways. They're either getting abused and molested, you know, by enemy actions, enemy actors. You know, lots of there's lots of child molesters here that have been sent here by other countries. You know, they don't want to host them in their own countries, so they'll send them here as a kind of punishment to us, there's a lot of people who get mistreated by, you know, people who are rendered crazy by social media and by technology generally. And of course, there's lots of abuses that go on of foreign actors targeting people through their iPhones, sending their DMS, you know, trying to blackmail them, trying to extort them. We talked about this the other night with Olivia Nuzzi, like she was clearly trying to compromise RFK Jr. in some kind of way by sending him nude photos. And by the way, I have had this happen to me with such regularity by so many different types of women that belong to different intelligence services that it's kind of become a joke like and I don't know what to do about it, because if I screenshot it and somehow those photos leak, then I'm like, guilty of revenge porn, right? So it's like, what do I do? How do I protect myself in

App.247

these situations? It's very unclear. I've had my phones hacked many, many times. I've sometimes deliberately put myself in positions where I know my phones will be hacked, so that's been a very interesting development. And then one of the other things that I do a lot is I will signal things with, like the food choices I have books I'm reading some of it, I'll signal on Twitter. So that's why, like many of you, don't know what the fuck I'm talking about on Twitter a lot of the time, and it's not your fault, you know, it's not really for you, it's for people who are smart enough. I'm trying to build basically a group of people that are intelligent enough where we can work on these problems together, and that way I don't really need to do it. I can go do other things. I can work on, you know, other technology projects I'm interested in. I have a lot of interests, basically, and I have, unfortunately, don't have, you know, if I live as long as my grandparents, like, I'm into my 90s, but like I'm in my mid 30s now, and I'm starting to feel I'm not as energetic as I was in my 20s. Shall we say? So anyway, I've also had people try to kill me many times because of who I am and what I represent and who have set traps for me in different countries. In the United States, I've had women on dating sites that turn out to be foreign spies. I've had women try to have sex with me, basically, like quasi rape me in different ways over the course of my life, which is why I'm constantly changing girlfriends, people have noticed that. And, yeah, it's a real issue. I've had, oh, I've also had people. I've also had men try to rape me. Not that I'm not there's anything wrong with being gay, but not despite, like many people who say I am. Wish that I were honestly because, like, a lot of life would be a lot easier. But anyway, so all of which is to say, and by the way, when I was talking to Jonathan Buma at the LA field office, you know, he talked about how he was molested when he was younger. You know, I've had a lot of people like who come to me, who tried to victimize me in different ways, how they themselves were victimized. So I'm more sympathetic to a lot of people I try to you'll notice, with a lot of my work, I'm not terribly vengeful.

14

Like, I will tell people like, Hey, don't attack me. Like, don't do it. And then they'll try to attack me or fuck with me in different ways. No, this is not an acceptable thing for you to do. And then what will happen is various bad things will happen to them, because clearly the NSA and other players are watching over my shoulder as I'm being attacked, and you know, then they get really mad at me, and I'm like, 'listen, I warned you. I said, like, don't try to cheat me. Don't try to fuck me.' And but what's happened now is that there's so many different players that have tried to fuck me, and what ends up happening is then they get indicted, or, like, their car doesn't work, or, you know, like a whole slew of things start to happen to them. And frankly, it's kind of fun. And so I have this, it's sort of like, it's like the man in the chair, you know, from, like the Spider Man movies, or whatever. It's kind of like that, just like going about my day to day business, and I've I try to recruit people, and I try to help people in different ways, because people try to help me, and I think it's the right thing to do. And I think because of my background, I'm able to go and talk with people that no one else can really talk to, and I can talk to them authoritatively. I can talk to them in a kind of, you know, friendly fetish kind of way. Now you'll see these people, like, attack me and they call me a Fed, or they call me this or whatever, and I'm like, Yeah, I'm a patriotic fed, yeah. Like, what are you going to do about it? And they because what they want to do is they want to tweet it to you behind avatars. This is, by the way, why I've also doxed a lot of these people. I was like, they want to attack people behind a screen they want to harm people, and many times, you know, we find out they're foreign intelligence. You know, they used to run a lot of intelligence assets in the United States, but now they can't do that anymore, because we're detecting it and it's illegal. So what they do is they run them from Canada or from Australia or places that are like similar language, type you don't necessarily even need, you know, there's some good reports out there. I think the Thesis folks did a good one. I just see Trundra in here. I tweeted it out, you know.

15

But I can just tell you my experience, by the way, too, is, if you work on technical questions, you will find a lot of people will try to steal things off of your phone and then try to replicate it themselves. So there's a whole number of countries, the Deseret world, the kind of Utah world that we talked about. There's certainly the Israeli world, certainly parts of the Russian world. And you know, the Russian world is not a monolith, you know, like, it has a lot of divisions. And these divisions, you know, even among the Russian aristocracy, the Russian Jewish mafia has a lot of distinctions. You know, there's a lot a lot of different distinctions that I think are often lost in these discussions. And we should also be a little leery and weary of people who sanction people, because what ends up happening is they ultimately create, you know, every time. You sanction somebody, you create a black market. And there are many players that actually control these black markets in different ways. And so we should be sort of mindful of, like, the rush on this stuff. He was trying to think, what else could I say about this? Yeah, I mean, this is, this is kind of it in the main I think, by the way, what I try to do, I also have the ability to protect people, and I will go with people, and I will write a memo to myself, and I'll screenshot it, and I know, by the way, I'm like, right near the NSA campus today in Baltimore, and I'm going to be there tomorrow too. And for what it's worth, I am moving to California to live full time in LA because I've been sort of instructed, but my family and others that are in the Baltimore area, they're taking over my operations here. And so anyway, what was he gonna say about this? Yeah. So what ends up happening is, you have these people meet with you for lunch, or whatever, journalists, reporters who are spies of different countries, and you know, they try to fuck me in different ways. I'm like, no, no, you don't want to do that. Olivia Nuzzi, no, no, you don't want to do this. And bad things start happening to them, and then they get really angry with me, and I try to explain to them like, no, no, you can't, you can't do this. Like, this is not how is this supposed to go? And I think they, you know, like Zav

App.250

Shalev has gotten very upset with me. I've had so many of these things over the years, and they all thought that I, like, worked for Peter Thiel. And I kept telling them, No, no, Peter Thiel works for me. And they're like, that's crazy, like he's a billionaire, and like, you're too dumb to understand what I'm talking about. And, you know, they don't. They don't understand the relationship of, like, the CIA to the German immigrants that came over. They don't. They just don't understand a lot of things.

And, you know, they, what they tried to do is they tried to, like, the Israeli world, you know, the IDF world, tried to smear me as a Holocaust denier. Now, I didn't really care all that much about it, because I was busy on other projects. But then various women I would date or mess about with would like, Wikipedia, Wikipedia me and be like, Are you a Holocaust denier? And I'd be like, no, like, you know, Shoshana, or whatever Jewish chick I was seeing at the time, but they wouldn't believe me. They'd be like, Oh, it's on Wikipedia, or it's in The Daily Beast, it must be true. I'm like, Oh, my God. Like, Barry Diller, and then you try to explain it to these people, and they think you're crazy, even though everything you're telling them is correct, right, Barry. So you end up in these situations where you're, like, fighting these fake versions of yourself, which is a major reason I started doing these spaces and writing my sub stack. And I also did it because, like, I can kind of take a lot of the psychological warfare that other people, like, seemingly can't take. And I think it's just, I don't know what it is about myself. Like, I kind of, I'm just, I can handle it. I don't know. It's just, it's something I've always wondered about myself. But, like, I don't, I don't really get bothered by it. And what ends up happening is, you know, I'll meet these people, journalists will introduce errors into our stories, and I'll be like, don't introduce that error into the story. And they'll be like, you know, like at Mattathias, Schwartz at Business Insider "yeah, don't do it." And they do, and then, like, bad things will start happening And I'm like, "Okay, well, like, I told you to be

App.251

accurate about this story, and you weren't accurate, and I told you to be accurate, and you weren't accurate, and now you're in trouble, and now you're like, losing your job, or you can't get a job in media or whatever." So there's all these ways in which everyone, like, however much money you think you have, right? It's only as good as your ability to use your credit cards or your debit card, okay?

**1:08:11-1:13:25**

**Charles Johnson:** Doug Emhoff represented an Armenian arms dealer who was moving guns, I think, from Bulgaria into a Black Africa, and particularly into Nigeria for the for forces to fight Boko Haram. And he was indicted by the Bill Barr administration, Bill Barr DOJ. And he was somebody I actually met like on different occasions in the Fresno area. This guy, Ara Dolarian, is his name, and he was represented by Doug Emhoff, and Doug Emhoff got him out of trouble. And this has kind of, you know, made me, made me think a lot about the kind of political persecutions that seem to always fall favor Israeli or Opus Dei or Mormon interests in the DOJ. And I know many, many examples of various stings these folks tried to do on people like myself, people like other friends of mine. And in fact, in many cases, I kind of knew that there were efforts to sting me, so I stung the people trying to sting me, and sort of then they got in trouble. And so when I recommend to people, a lot of the time, is, if you're ever in one of those situations, try to be unpredictable. Try to be like something where they can't necessarily, you know, grasp your what your intent is, and try to take a lot of notes and a lot, keep a lot of records. So anyway, because I've had this, like, weird relationship with these two different communities that have always, like, tried to help me in weird ways and giving me money. I've had issues with the IRS in different ways, but because I have my relationships with the intelligence community, I would just call up the intelligence community and be like, 'Hey, you asked me to do this stuff. I try to pay my taxes

18

the best I can. I think I'm doing it correctly. What do you think?' And. And what ends up happening a lot of the time is that what happened when I was audited is that the IRS shut down my audit. Actually, the IRS did an audit, and then they were like, trying to figure things out, and then the intelligence community shut down my audit. It was just like, shut down. And then I got a letter in the in the mail from the IRS apologizing for inconveniencing me, which I thought was kind of crazy anyway. Why do I bring all this up? Well, I bring all of it up because I think that people are starting to detect that there's a lot of weird stuff going on now, and there's a lot of weird stuff that you know. There there's a lot of weird things that have been happening to me, and similar weird things have happened to Nick Fuentes. I don't want to talk about what's going on with him. It's kind of his story to tell, but he and I and a number of these people who are some of whom are in the space of who are not. We've had these like, weirdly fortuitous, and weirdly like terrible things happen to us. And it's a very interesting question of like, where does it why? And I think it has to do a lot with like, how the world really works, not how we want it to work anyway. I think the other big issue too is that the confidential informant system is deeply corrupt and deeply fucked up. And I know [X User] 'tundra' could speak to that, and I certainly could speak to that, because I've had things entered into the files that I sent that were the opposite of what I put in the fucking system, which makes me very upset, because it makes me look incompetent, and I hate looking incompetent, and so I ended up getting in all this trouble for, you know, basically putting things into the system that were wrong. And what ended up happening is I started writing the reports for Jonathan Buma and for others. And you know what I'm hopeful now is that a lot of the dirty FBI agents can be helpful, can really, like, clean themselves up, but really, at this stage, it's getting to a point that's like, really, really ridiculous. You know, like my dad used to say, I don't know a single poor DEA agent. And I certainly don't know a single poor DEA agent, homeland security

19

person. And I do think you know, there's a lot of civil asset forfeiture, but a lot of us who are, like, mistreated by the FBI or by the Department of Homeland Security or whatever, we should be recompensed in a serious way. I think I mean, like, years of my life were ruined because of the Mueller investigation. My wife had a nervous breakdown over a lot of the attacks on me. She couldn't handle it, which is why she's no longer my wife. So, like, there have been real costs to this sort of thing, and I think that there should be real accountability and a 'Truth and Reconciliation' thing I would be okay with. Like, I don't necessarily need people to I don't necessarily even need, like, a compensation, like, I, you know, I put it, put it for charity, or, like, whatever, dance around it, naked, lighting it on fire, like the choker. I don't really care. I just think there needs to be a kind of reckoning that takes place, and I think it needs to happen sooner rather than later.

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **POINT BRIDGE CAPITAL, LLC and** | § | |
| **HAL LAMBERT,** | § | |
| | § | |
| **Plaintiffs,** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **v.** | § | |
| | § | **Hon. Mark Pittman** |
| **CHARLES JOHNSON,** | § | **U.S. District Judge** |
| | § | |
| **Defendant.** | § | |

**FRIEDMAN & FEIGER LLP, LAWRENCE J. FRIEDMAN, AND W. CARTER
BOISVERT'S MOTION TO WITHDRAW AS COUNSEL
FOR DEFENDANT CHARLES JOHNSON**

**TO THE HONORABLE JUDGE OF SAID COURT:**

COMES NOW Friedman & Feiger LLP, Lawrence J. Friedman, and W. Carter Boisvert ("Movants"), counsel of record for Defendant Charles Johnson ("Defendant") and, pursuant to Local Rule 83.12 of the Local Rules of the United States District Court for the Northern District of Texas, file this Motion to Withdraw as Defendant's Counsel, and respectfully show unto the Court as follows:

1.     Friedman & Feiger, LLP, Lawrence J. Friedman, and W. Carter Boisvert are counsel of record for Defendant.

2.     The circumstances allowing withdrawal are within those provided in the Texas Disciplinary Rules of Professional Conduct. There is good cause for this Court to grant the motion to withdraw. Rule 1.15 (b)(5)-1.15 (b)(7) of the Rules of Professional Conduct permits a lawyer to withdraw from representing a client if (5) the client fails substantially to fulfill an obligation to the lawyer regarding the lawyer's services, including an obligation to pay the lawyer's fee as agreed, and has been given reasonable warning that the lawyer will withdraw unless the obligation

**FRIEDMAN & FEIGER LLP, LAWRENCE J. FRIEDMAN, AND W. CARTER
BOISVERT'S MOTION TO WITHDRAW AS COUNSEL
FOR DEFENDANT CHARLES JOHNSON**                                                           **PAGE 1**

App.256

is fulfilled; (6) the representation will result in an unreasonable financial burden on the lawyer or has been rendered unreasonably difficult by the client; or (7) other good cause for withdrawal exists. Here, Defendant has failed to fulfill his obligations to the lawyers regarding the lawyers' services, including the obligation to pay the lawyers fee as agreed, and has rendered the representation unreasonably difficult. *See* TEX. DISCIPLINARY R. PROF CONDUCT 1.15(b)(5)-(6). Defendant has been given reasonable warning that Movants would withdraw unless the obligations were fulfilled.

3.     Accordingly, Friedman & Feiger, LLP requests that the Court permit the firm, Lawrence J. Friedman, and W. Carter Boisvert to withdraw as counsel of record for Defendant.

4.     Defendant Johnson has advised Defendant's counsel that he would sign a consent approving withdrawal and was emailed a copy of the Motion with a Notice of Consent to Withdrawal of Counsel to sign on April 22, 2025. At Defendant's request, the Notice of Consent to Withdrawal of Counsel was sent via DocuSign on April 23, 2025. As of the filing of this motion, and after due diligence to get Defendant's signed consent, Defendant has not returned a signed copy of the Notice of Consent to Withdrawal of Counsel.

5.     Movants are unaware if Defendant has a succeeding attorney at this time. The name address, telephone number, and email address of Defendant is Charles Johnson, 1624 Fieldthorn Drive, Reston, Virginia 20194, (617) 429-4718, charles@traitwell.com.

6.     Charles Johnson has been provided with a copy of the current Scheduling Order in this case and is aware of upcoming deadlines, a mediation scheduled for May 28, 2025, and that the case is set for jury trial on the Court's trial docket beginning December 15, 2025.

7.     A copy of this Motion has been emailed to Mr. Johnson.

**FRIEDMAN & FEIGER LLP, LAWRENCE J. FRIEDMAN, AND W. CARTER
BOISVERT'S MOTION TO WITHDRAW AS COUNSEL
FOR DEFENDANT CHARLES JOHNSON**                                    **PAGE 2**

App.257

8.      This Motion is not presented for the purposes of delay but so that justice may be served.

## PRAYER

WHEREFORE, Movants pray that the Court will grant Friedman & Feiger LLP's Motion to Withdraw as Defendant's counsel, and permit Friedman & Feiger, Lawrence J. Friedman, and W. Carter Boisvert to withdraw as Defendant's counsel, and for such other and further relief to which Friedman & Feiger may show itself to be justly entitled.

Respectfully submitted,

*/s/ W. Carter Boisvert*

**Lawrence J. Friedman**
State Bar No. 07469300
lfriedman@fflawoffice.com
**W. Carter Boisvert**
State Bar No. 24045519
cboisvert@fflawoffice.com
**FRIEDMAN & FEIGER, L.L.P.**
Dominion Plaza
17304 Preston Road, Suite 300
Dallas, Texas 75252
(972) 788-1400 (Telephone)
(972) 776-5313 (Telecopier)

**ATTORNEYS FOR**
**CHARLES JOHNSON**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing Motion to Withdraw has been served on all counsel of record via the Court's Electronic Filing/Notification System on this 24th day of April 2025.

*/**s**/ W. Carter Boisvert*
W. Carter Boisvert

---

**FRIEDMAN & FEIGER LLP, LAWRENCE J. FRIEDMAN, AND W. CARTER**
**BOISVERT'S MOTION TO WITHDRAW AS COUNSEL**
**FOR DEFENDANT CHARLES JOHNSON**                                    **PAGE 3**

App.258

## <u>CERTIFICATE OF CONFERENCE</u>

The undersigned counsel hereby certifies that he conferred with counsel for Plaintiffs Point Bridge Capital, LLC and Hal Lambert, and Plaintiffs' counsel advised that Plaintiffs are not opposed to the Motion.

<div align="right">

/s/ *W. Carter Boisvert*
W. Carter Boisvert

</div>

**FRIEDMAN & FEIGER LLP, LAWRENCE J. FRIEDMAN, AND W. CARTER
BOISVERT'S MOTION TO WITHDRAW AS COUNSEL
FOR DEFENDANT CHARLES JOHNSON**                        **PAGE 4**

App.259

# EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

POINT BRIDGE CAPITAL, LLC, ET
AL.,

    Plaintiffs,

v.                                          No. 4:24-cv-00988-P

CHARLES JOHNSON,

    Defendant.

## ORDER

Before the Court is Defendant's Counsel's Motion to Withdraw. ECF No. 41. Because the withdraw will leave Defendant to proceed *pro se* in this matter, the Court finds it appropriate to set a hearing on this matter. Accordingly, the Court **SETS** a hearing on the Motion for **Thursday, May 8, 2025, at 1:30 p.m.**, in the Fourth Floor Courtroom of the Eldon B. Mahon United States Courthouse.

The Court further **ORDERS** Defendant's Counsel to notify Mr. Johnson of the hearing and provide him a copy of this order through email and physical mail. Mr. Johnson is hereby noticed that should he fail to attend the hearing, the Court will enter a default judgment against him without further notice.

**SO ORDERED** on this **24th day of April 2025.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

App.261

# EXHIBIT 7

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| Point Bridge Capital, LLC, | § | |
| Hal Lambert | § | |
| | § | Case No. 4:24-cv-00988-P |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | |
| | § | |
| Charles Johnson, | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFFS' FIRST MOTION TO COMPEL PRODUCTION OF DOCUMENTS**
**<u>AND MEMORANDUM IN SUPPORT</u>**

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................... 1

BACKGROUND .................................................................................................... 4

    A.    Johnson's Pattern of Obstructing Discovery and Disregard for the Judicial
Process ...................................................................................................... 5

    B.    Plaintiffs' Written Discovery Requests ................................................... 6

ARGUMENT .......................................................................................................... 8

    A.    Johnson's Exclusive Reliance on a Single Gmail Account, and His Failure
to Search Other Relevant Sources, Renders His Production Incomplete and
Improper Under the Rules....................................................................... 8

    B.    Johnson's Failure to Produce Emails in a Reasonably Usable Form—
Including the Stripping of Metadata and Attachments—Violates Rule 34 .......... 12

    C.    Johnson's Failure to Disclose What Was Withheld or What Sources Were
Searched Violates Rule 34 and Obscures the Scope of His Noncompliance ....... 14

    D.    Sanctions: Johnson's Pattern of Obstruction—Including Prior Falsehoods
in Federal Court—Merits Sanctions Under Rule 37............................................ 15

CONCLUSION....................................................................................................... 16

App.264

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Beattie v. Madison County Sch. Dist.*,
  254 F.3d 595 (5th Cir. 2001) ...................................................8

*Export Worldwide, gmail.coLtd. v. Knight*,
  241 F.R.D. 259 (W.D. Tex. 2006) ...........................................8

*IV Solutions, Inc. v. United HealthCare Servs.*,
  No. 16-cv-09598, 2019 WL 9088037 (C.D. Cal. May 2, 2019).........................2, 11

*Johnson v. Clearview AI, Inc.*,
  No. 1:23-cv-024 (S.D.N.Y.)....................................................5

*Johnson v. Clearview AI, Inc.*,
  No. 1:23-cv-02441, ECF No. 68 (S.D.N.Y. Jan. 16, 2025.)................5, 13

*Osborne v. Billings Clinic*,
  No. 14-cv-0126, 2015 WL 1412626 (D. Mont. Mar. 25, 2015) ............................11

*In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*,
  No. 05-md-1720. 2007 WL 121426 (E.D.N.Y. Jan. 12, 2007)................11

*Piazza's Seafood World, L.L.C. v. Odom*,
  No. 07-cv-0413, 2011 WL 3664437 (M.D. La. 2011)..................................8

*Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*,
  685 F.3d 486 (5th Cir. 2012) ...................................................14

*Thomason v. Metro. Life Ins. Co.*,
  No. 14-cv-086, 2015 WL 1914557 (N.D. Tex. 2015) ............................8

## Other Authorities

FED. R. CIV. P. 26(b)(1) ........................................................7

FED. R. CIV. P. 26(g) ...........................................................9

FED. R. CIV. P. 34.....................................................9, 10, 11, 12

FED. R. CIV. P. 34(b) ...........................................................2

FED. R. CIV. P. 34(b)(2)(C) .......................................... *passim*

FED. R. CIV. P. 34(b)(2)(E)(i)..................................................11

App.265

FED. R. CIV. P. 37 ................................................................................................................3, 13

FED. R. CIV. P. 37(a)(1) .............................................................................................................1

FED. R. CIV. P. 37(b) ...............................................................................................................14

App.266

Plaintiffs Point Bridge Capital and Hal Lambert (together, "Plaintiffs") respectfully move for an order, pursuant to Rule 37(a)(1) of the Federal Rules of Civil Procedure, compelling Defendant Charles Johnson to (a) produce certain documents that have either been withheld or not searched for, (b) produce the documents in a manner that is not stripped of metadata and otherwise complies with the production requirements of the Federal Rules, (c) overrule his boilerplate objections, and (d) impose appropriate sanctions given Johnson's history of obstruction.

## INTRODUCTION

Defendant Charles Johnson has ignored the basic obligations that the Federal Rules of Civil Procedure impose on every litigant, and in doing so, he has repeated a pattern of discovery misconduct already documented in other federal courts.

Just weeks ago, a federal judge in New York sanctioned and admonished Johnson for refusing to participate in discovery and for launching personal attacks on opposing counsel. His excuse? He claimed that two Department of Homeland Security agents told him not to comply with discovery. When the judge followed up with DHS, the agency confirmed that no such agents exist, and no such instruction was ever given.

Now, Johnson brings the same conduct to this matter. Plaintiffs served routine discovery requests aimed at the core allegations in this case: that Johnson and his co-conspirator, Gator Greenwill, presented themselves as federal operatives to extort early-stage technology companies dependent on government contracts to obtain favorable investment terms and access. Johnson's scheme was straightforward—cooperate and be rewarded, or resist and be punished through defamatory attacks and sabotage of any business opportunities. When Plaintiffs resisted, Johnson told Plaintiffs that he followed through with his threats and sabotaged one of Plaintiffs' portfolio companies. Johnson sent such threats from a non-Gmail account, *charles@traitwell.com*, which stated, in pertinent part, as follows:

1

> Gave you the Agency (which you f[***]ed up) and the FBI (which you
> arrogantly ignored). I wonder why your revenue so low. . . huh. Didn't I tell
> you you'd get no contracts if you kicked me out of the company? And you
> haven't gotten a single federal contract yet. Weird! Biden government very,
> very good. All my family friends in the government now, especially intel
> services. I even got promoted.

(Ex. F, Appx. 089.)

That email, and others like it, are squarely within the scope of Plaintiffs' discovery requests. But Johnson has not produced that email—or any other—from the *traitwell.com* address. Plaintiffs possess that one message only because they already had it.

Instead of providing responsive materials, Johnson submitted a boilerplate-laden set of objections that raise more questions than they answer. He did not say what he searched. He did not identify what, if anything, he withheld. He did not even confirm that he searched beyond a single Gmail account. That violates Rule 34(b)(2)(C), which requires a party to state whether any responsive materials have been withheld. Johnson's silence leaves Plaintiffs—and this Court—in the dark.

What he did produce falls far short of his obligations. Johnson's production consists of a single 1,731-page PDF, cobbled together from one Gmail account, despite maintaining at least three other email accounts. The file is bloated with duplicates, scrubbed of all metadata, and delivered in a format that cannot be meaningfully sorted, searched, or reviewed. The Rules do not permit a litigant to render discoverable material unusable. *See* FED. R. CIV. P. 34(b) advisory committee's note to 2006 amendment.

And we know, definitively, that the production is deficient because it did not search emails from *charles@traitwell.com*—the very account Johnson used to threaten Plaintiffs. That omission is not a mistake. It is concealment. And Johnson cannot plausibly claim he lacks access to that account. His own counsel, in their motion to withdraw, listed *charles@traitwell.com* as Johnson's

App.268

official point of contact. ECF 41 at 2. That representation to the Court confirms what Plaintiffs already suspected: Johnson controls the account and actively uses it. His failure to produce emails from it is not a matter of burden or oversight. It is a refusal.

Moreover, Johnson's omissions contradict his own public statements about this case. In an October 2024 Substack post—published shortly after being served in this case—Johnson bragged: "Oh well. Everything was recorded, everything was noted, everything is in email and in text messages. Yes, I screenshotted them . . . ." (Ex. A at 4, Appx, 013, Charles Johnson, *Best Birthday Yet! A Foreign Compromised Billionaire is Backing A Frivolous Lawsuit Against Me*, Substack, Charles Johnson's Thoughts and Adventures, (Oct. 23, 2024), https://charlesjohnson.substack.com/p/best-birthday-yet-a-foreign-compromised.)

Despite that boast, Johnson has produced no Signal messages. No texts. No messages to or from his FBI handler, Jonathan Buma (who is currently under indictment for copying FBI materials) and who helped effectuate the conspiracy. And, again, no emails from the *traitwell.com* email account he continues to use (or other email addresses he uses).

Johnson's conduct cannot be characterized as mere carelessness. Rather, it is a pattern—one that has already drawn judicial scrutiny elsewhere. A litigant who fabricates excuses in one federal court and stonewalls discovery in another does not need a reminder. He needs a sanction.

Plaintiffs respectfully request that the Court compel full and proper discovery, including production from all accounts under Johnson's control—specifically including *charles@traitwell.com*. And because Johnson is no longer represented by counsel and cannot be trusted to conduct the search himself, Plaintiffs submit that a third-party vendor should conduct the collection. The vendor can collect documents based on search terms run against Johnson's devices and accounts and also screen out any privileged communications that may exist. Finally,

App.269

Plaintiffs request that the Court impose sanctions under Rule 37, including attorneys' fees and costs, for Johnson's willful noncompliance.

## BACKGROUND

Point Bridge Capital, LLC is a Fort Worth-based investment firm that provides strategic capital to emerging technology companies, many of which operate in the defense and intelligence sectors. Its founder, Hal Lambert, is a long-time Fort Worth resident, a husband, and a father of two. (Second Amended Complaint ("SAC") ECF 33 at ¶¶ 28-33.)

Beginning in 2020, Charles Johnson and his co-conspirator, Gator Greenwill, launched a multi-year scheme to defraud and extort technology companies and investors by falsely presenting themselves as U.S. intelligence assets. (SAC ¶¶ 1-9.) They offered a coercive "carrot and stick" proposition: if a target cooperated, they promised investment, access to federal contracts, and government protection; if the target resisted, they threatened regulatory action, reputational sabotage, and false allegations. (SAC ¶¶ 11.)

Johnson and Greenwill pitched this scheme to Plaintiffs in 2020 during a meeting with Mr. Lambert at Winslow's Wine Café in Fort Worth. (SAC ¶11.) They invoked their supposed government ties while discussing companies they knew were affiliated with Plaintiffs. (SAC ¶11.)

After Plaintiffs refused their demands, Johnson retaliated. He launched a campaign of defamatory attacks, false public statements, and litigation threats. (SAC ¶¶ 194–226.) Among other things, Johnson accused Mr. Lambert of being a "front for Russian money," a "dirty player in Fort Worth," and someone who "grabs the t[***] of younger women." (SAC ¶¶ 203-04.) In an X Space broadcast to thousands, Johnson falsely stated that Lambert had "sexually assaulted some women at parties in Austin." (SAC ¶¶ 24, 207.) These statements are categorically false and entirely unsupported.

App.270

After Plaintiffs filed suit, Johnson deactivated his X account, eliminating access to many of the defamatory posts/tweets at issue. He publicly claimed that Elon Musk suspended the account at Plaintiffs' request, but his own screenshots show he deactivated it himself and retains the ability to restore it and produce his posts/tweets. (SAC ¶ 16.)

## A.    Johnson's Pattern of Obstructing Discovery and Disregard for the Judicial Process

Johnson has a documented history of evading discovery and misleading the courts. In *Johnson v. Clearview AI, Inc.*, No. 1:23-cv-024 (S.D.N.Y.), he refused to produce documents, claiming that agents of the Department of Homeland Security instructed him to withhold them. When the court asked him to identify those agents, he named two individuals—"Alexander Rodriguez" and "Alexander Fletcher." (*Johnson v. Clearview AI, Inc.*, No. 1:23-cv-02441, ECF No. 68 at 5 (S.D.N.Y. Jan. 16, 2025), Ex. B at 5, Appx. 023.) Judge Failla, on her own initiative, inquired with DHS, who stated that no such agents existed. (*Id.*)  The court then ordered Johnson and his counsel to submit a sealed, in camera statement outlining how he would meet his discovery obligations. Soon after that order—and after his basis for obstruction unraveled—Johnson moved to dismiss his complaint. *See Johnson v. Clearview AI, Inc.*, No. 1:23-cv-02441, ECF No. 84. Although the court allowed the dismissal, Clearview's counterclaims remain pending.

Johnson has continued this obstructive pattern in the present case. He deactivated his X account after Plaintiffs cited it in their complaint. That deletion erased access to key statements central to Plaintiffs' claims. (SAC ¶ 16.)

His misconduct extends to sworn filings in this action. In support of his motion to dismiss for lack of personal jurisdiction, Johnson submitted a declaration claiming he was not a Texas resident. (ECF 14-2.) But public records, litigation filings, political donations, and campaign disclosures suggest otherwise: Johnson lived in Texas through at least late 2022, voted in Texas in

App.271

2022, and remains a registered voter in Montgomery County. (*See* ECF 27 at 6-8 (pointing out why Johnson's "assertions are false, contracted by [his] own statements, court filings, government records. . .").) These contradictions suggest Johnson submitted false testimony in an effort to avoid facing Plaintiffs' claims in Texas.

### B.    Plaintiffs' Written Discovery Requests

Plaintiffs served their "First Set of Requests for Production on Charles Johnson" on January 31, 2025. (Ex. C, Appx. 026-33.) These requests seek core materials relating to Johnson's shakedown scheme and defamation campaign, including:

- The factual basis and support for Johnson's false statements about Mr. Lambert (RFP Nos. 18-24);

- Communications with key individuals and entities, including communications with co-conspirator Gator Greenwill, currently indicted FBI agent Jonathan Buma, and the companies to whom Johnson presented himself as a government agent, (RFP Nos. 1-5, 10-12, 16-17);

- Johnson's Financial and Ownership Interests, which are relevant to show the ways in which he profited from and orchestrated the shakedown, (RFP Nos. 13-15);

- Evidence of Johnson's involvement with the government or  intelligence community, (RFP Nos. 25-33);

- Johnson's public statements, including his tweets and postings on X Plaintiffs and this lawsuit, including any tweets or posts that Johnson deleted, (RFP Nos. 6-7);

- Factual support for Johnson's claim that governments or third parties fund or otherwise support his lawsuits, (RFP Nos. 8-9); and

- Communications Johnson sent about Plaintiff Hal Lambert and about this lawsuit to reporters (RFPs 40-52).

Johnson served his written responses on March 11, 2025, but they were plainly deficient. (Ex. D, Appx. 036-72.) Johnson offered a series of boilerplate, non-specific objections—often copied and pasted verbatim across multiple requests—without explaining the basis for his objections or what documents, if any, were being withheld. (*See, e.g.*, *id.* at 3-5, Appx. 038-40.)

He failed to identify the custodians, devices, or sources he searched, an omission that is particularly concerning given that many of the relevant communications in this case—such as threats, extortion attempts, and defamatory statements—occurred via text message, encrypted messaging apps like Signal, or other non-email mediums. Moreover, Johnson's objections do not comply with Federal Rule of Civil Procedure 34(b)(2)(C), which requires a responding party to state whether any responsive materials are being withheld on the basis of the objection. By failing to provide this basic information, Johnson has left Plaintiffs in the dark as to what has or has not been searched or produced, rendering it difficult to assess the full scope of his noncompliance and requiring judicial intervention to obtain clarity and enforcement.

The actual substance of Johnson's production confirms his production's deficiencies. He produced only a single document:

- A 1,731-page PDF of emails exported from a Gmail account;[1]

- The document contained extensive duplicate emails, many repeated verbatim;

- All metadata was stripped, making it nearly impossible to assess senders, recipients, timestamps, or attachment details;

- All attachments appear to be stripped;

- No text messages, Signal messages, or other non-email communications were produced;

- No communications with government officials or agencies were included;

- No social media content was provided other than isolated Substack references;

- No documents were produced to support Johnson's defamatory accusations against Mr. Lambert.

(Declaration of Will Thompson ("Thompson Decl."), Ex. 1 at ¶8, Appx. 003-04.)

---

[1] In order to avoid burdening the Court with unnecessary amounts of paper, Plaintiffs have not attached these voluminous compilations to this Motion, but will submit them for the Court's review, if requested.

App.273

## ARGUMENT

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." FED. R. CIV. P. 26(b)(1). "In the discovery context, 'relevancy' is broadly construed, and relevant matter includes 'any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *Thomason v. Metro. Life Ins. Co.*, No. 14-cv-086, 2015 WL 1914557, at *1 (N.D. Tex. 2015) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978). "Discovery should therefore ordinarily be allowed, under the concept of relevancy, unless it is clear that the information sought can have no possible bearing upon the subject matter of the action." *Piazza's Seafood World, L.L.C. v. Odom*, No. 07-cv-0413, 2011 WL 3664437, at *2 (M.D. La. 2011).

With respect to managing discovery,  a "district court has broad discretion in all discovery matters." *Beattie v. Madison County Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001) (internal quotations omitted). "[Rule] 37(a) empowers the court to compel the production of documents and complete responses to interrogatories upon motion by the party seeking discovery." *Export Worldwide, Ltd. v. Knight*, 241 F.R.D. 259, 263 (W.D. Tex. 2006).

### A.    Johnson's Exclusive Reliance on a Single Gmail Account, and His Failure to Search Other Relevant Sources, Renders His Production Incomplete and Improper Under the Rules

Johnson has produced a single PDF in response to Plaintiffs' discovery requests: a 1,731-page document comprised almost entirely of emails pulled from a single Gmail account. That is the sum total of his production. There are no text messages. No Signal communications. No encrypted chats. He did not search at least three other email accounts that he uses. Nor is there a single document—email or otherwise—reflecting communications with Jonathan Buma, the FBI, or any other government agent Johnson claims to have interacted with. None.

App.274

The absence of these materials is not merely suspicious—it is incompatible with Johnson's own public statements and prior representations. Johnson has publicly stated, repeatedly and without equivocation, that he keeps meticulous records. When talking about the case, he boasted that he "welcomed" this litigation, stating "I kept everything, I recorded everything and so I fear nothing." (Ex. E at 4, Appx. 077, Charles Johnson, *Last Gasp of A Criminal Syndicate: Why I Welcome The Lawfare Attacks Against Me*, Substack, Charles Johnson's Thoughts and Adventures (Oct. 17, 2024), available at https://charlesjohnson.substack.com/p/last-gasp-of-a-criminal-syndicate.

Just days later, he doubled down: "Everything was recorded, everything was noted, everything is in email and in text messages. Yes, I screenshotted them . . . ." (Ex. A at 4, Appx. 013) Those are not ambiguous claims. They are sweeping representations of comprehensive recordkeeping. Such sweeping claims are impossible to reconcile with the barren document production that Johnson provided.

As to Signal messages specifically, Judge Failla explicitly admonished Johnson's refusal to produce messages on that platform, citing his "misstatements and omissions":

> [T]he Court is deeply concerned that the initial review of [Johnson's] materials for discoverable information may have been inadequate, in light of . . . [Johnson's] misstatements and/or omissions to the Court regarding the message-deleting capabilities of the Signal platform.

(Failla, J. Order at 2, Ex. B, Appx. 020.)

Indeed, there is no excuse for the absence of Signal messages because Johnson regularly used Signal (and retained screenshots of any automatically deleted messages) as well as texts messages. For example, he retained messages with reporters and his X account (before he deleted his X account). *See, eg*, Isaac Stanley-Becker, *JD Vance in texts with far-right figure: Profane and off-the-cuff*, Wash. Post (Aug. 7, 2024) https://www.washingtonpost.com/politics/2024/08/07/jd-

App.275

vance-charles-johnson-texts/ (sharing messages with JD Vance with Washington Post); Ex. G at 10, Appx. 101, Charles Johnson, *How Joe Lonsdale Works For The Russians*, Substack, Charles Johnson's Thoughts and Adventures, (Sep. 4, 2024) https://charlesjohnson.substack.com/p/how-joe-lonsdale-works-for-the-russians (stating "I have a lot of text messages and email which show him in another light" and complaining that journalists would not publish them.).

The Federal Rules of Civil Procedure impose a duty of reasonable diligence. That obligation is not satisfied by limiting a search to the one email account that a litigant finds most convenient or beneficial. Plaintiffs, for their part, left no room for ambiguity. Their discovery requests were explicit: Johnson was to search all platforms—including "direct messages on X, Twitter, Instagram, or other social media." (Ex. C at 2, Appx. 027.) The language wasn't buried. It was bolded. (*Id.*) Johnson doesn't get to pick and choose his platforms. He doesn't get to limit his search to the one repository he found convenient. He is required—under the Rules—to conduct a good-faith, comprehensive search of every location where relevant documents might be found. That means phones. That means apps. That means all email accounts. Johnson was not free to confine his search to a narrow subset of communications.

Indeed, it strains credulity to suggest that a conspiracy of such scale—years in the making, involving threats, coordination, and ostensible connections to federal agents—played out solely through a single Gmail account and left no other trace. That is not plausible. It is not remotely consistent with how digital communication works in the modern world.

Notably, Johnson's production omits all emails from *charles@traitwell.com*—an account he used to send threatening communications directly to Plaintiffs. (*See* Ex. F at 1-2, Appx. 088-89) The omission of documents from that email account, standing alone, renders Johnson's production deficient under Rule 26(g) and Rule 34. And Johnson cannot credibly claim that the *traitwell.com*

10

App.276

account is inaccessible or inactive. Johnson's former counsel listed *charles@traitwell.com* as his point of contact in their motion to withdraw. ECF 41 at 2. That filing confirms that Johnson retains control of the account and actively uses it. He has no basis to disclaim possession, custody, or control of emails from that account. Likewise, Johnson also communicates from two other accounts that were not searched in response to Plaintiffs document requests:

- charlesjohnsonwork@protonmail.com
- chuckwalla1022@gmail.com

(Thompson Decl. ¶9, Appx. 004.)

Moreover, the omission of any communications with former, and now indicted, FBI agent Jonathan Buma reveals Johnson's obstruction. Johnson claimed that he was "writing . . . reports for Jonathan Buma and for others." (SAC ¶ 99 (quoting Johnson, X Space, Sept. 24, 2024).) Yet, Johnson has not produced a single report, a single text, nor a single email involving Buma. Nothing. But such documents must exist and are responsive to Plaintiffs' document requests. (*See* RFP No. 27, Ex. C at 5, Appx. 030 (seeking "[a]ll Documents and Communications between [Johnson] and any person affiliated with the Federal Bureau of Investigation[.]").

Johnson's obligation under Rule 34 is clear: he must conduct a good-faith, diligent search of all locations where responsive documents are likely to be found. Johnson has not done that. And he has offered no justification for those omissions.

Discovery is not a game of hide-and-seek. A party cannot ignore entire categories of communications simply because their contents are inconvenient. Johnson's failure to conduct a complete and competent search violates his obligations under the Rules and warrants both an order compelling production.

App.277

In sum, Plaintiffs request the following relief given that counsel for Johnson has recently withdrawn (the second set of lawyers that have withdrawn their representation of Johnson in this matter) and he cannot be trusted to perform the search without oversight:

➢ Compel Johnson to search the following email addresses and messaging platforms for responsive documents based on search terms that the Plaintiffs provide

- charlesjohnsonwork@protonmail.com

- chuckwalla1022@gmail.com

- charlescarlislejohnson@gmail.com

- charles@traitwell.com

- Signal

- Telegram

- Instagram

- Substack

➢ Compel Johnson to provide his phone and devices to a third-party vendor that will conduct the search of his devices and accounts for responsive documents using search terms that Plaintiffs provide.

➢ Plaintiffs will submit (a) search terms to be run against his accounts and devices and (b) a protocol to ensure that privileged communications are excluded. Johnson can object to the search terms and protocol but—given his prior obstruction—the burden should fall on him to demonstrate why the search terms or protocol is not appropriate.[2]

➢ Compel Johnson to re-activate his X account to search for responsive posts, or allow Plaintiffs to archive his prior tweets and posts.

---

[2] In a prior case in the Fort Worth Division of the Northern District of Texas, the undersigned counsel implemented a similar protocol to search the devices of a party who refused to participate in discovery. *See Antero Resources Corporation v. C&R Downhole Drilling Inc.*, No. 4:16-cv-668 (N.D. Tex.), ECF 243 (granting motion to compel and ordering party to "provide . . . access to any electronic devices in his possession" to be searched). This protocol was successful in collecting relevant documents and avoided the disclosure of any privileged material.

App.278

B.    **Johnson's Failure to Produce Emails in a Reasonably Usable Form—
Including the Stripping of Metadata and Attachments—Violates Rule 34**

Johnson's email production—consisting of a single, 1,731-page PDF file is fundamentally defective. The production was not only duplicative and disorganized, but also stripped of all metadata. It includes no header information, no timestamps, no sender or recipient fields. As a result, it is not "reasonably usable" as required under the Federal Rules.

Rule 34 makes clear that electronically stored information must be produced as it is kept in the usual course of business or organized and labeled to correspond to the requests. *See* FED. R. CIV. P. 34(b)(2)(E)(i) (stating that parties must "produce documents as they are kept in the usual course of business"). The Advisory Committee notes to the 2006 amendment further clarify that if ESI is kept in a searchable format, it "should not be produced in a form that removes or significantly degrades this feature."

Federal courts have repeatedly enforced these principles and found that emails that are combined into a single PDF are incompatible with the Rules. *See In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation*, No. 05-md-1720, 2007 WL 121426, at *1, 3-4 (E.D.N.Y. Jan. 12, 2007) (holding that documents stripped of searchable metadata are not Rule 34 compliant); *Osborne v. Billings Clinic*, No. 14-cv-0126, 2015 WL 1412626, at *7 (D. Mont. Mar. 25, 2015) (finding that duplicative PDFs of thousands of pages of medical bills were not reasonably usable and should have been produced in their ordinary maintained format); *IV Solutions, Inc. v. United HealthCare Servs.*, No. 16-cv-09598, 2019 WL 9088037, at *1 (C.D. Cal. May 2, 2019) (holding that producing 20,000 pages of documents in a single PDF file "was not reasonably usable").

Here, Plaintiffs cannot determine whether the emails were complete, who received them, when they were sent, or whether attachments were omitted. Indeed, the PDF format in which the

App.279

email was provided stripped out all the attachments in the email thread. (*See* Thompson Decl. ¶10, Appx. 004-07.) The format obstructs—not facilitates—review and use. As a result of the altered form in which Johnson has produced emails in this case, Plaintiffs have been prejudiced.

Accordingly, Plaintiffs respectfully request that the Court compel Johnson to re-produce all responsive emails in their native format, with metadata, thread structure, and attachments preserved, in accordance with Rule 34 and well-established discovery standards.

### C.    Johnson's Failure to Disclose What Was Withheld or What Sources Were Searched Violates Rule 34 and Obscures the Scope of His Noncompliance

Rule 34(b)(2)(C) imposes a clear requirement: if a party objects to a discovery request and withholds responsive documents, he must affirmatively state that he is doing so, and specify the scope of the withholding. *Id.* ("An objection must state whether any responsive materials are being withheld on the basis of that objection."). This requirement is designed to prevent ambiguity and ensure a fair and transparent discovery process.

Johnson has not complied. His written responses consist of generalized, boilerplate objections. (Ex. D at 3-5, Appx. 038-40.) Nowhere does he disclose whether any responsive documents were withheld on the basis of those objections, nor does he clarify the categories of documents excluded or the rationale for doing so.

Even more concerning, as mentioned before, Johnson has provided no information whatsoever about the sources he searched. He has not identified any custodians, devices, communication platforms, or repositories of potentially responsive information. While it is evident that the production is deficient, the true extent of that deficiency remains obscured. Plaintiffs are, in essence, left to litigate in the dark—unable to determine whether the omissions are isolated or systemic, and unable to ascertain what has been intentionally or inadvertently excluded. This lack

App.280

of transparency frustrates both the letter and the purpose of the Federal Rules. The Court should compel Johnson to amend his responses to comply with Rule 34(b)(2)(C).

### D.   <u>Sanctions</u>: Johnson's Pattern of Obstruction—Including Prior Falsehoods in Federal Court—Merits Sanctions Under Rule 37

Johnson's discovery misconduct in this case is not a one-off lapse. It is part of a sustained pattern of disregard for his obligations under the Federal Rules of Civil Procedure—a pattern that mirrors his behavior in other federal courts.

In ongoing litigation before the Southern District of New York, Johnson has refused to comply with discovery, claiming that he had been instructed by two named agents of the Department of Homeland Security not to produce responsive documents. (*Johnson v. Clearview AI, Inc.*, No. 1:23-cv-02441, ECF No. 68 at 5 (S.D.N.Y. Jan. 16, 2025), Ex. B at 5, Appx. 023.) When the court investigated, DHS confirmed that no such agents existed. *Id.* He thus fabricated this fabricated. When confronted, Johnson attempted to sidestep the consequences by dismissing his own claims and exiting the case. His gambit failed because the court allowed the counterclaims to proceed and left Johnson as a party. The court's order also calls out multiple other instances where Johnson has frustrated the discovery process, including his "misstatements and omissions" about Signal and other sources of responsive documents. (Failla, J. Order at 2, Ex. B, Appx. 020.)

Here, Johnson is replaying a familiar hand. What stands out most—both for its brazenness and its legal consequence—is his refusal to produce categories of documents that he himself has admitted exist. His own words: "Everything was recorded, everything was noted, everything is in email and in text messages." And yet, here we are. No emails to or from his FBI handler. No texts. No Signal chats. Nothing beyond a solitary, metadata-stripped PDF. The documents Johnson is withholding go to the heart of Plaintiffs' claims. By any measure, the Federal Rules require more. Johnson has concealed the breadth of his noncompliance and offered no sign that he intends to fix

App.281

it. Not voluntarily, at least. The inescapable conclusion is that Johnson does not believe the Rules apply to him. But they do. That's why court intervention is not only justified—it's necessary. When a litigant repeatedly flouts the Rules—especially after having been called to account in another federal case—sanctions are not merely appropriate, they are necessary.

A district court "has broad discretion under Rule 37(b) to fashion remedies suited to the misconduct." *Smith & Fuller, P.A. v. Cooper Tire & Rubber Co.*, 685 F.3d 486, 488 (5th Cir. 2012) (internal quotations omitted). Plaintiffs respectfully request that the Court impose sanctions on Johnson, including the award of reasonable attorneys' fees and costs incurred in preparing this motion, and such additional relief as the Court deems just and proper under the circumstances.

## CONCLUSION

Johnson has disregarded his discovery obligations, produced documents in an unusable format, refused to identify what he is withholding, and failed to search—or admit to searching—critical sources of evidence. Worse still, he has declined to produce categories of documents that he has publicly acknowledged exist. These are not technical deficiencies; they are deliberate acts of evasion that prejudice Plaintiffs and obstruct the judicial process. This conduct, especially in light of Johnson's similar misconduct in prior federal litigation, warrants judicial intervention and sanction. Accordingly, Plaintiffs respectfully request that the Court:

> ➢ Compel Johnson to search the following email addresses and messaging platforms for responsive documents based on search terms that the Plaintiffs provide.

- charlesjohnsonwork@protonmail.com

- chuckwalla1022@gmail.com

- charlescarlislejohnson@gmail.com

- charles@traitwell.com

- Signal

App.282

- Telegram

- Instagram

- Substack

➢ Plaintiffs will submit (a) search terms to be run against his accounts and devices and (b) a protocol to ensure that privileged communications are excluded. Johnson can object to the search terms and protocol but—given his prior obstruction—the burden should fall on him to demonstrate why the search terms or protocol is not appropriate and he should pay the costs of the collection and production.

➢ Compel Johnson to re-activate his X account to search for responsive posts, or allow Plaintiffs to archive his prior tweets and posts.

➢ Compel Johnson to produce all responsive documents in a usable format, including complete email productions with metadata intact;

➢ Compel Johnson to supplement his written responses in compliance with Rule 34(b)(2)(C), including identifying what documents have been withheld and what sources have been searched; and

➢ Award Plaintiffs their reasonable attorneys' fees and costs incurred in connection with preparing and filing this Motion.

➢ Grant such other and further relief as the Court deems just and proper under the circumstances.

Dated: April 28, 2025

Respectfully submitted,

/s/ Will Thompson
Will Thompson
DLA PIPER LLP (US)
Will Thompson
State Bar No. 24094981
will.thompson1@us.dlapiper.com
1900 N. Pearl Street
Dallas, Texas 75201
Telephone: (406) 546-5587

COUNSEL FOR PLAINTIFFS

App.283

**CERTIFICATE OF CONFERENCE**

I hereby certify that conferred with counsel for the defendant, Carter Boisvert, multiple times about the contents of this motion, beginning on Friday, March 21, 2025. Counsel did not agree to the relief requested herein. Following the withdraw of Mr. Boisvert's firm, I contacted Mr. Johnson via the contact information provided in the motion to withdraw. I informed him that Plaintiffs were preparing to file this motion to compel in substantially the same form as attached and that his silence would be taken as opposition to the relief requested in this motion. Mr. Johnson responded to my email, but did not address any of the relief requested in this motion specifically.

*/s/ Will Thompson*
Will Thompson

**CERTIFICATE OF SERVICE**

I hereby certify that on April 28, 2025, a true and correct copy of the foregoing document was filed electronically using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Will Thompson*
Will Thompson

App.284

# EXHIBIT 8

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' FIRST MOTION TO COMPEL
PRODUCTION OF DOCUMENTS**

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") submit this Appendix in Support of their First Motion to Compel Production of Documents.

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| **1** | Declaration of Will Thompson, dated April 28, 2025. | Appx. 001 – Appx. 008 |
| **A** | Copy of the document titled "Best Birthday Yet! A Foreign Compromised Billionaire is Backing A Frivolous Lawsuit Against Me," dated October 23, 2024. | Appx. 009 – Appx. 017 |
| **B** | Docket entry number 68 in the matter, *Johnson v. Clearview AI, Inc.*, No. 1:23-cv-02441 (S.D.N.Y. Jan. 16, 2025). | Appx. 018 – Appx. 024 |
| **C** | "First Set of Requests for Production" in this matter, which were served on January 31, 2025 | Appx. 025 – Appx. 034 |
| **D** | Copy of the defendant's responses to "First Set of Requests for Production." | Appx. 035 – Appx. 0072 |
| **E** | Copy of the document titled "Last Gasp of A Criminal Syndicate: Why I Welcome The Lawfare Attacks Against Me, Substack," dated October 17, 2024. | Appx. 073 – Appx. 086 |

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| F | Copy of an email, titled "Ready to play in the majors yet?" | Appx. 087 – Appx. 090 |
| G | Copy of the document titled *How Joe Lonsdale Works For The Russians, Substack, Charles Johnson's Thoughts and Adventures,* dated September 4, 2024. | Appx. 091 – Appx. 103 |
| | **Unpublished Cases** | |
| | *Thomason v. Metro. Life Ins. Co.,* No. 14-cv-086, 2015 WL 1914557 (N.D. Tex. 2015) | Tab 1 |
| | *Piazza's Seafood World, L.L.C. v. Odom,* No. 07-cv-0413, 2011 WL 3664437 (M.D. La. 2011) | Tab 2 |
| | *IV Solutions, Inc. v. United HealthCare Servs.,* No. 16-cv-09598, 2019 WL 9088037 (C.D. Cal. May 2, 2019) | Tab 3 |
| | *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation,* No. 05-md-1720. 2007 WL 121426 (E.D.N.Y. Jan. 12, 2007) | Tab 4 |
| | *Osborne v. Billings Clinic,* No. 14-cv-0126, 2015 WL 1412626 (D. Mont. Mar. 25, 2015) | Tab 5 |

Dated: April 28, 2025

Respectfully submitted,

/s/ *Will Thompson*
Will Thompson
DLA PIPER LLP (US)
Will Thompson
State Bar No. 24094981
will.thompson1@us.dlapiper.com
1900 N. Pearl Street
Dallas, Texas 75201
Telephone: (406) 546-5587

COUNSEL FOR PLAINTIFFS

App.287

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing instrument has been served on this day April 28, 2025 via the Court's CM/ECF system to all counsel of record.

<div align="right">

*/s/ Will Thompson*
Will Thompson

</div>

App.288

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

**DECLARATION OF WILL THOMPSON**

I, Will Thompson, declare as follows. I am an attorney admitted to the State Bar of Texas and this Court and a partner at the law firm of DLA Piper LLP. I am attorney of record for the plaintiffs in the above captioned action. I am over the age of twenty-one years and am not a party to this action. I have personal knowledge of the facts set forth in this declaration.  I declare under penalty of perjury that the facts stated in this document are true and correct.

1. Exhibit A attached hereto is a true and correct copy of the document titled "Best Birthday Yet! A Foreign Compromised Billionaire is Backing A Frivolous Lawsuit Against Me," dated October 23, 2024. It was downloaded from the Substack "Charles Johnson's Thoughts and Adventures." It was retrieved from the following web address:

    https://charlesjohnson.substack.com/p/best-birthday-yet-a-foreign-compromised.

2. Exhibit B attached hereto is a true and correct copy of docket entry number 68 in the matter, *Johnson v. Clearview AI, Inc.*, No. 1:23-cv-02441 (S.D.N.Y. Jan. 16, 2025).

3. Exhibit C attached hereto is a true and correct copy of "Plaintiffs served their First Set of Requests for Production" in this matter, which were served on January 31, 2025.

1

4.      Exhibit D attached hereto is a true and correct copy of the defendant's responses to "Plaintiffs served their First Set of Requests for Production."

5.      Exhibit E attached hereto is a true and correct copy of the document titled "Last Gasp of A Criminal Syndicate: Why I Welcome The Lawfare Attacks Against Me, Substack," dated October 17, 2024. It was downloaded from the Substack "Charles Johnson's Thoughts and Adventures." It was downloaded on October. 23, 2024 and was retrieved from the following web address on April 25, 2025: https://charlesjohnson.substack.com/p/best-birthday-yet-a-foreign-compromised.

6.      Exhibit F attached hereto is a true and correct copy of an email, titled "Ready to play in the majors yet?" It was sent from the email address charles@traitwell.com to Hal Lambert's email address. The redactions address privileged communication with the undersigned counsel.

7.      Exhibit G attached hereto is a true and correct copy of the document titled *How Joe Lonsdale Works For The Russians*, Substack, Charles Johnson's Thoughts and Adventures, dated September 4, 2024. It was downloaded on April 25, 2025 from the following URL: https://charlesjohnson.substack.com/p/how-joe-lonsdale-works-for-the-russians.

8.      I have reviewed Defendant Charles Johnson's document production in this case. It was a single 1,731-page PDF of emails exported from a Gmail account. It contained extensive duplicate emails, many repeated verbatim. All metadata was stripped, making it nearly impossible to assess senders, recipients, timestamps, or attachment details. All attachments appear to be stripped. No text messages, Signal messages, or other non-email communications were produced. No communications with government officials or agencies were included. No

social media content was provided other than isolated Substack references. No documents were produced to support Johnson's defamatory accusations against Mr. Lambert.

9.     Based on a review of the 1731 page documents Johnson produced, he also communicates via email accounts charlesjohnsonwork@protonmail.com and chuckwalla1022@gmail.com. My statement is based on the fact that those email accounts show up in emails that were produced from his Gmail account, but they only appear a few times as cc's or forwards to the Gmail account.

10.     I say that Johnson's production stripped all email attachments because at the end of an email thread, there would be a list of documents that appear to reference attachments, but were not included in the production. A representative example comes from pages 396-398 of his production, which is pasted below.

Appx. 004

App.292

**From:** Charles Johnson <charlescarlislejohnson@gmail.com>
**Sent:** Friday, August 3, 2018 5:19 AM
**To:** David Smith Executive Chairman
**Cc:** Richard Schwartz; Hoan Ton-That
**Subject:** David << >> Richard, Hoan

David,

You should meet Richard Schwartz and Hoan who are working on a facial recognition venture you
might find useful for your various business interests.

—Charles

Update.eml
1022B

MC1R Capital.eml
8kB

Hoan, Richard << >> William.eml
4.1kB

Talking.eml
1.6kB

Call.eml
1017B

Ben << >> Hoan.eml
4.1kB

WSJ: Rejection Is Like Rocket Fuel.eml
15.6kB

JOHNSON 000396

Appx. 005

App.293

Yahoo Mail - Fwd: 8                                        https://mail.yahoo.com/d/folders/1/messages/AApR-t88LVQEZzx8Y...

Fwd: RE: RE:.eml
13.3kB

Kwok << >> Hoan.eml
2.3kB

Clearview AI - facial recognition meeting.eml
5kB

Gregory Cochran dinner in Hollywood on Monday or Tuesday.eml
5.7kB

Conference call Kyle Kazan, Hoan, Robert Lara, Charles Johnson and Richard RE: Images.eml
7.3kB

RE: Images Conference call dial in 1 (415) 805-1153 No PIN needed at 2:30 PM (PST).eml
30.7kB

Matt, John << >> Hoan.eml
9.7kB

Meeting up.eml
941B

going to hotel now.eml
818B

Some thoughts about working together.eml
65.4kB

Fwd: Simple retainer deal.eml
21kB

Real Estate.eml
7.2kB

Hoan << >> Ajay.eml
7.2kB

Invitation: Clearview Overview @ Fri Dec 21, 2018 1pm - 1:30pm (PST) (Charles Johnson).eml
19.8kB

Notification: Clearview Overview @ Fri Dec 21, 2018 1pm - 1:30pm (PST) (Charles Johnson).eml
14.5kB

Hoan << >> John.eml
13kB

Completed: charlescarlislejohnson@gmail.com.eml
329.2kB

charlescarlislejohnson@gmail.com.eml
12.6kB

Followup from last week.eml
1.9kB

What's up?.eml
4.1kB

Free to meet.eml
5.6kB

JOHNSON 000397

5

Appx. 006

App.294

Yahoo Mail - Fwd: 8                                                    https://mail.yahoo.com/d/folders/1/messages/AApR-t88LVQEZzx8Y...

Some information for some thinking.eml
7.6kB

DIUX.eml
4kB

designer.eml
711B

Ben Narasin, NEA.eml
41.6kB

Fwd: Hoan Ton-That <> Aaron Jacobson Introduction.eml
9.7kB

FW: Call with clearview - support+.eml
15kB

Call with clearview - Friendly reminder+.eml
5.7kB

Notification: Call with clearview - Friendly reminder+ @ Tue Aug 7, 2018 11am - 11:30am (PDT) (Charles Johnson).eml
18.3kB

Call with clearview - Friendly reminder+.eml
1.4kB

Sent you a build of our face recognition app.eml
8.6kB

Joe, Sinan << >> Hoan, Richard.eml
25kB

Never heard from David Smith.eml
6.2kB

Call with clearview.eml
9.4kB

David << >> Richard, Hoan.eml
775.8kB

Untitled
3.5kB

Untitled
4.1kB

invite.ics
1.5kB

Wind-down & Transfer Agreement - November 2018.pdf
234.1kB

image001.png
713B

Clearview AI - Exec Summary - August 2018.pdf
563.3kB

Untitled
1.4kB

JOHNSON 000398

40 of 40                                                                                                11:59 AM

6

Appx. 007

App.295

My name is Will Thompson, my date of birth is November 20, 1982, and my business

address is 1900 N. Pearl Street Dallas, Texas 75201, and USA. I declare under penalty of perjury

that the foregoing is true and correct.

Executed in Dallas County, State of Texas, on April 28, 2025.


_____*/s/ Will Thompson*_____
Will Thompson

Appx. 008

App.296

# Exhibit A

# Best Birthday Yet! A Foreign Compromised Billionaire is Backing A Frivolous Lawsuit Against Me



 CHARLES JOHNSON

OCT 23, 2024

♡ 11    💬    ⟳ 1                    Sha





At a coffee shop getting served. I asked them to take a picture of me and they did
but this one was taken by Arthur Bloom.

What an eventful birthday but honestly, dear reader, did you expect anything else?

I had a lovely day meeting with journalists and ate Ukrainian food for lunch and
French Moroccan food for dinner. I even snuck in a dinner date which went
exceedingly well though that's none of your business.

Along the way I got served at one of my favorite co ee shops! I was expecting this a
to be honest, I was kind of looking forward to it. I don't really fear courtrooms and
love the opportunity to make my case before a judge or jury. I sort of feel a bit like
Rohrsach in the Watchmen: "None of you understand. I'm not locked up in here wit
you. You're locked up in here with me."

Speaking of understanding my understanding is that billionaire John Burbank is
backing Hal Lambert's lawsuit against me. That makes sense because Hal was dodg
process servers when I tried to have him served. Naughty, naughty Hal!

But this is somewhat rich because I introduced Lambert and Burbank way back wh
brought them into Umbra — a synthetic aperture radar satellite — in 2020. Neither
one particularly liked the other but I made peace. Whoops.

A fraud can o#en unite the co-conspirators. Both men tried to cheat me out of that
deal and I sued Hal Lambert earlier this year.

Now it's been established in Howard Blum's best-selling book, [When the Night Comes](#) [Falling: A Requiem for the Idaho Student Murders](#), that I acted as a spotter for John Burbank on tech deals.

John's not a good person, which is something I learned over the years that I knew h I had many occasions to observe him. I vacationed and stayed at his properties in Healdsburg, San Francisco, Miami (twice!) and London. John was even part of a few signal groups until he ragequit when I said Joe Biden would be a good president.

Oh well. Everything was recorded, everything was noted, everything is in email and text messages. Yes, I screenshotted them all but I also know that my friends in GCI la piscine, Mossad and the NSA know what's up. I'm not sweating it.

# What do I have to do over here to get a GenXer to do a straight business deal? I'm not down to be GenXploitated

My understanding is that John and his firm Passport Capital is a front for a certain part of the Russian and Chinese world and he gets most of his money from the UAE and the Kingdom of Saudi Arabia. His late father — [John "Jock" Burbank](#) — did a l translation work for and acted as John's handler. In effect John Burbank inherited J Burbank's Russia network.

I'm further told that the Russians and Saudis who had been backing Burbank at not too pleased at his behavior or his investments.

As usual Arthur Bloom got there before me — [writing about John's work back in Ju](#)

> John Burbank is a hedge fund manager and former hot dog salesman—like Ignat
> J. Reilly—who was [plugging](#) Chinese Internet companies a decade ago, and he's
> deeply involved with the Saudis. After closing his main fund, he got really into
> crypto, and his philanthropy backs all kinds of left-wing causes out in California
> though that's probably his ex-wife's job.

He taught in China a#er college, and according to his Forbes pro$le is extremely unenthusiastic about the United States. When you have a guy who's unenthusias about America, invests a bunch of money abroad, then gets into cryptocurrency, start to wonder if we're dealing with a traitor here.

One interesting thing about him is he maintained his ties with the Saudis even a the Khashoggi dismemberment. Here he is with Matt Michelsen, the weird character tied to the Texas slush funds:



Su%ce it to say, a#er cheating me on several tech deals in genomics, facial recognition, robotic submarines and satellites, I didn't really want to have a close relationship with John. Nor apparently do other tech investors or founders.

I was creeped out with Burbank's behavior toward women — something he has in common with Hal Lambert, who despite being married, is rather lecherous. A little womanizing is $ne — heterosexuality isn't yet a crime — but too much is a bit gauc

John demanded that I sign a nondisclosure argument and I refused. John o ered to buy me out of all my positions — again I refused. I o ered instead to buy him out. H did not like that.

## As I said I'm not keen to be exploited but such is my dharma. I'll meet the challenges in front of me by telling the truth and exposing the criminal networks.

Like Hal, John has a lot of problems and those problems will continue as more of th world's intelligence services continue to pay attention. I welcome their scrutiny and the attention of the responsible press.

John's protégés include Anne Wojcicki of 23 & Me fame. He was also a big backer in Israeli ~~spyware~~ gaming company McLovin.

John's $xer was one Matt Michelsen, the human tra%cker tied into Governor Greg Abbott of Texas. From what I understand Michelsen even introduced John to his ba mama.

Isn't it interesting that the same person interested in exploiting young people woul be interested in human tra%cking?



Arthuriana

Where to Look for Human Smuggling at the Southern Border

4I ?J; L¢HG 1HG? 7L; J# 8?P; KTK HOG KL; L?$E?N?E <HJ>?J ?G¢HJ=?F ?GL ?®¢HJL# <?A; G
KBHJLEQ ; ¢L?J 5J?K¢>?GL 8JMF I E?¢L H®¢=?% 4G? H®LB? D?Q I E; Q?JK ¢K 2; LL

Case: 25-11393     Document: 16-1     Page: 304     Date Filed: 01/06/2026

Case 4:24-cv-00988-P     Document 44-1     Filed 04/28/25     Page 16 of 132     PageID 613
4/23/25, 7:46 PM          Best Birthday Yet! A Foreign Compromised Billionaire is Backing A Frivolous Lawsuit Against Me

2⌈=B?⌈K?G⌗ OBH  B;K  <??G =HN?J?> B?J?  I J?NCHMKⱣ⍟%  . ⍟K =HF I ;GQ  B;K

; O; J>?>  BMG>J?>K  H⍟ F ⌈⌈CHGK  H⍟ >H⌈⌈ JKT OHJLB  H⍟ KL: L?  =HGLJ:

> [ Read more ]

; Q?; J  ; AH ⍰ * ⌈⌈D?K ⍰ '  =HF F ?GL ⍰ +JLBMJ  ,

Don't sweat it. I got it.

Uncle Chuck is in command.

If you find yourself learning from this or any of my other writings, please consider becoming
paid subscriber.

---

## Subscribe to Charles Johnson's Thoughts and Adventures

1; MG=B?> ）Q?; JK  ; A

+  ⍟?O  LBHMABLK  B?J?  ; G>  LB⍵

[ Type your email... ]  [ Subscribe ]

, Q  KM<K=J<⍟GA⌈⍰'  ; AJ??  LH  7M<KL; =D  8?JF K  H⍟  9K⌗  ; G>  ; =DGHO⌈?>A⍰

⍟LK /G⍟HJF: LⱭHG  −H⌈⌈?=LⱭHG  3H⌈⌈⍵'  ; G>  5J⍟N;  =Q  5H⌈⌈⍵=Q.

---



'' 1⍟D?⍵ • '  6?KL: ⍟D

## Discussion about this post

[ Comments   Restacks ]

# Exhibit B

Case: 25-11393    Document: 16-1    Page: 307    Date Filed: 01/06/2026
Case 4:24-cv-00988-P    Document 44-1    Filed 04/28/25    Page 19 of 132    PageID 616
Case 1:23-cv-02441-KPF    Document 68    Filed 01/16/25    Page 1 of 6

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CHARLES JOHNSON,

                        Plaintiff,

                -v.-

CLEARVIEW AI, INC.; HOAN TON-THAT;
and RICHARD SCHWARTZ,

                        Defendants.

---

23 Civ. 2441 (KPF)

ORDER

KATHERINE POLK FAILLA, District Judge:

        This order summarizes various issues that were addressed at conferences before the Court held in person on January 8, 2025, and by telephone on January 13, 2025.  To begin with the most substantive development, the Court DISMISSES WITH PREJUDICE Plaintiff Johnson's claims against Defendants after confirming with Plaintiff and his counsel that Plaintiff wishes to do so.  What remains in the instant case are Defendants' counterclaims against Plaintiff.

        At the January 8 conference, the Court also addressed Defendants' motion for the imposition of sanctions against Plaintiff.  (Dkt. #60, 61).  Though the Court denied that motion on the record before it, the Court made clear that Plaintiff may not contact any Defendant directly; that Plaintiff may not post any statements to his social media accounts regarding defense counsel; and that any other public statements by Plaintiff regarding this case or any of its participants runs the risk of sanctions from this Court.  (See January 8, 2025 Minute Entry).  As a result of information learned at the January 13

Case: 25-11393    Document: 16-1    Page: 308    Date Filed: 01/06/2026
Case 4:24-cv-00988-P    Document 44-1    Filed 04/28/25    Page 20 of 132    PageID 617
Case 1:23-cv-02441-KPF    Document 68    Filed 01/16/25    Page 2 of 6

conference, the Court further admonishes Plaintiff that any effort to evade the Court's orders by using a third party as amanuensis will also merit investigation by the Court, and possibly sanctions.

The bulk of the conferences was spent addressing various discovery issues raised by Defendants. Before getting to the specifics of the claimed deficiencies, the Court addresses the threshold issue of the manner in which information was collected by Plaintiff and his counsel for review. <u>In brief, the Court is deeply concerned that the initial review of Plaintiff's materials for discoverable information may have been inadequate, in light of, among other things</u>, (i) current counsel's inability to access a hard drive of potentially discoverable materials that had been gathered by Plaintiff and produced to Plaintiff's prior counsel at Alston & Bird; (ii) counsel's confessed lack of facility with computers and technology; (iii) counsel's limited review of Plaintiff's email accounts, with no apparent effort to review texts, hard-copy documents, and/or social media platforms that did not copy to Plaintiff's email accounts; (iv) Defendants' identification of numerous categories of documents and materials that Plaintiff acknowledges exist, but that were not produced; and <u>(v) Plaintiff's misstatements and/or omissions to the Court regarding the message-deleting capabilities of the Signal platform</u>.[1] In consequence, the

---

[1]    In particular, the Court agrees with defense counsel's assessment that Plaintiff understood how to disable the automatic deletion feature on Signal so that messages could be saved, and indeed had previously disabled that feature so that he could save, among other things, 20 months' worth of messages with Vice President-Elect JD Vance. (See Giller Letter dated January 14, 2025 at 1-2). Given the allegations in Plaintiff's complaint, and the length of time over which the disputes underlying that complaint persisted, Plaintiff surely had both the ability and the motivation to retain his Signal messages with Defendants. Defense counsel's letter also includes Plaintiff's public

Case: 25-11393    Document: 16-1    Page: 309    Date Filed: 01/06/2026
Case 4:24-cv-00988-P    Document 44-1    Filed 04/28/25    Page 21 of 132    PageID 618
Case 1:23-cv-02441-KPF    Document 68    Filed 01/16/25    Page 3 of 6

Court ORDERS Plaintiff and his counsel to start from scratch and work together to ensure that all potentially discoverable material is gathered into a single location that Plaintiff's counsel can easily, and effectively, search.

To minimize the likelihood that potentially discoverable materials will be overlooked, Plaintiff's counsel is directed to submit a letter to the Court in camera and ex parte, explaining in detail how the materials were collected for review. This reconstitution of the universe of potentially discoverable materials will be completed on or before February 21, 2025, and counsel's letter to the Court will be submitted by the same date. Once those materials are collected, the Court expects that Plaintiff and his counsel will reconsider all of Defendants' discovery requests — except for those withdrawn as a consequence of Plaintiff's dismissal of his claims — in light of the newly collected information and the directives in this Order. In addition, the Court understands that Plaintiff is no longer willing to share with Defendants' counsel the search terms he used in conducting the initial review of discovery. As a result, the Court ORDERS counsel for the parties to meet and confer regarding search terms during the week of February 24, 2025; to the extent there are disagreements over those search terms, the parties are ORDERED to bring those disputes to the Court's attention promptly for resolution.

A related issue concerns the manner in which Plaintiff has produced electronic communications to Defendants to date. The Court agrees with

---

statements regarding his retention of "text messages," "recordings," and "documents" relevant to this case, and the Court fully expects these materials to be gathered and reviewed for production.

Appx. 021

App.309

Case: 25-11393    Document: 16-1    Page: 310    Date Filed: 01/06/2026
Case 4:24-cv-00988-P    Document 44-1    Filed 04/28/25    Page 22 of 132    PageID 619
Case 1:23-cv-02441-KPF    Document 68    Filed 01/16/25    Page 4 of 6

Defendants that Plaintiff's productions have not complied with Rule 34 of the

Federal Rules of Civil Procedure, which requires as follows:

> (E) Producing the Documents or Electronically Stored Information. Unless otherwise stipulated or ordered by the court, these procedures apply to producing documents or electronically stored information:
>
> (i) A party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request;
>
> (ii) If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms; and
>
> (iii) A party need not produce the same electronically stored information in more than one form.

Fed. R. Civ. P. 34(b)(2)(E).  In light of the Court's directives in the preceding few

paragraphs, the Court understands that Plaintiff and his counsel will be

reproducing all responsive electronic communications to Defendants.  <u>Going

forward, Plaintiff is admonished to produce electronic documents "as they are

kept in the usual course of business," including contextual communications,

as well as information making clear the addressee, recipient, and date of each

communication</u>.

On the issue of specific claimed deficiencies in production, the Court has

reviewed the revised list submitted by Defendants on January 14, 2025.  As

previewed by its comments at the January 8 conference, the Court agrees with

Defendants that there are deficiencies in Plaintiff's responses to

(i) Interrogatory Nos. 6, 7, 16, 17, 18, 19, 20, and 21; (ii) Requests for

Production Nos. 21, 22, 23, 24, and 28; and (iii) Requests for Admission Nos. 4,

Appx. 022

App.310

Case: 25-11393    Document: 16-1    Page: 311    Date Filed: 01/06/2026
Case 4:24-cv-00988-P    Document 44-1    Filed 04/28/25    Page 23 of 132    PageID 620
Case 1:23-cv-02441-KPF    Document 68    Filed 01/16/25    Page 5 of 6

5, 6, 7, 8, 9, 10, 11, 12, 13, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, and 35.  Once again, the Court understands that Plaintiff will be making additional productions and responses to the defense, and the Court expects those responses to address the deficiencies identified by Defendants' counsel in pages 4 and 5 of its January 6, 2025 letter.  (Dkt. #65).

Finally, at both the January 8 and January 13 conferences, Plaintiff advised the Court that he had taken, and refrained from taking, certain actions at the direction of federal law enforcement agents.  More particularly, Plaintiff advised the Court that he had been instructed not to produce any additional discovery in this case by two agents working for the Department of Homeland Security ("DHS").[2]  The Court obtained the consent of the parties to speak with the agents, identified as "Alexander Rodriguez" and "Alexander Fletcher," and received purported contact information for one of the agents from Plaintiff's counsel.  However, with the assistance of the United States Attorney's Office for the Southern District of New York, the Court has reached out to DHS to obtain additional information regarding these agents.  As relevant here, the Court has been advised that DHS can locate no Special Agent with those names, in HSI or in any other division of DHS, and, indeed, the DHS can locate no employee named Alexander Fletcher.  Given that development, the Court finds no basis for Plaintiff to refrain from producing additional discovery in this case. Accordingly, the Court ORDERS Plaintiff to respond to all of Defendants' fact

---

[2]    Though Plaintiff did not specifically refer to Homeland Security Investigations ("HSI"), the Court understands that organization to be the principal investigative and law-enforcement arm of DHS.

Case: 25-11393    Document: 16-1    Page: 312    Date Filed: 01/06/2026
Case 4:24-cv-00988-P    Document 44-1    Filed 04/28/25    Page 24 of 132    PageID 621
Case 1:23-cv-02441-KPF    Document 68    Filed 01/16/25    Page 6 of 6

discovery requests in this case on or before March 14, 2025, and further

ORDERS the parties to complete all fact depositions on or before April 11,

2025.

     SO ORDERED.

Dated:   January 16, 2025
         New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge

Appx. 024

App.312

# Exhibit C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| Point Bridge Capital, LLC, | § | |
| Hal Lambert | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Case No. 4:24-cv-00988-P |
| | § | |
| Charles Johnson, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFFS' FIRST SET OF DISCOVERY REQUESTS**
**TO DEFENDANT CHARLES JOHNSON**

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") serve the following First Set of Discovery Requests ("Requests") to Defendant Charles Johnson ("Defendant," "Johnson," or "You") pursuant to Federal Rules of Civil Procedure 26 and 34. Defendant is directed to respond within thirty (30) days after service of these Requests.

**INSTRUCTIONS**

The following instructions shall apply to each of the Requests herein:

1. Unless otherwise stated, the relevant time period for these Requests is from January 1, 2019 through the present.

2. In answering the following Requests, You must respond in the manner provided for by the Federal Rules of Civil Procedure, and the Local Rules of the United Stated District Court, Northern District of Texas.

3. All documents must be produced pursuant to the parameters in the parties' Agreed ESI Protocol, which the parties mentioned in their initial status report and is being conferred upon. If Your response to a particular Request is that the information or document requested is claimed to be privileged, please provide all information required under the Parties' Agreed ESI Protocol.

4. If Your response to a particular Request is a statement that you lack the ability to comply with that Request, You must specify whether the inability to comply is because the particular item or category of information never existed, has been destroyed, has been lost, misplaced, or stolen, or has never been, or is no longer, in your possession, custody, or control, in which case the name and address of any

person or entity known or believed by You to have possession, custody, or control of that information or category of information must be identified.

5.    If Your response to any Request is that the documents are not in Your possession, custody, or control, describe the efforts You made to locate such documents.

6.    If an objection is made to any part of a particular Request, that part should be specified (together with the grounds for the objection), and any other portion of the Requests to which no objection is made should be produced.

7.    Produce all documents responsive to the Requests for production, together with any objections, at the offices of Quinn Emanuel Urquhart & Sullivan LLP, 3100 McKinnon, Suite 1125, Dallas, Texas 75214, attn. Will Thompson.

8.    Your obligation to respond to these Requests is continuing and Your responses are to be supplemented to include subsequently acquired information.

## DEFINITIONS

1.    "Point Bridge" means Plaintiff Point Bridge Capital, LLC in the above-captioned action, and include its officers, directors, employees, staff members, agents, or other representatives.

2.    "Plaintiffs" collectively mean Plaintiffs Point Bridge Capital, LLC and Hal Lambert

3.    "Defendant," "You," "Your," or "Yourself" means Defendant Charles Johnson, the defendant in the above-captioned action, and includes, any agents, or other representatives acting on Your behalf.

4.    "Document(s)" shall be used in the broadest sense permitted under Federal Rule of Civil Procedure 34(a). Each Document is to be produced along with all non-identical drafts thereof in its entirety, without abbreviation or redaction.

5.    "Communication(s)" mean written or verbal exchanges between any person(s) or entity(ies), including without limitation verbal conversation, telephone calls, facsimiles, emails (including attachments), **direct messages on X, Twitter, Instagram, or other social media platforms, screenshots of Signal messages,** or any other means of electronic communication, letter, memoranda, reports, and any other documents which refer or relate to the written or verbal exchange.

6.    "Person(s)" means any individual, corporation, proprietorship, association, joint venture, company, partnership or other business or legal entity, including governmental bodies and agencies.

7.    "Concern," "concerning," "relate to," or "relating to" mean relating to, referring to, concerning, mentioning, reflecting, pertaining to, evidencing, involving, describing, discussing,

commenting on, embodying, responding to, supporting, contradicting, or constituting (in whole or in part), as the context makes appropriate.

8.    "Identify," "identifies," or "identification" mean: (1) when referring to a person, the person's full name, present or last known address, and the last known title and place of employment; (2) when referring to a business, legal, or governmental entity or association, the name and address of the main office; (3) when referring to a fact, the fact and the documentary or testimonial support for that fact; (4) when referring to a written communication, identity of the document(s) in which the communication was made; (5) when referring to an oral communication, the identity of persons participating in the communication.

9.    "Any" and "all" each mean and include the other.

10.    "Include" and "including" mean including without limitation.

11.    The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

12.    The singular form of any word shall be deemed to include the plural.  The plural form of any word shall be deemed to include the singular.

## REQUESTS FOR PRODUCTION

**Request for Production No. 1:**    All Documents and Communication[1] concerning or referencing Hal Lambert.

**Request for Production No. 2:**    All Documents and Communications concerning or referencing Point Bridge.

**Request for Production No. 3:**    All Documents and Communications You sent to, or received from, Clearview AI, Inc., which includes Clearview AI's officers, directors, employees, staff members, agents, or other representatives.

**Request for Production No. 4:**    All Documents and Communications concerning or referencing Umbra Space or Umbra Labs.

---

[1] For all Requests, Plaintiffs underscore the importance of Defendant fully considering and complying with the definition of "Communications" in the Definitions section above. To repeat, among other things, Documents and Communications would include direct messages on X/Twitter and screenshots of Signal Messages, irrespective of whether those messages were subsequently deleted on the messaging platform.

Appx. 028

App.316

**Request for Production No. 5:**    All Documents and Communications You sent to, or received from, Umbra Space or Umbra Labs, which includes Umbra Space's or Umbra Labs' employees, staff members, agents, or other representatives. This request does not seek communications sent to or sent by Umbra's board of directors.

**Request for Production No. 6:**    All social media posts, including posts on X or Twitter, concerning or referencing Hal Lambert.

**Request for Production No. 7:**    All social media posts, including posts on X or Twitter, concerning or referencing this lawsuit.

**Request for Production No. 8:**    All Documents and Communications evidencing that the United States government, foreign government, government agency, or government agent supported Your lawsuit(s) against ClearView AI or Hal Lambert.

**Request for Production No. 9:**    All Documents and Communications evidencing that a person or entity other than Yourself supported Your lawsuit(s) against ClearView AI or Hal Lambert.

**Request for Production No. 10:**    All Your Communications with Gator Greenwill.

**Request for Production No. 11:**    All Documents and Communications concerning any business relationship, formal or informal, with Gator Greenwill.

**Request for Production No. 12:**    All Documents and Communications concerning Metis Funding LLC, including any equity, investment, or ownership You have in Metis Funding LLC.

**Request for Production No. 13:**    All Documents and Communications evidencing any income, compensation, or benefit You derived from Metis Funding LLC and the source of such funding.

**Request for Production No. 14:**    All Documents and Communications concerning O15 Capital Partners.

**Request for Production No. 15:**    All Documents and Communications showing Your relationship with O15 Capital Partners, including income that You derive or have derived from O15 Capital Partners and the source of such funding.

**Request for Production No. 16:**    All Documents and Communications between You and Terry Dunmire.

**Request for Production No. 17:**    All Documents and Communications concerning any business relationship, formal or informal, You have with Terry Dunmire

4

Appx. 029

App.317

**Request for Production No. 18:** All Documents and Communications evidencing that Hal Lambert has ties, is affiliated with, or is "very close" to Russians, or any person or entity acting on behalf of the Russian government or Russian nationals.

**Request for Production No. 19:** All Documents and Communications supporting Your assertion that investors in Umbra Space, Umbra Labs, or any predecessor companies, were running a "mob bank."

**Request for Production No. 20:** All Documents and Communications supporting Your assertion that Hal Lambert engaged in any sexual misconduct, assault, or impropriety, including the allegations and assertions in paragraphs 203 and 207 of Plaintiffs' Second Amended Complaint.

**Request for Production No. 21:** All Documents and Communications supporting Your assertion that Hal Lambert is a "front" for Russian activity and "compromised cash."

**Request for Production No. 22:** All Documents and Communications supporting Your assertion that Hal Lambert is "the kind of dirty player in Fort Worth, maybe a front for the cartels

**Request for Production No. 23:** All Documents and Communications supporting Your assertion, "I knew that Lambert had a lot of connections with naughty players, like from foreign governments and whatnot."

**Request for Production No. 24:** All Documents and Communications supporting Your assertion that Hal Lambert "is very much tied in with the Russian world, particularly in the Russian and the COVID world, particularly operating in Texas."

**Request for Production No. 25:** Documents sufficient to show whether You ever served as a confidential human source, agent, or acted on behalf of any government agency, whether foreign or domestic.

**Request for Production No. 26:** All Documents and Communications between You and any member of the Federal Bureau of Investigation.

**Request for Production No. 27:** All Documents and Communications between You and any person affiliated with the Federal Bureau of Investigation, whether another agent, confidential human source, or anyone purporting to be affiliated with the Federal Bureau of Investigation.

**Request for Production No. 28:** All Documents and Communications between You and any member of the Central Intelligence Agency.

Appx. 030

App.318

**Request for Production No. 29:**    All Documents and Communications between You and any person affiliated with the Central Intelligence Agency, whether as confidential human source, agent, or anyone purporting to be affiliated with the Central Intelligence Agency.

**Request for Production No. 30:**    All Documents and Communications between You and any member of the Department of Homeland Security.

**Request for Production No. 31:**    All Documents and Communications between You and any person affiliated with the Department of Homeland Security, whether a confidential human source, agent, or anyone purporting to be affiliated with the Department of Homeland Security.

**Request for Production No. 32:**    All Documents and Communications between You and any member of the Turkish government.

**Request for Production No. 33:**    All Documents and Communications between You and any person affiliated with the Turkish government, whether an agent or anyone purporting to be affiliated with the Turkish government.

**Request for Production No. 34:**    Documents or communications concerning the factual basis for Your December 2024 post on X, which stated: "I'm told that Elon Musk instructed John Quinn, who is a Mormon and a registered Huawei lobbyist through Quinn Emanuel, to sue me on behalf of Hal Lambert and the Chinese interests."

**Request for Production No. 35:**    All leases, rental agreements, or mortgages in effect after 2021 showing that you resided in a state other than Texas.

**Request for Production No. 36:**    All leases, rental agreements, or mortgages in effect after 2021 for properties within the State of Texas.

**Request for Production No. 37:**    All Documents and Communications evidencing Your intent to indefinitely reside outside of the State of Texas. The time period for this request is 2021 to the present.

**Request for Production No. 38:**    Documents sufficient to show when You stopped residing in the State of Texas.

**Request for Production No. 39:**    Documents sufficient to show when You became a citizen or a resident of a state other than Texas.

Appx. 031

App.319

**Request for Production No. 40:**   All Documents and Communications about Hal Lambert that You sent to, or received from, any journalist, correspondent, investigative journalist, columnist, editor, news writer, feature writer, broadcast journalist, photojournalist, content creator, podcaster, vlogger, social media journalist, citizen journalist, multimedia journalist, online contributor critic (e.g., political critic) opinion writer, editorialist, pundit, analyst (e.g., political analyst), news aggregator, stringer (freelance reporter), or documentary filmmaker.

**Request for Production No. 41:**   All Documents and Communications about Point Bridge that You sent to, or received from, any journalist, correspondent, investigative journalist, columnist, editor, news writer, feature writer, broadcast journalist, photojournalist, content creator, podcaster, vlogger, social media journalist, citizen journalist, multimedia journalist, online contributor critic (e.g., political critic), opinion writer, editorialist, pundit, analyst (e.g., political analyst), news aggregator, stringer (freelance reporter), or documentary filmmaker.

**Request for Production No. 42:**   All Documents and Communications about this lawsuit that You sent to, or received from, any journalist, correspondent, investigative journalist, columnist, editor, news writer, feature writer, broadcast journalist, photojournalist, content creator, podcaster, vlogger, social media journalist, citizen journalist, multimedia journalist, online contributor critic (e.g., political critic), opinion writer, editorialist, pundit, analyst (e.g., political analyst), news aggregator, stringer (freelance reporter), or documentary filmmaker.

**Request for Production No. 43:**   All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Kristin Grind.

**Request for Production No. 44:**   All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Keach Hagey.

**Request for Production No. 45:**   All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Joseph Bernstein or Joe Bernstein.

**Request for Production No. 46:**    All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Ryan Mac.</u>

**Request for Production No. 47:**    All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Mattathias Schwartz</u>.

**Request for Production No. 48:**    All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Isaac Stanley-Becker.</u>

**Request for Production No. 49:**    All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Beth Reinhard.</u>

**Request for Production No. 50:**    All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Rob Copeland.</u>

**Request for Production No. 51:**    All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Kashmir Hill or (Kash Hill).</u>

**Request for Production No. 52:**    All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Jessica Le Masurier.</u>

Appx. 033

App.321

Dated: January 31, 2025                     Respectfully submitted,

                                            **QUINN EMANUEL URQUHART &**
                                            **SULLIVAN LLP**

                        By:      */s/ Will Thompson*
                                 Will Thompson
                                 State Bar No. 24094981
                                 illtwhompson@quinnemanuel.com
                                 3100 McKinnon St., Ste. 1125
                                 Dallas, Texas 75201
                                 Telephone: (469) 902-3600
                                 Facsimile: (469) 902-3610

                        **ATTORNEY FOR PLAINTIFFS**

                        <u>**CERTIFICATE OF SERVICE**</u>

        I hereby certify that on January 31, 2025, I served this document on counsel of record for

Defendant Charles Johnson via a manner authorized by the Federal Rules of Civil Procedure.

                                 */s/ Will Thompson*
                                 Will Thompson

Appx. 034

App.322

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| POINT BRIDGE CAPITAL, LLC and | § | |
| HAL LAMBERT, | § | |
| | § | |
| Plaintiffs, | § | Case No. 4:24-cv-00988-P |
| | § | |
| v. | § | |
| | § | Hon. Mark Pittman |
| CHARLES JOHNSON, | § | U.S. District Judge |
| | § | |
| Defendant. | § | |

DEFENDANT'S OBJECTIONS AND RESPONSES TO
PLAINTIFFS' FIRST SET OF DISCOVERY REQUESTS

TO:    Plaintiffs Point Bridge Capital, LLC and Hal Lambert, by and through their
attorney of record, Will Thompson, Esq., DLA Piper LLP, 1900 N. Pearl St., Dallas,
Texas 75201.

COMES NOW, Defendant Charles Johnson ("Defendant" or "Johnson"), and serve this his

Objections and Responses to Plaintiffs' First Set of Discovery Requests.

Respectfully submitted,

By: /s/ W. Carter Boisvert
    Lawrence J. Friedman
    State Bar No. 07469300
    lfriedman@fflawoffice.com
    W. Carter Boisvert
    State Bar No. 24045519
    cboisvert@fflawoffice.com

FRIEDMAN & FEIGER, L.L.P.
Dominion Plaza
17304 Preston Road, Suite 300
Dallas, Texas 75252
(972) 788-1400 (Telephone)
(972) 788-2667 (Telecopier)

ATTORNEY FOR DEFENDANT
CHARLES JOHNSON

<u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that a true and correct copy of the foregoing was served on all counsel of record on this the 11th day of March 2025, in accordance with the Federal Rules of Civil Procedure.

Will Thompson, Esq.
DLP Piper LLP
1900 N. Pearl St.
Dallas, Texas 75201
Telephone: (406) 546-5587
will.thompson1@us.dlapiper.com

                    /s/ W. Carter Boisvert
                    W. Carter Boisvert

I.
## OBJECTIONS AND RESPONSES TO REQUESTS FOR PRODUCTION

REQUEST FOR PRODUCTION NO. 1:  All Documents and Communication[1] concerning or referencing Hal Lambert.

RESPONSE:

Defendant objects to this Request as being overly broad, vague, unduly burdensome, and not being reasonably particular. The use of the word "concerning" renders the request vague and ambiguous. Defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 2:  All Documents and Communications concerning or referencing Point Bridge.

RESPONSE:

Defendant objects to this Request as being overly broad, vague, unduly burdensome, and not being reasonably particular. The use of the word "concerning" renders the request vague and ambiguous. Defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL

---

[1] For all Requests, Plaintiffs underscore the importance of Defendant fully considering and complying with the definition of "Communications" in the Definitions section above. To repeat, among other things, Documents and Communications would include direct messages on X/Twitter and screenshots of Signal Messages, irrespective of whether those messages were subsequently deleted on the messaging platform.

17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 3:    All Documents and Communications You sent to, or received from, Clearview AI, Inc., which includes Clearview AI's officers, directors, employees, staff members, agents, or other representatives.

RESPONSE:

Defendant objects to this Request as being overly broad, unduly burdensome, and not being reasonably particular. The defendant cannot reasonably identify all documents that would be responsive to such a request.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 4:    All Documents and Communications concerning or referencing Umbra Space or Umbra Labs.

RESPONSE:

Defendant objects to the Request because it is too global, general, and does not adequately describe which information is requested or sought with reasonable particularity. Objection is made to the extent that it is overly broad and seeks discovery of matters, things, or information that are not relevant or material to the subject matter in the pending action, and to the extent that the discovery sought is not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to this Request as being overly broad, unduly burdensome, and not being reasonably particular. The use of the word "concerning" renders the request vague and ambiguous. The Defendant cannot reasonably identify all documents that would be responsive to such a request. Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023

WL 9186710 (5ᵗʰ Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 5</u>:   All Documents and Communications You sent to, or received from, Umbra Space or Umbra Labs, which includes Umbra Space's or Umbra Labs' employees, staff members, agents, or other representatives. This request does not seek communications sent to or sent by Umbra's board of directors.

<u>RESPONSE</u>:

    Defendant objects to the Request because it is too global, general, and does not adequately describe which information is requested or sought with reasonable particularity. Objection is made to the Request to the extent that it is overly broad and seeks discovery of matters, things, or information that are not relevant or material to the subject matter in the pending action, and to the extent that the discovery sought is not reasonably calculated to lead to the discovery of admissible evidence.

    Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer <u>or</u> object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5ᵗʰ Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 6</u>:   All social media posts, including posts on X or Twitter, concerning or referencing Hal Lambert.

<u>RESPONSE</u>:

    Defendant objects to this Request to the extent that Plaintiffs have equal access to this information, this information is a matter of public record and is available from a less intrusive source.

    Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Defendant as to Plaintiffs, and therefore Plaintiffs can obtain this information from a less burdensome source.

    Defendant objects to this Request as being overly broad, unduly burdensome, and not being reasonably particular. The defendant cannot reasonably identify all documents that would be responsive to such a request. The use of the word "concerning" renders the request vague and ambiguous.

    Defendant stands on these objections without further answering "subject to and without

waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 7:  All social media posts, including posts on X or Twitter, concerning or referencing this lawsuit.

RESPONSE:

       Defendant objects to this Request to the extent that Plaintiffs have equal access to this information, this information is a matter of public record and is available from a less intrusive source.

       Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Defendant as to Plaintiffs, and therefore Plaintiffs can obtain this information from a less burdensome source.

       Defendant objects to this Request as being overly broad, unduly burdensome, and not being reasonably particular. The defendant cannot reasonably identify all documents that would be responsive to such a request. The use of the word "concerning" renders the request vague and ambiguous.

       Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 8:   All Documents and Communications evidencing that the United States government, foreign government, government agency, or government agent supported Your lawsuit(s) against ClearView AI or Hal Lambert.

RESPONSE:

       Defendant objects to the Request because it is too global, general, and does not adequately describe which information is requested or sought with reasonable particularity. Objection is made to the Request to the extent that it is overly broad and seeks discovery of matters, things, or information that are not relevant or material to the subject matter in the pending action, and to the

extent that the discovery sought is not reasonably calculated to lead to the discovery of admissible evidence. The use of the word "evidencing" renders the request vague and ambiguous.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to this request to the extent that it is overly broad and constitutes an impermissible fishing expedition.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 9</u>:   All Documents and Communications evidencing that a person or entity other than Yourself supported Your lawsuit(s) against ClearView AI or Hal Lambert.

<u>RESPONSE</u>:

Defendant objects to the Request because it is too global, general, and does not adequately describe which information is requested or sought with reasonable particularity. Objection is made to the Request to the extent that it is overly broad and seeks discovery of matters, things, or information that are not relevant or material to the subject matter in the pending action, and to the extent that the discovery sought is not reasonably calculated to lead to the discovery of admissible evidence. The use of the word "evidencing" renders the request vague and ambiguous. Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL

17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 9:   All Documents and Communications evidencing that a person or entity other than Yourself supported Your lawsuit(s) against ClearView AI or Hal Lambert.

RESPONSE:

Defendant objects to the Request because it is too global, general, and does not adequately describe which information is requested or sought with reasonable particularity. Objection is made to the Request to the extent that it is overly broad and seeks discovery of matters, things, or information that are not relevant or material to the subject matter in the pending action, and to the extent that the discovery sought is not reasonably calculated to lead to the discovery of admissible evidence.  The use of the word "evidencing" renders the request vague and ambiguous.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant further objects to this request to the extent Plaintiff has equal access to the information sought and is as readily available to Plaintiff as to Defendant, and therefore Plaintiff can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object."  Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 10: All Your Communications with Gator Greenwill.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objection is made to the Request because it is too global, general, and does not adequately describe which information is requested or sought with reasonable particularity. Objection is made to the Request to the extent that it is overly broad and seeks discovery of matters, things, or information that are not relevant or material to the subject matter in the pending action, and to the extent that the discovery sought is not reasonably calculated to lead to the discovery of

admissible evidence. Defendant objects to this request to the extent that it is overly broad and is a mere fishing expedition.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 11: All Documents and Communications concerning any business relationship, formal or informal, with Gator Greenwill.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objection is made to the Request because it is too global, general, and does not adequately describe which information is requested or sought with reasonable particularity. Objection is made to the Request to the extent that it is overly broad and seeks discovery of matters, things, or information that are not relevant or material to the subject matter in the pending action, and to the extent that the discovery sought is not reasonably calculated to lead to the discovery of admissible evidence. The use of the word "concerning" renders the request vague and ambiguous. Defendant objects to this request to the extent that it is overly broad and is a mere fishing expedition.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 12: All Documents and Communications concerning Metis Funding LLC, including any equity, investment, or ownership You have in Metis Funding LLC.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request to the extent that it is overly broad and is a mere fishing expedition.

Defendant objects to this Request as overly broad and harassing as it is not sufficiently tailored in scope to the parties' asserted claims or defenses. Defendant further objects to this Request as overly broad and unduly burdensome, as it requires Defendant to search through all of his records to determine if any electronically-stored information or physical documents is responsive. Defendant further objects that the use of the word "concerning" renders the request vague and ambiguous.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 13</u>: All Documents and Communications evidencing any income, compensation, or benefit You derived from Metis Funding LLC and the source of such funding.

<u>RESPONSE</u>:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request to the extent that it is overly broad and is a mere fishing expedition.

Defendant objects to this Request as overly broad and harassing as it is not sufficiently tailored in scope to the parties' asserted claims or defenses. Defendant further objects to this Request as overly broad and unduly burdensome, as it requires Defendant to search through all of his records to determine if any electronically-stored information or physical documents is responsive. Defendant further objects that the use of the word "evidencing" renders the request vague and ambiguous.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023

WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 14: All Documents and Communications concerning O15 Capital Partners.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request to the extent that it is overly broad and is a mere fishing expedition.

Defendant objects to this Request as overly broad and harassing as it is not sufficiently tailored in scope to the parties' asserted claims or defenses. Defendant further objects to this Request as overly broad and unduly burdensome, as it requires Defendant to search through all of his records to determine if any electronically-stored information or physical documents is responsive. Defendant further objects that the use of the word "concerning" renders the request vague and ambiguous.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 15: All Documents and Communications showing Your relationship with O15 Capital Partners, including income that You derive or have derived from O15 Capital Partners and the source of such funding.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request to the extent that it is overly broad and is a mere fishing expedition.

Defendant objects to this Request as overly broad and harassing as it is not sufficiently tailored in scope to the parties' asserted claims or defenses. Defendant further objects to this Request as overly broad and unduly burdensome, as it requires Defendant to search through all of

his records to determine if any electronically-stored information or physical documents is responsive.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 16: All Documents and Communications between You and Terry Dunmire.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request to the extent that it is overly broad and is a mere fishing expedition.

Defendant objects to this Request as overly broad and harassing as it is not sufficiently tailored in scope to the parties' asserted claims or defenses. Defendant further objects to this Request as overly broad and unduly burdensome, as it requires Defendant to search through all of his records to determine if any electronically-stored information or physical documents is responsive.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 17: All Documents and Communications concerning any business relationship, formal or informal, You have with Terry Dunmire.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request to the extent that it is overly broad and is a mere fishing expedition.

Defendant objects to this Request as overly broad and harassing as it is not sufficiently tailored in scope to the parties' asserted claims or defenses. Defendant further objects to this Request as overly broad and unduly burdensome, as it requires Defendant to search through all of his records to determine if any electronically-stored information or physical documents is responsive.  Defendant further objects that the use of the word "concerning" renders the request vague and ambiguous.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 18: All Documents and Communications evidencing that Hal Lambert has ties, is affiliated with, or is "very close" to Russians, or any person or entity acting on behalf of the Russian government or Russian nationals.

RESPONSE:

Defendant objects to this Request as being overly broad, unduly burdensome, and not being reasonably particular. The defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information. Defendant further objects that the use of the word "evidencing" renders the request vague and ambiguous.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object."  Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex.

2014) (cases collected).

REQUEST FOR PRODUCTION NO. 19: All Documents and Communications supporting Your assertion that investors in Umbra Space, Umbra Labs, or any predecessor companies, were running a "mob bank."

RESPONSE:

Defendant objects to this Request as being overly broad, unduly burdensome, and not being reasonably particular. The defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant further objects to this request to the extent Defendant has equal access to the information sought and is as readily available to Defendant as to Plantiff's, and therefore Defendant can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 20: All Documents and Communications supporting Your assertion that Hal Lambert engaged in any sexual misconduct, assault, or impropriety, including the allegations and assertions in paragraphs 203 and 207 of Plaintiffs' Second Amended Complaint.

RESPONSE:

Defendant objects to this Request to the extent that Plaintiffs have equal access to this information, this information is a matter of public record, and is available from a less intrusive source.

Defendant objects to this Request as having lack of possession or control. The defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 21: All Documents and Communications supporting Your assertion that Hal Lambert is a "front" for Russian activity and "compromised cash."

RESPONSE:

Defendant objects to this Request to the extent that Plaintiff has equal access to this information, this information is a matter of public record, and is available from a less intrusive source.

Defendant objects to this Request as having lack of possession or control. The defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 22: All Documents and Communications supporting Your assertion that Hal Lambert is "the kind of dirty player in Fort Worth, maybe a front for the cartels."

RESPONSE:

Defendant objects to this Request to the extent that Plaintiff has equal access to this information, this information is a matter of public record, and is available from a less intrusive source.

Defendant objects to this Request as having lack of possession or control. The defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 23: All Documents and Communications supporting Your assertion, "I knew that Lambert had a lot of connections with naughty players, like from foreign governments and whatnot."

RESPONSE:

Defendant objects to this Request to the extent that Plaintiff has equal access to this information, this information is a matter of public record, and is available from a less intrusive source.

Defendant objects to this Request as having lack of possession or control. The defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 24: All Documents and Communications supporting Your assertion that Hal Lambert "is very much tied in with the Russian world, particularly in the Russian and the COVID world, particularly operating in Texas."

RESPONSE:

Defendant objects to this Request to the extent that Plaintiff has equal access to this information, this information is a matter of public record, and is available from a less intrusive source.

Defendant objects to this Request as having lack of possession or control. The defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 25: Documents sufficient to show whether You ever served as a confidential human source, agent, or acted on behalf of any government agency, whether foreign or domestic.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither

relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this Request as having lack of possession or control. The defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 26</u>  All Documents and Communications between You and any member of the Federal Bureau of Investigation.

<u>RESPONSE</u>:

Defendant objects to this request to the extent it is duplicative of other discovery requests, and is therefore harassing.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request as overly broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to the extent this request calls for the production of documents subject to legislative privilege and deliberative process privilege. Defendant also objects to the extent that this request calls for the production of documents subject to the attorney-client privilege or the attorney work-product doctrine. Defendant objects to this request to the extent that it seeks documents and information protected from disclosure by Texas Government Code § 323.017 and/or the United States government under 18 U.S. Code § 1905. Defendant objects to this request to the extent that it calls for the production of documents within the control of third parties, including independent officers of the United States government, whose documents are not within Defendant's possession, custody, or control.

Furthermore, both Federal and State courts have recognized a constitutional "right of

privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome. Finally, records contained in the personnel files may be protected by statute. Other privileges may apply depending on the type of documents this request encompasses.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 27: All Documents and Communications between You and any person affiliated with the Federal Bureau of Investigation, whether another agent, confidential human source, or anyone purporting to be affiliated with the Federal Bureau of Investigation.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests, and is therefore harassing.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request as overly broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to the extent this request calls for the production of documents subject to legislative privilege and deliberative process privilege. Defendant also objects to the extent that this request calls for the production of documents subject to the attorney-client privilege or the attorney work-product doctrine. Defendant objects to this request to the extent that it seeks documents and information protected from disclosure by Texas Government Code § 323.017 and/or the United States government under 18 U.S. Code § 1905. Defendant objects to this request to the extent that it calls for the production of documents within the control of third parties, including independent officers of the United States government, whose documents are not within Defendant's possession, custody, or control.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome. Finally, records contained in the personnel files may be protected by statute. Other privileges may apply depending on the type of documents this request encompasses.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." *Superior Sales W., Inc. v. Gonzalez*, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); *see also Ferguson v. Sw. Reg'l PCR, LLC*, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); *Marquez v. TE Connectivity Corp.*, No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); *Heller v. City of Dall.*, 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 28: All Documents and Communications between You and any member of the Central Intelligence Agency.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests, and is therefore harassing.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request as overly broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to the extent this request calls for the production of documents subject to legislative privilege and deliberative process privilege. Defendant also objects to the extent that this request calls for the production of documents subject to the attorney-client privilege or the attorney work-product doctrine. Defendant objects to the extent that this request seeks documents and information protected from disclosure by Texas Government Code § 323.017 and/or the United States government under 18 U.S. Code § 1905. Defendant objects to this request to the extent that it calls for the production of documents within the control of third parties, including independent officers of the United States government, whose documents are not within Defendant's possession, custody, or control.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome. Finally, records contained in the personnel files may be protected by statute. Other privileges may apply depending on the type of documents this request encompasses.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." *Superior Sales W., Inc. v. Gonzalez*, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); *see also Ferguson v. Sw. Reg'l PCR, LLC*, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); *Marquez v. TE Connectivity Corp.*, No. EP-19-CV-341-KC, 2022 WL

17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 29: All Documents and Communications between You and any person affiliated with the Central Intelligence Agency, whether as confidential human source, agent, or anyone purporting to be affiliated with the Central Intelligence Agency.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests, and is therefore harassing.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request as overly broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to the extent this request calls for the production of documents subject to legislative privilege and deliberative process privilege. Defendant also objects to the extent that this request calls for the production of documents subject to the attorney-client privilege or the attorney work-product doctrine. Defendant objects to this request to the extent that it seeks documents and information protected from disclosure by Texas Government Code § 323.017 and/or the United States government under 18 U.S. Code § 1905. Defendant objects to this request to the extent that it calls for the production of documents within the control of third parties, including independent officers of the United States government, whose documents are not within Defendant's possession, custody, or control.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome. Finally, records contained in the personnel files may be protected by statute. Other privileges may apply depending on the type of documents this request encompasses.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 30: All Documents and Communications between You and

any member of the Department of Homeland Security.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests, and is therefore harassing.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request as overly broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to the extent this request calls for the production of documents subject to legislative privilege and deliberative process privilege. Defendant also objects to the extent that this request calls for the production of documents subject to the attorney-client privilege or the attorney work-product doctrine. Defendant objects to this request to the extent that it seeks documents and information protected from disclosure by Texas Government Code § 323.017 and/or the United States government under 18 U.S. Code § 1905. Defendant objects to this request to the extent that it calls for the production of documents within the control of third parties, including independent officers of the United States government, whose documents are not within Defendant's possession, custody, or control.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome. Finally, records contained in the personnel files may be protected by statute. Other privileges may apply depending on the type of documents this request encompasses.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 31: All Documents and Communications between You and any person affiliated with the Department of Homeland Security, whether a confidential human source, agent, or anyone purporting to be affiliated with the Department of Homeland Security.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests,

and is therefore harassing.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request as overly broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to the extent this request calls for the production of documents subject to legislative privilege and deliberative process privilege. Defendant also objects to the extent that this request calls for the production of documents subject to the attorney-client privilege or the attorney work-product doctrine. Defendant objects to this request to the extent that it seeks documents and information protected from disclosure by Texas Government Code § 323.017 and/or the United States government under 18 U.S. Code § 1905. Defendant objects to this request to the extent that it calls for the production of documents within the control of third parties, including independent officers of the United States government, whose documents are not within Defendant's possession, custody, or control.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome. Finally, records contained in the personnel files may be protected by statute. Other privileges may apply depending on the type of documents this request encompasses.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 32: All Documents and Communications between You and any member of the Turkish government.

RESPONSE:
Defendant objects to this request to the extent it is duplicative of other discovery requests, and is therefore harassing.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request as overly broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to the

extent this request calls for the production of documents subject to legislative privilege and deliberative process privilege. Defendant also objects to the extent that this request calls for the production of documents subject to the attorney-client privilege or the attorney work-product doctrine. Defendant objects to this request to the extent that it seeks documents and information protected from disclosure by Texas Government Code § 323.017 and/or the United States government under 18 U.S. Code § 1905. Defendant objects to this request to the extent that it calls for the production of documents within the control of third parties, including independent officers of the United States government, whose documents are not within Defendant's possession, custody, or control.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome. Finally, records contained in the personnel files may be protected by statute. Other privileges may apply depending on the type of documents this request encompasses.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 33</u>: All Documents and Communications between You and any person affiliated with the Turkish government, whether an agent or anyone purporting to be affiliated with the Turkish government.

<u>RESPONSE</u>:

Defendant objects to this request to the extent it is duplicative of other discovery requests, and is therefore harassing.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Defendant objects to this request as overly broad, unduly burdensome, vague, and not reasonably calculated to lead to the discovery of admissible evidence. Defendant objects to the extent this request calls for the production of documents subject to legislative privilege and deliberative process privilege. Defendant also objects to the extent that this request calls for the production of documents subject to the attorney-client privilege or the attorney work-product doctrine. Defendant objects to this request to the extent that it seeks documents and information protected from disclosure by Texas Government Code § 323.017 and/or the United States

government under 18 U.S. Code § 1905. Defendant objects to this request to the extent that it calls for the production of documents within the control of third parties, including independent officers of the United States government, whose documents are not within Defendant's possession, custody, or control.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome. Finally, records contained in the personnel files may be protected by statute. Other privileges may apply depending on the type of documents this request encompasses.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 34: Documents or communications concerning the factual basis for Your December 2024 post on X, which stated: "I'm told that Elon Musk instructed John Quinn, who is a Mormon and a registered Huawei lobbyist through Quinn Emanuel, to sue me on behalf of Hal Lambert and the Chinese interests."

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests, and is therefore harassing.

Defendant further objects to this Request to the extent that Plaintiffs have equal access to this information, this information is a matter of public record, and is available from a less intrusive source.

Defendant also objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. Defendant further objects that the use of the word "concerning" renders the request vague and ambiguous.

Defendant objects to this Request as having lack of possession or control. The defendant cannot reasonably identify all documents that would be responsive to such a request. To the extent Plaintiffs seek information relating to communications with Defendant's attorney, Defendant objects on the basis of attorney-client privilege, work-product doctrine, or other applicable protection against the disclosure of such privileged information.

Defendant further objects to this request to the extent Plaintiffs have equal access to the information sought and is as readily available to Plaintiffs as to Defendant, and therefore Plaintiffs can obtain this information from a less burdensome source.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 35: All leases, rental agreements, or mortgages in effect after 2021 showing that you resided in a state other than Texas.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome.

Defendants further object because this request seeks documents that are confidential and that contain personal and private information of individuals who are not parties to this lawsuit. As such, this request invades their constitutional privacy rights.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 36: All leases, rental agreements, or mortgages in effect after 2021 for properties within the State of Texas.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither

relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome.

Defendants further object because this request seeks documents that are confidential and that contain personal and private information of individuals who are not parties to this lawsuit. As such, this request invades their constitutional privacy rights.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 37</u>: All Documents and Communications evidencing Your intent to indefinitely reside outside of the State of Texas. The time period for this request is 2021 to the present.

<u>RESPONSE</u>:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome.

Defendants further object because this request seeks documents that are confidential and that contain personal and private information of individuals who are not parties to this lawsuit. As such, this request invades their constitutional privacy rights.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex.

2014) (cases collected).

REQUEST FOR PRODUCTION NO. 38: Documents sufficient to show when You stopped residing in the State of Texas.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome.

Defendants further object because this request seeks documents that are confidential and that contain personal and private information of individuals who are not parties to this lawsuit. As such, this request invades their constitutional privacy rights.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 39: Documents sufficient to show when You became a citizen or a resident of a state other than Texas.

RESPONSE:

Defendant objects to this request on the basis that the information requested is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Furthermore, both Federal and State courts have recognized a constitutional "right of privacy" in a variety of situations in order to prevent the unlimited disclosure of personal information, including the unlimited disclosure of personnel records. Therefore, Defendant objects to this unlimited request as overbroad, harassing, and unduly burdensome.

Defendants further object because this request seeks documents that are confidential and that contain personal and private information of individuals who are not parties to this lawsuit. As such, this request invades their constitutional privacy rights.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 40: All Documents and Communications about Hal Lambert that You sent to, or received from, any journalist, correspondent, investigative journalist, columnist, editor, news writer, feature writer, broadcast journalist, photojournalist, content creator, podcaster, vlogger, social media journalist, citizen journalist, multimedia journalist, online contributor critic (e.g., political critic), opinion writer, editorialist, pundit, analyst (e.g., political analyst), news aggregator, stringer (freelance reporter), or documentary filmmaker.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 41: All Documents and Communications about Point Bridge that You sent to, or received from, any journalist, correspondent, investigative journalist, columnist, editor, news writer, feature writer, broadcast journalist, photojournalist, content creator, podcaster, vlogger, social media journalist, citizen journalist, multimedia journalist, online contributor critic (e.g., political critic), opinion writer, editorialist, pundit, analyst (e.g., political

Appx. 064

App.352

analyst), news aggregator, stringer (freelance reporter), or documentary filmmaker.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 42: All Documents and Communications about this lawsuit that You sent to, or received from, any journalist, correspondent, investigative journalist, columnist, editor, news writer, feature writer, broadcast journalist, photojournalist, content creator, podcaster, vlogger, social media journalist, citizen journalist, multimedia journalist, online contributor critic (e.g., political critic), opinion writer, editorialist, pundit, analyst (e.g., political analyst), news aggregator, stringer (freelance reporter), or documentary filmmaker.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of

information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." *Superior Sales W., Inc. v. Gonzalez*, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); *see also Ferguson v. Sw. Reg'l PCR, LLC*, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); *Marquez v. TE Connectivity Corp.*, No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); *Heller v. City of Dall.*, 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 43</u>: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Kristin Grind</u>.

<u>RESPONSE</u>:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." *Superior Sales W., Inc. v. Gonzalez*, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); *see also Ferguson v. Sw. Reg'l PCR, LLC*, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); *Marquez v. TE Connectivity Corp.*, No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); *Heller v. City of Dall.*, 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 44</u>: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Keach Hagey</u>.

<u>RESPONSE</u>:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." *Superior Sales W., Inc. v. Gonzalez*, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); *see also Ferguson v. Sw. Reg'l PCR, LLC*, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); *Marquez v. TE Connectivity Corp.*, No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); *Heller v. City of Dall.*, 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 45: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Joseph Bernstein or Joe Bernstein.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." *Superior Sales W., Inc. v. Gonzalez*, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added);

see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 46: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Ryan Mac.

RESPONSE:

    Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

    Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

    Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

    Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

    Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 47: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Mattathias Schwartz.

RESPONSE:

    Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

    Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

<u>REQUEST FOR PRODUCTION NO. 48</u>: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, <u>Isaac Stanley-Becker</u>.

<u>RESPONSE</u>:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 49: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Beth Reinhard.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 50: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Rob Copeland.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to

the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 51: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Kashmir Hill or (Kash Hill).

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

REQUEST FOR PRODUCTION NO. 52: All Documents and Communications about this lawsuit, Point Bridge, Hal Lambert, or Your work (real or not) on behalf of any domestic or foreign government or government agency sent to, or received from, Jessica Le Masurier.

RESPONSE:

Defendant objects to this request to the extent it is duplicative of other discovery requests and is therefore harassing.

Defendant objects to this request on the grounds that it is overly broad does not seek specific requests for documents.

Defendant objects to this request to the extent that it is not calculated to lead to the discovery of admissible evidence, is overly broad, and is a mere fishing expedition.

Defendant objects that this request seeks inspection of communications and production of information which is neither relevant to any claim or defense nor reasonably calculated to lead to the discovery of admissible evidence and thus falls outside the scope of permissible discovery.

Defendant stands on these objections without further answering "subject to and without waiving the above objections" because "responding parties must either answer or object." Superior Sales W., Inc. v. Gonzalez, 335 F.R.D. 98, 103 (W.D. Tex. 2020) (Cardone, J.) (emphasis added); see also Ferguson v. Sw. Reg'l PCR, LLC, No. 5:22-CV-182-H, 2023 WL 4938091, at *5 (N.D. Tex. June 22, 2023); Marquez v. TE Connectivity Corp., No. EP-19-CV-341-KC, 2022 WL 17494655, at *6 n.1 (W.D. Tex. Dec. 7, 2022) (Cardone, J.), appeal dismissed, No. 23-50023, 2023 WL 9186710 (5th Cir. Sept. 12, 2023); Heller v. City of Dall., 303 F.R.D. 466, 485-88 (N.D. Tex. 2014) (cases collected).

#1115090

# Exhibit E

# "Last Gasp of A Criminal Syndicate" : Why I Welcome The Lawfare Attacks Against Me

4D 8;  Å?8;Å; :  8L H>;  -GF7;Å?$879@;:  :;<7B7H?DC GEI7:  ?G 7C >DCDF ?C



CHARLES JOHNSON
OCT 17, 2024

♡ 24        💬        ⟲ 4                                                    Sha





Sergio Gor (left) works closely with Israeli-American Ike Perlmutter. Here he is pictured with Hal Lambert (right).

I have been asked about this lawsuit quite a bit lately so I thought I'd just address it here.

Not only am I not worried about the suit but everything is working according to plan

I welcome the opportunity to hold accountable a foreign-backed, foreign-funded criminal defamation ring which has targeted me in a frivolous lawsuit led by a fraudulent Texas businessman with whom I used to associate.

Appx. 076

I had hoped that Mr. Hal Lambert would be a dutiful collector of checks from the Republican Party — he is a bundler for the Republican cause — but greed and his complicated personal life have made him vulnerable to even more bad behavior than his typical drunken lecherous shenanigans.

Fortunately I have amassed quite a lot of evidence of Lambert's involvement with hostile foreign intelligence— it is a" er all why we stopped working together — and I'll be putting a lot of thatout soon enough, likely through the courts or in the med or both.

In a way I almost feel bad for Hal Lambert who suddenly has the funding to hire wh shoe law rms. From my sourcesin the American and foreign intelligence services understand that the criminal network behind Elon Musk is fronting the cost. These are the last gasps of a discredited, weakened oligarchy and Lambert is, as always, th help.

### I kept everything, I recorded everything and so I fear nothing.

Interestingly I introduced Lambert to Steve Oskoui and Luke Nosek who run the foreign-backed GigaFund which is a major investor inElon Musk's projects, notabl SpaceX where Nosek is on the board. GigaFund is deeplytied into the unfolding Ti Ballard and Angel Studios scandal in Utah.

They'll be time enough to tuck into thelawfare against me in ner detail but be advised this is a ght I wanted and this'll be a ght I will win. In fact you could eve ar gue that I asked for it.

# Oftentimes the work I do comes at great personal sacrific but I'm really going to enjoy this and I hope you enjoy it with me, dear reader, because while it may be masterpiec it'll be among best work.

"Last Gasp of A Criminal Syndicate" : Why I Welcome The Lawfare Attacks Against Me

If you absolutely must know everything I'd recommend having a look at Eric Garlar twitter thread on the subject. It's exhaustive and rather funny.

First some quick details:

I learned of the lawsuit from Maxwell Tani who emailed me when I was enroute fro New York to Washington D.C. Tani has a history of being sued for defamation and I is not exactly someone you might call a journalist — more a hatchet man. Fair enou fair enough.

Anyways Tani works for Semafor, a disinformation website _nanced by FTX's convicted felon boss, Sam Bankman Fried, and several Chinese oligarchs.

Semafor is edited by Ben Smith, who, in a previous incarnation, edited BuzzFeed. Smith published Russian-Israeli backed billionaire Paul Singer's Steele Dossier.

Why yes, that's the same Paul Singer who is credibly accused of criminal behavior i Argentina and of bribing federal judges in America to help with that illegal activity Singer is also a chairman of the Manhattan Institute where my facial recognition Clearview.AI cofounders Hoan Ton-That and Richard Schwartz lied about having n one another. Lambert is on the board of Clearview.AI.

For our purposes Ben Smith has been investigated by the British media authorities running a disinformation operation. Rather hilariously Smith was once part of a gro of pro-Israeli "reporters" who would spin the media. In a way not much has change since we met one another in the o# ces of Seth Lipsky of the New York Sun way ba in 2008. The New York Sun, of course, went bankrupt a" er several of its funders were credibly accused of working for organized crime and foreign intelligence. I'm told Smith's father is a judge with a tarnished reputation so perhaps it runs in the family

Now I sued Hu# ngton Post and BuzzFeed, which gi" ed itself to Hu# ngton Post f dollar, for defamation. As I did with Gawker before it I caused the entities' bankrup before Smith decamped to start Semafor, $ush with Chinese funds.

Semafor also works closely with Chinese interests in Africa, particularly in rare ear
space which is aligned with Elon Musk and where I also have interests which are
aligned with the U.S. State Department.

Again, I have no objection per se to the Chinese involvement anywhere but they ne
to not use child slaves or pay bribes in violation of the Foreign Corrupt Practices A
Like most Americans I look favorably upon a world where America and China coul
work together on the big issues of our day, notably climate change.

Curiously Semafor used a photo of me from more than ten years ago when I spoke a
the Heritage Foundation in 2014 about busting frauds within the Republican Party.
Not that I much minded the $attering photo — oh to be 25 again — but I am totally
opposed to the Heritage Foundation and have been so for over a decade. I suspect I
being linked to the Heritage Foundation to try to muddy the waters and suggest tha
support Project 2025 or some other nonsense. I categorically don't.

Why doesn't Semafor mention that Hal Lambert is the founder of the MAGA ETF?
that Lambert is a bundler for Republican causes? Somehow I'm the right winger
despite being a con rmed Kamala Harris supporter. Oh dear, oh dear.

The truth is that I support law enforcement, Mr. Lambert is a frequent target of law
enforcement and I look forward to my total vindication though I suspect none of th
will ever get to trial.



GOP megadonor Hal Lambert explains why he's backing Florida Gov. Ron DeSar

A few legal asides:

Though I have not been served by any lawsuit I will not dodge process service. Hal Lambert did dodge process service [when I sued him](#) earlier this year but I find that conduct unbecoming.

I will retain counsel later today or tomorrow. Most likely it'll be Bernie Kleinman who is representing me in the Clearview.AI lawsuit.

This lawsuit was designed to blunt me and my network's rise as the preeminent investors in latest generation technology. It will be unsuccessful.

I'm unaware how a 30-something attorney with a work history in natural gas and Major League Baseball (really) —Go Dodgers! — has anything to say about the work have done, do do, and will continue to do for America.

My attorney Mr. Kleinman holds a TSCI and well acquainted with my work. Now I suspect that this is an attempt to suss out the full nature of my work. That attempt not be successful.

But then I realize that Quinn Emmanuel and the attorneys who   led this suit are registered foreign agents. Moreover this is the law   rm behind Elon Musk, Robert Kra" for his Florida massage parlor case, and Kanye West. Oh dear.

We will, of course, be exposing Musk (and Quinn Emmanuel) attorney Alex Spiro w I have had this displeasure of dealing with a few years ago when I encouraged Musl sue Ryan Mac and BuzzFeed. I have all the emails as well as the record phone call.

Naturally Jared Birchall, Musk's Mormon   xer who I introduced to the FBI and to c Hal Lambert, will also be brought into this lawsuit, especially his rather close relationship with transnational organized crime and the cartels.

Spiro is currently representing agents of the Netanyahu government against the government of Iran for ostensibly being involved in the October 7th attacks.

The photos of Musk with the crime minister of Israel — Benjamin Netanyahu — speak for themselves. Netanyahu has called the foreign-born Musk the "uno# cial president of the United States" and here, I, a son of the American Revolution on bo sides must stand up and call foul.

4/25/25, 7:02 PM                    "Last Gasp of A Criminal Syndicate" : Why I Welcome The Lawfare Attacks Against Me



Elon Musk and Benjamin Netanyahu speaking during a discussion broadcast on X,
formerly known as Twitter, on 18 September, 2023

Here's how the press recounted one of their meetings last year.

> Israel Prime Minister Benjamin Netanyahu has sought Elon Musk's guidance on
> the existential threat posed by arti_cial intelligence, hinting that the tech
> billionaire is more powerful than the US president.
>
> "I said to my wife Sara, 'this guy really knows what he's talking about', I said 'he'
> the Edison of our time'," Prime Minister Netanyahu said during a discussion with
> Mr Musk on X, formerly known as Twitter, on Monday.
>
> "You can't be president of the US last time I checked, but assume you are."

> The tech billionaire, who is currently the world's richest person, interjected: "No
> o# cially."
>
> President Netanyahu responded: "Not o# cially. OK, so you're the uno# cial
> president."

I want to be very clear that I do not hold the Israeli people or even the Israeli Defen
Forces responsible for the conduct of their criminal prime minister or his son or ev
his associates but it's getting late in the day and the eyes of the world are upon the
Israeli people.

My view on these matters is a bit more Lincolnian — "With malice toward none an
charity for all" — than the Confederate and Texas secessionist supporters who are
attacking me but please don't try my patience. I don't want to have to summon my
inner Ulysses S. Grant or Tecumseh Sherman.

Should any responsible journalist or investor or friend read this and want to reach o
to discuss further I'm available.

A democracy needs a free press, not a mob digital rag. We need courts that are fair,
compromised, and we need tech investors who serve the country rather than
themselves.

I'm happy to do my part and encourage others to do theirs — just as my family on b
sides has done before me.

It is a great gi" to continue the family service. I know where it ends and what it tak





My grandparents Marian Carlisle and Dwight Lyman Johnson at Arlington National Cemetery.

---

## Subscribe to Charles Johnson's Thoughts and Adventures

/7I C9>; : ) L; 7FG 7=

* <; K H>DI =>HG >; F; 7C: H>;

| Type your email... | Subscribe |

+L GI 8G9F?8?C=- 7=F; ; HD 3I 8GH79@ 4: FBG D< 5G# 7C: 79@CDK#; : =
?HG -C<DFB7H?DC_, DM: 9H?DC ODH?9 7C: 1F?J79L_1D#?9L.

---

 ' ( /?@: ( ( 2 GH79@G

## Discussion about this post

| Comments    Restacks |

 6F?H; 7 9DBB: CH#

---

# Exhibit F

From: <WPa[Tb B^W]b^]  charles@traitwell.com /
Date: :dVdbc /& , *, + Pc O4-+4 HE  <=k
To: @P[ DP\QTac  hal.a.lambert@gmail.com /
Subject: Fwd: Re: Ready to play in the majors yet?
Reply-To: <WPa[Tb B^W]b^]  charles@traitwell.com /

JT]c &a^\  Ha^c^] EPX[ &^a )C

'''''''''' >^af PaSTS  \TbbPVT '''''''''
>a^\4 <WPa[Tb B^W]b^] charles@traitwell.com /
=PcT4 G] KWd& dV /& , *, + Pc +,4-O }
JdQ(fTR&4 >fS4 } T4 } TPSg c^  _[Pg X] dWT  \P(^ab
K^4 hoan@clearview.ai  : hoan@clearview.ai /  richard@clearview.ai  : richard@clearview.ai /
<R4
NP&RW W^f  >PRTQ^^Z R^]d(]dTb c^  VTc &dRZTS(S KWXT[

: ]S  EdbZ(: ]S  ?PcTb

: ]S  gTc: \Ph^]  R^]d(]dTb c^  S^  f]

NT%aS  WdW&

JT]c &a^\  Ha^c^] EPX[ &^a )C

G] KWd& dV /& , *, + Pc +,4-.  HE& <WPa[Tb B^W]b^]b charles@traitwell.com7  fa^cT

@Tg @^P] P]S } XRWPa

: aT g^d  f&([X]V c^  [&bcT]  ]^f8 Ga fT V^%X]V c^  S^  \^aT S)

Ga PaT  fT b^[([ V^%X]V f&cW dWT bca^ZT @^^ TV^  bcaPcTVg8 <^]&(UTa T]RTb S^  ]
Rdbc^^\ Tab  \PZT d& dVW VaP]c @^^P] [^^Zb V^^S fWT] } WT V%eTb  _aTbb(d& @RP]
b&([ QT dWT \PbR^& @^^P](  F^Q^^Sg  ]TTSb c^  Z]]&(T RP] S^  %c HP[\\Ta DdR
bcg([T(

K^(\T &^%a b^^\T RWP]VTb Vdgbi  g^d RP]  _[Pg X] dWT  \P(^ab Qdc g^d V
g^dca WTPS X] dWT VP%T T P]S  \PgQT Qa&]V X] aT(X&  _(

Appx. 089

# Exhibit G

# How Joe Lonsdale Works For The Russians

8@9K <F 0FL <F N@=E 9 >IFEK <F=JE"K BEFN @="J 9 >



CHARLES JOHNSON

SEP 04, 2024

♡ 14          💬 2          ⟳ 5                                                Sha



Welcome to the @uaustinorg class of 2028. Governor Abbott gave a great short speech to our founding undergraduate class at the TX Capitol, before our convocation.

In the USA, when institutions are broken, we build anew. A historic day!





Joe Lonsdale (right) of Governor Abbott (in the wheel chair)

This predatory behavior of Joe Lonsdale — to launch the University of Austin, full tuition $58,000 and no accreditation — makes me think I should have done somethi sooner to expose this fraudster. Is this the new Trump U?

When I was younger I looked up to Joe Lonsdale in that way you foolishly do when you're young and you find a career on which you want to pattern your own life. How had he built his seemingly amazing empire? I made excuses for his rather unforgiva behavior — who sleeps with one of their undergrad students anyway? — and I rationalized his persecution as a "#MeToo" excess rather than telling of larger character defects. We developed if not a friendship than certainly a mutual respect. have certainly that view now.

To learn more I tracked down some of his investors. One of his earlier investors too me aside and told me what was going on. The hustle was explained to me. "When firms get to his size returns are irrelevant," my interlocutor said. It's "only about management fees and storytelling."

In other words, it's all a con. But whose? Who is he fronting for?

We got a sense of that [when news broke in Forbes](#) that sanctioned Russian oligarch Petr Aven's son Denis works for Joe Lonsdale.

The younger Aven's status, I think, covers a more interesting reality: that Lonsdale works for the Russians and Russian Jews who, having stolen money from Russia, deposited it first in the United Arab Emirates and now face increased global pressu

As with Pavel Durov and increasingly Elon Musk, it seems likely that there will be agreement between the various deep states — French, Russian, Emirati, and America — to rein in this sort of money laundering masquerading as technology. Already the have been inquiries into Lonsdale.

---

Charles Johnson's Thoughts and Adventures

---

The Joe Lonsdale Hustle Needs To Be Shut Down By The Feds

8@=E N= ; FEJA<=I K@= ; 9I==I F> 9CC=?=< M=EKLI= ; 9GAK9CCAJK 0F= 1FEJ<9C N=RI= C=>K NAK@ 9 CFK F> HL=JKAFEJQ

[ Read more ]

* DFEK@J 9?F S &) QAB=J S & ; FDD=EKS . @9IC=J 0F@EJFE

---

You watch Lonsdale be interviewed by Reason magazine.

How Joe Lonsdale Works For The Russians

> **Why this Palantir cofounder left California for Texas | Joe Lonsdale | The Reaso**
>
> 

At every turn Lonsdale champions Milton Friedman — who he cites as a major in!uence and whowound up being an advisor to Chilean dictator Augusto Pinoche

Of course this kindof free marketer, open borders liberalism leads ultimately to human tra%cking. A&er all, isn't that just the end point of open borders?

And no small wonder that Lonsdale was introduced to this pool of capital  rst by N Michelsen, the Lady Gaga business associate turned Rebekah Mercer consigliere turned coronavirus test fraudster turned human tra   cker—and Greg Abbott donor

If we know the Russians are weaponizing human tra%cking in Africa why not in th United States?

But I'm gettingahead of myself.

Who is Petr Aven? The Guardian  dd a write up in 2000 about how "Putin urged to apply the Pinochet stick."

How Joe Lonsdale Works For The Russians

Vladimir Putin should resort to totalitarian methods to push through radical economic reform and redeem his promise to make Russia great again, one of Russia's most successful bankers suggests.

Petr Aven, president of Alfa, Russia's biggest and most successful private bank, a a key business supporter of the newly elected president, said that Mr Putin shou model his regime on that of Augusto Pinochet of Chile, combining Reaganomics with dictatorial controls.

"The only way ahead is for fast liberal reforms, building public support for that p but also using totalitarian force to achieve that. Russia has no other choice," he s in a Guardian interview.

"I'm a supporter of Pinochet, not as a person but as a politician who produced results for his country. He was not corrupt. He supported his team of economists for 10 years. You need strength for that. I see that parallel here. There are similarities in the situation."

Mr Aven's advocacy of radical Thatcherism comes at the end of a decade of mass privatisation of Russian industry, a process which has been notoriously corrupt a has discredited the very notion of reform.

...'

Mr Aven is convinced that Mr Putin is the strong leader Russia needs, but is worried that his innate caution and his willingness to do deals with the commun will make him fudge and temporise.

"Nobody follows the law in this country," he said. "Pinochet tried to enforce obedience to the law and sometimes that's di%cult for a country. Sometimes you need to use force. The only role of the state is to use force when needed."

> Mr Aven, both of whose whose grandfathers died in Stalin's gulag, denied that h
> was urging a return to the repression of the Soviet era. But he said rampant
> criminality and corruption could not be tackled by applying the law.
>
> "You can't always   ght criminals by staying within the law. You can't always do
> peacefully."

That's right. Aven ran Putin's campaign in 2000 with the slogan Make Russia Great
Again.

Aven was totally wrong about how Pinochet operated, by the way. Pinochet had ple
of secret accounts around the world.

Lonsdale is currently backing Elon Musk's Super PAC for Donald Trump.



During the Cold War CIA agents communicated through their shoelaces.

Some months ago a Russian-compromised friend of mine asked me about Joe
Lonsdale. That was when I knew about Joe Lonsdale.

I had come to like this kind avuncular man from Northern Virginia. I relied upon h
for advice and I even gave him some money but before long our relationship took o
the character of that of teacher-student in The Good Shepherd (2006). Rough stu+.

Some times your teachers screw up and there's nothing you can do. Sometimes they
are a lesson in what not to do. I did all I could to help him and gave him many
opportunities to clean himself up. He chose against those options. Many such cases
"You were my teacher, you betrayed me."

To the extent I do the work I do it's because I want to save people. I
want to rescue them from the traps that we're laid for me—and for
them.

Of course there are quite a number of things that the Russian, American, and Chine
deep states can work together on. There are shared interests among the great powe
There always will be. I am for the comity between nations.

****

By now it should become clear that Joe Lonsdale is fucked. In this he isn't alone.

Indeed all of the people and all of the funds who backed Musk's 2022 takeover of
Twitter are going to have no choice but to turn Fed. I'm here to help them do that b
it has to happen soon and it's probably too late for a lot of them.

I have tried, in vain, to recruit Lonsdale over the years but I've come to believe that
part of the reason he was selected was because he was particularly dumb.



← **Post**

**Joe Lonsdale** ✔
@JTLonsdale

**Follow**  ···

Almost!

NPC fail. You misread the latest attack piece on me - my talented colleague we hired out of Stanford several years ago has a successful father in Russia, but they aren't our investor and our LPs have no tie to them.

Chinese mob cash is a new one lol. Weird ppl on here.

12:23 PM · 8/24/24 From Earth · **72** Views

**1** Like



**Arthur Bloom** @j_arthur_bloom · 33m  ···
You're as dumb as you look
arthuriana.substack.com/p/the-chinese-...

ıⅼⅼ 32

\*\*\*

I'm not a joiner. This you know. I do my own thing. For better and for worse.

It's sometimes useful to break apart what the fundamental hustle is.

Leonard Leo is [building a secret society of conservatives](#). Aron D'Souza, who helped on the Thiel-Hulk Hogan Gawker op, wants to cartelize the world's chiefs of sta+.

## Joe Lonsdale seeks to control the sons of powerful men. This isn't investing but politicking.

He's done it o&en — in America, in Russia, in China and Saudi Arabia and it's a ver e+ective shield. It likely stopped his brother from being further investigated by the FBI.

To be a super e+ective front you'd need the front not to know they were a front in the rst place. When they got pressure, they'd ght e+ectively and aggressively and ma even argue that they are the true Americans a&er all.

When you criticize Joe Lonsdale he wraps himself tightly in the ! ag. He's act indignant and he tried to get a head of the story.

I have a lot of text messages and email which show him in another light. Do we still have a journalistic elite in this country that will hold power to account?

Or do we have to rely on other countries — France, Denmark, Sweden — sending th journalists to do the jobs that Americans just won't do?

\*\*\*\*

Now here are the instructions for the Russian deep state. It is too dangerous to wor with you. Wish that it were another way.

4/25/25, 7:04 PM                                                How Joe Lonsdale Works For The Russians

Still you will search in vain for Russophobia or Sinophobia in my writings. There ar
great many problems America and these countries could work on were they incline
but I am frankly too terri ed to get too close.

Nevertheless a great country doesn't tolerate the looting of Russia in its name.

A magni cent country doesn't fund the drugging of other countries.

Once upon a time Russia created some of the best technology in the world.

"Never forget the sacri ce of the Russians to win the War," my CIA (and  Russiar
studying)  grandfatheronce told me. "Always show them respect."

I have kept to that.

We  could do great things together  —we could map the world, we could plumb the
genome, and we could  conquerthe stars.

But none of that will happen if the looting and polluting continues.

Let's clean up these ops together.

Get your house in order    rst

---

Subscribe to Charles Johnson's Thoughts and Adventures

19LE; @=<  )  0=9IJ 9?

,  >=N K@FL?@KJ @=I= 9E< K@=

| Type your email... | Subscribe |

–0 JL: J; IА: ЛE?Ḥ/ 9?I== KF 5L: JK9; B 6=IDJ F> 7JḴ 9E< 9;BEFNᶜ=<?
КJ /E>FID9КḴFE . Fᶜᶜᶜ=:КḴFE 2FҲḴ; 9E< 3IИ̶M9;:0 3Fᶜ:0.