instead. On the litigation front, his strategy, to the extent one exists, appears to be non-engagement at all costs.

Nor can Johnson excuse his conduct by pointing to financial hardship. The Court has ordered him to pay for the vendor, and that obligation stands. But none of the obligations Johnson has ignored require him to spend a single dollar. Plaintiffs have asked him only to answer emails, confirm where he is, and surrender his devices. These are basic, no-cost steps—well within the capacity of any litigant.

Finally, while Johnson has utterly refused to engage with Plaintiffs or comply with his discovery obligations, he has remained active in promoting his own narrative on social media. Johnson has continued to post publicly about this litigation—even after the most-recent hearing. On June 11, 2025, he shared an article describing him as a powerful, covert figure poised to win this case. Johnson accompanied the post with a sunglasses emoji—😎—signaling defiance and control. That same day, he responded to a tweet about the Court's June 5th Order warning of potential arrest with a cryptic, self-styled message of resistance: "How many things are not as people say they are." These are not the actions of a party confused about his obligations—they are the choices of someone deliberately ignoring the Court while performing victimhood and defiance for an online audience. Johnson isn't unable to comply. He's unwilling.

App.612

**DISCUSSION**

I.  <u>**Johnson's refusal to conduct discovery persists, even after two court orders and
    Plaintiffs' repeated outreach.**</u>

    A.  **The Court ordered Johnson to surrender his devices, search his accounts, and
    supplement his written discovery.**

The Court has twice made Johnson's discovery obligations unmistakably clear.

On May 8, 2025, the Court granted in part Plaintiffs' motion to compel and ordered
Johnson to produce documents from specific email accounts, messaging platforms, and social
media platforms. (*See* ECF No. 52). The Court required Johnson to re-activate his X account, run
agreed-upon search terms, and produce all responsive documents in usable format with metadata
intact. He was also ordered to supplement his written discovery responses and to pay the costs of
collection and production.

When Johnson failed to comply, the Court issued a second order on June 5, 2025. (ECF
No. 61). That order gave Johnson until Thursday, June 12, 2025, to surrender his devices and
accounts to a neutral vendor, ten days to supplement his written discovery responses, and warned
that failure to comply could result in his arrest for contempt.

One key deadline—Johnson's duty to "surrender" his devices—has come and gone without
Johnson making any attempt to comply.

    B.  **Plaintiffs' Repeated, Unanswered Efforts to Secure Johnson's Compliance**

What follows is a record of Plaintiffs' efforts—six separate emails over four days—to
secure even basic cooperation from Johnson, and his continued refusal to engage

    ➢ **June 9, 2025**
        ○ Plaintiffs remind Johnson of his discovery obligations by quoting from the
          Court's June 5th order.

        ○ Plaintiffs update Johnson on the vendor-selection process.

      o  Plaintiffs ask Johnson to identify where he will be located in order to facilitate the surrender of his devices.

      o  Plaintiffs invite Johnson to confer if he had "any questions about this process."

(Ex. A, June 9, 2025 Email from W. Thompson to C. Johnson, Appx. 005.)

*Johnson did not respond.*

➢ **June 10, 2025**
      o  Plaintiffs provide Johnson with the transcript of the June 5, 2025 hearing

(Ex. B, June 10, 2025 Email from W. Thompson to C. Johnson, Appx. 007.)

*Johnson did not respond*

➢ **June 10, 2025**
      o  Plaintiffs "update [Johnson] on the status of the proposed vendors for the device and account collection and subsequent production."

      o  Plaintiffs identify two potential vendors and provide Johnson with links to learn about the companies.

      o  Plaintiffs noted that if Johnson had "any proposed vendors, the plaintiffs would of course consider them in good faith."

      o  Plaintiffs offered to discuss any questions that Johnson had about the process.

(Ex. C, June 10, 2025 Email from W. Thompson to C. Johnson, Appx. 011).

*Johnson did not respond.*

➢ **June 11, 2025:**
      o  With the compliance deadline one day away, Plaintiffs followed up and again asked Johnson to identify his location:

            ■  "Where will you be tomorrow and Friday? I have previously asked you for your location, but you have not responded." (emphasis removed)

            ■  "The collection, and compliance with the Court's order, can't be accomplished if you will not identify where you are located in order to surrender your devices."

(Ex. D, June 11, 2025 Email from W. Thompson to C. Johnson, Appx. 014.)

*Johnson did not respond.*

➢ **June 11, 2025**
   o Plaintiffs sent a follow-up email identifying their preferred discovery vendor, requested his cooperation, and noted that his continued refusal to cooperate would necessitate the Plaintiffs seeking further relief from the Court:

   ▪ "Please confirm: Do you agree to have Innovative Driven serve as the neutral third-party vendor for purposes of effectuating the Court's June 5 Order?"

   ▪ "Additionally, I have repeatedly asked you to provide your current location . . . You have not responded."

   ▪ "You are under a court-ordered obligation to comply, and further delay or non-responsiveness will compel the plaintiffs to notify the court and request further relief. If you want to talk about this further, please propose a time and the specific points you want to address."

   (Ex. E, June 11, 2025 Email from W. Thompson to C. Johnson, Appx. 017.)

*Johnson did not respond.*

➢ **June 12, 2025**
   o On the final day for compliance, Plaintiffs sent a last follow-up and attached the Court's Order to Show Cause:

   ▪ "Again, where are you located in order to effectuate the surrender of your devices and account information?"

   ▪ "Are you going to respond in any way?"

   ▪ "There is a hearing next Wed. at 2pm—are you attending."

(Ex. F, June 12, 2025, Email from W. Thompson to C. Johnson, (numbering omitted), Appx. 020.)

*Johnson did not respond.*

## II.    <u>Johnson Refuses to Engage with Plaintiffs, But Continues to Engage Online</u>

While Johnson has ignored every effort by Plaintiffs to secure his compliance—or even a

basic discussion—he has remained active in discussing this litigation on social media, specifically

Substack.

App.615

On this past Wednesday, June 11, 2025—while he was ignoring Plaintiffs' communications—Johnson posted a Substack "note" containing only a sunglasses emoji ("😎")[1] and a link to a Substack article authored by an anonymous blogger, "Sammy Roosevelt."



---

[1] Dictionary.com, *Face With Sunglasses Emoji*, DICTIONARY.COM (June 28, 2021), https://www.dictionary.com/e/emoji/smiling-face-with-sunglasses-emoji/ The *Face With Sunglasses* emoji 😎 depicts a smiling face wearing sunglasses. It is commonly used to convey someone or something is cool, chill, easy-going, or carefree. It's also used to express appreciation or approval and to stand in for the sentiments of *OK* or *awesome*.") (emphasis in the original) (last visited June 13, 2025).

App.616

(Ex. G, Charles Johnson, Substack (June 11, 2025),
https://substack.com/@charlesjohnson/note/c-124886420, Appx. 024.)

Roosevelt's article directly referenced this case and portrayed Johnson as a covert

government actor with powerful connections:

> [T]o warn people, even Hal Lambert, not to underestimate him. Johnson is a fed,
> plain and simple, and one of the most crafty feds out there at that. He has a strange
> and powerful network around him, and while he may have paid his court costs with
> an American Express credit card at his last court hearing, it is likely that that is just
> another one of Chuck's tricks to appear weak when he really is strong. Unlike most
> people who have been covering this lawsuit, I am of the opinion that Lambert is
> chump change for Johnson, and that Johnson will win this lawsuit.

(Ex. H, Sammy Roosevelt, The Most Overlooked Fed in America, Substack (June 11,
2025), https://substack.com/home/post/p-165682285, Appx. 031.)

Later that same day, Johnson posted a screenshot on Substack of a tweet quoting directly

from the Court's June 5, 2025 Order, including the portion warning that he could be arrested for

contempt. Johnson commented on the post with his own cryptic response: "How many things are

not as people say they are."

7

App.617



(Ex. I, Charles Johnson, Substack Chat Post (June 11, 2025),
https://open.substack.com/chat/posts/5d9f0ee9-7300-4612-b2ba-
fcbf23805014?target_reply_id=daaaa744-6bcb-4367-9343-1e17b9d085ac&showTarget=true,
Appx. 035.)

    Johnson's continued social media activity is not just a distraction—it's part of a calculated

effort to cast himself as a victim of government overreach, rather than a litigant defying multiple

court orders. His recent posts follow comments in May where he publicly claimed it was "an honor

to pay sanctions for expressing my viewpoint," framing his defiance as a principled stand against

a corrupt system. But while Johnson works to cultivate that story for his followers, he is doing

nothing to meet his actual obligations in this litigation. He has made no attempt to comply with

the Court's orders, even though doing so would cost him nothing more than a few minutes (or

hours at most) of effort. What he is not doing—deliberately—is participating in this case. For all

the time Johnson has spent posting on Substack and commenting on social media, he could have

already complied with the Court's directives. He has the capacity to engage. He's just choosing not to do it where it counts.

## CONCLUSION AND REQUEST FOR FURTHER RELIEF

For over a month, Johnson has willfully refused to comply with this Court's discovery orders. The Court gave him clear instructions in its order from May 8th and June 5th. Plaintiffs made every effort to facilitate compliance—submitting search terms, proposing vendors, inviting discussion, and asking only for the most basic cooperation. Johnson responded with silence. He has not surrendered his devices, supplemented his written discovery, or taken even the minimal step of identifying his location so that a neutral vendor could collect his data.

This is not a case of confusion, financial hardship, or procedural delay. Johnson has shown that he understands the stakes—he continues to post about this litigation online. What he refuses to do is participate in it.

Plaintiffs therefore respectfully request that the Court enforce its June 5, 2025 Order (ECF No. 61) by:

1. Ordering that Johnson's devices and data sources be seized by the U.S. Marshals Service or another appropriate agent to facilitate compliance;

2. Compelling Johnson to provide all necessary credentials and access to messaging platforms, devices, and accounts identified in the May 8, 2025 Order (ECF No. 52);

3. Authorize the third-party vendor Innovative Driven to proceed with collection, filtering, and production of responsive materials using the search terms and privilege protocol Plaintiffs proposed, with Johnson being responsible for all costs;

4. Granting Plaintiffs the fees and costs associated with bringing this motion.

5. Grant any further relief the Court deems just and proper to ensure compliance and preserve the integrity of these proceedings.

Plaintiffs regret having to seek this relief. But Johnson's non-compliance leaves no other option.

App.619

Dated: June 13, 2025

Respectfully submitted,

/s/ *Will Thompson*
Will Thompson
DLA PIPER LLP (US)
State Bar No. 24094981
will.thompson1@us.dlapiper.com
1900 N. Pearl Street
Dallas, Texas 75201
Telephone: (406) 546-5587

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2025, a true and correct copy of the foregoing document was filed electronically using the CM/ECF system.

/s/ *Will Thompson*
Will Thompson

## CERTIFICATE OF CONFERENCE

Pursuant to Local Rule 7.1(b), I certify that I made good-faith efforts to confer with Charles Johnson regarding the subject of this motion. Between June 9 and June 12, 2025, Plaintiffs sent six separate emails to Johnson, requesting his cooperation in complying with the Court's discovery orders and offering to speak at a mutually convenient time. In particular, I wrote:

> You are under a court-ordered obligation to comply, and further delay or non-responsiveness will compel the plaintiffs to notify the court and request further relief. If you want to talk about this further, please propose a time and the specific points you want to address."

Johnson did not respond to that email—or to any of the others. In light of his ongoing silence and failure to comply with multiple court orders, further attempts to confer would be futile.

App.620

_/s/ Will Thompson_____
Will Thompson

App.621

# EXHIBIT 20

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

POINT BRIDGE CAPITAL, LLC,
ET AL.,

    **Plaintiffs,**

v.                 **No. 4:24-cv-00988-P**

CHARLES JOHNSON,

    **Defendant.**

## ORDER

The Court previously scheduled a hearing for **June 18, 2025, at 2:00 p.m.**, in the Fourth Floor Courtroom of the Eldon B. Mahon United States Courthouse "to ensure compliance with [its] Order." ECF Nos. 61, 64 (changing the date from June 19 to June 18 due to the federal holiday). On June 13, 2025, Plaintiff filed notice that Johnson has continued to not comply with the Court's orders. ECF No. 65. Johnson shall come to the June 18, 2025 hearing prepared to **SHOW CAUSE** why he should not be held in contempt, "arrested by the United States Marshals[,] and held in custody until such time as he fully complies with the Court's Order and purges his contempt." ECF No. 61. Failure of Johnson to appear at the hearing will result in the issuance of a default judgment against him.

**SO ORDERED** on this **13th day of June 2025.**

_Mark T. Pittman_
MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

App.623

# EXHIBIT 21

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

POINT BRIDGE CAPITAL, LLC,
ET AL.,

     Plaintiffs,

v.                                                No. 4:24-cv-00988-P

CHARLES JOHNSON,

     Defendant.

## ORDER

The Court previously scheduled a hearing for **June 18, 2025, at 2:00 p.m.**, in the Fourth Floor Courtroom of the Eldon B. Mahon United States Courthouse. On June 13, 2025, the Court was noticed that Johnson has again failed to comply with the Court's Orders and issued a show cause order. ECF No. 67. On June 16, 2025, the Court was notified that Johnson has wholly failed to participate in the mediation despite multiple orders to do so. Consequently, the Court adds the issue of Johnson's refusal to participate in the Court Ordered Mediation to the previously scheduled show cause hearing (ECF No. 67).

**SO ORDERED** on this **16th day of June 2025.**

_Mark T. Pittman_

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

App.625

# EXHIBIT 22

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

POINT BRIDGE CAPITAL, LLC,
ET AL.,

     Plaintiffs,

v.                             No. 4:24-cv-00988-P

CHARLES JOHNSON,

     Defendant.

## ORDER

The above numbered and styled case was filed on October 16, 2024. ECF No. 1. In this lawsuit, Defendant Charles Johnson is accused of black mailing Plaintiffs through a fraud and extortion scheme under which he, and his co-conspirator, "falsely present[ed] themselves as intelligence agents or assets of U.S. government agencies." ECF No. 33 at 1. Whether or not those allegations are true, Johnson is a party to this instant action and is thus obligated to participate in the litigation and comply with all Court orders. A fact which the Court has made abundantly clear. ECF Nos. 55 at 14 ("When it comes to participating in a lawsuit you have an obligation . . . ."); 57; 61; 62; 63 at 22. Johnson originally failed to comply with his litigation obligations by failing to respond to discovery requests. The Court granted Plaintiffs' motion to compel but, giving Johnson the benefit of the doubt, denied their request to involve a third-party vendor so that Johnson would have a chance to comply. ECF No. 55 at 27–28. After Johnson failed to comply, the Court granted Plaintiffs' subsequent motion and ordered that Johnson turn over his devices to and pay for a third-party vendor. ECF No. 61. In that order, the Court also stated:

To ensure compliance with th[is] Order, the Court **SETS** an additional hearing on the matter for **June 19, 2025, at 2:00 pm.** Should it be discovered that Defendant Charles Johnson failed to comply with this Order, the Court will exercise its authority under 18 U.S.C. § 401, and Mr. Johnson **WILL** be arrested by the United States Marshal[] and held in custody until such time as he fully complies with the Court's Order and purges his contempt.

ECF No. 61 at 2.

Despite this, Johnson continued to flout his obligations to obey Court orders and participate in this litigation. *See* ECF Nos. 65 (Johnson failing to comply with the Court's orders regarding discovery and failing to reply to Plaintiffs' emails regarding the same); 68 (Johnson refusing to participate in the Court ordered mediation). Due to Johnson's continued failure to comply with Court orders, the Court ordered Johnson to attend the June 18, 2025 hearing prepared to "**SHOW CAUSE** why he should not be held in contempt, arrested by the United States Marshal, and held in custody until such time as he fully complies with the Court's Order and purges his contempt." ECF No. 67 (citation cleaned up). At that hearing Johnson admitted that he had still not complied with the Court's orders regarding discovery.

## LEGAL STANDARD

"Federal Rule of Civil Procedure 37(b)(2)(A) provides that, '[i]f a party . . . fails to obey an order to provide or permit discovery, . . . the court where the action is pending may issue further just orders.'" *Keplar v. Google, LLC*, 346 F.R.D. 41, 52 (N.D. Tex. 2024) (quoting FED. R. CIV. P. 37(b)(2)(A)). The sanctions available to the Court include "striking pleadings in whole or in part." FED. R. CIV. P. 37(b)(1)(A)(iii). The Court's authority to issue sanctions also stems from its "inherent power 'to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Fuqua v. Horizon/CMS Healthcare Corp.*, 199 F.R.D. 200, 204 (N.D. Tex. 2000) (citation modified). The Court's inherent power authorizes litigation-ending sanctions in instances of bad faith or willful abuse of the judicial process. *Id.* "[A]nd the court has broad discretion in fashioning its sanction when it does so." *L. Funder,*

App.628

*L.L.C. v. Munoz*, 924 F.3d 753, 758 (5th Cir. 2019), *as revised* (June 6, 2019).

Fifth Circuit precedent imposes a heightened standard for litigation-ending sanctions (such as striking pleadings) and requires courts to make four additional findings. *Id.* Those four elements are: "(1) the discovery violation was committed willfully or in bad faith; (2) the client, rather than counsel, is responsible for the violation; (3) the violation 'substantially prejudice[d] the opposing party;' and (4) a lesser sanction would not 'substantially achieve the desired deterrent effect.'" *Id.* at 758–59 (quoting *FDIC v. Conner*, 20 F.3d 1376, 1380-81 (5th Cir. 1994)).

## ANALYSIS

Here, all four elements required for the Court to issue litigation-ending sanctions have been satisfied.

*First*, the Court finds that Johnson has acted willfully in his contempt for the Court's orders. Johnson has been sanctioned by this Court and its sister court but has not corrected his behavior. In the United States District Court for the Southern District of New York, Johnson has been sanctioned on multiple occasions for failing to participate in the litigation, failure to comply with the court's orders, and lying to the court. *See, e.g., Johnson v. Clearview AI, Inc.*, No. 1:23-cv-2441, ECF No. 84 (S.D.N.Y.). Despite those sanctions and warnings, Johnson has publicly stated that it is "an honor to pay sanctions for expressing my viewpoint," and has continued to ignore the court's orders. ECF No. 65 at 8.

In fact, Johnson was recently ordered to show cause for "willfully continu[ing] to fail to comply with discovery obligations . . ." and stated that "[g]iven the seriousness of [Johnson]'s violations of his discovery obligations, the extended period of time over which these discussions have taken place, and the lack of effectiveness of prior efforts, including monetary sanctions, the Court agrees with Defendants that heightened sanctions may be applicable here." *Id.* at ECF No. 93 at 1 (contemplating whether striking Johnson's pleadings is the appropriate sanction).

3

App.629

Similarly, in this case, Johnson has been sanctioned on multiple occasions. Despite those sanctions and the Court's warning that that should he continue to disregard Court orders he would be held in contempt and placed in the custody of the United States Marshal until he purged himself of his contempt, Johnson continued to flaunt the Court's orders. ECF Nos. 61 at 2, 63 at 9, 67. In fact, Johnson's response to these warnings was to mock them on social media.



App.630



Charles Johnson, Substack Chat Posts (June 11, 2025) & (June 14, 2025), https://charlesjohnson.substack.com/notes.

Johnson's social media posts evidence the willfulness behind his non-compliance, as they show that he had no intention of complying with the Court's orders. This fact was confirmed at the hearing when Johnson stated that he had simply made the decision not to comply. Therefore, there is no other conclusion the Court can reach other than Johnson is willfully ignoring the orders of the Court. Accordingly, the Court finds that the first element has been satisfied.

*Second*, the Court finds the second element has also been satisfied. Johnson has had two sets of counsel in this matter but is currently proceeding *pro se*. ECF No. 52. Thus, Johnson, rather than any counsel, is responsible for the violations and the second element has been satisfied.

*Third*, Johnson's violations have substantially prejudiced Plaintiffs. This case was filed on October 16, 2024, and is set for trial on December

15, 2025. ECF Nos. 1, 26. The Parties' discovery deadline is July 18, 2025. ECF No. 26. However, because of Johnson's violations of this Court's orders, no cognizable discovery has occurred. Johnson's unwillingness to participate in discovery or comply with this Court's orders is worsened by the fact that Johnson has admitted to the destruction of potentially responsive evidence. *See* ECF No. 55 at 30 (admitting that his messages delete after a "month or two months" and he has taken no steps to preserve those messages). Thus, not only have Plaintiffs been deprived of the ability to prepare their case[1] but there is likely a substantial amount of evidence that has been destroyed. Therefore, the Court finds the third element to be established.

*Fourth*, and finally, there is no lesser sanction that would substantially achieve the desired deterrent effect. As discussed above, Johnson has demonstrated that further monetary sanctions will have no effect on his willingness to participate in litigation and comply with Court orders. That led the Court to believe that holding Johnson in contempt and placing him in the custody of the Marshal was the sanction most likely to achieve the desired deterrent effect. However, at the hearing, it became evident to the Court that not only did its threat to place Johnson in the custody of the Marshal not effect Johnson, but he wished the Court him arrest him so that he could portray it as further evidence of his self-proclaimed martyrdom. Johnson's attitude towards going to jail is perfectly encapsulated by his social media post the day after the hearing, in which he stated, *inter alia*: "In my more romantic delusions I think that there's a long history of people who were jailed leaving jail and becoming prime minister. Why not someone leaving prison and becoming president? And why not me?" https://charlesjohnson.substack.com/p/notes-on-the-state-of-israel-and.

Additionally, Johnson testified that he had no one to assist him in purging his contempt. Thus, the Court was left with the choice of placing Johnson in jail for an extended period of time (a result he seemingly wanted) or striking his pleading and entering default against him. After

---

[1]The Court notes that as of the date of this order, Plaintiffs were forced by Johnson's actions to pay for and attend the Court ordered mediation without the benefit of discovery.

App.632

thoughtful consideration and thorough research, the Court determined that placing Johnson in the custody of the Marshal would not only not achieve the desired effect, but it would potentially deprive Johnson of his freedom for an extended period of time. Consequently, the Court determined there is no lesser sanction the Court can render to ensure compliance. Accordingly, the *fourth* element is satisfied.

For the reasons set out above, in accordance with Federal Rule of Civil Procedure 37(b)(1)(A)(iii) and the Court's inherent authority, it is **ORDERED** that Johnson's Amended Answer (ECF No. 36) is hereby **STRICKEN** in its entirety. Furthermore, it is **ORDERED** that the Clerk of the Court enter default against Johnson. Judgment will be entered against Johnson regarding his liability for actual, treble, and punitive damages on all of Plaintiffs' claims. It is further **ORDERED** that the Court's prior scheduling order is hereby moot. Finally, it is **ORDERED** that this matter is set for a jury trial on Plaintiffs' damages for **July 14, 2025, at 9:00 a.m.**, in the Fourth Floor Courtroom of the Eldon B. Mahon United States Courthouse. At the trial, Johnson will be permitted to cross-examine Plaintiffs' witnesses (with relevant questions), but he will not be allowed to present any witnesses or documentary evidence.

**SO ORDERED** on this **23rd day of June 2025.**

Mark T. Pittman

**MARK T. PITTMAN**
**UNITED STATES DISTRICT JUDGE**

App.633

# EXHIBIT 23

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF TEXAS

3                      FORT WORTH DIVISION

4    POINT BRIDGE CAPITAL, LLC    )    CASE NO. 4:24-CV-00988-P
     ET AL                        )
5                                 )
                                  )    FORT WORTH, TEXAS
6    vs.                          )
                                  )    JUNE 18, 2025
7    CHARLES JOHNSON              )    2:20 P.M.

8                            VOLUME 1
                   TRANSCRIPT OF SHOW CAUSE HEARING
9             BEFORE THE HONORABLE MARK T. PITTMAN
                UNITED STATES DISTRICT COURT JUDGE
10

11   **A P P E A R A N C E S:**

12   FOR THE PLAINTIFF:      WILLIAM BENNETT THOMPSON
                             DLA Piper, LLP US
13                           1900 N. Pearl Street
                             Suite 2200
14                           Dallas, Texas  75201
                             Telephone:  214.743.4500
15

16   PRO SE DEFENDANT:       CHARLES JOHNSON
                             1624 Fieldthorn Drive
17                           Reston, Virginia  20194
                             Telephone:  617.429.4718

18                           JOSHUA SMITH RHODES
                             DEVON JUDY SANDERS
19                           ASSISTANT FEDERAL PUBLIC DEFENDER
                             NORTHERN DISTRICT OF TEXAS
20                           819 Taylor Street, Room 9A10
                             Fort Worth, Texas  76102
21                           Telephone:  817.978.2753

22   COURT REPORTER:         MONICA WILLENBURG GUZMAN, CSR, RPR
                             501 W. 10th Street, Room 310
23                           Fort Worth, Texas  76102
                             Telephone:  817.850.6681
24                           E-Mail:  mguzman.csr@yahoo.com

25   Proceedings reported by mechanical stenography, transcript
     produced by computer.

1                              **<u>INDEX</u>**

2                                           PAGE   VOL.

3    Appearances .................................3      1

4

5    Miranda Rights Given ........................5      1

6

7    Discussion with the Court ...................6      1

8

9    Comments by the Court ......................10      1

10

11   Discussion with the Court ..................11      1

12

13   Comments by the Court ......................14      1

14

15   Court's Ruling .............................15      1

16

17   Proceedings Adjourned ......................19      1

18

19   Reporter's Certificate .....................20      1

20

21

22

23

24

25

1    **P R O C E E D I N G S**

2    *(June 18, 2025, 2:20 p.m.)*

3    *THE COURT:*  All right.  The next matter before the

4    Court is the matter of Point Bridge Capital, LLC vs. Charles

5    Johnson, this is Case Number 4:24-CV-988-P.

6    We are here today on a motion *(sic)* that the Court

7    had entered requiring Mr. Johnson to provide some information,

8    that he's been twice ordered to do.  And if he didn't provide

9    that information, it was threatened that he would be held in

10    contempt or face other sanctions by the Court; and that

11    necessitated this hearing.

12    Who do I have for the plaintiffs, Point Bridge

13    Capital and Mr. Lambert?

14    *MR. THOMPSON:*  Good afternoon, Your Honor.  Will

15    Thompson for the plaintiffs, Point Bridge Capital and Mr.

16    Lambert.  And Mr. Lambert is with me at counsel table.

17    *THE COURT:*  All right.  Thank you.

18    And the Court has taken upon itself, due to the

19    nature of this case, to appoint our public defender to help

20    represent you with any criminal aspects of this case,

21    Mr. Johnson.

22    So, I need to do a couple of things.  Number one,

23    Mr. Johnson, state your full name on the record, identifying

24    yourself --

25    *DEFENDANT JOHNSON:*  Sure.

1           *THE COURT:*  -- here in the courtroom.

2           *DEFENDANT JOHNSON:*  Charles Carlisle Johnson.

3           *THE COURT:*  And don't interrupt me, or you're not

4 going to like it, all right?

5           *DEFENDANT JOHNSON:*  Yes, sir.

6           *THE COURT:*  And again, out of abundance of caution,

7 the Court thought it was necessary to make sure we don't

8 trample on any of the Constitutional rights of Mr. Johnson, I

9 have appointed two of our very capable public defenders to

10 represent you for any criminal act -- aspects of this case,

11 when it comes to holding you in contempt and whether I need to

12 jail you until you purge yourself of that contempt.

13           So, I'm ordering that Ms. Devon Sanders and

14 Mr. Joshua Rhodes, of our Public Defender's Office, be

15 appointed to represent you here at the hearing.

16           Would you-all enter your appearance, please?

17 Mr. Rhodes and Ms. Sanders, state your name for us.

18           *MR. RHODES:*  Joshua Rhodes for Mr. Johnson, Your

19 Honor.

20           *MS. SANDERS:*  And Devon Sanders on behalf of

21 Mr. Johnson as well.

22           *THE COURT:*  All right.  Have either of you or both

23 of you got a chance to visit with Mr. Johnson?

24           *MS. SANDERS:*  Yes, Your Honor.

25           *THE COURT:*  I don't know if I want to regurgitate

1  the entire record in this case, but we've had a lot of issues

2  getting Mr. Johnson to comply with the Court's orders;

3  although he sure seems to make a lot of hay about them on his

4  various Substacks and internet postings and social media after

5  he leaves.

6       He's also got into a lot of trouble with the Judge

7  up in New York for not complying with her orders.  I know that

8  my very competent defense counsel have explained just how busy

9  we are over here and we don't like a lot of shenanigans.

10      Mr. Johnson, I don't know if you want to speak or do

11 you want to have your attorney speak for you.  I gave you your

12 Miranda warnings, I believe, at the last hearing, and I know

13 that you've probably been instructed on those, but I'll give

14 them to you again.

15      You do have the right to remain silent.  Anything

16 you say can and will be used against you in a court of law.

17 You have a right to speak with an attorney.  And you have a

18 right to have attorney present during questioning.  If you

19 cannot afford a lawyer, one will be provided for you at

20 Government expense.

21      I give you those warnings because I don't want you

22 to commit perjury; which it's a crime to do so.  But I do need

23 to ask you some questions under oath.  Now, what I'm

24 considering today would be civil contempt, not criminal

25 contempt.

1        The law provides that the Court has the option of

2   holding someone in civil contempt and holding them, in this

3   case, in our Johnson County jail until you're able to purge

4   yourself of the contempt.  It's a separate matter as to

5   whether you're able to answer my questions truthfully.

6   Because if you commit perjury, that in itself is a different

7   matter, that's a Federal crime, which you can be charged and

8   held in criminal contempt for that.

9        So, raise your right hand for me.

10            *(Defendant sworn)*

11        *THE COURT:*  All right.  Let me ask you a few

12   questions.

13        Have you provided the information that you were

14   supposed to to the third-party vendor?

15        *DEFENDANT JOHNSON:*  I have not, Your Honor.

16        *THE COURT:*  Okay.  Why didn't you do that?

17        *DEFENDANT JOHNSON:*  I recently instructed my

18   attorney in the other case to file an affidavit saying that I

19   was unable to afford E-discovery.  And it seems to me, that I

20   would be in violation -- if I couldn't afford it in one case,

21   I probably couldn't afford it in the other.  And --

22        *THE COURT:*  And you took it upon yourself to make

23   that decision without coming and telling me; is that correct?

24        *DEFENDANT JOHNSON:*  I did, Your Honor.

25        *THE COURT:*  Does that seem like a wise decision?

1          It almost seems like you want to have yourself

2    thrown in jail.

3          *DEFENDANT JOHNSON:*  It does not seem like a wise

4    decision, but it was a decision that I made.

5          *THE COURT:*  Well, I feel like we're on the tenth

6    verse of the same song here.

7          What are we on, Mr. Thompson, is this our third or

8    fourth hearing to impose sanctions to get these basic

9    discovery documents?

10          *MR. THOMPSON:*  Yes, Your Honor.

11          *THE COURT:*  What number are we on?

12          *MR. THOMPSON:*  I think we're on our third hearing

13    and multiple show cause orders.

14          *THE COURT:*  Nothing has been produced?

15          *MR. THOMPSON:*  No.  Let me just amend that, Your

16    Honor.  Prior to the plaintiffs filing their first motion to

17    compel, we did get sort of a thousand pages of duplicate

18    emails from the Gmail.  But since -- since Your Honor's

19    orders, nothing has been produced, Mr. Johnson has not engaged

20    with me.

21          I do want to say, I think he forwarded four or five

22    emails, but that was -- nothing has happened since our prior

23    hearing on June 5.  In our submission, I think we sent four or

24    five, six emails to him; he has not responded.

25          *THE COURT:*  Is that correct, Mr. Johnson?

1    *DEFENDANT JOHNSON:* That is, Your Honor.

2    I have no objection to complying with discovery.  I

3    just don't think that --

4    *THE COURT:* I've heard that twice, and you haven't

5    done anything.

6    *DEFENDANT JOHNSON:* If I may, Your Honor?

7    *THE COURT:* And you're giving me an illegitimate

8    excuse, all right?  The time is up.  I've ordered you twice to

9    do it.

10    *DEFENDANT JOHNSON:* Your Honor --

11    *THE COURT:* I don't have the patience for this.

12    *DEFENDANT JOHNSON:* I did not receive a --

13    *THE COURT:* You sat here and told me you made the

14    decision to comply with my order.

15    *DEFENDANT JOHNSON:* No, Your Honor.  If I may?

16    *THE COURT:* Briefly.

17    *DEFENDANT JOHNSON:* Briefly.

18    I did not receive a cost estimate for the discovery

19    until, I think, Friday.  And the cost estimate that was

20    provided to me from the third-party vendor has no limit, has

21    no cap on the cost associated with it.  And that seems, to me,

22    to be rather -- rather crazy.  I mean, I --

23    *THE COURT:* Well, you're involved in litigation,

24    which means you have to comply with my orders.  If you can't

25    financially do so, then you can choose not to defend the

1  lawsuit.

2      *DEFENDANT JOHNSON:*  I intend to do just that on the

3  mediation on the 23rd.

4      *THE COURT:*  I'm sorry, what does that have to do

5  with the cost of tea in China?  I'm talking about the order

6  before the Court.

7      *DEFENDANT JOHNSON:*  Yes, I understand, Your Honor.

8  So --

9      *THE COURT:*  And -- that you did not comply with.

10      *DEFENDANT JOHNSON:*  Your Honor --

11      *THE COURT:*  I entered an order that you comply with

12  it, whether you made a decision as to whether you could afford

13  it or not is irrelevant.

14      Do you understand?

15      *DEFENDANT JOHNSON:*  I do.

16      *THE COURT:*  So, you told me you made a conscious

17  decision, because you thought it might be too expensive not to

18  comply with my order that I've twice ordered you to do

19  something; is that correct?

20      *DEFENDANT JOHNSON:*  No, Your Honor.

21      It's -- the decision I made was made earlier, after

22  my attorney in the other case had filed something with the New

23  York court saying that I was unable to afford the rather high

24  discovery costs in that case.  So, I didn't want to be in a

25  situation in which I was saying I could afford it in the one

1   case and not the other.

2          So, what I suggest, Your Honor -- I have no

3   objection to the rather overbroad, kind of crazy research

4   terms.  They can -- they can comb through everything they

5   want, they can go to it, as long as a fishing expedition as

6   they see fit; I just don't want to have to pay for it.  And I

7   think that's --

8          THE COURT:  Sorry.  I ordered you to pay for it.

9   You don't have a choice in the matter.

10         If you don't like my decision, you can file a writ

11  of mandamus with the Fifth Circuit and see if they disagree

12  with me.  But I'm guessing they'll look at the record of all

13  the times you haven't been compliant with the Court's explicit

14  orders, and they'll probably agree with me.

15         You are becoming a drain on my resources, a drain on

16  the plaintiffs' resources.  Now I've had to use Government

17  resources to appoint two public defenders to advise you, and I

18  can assure you they have a heavy workload, too.  The two

19  marshals that are present that are prepared to take you under

20  arrest, are also going to have to take you down to the Johnson

21  County jail, which is about a two-hour round trip for them,

22  and that doesn't include booking you in.

23         So, you are a drain on the resources of everyone

24  else, and you continue to make these excuses which are not

25  valid.  So I'm left with a situation, what is the least severe

1    sanction that I can impose to try to get you to comply with

2    the orders?

3            I've also been informed by the mediator in this

4    case, Judge Evans, that shortly before the hearing today, you

5    did submit a mediation position paper; that was also in

6    violation of the orders, you were ordered to produce that

7    earlier.

8            I'm losing my patience.  This is a pattern of trying

9    to avoid the Court orders, making up excuses.  I don't have

10   patience for this anymore.

11           So, I'm trying to find a way to get you to comply.

12   Monetary sanctions don't work on you, admonishments don't work

13   on you.  The only tool that I can think of that might possibly

14   work, would be holding you until you purge yourself of your

15   contempt.  Which means you providing the information that's

16   twice been ordered for you to do related to the search terms.

17           Another choice that I have is, based on your

18   conduct, is just simply striking your pleadings and we go to

19   trial.

20           Are you prepared to go to trial and prove up your

21   damages, Mr. Thompson?

22           *MR. THOMPSON:*  Your Honor, no.

23           *THE COURT:*  No?

24           *MR. THOMPSON:*  No.  I mean, we need to know --

25           *THE COURT:*  Do you have to have this information to

1   prove up your damages?

2          MR. THOMPSON:  In part, yes, Your Honor.  And I'll

3   explain briefly why.  Part of this is we need to know the

4   scope of all the defamatory stuff he spread, how many

5   investors of Mr. Lambert --

6          THE COURT:  You don't -- you don't think that

7   Mr. Lambert and his colleagues and witnesses can prove up what

8   your damages are?

9          MR. THOMPSON:  I think we can -- we're just

10  scratching the tip of the surface, Your Honor.

11         THE COURT:  Well, had enough to file a lawsuit.

12         MR. THOMPSON:  Absolutely, Your Honor.  And we have

13  sufficient -- but we're just trying to understand what the

14  scope --

15         THE COURT:  You're never going to get this

16  information from him.  You're never going to get it.

17         MR. THOMPSON:  Your Honor --

18         THE COURT:  The only thing you're going to be able

19  to get is you're going to be able to get a judgment for

20  several million dollars, which you can prove up, and then go

21  and chase him.

22         And I can hold him in prison from now until Jesus

23  comes back, and I bet you're not going to get it.  This guy

24  does nothing but flaunt the Court's orders.  This Judge up in

25  New York, I don't know how she stands this.  It's beginning to

1   become a drain on my resources.  I'm giving you an opportunity

2   to get everything you want.

3          So now I need to consider how many days it's going

4   to take you to purge yourself of the contempt.  Are you

5   prepared to purge yourself of the contempt and provide all

6   that information today?

7          *DEFENDANT JOHNSON:*  I am, Your Honor.

8          *THE COURT:*  So you have all your devices ready?

9          *DEFENDANT JOHNSON:*  I have my cell phone, Your

10  Honor.  But my computer is at home.

11         *THE COURT:*  Okay.  And your home --

12         *DEFENDANT JOHNSON:*  And I'm happy to -- I understand

13  that Mr. Thompson --

14         *THE COURT:*  How fast can you have it flown down here

15  and given over to the third-party vendor?

16         *DEFENDANT JOHNSON:*  I don't know anyone that would

17  do that for me.

18         *THE COURT:*  Okay.  Well, you're going to have to try

19  to get that done between now and the next few days, because

20  you're about to be in jail.

21         *DEFENDANT JOHNSON:*  I understand that.

22         *THE COURT:*  And you'll stay in jail until you do

23  that.

24         My deputies, tell me, how long is it going to take

25  to process him in and get him down to Johnson County?

1   *THE MARSHAL:* It will probably take an hour to

2 process him, Your Honor, and then another hour to get Johnson

3 up here for transport, and an hour down.

4   *THE COURT:* Okay. Let me take a break, and we'll

5 try to figure out the best way out of this.

6   *(Short recess taken)*

7   *THE COURT:* The Court's back on the record in the

8 matter of Point Bridge Capital vs. Charles Johnson. Y'all can

9 be seated.

10   The Court, after much deliberation, has tried to

11 determine what the best way to get compliance with the Court's

12 orders would be, what's the least severe sanction that I can

13 do to ensure a compliance.

14   I'll be quite frank with you, Mr. Johnson, based on

15 the material that's been submitted to me in support of some of

16 these pleadings, I think you want to get thrown in jail, I

17 really do, I think you want to be seen as a martyr.

18   You've been given every opportunity to comply with

19 my orders, and you refuse to do so. I've got some news for

20 you, you're just a litigant like everybody else. You cannot

21 continue wasting our time. I don't want to throw you in jail,

22 and then you just tweet and make yourself a martyr, et cetera,

23 et cetera.

24   I think the best way, after having read the

25 affidavit that you filed up in the New York case, is to do the

1   following:  That would be to strike your pleadings, which

2   means you're not going to be allowed to put on a defense based

3   on your noncompliance with the Court orders.  I think that

4   this is the only thing that's going to be able to really get

5   the ball moving in this case.

6            If I were to throw you in jail, I would also run the

7   possibility of thwarting my colleague in New York's ability to

8   enforce her sanctions orders against you; several of those

9   remain pending.

10           You have admitted, at one of the earlier hearings,

11  that you had already begun destroying some of the evidence

12  that is responsive to plaintiffs' request.  I think, even if I

13  sent the marshals with you to New York to get your computer,

14  or Boston, or wherever, I'm sorry, I don't remember where

15  you're from, they would probably find most of the pertinent

16  information has already been destroyed or erased.

17           I don't believe anything you tell the Court.  Your

18  word cannot be trusted.  And this is not based on what I've

19  observed today, it's been a pattern over the last six months,

20  it's been a pattern in the New York case.  I have seen

21  multiple times where you've given the same excuses, the same

22  admonishments were given by the Court, I have no reason to

23  trust anything that you tell me.

24           I am left with no other choice than to strike your

25  pleadings.  I am ordering the parties to continue with the

1  mediation to occur in front of the Honorable David Evans on

2  Monday.  And I know the Judge will tell me if you-all are able

3  to reach any type of accommodation.  I'm not positive you

4  will, but I do want to give you an opportunity to try to

5  settle the case.

6          I'm also moving up the trial date.  We'll conduct

7  our trial in this case on Monday, July the 14th of 2025, at

8  9:00 a.m, at which time Point Bridge Capital can put on their

9  case and prove their damages.  The best thing for you-all is

10 to get your final judgment and move on; get ahead of who else

11 is out there.

12         Until this individual, I think, is brought up on

13 charges, Federal or state criminal charges, this type of

14 behavior is not going to change, okay?

15         *MR. THOMPSON:*  Understood, Your Honor.

16         *THE COURT:*  I also believe that it would be

17 beneficial for you-all to go to your mediation in front of

18 Judge Evans; you never know.

19         I do think that you are entitled to your attorney

20 fees; you've asked for them as part of the motion that led us

21 here today.  Would you like to prove up your attorney fees?

22 Because I will be ordering Mr. Johnson to pay those as part of

23 a sanction in this case.

24         *MR. THOMPSON:*  Yes, Your Honor.

25         And one point on that.  Tomorrow is our deadline to

1  submit the previous fees we were seeking.  If we could just

2  have one more week and we'll file one consolidated submission

3  on that.

4          *THE COURT:*  I'd like to have both of those by

5  Friday.  I'm ready to be done with this.

6          *MR. THOMPSON:*  Your Honor, we'll submit one single

7  submission -- consolidated submission on Friday.

8          *THE COURT:*  I want it by Friday.

9          *MR. THOMPSON:*  No problem.

10         *THE COURT:*  As soon as I get it, you're going to be

11 ordered to pay all of the attorney fees that plaintiffs have

12 incurred to bring these various motions.  And if you don't pay

13 those, you will be held in contempt.

14         So, I'm going to give you a date certain, once I

15 sign that order, for you to sign *(sic)* those.  So, you'll be

16 given a double whammy.  Not only have I struck your pleadings

17 so you cannot put on your defenses, but you will be subject to

18 paying those attorney's fees.  And if you don't, at that point

19 I will be holding you in contempt until you purge yourself,

20 and I'll be jailing you until you pay those.

21         But I'm not going to make you a martyr here today.

22 We're going to move on with this case, and then they'll get

23 their judgment against you, and they'll chase you from now

24 until the end of time until you pay it.

25         All right.  Any questions for me?

1        *MR. THOMPSON:*  No, Your Honor.

2        *DEFENDANT JOHNSON:*  No, Your Honor.

3        *THE COURT:*  All right.  I look forward to seeing

4 everybody on the 14th of July, at which time we'll be

5 conducting our trial in this case.

6        Ms. Sanders and Mr. Rhodes, thank you for your time

7 and attention and for volunteering to come over and represent

8 Mr. Johnson.  As always, you went above and beyond the call of

9 duty.

10        My marshals, thank you deputies for coming up here

11 today.  And we may need you again; so we'll let you know at

12 the next hearing if we have one.  Thank you, gentlemen.

13        *MR. RHODES:*  Your Honor, if I may, before we go off

14 the record.  Would you prefer, because we were appointed for

15 the limited purpose of today's hearing, for us to file a

16 motion to withdraw as counsel?

17        *THE COURT:*  I was just going to enter an electronic

18 order dismissing you, so you-all don't have to join us in

19 spending yet even more wasteful time and money and effort that

20 the United States Government could be using elsewhere.  So let

21 us do that for you.  Thank you all.

22        *MR. RHODES:*  Thank you, Your Honor.

23        *MS. SANDERS:*  Thank you, Your Honor.

24        *THE COURT:*  We'll see you at the next criminal

25 docket.

1          MR. RHODES:  I'm sure it will be sooner than we

2     prefer.

3          THE COURT:  I'm sure you're right.  Thank you.

4     All right.  Thank you, Mr. Thompson.

5          MR. THOMPSON:  Thank you, Your Honor.

6               (Proceedings Adjourned)

# REPORTER'S CERTIFICATE

I, Monica Willenburg Guzman, CSR, RPR, certify that the foregoing is a true and correct transcript from the record of proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

Signed this 25th day of June, 2025.


                         /s/Monica Willenburg Guzman
                         Monica Willenburg Guzman, CSR, RPR
                         Texas CSR No. 3386
                         NCRA No. 32278
                         Official Court Reporter
                         The Northern District of Texas
                         Fort Worth Division


CSR Expires:          7/31/2025

Business Address:    501 W. 10th Street, Room 310
                      Fort Worth, Texas   76102

Telephone:           817.850.6681

E-Mail Address:      mguzman.csr@yahoo.com

DEFENDANT JOHNSON: [24]
MR. RHODES: [4]  4/18 18/13 18/22 19/1
MR. THOMPSON: [16]  3/14 7/10 7/12 7/15 11/22 11/24 12/2 12/9 12/12 12/17 16/15 16/24 17/6 17/9 18/1 19/5
MS. SANDERS: [3]  4/20 4/24 18/23
THE COURT: [47]
THE MARSHAL: [1]  14/1

**/**

**/s/Monica [1]**  20/11

**1**

**10th [1]**  1/22 20/17
**14th [1]**  16/7 18/4
**1624 [1]**  1/16
**18 [2]**  1/6 3/2
**1900 [1]**  1/13

**2**

**20194 [1]**  1/16
**2025 [5]**  1/6 3/2 16/7 20/9 20/16
**214.743.4500 [1]**  1/14
**2200 [1]**  1/13
**23rd [1]**  9/3
**25th [1]**  20/9
**2:20 [2]**  1/7 3/2

**3**

**310 [2]**  1/22 20/17
**32278 [1]**  20/12
**3386 [1]**  20/12

**4**

**4:24-CV-00988-P [1]**  1/4
**4:24-CV-988-P [1]**  3/5

**5**

**501 [2]**  1/22 20/17

**6**

**617.429.4718 [1]**  1/17

**7**

**7/31/2025 [1]**  20/16
**75201 [1]**  1/14
**76102 [3]**  1/20 1/23 20/17

**8**

**817.850.6681 [2]**  1/23 20/18
**817.978.2753 [1]**  1/21
**819 [1]**  1/20

**9**

**9:00 [1]**  16/8
**9A10 [1]**  1/20

**A**

**a.m [1]**  16/8
**ability [1]**  15/7
**able [6]**  6/3 6/5 12/18 12/19 15/4 16/2
**about [4]**  5/3 9/5 10/21 13/20
**above [1]**  18/8
**Absolutely [1]**  12/12
**abundance [1]**  4/6
**accommodation [1]**  16/3

**act [1]**  4/10
**Address [2]**  20/17 20/19
**Adjourned [1]**  19/6
**admitted [1]**  15/10
**admonishments [2]**  11/12 15/22
**advise [1]**  10/17
**affidavit [2]**  6/18 14/25
**afford [7]**  5/19 6/19 6/20 6/21 9/12 9/23 9/25
**after [4]**  5/4 9/21 14/10 14/24
**afternoon [1]**  3/14
**again [3]**  4/6 5/14 18/11
**against [3]**  5/16 15/8 17/23
**agree [1]**  10/14
**ahead [1]**  16/10
**AL [1]**  1/4
**all [20]**  3/3 3/17 4/4 4/16 4/22 6/11 8/8 10/12 12/4 13/5 13/8 16/2 16/9 16/17 17/11 17/25 18/3 18/18 18/21 19/4
**allowed [1]**  15/2
**almost [1]**  7/1
**already [2]**  15/11 15/16
**also [7]**  5/6 10/20 11/3 11/5 15/6 16/6 16/16
**although [1]**  5/3
**always [1]**  18/8
**am [3]**  13/7 15/24 15/25
**amend [1]**  7/15
**another [2]**  11/17 14/2
**answer [1]**  6/5
**any [5]**  3/20 4/8 4/10 16/3 17/25
**anymore [1]**  11/10
**anyone [1]**  13/16
**anything [4]**  5/15 8/5 15/17 15/23
**appearance [1]**  4/16
**appoint [1]**  3/19 10/17
**appointed [3]**  4/9 4/15 18/14
**are [15]**  3/6 5/9 7/7 7/11 10/15 10/19 10/19 10/20 10/23 10/24 11/20 12/8 13/4 16/2 16/19
**arrest [1]**  10/20
**ask [2]**  5/23 6/11
**asked [1]**  11/19
**aspects [2]**  3/20 4/10
**ASSISTANT [1]**  1/19
**associated [1]**  8/21
**assure [1]**  10/18
**attention [1]**  8/7
**attorney [8]**  5/11 5/17 5/18 6/18 9/22 16/19 16/21 17/11
**attorney's [1]**  17/18
**avoid [1]**  11/9

**B**

**back [2]**  12/23 14/7
**ball [1]**  15/5
**based [4]**  11/17 14/14 15/2 15/18
**basic [1]**  7/8
**be [34]**
**because [6]**  5/21 6/6 9/17 13/19 16/22 18/14
**become [1]**  13/1
**becoming [1]**  10/15
**been [12]**  3/8 5/13 7/14 7/19 10/13 11/3 11/16 14/15 14/18 15/16 15/19 15/20
**before [5]**  1/9 3/3 9/6 11/4 18/13

**beginning [1]**  12/25
**begun [1]**  15/11
**behalf [1]**  4/20
**behavior [1]**  16/14
**believe [5]**  5/12 15/17 16/16
**beneficial [1]**  16/17
**BENNETT [1]**  1/12
**best [4]**  14/5 14/11 14/24 16/9
**bet [1]**  12/23
**between [1]**  13/19
**beyond [1]**  18/8
**booking [1]**  10/22
**Boston [1]**  15/14
**both [2]**  4/22 17/4
**break [1]**  14/4
**BRIDGE [6]**  1/4 3/4 3/12 3/15 14/8 16/8
**briefly [3]**  8/16 8/17 12/3
**bring [1]**  17/12
**brought [1]**  16/12
**Business [1]**  20/17
**busy [1]**  5/8

**C**

**call [1]**  18/8
**can [18]**  5/16 6/7 8/25 10/4 10/4 10/5 10/10 10/18 11/1 11/13 12/7 12/9 12/20 12/22 13/14 14/8 14/12 16/8
**can't [1]**  8/24
**cannot [4]**  5/19 14/20 15/18 17/17
**cap [1]**  8/21
**capable [1]**  4/9
**CAPITAL [6]**  1/4 3/4 3/13 3/15 14/8 16/8
**Carlisle [1]**  4/2
**case [22]**
**cause [2]**  1/8 7/13
**caution [1]**  4/6
**cell [1]**  13/9
**certain [1]**  17/14
**CERTIFICATE [1]**  20/1
**certify [2]**  20/3 20/6
**cetera [2]**  14/22 14/23
**chance [1]**  4/23
**change [1]**  16/14
**charged [1]**  6/7
**charges [2]**  16/13 16/13
**CHARLES [5]**  1/7 1/15 3/4 4/2 14/8
**chase [2]**  12/21 17/23
**China [1]**  9/5
**choice [3]**  10/9 11/17 15/24
**choose [1]**  8/25
**Circuit [1]**  10/11
**civil [2]**  5/24 6/2
**colleague [1]**  15/7
**colleagues [1]**  12/7
**comb [1]**  10/4
**come [1]**  18/7
**comes [2]**  4/11 12/23
**coming [2]**  6/23 18/10
**commit [2]**  5/22 6/6
**compel [1]**  7/17
**competent [1]**  5/8
**compliance [2]**  14/11 14/13
**compliant [1]**  10/13
**comply [10]**  5/2 8/14 8/24 9/9 9/11 9/18 11/1 11/11 14/18 20/7

**C**

complying [2]  5/7 8/2
computer [2]  1/25 13/10 15/13
conduct [2]  11/18 16/6
conducting [1]  18/5
Conference [1]  20/8
conscious [1]  9/16
consider [1]  13/3
considering [1]  5/24
consolidated [2]  17/2 17/7
Constitutional [1]  4/8
contempt [13]  3/10 4/11 4/12 5/24
5/25 6/2 6/4 6/8 11/5 13/4 13/5 17/13
17/19
continue [3]  10/24 14/21 15/25
correct [4]  6/23 7/25 9/19 20/4
cost [4]  8/18 8/19 8/21 9/5
costs [1]  9/24
could [4]  9/12 9/25 17/1 18/20
couldn't [2]  6/20 6/21
counsel [3]  3/16 5/8 18/16
County [3]  6/3 10/21 13/25
couple [1]  3/22
court [19]  1/1 1/9 1/22 3/4 3/6 3/10
3/18 4/7 5/16 6/1 9/6 9/23 11/9 14/10
15/3 15/17 15/22 20/7 20/13
Court's [5]  5/2 10/13 12/24 14/7 14/11
courtroom [1]  4/1
crazy [2]  8/22 10/3
crime [2]  5/22 6/7
criminal [6]  3/20 4/10 5/24 6/8 16/13
18/24
CSR [5]  1/22 20/3 20/11 20/12 20/16
CV [1]  1/4 3/5

**D**

Dallas [1]  1/14
damages [4]  11/21 12/1 12/8 16/9
date [2]  16/6 17/14
David [1]  16/1
day [1]  20/9
days [2]  13/3 13/19
deadline [1]  16/25
decision [9]  6/23 6/25 7/4 7/4 8/14
9/12 9/17 9/21 10/10
defamatory [1]  12/4
defend [1]  8/25
DEFENDANT [2]  1/15 6/10
defender [2]  1/19 3/19
Defender's [1]  4/14
defenders [2]  4/9 10/17
defense [2]  5/8 15/2
defenses [1]  17/17
deliberation [1]  14/10
deputies [2]  13/24 18/10
destroyed [1]  15/16
destroying [1]  15/11
determine [1]  14/11
devices [1]  13/8
DEVON [3]  1/18 4/13 4/20
did [6]  6/24 7/17 8/12 8/18 9/9 11/5
didn't [3]  3/8 6/16 9/24
different [1]  6/6
disagree [1]  10/11
discovery [5]  6/19 7/9 8/2 8/18 9/24
dismissing [1]  18/18
DISTRICT [5]  1/1 1/2 1/9 1/19 20/13

DIVISION [2]  1/3 20/14
DEA [1]  7/12
do [27]
docket [1]  18/25
documents [1]  7/9
does [4]  6/25 7/3 9/4 12/24
doesn't [1]  10/22
dollars [1]  12/20
don't [24]
done [3]  8/5 13/19 17/5
double [1]  17/16
down [4]  10/20 13/14 13/25 14/3
drain [2]  10/15 10/15 10/23 13/1
Drive [1]  1/16
due [1]  3/18
duplicate [1]  7/17
during [1]  5/18
duty [1]  18/9

**E**

E-discovery [1]  6/19
E-Mail [2]  1/24 20/19
earlier [3]  9/21 11/7 15/10
effort [1]  18/19
either [1]  4/22
electronic [1]  18/17
else [3]  10/24 14/20 16/10
elsewhere [1]  18/20
emails [3]  7/18 7/22 7/24
enforce [1]  15/8
engaged [1]  7/19
enough [1]  12/11
ensure [1]  14/13
enter [2]  4/16 18/17
entered [2]  3/7 9/11
entire [1]  5/1
entitled [2]  16/19 20/5
erased [1]  15/16
estimate [2]  8/18 8/19
et [3]  1/4 14/22 14/23
Evans [3]  11/4 16/1 16/18
even [2]  12/12 18/19
every [1]  14/18
everybody [2]  14/20 18/4
everyone [1]  10/23
everything [2]  10/4 13/2
evidence [1]  15/11
excuse [1]  8/8
excuses [3]  10/24 11/9 15/21
expedition [1]  10/5
expense [1]  5/20
expensive [1]  9/17
Expires [1]  20/16
explain [1]  12/3
explained [1]  5/8
explicit [1]  10/13

**F**

face [1]  3/10
fast [1]  13/14
FEDERAL [3]  1/19 6/7 16/13
feel [1]  7/5
fees [6]  16/20 16/21 17/1 17/11 17/18
20/6
few [2]  6/11 13/19
Fieldthorn [1]  1/16

Fifth [1]  19/11
figure [1]  14/5
file [5]  6/18 10/10 12/11 17/2 18/15
filed [2]  9/22 14/25
filing [1]  7/16
final [1]  16/10
financially [1]  8/25
find [2]  11/11 15/15
first [1]  7/16
fishing [1]  10/5
fit [1]  10/6
five [2]  7/21 7/24
flaunt [1]  12/24
flown [1]  13/14
following [1]  15/1
foregoing [2]  20/4 20/5
format [1]  20/6
FORT [6]  1/3 1/5 1/20 1/23 20/14
20/17
forward [1]  18/3
forwarded [1]  7/21
four [2]  7/21 7/23
fourth [1]  7/8
frank [1]  14/14
Friday [4]  8/19 17/5 17/7 17/8
front [2]  16/1 16/17
full [1]  3/23
further [1]  20/6

**G**

gave [1]  5/11
gentlemen [1]  18/12
get [21]
getting [1]  5/2
give [4]  5/13 5/21 16/4 17/14
given [5]  13/15 14/18 15/21 15/22
17/16
giving [2]  8/7 13/1
Gmail [1]  7/18
go [6]  10/5 11/18 11/20 12/20 16/17
18/13
going [18]  4/4 10/20 12/15 12/16
12/18 12/19 12/23 13/3 13/18 13/24
15/2 15/4 16/14 17/10 17/14 17/21
17/22 18/17
Good [1]  3/14
got [3]  4/23 5/6 14/19
Government [3]  5/20 10/16 18/20
guessing [1]  10/12
guy [1]  12/23
GUZMAN [4]  1/22 20/3 20/11 20/11

**H**

had [6]  3/7 5/1 9/22 10/16 12/11 15/11
hand [1]  6/9
happened [1]  7/22
happy [1]  13/12
has [11]  3/18 6/1 7/14 7/19 7/19 7/22
7/24 8/20 8/20 14/10 15/16
have [39]
haven't [2]  8/4 10/13
having [1]  14/24
hay [1]  5/3
he [7]  3/8 3/9 5/3 5/5 7/21 7/24 12/4
he's [2]  3/8 5/6
heard [1]  8/4
hearing [10]  1/8 3/11 4/15 5/12 7/8

## H

**hearing... [5]** 7/12 7/23 11/4 18/12 18/15
**hearings [1]** 15/10
**heavy [1]** 10/18
**held [3]** 3/9 6/8 17/13
**help [1]** 3/19
**her [2]** 5/7 15/8
**here [11]** 3/6 4/1 4/15 5/9 7/6 8/13 13/14 14/3 16/21 17/21 18/10
**high [1]** 9/23
**him [7]** 7/24 12/16 12/21 12/22 13/25 13/25 14/2
**his [2]** 5/3 12/7
**hold [1]** 12/22
**holding [5]** 4/11 6/2 6/2 11/14 17/19
**home [2]** 13/10 13/11
**Honor [32]**
**Honor's [1]** 7/18
**HONORABLE [2]** 1/9 16/1
**hour [4]** 10/21 14/1 14/2 14/3
**how [6]** 5/8 12/4 12/25 13/3 13/14 13/24

## I

**I'd [1]** 17/4
**I'll [4]** 5/13 12/2 14/14 17/20
**I'm [18]** 4/13 5/23 9/4 9/5 10/12 10/25 11/8 11/11 13/1 13/12 15/14 16/3 16/6 17/5 17/14 17/21 19/1 19/3
**I've [7]** 8/4 8/8 9/18 10/16 11/3 14/19 15/18
**identifying [1]** 3/23
**illegitimate [1]** 8/7
**impose [2]** 7/8 11/1
**include [1]** 10/22
**incurred [1]** 17/12
**INDEX [1]** 2/1
**individual [1]** 16/12
**information [8]** 3/7 3/9 6/13 11/15 11/25 12/16 13/6 15/16
**informed [1]** 11/3
**instructed [2]** 5/13 6/17
**intend [1]** 9/2
**internet [1]** 5/4
**interrupt [1]** 4/3
**investors [1]** 12/5
**involved [1]** 8/23
**irrelevant [1]** 9/13
**is [30]**
**issues [1]** 5/1
**it [30]**
**it's [7]** 5/22 6/4 9/21 12/25 13/3 13/19 15/20
**itself [2]** 3/18 6/6

## J

**jail [9]** 4/12 6/3 7/2 10/21 13/20 13/22 14/16 14/21 15/6
**jailing [1]** 17/20
**Jesus [1]** 12/22
**JOHNSON [23]**
**join [1]** 18/18
**JOSHUA [3]** 1/18 4/14 4/18
**JUDGE [6]** 1/9 5/6 11/4 12/24 16/2 16/18
**judgment [3]** 12/19 16/10 17/23

**Judicial [5]** 20/7
**JUDY [1]** 1/18
**July [2]** 16/7 18/4
**JUNE [4]** 1/6 3/2 7/23 20/9
**just [12]** 5/8 7/15 8/3 9/2 10/6 11/18 12/9 12/13 14/20 14/22 17/1 18/17

## K

**kind [1]** 10/3
**know [11]** 4/25 5/7 5/10 5/12 11/24 12/3 12/25 13/16 16/2 16/18 18/11

## L

**Lambert [5]** 3/13 3/16 3/16 12/5 12/7
**last [2]** 5/12 15/19
**law [2]** 5/16 6/1
**lawsuit [2]** 9/1 12/11
**lawyer [1]** 5/19
**least [2]** 10/25 14/12
**leaves [1]** 5/5
**led [1]** 16/20
**left [2]** 10/25 15/24
**let [5]** 6/11 7/15 14/4 18/11 18/20
**like [10]** 4/4 5/9 6/25 7/1 7/3 7/5 10/10 14/20 16/21 17/4
**limit [1]** 8/20
**limited [1]** 18/15
**litigant [1]** 14/20
**litigation [1]** 8/23
**LLC [2]** 1/4 3/4
**LLP [1]** 1/12
**long [2]** 10/5 13/24
**look [2]** 10/12 18/3
**losing [1]** 11/8
**lot [4]** 5/1 5/3 5/6 5/9

## M

**made [6]** 7/4 8/13 9/12 9/16 9/21 9/21
**Mail [2]** 1/24 20/19
**make [4]** 4/7 5/3 6/22 10/24 14/22 17/21
**making [1]** 11/9
**mandamus [1]** 10/11
**many [2]** 12/4 13/3
**MARK [1]** 1/9
**marshals [3]** 10/19 15/13 18/10
**martyr [3]** 14/17 14/22 17/21
**material [1]** 14/15
**matter [7]** 3/3 3/4 6/4 6/7 10/9 14/8 20/5
**may [4]** 8/6 8/15 18/11 18/13
**me [22]**
**mean [2]** 8/22 11/24
**means [3]** 8/24 11/15 15/2
**mechanical [1]** 1/25
**media [1]** 5/4
**mediation [4]** 9/3 11/5 16/1 16/17
**mediator [1]** 11/3
**mguzman.csr [2]** 1/24 20/19
**might [2]** 9/17 11/13
**million [1]** 12/20
**Miranda [1]** 5/12
**Monday [2]** 16/2 16/7
**Monetary [1]** 11/12
**money [1]** 18/19
**MONICA [4]** 1/22 20/3 20/11 20/11
**months [1]** 15/19

**more [2]** 17/2 18/19
**most [1]** 15/15
**motion [4]** 3/6 7/16 16/20 18/16
**motions [1]** 17/12
**move [2]** 16/10 17/22
**moving [2]** 15/5 16/6
**Mr [26]**
**Ms [3]** 4/13 4/17 18/6
**much [1]** 14/10
**multiple [2]** 7/13 15/21
**my [17]** 5/8 6/5 6/17 8/14 8/24 9/18 9/22 10/10 10/15 11/8 13/1 13/9 13/10 13/24 14/19 15/7 18/10

## N

**name [2]** 3/23 4/17
**nature [1]** 3/19
**NCRA [1]** 20/12
**necessary [1]** 4/7
**necessitated [1]** 3/11
**need [7]** 3/22 4/11 5/22 11/24 12/3 13/3 18/11
**never [3]** 12/15 12/16 16/18
**New [7]** 5/7 9/22 12/25 14/25 15/7 15/13 15/20
**news [1]** 14/19
**next [2]** 3/3 13/19 18/12 18/24
**no [18]** 1/4 7/15 8/2 8/15 8/20 8/21 9/20 10/2 11/22 11/23 11/24 15/22 15/24 17/9 18/1 18/22 20/12 20/12
**noncompliance [1]** 15/3
**NORTHERN [3]** 1/2 1/19 20/13
**not [22]**
**nothing [4]** 7/14 7/19 7/22 12/24
**now [5]** 5/23 10/16 12/22 13/3 13/19 17/23
**number [2]** 3/5 3/22 7/11

## O

**oath [1]** 5/23
**objection [2]** 8/2 10/3
**observed [1]** 15/19
**occur [1]** 16/1
**off [1]** 18/13
**Office [1]** 4/14
**Official [1]** 20/13
**okay [5]** 6/16 13/11 13/18 14/4 16/14
**once [1]** 17/14
**one [10]** 3/22 5/19 6/20 9/25 15/10 16/25 17/2 17/2 17/6 18/12
**only [4]** 11/13 12/18 15/4 17/16
**opportunity [3]** 13/1 14/18 16/4
**option [1]** 6/1
**order [6]** 8/14 9/5 9/11 9/18 17/15 18/18
**ordered [7]** 3/8 8/8 9/18 10/8 11/6 11/16 17/11
**ordering [3]** 4/13 15/25 16/22
**orders [14]** 5/2 5/7 7/13 7/19 8/24 10/14 11/2 11/6 11/9 12/24 14/12 14/19 15/3 15/8
**other [6]** 3/10 6/18 6/21 9/22 10/1 15/24
**our [12]** 3/19 4/9 4/14 6/3 7/7 7/12 7/22 7/23 14/21 16/7 16/25 18/5
**out [4]** 4/6 14/5 14/5 16/11
**overbroad [1]** 10/3

**P**

**p.m** [2]  1/7 3/2
**PAGE** [1]  2/2
**pages** [1]  7/17
**paper** [1]  11/5
**part** [4]  12/2 12/3 16/20 16/22
**parties** [1]  15/25
**party** [3]  6/14 8/20 13/15
**patience** [3]  8/11 11/8 11/10
**pattern** [3]  11/8 15/19 15/20
**pay** [7]  10/6 10/8 16/22 17/11 17/12
17/20 17/24
**paying** [1]  17/18
**Pearl** [1]  1/13
**pending** [1]  15/9
**perjury** [2]  5/22 6/6
**pertinent** [1]  15/15
**phone** [1]  13/9
**Piper** [1]  1/12
**PITTMAN** [1]  1/9
**PLAINTIFF** [1]  1/12
**plaintiffs** [4]  3/12 3/15 7/16 17/11
**plaintiffs'** [2]  10/16 15/12
**pleadings** [5]  11/18 14/16 15/1 15/25
17/16
**please** [1]  4/16
**point** [8]  1/4 3/4 3/12 3/15 14/8 16/8
16/25 17/18
**position** [1]  11/5
**positive** [1]  16/3
**possibility** [1]  15/7
**possibly** [1]  11/13
**postings** [1]  5/4
**prefer** [2]  18/14 19/2
**prepared** [3]  10/19 11/20 13/5
**prescribed** [1]  20/7
**present** [2]  5/18 10/19
**previous** [1]  17/1
**prior** [2]  7/16 7/22
**prison** [1]  12/22
**PRO** [1]  1/15
**probably** [5]  5/13 6/21 10/14 14/1
15/15
**problem** [1]  17/9
**proceedings** [3]  1/25 19/6 20/5
**process** [2]  13/25 14/2
**produce** [1]  11/6
**produced** [3]  1/25 7/14 7/19
**prove** [6]  11/20 12/1 12/7 12/20 16/9
16/21
**provide** [3]  3/7 3/8 13/5
**provided** [3]  5/19 6/13 8/20
**provides** [1]  6/1
**providing** [1]  11/15
**public** [5]  1/19 3/19 4/9 4/14 10/17
**purge** [6]  4/12 6/3 11/14 13/4 13/5
17/19
**purpose** [1]  18/15
**put** [3]  15/2 16/8 17/17

**Q**

**questioning** [1]  5/18
**questions** [4]  5/23 6/5 6/12 17/25
**quite** [1]  14/14

**R**

**raise** [1]  6/9

**rather** [4]  8/22 8/22 9/23 19/3
**reach** [1]  16/3
**read** [1]  14/24
**ready** [2]  13/8 17/5
**really** [2]  14/17 15/4
**reason** [1]  15/22
**receive** [2]  8/12 8/18
**receive a** [1]  8/12
**recently** [1]  6/17
**recess** [1]  14/6
**record** [6]  3/23 5/1 10/12 14/7 18/14
20/5
**refuse** [1]  14/19
**regurgitate** [1]  4/25
**related** [1]  11/16
**remain** [2]  5/15 15/9
**remember** [1]  15/14
**reported** [1]  1/25
**REPORTER** [2]  1/22 20/13
**REPORTER'S** [1]  19/7
**represent** [4]  3/20 4/10 4/15 18/7
**request** [1]  15/12
**requiring** [1]  3/7
**research** [1]  10/3
**resources** [5]  10/15 10/16 10/17
10/23 13/1
**responded** [1]  7/24
**responsive** [1]  15/12
**Reston** [1]  1/16
**RHODES** [5]  1/18 4/14 4/17 4/18 18/6
**right** [14]  3/3 3/17 4/4 4/22 5/15 5/17
5/18 6/9 6/11 8/8 17/25 18/3 19/3 19/4
**rights** [1]  4/8
**Room** [3]  1/20 1/22 20/17
**round** [1]  10/21
**RPR** [3]  1/22 20/3 20/11
**run** [1]  15/6

**S**

**same** [3]  7/6 15/21 15/21
**sanction** [3]  11/1 14/12 16/23
**sanctions** [4]  3/10 7/8 11/12 15/8
**SANDERS** [5]  1/18 4/13 4/17 4/20
18/6
**sat** [1]  8/13
**say** [2]  5/16 7/21
**saying** [3]  6/18 9/23 9/25
**scope** [2]  12/4 12/14
**scratching** [1]  12/10
**SE** [1]  1/15
**search** [1]  11/16
**seated** [1]  14/9
**see** [3]  10/6 10/11 18/24
**seeing** [1]  18/3
**seeking** [1]  17/1
**seem** [2]  6/25 7/3
**seems** [4]  5/3 6/19 7/1 8/21
**seen** [2]  14/17 15/20
**sent** [2]  7/23 15/13
**separate** [1]  6/4
**settle** [1]  16/5
**several** [2]  12/20 15/8
**severe** [2]  14/25 14/12
**she** [1]  12/25
**shenanigans** [1]  5/9
**Short** [1]  14/6
**shortly** [1]  11/4

**show** [2]  18/7/13
**sic** [2]  3/6 17/15
**sign** [2]  17/15 17/15
**Signed** [1]  20/9
**silent** [1]  5/15
**simply** [1]  11/18
**since** [3]  7/18 7/18 7/22
**single** [1]  17/6
**sir** [1]  4/5
**situation** [2]  9/25 10/25
**six** [2]  7/24 15/19
**SMITH** [1]  1/18
**social** [1]  5/4
**some** [5]  3/7 5/23 14/15 14/19 15/11
**someone** [1]  6/2
**something** [2]  9/19 9/22
**song** [1]  7/6
**soon** [1]  17/10
**sooner** [1]  19/1
**sorry** [3]  9/4 10/8 15/14
**sort** [1]  7/17
**speak** [3]  5/10 5/11 5/17
**spending** [1]  18/19
**spread** [1]  12/4
**stands** [1]  12/25
**state** [3]  3/23 4/17 16/13
**STATES** [4]  1/1 1/9 18/20 20/8
**stay** [1]  13/22
**stenography** [1]  1/25
**Street** [4]  1/13 1/20 1/22 20/17
**strike** [2]  15/1 15/24
**striking** [1]  11/18
**struck** [1]  17/16
**stuff** [1]  12/4
**subject** [1]  17/17
**submission** [4]  7/23 17/2 17/7 17/7
**submit** [3]  11/5 17/1 17/6
**submitted** [1]  14/15
**Substacks** [1]  5/4
**sufficient** [1]  12/13
**suggest** [1]  10/2
**Suite** [1]  1/13
**support** [1]  14/15
**supposed** [1]  6/14
**sure** [5]  3/25 4/7 5/3 19/1 19/3
**surface** [1]  12/10
**sworn** [1]  6/10

**T**

**table** [1]  3/16
**take** [6]  10/19 10/20 13/4 13/24 14/1
14/4
**taken** [2]  3/18 14/6
**talking** [1]  9/5
**Taylor** [1]  1/20
**tea** [1]  9/5
**Telephone** [5]  1/14 1/17 1/21 1/23
20/18
**tell** [4]  13/24 15/17 15/23 16/2
**telling** [1]  6/23
**tenth** [1]  7/5
**terms** [2]  10/4 11/16
**TEXAS** [9]  1/2 1/5 1/14 1/19 1/20 1/23
20/12 20/13 20/17
**than** [2]  15/24 19/1
**thank** [10]  3/17 18/6 18/10 18/12
18/21 18/22 18/23 19/3 19/4 19/5

**that [73]**

**that's [5]** 6/7 10/7 11/15 14/15 15/4

**their [4]** 7/16 16/8 16/9 17/23

**them [5]** 5/3 5/14 6/2 10/21 16/20

**then [5]** 8/25 12/20 14/2 14/22 17/22

**there [1]** 16/11

**these [4]** 7/8 10/24 14/16 17/12

**they [8]** 10/4 10/4 10/4 10/5 10/6 10/11 10/18 15/15

**they'll [4]** 10/12 10/14 17/22 17/23

**thing [3]** 12/18 15/4 16/9

**things [1]** 3/22

**think [16]** 7/12 7/21 7/23 8/3 8/19 10/7 11/13 12/6 12/9 14/16 14/17 14/24 15/3 15/12 16/12 16/19

**third [5]** 6/14 7/7 7/12 8/20 13/15

**third-party [3]** 6/14 8/20 13/15

**this [30]**

**THOMPSON [6]** 1/12 3/15 7/7 11/21 13/13 19/4

**those [10]** 5/13 5/21 15/8 16/22 17/4 17/13 17/15 17/18 17/20 20/7

**thought [2]** 4/7 9/17

**thousand [1]** 7/17

**threatened [1]** 3/9

**through [1]** 10/4

**throw [2]** 14/21 15/6

**thrown [2]** 7/2 14/16

**thwarting [1]** 15/7

**time [7]** 8/8 14/21 16/8 17/24 18/4 18/6 18/19

**times [2]** 10/13 15/21

**tip [1]** 12/10

**today [8]** 3/6 5/24 11/4 13/6 15/19 16/21 17/21 18/11

**today's [1]** 18/15

**told [2]** 8/13 9/16

**Tomorrow [1]** 16/25

**too [2]** 9/17 10/18

**took [1]** 6/22

**tool [1]** 11/13

**trample [1]** 4/8

**transcript [4]** 1/8 1/25 20/4 20/6

**transport [1]** 14/3

**trial [5]** 11/19 11/20 16/6 16/7 18/5

**tried [1]** 14/10

**trip [1]** 10/21

**trouble [1]** 5/6

**true [1]** 20/4

**trust [1]** 15/23

**trusted [1]** 15/18

**truthfully [1]** 6/5

**try [4]** 11/1 13/18 14/5 16/4

**trying [3]** 11/8 11/11 12/13

**tweet [1]** 14/22

**twice [5]** 3/8 8/4 8/8 9/18 11/16

**two [4]** 4/9 10/17 10/18 10/21

**two-hour [1]** 10/21

**type [2]** 16/3 16/13

## U

**unable [2]** 6/19 9/23

**under [2]** 5/23 10/19

**understand [5]** 9/7 9/14 12/13 13/12 13/21

**Understood [1]** 16/15

**UNITED [4]** 1/1 1/9 18/20 20/8

**until [11]** 4/12 6/3 8/25 11/14 12/22 13/22 16/12 17/19 17/20 17/24 17/24 18/10

**up [14]** 5/7 8/8 11/9 11/20 12/1 12/7 12/20 12/24 14/3 14/25 16/6 16/12 16/21 18/10

**upon [2]** 3/18 6/22

**us [6]** 1/12 4/17 16/20 18/15 18/18 18/21

**use [1]** 10/16

**used [1]** 5/16

**using [1]** 18/20

## V

**valid [1]** 10/25

**various [2]** 5/4 17/12

**vendor [6]** 6/14 8/20 13/15

**verse [1]** 7/6

**very [2]** 4/9 5/8

**violation [2]** 6/20 11/6

**Virginia [1]** 1/16

**visit [1]** 4/23

**VOL [1]** 2/2

**VOLUME [1]** 1/8

**volunteering [1]** 18/7

**vs [3]** 1/6 3/4 14/8

## W

**want [15]** 4/25 5/10 5/11 5/21 7/1 7/21 9/24 10/5 10/6 13/2 14/16 14/17 14/21 16/4 17/8

**warnings [2]** 5/12 5/21

**was [11]** 3/9 4/7 6/19 7/4 7/22 8/19 9/21 9/23 9/25 11/5 18/17

**wasteful [1]** 18/19

**wasting [1]** 14/21

**way [4]** 11/11 14/5 14/11 14/24

**we [20]** 3/6 4/7 5/9 5/9 7/7 7/11 7/17 7/23 11/18 11/24 12/3 12/9 12/12 17/1 17/1 18/11 18/12 18/13 18/14 19/1

**we'll [7]** 14/4 16/6 17/2 17/6 18/4 18/11 18/24

**we're [5]** 7/5 7/12 12/9 12/13 17/22

**we've [1]** 5/1

**week [1]** 17/2

**well [5]** 4/21 7/5 8/23 12/11 13/18

**went [1]** 18/8

**were [6]** 6/13 11/6 15/6 15/22 17/1 18/14

**whammy [1]** 17/16

**what [10]** 5/23 7/7 7/11 9/4 10/2 10/25 12/7 12/13 14/11 15/18

**what's [1]** 14/12

**when [1]** 4/11

**where [2]** 15/14 15/21

**wherever [1]** 15/14

**whether [4]** 4/11 6/5 9/12 9/12

**which [11]** 5/22 6/7 8/24 9/25 10/21 10/24 11/15 12/20 15/1 16/8 18/4

**who [2]** 3/12 16/10

**why [2]** 6/16 12/3

**will [11]** 3/14 5/16 5/19 14/1 16/2 16/4 16/22 17/13 17/17 17/19 19/1

**WILLENBURG [4]** 1/22 20/3 20/11 20/11

**WILLIAM [1]** 1/12

**wise [2]** 6/25 7/3

**withdraw [2]** 18/16 18/16

**without [1]** 6/23

**witnesses [1]** 12/7

**word [1]** 15/18

**work [3]** 11/12 11/12 11/14

**workload [1]** 10/18

**WORTH [6]** 1/3 1/5 1/20 1/23 20/14 20/17

**would [13]** 3/9 4/16 5/24 6/20 11/14 13/16 14/12 15/1 15/6 15/15 16/16 16/21 18/14

**writ [1]** 10/10

## Y

**Y'all [1]** 14/8

**yahoo.com [2]** 1/24 20/19

**yes [6]** 4/5 4/24 7/10 9/7 12/2 16/24

**yet [1]** 18/19

**York [6]** 5/7 9/23 12/25 14/25 15/13 15/20

**York's [1]** 15/7

**you [140]**

**you'll [2]** 13/22 17/15

**you're [17]** 4/3 6/3 6/5 8/7 8/23 12/15 12/16 12/18 12/19 12/23 13/18 13/20 14/20 15/2 15/15 17/10 19/3

**you've [4]** 5/13 14/18 15/21 16/20

**you-all [5]** 4/16 16/2 16/9 16/17 18/18

**your [59]**

**yourself [10]** 3/24 4/12 6/4 6/22 7/1 11/14 13/4 13/5 14/22 17/19

# EXHIBIT 24

```
 1               IN THE UNITED STATES DISTRICT COURT

 2               FOR THE NORTHERN DISTRICT OF TEXAS

 3                       FORT WORTH DIVISION

 4   POINT BRIDGE CAPITAL, LLC   )   CASE NO. 4:24-CV-00988-P
     ET AL                       )
 5                               )
                                 )   FORT WORTH, TEXAS
 6   vs.                         )
                                 )   JULY 14, 2025
 7   CHARLES JOHNSON             )   10:20 A.M.

 8                            VOLUME 1
                       TRANSCRIPT OF JURY TRIAL
 9            BEFORE THE HONORABLE MARK T. PITTMAN
          UNITED STATES DISTRICT COURT JUDGE AND A JURY
10

11   A P P E A R A N C E S:

12   FOR THE PLAINTIFFS:    WILLIAM BENNETT THOMPSON
                            DLA Piper, LLP US
13                          1900 N. Pearl Street
                            Suite 2200
14                          Dallas, Texas  75201
                            Telephone:  214.743.4500
15

16   PRO SE DEFENDANT:      CHARLES JOHNSON
                            1624 Fieldthorn Drive
17                          Reston, Virginia  20194
                            Telephone:  617.429.4718
18

19
     COURT REPORTER:        MONICA WILLENBURG GUZMAN, CSR, RPR
20                          501 W. 10th Street, Room 310
                            Fort Worth, Texas  76102
21                          Telephone:  817.850.6681
                            E-Mail: mguzman.csr@yahoo.com
22

23   Proceedings reported by mechanical stenography, transcript
     produced by computer.
24

25
```

<u>**INDEX**</u>

PAGE  VOL.

Opening Statements

    By Mr. Thompson ......................10    1

    By Defendant Johnson .................14    1

| Plaintiffs' Witnesses | Direct | Cross | Voir Dire | |
|---|---|---|---|---|
| Hal Lambert | 22 | 85 | | 1 |
| Stewart Baker | 105,134 | 127 | | 1 |
| Charles Johnson | 136 | 155 | | 1 |
| Dennis Brady | 161 | 172 | | 1 |

Plaintiffs Rest ...........................182    1

Defendant Rests - by Court Order .........183    1

Objections to Court's Charge

    By Mr. Thompson ......................184    1

    By Defendant Johnson .................185    1

Court's Charge Read ......................186    1

Closing Arguments

    By Mr. Thompson ......................199    1

    By Defendant Johnson .................204    1

    By Mr. Thompson ......................209    1

Jury Deliberates .........................211    1

Verdict of the Jury ......................213    1

Jury Polled ..............................214    1

Jury Admonished ..........................215    1

Jury Excused .............................216    1

1    Proceedings Adjourned .....................217     1

2    Reporter's Certificate ...................218     1

3

4                              *  *  *

5                  **ALPHABETICAL INDEX OF WITNESSES**

6

7    Plaintiffs' Witnesses     Direct  Cross  Voir Dire

8    Baker, Stewart            105,134 127              1

9    Brady, Dennis             161     172              1

10   Johnson, Charles          135     155              1

11   Lambert, Hal               22      85              1

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PLAINTIFFS' EXHIBITS**

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED | VOL. |
|---|---|---|---|---|
| 1 | Internet Post | 21 | 21 | 1 |
| 2 | Internet Post | 21 | 21 | 1 |
| 3 | Internet Post | 21 | 21 | 1 |
| 4 | Internet Post | 21 | 21 | 1 |
| 5 | Internet Post | 21 | 21 | 1 |
| 6 | Internet Post | 21 | 21 | 1 |
| 7 | Internet Post | 21 | 21 | 1 |
| 8 | Internet Post | 21 | 21 | 1 |
| 9 | Internet Post | 21 | 21 | 1 |
| 10 | Internet Post | 21 | 21 | 1 |
| 11 | Internet Post | 21 | 21 | 1 |
| 12 | Internet Post | 21 | 21 | 1 |
| 13 | Internet Post | 21 | 21 | 1 |
| 14 | Internet Post | 21 | 21 | 1 |
| 15 | Internet Post | 21 | 21 | 1 |
| 16 | Internet Post | 21 | 21 | 1 |
| 17 | Internet Post | 21 | 21 | 1 |
| 18 | Internet Post | 21 | 21 | 1 |
| 19 | Credit Suisse Video – 3/15/2023 | 21 | 21 | 1 |
| 20 | Morningstar Medalist Rating – 5/1/2023 | 21 | 21 | 1 |
| 21 | Internet Post | 21 | 21 | 1 |
| 22 | Internet Post | 21 | 21 | 1 |

| 23 | Internet Post | 21 | 21 | 1 |
|----|---------------|----|----|----|
| 24 | Internet Post | 21 | 21 | 1 |
| 25 | 10/22/2023 Email – Lambert to Investors | 21 | 21 | 1 |
| 26 | 10/22/2023 Email – Leider to Lambert on Umbra | 21 | 21 | 1 |
| 27 | 10/22/2023 Email – Johnson to Lambert on Umbra | 21 | 21 | 1 |
| 28 | 10/24/2023 Email – Barnard to Wise on Johnson | 21 | 21 | 1 |
| 29 | 10/24/2023 Email – Muns to Lambert on Umbra | 21 | 21 | 1 |
| 30 | Internet Post | 21 | 21 | 1 |
| 31 | Internet Post | 21 | 21 | 1 |
| 32 | Internet Post | 21 | 21 | 1 |
| 33 | Internet Post | 21 | 21 | 1 |
| 34 | Internet Post | 21 | 21 | 1 |
| 35 | Internet Post | 21 | 21 | 1 |
| 36 | Internet Post | 21 | 21 | 1 |
| 37 | Internet Post | 21 | 21 | 1 |
| 38 | Internet Post | 21 | 21 | 1 |
| 39 | Internet Post | 21 | 21 | 1 |
| 40 | Internet Post | 21 | 21 | 1 |
| 41 | Internet Post | 21 | 21 | 1 |
| 42 | Internet Post | 21 | 21 | 1 |
| 43 | Internet Post | 21 | 21 | 1 |

| | | | | |
|---|---|---|---|---|
| 44 | Internet Post | 21 | 21 | 1 |
| 45 | Internet Post | 21 | 21 | 1 |
| 46 | Omitted | 21 | 21 | 1 |
| 47 | Omitted | 21 | 21 | 1 |
| 48 | Internet Post | 21 | 21 | 1 |
| 49 | Internet Post | 21 | 21 | 1 |
| 50 | Internet Post | 21 | 21 | 1 |
| 51 | Internet Post | 21 | 21 | 1 |
| 52 | Internet Post | 21 | 21 | 1 |
| 53 | Internet Post | 21 | 21 | 1 |
| 54 | Internet Post | 21 | 21 | 1 |
| 55 | 9/19/2024 Letter – Buma | 21 | 21 | 1 |
| 56 | Internet Post | 21 | 21 | 1 |
| 57 | Omitted | 21 | 21 | 1 |
| 58 | Internet Post | 21 | 21 | 1 |
| 59 | Internet Post | 21 | 21 | 1 |
| 60 | Internet Post | 21 | 21 | 1 |
| 61 | 10/16/2024 Google Search – Lambert | 21 | 21 | 1 |
| 62 | Internet Post | 21 | 21 | 1 |
| 63 | 10/23/2024 Email – Johnson to Point Bridge on Umbra | 21 | 21 | 1 |
| 64 | 10/23/2024 Email – Johnson on Subject 28 | 21 | 21 | 1 |
| 65 | Internet Post | 21 | 21 | 1 |

| | | | | |
|---|---|---|---|---|
| 66 | Internet Post | 21 | 21 | 1 |
| 67 | Internet Post | 21 | 21 | 1 |
| 68 | Internet Post | 21 | 21 | 1 |
| 69 | 4/5/2025 Expert Report – Dennis Brady | 21 | 21 | 1 |
| 70 | Internet Post | 21 | 21 | 1 |
| 71 | 7/7/2025 Email/Letter – Lambert on Witherspoon | 21 | 21 | 1 |
| 72 | Internet Post | 21 | 21 | 1 |
| 73 | Article – Tech FW's Post | 21 | 21 | 1 |
| 74 | Institutions Offering MBA | 21 | 21 | 1 |
| 75 | Fort Worth Stock Show | 21 | 21 | 1 |
| 76 | Video – Cavuto Interview | 21 | 21 | 1 |
| 77 | Internet Post | 21 | 21 | 1 |
| 78 | Internet Post | 21 | 21 | 1 |
| 79 | Internet Post | 21 | 21 | 1 |
| 80 | Internet Post | 21 | 21 | 1 |
| 81 | Internet Post | 21 | 21 | 1 |
| 82 | Internet Post | 21 | 21 | 1 |
| 83 | 4/2/2024 – Court Order | 21 | 21 | 1 |
| 84 | 5/20/2024 – Court Order | 21 | 21 | 1 |
| 85 | 9/17/2024 – Court Order | 21 | 21 | 1 |

| | | | | | |
|---|---|---|---|---|---|
| 86 | 1/16/2025 – Court Order | 21 | 21 | 1 |
| 87 | Omitted | 21 | 21 | 1 |
| 88 | Demonstrative – Johnson Posts | 21 | 21 | 1 |
| 89 | Demonstrative – Timeline | 21 | 21 | 1 |
| 90 | Demonstrative – Internet Post | 21 | 21 | 1 |
| 91 | Demonstrative – Internet Posts | 21 | 21 | 1 |
| 92 | 7/8/2025 Email – Johnson | 21 | 21 | 1 |
| 93 | 10/28/2023 Email – Johnson on Umbra | 21 | 21 | 1 |
| 94 | Email – Johnson to Hyland | 21 | 21 | 1 |
| 95 | Critical Mention Reports | 21 | 21 | 1 |
| 96 | Summary – Critical Mention Reports | 21 | 21 | 1 |
| 97 | 11/14/2019 Video – Cavuto | 21 | 21 | 1 |
| 98 | Demonstrative – Damages Slides | 21 | 21 | 1 |
| 99 | Demonstrative – Brady Slides | 21 | 21 | 1 |
| 100 | Demonstrative – Chiagouris Slides | 21 | 21 | 1 |
| 101 | Demonstrative – Baker Slides | 21 | 21 | 1 |
| 102 | Demonstrative – Photograph | 21 | 21 | 1 |

| | | | | |
|---|---|---|---|---|
| 103 | Demonstrative – Burden of Proof | 21 | 21 | 1 |
| 104 | Internet Post | 21 | 21 | 1 |
| 105 | Internet Post | 21 | 21 | 1 |
| 106 | Internet Post | 21 | 21 | 1 |
| 107 | Internet Post | 21 | 21 | 1 |
| 108 | Internet Post | 21 | 21 | 1 |
| 109 | Internet Post | 21 | 21 | 1 |
| 110 | Internet Post | 21 | 21 | 1 |
| 111 | Summary – Point Bridge Investments | 21 | 21 | 1 |
| 112 | Demonstrative – Summary of Investments | 21 | 21 | 1 |
| 113 | Lawsuit – Johnson v. Verizon | 21 | 21 | 1 |
| 114 | Lawsuit – Johnson v. Gawker | 21 | 21 | 1 |

1           **P R O C E E D I N G S**

2              *(July 14, 2025, 10:20 a.m.)*

3        *THE COURT:*  All right.  Joe, can we get notepads

4   from the back?

5        *SECURITY OFFICER:*  Yes, sir.

6        *THE COURT:*  While we're doing that, we'll go ahead

7   and get everything ready to go; and next we'll hear from the

8   parties to hear opening statements.  So, let's get your

9   notepads out here, and then we'll begin the opening

10  statements.

11              *(Brief pause)*

12       *THE COURT:*  All right.  We'll be handing you our

13  notepads at this time.  Remember the instructions that I gave

14  you with regards to note-taking.  Thank you.

15       All right.  At this time, I'll call upon the

16  plaintiff to begin his opening statement.  You have 5 minutes,

17  we'll give you a 1-minute warning.  And let us know when

18  you're ready.

19       *MR. THOMPSON:*  I am, Your Honor.  May I proceed?

20              *(Court Reporter interrupts)*

21       *MR. THOMPSON:*  May I begin, Your Honor?

22       *THE COURT:*  Yes, sir.

23       *MR. THOMPSON:*  Ladies and gentlemen of the jury,

24  again, my name is Will Thompson, and I'm honored to represent

25  Mr. Hal Lambert and his company, Point Bridge Capital, which

1    is just a few blocks down the road from here.

2             And you're going to hear that this case started when

3    the defendant, Charles Johnson, demanded half of Mr. Lambert's

4    business.  What did Mr. Johnson offer in return?  Nothing.

5    Absolutely nothing.  When Mr. Lambert said no, Mr. Johnson

6    retaliated with threats, lies, and a coordinated smear

7    campaign.

8             And let me be clear, the trial is not about whether

9    Mr. Johnson defamed Mr. Lambert or engaged in a racketeering

10   scheme, the Court has already decided that.  It's already been

11   decided, because the Court's entered liability on RICO and

12   defamation.  And RICO is a statute that was originally

13   designed to combat organized crime.

14            The way to think about this case is like a fire.

15   Mr. Johnson lit it deliberately with one goal, to destroy

16   Mr. Lambert's business and his life.  That fire is still

17   burning right now.  Your job is to assess the damage and stop

18   it from spreading.

19            So, what's the evidence going to show here?  You

20   will hear about an escalating campaign of retaliation, where

21   there was no line that Mr. Johnson wouldn't cross.  First, it

22   was threats directly to Mr. Lambert.  Mr. Johnson sent a

23   message to Mr. Lambert, said he would end up in jail unless

24   Mr. Lambert, "Did the right thing."

25            There were investor threats.  After the direct

1   threats didn't work, the evidence will show that Mr. Johnson
2   started escalating things further.  He used lies to try to
3   turn Mr. Lambert's investors and business partners against
4   him.  Mr. Lambert spent years cultivating those relationships.
5   They were the lifeblood of Point Bridge Capital; without them,
6   it ceases to exist.
7          Then it started, when the smears to the investors
8   didn't work, it turned to lawsuits; not one, but multiple.
9   When those all got thrown out, what did Mr. Johnson do next?
10  He turned to an online smear campaign.
11         You may be wondering what Mr. Johnson actually said.
12  I'll let you read it with your own eyes.  I don't want to go
13  and repeat the gross details here.  But it's allegations of
14  sexual assault, and associations with the Russian mob, and
15  compromised cash and dirty money.
16         And you'll hear that Mr. Johnson didn't just choose
17  those words by random, he chose them calculating, because
18  what Mr. Lambert's business is in Point Bridge Capital, it
19  emphasizes on early stage defense startup companies.  The
20  words that Mr. Johnson used about Russian money is a death
21  sentence to Mr. Lambert's company.
22         The damage was real in this case, the economic
23  damage was real.  You'll hear that Mr. Lambert spent over a
24  decade building Point Bridge Capital from the ground up here
25  in Fort Worth himself.

1          And before the attacks, Mr. Lambert regularly

2    appeared on nationwide TV in prime time, CNBC, Fox Business.

3    And that's really important, because he was able to showcase

4    his expertise and build investor trust, which is everything to

5    him.  He doesn't run some sort of, type of billion-dollar Wall

6    Street company that has a huge ad campaign behind it.  He

7    relies on his expertise in building trust.

8          So, how does he do it?  He gets out in the media and

9    he demonstrates it, that is very valuable.  It's called earned

10   media, and we're going to quantify it and show you that, and

11   those are some of the damages of what we're seeking in this

12   case.  And they disappeared after Mr. Lambert's *(sic)* -- his

13   defamation campaign kicked off, it fell off a cliff.  And

14   you'll also hear that the investments in Point Bridge Capital

15   also fell off a cliff.

16          *LAW CLERK:*  One minute.

17          *MR. THOMPSON:*  So, in seven months since Mr. Johnson

18   made those attacks, and investor -- investments have gone down

19   90%.

20          You're going to hear about the personal toll on

21   Mr. Lambert.  He's a husband and a father of two daughters.

22   He's going to talk about the humiliation of seeing his name

23   next to these baseless allegations.

24          And Mr. Johnson acted with malice in this case.

25   And Mr. Johnson, in going on this online smear campaign,

1    Mr. Lambert, you'll see an email, asked him to stop.  Said,

2    Take down these lies, I'm a family man, this is hurting me and

3    my business.  Mr. Johnson responded with two words, Sue me.

4    And after that, he posted it to his very active online

5    following, and they amplified the lies further.

6           So, it's your responsibility in this case to say

7    what the damage is to Mr. Lambert, personally, to his

8    business, Point Bridge Capital; and also, there's punitive

9    damages in this case.  And punitive damages are designed to

10   punish Mr. Johnson for his conduct, which is egregious, but

11   also to send a message and deter Mr. Johnson and people like

12   him, that this type of -- like this type of activity, trying

13   to trash and take down a man -- a family man of integrity,

14   who's a member of this community, that it needs to stop.

15           *LAW CLERK:*  Time.

16           *MR. THOMPSON:*  And that's what we're going to be

17   asking you to do, ladies and gentlemen.

18           Thank you.

19           *THE COURT:*  All right.  Thank you.

20           Mr. Johnson, do you care to make an opening

21   statement?

22           *DEFENDANT JOHNSON:*  Thank you.

23           One of the things that happens when you're wrongly

24   accused about something is that you -- you start to think a

25   lot about how you can't make the other person whole.  Not in a

1    monetary sense.  But when you're in a fight with somebody,

2    you -- some would say things that are heated, some would say

3    things that are exaggerated; and so, I want to be clear here.

4           I'm sorry we're here.  I tried to help many times to

5    solve this matter.  We were business partners at one point.

6    In fact, the very company at question here is a synthetic

7    aperture radar satellite system.  It's a company that

8    Mr. Lambert has no familiarity with, none whatsoever.

9           Something I know quite well, because my grandfather

10   was a Raytheon engineer down the street at E-Systems, back in

11   the day.  I am a nerd's nerd, it's true.  I do get hotheaded,

12   maybe the gingerness of me; and we have said a number of

13   things.

14          Now, you'll notice reputationally, if somebody

15   accuses you of belonging to a conspiracy, one of the best ways

16   to deal with that conspiracy is to represent yourself.  After

17   all, I'm here alone, right?  Came all the way from Virginia.

18   This is the fifth time I've been to Fort Worth.  By the way,

19   it's a lovely city.  I had a great time.  The barbecue here is

20   delicious.

21          But we're here because I embarrassed plaintiff in

22   front of his wife.  And it happened many years ago.  It

23   happened at a drunken restaurant; Mr. Lambert does like to

24   drink, that is a fact.  And I regret it, it was the wrong

25   thing to do.

1          I have asked only one thing of Mr. Lambert.  I've

2    offered to give him the $200,000, this is hardly the behavior

3    of an extortionist.  By the way, it's $200,000 I worked for.

4    It's hard to write books.  As you can see, I'm a writer, I

5    have a lot of these.  And I was extremely upset about it.

6          Now, I came to Texas, like a lot of people, because

7    I had nowhere else to go.  My -- my wife and daughter are

8    shareholders still, because of how we structured trusts in the

9    divorce, and I sued in two cases.  One in Clearview AI, which

10   he's now the co-CEO of, whatever, a company I helped start.

11   And the other was the synthetic aperture radar company.

12         Mr. Lambert is accusing me of destroying his

13   business.  It's not possible.  I don't have the means to do

14   that.  My website is read by maybe 5 to 10,000 people.  You

15   know, as you can see, like the media is obviously not really

16   here, nobody really cares about this case.

17         And look, I'm not a wealthy person.  I have been in

18   the past.  I don't particularly like having been wealthy in

19   the past, it led to a lot of problems.  It led to a divorce,

20   it led to me gaining lots of weight, it led to a lot of

21   miserable things.

22         Now, it is true that I do know some of the

23   wealthiest people in the country.  I regret knowing most of

24   them.  I've been among billionaires now effectively since the

25   2016 election, it's how Mr. Lambert and I first met each

1   other.  I don't particularly like them.  They are not -- a lot

2   of them are not good people.  And I've written about them

3   publicly.

4        And you'll note that Mr. Lambert has the same

5   attorney as the so-called richest man in the world, and has

6   represented them both at his first firm and his second.

7        MR. THOMPSON:  Your Honor, I have to object to that.

8   That's not true.

9        THE COURT:  Well, whether it's true or not, it's

10  irrelevant when it comes to the opening statement.

11       So, the purpose of the opening statement is for you

12  to show -- make your presentation to the jury what you think

13  the evidence will show.

14       So, again, remember, although he is acting as his

15  own attorney, until he says something under oath upon the

16  witness stand, it's not to be considered evidence.  Does

17  everybody understand that?  *(Heads nod)*

18       I do want to give you some leeway, though,

19  Mr. Johnson.

20       DEFENDANT JOHNSON:  Thank you, Your Honor.

21       THE COURT:  Go ahead.  Just be very careful.

22       DEFENDANT JOHNSON:  Just one more, really quick.

23       This isn't really about anything, other than

24  Mr. Lambert wanting to punish me.  You can understand that

25  from Mr. Thompson's opening remark.

1    How do I know that?  Well, I offered Mr. Lambert

2    stock worth millions, I only asked him to cash out my wife and

3    daughter of the investments that we have together -- or that

4    they have together, because I've given up most of the things

5    that I own.

6    And so, I was upset.  As you'll see, we haven't

7    actually litigated the truth of some of these statements.

8    This tends to be an issue that we're going to bring up on

9    appeal --

10    *MR. THOMPSON:*  Objection, Your Honor.

11    *DEFENDANT JOHNSON:*  -- if it needs to get appealed.

12    *MR. THOMPSON:*  I have to object to his statement,

13    his argument.

14    *THE COURT:*  Let's try to keep it to what you think

15    the facts will demonstrate in your favor, not argument.  So --

16    *DEFENDANT JOHNSON:*  Sure.

17    The facts will show --

18    *THE COURT:*  Don't interrupt me --

19    *DEFENDANT JOHNSON:*  -- that many of.

20    *THE COURT:*  -- or you're going to get in trouble.

21    *DEFENDANT JOHNSON:*  Sorry.

22    *THE COURT:*  Okay.  So, what do you think the

23    evidence is going to show that's going to be favorable to you.

24    Again, liability has already been determined, so you might

25    want to concentrate on damages-type issues.

1        *DEFENDANT JOHNSON:*  Sure.

2            Very simply, this is a treasure hunt; I don't have

3    the resources.  Time will show that that's the case.

4            And I hope to get out of this as quickly as possible

5    and go home, and hopefully get remarried and write novels and

6    books.  It's much easier to write things in a novel, because

7    people are less likely to sue you over them, even if they're

8    true.

9            So, thank you.  With that, I look forward to us

10   continuing.

11       *THE COURT:*  All right.  Thank you very much.

12           Now, ladies and gentlemen, we're about to get into

13   what's called the evidence phase of the trial.  But before we

14   do, we have some housekeeping matters to take care of.

15           Let me tell you a few instructions.  You just heard

16   both plaintiffs and defendant give what's called their opening

17   statements.  Again, this is simply just an outline for you to

18   keep in mind that -- what the plaintiffs and the defendant

19   expect the evidence to show.  It's not evidence.

20           After that, that's when we get into the evidence

21   phase of the trial.  The plaintiff is allowed to put on their

22   case in chief first, and then plaintiff rests, and then

23   Mr. Johnson, as defendant, can put on his case in chief.  And

24   then, if necessary, the plaintiffs are allowed to put on a

25   rebuttal case.

1          Again, we've given the attorneys some very, and also

2     Mr. Johnson, some very tight deadlines in order to get this to

3     you as quickly and efficiently as possible.

4          And after all the evidence is introduced, both sides

5     close, then at that time the parties make their closing

6     arguments.  But like an opening statement, closing arguments

7     are not evidence.  That's merely the party's interpretations

8     of what they believe the evidence has shown or has not shown.

9          And then finally, after all of that, I will allow

10    you to go back to the jury room to deliberate and reach your

11    verdict.

12         Now, all I would ask is to remember my prior

13    instructions, which are basically to keep an open mind during

14    the entire trial, don't decide the case until you have heard

15    all of the evidence, the closing arguments and my

16    instructions.

17         So, perhaps we can move the board, as well as the

18    podium there, and we'll begin the case in chief.  Before we

19    get to our case in chief, though, we need to make a motion

20    regarding exhibits.

21         And plaintiff has submitted several exhibits that it

22    would like to use here in trial.  There's been no objection to

23    the admission of those exhibits; is that correct, Mr. Johnson?

24              *DEFENDANT JOHNSON:*  No objection, Your Honor.

25              *THE COURT:*  Okay.  At this time, Mr. Thompson, would

1  you like to make a motion to move in the exhibits that you

2  intend to use here at trial?

3         *MR. THOMPSON:*  Yes, I would, Your Honor.

4         Plaintiffs would move to -- would seek to move

5  Exhibits 1 through 114 into evidence.

6         *THE COURT:*  All right.  Again, just so the record is

7  clear, Mr. Johnson, do you have an objection to the admission

8  of Plaintiffs' Exhibits 1 through 114?

9         *DEFENDANT JOHNSON:*  No, Your Honor.

10        *THE COURT:*  Okay.  Be sure and stand when you

11  address the Court, okay?

12        *DEFENDANT JOHNSON:*  No, Your Honor.

13        *THE COURT:*  All right.  Hearing no objection,

14  Plaintiffs' Exhibits 1 through 114 will be admitted at this

15  time.  So, there is no need to lay any type of foundation.

16  Mr. Thompson, you may merely consider these admitted and refer

17  to them, okay?

18        *MR. THOMPSON:*  Understood, Your Honor.

19        *THE COURT:*  All right.  So, at this time, plaintiff,

20  you can begin your case in chief.  Call your first witness.

21        *MR. THOMPSON:*  Your Honor, plaintiffs, Point Bridge

22  Capital and Hal Lambert, call Hal Lambert to the stand.

23        *THE COURT:*  All right.  Mr. Lambert, if you would

24  approach the witness stand for us.

25              *(Witness approaches the stand)*

1    *THE COURT:*  Before you take a seat, raise your right

2    hand.

3            *(Witness sworn)*

4    *THE COURT:*  Mr. Lambert, please speak directly into

5    the microphone.

6        *MR. THOMPSON:*  May I proceed, Your Honor?

7    *THE COURT:*  Yes, sir.

8                    HAL LAMBERT,

9    having been first duly sworn, testified as follows:

10                DIRECT EXAMINATION

11   *BY MR. THOMPSON:*

12   *Q.*    Good morning, Mr. Lambert.  Please introduce yourself

13   to the jury.

14   *A.*    I'm Hal Lambert.  I am from Fort Worth, Texas; I live

15   here.  And my wife and I have been married 30 years, and I

16   have two adult daughters.

17   *Q.*    Okay.  At a high level, tell the jury what you are here

18   to testify about today?

19   *A.*    Well, I'm here to testify because Charles Johnson

20   demanded 50% of my investment firm to extort money from me.

21   And when I said no, he went after me publicly.  He attacked me

22   with lies, he attacked my family, and he went after me to

23   thousands and thousands of his followers online and defamed

24   me.

25   *Q.*    Mr. Johnson said something --

1              (Court Reporter interrupts)

2    Q.   (By Mr. Thompson)  A couple of minutes ago in his

3    opening, Mr. Johnson said that this case didn't mean a lot

4    because there's not a lot of people in the courtroom.

5              Does it mean anything to you?

6    A.    Oh, it means an enormous amount to me, because I've

7    been damaged greatly.  My reputation's been damaged, my family

8    has been damaged, my business has been damaged.

9    Q.    Okay.  So, before we go into the extent of the harm

10   that Mr. Johnson caused, I want the jury to understand more

11   about you.

12             Let's talk a bit about your background, where you're

13   from, how you got started.

14   A.    I'm from Fort Worth, I was born and raised.  I went to

15   public schools here.  My parents are from Eastland, and moved

16   here before I was born.

17   Q.    What did your parents do for a living?

18   A.    My parents were both teachers in the Fort Worth School

19   District.

20   Q.    Which -- do you know what schools they were at?

21   A.    Yeah.  There were different ones.  But my mom was

22   elementary and my dad was a math teacher.  I went to Southwest

23   High School.  And I went through public schools here, K

24   through 12.

25   Q.    Any extracurriculars in high school?

1    *A.*     Yeah.  I played both baseball and football in high

2    school.

3    *Q.*     So, after high school, did you go to college?

4    *A.*     I did.  I went to the University of Texas in Austin and

5    majored in finance down there.  It was, you know, obviously a

6    much more affordable college to go to, but it was also one of

7    the best finance programs around.

8    *Q.*     Why did you decide to get into business or study at the

9    business school?

10    *A.*     Well, I had always wanted to have my own business.

11    When I was about 13 years old, I actually started my own

12    business, I started cutting yards of neighbors; and I did that

13    all the way through college.  So, by the time I was 16, I was

14    able to drive, and so I could drive to -- to houses.  I ended

15    up with about 25 customers.

16         And, you know, as you know, being here in Texas,

17    that kind of goes March to October timeframe when you start,

18    you know, cutting the grass.  So, that was a business that I

19    did, you know, again, from the time I was about 13 until

20    21 years old.

21    *Q.*     What kind of car did you take your lawn-mowing

22    equipment around in?

23    *A.*     Well, I got a used car that my dad had gotten, and I

24    had to pay him back.  But it was a Cutlass, I believe, at the

25    time.

1  *Q.*    Okay.  So, to orient the jury, what year did you

2  graduate from the University of Texas?

3  *A.*    I graduated early.  I graduated in 3 1/2 years, in

4  December of 1991.

5  *Q.*    Okay.  So, tell the jury a little bit about what the

6  job market was like coming out?

7  *A.*    Yeah, it wasn't a good job market back then, it was

8  basically a recession.  So, it was actually pretty tough to

9  get jobs.  But I, you know, interviewed a lot, and I was able

10 to get a job at a -- at a closely held, you know, small bank

11 here in Fort Worth.

12 *Q.*    What was the name of that bank?

13 *A.*    It was called Overton Bank and Trust.  It's not around

14 anymore, it was subsequently bought by Frost Bank.  But when I

15 was there, it was called Overton Bank.

16 *Q.*    Okay.  Tell the jury some of -- like what you were

17 doing there right out of college?

18 *A.*    Yeah.  So, I started working directly with clients back

19 then, you know, small accounts, advising on trusts and

20 investments.  And it was, basically, you know, a finance -- a

21 good-grade finance job.  It didn't pay a lot, I started at

22 $25,000 a year.

23 *Q.*    Okay.  And how long were you working at that bank?

24 *A.*    I was there about four and a half years.

25 *Q.*    Okay.  So, why did you decide to leave and where did

1   you go?

2   *A.*    So, then I decided to go get an MBA, a Master's in

3   business in finance.  You really kind of need to do that if

4   you want to kind of move up in your career back then.  So, I

5   left to go do that.

6   *Q.*    Okay.  So, when did you graduate with your MBA?

7   *A.*    I went to Georgetown in Washington, D.C., it was one of

8   the better programs, and still is.  I graduated from there in

9   1998.

10  *Q.*    Okay.  What was your first job after you got your MBA?

11  *A.*    Yeah.  I was very fortunate, I was able to go to work

12  for, locally here, known as the Bass family.  So, it was a

13  very prestigious role to get there, they don't hire a lot of

14  people.  And that firm is known for having, you know, former

15  employees and that type of thing go off and do very well, so I

16  worked directly for them.

17  *Q.*    Give the jury a little more detail about the work you

18  were doing for the Basses and things you learned?

19  *A.*    It was -- yeah, it was very complex types of

20  investments, so -- it was known as convertible arbitrage, but

21  I did creative analysis.  I learned a lot.  It was a lot of

22  intense work.  But I got to work directly with publicly traded

23  CFOs and CEOs, talking to them about their companies and

24  making investment decisions.

25  *Q.*    So, when you were working for the Basses, about how old

1    are you?

2    *A.*    I would have been 28.

3    *Q.*    Okay.  How long did you work for them, like for the

4    Bass family?

5    *A.*    I worked for them for a few years.  And I, you know,

6    again, learned a lot.  It was very -- very challenging and

7    demanding, and it was an excellent job to have.

8    *Q.*    Where did your career take you next?

9    *A.*    I was recruited away from them by a large investment

10   firm called JPMorgan, and I went to work for JPMorgan.  And it

11   was a big -- big adjustment, because it was managing all the

12   discretionary money for the southwest part of the United

13   States.  It was a really good job.

14        And I, you know, I remember interviewing there.  And

15   the guy that eventually hired me said, You know everything is

16   great, but you just look so young.  And I'm like, well,

17   there's nothing I can do about that.  But they hired me, and I

18   worked there about six years.

19   *Q.*    So, when you started working for JPMorgan, how old were

20   you?

21   *A.*    Let's see, I would have been about 30.

22   *Q.*    Okay.  And so, did your responsibility increase from

23   the things that you did with the Basses, and tell the jury

24   about your career evolving at JPMorgan?

25   *A.*    Right.  Yeah -- no, I was what's called a portfolio

1    manager there.  So, I was in charge of anytime a client,

2    typically a ultra-high net worth family, or an institution,

3    wanted money managed on what's called a discretionary basis,

4    where they'd just say, Here's what we want to do, we want you

5    to just handle it; I was responsible for that.  So I picked

6    individual stocks, and made investment decisions on their

7    behalf.

8    Q.    And how long were you at JPMorgan?

9    A.    That was about six years.

10   Q.    Okay.  So, I guess you eventually left?

11   A.    I left and went to another investment Wall Street firm

12   called Credit Suisse First Boston.

13                    (Court Reporter interrupts)

14   A.    Credit Suisse, S-U-I-S-S-E, First Boston is what it was

15   called, so CSFB for short.  And I did similar things there.

16   And a lot of the investors that I had previously at JPMorgan

17   actually moved with me to CS First Boston.

18   Q.    And what prompted the move?  Was it more responsibility

19   or what?

20   A.    Yeah, it was just a different approach.  I had a lot

21   more flexibility at CS First Boston than I did at JPMorgan.

22   JPMorgan was more structured-specific ways, and CS First

23   Boston had a lot more open investment ability.

24   Q.    You eventually came back home to Fort Worth.  Tell the

25   jury about that evolution and what went into it.

1   *A.*     Well, I had always wanted to have my own business,

2   right.  So, I decided, after about eight years at CSFB, that I

3   had enough experience and I could do it; but it was a huge

4   risk, right.

5          So, you know, when I launched Point Bridge Capital

6   from there, here in downtown Fort Worth, you don't know who's

7   going to join you and come with you that have been investing

8   with you for a long time.  So, you know, the clients that I

9   had developed at Credit Suisse or JPMorgan, many of them came

10  over to my firm.

11          And so, I've been working with some of these

12  families for 20-plus years, but you don't know when you're

13  going to do that.  Because at that point it's just me, it's my

14  name, it's Point Bridge, it's never -- you know, it's just

15  created, it's not a giant Wall Street firm.

16  *Q.*     Okay.  And so you mentioned some risk.  What were some

17  of those risks you were taking?

18  *A.*     Well, I was leaving where I was -- could get paid

19  pretty regularly to I don't know if I'm going to get paid

20  anything.  Because if they're not there, I wouldn't have any

21  ability to generate money.  The firm, you know, collects fees,

22  and if there's no clients then it can't collect fees, so

23  there's not -- there's not any money to pay anybody.

24  *Q.*     Okay.  And when you started Point Bridge -- we're going

25  to get into some of the investments that Point Bridge does,

1   but when you came to Point Bridge or founded, what was sort of

2   the approach you wanted to take?

3   A.   Well, again, that -- that opened up even more

4   flexibility.  So, you know, clients could do -- I could do

5   different things with different investors, different

6   approaches.  Again, less cookie-cutter, less specific types of

7   things that the Wall Street firms wanted to do.

8         And, you know, so I could work with clients across a

9   broad spectrum.  I wanted to be able to provide what I could

10  do at CS First Boston or JPMorgan, but do it in a more

11  customized way working directly with clients; and, again,

12  having my name on the door.

13  Q.   Okay.  So, you mentioned cookie-cutter.  So just --

14  what's something that's, I guess, not cookie-cutter that Point

15  Bridge does?

16  A.   Yeah.  So, there's two kind of key areas that I have in

17  my firm.  One is, I launched two different what's called

18  exchange-traded funds, ETF for short.  Those are basically

19  mutual funds that people invest in, like in your 401(k) or

20  your retirement plans, but they're traded on the stock

21  exchange, so they're daily trading.  So, you can buy in and

22  out during the day; unlike a mutual fund, which is only traded

23  at the end of the day.

24        And the other is early stage defense technology

25  companies that I do --

1    *Q.*    We'll get to that.

2    *A.*    Okay.

3    *Q.*    So, as to the -- so, as -- just briefly set the stage

4    for the jury.  What are two main things that kind of set Point

5    Bridge apart?

6    *A.*    Yeah.  It would be the defense technology investing and

7    the exchange-traded funds.

8    *Q.*    Okay.  So, we talked a little bit about the

9    exchange-traded fund or the ETF.  Do you need a lot of money

10   to invest in that?  Like, what -- what are those kinds of

11   customers?

12   *A.*    No, those customers can be all over the country, so you

13   don't have to be here in Fort Worth, you don't have to have an

14   account at Point Bridge Capital.  You can have an account at

15   Charles Schwab or TD Ameritrade, if you have a brokerage

16   account.

17         And you can do it as small as you want, you know,

18   $500 someone could invest.  So, it's really for anybody that

19   has a brokerage account that wants to go through a strategy,

20   they can buy the ETF.

21   *Q.*    And are these ETFs that you, yourself, put together or

22   created?

23   *A.*    Correct.  Yes.

24   *Q.*    Okay.  So, now let's shift our focus to the investment

25   in defense technology companies, upstart defense technology

1    companies.  Go into some detail about that, what that sector

2    involves and why you focus on it.

3    A.    Sure.  So, that involves companies that are trying to

4    help the United States from a defense standpoint.  So, they're

5    early stage, a lot of times it's, you know, maybe just one or

6    two founders and a handful of employees.  So, it's a much

7    higher risk.

8          The technology is pretty dynamic, and, you know,

9    you've got to be able to analyze and understand.  But the key

10   thing is the founders and the people that are running the

11   companies.  But it's high risk, and it's really for ultra-high

12   net worth people to invest in.  So, even by regulatory

13   statute, you have to have a certain minimum net worth to do

14   it.

15   Q.    Why is it riskier?

16   A.    Well, because you can lose all the money, right.  So,

17   it's high risk because the companies are early stage, and a

18   lot of early stage companies fail.

19   Q.    Okay.  So, explain to the jury how Point Bridge Capital

20   makes money on those defense -- on that kind of startup tech,

21   defense tech business?

22   A.    So, I create what's called an SPV, a special purpose

23   vehicle, and so I go out and I get limited partners to invest

24   in the companies.  So, it's a -- it's a structure where

25   there's a management fee on the -- on the SPV, that's how

1    Point Bridge makes money, on the management fee, and then

2    there's also participation in the future if it does well.  So,

3    there's really two ways there.  But the early part of it is --

4    is a management fee.

5    Q.    Okay.  And in terms of sort of magnitude, is the

6    upside, you know, more lucrative or is it just the kind of

7    steady management fees?

8    A.    Yeah.  No, the upside is more lucrative for sure.

9    Q.    Okay.  And I want to talk a little about your ability

10   to earn income from these deals.  And how long does it usually

11   take for these type of deals to monetize?

12   A.    Well, in the SPVs, those are long-term investments, so

13   they could -- they could last, you know, eight, nine years.  I

14   typically only do a management fee for up to four years, but

15   they can certainly go longer.

16         And then on the EFTs, those are shorter, people can

17   trade in and out of those, but that also has a management fee

18   underneath it.  So, there's really two ways, it's management

19   fees.  I don't get paid commission or anything like that.

20   Q.    Okay.  And I'll just make this really blunt.  If Point

21   Bridge Capital can't raise investment, what happens to the

22   business?

23   A.    Well, I could go out of business.  If I don't have

24   investors that are investing with me, my company would cease

25   to exist.

1    Q.    All right.  Mr. Lambert, I want to talk a little bit --

2    talk about your firm, the investment strategy at a higher

3    level.  I want to talk to you about your family, and let the

4    jury know a little bit about your family, okay?

5          Okay.  So, I placed -- let's bring up, Ms. Faulkner,

6    can we bring up Exhibit 102, which has been admitted.

7          And Mr. Lambert, tell me if you can see that on your

8    screen.

9    A.    Yes.

10   Q.    Okay.  What are we looking at?

11   A.    That's my wife and two daughters.

12   Q.    What's your wife's name?

13   A.    Elaine.

14   Q.    Okay.  And where is this picture taken?

15   A.    That's at the Fort Worth Stock Show & Rodeo.

16   Q.    Okay.  Tell us a little bit more about your family.

17   A.    Well, those are my two daughters that are, like I said,

18   both adults and my wife.  We have gone to the Fort Worth Stock

19   Show & Rodeo basically their whole lives.  It's something we

20   all like to do, and that's one of our family outings.

21   Q.    Where did your daughters grow up?

22   A.    They grew up here in Fort Worth as well.

23   Q.    How long have you been married to your wife?

24   A.    Thirty years.

25   Q.    And is the rodeo -- is this just a photo op or is the

1  rodeo important to you?

2  *A.*    No, it's really important.  I've been involved with the

3  Fort Worth Stock Show & Rodeo for about 20 years.  I help

4  raise money for the kids that are selling steers in the show.

5  And there's a lot of kids that come in from all over the State

6  of Texas that do that, and they also -- you know, goats and

7  different types of livestock.

8  *Q.*    Why do you want the jury to see this photo?

9  *A.*    Well, this is who Mr. Johnson attacked when he attacked

10  me.  And it was devastating, you know, as you saw from the

11  graphs earlier.  It's already been ruled upon in court, he

12  said all kinds of terrible things about me, which was negative

13  for my family as well.

14  *Q.*    All right.  So, let's go back to Point Bridge Capital

15  and the importance of reputation for yourself and Point Bridge

16  Capital, okay?

17  *A.*    Okay.

18  *Q.*    How close is your personal reputation, the brand of Hal

19  Lambert, to Point Bridge Capital?

20  *A.*    I mean they're one and the same.  You can't -- you

21  can't separate the two.  You know, when you -- when you damage

22  me and say things about me, it's damaging Point Bridge as

23  well, and he did both.

24  *Q.*    So, before Mr. Johnson launched his attack campaign and

25  made his smears, were you regularly invited on national TV?

1    *A.*    Yes.  I've been regularly going on national TV now for

2    -- since about 2016, 2015.

3    *Q.*    What type of stations or networks?

4    *A.*    You know, Fox Business, CNBC, Bloomberg.  I do radio

5    interviews as well.  I do interviews with radio in the United

6    kingdom.  So, quite a bit of different types of media.

7    *Q.*    And are you appearing in prime time or sort of the

8    middle of the night?

9    *A.*    No, it's prime time.  I mean, there's, you know,

10    millions of viewers that watch this.

11    *Q.*    And I just want to be clear, we're talking about the

12    time period before Mr. Johnson started making defamatory

13    statements about you?

14    *A.*    Correct.

15    *Q.*    Okay.  Let's -- I'd like to show the jury one of your

16    appearances.  If we could bring up Exhibit 97.  Please hold

17    off on playing it, Ms. Faulkner.

18        Are you familiar with this clip the jury is about to

19    see?

20    *A.*    I am.  Yes.

21    *Q.*    Okay.  What is the jury about to see?

22    *A.*    They're about to see a pretty typical, but shortened?

23            *(Video playing)*

24    *A.*    They're about to see a pretty typical appearance that I

25    had.  This is shortened down to a couple of minutes.  But I --

1    I would do these very regularly, sometimes as many as twice a

2    week during this -- during this time period.  So, this is just

3    a typical example.

4          And, you know, this is -- I don't pay to be on this,

5    they don't pay me to be on it.  They invite me on these,

6    because they want to hear what I have to say.

7    Q.    Okay.  Let's play the clip.

8          *(Video played)*

9    Q.    So, when the host there, Neil Cavuto, says, sort of,

10   Hats off to you, are these type of TV appearances important

11   for you and Point Bridge Capital?

12   A.    Extremely.  I mean, you could see they had the name of

13   my firm below my name, that goes out.  It also goes online,

14   they'll post those online, so millions of people see it and it

15   gives credibility to me, my name, and my firm.

16   Q.    So, can you give the jury sort of a real world anecdote

17   or a specific example of how these type of TV appearances,

18   earned media appearances, translate into business and success

19   for you and Point Bridge?

20   A.    Sure.  I mean, you know, I get introduced by my friends

21   to people all the time and they say, Hey, this is Hal Lambert,

22   he's on Fox Business, he's on CNBC all the time, you should

23   listen to what he has to say about different investments;

24   that's very valuable.

25          People will call me after an appearance like that.

1  My number is readily available, my work number is out there.

2  They'll call the office and say, Hey, how do I invest with

3  you?  So, it's extremely valuable.

4         And as I said, you know, I don't get paid to go on

5  there and I don't pay to go on there; it's what's called

6  earned media.  So, they want me on there because I have

7  interesting things to say.

8  Q.    Do you ever see sort of a cause and effect between your

9  TV appearances and commentary and investment?

10 A.    Sure.  I've had times where I've appeared speaking

11 specifically about the ETF, and then I can see real time,

12 after the appearance, investors investing into the ETF.  I can

13 see money flows into the ETF.  So, it's real time, you can see

14 it happen.

15 Q.    Okay.  So, talk to the jury about this national media

16 presence.  And is it something that can be easily replaced or

17 recreated elsewhere?

18 A.    No.  I mean, this is really rare. I'm really, you know,

19 privileged to be able to do this.  You know, I didn't have any

20 contacts or connections to do this.  I grew up here in Fort

21 Worth, son of two school teachers, right.  Everything I built

22 I have, you know, done from the ground up.

23         And so, I'm now appearing on these shows.  There's

24 thousands of people out there that would love to be on these

25 shows; so they can easily replace me if they want to.  So,

1    it's a really important aspect of my work.

2    *Q.*    Okay.  Just like -- we'll move on from this.  Last

3    question here.  Let's talk about, just how does that build

4    credibility and why is credibility important to Point Bridge?

5    *A.*    Well, because people view that you've been vetted

6    effectively when you're on TV; so that's one aspect to it.

7    And again, if you're on TV, they -- my clients love to watch

8    this stuff.  They will tell me to text them if I'm -- when I'm

9    going to be on.

10          When I finish a show like this, I'll have a clip of

11   it, I put it up on the website.  I also send it out, in email,

12   to thousands of people that I have on a list that I send it

13   out to.  So, it's an integral part of my business.

14   *Q.*    Okay, Mr. Lambert.  I want to shift now to how all of

15   this came under attack.  So, let's start talking about

16   Mr. Johnson.

17          So, before any of this happened, the lawsuits, the

18   attacks, how did you first come to know him?

19   *A.*    Well, I was working in a political campaign for a

20   presidential race, and Charles Johnson called me.  I didn't

21   know who he was, and he said that the campaign had asked him

22   to call me and that he could help raise some money for the

23   presidential campaign that I was working on.

24   *Q.*    And so, just -- what time period was this about?

25   *A.*    That would have been about 2016.

1  *Q.*    So, when you first met him, did he seem like a serious

2  person?

3  *A.*    Yeah, he did.  He seemed serious.  And he was running

4  in circles with, you know, ultra, you know, wealthy people and

5  big-time investors, and, you know, he seemed like a serious

6  person.

7  *Q.*    So, did he seem like someone that was connected and, I

8  guess, could make -- provide a benefit to you, provide access?

9  *A.*    Certainly, he offered it.  So, you know, in those kind

10 of situations, you know, and you've been told, Hey, this is a

11 guy you should talk to; I did.

12         And so we started talking about it.  And he even set

13 up a meeting with, you know, a very high-profile person, that

14 I went to the meeting.  Ultimately, there was no money raised

15 from anything Charles did, but, you know, he did have the

16 right contacts.

17 *Q.*    Let's talk a little bit about what you came to learn

18 about Mr. Johnson.  Did he attend the State of the Union

19 address?

20 *A.*    Yeah, he actually did.  He ran in some pretty serious

21 circles.  And so, there was one year that he was actually

22 invited to attend the State of the Union.

23 *Q.*    Invited by who?  Like a congressman?

24 *A.*    A congressman, correct.  Yeah.

25 *Q.*    Okay.  So -- and I'm focusing on this time period

1    between 2016 and 2020, okay?  How often would you see him,

2    interact with him?

3    A.    Well, you know, he didn't live here.  At the time I met

4    him, he was living in Los Angeles.  He ultimately then moved

5    to Houston.

6          But he would text me and we'd communicate, we'd

7    talk.  A lot of it was texts, but we'd talk over the phone.

8    And we'd talk about politics, we'd talk about investing.  So,

9    you know, there was some decently, relatively, you know, often

10   contact that way.

11   Q.    Did he ever meet your family?

12   A.    He did.  So, he would come -- he came to Fort Worth a

13   few times, we'd meet up.  And I actually had him over at my

14   house for dinner, so he met my wife and daughters.

15   Q.    So, at some point, did the relationship with

16   Mr. Johnson start changing?

17   A.    It did.

18   Q.    What caused it?

19   A.    Well, I think that the main time that it really started

20   to change was when I went on the board of a company called

21   Clearview AI.

22   Q.    Tell the jury about that.

23   A.    So Clearview is a facial recognition company.  It's a

24   technology company that I had invested in early on.  And, you

25   know, ultimately I ended up being on the board of that

1  company.  They help law enforcement, is kind of the main thing

2  that they do.

3  Q.    So, just -- I guess, is Clearview AI, sort of like one

4  of those type of, you know, upstart defense tech --

5  A.    Correct.

6  Q.    -- tech companies that you invest in?

7  A.    Correct.  That's exactly right.

8  Q.    It's a good example?

9  A.    That's right.  Yes.

10  Q.    Okay.  And was Mr. Johnson -- I think he mentioned it

11  in his opening -- was he affiliated with Clearview in any way?

12  A.    He was.  Yeah, he -- he had said -- it's been disputed,

13  but he said he helped found it, which some of the founders

14  disputed.  But he -- ultimately, he was helping them with, you

15  know, sales, and I think he was getting commissions or

16  something like that based on sales.

17  Q.    Okay.  So, tell the jury how things shifted when you

18  came on the board?  So, I guess, when you came on the board

19  you got more influence?

20  A.    Correct.

21  Q.    Okay.  Explain to the jury.

22  A.    Well, he started, you know, to ratchet up pressure.

23  And, you know, he -- he invited me to meet a guy named Gator

24  Greenwill about that time.  And he introduced me originally to

25  Gator by text.  He'd do that a lot, he would just send texts

1    off.

2          But he introduced me by text.  And then at some

3    point he said, Let's have a meeting with Gator, and we'll do

4    it in Fort Worth.  And we went to Winslow's Wine Cafe, there

5    on the west side of town, and met there.

6    Q.    I'm sorry, so his name was Gator?

7    A.    Gator.  Gator Greenwill, yes.

8    Q.    Like alligator?

9    A.    Like alligator, yes.

10   Q.    All right.  So, set up this meeting at Winslow's for

11   the jury, and why it's so important in your -- the evolution

12   of your relationship with Mr. Johnson?

13   A.    Yeah.  This was in about 2020 that we had this meeting.

14   And at the meeting, you know, Charles introduced Gator as

15   being CIA affiliate, or like he was in the CIA, or used to be,

16   or might be now, or, you know, it was always kind of weird and

17   convoluted.

18         And Charles had always talked about his intelligence

19   community ties, and how he had ties to the intelligence

20   community and how he can, you know, help in that area, as

21   needed, with Department of Defense contracts and that kind of

22   thing.  So, this meeting was to talk about that.

23   Q.    Okay.  And just go into detail, what was said at this

24   meeting?

25   A.    Yeah.  So, you know, again, it was back to, Oh, we can

1    help with this kind of thing.  And, you know, Gator, with his

2    intelligence community, can help, you know, Clearview, he can

3    help companies in the future.  And oh, by the way, we can hurt

4    these companies as well.

5            So, if you don't -- if you don't -- you know, if the

6    companies don't do what we want, we can get DOD contracts shut

7    down, we can go to the intelligence community and get things

8    shut down.  So, we can hurt companies as well as help them.

9    *Q.*    So, did you receive a clear message from them?

10   *A.*    Yeah, it was pretty clear that they were wanting to be

11   actively involved in, you know, the fate of companies that I

12   was going to be involved in.

13   *Q.*    Were the things that Mr. Johnson and his associate,

14   Gator Greenwill, said, was it credible?

15   *A.*    It was -- it was credible.  Because, again, you know,

16   Charles had been talking over this period of time about his

17   intelligence ties.  You know, it's always -- it was very

18   cloak-and-dagger stuff.  And he, again, you know, he was

19   involved in politics pretty heavily and with some very

20   big-time venture capital investors.  So, it all seemed

21   credible to me.

22   *Q.*    So, just to really emphasize, what was the top-line

23   takeaway or message that you received from Mr. Johnson?

24   *A.*    Well, the takeaway was, we can help or we can hurt, and

25   it's your choice.  And, you know, it was -- it was disturbing,

1    but, you know, it was certainly credible as well.

2    Q.    How did you respond to that meeting?

3    A.    Well, you know, I -- I didn't know how to respond.  I

4    didn't go to law enforcement.  There wasn't really anything

5    that would mean you would go to law enforcement over.  But it

6    was just -- it was very strange.  I never had that type of,

7    you know, dialogue before.

8    Q.    Okay.  So now let's set up -- and when, just for the

9    jury's benefit, when was this meeting at Winslow's?

10   A.    It was in like 2020, early 2020.  Mid, you know, I'd

11   say April, something like that.

12   Q.    Okay.  So now I want to focus on a period of time from

13   that meeting in 2020 at Winslow's, up to October of 2023.

14          Are you with me, Mr. Lambert?

15   A.    Yes.

16   Q.    Okay.  Describe to the jury what you were doing and

17   Point Bridge was doing, and how Mr. Johnson was interacting or

18   involved with it.

19   A.    Yeah.  So, it was shortly after that I was -- I started

20   looking at a satellite company, synthetic aperture radar

21   company, as Charles mentioned in his opening statement, for an

22   investment opportunity in that company and to do a special

23   purpose vehicle, you know, for that SPV.

24   Q.    Okay.  Was this investment connected to Clearview AI in

25   any way?

1    *A.*    No.  Completely different.

2    *Q.*    Okay.  And did Mr. Johnson do any investments or

3    business with Point Bridge?

4    *A.*    Yeah.  He decided to make an investment in that

5    particular SPV.

6    *Q.*    Okay.  Was it his money he was putting up?

7    *A.*    The wire came from someone else.  So, it didn't appear

8    to be -- I don't know if he got, you know, a loan or whatever

9    he did, but the wire came from a different person, but it was

10   for his -- his name.

11   *Q.*    Do you know who the wire came from?

12   *A.*    Yeah.  It was a venture capital person in San

13   Francisco.

14   *Q.*    So, was Mr. Johnson's investment, did it give him any

15   controlling interest or access?

16   *A.*    No.  It was about a 2% investment in the fund, so it

17   was -- it was small.

18   *Q.*    Did he have a managing role in it?

19   *A.*    No.

20   *Q.*    Okay.  So, after this investment, what happened next?

21   *A.*    Well, he started to make demands and, you know, he

22   ratcheted up pressure after that investment and started saying

23   he wanted 50% of my business.

24   *Q.*    He wanted 50% of what business?

25   *A.*    Of the Point Bridge SPV business going forward.

1    *Q.*    And what was he offering in return?

2    *A.*    Nothing.

3    *Q.*    How did you react?

4    *A.*    I was shocked.  I was like, you must be kidding.

5    *Q.*    So, you told him no?

6    *A.*    I told him no.  And I said, No, we're not doing that.

7  And he continued to harass me over it, and would send texts

8  and call.  And I, you know, finally had to block him.  So, I

9  blocked his texts and I blocked his emails, because he just

10  continued to do it.

11    *Q.*    Just give the jury a nature of some of the types of

12  things that he would say, and how often, and times of day?

13    *A.*    You know, he would -- he would text sometimes in the

14  middle of the night.  It just -- it varied.  He, you know, he

15  would make threats, you know, you're going to see, he's

16  threatened to go to law enforcement, he's threatened to attack

17  me publicly.  You know, it was basically just a shakedown.  It

18  was just like a mob shakedown that you would see anywhere.

19    *Q.*    Okay.  So now let's go forward to October of 2023.

20          Are you with me, Mr. Lambert?

21    *A.*    Yes.

22    *Q.*    Okay.  I'm going to ask some questions about your

23  interactions with Mr. Johnson and what he did next, okay?

24    *A.*    Yes.

25    *Q.*    Okay.  So, I'd like Ms. Faulkner to bring up

1    Exhibit 28.

2            And this is an email from Mr. Johnson to you, I

3    believe, Mr. Lambert.

4    A.    That's correct.

5    Q.    And tell the jury the context of this email -- and

6    let's go to the second page, I believe.  And I want to focus

7    on the email that Mr. Johnson sent to you on October 19th,

8    2023.

9            Actually, Ms. Faulkner, let's get the rest of the

10   page to the top, so we see the -- perfect.  Thank you.

11           So, Mr. Lambert, walk the jury through what's going

12   on, starting with Mr. Johnson's statement on October -- or

13   email on October 19th, 2023.

14   A.    Yeah.  So, he -- since I blocked him on my Gmail, which

15   is how we had normally communicated in the past, and I blocked

16   his phone number, he started using my work email.  So, this is

17   a work email, where he says, I have haven't heard from you,

18   Hal, so we're going to escalate things if I don't hear from

19   you by tomorrow.  Talk to Elaine, my wife, if she thinks

20   that's a good idea.

21   Q.    Okay.  So, let's actually -- we'll get to that one.

22   Let's go to the one on --

23   A.    Oh, this one right here?

24   Q.    Yeah.  It begins with, This might.

25   A.    This might also help you do the right thing.  And then

1    he puts a link right here.  And this is a link about a guy

2    that was being arrested that he was taking credit for, for

3    being arrested.

4    *Q.*    You mean Mr. Johnson was taking credit for someone

5    getting arrested?

6    *A.*    Correct.

7    *Q.*    Do you know the nature of the arrest or what was going

8    on?

9    *A.*    Federal authorities arrested him.  It was a guy, I

10   believe, named Doug Mackey.

11   *Q.*    Okay.  And did Mr. Johnson have disagreements or

12   disputes with this man?

13   *A.*    Evidently.  But he -- that was the purpose of this

14   email, was to say, you know, you're going to go to jail if you

15   don't do what I want.

16   *Q.*    And so what was the right thing?

17   *A.*    To give him 50%.

18   *Q.*    Okay.  And then to go up to the top of the page.  I

19   believe -- is that Mr. Johnson writing to you?

20   *A.*    Yeah.  The part where I read -- where are we going now?

21   Let's see.

22   *Q.*    If we could go back.  Page 2, please, Ms. Faulkner.

23   Thank you.

24           So, he mentions Elaine?

25   *A.*    Yeah.

1   Q.      Let's focus on the top of the email there,

2   Ms. Faulkner, starting with, I haven't heard.

3   A.      So, I haven't heard from you, Hal, so we're going to

4   escalate things if I don't hear from you by tomorrow.  Talk to

5   Elaine if she thinks that's a good idea.

6   Q.      And, again, who's Elaine?

7   A.      That's my wife.

8   Q.      How did you take that statement from Mr. --

9   A.      It was bizarre.  I took it as a threat.  I took it as,

10  you know, she's going to somehow be involved, I'm going to do

11  something about this.

12  Q.      Okay.  So, he sends you an email, where he says, You

13  might -- you might also help -- this might also help you do

14  the right thing, referencing an arrest --

15  A.      Right.

16  Q.      -- and mentions your wife.

17  A.      Right.

18  Q.      And what is your state of mind right now?

19  A.      Well, I think he's basically trying to say I'm going to

20  have you arrested and your family is going to be destroyed if

21  I don't -- if you don't do what I want.

22  Q.      Okay.  Now, let's go to the first page.  This is

23  October 22nd, 2023.

24          Read Mr. Johnson's email to you?

25  A.      Yeah.  I have already been in touch with law

1  enforcement about your --

2              (*Court Reporter interrupts*)

3  *A.*    Sorry.  I've already been in touch with law enforcement

4  about your behavior.  I want to be very clear with you that

5  you were given a chance to do the right thing.

6  *Q.*    What was your interpretation of what Mr. Johnson was

7  trying -- what message is he trying to send?

8  *A.*    He's trying to say that if I don't do what he wants,

9  he's going to have me arrested and put in jail.  And what he

10 wanted was 50% of my business.

11 *Q.*    And, again, was he offering anything in return?

12 *A.*    No.

13 *Q.*    Okay.  So, what did you do next?  Did his pressure

14 ratchet up?

15 *A.*    It did.

16 *Q.*    What happened?

17 *A.*    Well, later that same day, I get an email from one of

18 my investors, one of my limited-partner investors in the SPVs.

19 And he had sent them an email, he sent emails to like

20 40-something investors, attacking me to my own clients.

21 *Q.*    Okay.  Let's bring up that email, which has, I believe,

22 been marked as Exhibit 26.  And, Ms. Faulkner, I'd like you to

23 go to the last page.  And Mr. Lambert -- let's blow that up a

24 little bit for the jury and Mr. Lambert.

25              Are you familiar with this email, Mr. Lambert?

1   *A.*     I am.

2   *Q.*     Okay.  Explain to the jury what's going on here.  We

3   don't -- we don't see who the to and from is; but first set

4   the stage.

5   *A.*     Yeah.  So, he had sent the previous email to me, which

6   I didn't realize he had already done this.  So, by the time

7   this had come -- I was not on this email.  He sent this

8   directly to investors and left me off the email.

9          So, I start getting emails from my investors going,

10  What is this?  What's going on?  I'm getting phone calls and

11  texts.  And basically what he's saying here is -- he's

12  basically threatening that these investors could get brought

13  into a discovery, they shouldn't talk to me about this, this

14  is going to be a lawsuit between me and Hal.  And, you know,

15  he, again, is trying to destroy my credibility with these

16  investors.  It was -- it was devastating.

17  *Q.*     Why do you say he was trying to destroy your

18  credibility?

19  *A.*     Because he's accusing me of things.  He said I'm --

20  he's basically accusing me of stealing money, because he says

21  in here that, you know, I'm using the money from the SPV

22  against them.  And he's saying that, you know, caution,

23  don't -- Hal's -- don't lead the witness.  Outreach could

24  complicate matters with respect to individual investors and

25  draw any of them deeper into litigation.  I ask you to avoid

1    this risk.

2                    (Court Reporter interrupts)

3    A.    I'm sorry.

4    Q.    Mr. Lambert, she has to -- the court reporter has to

5    type it out.

6    A.    I apologize.

7    Q.    She's really fast, but not that fast.

8          All right.  Let's move up to the first part where it

9    says, Discovery will bring facts?

10   A.    Right.

11   Q.    He talks about your personal conduct?

12   A.    Yes.

13   Q.    What's he trying to get at?

14   A.    I have no idea.  He -- he was making stuff up.  He just

15   says, This behavior, as well as his personal contact --

16   conduct on Hal's behalf, which is disqualifying, including

17   towards female founders.  I've spoken to law enforcement also.

18   You may have read about my work.  And he puts a link to

19   himself, to introduce himself, basically, to these people.

20   Q.    Okay.  And are you on this email, again?

21   A.    No.  I was not on this email.

22   Q.    Who was it to?

23   A.    It was to my investors.

24   Q.    About how many?

25   A.    About 40.

1    *Q.*    And those are your partners?

2    *A.*    They're limited partners in my -- in my SPVs.

3    *Q.*    Okay.  What was their reaction?

4    *A.*    Well, I mean, they didn't know what to think.  They had

5    never seen -- I've never seen -- this has never happened

6    before, this is not normal behavior.  And so, when you have --

7    when you're brought into something like this, and you get an

8    email out of the blue from someone, the first thing you do

9    is -- is contact me, or email me, or, you know, reach out to

10    me in some way to find out what's going on.

11         I was -- this was devastating to me.  I mean, I felt

12    sick to my stomach when I saw this, because I knew right then

13    that this guy would not -- there were no lines he wouldn't

14    cross.

15    *Q.*    What's so bad about it?  He sent an email, you know,

16    saying you're not a great guy, you had some disqualifying

17    conduct, you know.  But just describe to the jury why this

18    email is so serious.

19    *A.*    Well, it's so serious, because these investors have to

20    trust you.  They're not going to -- these are high-risk

21    investments.  You know, they don't understand all of the

22    aspects of the companies, they have to trust that you know

23    what you're doing, they have to trust that you're a good

24    person and that you're going to do what you say you do.

25         And when you have someone come out and say they're

1    contacting law enforcement about me, that's going to raise all

2    kinds of red flags, which means they're not going to invest

3    with me in the future, things are going to be a problem.

4    Q.    What did you do to try to go into damage control?

5    A.    Well, I had to get an email out and get in front of

6    this as best I could.  Obviously, I couldn't reach out to 40

7    people simultaneously.  So, I drafted up an email and sent it

8    to the group that had received this.

9    Q.    Let's just quickly bring up that email for the jury to

10    see, Exhibit 25.

11          All right.  Mr. Lambert, let's just focus in on the

12    text of the email.

13    A.    All right.

14    Q.    Is this an email that you drafted?

15    A.    Yes.

16    Q.    Okay.  And what are you trying to communicate to your

17    limited partners?

18    A.    I'm trying to quell the damage that was done.

19    Q.    And what are you saying?

20          If you can just bring it up a little bit more.  It's

21    a little hard for me to read, Ms. Faulkner.

22    A.    I -- I let them know who Charles was.  So, I said, I

23    apologize for the email you may have received from Charles

24    Johnson earlier today.  Charles is also a limited partner

25    investor in Point Bridge Capital SVP -- SPV, and he evidently

1   pulled your email from one of my earlier updates where I had

2   cc'd you.

3         He's now using your personal contact information to

4   pursue his own agenda and objectives, which was both

5   unauthorized and unprofessional.  Charles contacted me several

6   months ago with baseless demands for compensation with respect

7   to it, the SPV.

8         Despite my efforts to discuss this matter directly

9   with me, Charles has, instead, decided to personally attack

10  and threaten me.  Regardless, this matter does not affect your

11  investment in or management of the SPV.  I am in touch with

12  legal counsel, and will handle this through the appropriate

13  channels.

14  Q.    Okay.  So, when you hit send at 7:17 at night, what's

15  going through your head?

16  A.    I'm just extremely worried, extremely upset.  It's a --

17  you know, again, as I said, I felt sick to my stomach when I

18  saw the email; literally, I wanted to throw up.

19  Q.    All right.  So -- let's take that down, Ms. Faulkner.

20        So, after this -- these communications from

21  Mr. Johnson, where he accuses you of, you know -- I guess is

22  it an accurate way to say he's accusing you of defrauding the

23  investors?

24  A.    Right.  He said that, you know, I'm afraid he's using

25  fees that, you know, he's using your money to fight this, and

1    different things like that.  So, basically, inappropriate use

2    of funds, which, obviously, if you're an investor, you don't

3    want that.  So, these were attacks to put doubt into them, and

4    then also to make me appear to be a criminal.

5    Q.    Okay.  So, after the events of October 22nd, 2023, did

6    Mr. Johnson stop?

7    A.    No.  He escalated even further.

8    Q.    What did he do?

9    A.    He filed a lawsuit against me.

10   Q.    Against you personally?

11   A.    Point Bridge Capital and me.  Yes.

12   Q.    What happened to it?

13   A.    It was tossed out.  It didn't go anywhere.  He filed it

14   in Virginia, and the Federal judge up there tossed it out, it

15   never went to trial or anything.

16   Q.    Did he file another lawsuit after that?

17   A.    He did.  He filed another one after that.  So, he

18   continues to escalate.  And, you know, he sent me an email

19   telling me what he was going to do, and he filed a second

20   suit.

21   Q.    Okay.  So now let's bring up Exhibit 89, just so we can

22   orient the jury where we are at in the timeline, Mr. Lambert.

23         So, just kind of give the jury just sort of a

24   picture of where we've been and where we're at, and now where

25   we're going in the red?

1  *A.*     Right.  So, you know, he starts making demands of, you

2  know, 50% of my company.  And when those were not -- you know,

3  when I said no to those, he starts -- he starts the, you know,

4  attacks to me personally, which I then blocked him.

5           And then he goes on and decides to go directly to my

6  investors with false allegations.  And then he does -- and

7  that was in 2023, and then he immediately does the first

8  lawsuit.  After that's dismissed in 2024, he files that second

9  lawsuit.

10 *Q.*     Okay.  Did he stop?

11 *A.*     No.  He -- in fact, he -- before he filed the lawsuit,

12 he said -- he contacted me in an email and said, Yeah, the

13 first one is dismissed, I'm going to file a -- I'm filing

14 again, and this time I'm going to be a bit louder.

15 *Q.*     How did you take that?

16 *A.*     I knew exactly what he meant.  He was going to go out

17 and attack me even more.

18 *Q.*     Okay.  Well, let's turn to the things that Mr. Johnson

19 said and what the jury saw this morning, okay, Mr. Lambert?

20 *A.*     Okay.

21 *Q.*     I want to play a clip from one of Mr. Johnson's

22 broadcasts.  Have you heard this clip before?

23 *A.*     I have.

24 *Q.*     Okay.  And where is Mr. Johnson making this?

25 *A.*     He's making it on his Substack and -- or this might

**App.718**

1  have been one of his X posts.  He use -- he uses X, which is

2  Twitter and he uses Substack.  But he goes out and does

3  these -- these, basically, podcasts, is what they are.  And he

4  goes out and talks on those.  So you hear his own words say

5  it.

6  Q.    Okay.  Let's bring up Exhibit 88, page 2.

7        Do you see that slide, Mr. Lambert?

8  A.    I do.

9  Q.    Okay.  Ms. Faulkner is going to play the audio.

10       (Audio Played)

11  Q.   What was your reaction when you heard that,

12  Mr. Lambert?

13  A.    It was disgusting.  I've got, you know, two daughters,

14  wife, married 30 years, and he's making up lies about me to

15  try to destroy my reputation.

16  Q.   Let me just be clear, have you done any of that --

17  A.    No.

18  Q.   -- that he's accusing you of?

19  A.    No.

20  Q.   Have you ever grabbed young -- younger women?

21  A.    No.

22  Q.   Have you ever -- have women that don't belong to you?

23  A.    No.

24  Q.   Do you ever get drunk and cause trouble?

25  A.    No.

1    *Q.*    Let's go to the next slide, Ms. Faulkner.  Let's

2    play -- excuse me, let's go to the next page.  Exhibit 88 at

3    page 4.  Play that, please, Ms. Faulkner.

4                    *(Audio Played)*

5    *Q.*    So what's the deal with him saying -- like asking for

6    research?

7    *A.*    He's trying to get other people to come out and join

8    with him and attack me publicly, that's what he's -- that's

9    what he's trying to do.

10   *Q.*    Is this how Mr. Johnson operates?  Are you unique?

11   *A.*    No.  He does this -- he's done this to other people,

12   too.  So, this is a pretty standard thing and operation for

13   Charles Johnson.

14   *Q.*    Let's talk about what Mr. Johnson said about your

15   business, Exhibit 88 at 3.

16                    *(Audio Played)*

17   *Q.*    Is any of this true, Mr. Lambert?

18   *A.*    No.

19   *Q.*    Are you or Point Bridge Capital a front for Russian

20   activity?

21   *A.*    Absolutely not.

22   *Q.*    Compromised cash?

23   *A.*    No.

24   *Q.*    Are you a dirty player in Fort Worth?

25   *A.*    No.

1  *Q.*    Do you have any interaction with the cartels?

2  *A.*    No.

3  *Q.*    So, do you take money from any foreign adversary of the

4  United States?

5  *A.*    No.

6  *Q.*    So, what's it like to hear Mr. Johnson say this stuff

7  about you?

8  *A.*    Well, he's doing this -- it's very targeted and very

9  specific.  Because when you're doing early stage defense

10  investing, which is what I'm doing, the Government has to make

11  sure that you're a good player, you're clean, and you're not

12  taking Russian money.  So, they actually do a check on you.

13        When I -- when I did some of these investments, you

14  have to provide your social security number, your name and

15  date of birth, and they will look that up.  And then the

16  company can decide, Hey -- you'll get notification from the

17  Government, Yes, this person's okay, you can take their money.

18  Because the Government doesn't want, you know, Russian

19  influence or Chinese influence into these investments.

20        So, what he's doing here is twofold.  He's trying to

21  hurt the companies I'm already in, be able to work with the

22  U.S. Government, and the military, the DOD.  And he's trying

23  to keep future investors, or future companies, from taking me

24  as an investor, because they can see this.  And so those are

25  the two aspects of what he's doing there.

1          And then the sexual assault stuff is just to attack

2    me personally.  Like to make people wary of doing business

3    with me, to hurt me being able to go on television, to hurt my

4    business.  I mean, that's what -- this is all very targeted,

5    it's very specific.  This isn't by accident, this isn't off --

6    off-color at all.  You know, these were multiple sets that he

7    did over and over again.

8    Q.    Okay.  So we heard three clips, the jury heard that.

9    Does that paint the totality of what Mr. Johnson said about

10   you?

11   A.    No.  We'd be here all day, if -- if we had to put up

12   every single time that he did something like this.  So, this

13   was -- this was attacks over and over and over again.

14   Q.    So, this is just a snippet of what he said?

15   A.    Very -- it's a tiny snippet.

16   Q.    Okay.  So, did Mr. Johnson engage in anything to try to

17   amplify the reach of these statements?

18   A.    Yeah.  He would have his followers, he would try to get

19   them to post this stuff.  So, there was a guy named Jacob

20   Canopy, or something like that, one of the bloggers, would

21   take exactly what Charles did and just put it out verbatim.

22   So they could amplify this out to tens of thousands of people;

23   that was the point, was to amplify the message.

24   Q.    So, shift gears a little bit, Mr. Lambert.

25          Do you have an understanding of Mr. Johnson's

1   reputation for truthfulness in the communities he moves in?

2   *A.*     I do now.  Yes.

3   *Q.*     What is it?

4   *A.*     He's a liar and a fabricator.

5   *Q.*     Why do you say that?

6   *A.*     I mean, he's done this to numbers of people online.  He

7   -- it's -- anytime he gets into a dispute with someone, he

8   goes after them publicly like this.  He's done other things,

9   that are not, you know, not even believable.  Like, you know,

10  he's known to be a Holocaust denier.  There's -- there's all

11  kinds of things that he's done publicly that are really,

12  really bad lies and things that he's done.

13  *Q.*     Did you know anything about this reputation for

14  truthfulness when you first met him?

15  *A.*     No.  I mean, he has a very common name, right.  So, you

16  know, you google Charles Johnson and nothing popped up.  You

17  know, part of the reason nothing popped up, is a lot of what

18  he was doing in the past he did under Chuck Johnson.  So, he

19  switched -- I knew him as Charles Johnson, other people knew

20  him as Chuck Johnson.

21         But if you look up Charles Johnson, it's a

22  professional athlete that pops up.  So, you don't really see

23  this.  And again, he was running in very credible circles when

24  I first met him.

25  *Q.*     Okay.  So, we talked -- I asked you a question about

1  his reputation for truthfulness.  Do you, Mr. Lambert, have an

2  opinion on his truthfulness?

3  *A.*    Yeah.  He's a complete liar and, you know, I'd

4  categorize as sociopathic.

5  *Q.*    What's the basis for your opinion?

6  *A.*    All the things that he's done online and the lies that

7  he's told.  I mean, trying to turn me -- saying he's going to

8  -- I'm going to be arrested by law enforcement, that I'm

9  sexually assaulting people, Russian money, Chinese money,

10  cartels, Israel; I mean, it was nonstop attacks.  And, like I

11  said, he was doing other things online as well.

12  *Q.*    Does Mr. Johnson ever compare himself to other public

13  figures?

14  *A.*    Yeah.  In fact, he, somewhat recently, said he's --

15  thinks he's supposed to be the next Jeffrey Epstein.  Why

16  anyone would want to be that, I have no idea.  But that --

17  that's what he put out.

18  *Q.*    Okay.  I think we've got enough of that, Mr. Lambert.

19        Let's now transition to the damages.  So, we know

20  the context --

21  *A.*    Yep.

22  *Q.*    -- we know who you are, we know who Point Bridge is.

23  Let's focus on the specific damages, all right?

24        So, what are sort of three main buckets, how we can

25  understand the economic damages --

1    *A.*    Right.

2    *Q.*    -- that you and Point Bridge Capital suffered?

3    *A.*    Well, there's the media side of it, right, the earned

4    media; massive damages there.  There is the fee income, in

5    damages from fees, asset management fees.  And then there's

6    the reputational harm and what I'm going to have to spend to

7    try to repair my reputation.

8    *Q.*    Okay.  We touched on the earned media a little bit when

9    we saw the Neil Cavuto clip, right?

10    *A.*    Uh-huh.

11    *Q.*    Do you recall that?

12    *A.*    Yes.

13    *Q.*    Okay.  So, I want to focus on the period after

14    Mr. Johnson started broadcasting his attacks, back in August

15    of 2024.  What happened to your appearances and invitations

16    earned on big, nationwide prime time?

17    *A.*    They fell off dramatically.  Basically fell off a

18    cliff.

19    *Q.*    How dramatic?

20    *A.*    90%.

21    *Q.*    Did anything change in your desire to go on these?

22    *A.*    No.  Nothing changed in what I was doing as a business.

23    Nothing changed in any of my desires to go on.  The producers

24    simply weren't having me on the show.  The producers make

25    decisions on who they're going to have on.

1    *Q.*    Describe what that causes to Point Bridge Capital and

2  yourself?

3    *A.*    Well, it's -- it's millions of dollars of value that's

4  gone.  And, you know, I don't know if it will come back.

5  Because once this is out there, it's out there forever, as we

6  all know.  When you put stuff on the Internet, it doesn't ever

7  go away.

8          And quite frankly, with alternative -- I mean, with

9  AI, artificial intelligence, you know, we're not too far off,

10  if not already, where you can just go, Hey, you know, Barack

11  or whatever, I want a dossier on this person; and it will pull

12  up everything that's about them on the internet.  So, this is

13  never going to go away, it's out there permanently, and you

14  can see it.

15    *Q.*    So, do you and Point Bridge Capital actually put a

16  specific dollar figure on the value of this earned media?

17    *A.*    Yes.  There's a third party called Critical Mention

18  that we use to value this media presence that I have.

19    *Q.*    Okay.  Ms. Faulkner, let's bring up Exhibit 95, please.

20          And, Mr. Lambert, let me show you just an example of

21  the Critical Mention report.  And just -- we're not going to

22  spend a ton of time on this, we have a summary of this.

23          But just tell the jury what this represents or just

24  the things that are being shown.

25    *A.*    Yeah.  So, this is -- we did a comparison of media

1    prior to Charles Johnson's attacks on me, and then media after

2    Charles Johnson's attacks on me.  And as we said, it dropped

3    off dramatically during that period of time.

4    Q.    I think we can see it a little better.  So, there's

5    some that says Total National Publicity, what's that?

6    A.    That's how many people can see it, and how -- what the

7    reach was on particular programs and television programs.  And

8    again, Critical Mention is used by lots of different companies

9    to value the media that companies have.

10   Q.    All right.  Let's bring up Exhibit Number 96, page 3,

11   Ms. Faulkner.

12          And this is a summary, I believe, of the Critical

13   Mention reports that we just looked at in Exhibit 95, right,

14   Mr. Lambert?

15   A.    That's correct.  So, this is a comparison prior to

16   Charles Johnson, during the exact, you know, seven-month

17   period prior, to seven months after.  And you can see that the

18   value prior is the green bar, and then the red bar is after.

19          And this is both for Point Bridge, is the bottom

20   one, and Hal Lambert is at the top there.  So, the drop-off,

21   according to Critical Mention, is 6 million -- about

22   6,800,000 -- $6,794,706 of -- of lost earned media.

23   Q.    And so, what time period are we talking here,

24   Mr. Lambert?

25   A.    This is only -- this is seven months.  That's how

1   valuable this is.  I mean, you go on national TV and get those

2   types of -- millions of eyes and people watching you; again,

3   it's worth a tremendous amount of money.

4          And the bottom one -- the bottom one is for Point

5   Bridge.  So, we separated out for me and for Point Bridge.

6   And you can see the Point Bridge one dropped, also similar

7   percentage.  And the total dollar there is negative $5,617,000

8   of cost.

9   Q.    So, we're going to keep track of the damages that you

10  and Point Bridge suffered.  So, over that seven-month period,

11  Mr. Lambert --

12  A.    Yes.

13  Q.    -- what was the loss in earned media to you personally?

14  A.    To me personally, it was $6,794,000.

15  Q.    6 million?

16  A.    6,794,706.

17  Q.    So, let's talk about Point Bridge specifically now.

18  A.    That one is $5,617,102.

19  Q.    Let's talk about how this -- how Mr. Johnson's attacks

20  and the loss of earned media translated to investments with

21  Point Bridge.

22         Are you prepared to talk about that, Mr. Lambert?

23  A.    I am.  So, what we'll see here shortly is the massive

24  drop-off in my SPV business based on this as well.

25  Q.    Okay.  So, just briefly walk through -- we don't need

1   to repeat anything.  But talk about how you make money on

2   investments, and what happened from the time before

3   Mr. Johnson's attacks to after?

4   A.    Well, obviously, before his attacks, I had never had

5   any problems at all.  I've never been in a lawsuit, I've never

6   been up on a stand like this.  I certainly don't want to be

7   here today, any more than anybody else does.  But I'm having

8   to be here, because this has caused massive damages.

9         So, when you look at it from the standpoint of my

10  fee income, it hurts my fee income because I don't have

11  investors investing in those partnerships like I did.  And it

12  hurts -- my reputation is damaged as well.  But specifically,

13  the fee income.

14  Q.    Let's look at the specifics.  Bring up Exhibit 111,

15  please, Ms. Faulkner.

16        So, Mr. Lambert, explain to the jury what's going on

17  with Point Bridge and what these numbers represent?  Start

18  with the green.

19  A.    So the green bar is -- is the amount of money that I

20  had invested and raised in the SPVs prior to Charles Johnson's

21  attacks.  So, it's almost 43 million -- or excuse me, almost

22  $44 million.  So, you're looking at $43.9 million into those

23  funds.

24  Q.    And what happened after his attacks?

25  A.    Well, since then, I've -- I have three SPVs I'm doing.

1    And the one I'm currently in, raising money for right now, and

2    it's only 5.5 million.  So, it's a drop of like $38 million in

3    investments.

4    Q.    What explains the drop?

5    A.    There's been no change other than these attacks.

6    Q.    Is the economy different?

7    A.    The economy is fine.  The economy, you know, we're at

8    all-time highs in the stock market right now.

9    Q.    What about defense tech?

10   A.    The world's more dangerous than ever.  So, the defense

11   tech is a very hot market, a lot of people are investing in

12   defense technology.  So, that's even more desired now than it

13   was a few years ago.

14   Q.    So, other than Mr. Johnson's attacks on you, is there

15   anything that you could testify to today that would explain

16   the drop in -- the $1.6 million drop?

17   A.    No.

18   Q.    And again, just translate to the jury.  So, I see 43.9,

19   I see a 5.55, where do we get to 1.6?

20   A.    So, the way to think about that is, it's approximately

21   $400,000 of fee income.  And so, you do that over four years,

22   that's the 1.6 million.

23        So, what it is, is you look at the difference.  You

24   take 300 -- 3800 -- excuse me, $38 million drop, and a 1% fee

25   on that is $385,000 a year of damages.

1    Q.    Okay.  Does this take into consideration the sort of
2    upside?
3    A.    No.  This is -- this is only limited to the fees.  So,
4    there's upside-down participation in these deals that I'll
5    never have because the money -- the investment wasn't -- it
6    wasn't there.  So, this is strictly the fee income that's been
7    lost.
8    Q.    So, it's conservative, I guess?
9    A.    It's conservative.  Correct.
10   Q.    And is this a loss to you, or Point Bridge, or both?
11   A.    This all goes to my firm.  So, I pay rent, I pay
12   employees, I pay expenses.  You know, that's all used to keep
13   my business afloat.  This doesn't go into my, you know,
14   pocket, personally.
15   Q.    So, 1.6 million and that goes to Point Bridge.
16           All right.  Is that the extent of the harm and
17   damage that Mr. Johnson caused to you and Point Bridge?
18   A.    No.  I've had to reach out to some PR firms and -- and
19   figure out what -- what I need to do to re- -- you know,
20   rehabilitate my reputation.
21   Q.    Why is that important?
22   A.    Because, again, this all comes down to trust.  And, you
23   know, it's really frustrating, because when you meet someone
24   new, you know -- I'll give an example.
25           I was introduced to someone a few months ago, by a

1    friend, mutual friend.  We had a great conversation, this was

2    in person.  We were out and he introduced me and said, Hey,

3    you should talk to how Hal, he's doing these interesting

4    things.  This guy was a former military guy, he was really

5    interested.  We had a great conversation, talked about

6    specifics, exchanged phone numbers.

7        And I reached out to him later with a text, heard

8    nothing back.  Waited a week or two, reached out again with

9    another text, heard nothing back.  I called my friend and

10   said, Hey, I don't know what's going on here, can you check

11   and see, you know, if he's looked me up.

12       But every time from now on, when you meet someone

13   and then you get ghosted like that, and it doesn't happen --

14   that doesn't happen previously, it's clear -- you know, you

15   can look up, Hal Lambert lawsuit, and boom, it pops up right

16   there.

17   Q.    All right.  Let's just put some specific dollars on

18   this.  Bring up Exhibit 71, Ms. Faulkner.

19       Okay.  This looks like an email from Mike Willie to

20   you, Mr. Lambert.

21   A.    Yes.  Mike Willie.  And he's the president of

22   Witherspoon & Associates, which is a PR firm here in Fort

23   Worth.

24   Q.    Let's go to the next page, Ms. Faulkner.

25       Okay.  And what's this showing, Mr. Lambert?

1    *A.*    So, I had -- I had a talk with him, and told him, you

2    know, I needed to do some rebranding and, you know, management

3    of my brand as well as Point Bridge.  And, you know, he gave

4    me the estimates to do that.  So, you can see those here.

5         A full strategy development is $40,000 for Point

6    Bridge.  And then, at a minimum, he said $50,000 a month for

7    12 months.  That's actually -- that doesn't include doing any

8    kind of TV or anything like that, because that would be

9    insanely expensive.  So, this is purely, you know, going out

10    mostly on a digital campaign and some print.  And so, that was

11    50,000 a month for Point Bridge, and then 50,000 a month for

12    me, personally, that I would need to spend to, you know, redo

13    my reputation.

14    *Q.*    Are you going to spend that money?

15    *A.*    Yes.

16    *Q.*    Why haven't you spent it so far?

17    *A.*    Well, because these attacks have continued all through

18    this trial.  I mean, not trial, we haven't been on trial.  But

19    through this whole lawsuit, there's been more attacks out

20    there.  So, you know, I have to get through this and get to

21    the point of having you-all decide, you know, what the damages

22    are before I could even start the rehab process.

23    *Q.*    In the last month, have Mr. Johnson's online followers

24    targeted you?

25    *A.*    Yes.

App.733

1    *Q.*    How so?

2    *A.*    They posted bizarre things.  You know, there's a post

3    -- not too long ago I had gone to Washington, D.C., and they

4    posted out, you know, We saw Hal Lambert in D.C., he's looking

5    disheveled, and, you know, just weird stuff.  It's like who's

6    -- why are these people looking at me and following me.  And,

7    you know, those -- these attacks have continued with his

8    online followers, you know, basically mocking me online.

9    *Q.*    From the time you landed in Washington, D.C. to when

10   that post came up from one of his followers, how much time

11   elapsed?

12   *A.*    I was still in D.C.

13   *Q.*    A couple of hours?

14   *A.*    I don't know.  I can't remember exactly the time.  I

15   was still there, let's put it that way.

16   *Q.*    Okay.  So, if my math is right, the Witherspoon -- what

17   the proposal is and what you guys are going to pay, it's going

18   to be for Point Bridge, if my math is right, $640,000.

19   *A.*    Correct.

20   *Q.*    And for you, Mr. Lambert, it's 600,000, right?

21   *A.*    Correct.  Yes.

22   *Q.*    So, if we put the numbers all together, so we have the

23   loss in earned media, the loss in investment income, and then

24   turn to the cost to repair the -- to rehab the reputation,

25   that gets us, by my math here -- I don't have all the decimal

1    points, but I have for you, Mr. Lambert, 7.39 million, and for

2    Point Bridge, I have 7.81.

3           Does that sound about right?

4    A.    That sounds correct.  Yes.

5    Q.    Does that fully capture all the damage that Mr. Johnson

6    has done to you?

7    A.    No.  This will be a scar that won't heal maybe forever.

8    Because once things are out there, they're out there.  And

9    people can't -- you know, they don't know what to believe or

10   not believe.  A lot of people just read something and go, I

11   don't want to be a part of that, I don't want to deal with

12   that.

13          I'm here in the community, I have to see my friends

14   and see this out there.  You know, he's living somewhere else,

15   it doesn't affect him.  As he said in his opening statement,

16   it doesn't really matter.  But to me, it matters a lot.

17   Q.    Okay.  So, let's shift gears to that, Mr. Lambert.

18   Just straight up, what kind of impact has Mr. Johnson's

19   defamation campaign taken on you personally?

20   A.    Well, the damages personally are enormous.  You know,

21   I've had to talk to my wife, obviously, and my daughters.

22   And, you know, this is someone they've met.  So, you know,

23   they -- it's been -- it's been bad.

24          You know, when you -- when you're accused of

25   felonies, right, you're accused of felonies of the worst kind.

1   And, again, it's targeted, because, you know, he knows that

2   that's going to hurt me on getting on television.  He knows

3   that calling -- saying I'm dealing with Chinese and Russian

4   money and mafia money, that's going to hurt me with getting

5   defense contracts and the company getting defense contracts.

6   So, it's all very targeted, it's all very calculated, and it

7   was all about pressure, again, to try to extort money out of

8   me.

9   Q.     What about your relationship with your wife and

10  daughters?

11  A.     Yeah.  I mean, you know, it's been hurtful.  You know,

12  I had -- you know, we obviously knew -- she knew I was coming

13  over here today and we talked about it.  I had to talk about

14  it last night, and had a call with one of my daughters last

15  night.  So, they're obviously -- they're adults, my daughters

16  are, they're aware of what's going on.

17  Q.     Do you feel like this was a misunderstanding?

18  A.     No.  This wasn't a misunderstanding at all.  This

19  was -- this was a character assassination.  And, you know, I

20  built this myself, so -- I didn't have help.  You know, 30

21  years of work, and because someone, you know, decides they

22  want to take you out and take you down, they do a concerted

23  effort with a group of people to do it is -- it's devastating.

24  Q.     When you look back at what Mr. Johnson did, what do you

25  believe his goal was?

1   *A.*    You know, I think his goal ultimately -- you know, it

2   starts off about money and wanting to take part of my business

3   or take like 50%, and it turns into I'm just going to do a

4   character assassination, because I like to do that.  He likes

5   -- he enjoys this.  He's done it to others.

6           And, you know, he can sit behind a keyboard and send

7   this stuff out, and he thinks that he can't be, you know, he

8   can't -- nothing can happen to him.  You know, he -- he put

9   something out before about -- falsely accused someone of

10  killing someone at the Charlottesville rallies and got sued

11  for that, and lost that case as well.  So, he's done this

12  before.  And, you know, here he is again.

13  *Q.*    Did you ever ask him to stop?

14  *A.*    I did.  Yeah, I sent him an email.

15  *Q.*    Let's bring up that email, Exhibit 52, please.  And

16  let's focus in -- first, I want to start, looks like it's

17  Monday, August 26.  So, roughly a couple of weeks Mr. Johnson

18  has been broadcasting his defamation campaign against you.

19  Let's bring it up.

20          All right.  So, Mr. Lambert, go slow to save our

21  court reporter here.

22  *A.*    Okay.  So --

23  *Q.*    I want you to set the context; why you sent this and

24  what you said.

25  *A.*    Well, you know, he had been going online, we played

1    some of it, attacking me personally, attacking my business,

2    making all kinds of lies about me, which we've now shown in

3    court.  And so, I said, Look, I'm just going to -- I'm going

4    to send him an email and ask him -- try to stop this.  It just

5    -- it had gotten completely out of control.

6           And so I said, Charles, it's been brought to my

7    attention that in your X spaces, you've accused me of sexually

8    assaulting women at parties in Austin, getting drunk and

9    causing trouble, that I am a front for Russian money and

10   interests and other dirty money, and that I may be a front for

11   drug cartels.  I said, These are lies.  And the fact that you

12   asked your deranged fans to research me and find a

13   whistleblower, shows me that you know they are lies, and you

14   are fishing for someone to make up these lies or other people

15   to make up these lies.

16          And I put up the two links, by the way.  So, these

17   two links are links to his actual posts, so he can see it.

18   And I said, I'm a married man with a family, and these lies

19   undermine my family and my business relationships.  Stop lying

20   about me and correct the record.

21   Q.    What did Mr. Johnson do?  Did he respond?

22   A.    He responded with, Sue me.

23   Q.    Let's pull that up for the jury.

24          And it looks like -- how much time had elapsed since

25   you sent that email?

1    *A.*    Well, it's the same -- what's the -- it was very

2    quickly after I sent it.

3    *Q.*    Yeah.  Looks like you sent it at -- like 8:37 central?

4    *A.*    Yep.

5    *Q.*    And he sends you back something less than an hour

6    later?

7    *A.*    Less than an hour later.  And, you know, that was part

8    of the tactic, too.  He knew, like, okay if I decide to sue

9    him, it will just amplify it more and he'll be able to go

10    online and talk about the lawsuit; which he's done.  He'll

11    have other people out there go online and talk about this

12    lawsuit; which they've done.  So, it just gives him more time

13    to amplify the message.

14         He's gone out and said he's winning the case -- he's

15    winning that case; which wasn't true.  He said in the cases in

16    Virginia that he was winning those cases; they were both

17    dismissed.  So, again, just pure fabrications.  But, you know,

18    that's what he's putting out there.

19    *Q.*    Did Mr. Johnson -- this was a direct email just to

20    Mr. Johnson, right?

21    *A.*    Correct.

22    *Q.*    Did he do anything with this email?

23    *A.*    Oh, yeah.  He took this and posted it out to everybody

24    online.

25    *Q.*    Let's bring up Exhibit 53, Ms. Faulkner, please.

1              Is this like a tweet or an X post?

2    *A.*     Yeah.  That's an X post.

3              So, he's saying, Hal Lambert, who started this MAGA

4    ETF, should not have committed fraud against me in business,

5    nor mistreated lady founders -- once again -- nor taken money

6    from foreign fronts, as he cheated me out of Clearview and

7    Umbra equity.  I love discovery.  By the way, I'm currently

8    suing Hal.

9    *Q.*     What message is he trying to send to you?

10   *A.*     He's saying he's going to ratchet up more and more

11   negative publicity and press about me, that's what he's

12   saying, and he's just going to continue with these lies.  And

13   if -- you know, there's nothing you can do about it, he's just

14   going to keep doing it.

15   *Q.*     The quality of this post is kind of bad.  Why is that?

16   *A.*     Excuse me, what was that?

17   *Q.*     Seems like the quality, it's pretty low def, it's hard

18   to read.  Why is that?

19   *A.*     Oh, yeah.  I mean, he -- at one point he deleted -- he

20   deleted his X account.  After we started this lawsuit, he

21   deleted his X account.

22   *Q.*     All right.  We can take that down, Ms. Faulkner.

23             So, after you asked him to stop, and he posted

24   publicly and tagged you, has he stopped?

25   *A.*     No.  He continues.  It's just nonstop.  And, you know,

1    he's got a Substack.  He charges money to people to -- to be a

2    subscriber to his Substack.  So, he's making money off of

3    this.

4         He directs people over that.  He has other people

5    direct people over to his Substack.  And, again, he has a

6    subscription business on this thing.

7    *Q.*    What helped you get through this, or what helps you get

8    through this?

9    *A.*    Well --

10   *Q.*    Or how are you getting through this?

11   *A.*    -- it's been hard.  My family has been good about it to

12   me.  And, you know, my faith.  And, you know, again, it's

13   devastating.  Because you do this, you build up your

14   reputation over a long period of time, and in a very short

15   time you can have someone destroy it.

16   *Q.*    So, final question, Mr. Lambert.  Why did you decide to

17   come here and to fight back publicly?

18   *A.*    You know, I -- I had to come here.  There were just --

19   he had done this too many times to other people, he was doing

20   it to me in a huge way, just attacks and lies.

21        You know, it was -- it was to the point -- I mean,

22   literally, I had people reach out during this, you know, this

23   public lawsuit.  They've reached out to my attorney, they've

24   reached out to me saying, Hey, Charles has done this to me, I

25   know what you're going through.  And, you know, they wanted to

1   let me know that -- that I wasn't the only one.

2   Q.     Thank you.

3   A.     And I would add one other thing.  You know, I asked --

4   I did ask for a few to come in here and testify, and they were

5   actually too scared to do it.  They're like, Look, I'm not

6   going to, because he's just going to go out online and attack

7   me and destroy me.  And then they're going to be in a

8   position, well, what do they do about it?  I mean, these

9   lawsuits are, you know, it's a lot of time, it's a lot of

10  really, quite frankly, trauma that you have to go through to

11  do this and fight back.  And most people just aren't going to

12  do it.  They're just going to just try to stay away from it.

13              MR. THOMPSON:  Pass the witness.

14              THE COURT:  All right.  Ladies and gentlemen, at

15  this time we're going to take our lunch break.

16              I'm going to give you a pretty long lunch break

17  today, and then when we come back on Wednesday, I'll buy your

18  lunch, okay?  I'm not saying it's going to be Capital Grille

19  quality, but it's probably like Jason's Deli, but we'll take

20  care of you.

21              Even though I'm going to have you come back at 1:00,

22  that means you need to be here and through security so we can

23  start at 1:00.  Does everybody understand that?  *(Heads nod)*

24              So, there's a lot of good places to go and grab

25  something quick.  Probably not a good idea to go and order a

1  steak for lunch, okay?

2           We've heard a lot in Mr. Lambert's testimony and the

3  opening statements regarding posts on X, posts on social

4  media, Substacks.  Do not google, do not look up any of this

5  stuff, all right?  The instructions that I gave you continue

6  to be in effect.

7           Let me give you an admonishment, you'll be hearing

8  this throughout the next couple of days.  You're reminded that

9  you should not talk amongst yourselves or with anyone else on

10 any subject connected with the trial, or form or express any

11 opinion thereon until the very end of trial, okay?

12          So, be back in the jury room and ready to go at

13 1:00.  Thank you.

14               *(Jury leaves courtroom)*

15          THE COURT:  Anything else from me before we take our

16 lunch break?

17          MR. THOMPSON:  Just housekeeping.  I know the

18 Court's rules, can I have any contact with my client since

19 he's been tendered for cross-examination?

20          THE COURT:  You don't need to.  We need to -- as far

21 as taking him to lunch and that sort of thing.  But you're not

22 to speak to him or try to coach him, because now he's tendered

23 for cross, okay?

24          MR. THOMPSON:  Absolutely.

25          THE COURT:  But certainly when it comes to basic

```
1   things, such as lunch, procedurally what it looks like, that's

2   fine.

3               MR. THOMPSON:  Thank you, Your Honor.

4               THE COURT:  Okay.  Anything from you, Mr. Johnson?

5               DEFENDANT JOHNSON:  No, sir.

6               THE COURT:  All right.  We'll go back on the record

7   at 1:00.

8               And, Mr. Lambert, when we come back in, if you would

9   please take your seat, and then we'll have the

10  cross-examination, all right?

11              THE WITNESS:  Thank you.

12                  (Lunch recess taken)

13                  (Jury enters courtroom)

14              THE COURT:  We're back on the record, Point Bridge

15  Capital, et al vs. Charles Johnson, 4:24-CV-988-P.

16              When we had left off, Mr. Lambert had completed his

17  direct examination.  At this time, I call upon Mr. Johnson,

18  and you begin a cross-examination, if you have one.

19              DEFENDANT JOHNSON:  Right up here, Your Honor?

20              THE COURT:  You need to stand at the podium.

21              DEFENDANT JOHNSON:  Okay.

22              THE COURT:  Thank you.

23              DEFENDANT JOHNSON:  Your Honor, how do I address

24  Mr. Lambert?

25              THE COURT:  Mr. Lambert.
```

1    *DEFENDANT JOHNSON:*  Okay.  Great.

2                        CROSS-EXAMINATION

3    **BY DEFENDANT JOHNSON:**

4    *Q.*    So, I thought a lot about the kind of questions that I

5    want to ask about today.  And I even prayed about it next door

6    at St. Andrews, which is a lovely service, by the way, if you

7    haven't gotten a chance **--**

8            *THE COURT:*  Let me just warn you, okay?  So, you

9    need to ask questions.  You don't need --

10           *DEFENDANT JOHNSON:*  Yes.

11           *THE COURT:*  -- to testify.

12           *DEFENDANT JOHNSON:*  I'm not going to ask any

13   questions about Mr. Lambert's personal conduct.  I think

14   family should be off limits.

15           *THE COURT:*  Well, why don't you ask your question --

16           *DEFENDANT JOHNSON:*  Very good.

17           *THE COURT:*  -- and we'll go from there.

18   *Q.*   *(By Defendant Johnson)*  So, very simple.  Who is Palmer

19   Luckey?

20   *A.*    Palmer Luckey?

21   *Q.*    Yes.

22   *A.*    He's the CE -- well, he's one of the founders of a

23   company called Anduril.

24   *Q.*    Okay.  How did you meet Palmer Luckey?

25   *A.*    I met him at a dinner in Dallas.

1    *Q.*    Okay.  Who introduced you to Palmer Luckey?

2    *A.*    I don't recall.  It's possible it's you, but I don't

3    recall.  You weren't at the meeting.

4    *Q.*    Did Palmer Luckey invest in Point Bridge Capital's SPV,

5    the MAGA ETF?

6    *A.*    MAGA ETF is not an SPV.

7    *Q.*    Excuse me.  The MAGA ETF, your electronically traded

8    fund?

9    *A.*    He did.  Yes.

10   *Q.*    Okay.  Is Palmer Luckey still an investor in the MAGA

11   ETF?

12   *A.*    No, I don't believe so, but I don't know for certain.

13   *Q.*    Okay.  How did you meet Peter Thiel?

14   *A.*    I met Peter Thiel from you.

15   *Q.*    Who is Peter Thiel?

16   *A.*    He is the -- one of the large, you know, venture

17   capital investors and well known in that area.  He lives in

18   San Francisco.

19   *Q.*    Now, you were backing Ted Cruz in 2016; is that right?

20   *A.*    That -- that's correct.

21   *Q.*    What about 2024?  Were you backing Donald Trump in the

22   Republican primary, or were you backing Ron DeSantis?

23            *MR. THOMPSON:*  Objection, Your Honor.  Relevance.

24            *DEFENDANT JOHNSON:*  The relevance --

25            *THE COURT:*  Why don't we see where this goes.

1    *DEFENDANT JOHNSON:*  The relevance of it --

2    *THE COURT:*  Objection overruled.

3    You need to let me make my ruling.  Don't talk over

4  me.

5    *DEFENDANT JOHNSON:*  Sorry.

6    *THE COURT:*  So, you won that one.  Be careful.

7    *DEFENDANT JOHNSON:*  Yes, sir.  I'm happy to do it.

8    *THE COURT:*  I'm giving you a lot of leeway.

9    *DEFENDANT JOHNSON:*  Thank you, sir.

10  *Q.*   (By Defendant Johnson)  Okay.  How did you meet John

11  Burbank?

12  *A.*    I don't recall.  It could have been Josh Manchester

13  that did that.

14  *Q.*    No.  It was, in fact, me that introduced you to him.

15    But who is John Burbank's father?

16  *A.*    I don't know.

17  *Q.*    Jacques Burbank was the CIA station chief in Bonn,

18  Germany.  He was a friend of mine.

19    *THE COURT:*  Is that a question?

20    *DEFENDANT JOHNSON:*  Yes.  It's a question, because

21  it gets to the question of money here.

22    *THE COURT:*  No, buddy, that's a statement --

23    *DEFENDANT JOHNSON:*  Okay.

24    *THE COURT:*  -- okay?

25  *Q.*   (By Defendant Johnson)  All right.  How did you meet Elon

```
1   Musk --
2              THE COURT:  You need to ask questions here.
3              DEFENDANT JOHNSON:  Yes.
4              THE COURT:  You will have an opportunity to testify
5   when it's your turn.
6              DEFENDANT JOHNSON:  Okay.  I get it.
7   Q.   (By Defendant Johnson)  How did you meet Elon Musk's
8   business partners, Steve and Luke Nosek?
9   A.     Yes.  You did introduce those two to me.
10  Q.     Have you ever gone to a party with them in Austin,
11  Texas?
12  A.     They've been at parties with me.  Yes.
13  Q.     How did you meet Special Agent Johnathan Buma of the
14  FBI?
15  A.     You had him call me.
16  Q.     Did you work on a Federal case with Johnathan Buma?
17  A.     No.  I met him one time.
18  Q.     You worked for the Bass family, right, a local family
19  here in Fort Worth?
20  A.     Correct.
21  Q.     Did they invest with you in either the MAGA ETF or any
22  of the SPVs?
23  A.     No.  They're not the type of client that would invest
24  in that --
25  Q.     Did you --
```

1    *A.*    -- kind of thing.

2    *Q.*    Did you and I visit with Perry Bass and Ardon Moore at

3    their offices here in Fort Worth several years ago?

4    *A.*    Yes.  With Palmer.

5            *THE COURT:*  Mr. Perry Bass has been dead for about

6    20 years, I bet he wasn't at the meeting.

7            *THE WITNESS:*  This was -- this was the grandson.

8            *THE COURT:*  Okay.

9            *THE WITNESS:*  He's also named Perry.  Yes.

10   *Q.*    *(By Defendant Johnson)*  Okay.  Did you back Donald Trump

11   in 2016?

12   *A.*    Yes.

13   *Q.*    Did you back Donald Trump before the election on

14   November 7, 2016?

15   *A.*    Yes.

16   *Q.*    Okay.  Did you work with Chinese software developers on

17   the MAGA ETF?

18   *A.*    No.

19   *Q.*    So, Terrence Liu is not a Chinese national?

20   *A.*    He's not a Chinese developer.  He lives in Wisconsin.

21   *Q.*    No, no.  I asked if he was a Chinese national?

22   *A.*    He's Chinese ethnicity.

23   *Q.*    Okay.  Did you do a background check on Terrence Liu?

24   *A.*    No.

25   *Q.*    What about on Hoan Ton-That?

1    *A.*    What's the question?

2    *Q.*    Did you do a background check on Hoan Ton-That?

3    *A.*    No.

4    *Q.*    Is Hoan Ton-That a foreign national?

5    *A.*    I believe he's Australian.

6    *Q.*    Okay.  What about a security clearance?  Have you ever

7    gotten a security clearance ever?

8    *A.*    No.

9    *Q.*    Have you ever applied for a security clearance?

10    *A.*    No.

11    *Q.*    Have you been to CIA headquarters in Langley, Virginia?

12    *A.*    Yes.

13    *Q.*    Remember, you're under oath.

14    *A.*    Yes.

15    *Q.*    Okay.  Have you ever been to the National

16    Reconnaissance Office?

17    *A.*    No.

18    *Q.*    Okay.  Is the National Reconnaissance Office the

19    largest clients, I guess you would say, of Umbra, the

20    synthetic aperture radar company?

21    *A.*    I would think so.  But it's -- a lot of it's

22    classified, so you don't know.

23    *Q.*    What about the John McCain National Security *(sic)* Act

24    of 2019 --

25              *(Court Reporter interrupts)*

```
1              THE COURT:  You're going to have to go a little
2    slower.
3              DEFENDANT JOHNSON:  Sorry.  My bad.
4              THE COURT:  Repeat the question.
5              DEFENDANT JOHNSON:  Sorry.  My mother wanted to be
6    an attorney.  It's kind of fun.
7    Q.    (By Defendant Johnson)  All right.  What about the
8    National -- the John McCain National Security Act of 2019, are
9    your companies compliant with it?
10   A.     I don't know what that Act is.
11   Q.     Okay.  Do you do background checks on any of the money
12   you take in politically, or into your SPVs, or into your ETFs?
13   Do you do any background checks whatsoever?
14   A.     Yes.
15   Q.     What firm provides those background checks?
16   A.     I use a KYC method that's done with one of my
17   compliance firms.
18   Q.     Okay.  Which compliance firm is that?
19   A.     They're a software company called Flow, and there's
20   another one called AdvisorAssist.
21   Q.     All right.  Were you in Congress last month?
22   A.     You mean the building?
23   Q.     Yeah, the building.  Did you go to Congress last month;
24   yes or no?
25   A.     Yes.
```

1    *Q.*    Who did you meet with there?

2    *A.*    I met with different staffers of congressional members.

3    *Q.*    Why were you there?  What was the purpose?

4    *A.*    I'm involved with a lot of companies that do DOD work,

5    as I've stated.

6    *Q.*    Okay.  Are any of the congressional staffers there

7    eligible to give you a Federal contract; yes or no?

8    *A.*    No.  They're not eligible to give me a Federal

9    contract.

10   *Q.*    Okay.

11   *A.*    I don't get Federal contracts.

12   *Q.*    Were you on CNN or Fox Business in the last month and

13   change?

14   *A.*    Yes.

15   *Q.*    Okay.  Now, is it possible that some of the things you

16   said on CNN, right, Fox Business -- I don't have a TV, I don't

17   watch these things -- but is it possible that some of the

18   things you said on those shows led to you not being invited on

19   those shows anymore?

20   *A.*    No.

21   *Q.*    Why isn't that possible?

22   *A.*    Because I didn't do anything different than what I've

23   been doing.

24   *Q.*    Okay.  Have you ever been accused of saying a racist

25   statement about Black Lives Matter on CNN?

1  *A.*    I don't -- I don't recall if I was or not.  It was a

2  panel, so I don't -- I don't recall what the other person

3  said.  It was a back-and-forth panel.

4  *Q.*    But you've never been publicly accused of racism by

5  anyone, ever, in a context?  You never had clips shared of you

6  online?

7  *A.*    Not that I'm aware of.  No.

8          *MR. THOMPSON:*  Your Honor, I'm just going to object.

9  We're straying so far from damages.  I've let it go on.  I

10  tried to give him --

11          *THE COURT:*  Well, I do want him to be able to --

12          *DEFENDANT JOHNSON:*  Okay.

13          *THE COURT:*  -- put on some --

14          *DEFENDANT JOHNSON:*  I just have just --

15          *THE COURT:*  Would you please not interrupt me, or

16  I'm going to hold you in contempt --

17          *DEFENDANT JOHNSON:*  Sorry.

18          *THE COURT:*  -- okay?

19          *DEFENDANT JOHNSON:*  Yes, sir.

20          *THE COURT:*  I'm trying to be very patient and very

21  polite.  A lot of the stuff that you've been asking has

22  nothing to do with the reason why we're here.  We're here on a

23  damages trial.

24          One of the things -- you're not a lawyer, but one of

25  the things they taught me in law school that I've learned in

1    30 years that I've been doing this, is that when it comes to

2    cross-examination, make your three or four points and move on.

3                    *DEFENDANT JOHNSON:*  Thank you, Your Honor.

4                    *THE COURT:*  And remember what we're here for.

5    You've already been found to be liable of both defamation and

6    violations of civil RICO.

7                    If you want to avoid a big damages judgment, I would

8    suggest you cater your questions to that type of issue,

9    whether his testimony that he gave regarding the damages that

10   he suffered in this case, you feel that those are trustworthy

11   or not.  That might be a good place to concentrate your

12   questions.

13                   *DEFENDANT JOHNSON:*  Yes, sir.  My next line of

14   questions.

15   Q.    *(By Defendant Johnson)*  So, who is Rebekah Mercer?

16   A.    She's a Republican donor.

17   Q.    Have you done business with her?

18   A.    No.

19   Q.    You're not in any business deals with her and Gabe

20   Dominocielo?

21   A.    I -- I didn't realize she was doing any business with

22   that company.  But I have -- I have nothing to do with her

23   doing any business.

24   Q.    Okay.  You're aware that she's married to or she was

25   married to a Russian national?

1    *A.*    No.  I'm not aware of that.

2    *Q.*    Okay.

3    *A.*    So, she was married to one?

4    *Q.*    Yes.

5    *A.*    Okay.

6    *Q.*    Now, did my ex-wife contact you, or the mother of my

7    daughter contact you recently?

8    *A.*    I believe I got an email -- I didn't know who it was

9    actually, but I got an email asking some questions about

10   Clearview.

11   *Q.*    Okay.  Was she a shareholder in Clearview?

12   *A.*    The person that sent that email I'm told is a very

13   small shareholder.  Yes.

14   *Q.*    Okay.  Did you follow what Hoan Ton-That had offered,

15   and offered to pay her the $400,000 he promised her, or did

16   you refuse her --

17         *THE COURT:*  Counsel, do you have an objection?

18         *MR. THOMPSON:*  I have an objection, Your Honor.

19   It's irrelevant.  It's -- he's trying to litigate a lawsuit

20   that Mr. Johnson lost.  I think a month ago it got dismissed.

21   It's completely irrelevant to damages.

22         *THE COURT:*  Tell me how this is relevant to your

23   damages?

24         *DEFENDANT JOHNSON:*  It gets to the question here of

25   whether or not Mr. Lambert is actually interested in

1    good-faith issues around damages.

2          So, for example, when I was with Judge Evans, I

3    agreed in that -- in that mediation, as you're well aware, to

4    actually give Mr. Lambert all of the investment money that I

5    had put together.  That he could have -- all of my $200,000

6    plus whatever interests --

7          *THE COURT:*  All right.  You're giving testimony and

8    you're talking about stuff -- and statements that was made in

9    settlement communications.  You can't talk about that under

10    our rules.

11          *DEFENDANT JOHNSON:*  I see.

12          *THE COURT:*  So, that colloquy and testimony you just

13    gave is stricken.  Please don't consider it in your

14    deliberations, jury.

15          The objection here has been relevance and how this

16    relates to damages.  So, do you have a very succinct response

17    to that before I rule on the objection?

18          *DEFENDANT JOHNSON:*  Yes.  Very succinctly, the

19    question here is, how are we aware that Mr. Lambert has, in

20    fact, been damaged at all by any of the things that I have

21    allegedly said?

22          *THE COURT:*  I think that he gave testimony to that

23    effect.  So now is your opportunity to try to poke holes in

24    that.

25          *DEFENDANT JOHNSON:*  Okay.

1          *THE COURT:*  All right.  So, why don't you rephrase
2    the question and really think and concentrate.  You will have
3    an opportunity to provide your own testimony and to give
4    argument.  But now is your opportunity to try to question him
5    about his testimony and how can you poke holes in that, okay?
6    That's what I want you to think about.

7          And, again, I'm not here to coach you, but I am
8    doing the best I can to give you a fair opportunity to be
9    heard.

10         *DEFENDANT JOHNSON:*  Okay.  Thank you.

11   *Q.*   *(By Defendant Johnson)*  You're not going to list any of
12   the people who contacted you, right, from your testimony?

13   *A.*     Which part?

14   *Q.*     You said they're afraid?

15   *A.*     Oh, correct.

16   *Q.*     Okay.  Is it possible that they are playing you to have
17   you sue me?

18   *A.*     No.

19   *Q.*     Why not?

20   *A.*     I disagree with that.  Because they were just -- they
21   weren't wanting to get involved in a lawsuit.

22   *Q.*     But they're --

23   *A.*     They just wanted us to know what had happened to them
24   as well.

25   *Q.*     But they're contacting you?

App.757

1  *A.*    They contacted my attorney in maybe two instances, and
2  me separately.
3  *Q.*    Okay.  But you're not going to name them, right?  So
4  we're just going to assume they exist, for the sake of
5  argument?
6  *A.*    I'm not going to name them.  They're afraid that you're
7  going to go after them.
8  *Q.*    Okay.  Now, on what basis do we have that any of the --
9  you know, you've listed there was something where you had
10  $40 million and it was down to like $5 million.  Does anyone
11  have this thing here?  I think it was like a PowerPoint or
12  something, right?
13        On what basis do we have that it is not, in fact,
14  your politics that have shifted; whereas Mr. Palmer Luckey,
15  who you admitted -- I think he's a billionaire, right --
16  somebody I introduced you to, by the way -- on what basis do
17  you have of him just withdrawing the money because he didn't
18  like the fact that you had switched your political
19  affiliation?
20        He's a big Trump supporter.  I think his
21  brother-in-law is a big Trump supporter, is a member of
22  Congress.
23        On what basis do you have that it was me, and not
24  Palmer, disliking something that you said maybe at one of his
25  honor roll events?

1    *A.*    What's the question again?

2    *Q.*    The question is, How do you know that I am to blame,

3    and not Palmer just changing his mind about you, thinking

4    that, you know, you behaved badly at one of his events?

5    *A.*    I never testified that Palmer pulled money from me.

6    You brought that up.  I didn't -- I didn't bring that up at

7    all.

8    *Q.*    You mentioned --

9          *THE COURT:*  I guess what he's trying to ask you --

10    and again, I'm just trying to throw you a lifeline here.

11          How do you know that the losses you testified to are

12    because of the allegations and statements you're testifying

13    that Mr. Johnson made about you, and not because maybe one of

14    your investors changed their mind about you as an investor or

15    your political beliefs?

16          *THE WITNESS:*  Gotcha.

17          Okay.  So, I'll answer that, I guess, in three

18    parts.  One, when Palmer decided to remove some of the money

19    that he put with me, I was a Trump supporter, as was he; so,

20    number one.

21          Number two, it was prior to your attacks on me.  So,

22    I'm not claiming that his decision on that -- and I spoke to

23    him about it.  So, I know why he did it, and that's a personal

24    matter for him.  But it had nothing to do with anything in

25    this courtroom, and I never said it did.

1          THE COURT:  So, I guess the follow-up question that

2     I would have, The damages that you testified to, those amounts

3     on that board, don't have anything to do with --

4          THE WITNESS:  Don't have any relevance to Palmer.

5          THE COURT:  It would have included --

6          THE WITNESS:  Right.  Right.

7          THE COURT:  -- Mr. Palmer?

8          THE WITNESS:  I did not include anything with Palmer

9     with that.  That's correct.

10         THE COURT:  Go ahead, Mr. Johnson.

11         DEFENDANT JOHNSON:  If I may, Your Honor.

12         THE COURT:  Yeah.

13         DEFENDANT JOHNSON:  It does get to this, because he

14    was the anchor investor in the MAGA ETF.  If he's taking the

15    money from the MAGA ETF, and then taking the money out, that

16    would of course lead to damages.

17         THE COURT:  Why don't you ask him a question.

18         DEFENDANT JOHNSON:  Oh, okay.

19    Q.   (By Defendant Johnson)  Okay.  Palmer Luckey was -- was

20    he one of the major investors in the MAGA ETF?

21    A.      Initially, yes.

22    Q.   Okay.  What percentage of the MAGA ETF was Palmer

23    Luckey?

24    A.      I don't know the percentage.  I don't have the exact

25    investor pool in MAGA ETF.

1  *Q.*      He told me about 85%.

2            Now, in the MAGA ETF --

3            *THE COURT:*  Is there an objection?  That's 100%

4  hearsay.

5            *MR. THOMPSON:*  Yes.  Objection.  He's testifying;

6  hearsay.

7            *THE COURT:*  That's testimony, that's hearsay.

8            *DEFENDANT JOHNSON:*  We just had hearsay earlier,

9  just a second ago.

10           *THE COURT:*  I am about to hold you in contempt,

11  okay?

12           *DEFENDANT JOHNSON:*  Okay.

13           *THE COURT:*  And if you push me too much, you're

14  going to go down to the holding cell and you're going to be

15  able to watch this trial, all right?

16           I'm trying to be very patient.  I'm even doing what

17  I can to help you out with questions.

18           *DEFENDANT JOHNSON:*  Thank you.

19           *THE COURT:*  But you have to refrain from

20  interrupting me, interrupting the witness, testifying.  You

21  made the decision, which you're allowed to do, to appear

22  without an attorney.

23           *DEFENDANT JOHNSON:*  Uh-huh.

24           *THE COURT:*  That does not mean that you are excused

25  from following the rules.  You are held to the same standard

1  that everybody else is, all right?

2          *DEFENDANT JOHNSON:*  Yes, sir.

3          *THE COURT:*  And I've warned you numerous times at

4  numerous hearings.

5          *DEFENDANT JOHNSON:*  Yes, you have.

6          *THE COURT:*  I do not want to have to hold you in

7  contempt.  I want you to be able to put on what defense that

8  you'd like to put on within reason.  And I'm prepared to give

9  you a lot of leeway.

10          But you have to show me the same respect that I'm

11  trying to show you.  Because if you don't, I will be left with

12  no other option, other than having you held in the holding

13  cell; because I've tried money damages, that doesn't seem to

14  work.  Okay?

15          *DEFENDANT JOHNSON:*  Yes, sir.

16          *THE COURT:*  All right.  Next question.

17  *Q.*  *(By Defendant Johnson)*  In 2020 -- you know, you're on

18  television quite often, talking about financial matters,

19  right?  We just saw a clip, Fox Business.

20          Do investors, high-net worth individuals, have more

21  capital to invest now or less capital to invest since interest

22  rates have risen, in your considered opinion as a financial

23  expert?

24  *A.*    In my opinion, investors have plenty of money to

25  invest.

1   *Q.*    So, there hasn't been a change in liquidity as interest

2   rates have risen?

3   *A.*    Not for the clientele that I service.

4           *DEFENDANT JOHNSON:*  No further questions, Your

5   Honor.

6           *THE COURT:*  All right.  Any redirect?

7           *MR. THOMPSON:*  Nothing, Your Honor.

8           *THE COURT:*  All right.  Mr. Lambert, you can be

9   excused at this time.  May this witness be excused?

10          *MR. THOMPSON:*  Yes, he can.

11          *THE COURT:*  Mr. Johnson, may this witness be

12  excused?

13          *DEFENDANT JOHNSON:*  Yes.

14          *THE COURT:*  Okay.  Thank you, Mr. Lambert.

15          Call your next witness.

16          *MR. THOMPSON:*  All right.  So, this is Mr. Stewart

17  Baker.  He is our remote witness.

18          *THE COURT:*  All right.  Elec, we need your magic.

19          *MR. THOMPSON:*  We do need the magic.

20          *THE COURT:*  Ladies and gentlemen, we don't have a

21  good track record of remote witnesses working.  But we're

22  going to do the best that we can.  But I promise you, I won't

23  be wasting your time.  So, I will be holding a very short

24  leash.

25          If this doesn't work, we may have to strike his

1   testimony.  And I'm not saying this to be mean, it's just --

2   we talked a lot about politics and Congress and Uncle Sam, et

3   cetera.  Uncle Sam hasn't given us a lot of money to try to

4   update our technology here.

5         I was a judge for a number of years over at the

6   state; the stuff that we had over there even 20 years ago was

7   better than what we have over here, okay?

8         All right.  Let's see if the technology works.

9         MR. THOMPSON:  Mr. Baker, can you hear me?  This is

10  Will Thompson.

11        THE WITNESS:  I can hear you.

12        MR. THOMPSON:  You can.  Is that a yes?  Thumbs up?

13        THE WITNESS:  Yes.

14        MR. THOMPSON:  Excellent.

15        THE COURT:  Mr. Baker, can you hear me?  Mr. Baker,

16  can you hear me?

17        THE WITNESS:  I can.

18        THE COURT:  All right.  I need you to raise your

19  right hand.  I need you to raise your right hand.

20        MR. THOMPSON:  Can you -- the Judge asked you to

21  raise your right hand to put you under oath.  Did you hear

22  that?

23        THE WITNESS:  I apologize.  Yeah, he broke up on me

24  I'm afraid.  Okay.

25              (Witness sworn)

1          *THE COURT:*  Go ahead, counsel.

2                        STEWART BAKER,

3     having been first duly sworn, testified as follows:

4                     DIRECT EXAMINATION

5     *BY MR. THOMPSON:*

6     *Q.*     Mr. Baker, good afternoon.  Can you hear me?

7     *A.*     I'm sorry, you're breaking up.

8     *Q.*     Can you hear me, Mr. Baker?

9     *A.*     Hello?

10    *Q.*     We'll try it one more time.

11              Mr. Baker, can you --

12    *A.*     I heard it.

13    *Q.*     Okay.  Introduce yourself to the jury and explain why

14    you're testifying remotely.

15    *A.*     Okay.  I'm -- I'm glad to do that.

16              And I very much regret not being there.  I've got a

17    medical issue that has kept me tied to Northern Virginia.

18              But I am a former general counsel of the National

19    Security Agency, a former head of policy at the Department of

20    Homeland Security, somebody who's done a lot of Government

21    work on national security and intelligence matters.

22              And I've also provided a lot of advice to investors

23    and startup companies about doing business with the

24    intelligence community and the national security agencies.

25    So, my background for the last --

1    *Q.*    Let me stop you just right there, Mr. Baker.  Do you
2    have -- did you prepare some slides today to assist the jury
3    with your testimony?
4    *A.*    I did.
5    *Q.*    Okay.  Do you have those slides in front of you?
6    *A.*    I do.
7    *Q.*    Okay.  So, the jury has them up on their screens in
8    front of them.  And we're looking at the title page, it says,
9    Hal Lambert and Point Bridge Capital vs. Charles Johnson.
10            Do you see that?
11   *A.*    Yes.
12   *Q.*    Okay.  Wonderful.
13            So, we have two logos, one on the left and one on
14   the right.  What do those represent?
15   *A.*    Can you say that again?
16   *Q.*    We'll move on.
17            Mr. Baker, I was just trying to get your background.
18   Please explain to the jury why you are here testifying today?
19   *A.*    I'm here to testify about the statements that
20   Mr. Johnson made about Mr. Lambert and Point -- and his -- his
21   investment firm, and why they would be very credible and very
22   damaging, even if they were completely false.  And that's --
23   that's, essentially, what I'm going to offer my opinion on.
24   *Q.*    Okay.  So, we're bringing up -- it's going to be page 3
25   of your slide deck.

1          Do you have that in front of you?

2     A.     Yes.  I do.

3     Q.     And it's titled Summary of Role.

4          Do you see that?

5     A.     Yes.

6     Q.     Okay.  Mr. Baker, please explain to the jury, walking

7     them through using your slide, what your role in this case is,

8     or what your assignment was.

9     A.     So, I was asked to look at the things that -- the

10    claims that Mr. Johnson had made about Lambert and his

11    company and their failings, and also claims that he made to

12    Mr. Lambert about his ability to get or prevent Lambert from

13    getting particular national security contracts.

14          So, the question was, are those claims, claims that

15    would actually have a coercive effect on Mr. Lambert, and

16    could they cause serious damage, whether or not they're true?

17    Q.     And Mr. Baker --

18         *MR. THOMPSON:*  Your Honor, I don't want to press my

19    luck with the IT, but can we rotate the screen.  I don't know

20    if the jury can see Mr. Baker.

21         *THE COURT:*  Certainly.

22    Q.     *(By Mr. Thompson)*  Mr. Baker, can you see the jury now?

23    A.     Well, I'd love to see the jury.  What I'm seeing is the

24    screen with my talking place on it.

25    Q.     All right.  So, let's go to the next slide.  It's going

1    to be titled Summary of Opinions.

2            Do you have that in front of you?

3    A.    I do.

4    Q.    Explain to the jury, just walk them through, point by

5    point, what your high-level opinions were in this case.

6    A.    Yeah.  First, I'm starting from the assumption that

7    much of what Mr. Johnson said about Mr. Lambert wasn't true.

8    And I'm evaluating whether it could have caused him harm,

9    induced him to take action he otherwise wouldn't have taken,

10   even if the statements were false.

11           And I've come to the conclusion that because of the

12   way the national security community works, that many of the

13   things that Mr. Johnson said about Mr. Lambert would have

14   caused him harm, even if no one was sure whether they were

15   true.

16   Q.    And let's go to the second bold point, or is that just

17   your overall conclusion?

18   A.    That's my overall conclusion.

19   Q.    We'll go into those in more detail, because I know the

20   Court wants to move this along.  So, let's go to your next

21   slide, where it says -- it's titled National Security

22   Contracting and Expert Qualifications.

23           Do you see that?

24   A.    Yes.

25   Q.    Please discuss -- sorry, excuse me.  Background Decades

1    of Government Service.  It should be slide five for you, I

2    believe.

3    A.    It is.

4    Q.    Okay.  Discuss with the jury -- explain to the jury

5    your background and what makes you qualified to testify as an

6    expert here today in this matter.

7    A.    Okay.  I'm going to have to toot my own horn a little,

8    and I apologize.  I have a pretty good background in law.  And

9    for the early part of my career, I did a lot of international

10   trade, I helped start the Education Department.

11          But in 1992, I went to the National Security Agency

12   as the general counsel, and that changed the direction of my

13   career.  People said, Well what -- what does that job consist

14   of?  You're going to have to be briefed on all of the

15   classified stuff, because you don't know particularly a lot of

16   that classified information.  I said, That's right.

17          I would sit in my office, and people would come in

18   and brief me on what they were doing to gather intelligence

19   for the United States.  And the whole time I would say, Well,

20   you know, there's this law, and you're not breaking that law,

21   and you're abiding by the other law.  And they'd all give me

22   the right answers.  But the whole time what I really wanted to

23   say was, God, that is so cool.

24          And that was what hooked me on this.  The

25   capabilities and the reach of our intelligence agencies are

1    remarkable.  And also, the agencies, in my experience, needed

2    help dealing with the outside world.  They were not as

3    sophisticated about the outside world as they were about the

4    targets that they were trying to collect against.  So, I felt

5    I had something valuable to offer.

6    *Q.*    Okay.  Mr. Baker, the next bullet point on our slide,

7    it says, Testified Before the 9/11 Commission on Risk of

8    Misunderstanding Intelligent Agency Risk.

9          Explain to the jury how that relates to this case

10   and what you did there.

11   *A.*    So, my -- I'm not going to oversell this connection.

12   But I did testify to the 9/11 Commission about how it was that

13   we managed to miss some very obvious signs that terrorists

14   were already in the United States.

15          And I attributed it to a set of legal documents that

16   had prevented good communication among the agencies.  And that

17   it reflected, in my view, a failure of the intelligence

18   committees to explain why they had to do things a certain way.

19   They ended up with rules that they couldn't live with, those

20   rules prevented them from communicating about terrorists who

21   were already in the country getting ready to hijack the

22   planes.  And to my mind, it was a major contributor to the

23   success of the attacks.

24   *Q.*    Okay.  So, let's just keep moving on through your

25   resume here.  It also says, General Counsel WMD Commission.

1          What was that about and how does it relate to this

2     case?

3     *A.*    If I can -- if I can step just back a bit.  When I was

4     talking to NSA officials, saying, Well, I don't know, you'll

5     have to brief me on this, you'll have to brief me on that.

6     They finally came to me with a case in which a major rocket

7     company, Morton Thiokol, had gotten in trouble because they

8     were blamed for the shuttle disaster, and they were for sale.

9     A French company wanted to buy them.

10          And NSA was concerned about whether that would mean

11    that their secrets would end up in the hands of the French

12    government.  And I said, Well, I haven't had a good answer for

13    most of the questions that you've asked up till now, but I

14    think, based on my work in international trade, I'm completely

15    qualified to answer the question, can we trust the French?

16    The answer is, We cannot trust the French.  If they can steal

17    this information, they will; we should not approve this deal.

18          That was my first connection to reviewing

19    investments from foreign companies in U.S. technology

20    companies that had a national security implication.

21          When I got to DHS, it was an opportunity to take

22    that set of concerns, which I felt very strongly about and I

23    felt I actually had a useful contribution to make on, to take

24    that and expand it and take the authorities that the

25    Department of Homeland Security had, as well as the

1    interagency committee on foreign investments in the United

2    States, and say, Let's -- let's start asking harder questions.

3    Let's start demanding more from investors by way of assurances

4    that they're not going to mess up the technology they're

5    acquiring.

6         This was important for DHS, because it's the -- it's

7    really the agency -- the theme of the agency is preventing and

8    recovering from disasters.  And there's no bigger disaster

9    than having a foreign government that is hostile to you inside

10   your communications or your IT networks and trying to make

11   them fail.

12        And so, we did much more aggressive reviews of

13   critical infrastructure, especially telecommunications.  We

14   were the first to really raise questions about Chinese efforts

15   to install their telecommunications gear inside the United

16   States to sell it to big U.S. companies.

17        We stopped a transaction that we thought was

18   particularly egregious, where Huawei was acquiring an ability

19   to influence the U.S. company 3CON.  And we defined influence

20   in a very new way.  We said, It doesn't matter if they own the

21   whole company, they have complete control of the parts

22   supply -- the supply of parts of this company under this deal,

23   they are going to be the main customer for the company, and

24   they will be on the board.  That's enough, even if they don't

25   actually own the company, for us to feel that we can't trust

1   the equipment that we're going to be getting from 3CON.  So,

2   we're not going to allow this deal to go through.

3   Q.    Let me just jump in there, Mr. Baker.  Are you

4   referring to your time where you were first assistant

5   secretary for policy at DHS?

6   A.    Yes.

7   Q.    What time period are we talking about there?

8   A.    We're talking about 2005, '06, '07, '08.

9   Q.    Okay.  And is that a -- is that a high-level position,

10  does it require Senate confirmation?

11  A.    It does.  I had to be nominated, I had to go through

12  confirmation.  I had to try to get as many votes as I could.

13          And it was a particularly high-ranking position

14  under Secretary Chertoff, who wanted a number three position.

15  He had a deputy, he wanted a number three position that could

16  look at what DHS was doing in a broad perspective and make

17  sure that it made sense.  So, that was the job that I took.

18  Q.    Okay.  So, we're going to go to the next slide, it's

19  going to be slide five.  I'll try to move this along,

20  Mr. Baker.

21          So, how long were you -- when did your Government

22  service end?

23  A.    It ended when President Obama was inaugurated.  I was a

24  political appointee, and so I left on, I think, January 19,

25  2009.

1    Q.    Okay.  So, just briefly, you know, explain to the Judge

2    and jury what you did after leaving Government service, and

3    how it relates to this case and the scope of your expert work.

4    A.    So, when I left NSA, I had ended up with a lot of

5    clients who were tech companies that had a lot of issues that

6    they had not had five years earlier with the National Security

7    Agency.  And they thought there was something wrong with NSA,

8    they were mad, they wanted relief.  And it was because they

9    didn't fully understand what NSA's interests were.  They

10   weren't the same as the tech sector, there was a fundamental

11   conflict.

12          But my job ended up being, in the private sector,

13   trying to explain any of these National Security interests to

14   tech CEOs who just were completely unfamiliar with the world.

15   And so, I spent much of that time as a sort of interlocutory

16   between the two.

17          And the same thing turned out to be true after I

18   left DHS, where many of the concerns were related to DHS's

19   regulatory and national security concerns.  Particularly their

20   interests in preventing prejudicial investments from companies

21   that were influenced by the Chinese Government, the Russian

22   Government, the Iranian Government, et cetera.

23          MR. THOMPSON:  Okay.  Let me stop you there.  Your

24   Honor, at this point, the plaintiffs would offer Mr. Stewart

25   Baker as an expert in national security contracting and

1   compliance, with specialized expertise in reputational risks,

2   foreign influence mitigation, and policies governing

3   Government procurement.

4           *THE COURT:*  Do you have any objection?

5           *DEFENDANT JOHNSON:*  No objection, Your Honor.

6           *THE COURT:*  All right.  The witness is admitted as

7   an expert.

8           Go ahead.

9   *Q.*   *(By Mr. Thompson)*  All right.  Mr. Baker, let's move on

10  to the next slide, I think it's eight for you.  It's going to

11  be Scope of Expert Assignment.

12  *A.*    As I understood it, it was simply to say, taking the

13  statements that Mr. Johnson had made about his authority or

14  ability to influence Government contracts and the statements

15  that he made about Mr. Lambert in which he casts doubt on

16  Mr. Lambert's probity and suitability to work on national

17  security matters, would those statements have had an impact, a

18  prejudicial impact, on Mr. Lambert and his company, even if

19  they weren't true?  Because I didn't really believe they were

20  true.

21          And so, I looked hard at how the national security

22  agencies and people who invest in national security companies

23  would be likely to respond to those statements.  And I

24  concluded -- if you want to skip to the next slide -- that

25  they would have had a significant impact.

1         And the reasons for that are, essentially that the

2    Government -- he claimed that he had a lot of authority --

3    Q.    Let me just stop you right there, Mr. Baker, so we can

4    follow along.

5         So, we're looking at your Johnson's claims of

6    authority slide; is that what you're looking at?

7    A.    Yep.

8    Q.    Okay.  So, just walk through the bullet points, you

9    know, so the jury understands where we're at.

10   A.    So, his -- his claim, as I said, was that he had the

11   ability to influence contracts and particular agencies, that

12   he had been delegated some authority to make sure that certain

13   companies got on the straight and narrow, et cetera, et

14   cetera.  And so, he could kill or make a company's ability to

15   get national security contracts.

16        That is an unfortunately all-too-plausible claim.  I

17   don't think it was true, but it is a fact that a lot of

18   national security agencies have authority granted by law to

19   say you're not going to make this investment.  If you make

20   this investment, you're going to have to meet a whole bunch of

21   requirements that we made up just for you.  To say that to

22   companies, because they are concerned about the possibility of

23   foreign government interference with that company's business.

24        Those are all authorities that the Government has

25   and that it has used.  And so, it would be understandable that

1    someone who followed these things in a general way would have

2    said, Well, maybe he can do those things.

3          So, I think he was borrowing from very real

4    authorities, and, you know, distorting them for his own

5    purposes.  That's -- that's my assessment of what's going on

6    here.  It is not at all unknown for people to pretend to be

7    CIA agents, especially in singles bars, but they have also

8    done it to win contracts.

9    Q.    So, I think you're on like bullet three, this kind of

10   deception has worked against sophisticated actors before.

11         What do you mean by sophisticated actors?

12   A.    So, there have been cases where the people have held

13   themselves out as having been either former or current CIA

14   agents with the ability to carry out -- to award contracts.

15   And they have then gone out to encourage people to invest in

16   their company so that they can get these contracts.

17         And as I remember, in a couple of -- a couple of

18   cases, they actually won contracts.  They took the money and

19   they went out and went to get contracts.  But they were --

20   they were faking it the whole time.  The pretenses under which

21   they were gathering the money were that they had a special

22   relationship with the CIA or some other agency, and they

23   didn't have.

24         And this is -- there are people who are prosecuted

25   every year or two for this kind of impersonation fraud.  But

1   it happens far more often than people are prosecuted for.

2   *Q.*     And you say these impersonations succeed?  So, just --

3   you mentioned also at the last bullet -- I guess I'll skip

4   forward to Johnson tactics follow this familiar and dangerous

5   pattern.

6           What do you mean there, sir?

7   *A.*     So, as I said, people make false representations about

8   their connections to the national security community.  And

9   they're taking advantage of the fact that the national

10  security agents, you know, you can't call them up, like you

11  might call up the Post Office, or Health and Human Services,

12  or Social Security Administration, and say, Who does this for

13  you?  Does this person work for you?  They're not going to

14  answer those questions.  They're not even going to answer the

15  phone.

16          So, it's very hard, when someone says, I have this

17  connection to the national security community, to be sure

18  whether they're telling you the truth or not.  You kind of

19  have to guess from how plausible they sound.  And I think that

20  Johnson sounded plausible enough, because he was borrowing

21  some of the other authorities that the Government had, and

22  this is the pattern that other folks have discovered as well.

23  You can claim to be an FBI agent, you can claim to be a CIA

24  agent, and none of these agencies is going to say that's not

25  true, unless they get really mad at your claims.

1    *Q.*    Okay.  Let's skip to the next slide.  So, we have

2    slide 10 up, Mr. Baker.  It says, Johnson's claims of

3    wrongdoing by Lambert.

4           Are you there?

5    *A.*    Yes.  I am.

6    *Q.*    So, are you familiar with the allegation -- actually

7    the defamatory statements that Mr. Johnson made about

8    Mr. Lambert and Point Bridge Capital?

9    *A.*    Yeah.  I put -- I put them down there, that he said he

10   was a front for Russian money, and that he was somehow tied to

11   the Russian mob, and that he had engaged in sexual predatory

12   behavior at social events.

13          And my conclusion is, that is worse for someone who

14   wants contracts from the national security community than it

15   would be from somebody who wanted IT contracts from the Social

16   Security Administration.  It's bad wherever you go, but the

17   national security agencies are surprisingly concerned about

18   their reputations and they hate publicity.

19          Anything that said, Oh, you know, this particular

20   contractor for a national security agency is also on the

21   Me-Too list because of his predatory behavior, that means long

22   -- a long series of stories in which the national security

23   agency is going to take bad press, and they don't want any

24   press, let alone bad press.

25   *Q.*    Mr. Baker, let me break this up for you.  So, I want to

1    focus on the -- when Mr. Johnson said that Hal Lambert and

2    Point Bridge Capital was a front for dirty Russian money and

3    the Russian mob.

4         Can you explain how those type of statements are

5    assessed or applied within sort of the statutory or regulatory

6    framework and what's relevant?

7    *A.*     I'm glad to talk about that.

8         So, there -- I said earlier that, when we were

9    talking about the Morton Thiokol transaction, or Chinese

10   influence over telecommunications and infrastructure.  It's

11   kinds of a more-or-less assumption on the part of U.S.

12   national security agencies that our adversaries, like Russia

13   and China, if they have a chance to corrupt our

14   infrastructure, our IT or other telecommunications

15   infrastructure, or to steal secrets from our companies, they

16   will do it.

17        And so, if somebody is putting themselves forward as

18   an American investor, and then actually fronting for Russian

19   businessmen who might have an interest in hurting the United

20   States, that requires an investigation under -- by the

21   Committee on Foreign Investments in the United States.  And

22   they would be very concerned about that.

23        It also requires elaborate invocation of the foreign

24   ownership, control and influence rules that say, you know, we

25   need to -- we, the U.S. Government, if you have a classified

1   contract, need to know everybody who has influence over your

2   company, who plays a significant role in the company.  And we

3   need to make sure that their communications are not allowed to

4   touch on sensitive matters, unless we have already agreed that

5   they are entitled to that kind of information.

6          So, as soon as this kind of an allegation is made,

7   it raises, for everybody, including investors, the prospect

8   that you're not going to get approved for the transaction

9   without at least one and probably a couple of different

10  investigations.

11  Q.    Okay.  So, let's try to wrap up the -- the Russian --

12  like the front for dirty Russian money and Russian mob sort of

13  statements.

14         So, is it your opinion that those statements that

15  Mr. Johnson made were particularly targeted or could have a

16  particularly impactful or a detrimental impact on Mr. Lambert

17  and Point Bridge Capital?

18  A.    Yeah.  I think they -- they point directly at national

19  security concerns.  And probably, quite deliberately, as a way

20  of triggering this sort of concern and likely investigation.

21         The fact that he said it so loudly and on the record

22  means that, even if you don't have any other corroboration,

23  many people would say, Well, no one would say that publicly

24  without some basis for that.  We're going to have to assume

25  there's a basis for it, because he's so vociferous in making

1    those claims.

2    *Q.*    And does the Government, if they don't go with you, do

3    they tell you why?  It there a way to clear your name on this

4    type of stuff?

5    *A.*    Rarely.  All of these agencies value their ability to

6    maintain a veil between what they're worried about and what

7    the rest of the world knows.

8          And so, yes, if -- if your effort to acquire a

9    company is rejected, then that would become public.  But only

10   -- only if you make it public.  The Government's position is,

11   We're going to talk to the investor and the company that's

12   being acquired and nobody else.  And they have strict rules on

13   the confidentiality of their deliberations.

14         So, yeah, it's highly unlikely that you would know

15   the details of why the decision was made.  Various companies

16   have sued to try to find out more, and they have gotten

17   completely generic and uncommunicative responses.  And that

18   has -- the Government has made that stick.  So, you're not

19   going to find it out.

20         And if what they do is simply decide not to do

21   business with you, as opposed to not allow you to make an

22   investment, then all you know is you didn't get the contract.

23   And rarely does the Government say, You didn't get the

24   contract because we don't wholly trust you.

25   *Q.*    Okay.  So, let's move -- thank you for that.

1          So, we'll just briefly, briefly touch on the impact

2   that the allegations of sexual assault against Mr. Lambert,

3   what impact those would have, again, from a Government

4   perspective.

5   A.    Yeah.  And that is slide 11.

6          We can't forget that the Me-Too era has been a

7   particular part of U.S. culture for the last five years.  And

8   so, you can guarantee a scandal, guarantee hostile press

9   coverage by making allegations of this kind.

10          And if those allegations were made against somebody

11   who was a Government contractor, then the Government has the

12   authority, because it has provisions that say you're not

13   allowed to engage in sexual discrimination and they treat

14   sexual harassment as sex discrimination, they can investigate

15   that.

16          So, you'd probably -- you'd be guaranteeing bad

17   publicity, and highly likely an investigation of Mr. Lambert's

18   personal conduct.  Which would put the entire contract at

19   risk, because contracts are not supposed to be awarded to

20   people who engage in that behavior.

21   Q.    Okay.  So, now let's transition a little bit to the

22   investor perspective.  And go to the next slide, Ms. Faulkner.

23   So, looking at slide 12, Investor view, high risk, low upside.

24          Walk the jury through your findings on that issue,

25   from an investor perspective.

1   *A.*    Okay.  So, as we've seen, allegations like this stick,

2   they get covered, whether or not they're true, especially if

3   you made them loud and proud, the way Mr. Johnson did.  And

4   while people who are -- you're asking them to invest in your

5   company, to join with you in finding investments, it is a

6   request that is fundamentally based on trust and your track

7   record.

8          This is not a situation where everybody gets out the

9   accountant -- am I being interrupted?

10  *Q.*    No, you're not.

11  *A.*    Okay.  You don't -- you don't go and say, Okay, we're

12  going to spend three weeks going through the books, and we

13  want to verify everything that the people were being asked to

14  invest in have said to us.  Instead, you very quickly start to

15  say, Do I trust this guy, has he delivered for me in the past,

16  is he a successful investor, and does it look like a clean

17  opportunity?  And then, of course, you do due diligence.

18         But you can never say, I have verified all of the

19  facts, when you're talking about early investments.  And

20  that's why -- why Mr. Lambert's reputation is an important

21  part of actually attracting investors.  And if his reputation

22  has been scuffed up, in the way we've just been talking about,

23  he can ask people to participate in his investments, lots of

24  people get asked lots of times, and they mostly say no.

25         And so, it's not hard for somebody who's asked to

1    invest to say, Oh, I think I'll take a pass now.  Not because

2    they actually think there's a problem with the investment, but

3    because they want to see how these allegations are going to

4    play out, they're uneasy about what the allegations might

5    mean.  It's just -- if your risk averse pushes you away from

6    the investment just enough so that when you count up how many

7    investments you have, you don't have as many as you had hoped.

8    Q.    Okay.  Thank you for that, Mr. Baker.

9          So, let's go to our final slide, slide 13.  And I

10   believe it says Conclusions.

11         Do you have that up?

12   A.    Yep.

13   Q.    Okay.  So, summarize for the jury what your ultimate

14   conclusions are.

15   A.    Yeah.  So, this -- this is going to -- you're talking

16   about 12, right?

17   Q.    Go ahead.  Go ahead.

18   A.    All right.  Well, first, as I said, this is going to

19   deter investment, because it will raise questions about

20   Mr. Lambert that hadn't been there before.  And that is going

21   to reduce people's enthusiasm for making those investments,

22   and it will likely affect how many and how big those

23   investments are.

24         It's a problem that once those allegations are made,

25   they can last forever.  You know, Google is forever.  People

1    who have been cancelled for stuff they tweeted ten years ago,

2    we've all seen those stories.

3              And there's no way to get the Government to say,

4    Yeah, we looked into that and it's not true.  It's just the

5    Government doesn't have time or an interest in adjudicating

6    all of that.  The only way you get out from under that, if you

7    can, is wait long enough, or engage in some kind of self-help

8    to demonstrate that the -- that the statements are false.  And

9    so, it is very hard to recover from this.

10   Q.    Third bullet?

11   A.    To the next slide, Mr. Johnson made plausible claims

12   that he had authority to cause real harm to the business.  He

13   made public claims of conduct -- of misconduct that would set

14   off alarms in Government agencies, and among institutional

15   investors, and it would definitely hurt Mr. Lambert's

16   business.

17             I think Mr. Lambert acted reasonably in response, in

18   the sense that he tried to accommodate Mr. Johnson for a time.

19   That's not -- you know, he was coerced into that, and that's

20   part of the harm that he suffered.  And so, I -- I would say

21   that the damage that his company suffered is very real, it was

22   predictable from the start, and it's, you know, unfortunately

23   part of -- it was easier to do in a national security context

24   than maybe in some other context, and that's unfortunate.  I

25   wish that the Government was more aggressive about policing

1    impersonations of this kind.

2                *MR. THOMPSON:*  Thank you, Mr. Baker.

3                We'll pass the witness.  I wish you good health.

4                *THE WITNESS:*  Thank you.

5                *THE COURT:*  Mr. Johnson, do you have a cross?

6                *DEFENDANT JOHNSON:*  I do, Your Honor.

7                            CROSS-EXAMINATION

8    *Q.    (By Defendant Johnson)*  It's quite an honor to speak with

9    you, sir.  I remember studying you when I was way back in high

10   school.  And it's a great -- it's a great opportunity to speak

11   with somebody.  I wish it were under better circumstances.

12   *A.*    Yeah.

13   *Q.*    Now, do you -- do you hold an active security

14   clearance?

15   *A.*    I have.  I think I surrendered my clearance at the end

16   of the year.  But it's likely that somebody will ask me to do

17   something that requires me to revive it.

18   *Q.*    Okay.  Have you evaluated any of Mr. Lambert's

19   companies for national security violations?

20   *A.*    I have not.

21   *Q.*    Okay.  Are you familiar with the John McCain National

22   Security Act of 2019?

23   *A.*    It's a big Act, but, yes, I know, generally, that

24   it's -- that it's out there.  What part of it are you talking

25   about?

1  *Q.*    I'm referring to the part about how investors are

2  required to check for foreign capital before they make

3  investments, particularly from hostile nations:  Russia,

4  China, Iran.

5  *A.*    Yes.  In general.  I can't remember, it's possible that

6  that is the outward bound investment, that they should not

7  make investments in foreign companies that would assist those

8  companies in developing technologies that the Government is

9  concerned about.

10         But I -- the Government, really since we took our

11  stand over Huawei and 3CON back in 2008 or so, the

12  Government -- and I'm kind of proud of this -- both parties

13  have gotten much tougher on foreign investment and asking

14  private companies to take into account the U.S. national

15  security interest before they accept investments.

16  *Q.*    Would it raise concerns with you if a CEO of a company

17  was a foreign national, as your expertise doing these kind of

18  assessments?

19  *A.*    Sometimes that is a barrier to doing national security

20  work; sometimes it's not.  What you would have to do then

21  usually, is set up a separate subsidiary with a separate set

22  of directors, all of whom are trusted by the U.S. Government

23  and who have sworn to make sure that there will be no leaks of

24  the technology from the classified subsidiary to the

25  foreign-influenced company.  So, it is possible to set those

1   up, but there's no doubt it's a concern.

2   *Q.*    Thank you.

3           In your expertise in Government, have you ever run

4   confidential human sources in the field?

5   *A.*    No.  I think that would be malpractice.  I wouldn't try

6   to do that.  I -- I spent a lot of time looking at some of the

7   CIA's practices with respect to their overseas sources; some

8   of them good, some of them bad.  A lot of the problems we had

9   with intelligence against Saddam Hussein came from the

10  decisions that the agency made with respect to particular

11  sources.

12  *Q.*    Yes, particularly abroad.

13          But you've never run domestic confidential human

14  sources, no relationship with the national -- excuse me, the

15  Natural *(sic)* Resources Division of the CIA, none of that,

16  right?

17  *A.*    I have -- I have worked with the national -- basically

18  the domestic part of CIA on things that they're doing in the

19  United States.  But I've never been operationally responsible

20  for any of that.

21  *Q.*    Now, you mentioned earlier that you have not evaluated

22  any of the veracities of the claims, you just take Mr. Lambert

23  at his word that the things happened as he describes them; is

24  that correct?

25  *A.*    Yeah.

1    *Q.*    Not done your own investigation, you have not, you

2    know, called anyone who's an expert in doing investigations?

3    As far as you know, the material that you've been submitted is

4    true.  But even if it's not true, that's not really your point

5    in being here as a subject matter expert?

6    *A.*    Well, it's my understanding that you've already been

7    found to have defamed him, which means that the statements

8    would not be fully true.  And so, I think I can rely on that

9    determination, which is part of the reasons for my skepticism.

10    *Q.*    Sure.  But as an attorney, you're well aware that

11    things get overturned in appeal all the time, right?

12    *A.*    Findings of facts are very difficult to overturn on

13    appeal.

14    *Q.*    But it does happen?

15    *A.*    It does happen.

16    *Q.*    Okay.

17    *A.*    I don't -- I did not find your statements particularly

18    persuasive.  I thought they were bogus.  But I also thought

19    that someone hearing those, and even suspecting they were

20    bogus, would be afraid that they could cause trouble anyway.

21    *Q.*    But Mr. Lambert didn't go to law enforcement, by his

22    own admission, right?

23    *A.*    I'm not aware that he did.  But law enforcement is not

24    in the business of saying, Oh, yeah, this guy -- this guy's an

25    undercover agent for us, or he's a source for us.  That is --

1   they're just never going to tell you that.

2   *Q.*     Of course not.  We have to protect our sources and

3   methods at all opportunities.

4           Now, is it possible that in sounding the alarm

5   publicly, that I was acting as a whistleblower both to the

6   Government and institutional investors to say, Hey, you know,

7   you should be kind of careful of this Lambert guy?  Is that a

8   possible interpretation of the facts?

9   *A.*     So, I think you're recharacterizing what you said.

10  Basically saying, Yes, I said that, but I think it should be

11  viewed as a whistleblower blowing the whistle.

12  *Q.*     I just asked if it was possible, not if it -- yeah.

13  *A.*     Yeah.  Although, if you're blowing the whistle on

14  somebody because you are afraid of the national security

15  implications of what they're doing, you can do that by going

16  to the FBI, other national security agencies and saying, This

17  is what I know.  You could do it confidentially, and let them

18  go figure out whether it's true.

19          And so, when you just sort of --

20  *Q.*     Excuse me, sorry.

21  *A.*     -- put it everywhere, I think you -- you did more than

22  just blow the whistle, you were causing real harm, and I think

23  you knew quite well --

24  *Q.*     No doubt.

25  *A.*     -- what you were doing.

1    *Q.*    I mean, one could argue that I was sounding the alarm

2    with a trumpet with a full brass band, right?  One could make

3    that argument?

4    *A.*    I -- you definitely had the brass band.  I'm not sure

5    that you were blowing the whistle.

6    *Q.*    Yes.  Fair enough.

7            And in your expertise in the WMD's investigations in

8    the Iraq war, and I think you were also involved in the 9/11

9    commission, if I recall correctly, were there, in fact, people

10   who made whistleblower complaints about dealing with foreign

11   nationals in the United States, and were they ignored when

12   they went through approved channels?

13   *A.*    There have been allegations of that kind, yes.  And

14   it's -- well, I'm not going to say it never happens, because I

15   think it probably does.  Nobody likes to be told that they're

16   doing something wrong, and the agencies react badly to that,

17   and sometimes they punish the people who bring them that

18   message.  So, it does -- it has happened for sure.

19   *Q.*    And whistleblowers, particularly confidential human

20   sources, or someone's retaliated against by Government

21   agencies, right, in your expert -- in your experience?

22   *A.*    That's harder.  There are allegations of that kind

23   fairly often.  But in my experience, the relationship between

24   confidential sources and the agencies that they are enmeshed

25   with are -- it's like a marriage, and you're probably talking

about divorce court.  So, lots of bad things get said.

Q.    True.

So, just to reiterate, you have never run confidential human sources in the field in the United States, right, and you have not evaluated the veracity of any of the claims, you just take the claims as presented by Mr. Lambert as true, correct?

A.    I -- I have done a boss evaluation, I don't think they're true.  But I -- I will not say I investigated them.

Q.    Sure.

And you've been out of Government, other than having a top-secret clearance until the end of last year, you've been out of Government since 2009; is that correct?

A.    That's correct.  I believe I served on some Government commissions and given advice to Government since then.  But, basically, I've been out of Government.

Q.    Yeah.  You remind me a lot of my grandfather, he used to do a lot of work after he was out of Government.

So, I wish you speedy health, and I'm very glad that we could hear from you today, and long life and good success. And I appreciate what you write on reason, it's quite interesting.  Take care.

A.    Thank you.

THE COURT:  Any redirect?

MR. THOMPSON:  Real brief, Your Honor.

REDIRECT EXAMINATION

**_BY MR. THOMPSON:_**

Q.     Mr. Baker, can you hear me?

A.     You're breaking up a little.

Q.     Mr. Baker, can you hear me?

A.     Yes.

Q.     Explain to the jury why you assumed it was false that
Mr. -- when Mr. Johnson said that he sexually -- when
Mr. Johnson alleged or stated that Mr. Lambert sexually
assaulted younger woman?

A.     I think the easiest answer to that is that the jury's
already found that the statements were defamatory, and that
means they must be false.  And so, I -- I'm quite comfortable
accepting the jury's view on that, because it, frankly, fits
with my assumptions about what I've heard.  And so, I -- I
don't think that we're really arguing about whether it's true
or not.  Nobody who's looked at this thinks it's true.

Q.     And what role did the Court's entry of liability on
defamation as to the allegations about Russian money, what
role did that play in your opinions, or coming to your
assumptions?

A.     You're going to have to say that again.

Q.     That's fine.  We've pushed the technology long enough.
So, I appreciate your time, Stewart -- or Mr. Baker.  Thank
you.

1  THE COURT: May this witness be excused?

2  MR. THOMPSON: Yes, he can.

3  DEFENDANT JOHNSON: Yes, Your Honor.

4  THE COURT: All right. This witness is excused.

5  Thank you, Mr. Baker.

6  Call your next witness.

7  MR. THOMPSON: Right now, Your Honor, the plaintiffs

8  call Charles Johnson.

9  THE COURT: Mr. Johnson --

10  DEFENDANT JOHNSON: Yes, Your Honor.

11  THE COURT: -- approach the witness stand.

12  (Defendant approaches the stand)

13  THE COURT: Before you take a seat -- stand up.

14  DEFENDANT JOHNSON: Oops, sorry.

15  THE COURT: Raise your right hand.

16  (Witness sworn)

17  THE COURT: All right. Take a seat.

18  CHARLES JOHNSON,

19  having been first duly sworn, testified as follows:

20  DIRECT EXAMINATION

21  BY MR. THOMPSON:

22  Q.   Mr. Johnson, you heard the recordings where you accused

23  Mr. Lambert of sexual assault and being involved with foreign

24  Russian money?

25  A.   I have.

1    *Q.*    That was your voice?

2    *A.*    It was my voice.  Yes, it was.

3    *Q.*    It was not manipulated, correct?

4    *A.*    They're shortened, catenated from a longer segment

5    where I go into more detail.  But that is, in fact, my voice.

6    Yes.

7    *Q.*    Those were your words, right?

8    *A.*    They were entirely my words.

9    *Q.*    You were sitting here when Mr. Lambert testified about

10   the different economic damages that he suffered, correct?

11   *A.*    I was.

12   *Q.*    And you recall Mr. Lambert testifying as to lost earned

13   media; do you recall that?

14   *A.*    Say that again.  I'm sorry, I missed that.

15   *Q.*    It was lost earned media; do you remember that?

16   *A.*    I did see that.  Yes.

17   *Q.*    And it's right up here, I wrote it down so you can see

18   it.  Mr. Lambert said the damages that he suffered due to your

19   conduct was $6,794,000- -- $794,000 and 7-0-6; is that right?

20   *A.*    That's right.  Yeah.

21   *Q.*    Okay.  You don't have an alternative number that you're

22   providing here today, correct?

23   *A.*    I think the alternative number is likely -- likely

24   zero.

25   *Q.*    You don't have any evidence of that, correct?  You're

1   not providing a document?

2   *A.*      That's correct.  No, I'm not.

3   *Q.*      No document, right?

4   *A.*      No document, none whatsoever.

5   *Q.*      You're not providing a document that says --

6   *A.*      No subject-matter expert, no document.  Nope, I'm not

7   doing that.

8   *Q.*      So, you admit that you're not a subject-matter expert

9   on this, correct?

10  *A.*      That's correct.

11  *Q.*      Okay.  Same as to the damages that Point Bridge Capital

12  suffered from lost earned media, you're --

13  *A.*      I'm not a subject-matter expert on that either.

14  *Q.*      So, you have no evidence on that to present to the

15  jury, correct?

16  *A.*      That's correct.

17  *Q.*      Similar questions as to the lost money from invest --

18  like investments.  This $1.6 million, do you see that, sir?

19  *A.*      I do.

20  *Q.*      Okay.  Are you a subject-matter expert on that?

21  *A.*      I am not.  Though, I would dispute all of these.

22  *Q.*      The answer is --

23  *A.*      I would trust the jury to draw their own conclusions on

24  the veracity of those statements --

25  *Q.*      Okay.

1  *A.*      -- based upon the subject-matter experts.

2  *Q.*      Mr. Johnson, it's a yes or no question.

3  *A.*      No.  I'm not a subject-matter expert on any of those

4  things.

5  *Q.*      Okay.  And you're not offering an alternate number,

6  correct?

7  *A.*      That's correct.  Other than zero, no.

8  *Q.*      Similar questions to the reputation rehabilitation that

9  Mr. Lambert suffered, you're not a subject-matter on that,

10  correct?

11  *A.*      No.  Not at all.

12  *Q.*      You're not offering another document on that, correct?

13  *A.*      No.  I'm not.

14  *Q.*      You're a wealthy individual, correct, Mr. Johnson?

15  *A.*      No.  I am not.

16  *Q.*      You're worth tens of millions of dollars in net

17  worth --

18  *A.*      I am not.

19  *Q.*      -- right?

20  *A.*      Not concurrently.  No.

21  *Q.*      Let's turn to Exhibit 108.  Let's pull that up for

22  Mr. Johnson and the jury.  Go to page 3, Ms. Faulkner.

23         You wrote this on your Substack, correct,

24  Mr. Johnson?

25  *A.*      It looks like extract from my Substack; but, yes.

```
 1   Q.    We can go to the first page.  But you don't dispute

 2   that that's your writing, correct?

 3   A.    I don't dispute it at all.

 4         But what -- what date is it from, if I may?  Do we

 5   have a date on the document?

 6   Q.    Pull up the first page.

 7   A.    That's important.  Obviously things change over time.

 8         So, this is from, I believe, correct me if I'm

 9   wrong, you may know better than I would, I'm just relying on

10   memory, I believe this is -- so this is the Lincoln cabin in

11   front of my hometown in Milton, Massachusetts, right near

12   where George Herbert Walker Bush was born.

13   Q.    Mr. Johnson --

14   A.    And --

15         MR. THOMPSON:  Objection.  Nonresponsive.

16   Q.   (By Mr. Thompson)  When did you write the document?

17   A.    Okay.  So, this is from 2019, 2020 time frame,

18   something like that.

19   Q.    You can take that down.  Let's pull up Exhibit 64.

20         This is an email that you wrote, Mr. Johnson.  I'll

21   note on Wednesday, October 23rd, 2024, right?

22   A.    No.  I don't think that's correct.

23   Q.    You didn't write this?

24   A.    That -- so you're -- you're -- what I see here is that

25   it says from Charles Johnson.  You're redacting the to and
```

1    from.  I'm not sure where this email came from.  There have

2    been allegations of hacking --

3    Q.    Mr. Johnson --

4    A.    -- in this case.

5    Q.    Mr. Johnson, this is a yes or no question.

6    A.    No.  This email is not from me.  This is from material

7    that was copied and pasted, and then forwarded, I presume, to

8    counsel.

9    Q.    Mr. --

10   A.    But, no, I don't think it's from me.

11   Q.    Mr. Johnson, it's a yes or no question.

12         Ms. Faulkner --

13   A.    I think it's a no.  But I assume if I -- if you say

14   that I wrote, then maybe I wrote it.  I don't know.

15   Q.    Ms. Faulkner, please zoom in on the email address.

16         That's your email address, right, Mr. Johnson?

17   A.    That is.  But I'm curious as to what the redacted is.

18   That's quite curious.  I have not seen that before.

19         MR. THOMPSON:  I'm going to object as nonresponsive.

20   Q.    (By Mr. Thompson)  Mr. Johnson, it's a yes or no

21   question.  Is --

22   A.    Then, no, this is not my email.  This looks like a

23   copy-and-paste version.  I reject it.

24         THE COURT:  He said that twice.  So --

25         THE WITNESS:  I could do it a third time, if you

1    want to.

2           *THE COURT:*  He contends that this is, what, a fake

3    email --

4           *THE WITNESS:*  I can --

5           *THE COURT:*  You need to --

6           *THE WITNESS:*  It looks like --

7           *THE COURT:*  Please --

8           *THE WITNESS:*  -- a composite, Your Honor.

9           *THE COURT:*  -- please be quiet.

10          *THE WITNESS:*  I'm sorry.

11          *THE COURT:*  So, you have your answer, Mr. Thompson,

12   now you can run with it.

13          *MR. THOMPSON:*  I'll move on.

14          *THE COURT:*  Well, you don't -- it's in evidence, you

15   can ask him about it.

16   *Q.*  *(By Mr. Thompson)*  So, let's go down to the middle of

17   this page, okay?

18   *A.*     Yes.

19   *Q.*     It says -- do you see where it says, I invested 200K?

20   Do you see that?  It's in the middle of the page.

21   *A.*     I don't see it.  Could you read it for me?

22          I invested 200K at the seed stage, which is about

23   3 million.  Yeah, I don't think that's accurate.

24   *Q.*     I didn't ask you if it was accurate, sir.

25   *A.*     Yes.

1    *Q.*    Read the sentence to the Judge and jury.

2    *A.*    I invested 200K at the seed stage when it was about

3    3 million.  This is for a company called Genomic Prediction.

4    That would have been, like, 2018 time frame, something like

5    that.

6    *Q.*    Mr. Johnson, I asked you to first read the sentence --

7    *A.*    I invested --

8    *Q.*    -- to the Judge and --

9    *A.*    -- 200K --

10                    *(Court Reporter interrupts)*

11   *A.*    Sorry.  My bad.

12   *Q.*    Go ahead, Mr. Johnson.  Please read -- under Genomic

13   Prediction, please read the sentence, the whole line, I

14   invested.

15   *A.*    I invested 200K at the seed stage when it was worth

16   around 3 million.  It is now worth around 60 -- or excuse me,

17   40 million minimal dilution.

18   *Q.*    Okay.  Now let's go to the -- down two lines.  What's

19   -- it Anduril?  How do you say that, Mr. Johnson?

20   *A.*    I think it's Anduril, but I don't know.

21   *Q.*    Okay.  Please read the whole line below Anduril.

22   *A.*    I invest -- oh, below it.  Okay.

23           I invested about 200K in Anduril at the seed stage

24   of 80 million.  The current valuation of the company is worth

25   north of 2 billion.

1          Oh, so I have a sense of when this email might have

2     been done, by the way, I think, based upon that, which is not

3     October 24th.  It's from like 2020 time frame.

4     *Q.*     And Mr. Johnson --

5               *THE COURT:*  So, did you draft this email or not --

6               *THE WITNESS:*  This email --

7               *THE COURT:*  -- since you testified three times --

8               *THE WITNESS:*  No.  I did not draft this email, as

9     it's presented to the Court.

10              *THE COURT:*  Well, you seemed to have had some

11    recollection of it in answering these questions.

12              Why don't you explain your theory of where this came

13    from.

14              *THE WITNESS:*  Sure.

15              It is true that I am a critic of the richest man in

16    the world, Elon Musk.  And it is the case that he is being

17    accused in a number of cases of hacking.

18              My phone has been hacked.  I was a confidential

19    informant for the FBI; that's not in dispute.  And a lot of my

20    material has surfaced in different places around the internet.

21    I'm not happy about that, for obvious reasons.  It's part of

22    the reasons I've actually sold off a lot of my assets and done

23    other things.

24              But my theory of the case is that the plaintiffs are

25    relying on data that was illegally obtained and from an

1    earlier time frame.  And also, a lot of this was not entered

2    under oath, a lot of this is not accurate.  I have since sold

3    some of these positions or given away the money.

4              THE COURT:  Well, you're under oath now.

5              THE WITNESS:  Yes.

6              THE COURT:  And if I find you're lying, you're

7    guilty of perjury, which is --

8              THE WITNESS:  I understand --

9              THE COURT:  -- a Federal crime.

10             THE WITNESS:  -- totally, Your Honor.

11   Q.   (By Mr. Thompson)  Ms. Faulkner, can you zoom out so we

12   see the whole email?

13             Do you know how the plaintiffs got this document,

14   Mr. Johnson?

15   A.   I do not.

16   Q.   Your lawyers produced it, when you had a lawyer in this

17   case.  Did you know that, sir?

18   A.   I did not know that.  But it looks like you're

19   redacting the email.

20   Q.   Do you know that Johnson00062, do you know that your

21   lawyers put it on that, Mr. Carter Boisvert?

22   A.   I did not know that.  But if he did, it was an error on

23   his part, because I hadn't sent him this.  And if I did, it

24   was from a long time ago.

25   Q.   So, your position is your lawyer -- Mr. Carter Boisvert

1    represented you in this matter, right?

2    *A.*    He did.  And there's good reason why he no longer

3    represents me.

4            *THE COURT:*  Can I ask you a question?

5            I've worked in law enforcement for a number of

6    years, I've been a judge for a number of years, had various

7    security clearances.  I never remember any of the FBI or

8    national security assets that I worked for actually telling

9    people that they were?

10           It seems pretty unusual to me.  I just --

11           *THE WITNESS:*  Definitely unusual, Your Honor.  And,

12   in fact --

13           *THE COURT:*  You don't remain an asset very long if

14   you tell people.

15           *THE WITNESS:*  It's possible that you might actually

16   be brought to another Government agency, that's a possibility.

17   That does happen quite often.

18           And it's also the case that sometimes a Government

19   agency might be using a confidential human source in an

20   illegal manner, and that person may be outed as a confidential

21   human source.  That happens quite often, actually,

22   unfortunately.  And in those cases --

23           *THE COURT:*  So, I guess -- did your -- did you have

24   permission from your agency to go ahead and tell anyone out

25   there that wasn't in law enforcement that you were an

1    intelligence asset?

2            THE WITNESS:  Well, I was a confidential human

3    source for Special Agent Johnathan Buma, who is now under --

4    he was arrested, I believe, by the FBI by the Department of

5    Justice, I haven't followed the particulars of that.  And

6    there's a number of agents that have handled me over the years

7    in different Government agencies.

8            Did I have permission?  No.  I have a First

9    Amendment right to talk about this.  But I have not been

10   penalized in any form or fashion by the FBI.

11           THE COURT:  No.  That's not what I meant.  I just

12   meant, it's kind of unusual if you're an intelligence asset,

13   you probably wouldn't be one for very long if you're telling

14   everybody you're an intelligence asset.

15           THE WITNESS:  Or it might be a good cover, Your

16   Honor.

17           THE COURT:  Well, I don't know.  I wish James

18   Angleton was here, I would ask him.  I bet he would have a lot

19   to say.  Maybe him or Allen Dulles about the value of outing

20   ourselves as intelligence assets.

21           Let's take a break.  Ladies and gentlemen, before I

22   do, let me give you my admonishment.  You're not to form any

23   opinion or talk about the case until I release you to do so at

24   the very end of the trial.

25           We'll be back in about 15 or 20 minutes.

1          *THE WITNESS:*  Thank you, Your Honor.

2          Am I dismissed?

3          *THE COURT:*  You can stay there for a moment.

4               *(Jury leaves courtroom)*

5          *THE COURT:*  Mr. Thompson, I don't want to tell you

6    how to try your case, but if you actually think you're going

7    to get answers from Mr. Johnson, you're probably not.

8          So, think about if you're using your time wisely.

9    You already have a liability finding, we're just here to prove

10   up damages.  The jury already has enough to do so, okay?

11         So, if you think you're going to make headway with

12   him, my experience in these last few months, you're not going

13   to get any straight answers, okay?  So think about how you're

14   using everybody's time.

15         *MR. THOMPSON:*  Thank you, Your Honor.

16         *THE COURT:*  This is -- this verbal fencing and

17   trying to get truthful answers is just not going to happen.

18   Remember how many times I threatened to hold him -- we've had

19   sanctions hearings, the Judge in New York has similar

20   feelings.

21         It got so bad, the first time in all of these years

22   that I've been a judge, I've had to strike somebody's

23   defenses.  That is an extreme sanction.  I felt it was

24   necessary here due to his actions.  I was left with no other

25   choice.  And I take very seriously the Fifth Circuit's

1    admonishment that I consider the least severe sanction to

2    correct the problem.

3            As I stated at the last hearing, he actually, I

4    think, wanted me to hold him in contempt and throw him in

5    jail.  I think somewhere in his mind he thinks that maybe

6    helps him, but I'm not going to make a martyr of him.

7            I am going to hear the evidence, we're going to

8    submit it to the jury, and we're going to see what they come

9    back with, and we'll go from there.  And I have a strong

10   suspicion it won't be the last time that I hear from you.

11           So, let's get past this step and go on to the next

12   one.  Certainly everyone has their appellate rights, if they

13   would like to, but I'm just giving you my suggestions.

14           *MR. THOMPSON:*  Your Honor, loud and clear.

15           *THE COURT:*  But, you know, I can -- it reminds me of

16   putting one of my children on the stand and trying to ask them

17   questions, you're not going to get straight answers, I'm

18   afraid, all right?  And I can admonish him, sanction him, et

19   cetera, et cetera.  But just ask, Is the juice worth the

20   squeeze, okay?

21           Be back in about 15 minutes.

22                *(Short recess taken)*

23                *(Jury enters courtroom)*

24           *THE COURT:*  Okay.  At this time, let's go back on

25   the record.  We're in the continuation of the trial of Point

```
 1   Bridge Capital and Hal Lambert vs. Charles Johnson.
 2           We were in the middle of direct testimony and
 3   examination of the defendant, Mr. Johnson.  So, go ahead,
 4   Mr. Thompson, ask your next question.
 5   Q.   (By Mr. Thompson)  Ms. Faulkner, please bring up
 6   Exhibit 113.
 7           Mr. Johnson, do you see Exhibit 113 that's in front
 8   of you?
 9   A.     Yes.  This is one of my favorite cases.
10   Q.     My question is did you --
11   A.     Yes.  Yes, I see.
12   Q.     Okay.  It says, Charles Johnson vs. Verizon CMP
13   Holdings, HuffPost.
14           Do you see that?
15   A.     Yes, sir.  I do.
16   Q.     Okay.  You're the Charles Johnson there, right?
17   A.     I am.
18   Q.     Yes?
19   A.     Yes.  I am.  Absolutely.
20   Q.     Ms. Faulkner, please go to page 3.
21           Mr. Johnson, I want you to focus on paragraph 3
22   here, okay?  I'm going to read this to you, and I want you to
23   tell me yes or no whether I wrote (sic) it correctly, all
24   right?
25   A.     But did you write this or are you just quoting from
```

1   the -- from the case?

2              THE COURT:  I think he's just going to read it to

3   you, and you tell him whether he read it correctly, all right?

4              THE WITNESS:  Yes, sir.

5              THE COURT:  Stop playing this game of fencing.

6   You're going to have an opportunity to ask yourself questions

7   in a moment, but you're wearing us out.  So, answer the

8   questions.

9              THE WITNESS:  Happy to do it.

10  Q.   (By Mr. Thompson)  So, tell me yes or no, I read this

11  correctly.

12  A.     Yes.

13  Q.     Starting with being.  Being labeled by the press with a

14  loathsome term that brings with it stigma and ostracization

15  that could result in losing a career, public scorn, and

16  humiliation, and even the risk of physical harm.

17             Did I read that correctly?

18  A.     You did.

19  Q.     Okay.  Now I'm going to read the sentence beginning

20  with once, okay?  Once these labels are given in this digital

21  age, they are permanent and scar a reputation for indefinite

22  duration with a simple internet search.

23             Did I read that correct, yes or no?

24  A.     Yes.  You did.

25  Q.     Going to turn to paragraph 5.  I'm going to read the

1    first line.  The terms white nationalist, Holocaust denier,

2    and white supremacist are the new buzz terms used to describe

3    a myriad of person on the political right who may have views

4    that diverge from mainstream politics.

5            Did I read that correctly?

6    *A.*    You did, indeed.

7    *Q.*    You sued -- this is your lawsuit, right, Mr. Johnson?

8    *A.*    It is.  From 2020.

9    *Q.*    And I'm going to turn to page 5, paragraph 13.  Tell me

10   if I read this correctly.  Plaintiff -- page 5, paragraph 13.

11   Exhibit 113, Ms. Faulkner, paragraph 13.

12           Tell me if I read this right, Mr. Johnson.

13   Plaintiff -- that was you, correct?

14   *A.*    It was, or it is me.  Yep.

15   *Q.*    Further seeks exemplary damages because defendant's

16   actions were committed with actual malice and/or reckless

17   disregard for the truth.

18           Did I read that correctly?

19   *A.*    You did.

20   *Q.*    Now, let's go back to page 4, paragraph 10.  Tell me if

21   I read this correctly.  As a result -- as a result of these

22   false statements of fact of and concerning Johnson, his

23   reputation has been damaged and he has suffered actual damages

24   and reputational injury in excess of $1 million.

25           Did I read that correctly?

1    *A.*     You did.

2    *Q.*     You sued in this case because you were called a white

3    supremacist, correct?

4    *A.*     I believe the term is white national.  But, yes, I did

5    sue over it.

6    *Q.*     The Huffington Post wrote that you were a white

7    nationalist, right?

8    *A.*     Yes.  They said I was a Holocaust-denying white

9    nationalist.

10   *Q.*     Ms. Faulkner, please bring up -- and in this case you

11   were seeking over a million dollars in damages, right?

12   *A.*     Yes.  Though, if I recall correctly --

13   *Q.*     Mr. Johnson, yes or no?

14   *A.*     Yes.  That's true.

15   *Q.*     Okay.  Ms. Faulkner, please bring up Exhibit 114.

16          So, this case against Huffington Post, that wasn't

17   your only defamation suit that you filed, right, Mr. Johnson?

18   *A.*     No.  I filed quite a number of them.

19   *Q.*     Mr. Johnson, yes or no?

20   *A.*     No.  It's not my only one.

21   *Q.*     Okay.  Let's go to page -- Exhibit 114, and we'll go to

22   the second page.

23   *A.*     Yes.  This is the one I won.

24   *Q.*     Yes or no, do you recognize this lawsuit?

25   *A.*     Yes.

1   Q.     Is the plaintiff there, Charles C. Johnson, is that

2   you?

3   A.     That is 100% me.

4   Q.     And Got News, LLC, is that -- was that your company?

5   A.     That was my company.  Yes, it was.

6   Q.     Okay.  Let's go to page 16, paragraph 74.

7          Do you see what's on the screen, Mr. Johnson?

8   A.     Yes.

9   Q.     Okay.  I'm going to read the highlighted part, and you

10  tell me if I read it correctly.  Plaintiffs, Charles C.

11  Johnson and Got News, LLC, have been damaged in reputation and

12  have suffered pecuniary damages of lost business and lost

13  investments due to damaged business reputation, as well as the

14  need for plaintiff to file this lawsuit to defend his good

15  name, and the related costs from attorney's fees, in an amount

16  exceeding $2 million, right?

17  A.     Yes.

18  Q.     Okay.  Let's go down to the other part.  It references

19  punitive damages.

20          Do you see that?

21  A.     I do.

22  Q.     Okay.  It says, Defendant Trotter's conduct in

23  publishing the statements described in paragraphs 64 through

24  66 -- and now we're focusing you on the highlighted part,

25  Mr. Johnson -- was done with knowledge that the statements

1    were false, or with reckless disregard for whether they were

2    true or false at a time when defendant had serious doubts as

3    to whether they were true; thereby warranting an award of

4    punitive damages in a sum of not less than $20 million.

5           Did I read that correctly?

6    A.    You did.

7    Q.    That was your lawsuit, right, Mr. Johnson?

8    A.    Yes.  We successfully bankrupted --

9    Q.    Mr. Johnson --  Mr. Johnson, I said --

10   A.    Yes.  It's my lawsuit.  I stand by it and I'm proud of

11   it.

12   Q.    I said, yes or no, is this your lawsuit?

13   A.    Yes.  100% my lawsuit.

14          MR. THOMPSON:  Pass the witness, Your Honor.

15          THE COURT:  Okay.  Now, Mr. Johnson, this is a

16   little bit strange because you're representing yourself.

17   Under our rules, you're not supposed to give narrative

18   testimony; which means you just can't get up and just keep

19   talking and keep talking.

20          So, at this point, this is your opportunity to ask

21   yourself questions, and then you can respond to them.

22          DEFENDANT JOHNSON:  Sure.

23          THE COURT:  So, are you prepared to do that at this

24   time?

25          DEFENDANT JOHNSON:  I am.  It's a little strange,

1   but I'm prepared to go through with it.

2               *THE COURT:*  Okay.

3               *DEFENDANT JOHNSON:*  Maybe you can help me if I

4   screw it up.

5               *THE COURT:*  Well, you don't want me asking the

6   questions, you might not like the way I ask them.

7               *DEFENDANT JOHNSON:*  Fair enough.

8               *THE COURT:*  As best you can, ask yourself a

9   question, and then respond to it, okay?

10              *DEFENDANT JOHNSON:*  Okay.  Do I address myself as

11   Mr. Johnson, or how do I --

12              *THE COURT:*  As -- the best as you see fit.

13              *DEFENDANT JOHNSON:*  Okay.

14              *THE COURT:*  Unfortunately, as I said, we're not

15   allowed just to get up and give narrative-style testimony --

16              *DEFENDANT JOHNSON:*  No, no.

17              *THE COURT:*  -- okay?

18              *DEFENDANT JOHNSON:*  I'm not going to do that.  Okay.

19                   CROSS-EXAMINATION

20   ***BY DEFENDANT JOHNSON:***

21   *Q.*     So, Mr. Johnson, is it true that you sued Gawker Media,

22   and that Gawker Media was backed with Russian money, from a

23   Russian oligarch named Viktor Vekselberg?

24   *A.*    Why, yes.  It is true that that's what I did.  And

25   Gawker is currently bankrupt, and I received $500,000 for my

1   efforts in the bankruptcy hearing.

2   *Q.*    Mr. Johnson, is it true that you sued Huffington

3   Post -- actually, I think it was Verizon Media at the time?

4   *A.*    Yes.  Yes, counsel *(sic)*, it is true that I sued them.

5   And I seem to recall Huffington Post is now bankrupt as well.

6   *Q.*    Mr. Johnson, were you instructed by anybody who has

7   connections with law enforcement to clean-up the media in the

8   United States, or to clean-up venture capital in the United

9   States?

10  *A.*    Well, Mr. Johnson, I'm not sure if I should answer that

11  question.  Maybe we can address it at some other point.

12  *Q.*    Now, is it true, Mr. Johnson, that you were involved in

13  efforts to infiltrate white nationalist organizations on

14  behalf of the Federal Bureau of Investigations?

15  *A.*    Why, yes, Mr. Johnson.  That is true.

16  *Q.*    Is it also true, Mr. Johnson, that you were instructed

17  to investigate compromised law firms, and that sometimes you

18  retain those law firms?

19  *A.*    Yes.  That's also true.

20  *Q.*    Okay.  Now, Mr. Johnson, is it possible that you are

21  engaged in this case because you are concerned about the

22  venture capital community in the United States, and is it

23  possible that you are, as you have in your other lawsuits,

24  litigating on behalf of some larger public interest?

25          *MR. THOMPSON:*  Objection.  Speculation.

1      *THE COURT:*  How do you respond, Mr. Johnson?

2      *DEFENDANT JOHNSON:*  Well, I think it gets to the

3  heart of the matter, Your Honor.  I am an admittedly strange

4  person.  I've never heard of anyone asking themselves

5  questions in a court -- Federal courtroom in Texas.

6      *THE COURT:*  Well, you're the one that made the

7  decision to represent yourself.  So, you --

8      *DEFENDANT JOHNSON:*  I did.  And it's a great way to

9  prove that you're not involved in a conspiracy to represent

10  yourself.

11      *THE COURT:*  You need to save your argument for

12  later.  Please strike that.

13      *DEFENDANT JOHNSON:*  Okay.

14      *THE COURT:*  Okay.  This is exhausting having to deal

15  with this.  I am going to give you some leeway, though.  So,

16  objection overruled.

17      Let's continue.  But if I were you -- and I already

18  found a liability finding against me, so you've already been

19  found liable for civil RICO and defamation.

20      *DEFENDANT JOHNSON:*  That's true.

21      *THE COURT:*  We're here merely to establish what the

22  damages are, if any.

23      *DEFENDANT JOHNSON:*  Could Mr. Thompson pull up the

24  Genomic Prediction email, and all that, if he would?

25      *THE COURT:*  Sure.

1            MR. THOMPSON:  Is this the email that you said you

2    didn't produce that your lawyer sent us?

3            DEFENDANT JOHNSON:  Yep.  Have you to pull it up,

4    please?

5            MR. THOMPSON:  Exhibit 64.  I can hand it to you.

6            DEFENDANT JOHNSON:  No, no.  Pull it up.  I think

7    the jury should see it.

8            THE COURT:  Sherry, can you find the email?

9            DEFENDANT JOHNSON:  Thank you.

10           THE COURT:  Go for it.

11   Q.  (By Defendant Johnson)  Mr. Johnson, did you claim in

12   Federal courts that you started a company, Clearview AI, with

13   Hoan Ton-That and Richard Schwartz?

14   A.    I did, Your Honor (sic).

15   Q.    Are you and your family investors in this company?

16   A.    No, Your Honor (sic).  Only my ex-wife and daughter are

17   investors in that.

18   Q.    But, Mr. Johnson, I thought you started the company?

19   A.    Well, that was a matter of some dispute.  And I

20   actually lost the investment after I had structured the things

21   in separate trusts to protect the interests of my wife and the

22   mother of my child.

23   Q.    Now, Mr. Johnson, how did you meet Hoan Ton-That?

24   A.    Mr. Ton-That was introduced to me by a number of

25   Chinese individuals in the New York City area.

1          *MR. THOMPSON:*  Objection.  Relevance.

2          *THE COURT:*  What's the relevancy of this?

3          *DEFENDANT JOHNSON:*  The question gets to whether or

4     not -- with all of the investments, whether or not I have any

5     of these assets at all currently.

6          *THE COURT:*  What's your response, counsel?

7          *MR. THOMPSON:*  I -- I have no response, Your Honor.

8     I don't.

9          *THE COURT:*  So, do you have any of these assets

10    currently?

11         *DEFENDANT JOHNSON:*  I do not.

12         *THE COURT:*  All right.  Let's move on.

13         *DEFENDANT JOHNSON:*  Okay.  No further questions,

14    Your Honor.

15         *THE COURT:*  All right.  Do we have any redirect?

16         *MR. THOMPSON:*  No, Your Honor.

17         *THE COURT:*  All right.  Thank you, Mr. Johnson.  You

18    can step down.

19         *DEFENDANT JOHNSON:*  Thank you.

20         *THE COURT:*  May this witness be excused?

21         *MR. THOMPSON:*  Yes.

22         *THE COURT:*  Okay.

23         *DEFENDANT JOHNSON:*  Yes.

24         *THE COURT:*  All right.  Thank you.

25              Call your next witness.

1      MR. THOMPSON:  Your Honor, plaintiffs call Dennis

2   Brady.  And he's an expert in law enforcement confidential

3   sources.  I'm going to try to pare it down dramatically to

4   10 minutes or less.

5      THE COURT:  Okay.

6      MR. THOMPSON:  We have a whole big slide, but I

7   think everyone wants to move on.

8      THE COURT:  That'll be fine.  It's up to you.

9      Raise your right hand.

10         (Witness sworn)

11      THE COURT:  All right.  Take a seat.

12      Mr. Brady, just be sure you speak into the

13   microphone.

14      Have you ever testified in here before?  In front of

15   Judge McBryde maybe?

16      THE WITNESS:  Yes, Your Honor.  It was a day or two

17   ago, though.

18      THE COURT:  Well, it hasn't changed much as far as

19   technology.  Be sure you speak into the microphone.  I'm not

20   quite as mean as he is -- or was.

21      THE WITNESS:  He was always good to me, Your Honor.

22      THE COURT:  Go ahead.  I was going to make another

23   comment, but I need to keep my mouth closed.

24      Well, I'll tell you some stories.  See this guy up

25   here, this very intimidating-looking judge.  That's who I

1   replaced.  His name was John McBryde.  He served until he was

2   92.  He signed his last order Christmas Eve, and he passed

3   away on Christmas morning.

4           But he was a very, very stern judge.  I'm warm and

5   cuddly compared to him.  But jurors always loved him, because,

6   guess what, you wouldn't have to be in here very long with

7   him.

8           Go ahead, counsel.

9                           DENNIS BRADY,

10  having been first duly sworn, testified as follows:

11                       DIRECT EXAMINATION

12  *BY MR. THOMPSON:*

13  *Q.*     Mr. Brady, introduce yourself to the jury, please.

14  *A.*     My name is Dennis Brady.  I am a private investigations

15  manager for Denshaw Group, LLC, a private investigations firm

16  here in Texas.  We do private investigations, and we consult

17  in security, law enforcement and intelligence matters.

18  *Q.*     Mr. Brady, very briefly, tell the jury why you are here

19  testifying.

20  *A.*     I'm here to testify about the conduct of Charles

21  Johnson, allegedly as a confidential human source, extensively

22  for the FBI.

23  *Q.*     Mr. Brady, please explain to the jury your background

24  and qualifications which qualify you as an expert on that

25  topic.

A.    From 1983 to 1987, I was a police officer in Boise,
Idaho.  I was assigned to their special operations unit.  We
interfaced with a lot of other agencies, including Idaho State
Police and the FBI.  At that time there was a number of
armored car robberies by white supremacist groups, and I was
recruited by the FBI.

In 1987, I went to Quantico.  The first office was
Dallas.  I was assigned to the bank robbery squad, developed a
number of human sources that were relevant to Jamaican drug
traffickers.  So, I was assigned to a newly created gang and
organized crime squad.  Moved my way through the Jamaican drug
traffickers and found a Mexican source of supply.  And the
supply was directly related to the Mexican cartels active at
that time.

I moved to the organized crime drug enforcement task
force squad, which is part of the high intensity drug
trafficking area.  I specialized in undercover operations and
Title III investigations.  It's a search warrant so that we
intercept telephones, it was what we basically did at that
point in time.

Because I was operating human sources, I was also
gathering intelligence.  Some of that intelligence was
pertinent to public corruption.  Specifically, corrupt police
officers and some corrupt city politicians, city council
members.

1          9/11 happened, and I was transferred to the newly

2     created national security branch of the FBI.  Because I had

3     those skills and the Title III wiretap area, I was assigned to

4     a counterterrorism squad.  And I used those skills in the

5     FISA, F-I-S-A, Foreign Intelligence Surveillance Act, Title 50

6     and Title 10 authorities, the intelligence collection and

7     military authorities pertinent to protecting the U.S.

8     homeland.

9          I specialized particularly in malign Iranian

10    influence.  And in 2007, I was recruited to go to Iraq as an

11    interrogator at Balad, an air base there.  And I worked with

12    the Navy Seals and Delta Force there -- you know, the Seals

13    are called DEVGRU, Delta forces for a special forces

14    operational detachment.  Delta --

15    Q.    Mr. Brady, just real quick --

16    A.    I worked with the CIA, the NSA.  Eventually, I was

17    assigned to Yemen.  Then they promoted me to Afghanistan and

18    I was assigned to an interrogation group called the High-Value

19    Detainee Interrogation Group.

20          I retired as a senior executive in Nairobi, Kenya,

21    in 2016.

22    Q.    Okay.  So, very briefly, tell the jury about any awards

23    or decorations that you received?

24    A.    You know, I got a lot of incentive awards, I got

25    promoted a lot.  One half of 1% of the FBI is in the Senior

1    Executive Service.  Every promotion was -- was a quality

2    salary increase, it was also a bonus.

3              In Iraq, I got an intelligence award.  At the Egg, I

4    got an interagency intelligence award.  In Yemen, Afghanistan,

5    and Nairobi, I and my team won the director's awards for

6    international investigations.  That's just kind of an outline.

7    Q.    Why do you consider yourself an expert to provide your

8    opinions to the jury about confidential human sources, and

9    whether Mr. Johnson has any legitimacy to what he just said?

10   A.    Even before I was in the FBI, I was responsible for

11   vetting confidential human sources:  Spotting, recruiting and

12   assessing them.  I was responsible for developing them, and I

13   was responsible for operating them.

14             As I progressed through my career, I was responsible

15   for supervising others as they did so.  And then as I

16   progressed further, I was responsible for creating entire

17   programs, squads of agents collecting intelligence, using it

18   through confidential human sources.  They are the foundation

19   of all of the quality investigations in the FBI.

20             MR. THOMPSON:  Your Honor, at this point, we tender

21   Mr. Dennis Brady as an expert on developing and working

22   confidential sources for the Government.

23             THE COURT:  Any objection?

24             DEFENDANT JOHNSON:  None whatsoever.

25             THE COURT:  All right.  The Court will accept Agent

1   Brady on the expertise that's been proffered.

2           Go ahead.

3   Q.   (By Mr. Thompson)  Mr. Brady, how would you characterize

4   Charles Johnson's claims of being a Government asset, or any

5   of the testimony you heard today?

6   A.    At best, Charles Johnson was temporarily and briefly a

7   low-level confidential human source reporting to a low-level

8   FBI agent on low-priority matters.

9   Q.    Let me stop you there.  What do you mean by

10  low-priority, low-level FBI agent?  Give us some specifics why

11  you say that.

12  A.    You've heard Mr. Buma's name come up.  Mr. Buma is a --

13  Q.    Just so we orient, who is -- who's Mr. Buma?

14  A.    Special Agent Johnathan Buma.  There's some information

15  in the public domain, specifically from Mr. Johnson, that his

16  FBI handler was Johnathan Buma, a special agent then assigned

17  to the Orange County resident agency of the Los Angeles field

18  division of the FBI.

19          Mr. Buma had some administrative difficulties during

20  his employment with the FBI.  He is no longer employed by the

21  FBI.  He is actually being prosecuted by the FBI at this point

22  in time.

23          Mr. Buma elected to write a number of letters that

24  landed in the public domain, highlighting his feelings about

25  the FBI, his source handlings, some of which identified

1  shortcomings, and identified that Buma was ordered by FBI

2  executive management to close at least four human sources

3  because they were reporting false, fictitious, misleading

4  information.

5  Q.    If I could jump in, Mr. Brady.  Let's just move it

6  along.

7       The way I understood Mr. Johnson's testimony, is he

8  says that he launches these vicious lies and makes these

9  terrible accusations at Hal Lambert and Point Bridge Capital

10  because he's directed by some high-level Government authority.

11  So, all of the horrific things he did, he's doing at the

12  behest of the Government.

13       What is your opinion on that?

14  A.    That is a lie.

15  Q.    Why do you say that?

16  A.    The FBI operates under its own policy manual, but it's

17  also an entity within the Department of Justice.  So, the

18  Attorney General of the United States, all of them, have

19  published what are called the Attorney General Guidelines for

20  Domestic Investigations.  There's also Attorney General

21  Guidelines for Confidential Human Sources.  And in this day

22  and age you can buy them on Amazon and read them for yourself.

23       But if I were to summarize what the guidelines say,

24  is that every year, at least once, or more often as deemed

25  necessary, the handling agent for a confidential human source

1    is required to admonish the confidential human source of a

2    number of things.

3           Among those is that the agent -- the agent tells the

4    source, You are not an employee, agent, or otherwise of the

5    United States Government.  There's another admonishment that

6    you are not to take independent action on behalf of the United

7    States Government.  Everything you do must be authorized.

8           I also know, from the Attorney General Guidelines

9    for Domestic Investigations, the situation that Mr. Johnson

10   describes is called engaging in authorized criminal activity.

11   I'm familiar with that, I did that.  I had people working for

12   me that did that.  We did not do it in the manner that

13   Mr. Johnson describes, or on those particular types of

14   investigations that Mr. Johnson describes.  In fact, those are

15   probably completely counter to the letter, the spirit, and the

16   intent of the attorney general guidelines.

17   Q.    How many years did you work for the Government?

18   A.    Twenty-nine years and six months.

19   Q.    Is there any possibility that there's some

20   off-the-books secret group within the Government that's

21   directing Mr. Johnson?

22   A.    There are off-the-books secret entities within the U.S.

23   Government.  I do not believe that any of those people would

24   direct someone like Mr. Johnson to do the things that

25   Mr. Johnson has done.  It's not plausible to me.

1    Q.    Have you heard anything -- have you seen any, in your

2    decades of experience, anything, any source, any Government

3    operation that would remotely resemble what Mr. Johnson says

4    he's conducting?

5    A.    Mr. Johnson, for example, is what we used to call a

6    poison pen writer.  Someone who can't say anything nice, needs

7    to have attention paid to him, and is trying to extort or

8    defraud someone, another person or entity, of something of

9    tangible value.

10   Q.    In your evaluation of Mr. Johnson's conduct, did you

11   see things that resembled criminal activity?

12   A.    Yes.  I did.

13   Q.    Describe that.

14   A.    Mr. Johnson's representations of himself as a

15   Government operative are just not true, they're blatantly

16   false.  He is not an employee, he is not an agent, he's not an

17   intelligence officer, he's not an asset in the way that the

18   CIA determines -- defines assets.

19        He is not a contractor, he is not a contracting

20   authority.  He does not have the ability to award contracts.

21   He does not have the ability to take contracts away.  He

22   cannot order the IRS to audit someone's taxes.  He cannot

23   order the SEC to start an investigation.  All of these things

24   that he claimed he had the ability to do in his

25   carrot-and-stick approach, he does not have the ability to do.

1    *Q.*    Despite him not having the authority -- and this is the

2    final question, perhaps -- was it still plausible for

3    Mr. Lambert to believe those threats and extortionist

4    behavior?

5    *A.*    Mr. Lambert does not have the ability to pick up the

6    phone and call people who would answer his questions, were he

7    to pose them.  There is -- there is no public information

8    office of the U.S. intelligence community that's going to

9    answer his questions on that topic.

10            Mr. Lambert is operating with a -- with a legitimate

11   belief that the things he's seeing and hearing are true, when

12   they're completely false.

13            *MR. THOMPSON:*  Pass the witness.

14            *THE COURT:*  In your experience, does a confidential

15   human source tell folks, whether they be ordinary citizens or

16   for that matter anybody else, important folks, that they are

17   confidential sources?

18            *THE WITNESS:*  No.

19            *THE COURT:*  Why not.

20            *THE WITNESS:*  Key word is confidential.  People, you

21   know, we -- the law enforcement community and the intelligence

22   community both use confidential sources for the same reason.

23   Because if I walk up to somebody as an FBI agent and start

24   asking questions, I'm an overt government entity.  The

25   intelligence community doesn't walk up and tell you, Hi, I'm

1   from the CIA and I'd like to ask you a few questions.  Some

2   things need to remain covert.  Some things might even need to

3   remain clandestine.

4          THE COURT:  What value, if any, is a confidential

5   human source that tells people he is a confidential human

6   source?

7          THE WITNESS:  He's only a value to himself.  He's

8   burnishing his credentials in broadcasting his position.

9          THE COURT:  So, if you were managing a confidential

10  human source that told folks he was the confidential human

11  source, would you continue using him as a former special agent

12  at the FBI as a confidential human source?

13         THE WITNESS:  I would close him for cause.  And then

14  tell him that's why I closed him, that's specifically why I

15  closed him.  And I -- I find it hard to believe that any

16  credible agent wouldn't do the same.

17         THE COURT:  Well, if you were an agent and you had a

18  confidential human source that was telling folks he was a

19  confidential human source and you did not stop using him, what

20  would your supervisor do?  Because you've also been a

21  supervisor.

22         THE WITNESS:  The first step is a performance plan.

23  They'll -- you call the agent in and you tell him he needs to

24  improve his performance.  Usually it's an oral counseling

25  session.

1          The next step is a documented counseling session.

2     After that, you start to downgrade them on their performance

3     appraisals.  Some agents will walk around and say, Hey, my

4     supervisor told me that I was exemplary.  You would explain to

5     them that that just means that you're an example.  It doesn't

6     mean you're good or bad, it just means you're an example.

7          THE COURT:  So, it might be that the agent could

8     ultimately get fired?

9          THE WITNESS:  Yeah.  Eventually the agent is going

10    to be terminated for cause.

11         THE COURT:  Would they lose their security clearance

12    at that point?

13         THE WITNESS:  The first step in the termination

14    process is the agent loses his security clearance.  The first

15    step is, they remove them from an investigative squad to a

16    surveillance squad.  Then they revoke their clearance, you

17    know, and then there's a -- there's a long stretch after that.

18    But that's --

19         THE COURT:  This isn't anything new.  So, if I were

20    to go out and resurrect J. Edgar Hoover, he would tell me the

21    same thing, I bet.

22         THE WITNESS:  I am familiar with agents running

23    afoul of the guidelines my entire career.  It happened on my

24    first squad, my second quad, my third squad.  For some reason,

25    for a variety of reasons, people don't finish their careers

1  with the FBI, and it's generally because they won't do what

2  the rules require them to do.

3          *THE COURT:*  One of those would be keeping your

4  confident human informants confidential.

5          *THE WITNESS:*  Yes, Your Honor.

6          *THE COURT:*  All right.  Mr. Johnson, do you have any

7  questions?

8          *DEFENDANT JOHNSON:*  I do.

9                       CROSS-EXAMINATION

10  *BY DEFENDANT JOHNSON:*

11  *Q.*     Mr. Brady, when was the last time you operated a

12  confidential human source?

13  *A.*     In 2015.

14  *Q.*     So, kind of around the iPhone era, right, fair to say?

15  Could you communicate with confidential human sources on

16  iPhone?  What was the typical method?

17  *A.*     You're kidding, right?  Is this a serious question?

18  *Q.*     It's a serious question.

19  *A.*     Your handler talks to you by your iPhone, or your cell

20  phone?

21  *Q.*     Yeah.  So, if your handler would talk to you with your

22  cell phone, maybe that's an indication that they weren't

23  actually that good of a handler, right?  We would assume that?

24  *A.*     That would probably be a safe assumption.

25  *Q.*     Okay.  Now, you mentioned earlier that you had a

1  situation where -- by the way, I'm a huge fan of the work you

2  did shutting down the order and all of that.

3  A.    Didn't shut them down.  That was only a small part of a

4  big team.

5  Q.    I've read a lot about that, that history of shutting

6  down white nationalist drug trafficking organizations in

7  Washington state, and it's really amazing work.  There's a

8  great movie about it.

9  A.    You're under the impression that it shut down?

10 Q.    What's that?

11 A.    Are you under the impression that it shut down?

12 Q.    That the order was shut down or what?

13 A.    That the white supremacy movement is shut down.

14 Q.    No, not at all, on the contrary.  But I think the order

15 was the one I was mentioning.  I was trying to pay you a

16 compliment.

17       Now, you're aware that there are corrupt FBI agents,

18 right, just as there are corrupt judges, corrupt lawyers, all

19 kinds of corruption in our society?

20 A.    Yes.

21 Q.    Okay.  Would it stand to reason that maybe somebody

22 becomes a confidential source against their will?  Does that

23 typically happen?  Does that happen in your experience as a --

24 A.    I mean, I'd roll with it.  I could -- I could come up

25 with a set of circumstances where, in my mind, I've got

```
 1    somebody over the barrel on a criminal case.  They don't
 2    really want to be my confidential human source, but they don't
 3    really want to go to prison for the rest of their natural
 4    life --
 5    Q.    Right.
 6    A.    -- so they decided to be my source.
 7          So you could use that kind of --
 8    Q.    So, if you had a corrupt FBI agent that was threatening
 9    somebody with going to jail --
10    A.    I mean, we're talking over each other.  I missed --
11    Q.    Go ahead, sir.
12    A.    -- part of your question.
13    Q.    Go ahead.  Sorry.  Please, by all means.
14    A.    No, I was answering your question and you were talking
15    and --
16    Q.    No problem.
17    A.    -- I need to hear your question --
18    Q.    Go ahead?
19    A.    -- in order to answer it.
20    Q.    So, if you had a corrupt FBI agent that opened somebody
21    as a confidential human source, who hadn't actually done
22    anything criminal, couldn't they get lots of information from
23    this person, particularly if they knew a bunch of
24    billionaires, you know, a bunch of republicans?  Isn't that a
25    possibility?
```

1          MR. THOMPSON:  Objection.  Speculation.

2          THE COURT:  I'd like to hear the answer.

3          THE WITNESS:  In my experience, getting a lot of

4    information is not as valuable as getting quality information.

5    So, just because somebody talks to you and tells you things,

6    doesn't mean their information has any value whatsoever.

7    Q.   (By Defendant Johnson)  But I'm sure in your career that

8    you've had situations where informants were very correct about

9    things that led to presidential briefings, or wrong about

10   other things, or maybe not as accurate because it's an ongoing

11   thing, like, say, a January 6th investigation.

12          I'm sure you had situations where the credibility --

13   I mean, we're all humans, right, we make mistakes, or we don't

14   have the full story, or we have a small piece of the story.

15   So, I'm sure you've had confidential human sources that came

16   through for you at times that was unexpected, and ones that

17   failed you at times when it was unexpected, right?

18   A.   What -- what I dealt with, in terms of confidential

19   human sources, was validating the information and vetting the

20   source.

21   Q.   Okay.

22   A.   So, I ensured that the source, number one, was giving

23   me accurate information.  And when that was proven not to be

24   true, then I tried to determine whether or not the source was

25   giving me information that the source believed was credible.

1    And then I moved on to the next step of that equation, where

2    the source didn't bother to determine whether the information

3    was credible and didn't really care.

4    Q.    Did you ever ask a source for a job after you left?

5    A.    Never.

6    Q.    Never happens, right?  FBI agents don't go and work for

7    super rich people after they --

8    A.    No, there was a SAC in New York that --

9    Q.    Of course, right.  Like there's -- there's a great

10   promotion for lots of people who are in Federal law

11   enforcement to go work for billionaires.  I believe Elon Musk

12   has someone on payroll, Peter Thiel does.  It's a very common

13   thing, right?

14   A.    I don't know Mr. Musk or Mr. Thiel.

15   Q.    Fair enough.  I do, unfortunately.

16         Now, did you ever get into a hot tub with your

17   handler or with your -- with your confidential human sources?

18   A.    Didn't exchange Star Trek t-shirts either.

19   Q.    No you didn't, did ya?

20   A.    No.  Not in the hot tub --

21   Q.    Did you ever make them steak dinners?

22   A.    Make them steak dinners?

23   Q.    Yeah.

24   A.    I just don't cook that well.

25   Q.    It's a very good steak.

1          Now, is it possible -- just go with me here -- is it

2    possible that there could have been off-the-book operations to

3    deal with corrupt FBI agents in the Federal Government by

4    another Government agency?

5    A.     What agency?

6    Q.     I didn't ask that question.

7    A.     You'd have to be more specific.

8    Q.     Okay.  Is it a possibility -- let me ask the question a

9    different way, so that we can get your expert testimony on

10   this.

11          Does the FBI have a good reputation these days, as

12   far as law enforcement goes?

13   A.     It depends on who you ask.

14   Q.     Okay.  Are there lots of press reports lately about

15   confidential human sources getting penetrated by people, say,

16   hacking cell phones?

17   A.     I -- I really haven't read a lot about that.

18   Q.     No, because you've been out of the bureau, what, ten

19   years now, right?

20   A.     It's been a little bit, it's almost nine.

21   Q.     Yeah, nine.  That's -- that's like a long time in

22   technology, right?  You didn't have a Signal, you didn't have

23   Confide, no Telegram, none of that, right?  None of those

24   things?

25   A.     We have had plenty of ways of contacting --

1    *Q.*    No, no, I didn't ask that question.

2          You didn't have those three technology platforms?

3    *A.*    WhatsApp existed back then.

4    *Q.*    Okay.  WhatsApp didn't exist then?  I think it did

5    exist then.

6    *A.*    It did exist.

7    *Q.*    So, WhatsApp that -- that right now we're not allowed

8    to use in Congress, you used -- because of security issues --

9    you used that platform?

10   *A.*    No, no, no.  I never said I used it.  I said -- you

11   were asking me what existed back then.

12   *Q.*    Uh-huh.  Okay.

13   *A.*    You didn't ask me what I used.

14   *Q.*    That's fine.  You answered my question.

15          Are you aware of the movie The Lives of Others?

16   Have you seen this movie?

17   *A.*    Sorry, I have not.

18   *Q.*    Okay.  But you're aware that sometimes the

19   relationships between handlers and confidential human sources

20   get a little blurry?

21          *MR. THOMPSON:*  Your Honor, I object on relevance,

22   and asked and answered.

23          *THE COURT:*  What's the relevance of this?

24          *DEFENDANT JOHNSON:*  Johnathan Buma is currently

25   facing five years in jail, he was my confidant, he was my

1    handler, he was my friend.  He wrongly opened me as a --

2              *THE COURT:*  Is there a question?

3              *DEFENDANT JOHNSON:*  There is a question.

4              He wrongly opened me as a confidential human source.

5    And I have not been federally charged; he has been.  And

6    Mr. Buma, I believe, if I were to truthfully ask some of the

7    questions that I'd like to ask, that might imperil Mr. Buma's

8    liberty, and I am unwilling to do that.

9              So, is he aware that there are times in which

10   confidential human sources and handlers --

11             *THE COURT:*  There's a lot of testimony there.

12             So, what question do you have to ask?  And then I'd

13   like to hear from Special Agent Brady, and what he thinks

14   about all of this.

15             *THE WITNESS:*  Mr. Buma is charged with a

16   misdemeanor.  He's charged with disseminating sensitive

17   information in an unauthorized fashion.  Essentially what he's

18   charged with is going into his office on his last day,

19   downloading more than a hundred reports, and disseminating

20   those reports to individuals outside the FBI not authorized to

21   receive them.

22             Now, Mr. Buma apparently went through a lot, felt

23   that he had post-traumatic stress disorder, might have had

24   some substance abuse problems from some of the text messages.

25             *DEFENDANT JOHNSON:*  No doubt.

1    *THE WITNESS:* And at some point in time he felt that

2    the FBI agency he was working with were going to kidnap, or

3    kill him, assassinate him, I think --

4    *DEFENDANT JOHNSON:* That's correct.

5    *THE WITNESS:* -- is one of the words he used.

6    Q.    (By Defendant Johnson) Did he file --

7    A.    Stand by, I'm still --

8    Q.    Go ahead.

9    A.    I'm still answering.

10   Q.    Sorry.

11   A.    So, in my opinion, Mr. Buma is a sad story; not a good

12   story.  But what he's not, is he is not charged with a felony,

13   he's charged with a misdemeanor.  Mr. Buma is not facing five

14   years in prison.

15        Mr. Johnson is not a part of that case.  That case,

16   that criminal case, it's a misdemeanor case in Orange County

17   in Magistrate's Court, has absolutely nothing to do with Hal

18   Lambert and Point Bridge Capital, and the fact that this is a

19   damages trial.  Mr. Johnson has already been found liable.

20        *THE COURT:* Do you see any world where Special Agent

21   Buma would have forced the defendant to defame Mr. Lambert?

22        *THE WITNESS:* No.

23        *THE COURT:* Next question.

24   Q.    (By Defendant Johnson) How often, as a special agent,

25   did you threaten somebody with more time than they wound up

1    actually receiving?

2            *MR. THOMPSON:*  Objection.  Has no relevance.

3            *THE COURT:*  I would bet never, because you're not

4    supposed to do that, are you?

5            *THE WITNESS:*  Nope.

6            *THE COURT:*  Yeah.  If you did that, and the U.S.

7    Attorney you were working with found out about it, how much

8    longer would you be in the Bureau?

9            *THE WITNESS:*  I would be done that day.

10           *THE COURT:*  What do you think this dude up here in

11   the portrait would do to you?

12           *THE WITNESS:*  Oh, man.

13           You wore a tie in front of that man.

14           *THE COURT:*  Yeah.

15           *THE WITNESS:*  And you -- and all the pieces on your

16   suit matched, and your shirt was starched and pressed.

17           *THE COURT:*  Next question.

18   *Q.*   *(By Defendant Johnson)*  Final question.  What, in your

19   opinion, should a confidential human source do that was

20   wrongly recruited as a confidential human source?  What

21   recourse should they do when their FBI special agent files a

22   whistleblower complaint and it's not heeded?

23   *A.*    Walk away, remain confidential, it's a keyword.

24   *Q.*    And what if they don't want to work with the FBI after

25   the experience of being wrongly opened as a confidential human

1  source and think that it's corrupt?

2  A.    That's okay.  Don't work for the FBI.

3        DEFENDANT JOHNSON:  No further questions, Your

4  Honor.

5        THE COURT:  Any redirect?

6        MR. THOMPSON:  Nothing, Your Honor.

7        THE COURT:  Okay.  May this witness be excused?

8        MR. THOMPSON:  Yes, he may.

9        THE COURT:  All right.

10       THE WITNESS:  Thank you, Your Honor.

11       THE COURT:  Thank you.

12       Call your next witness.

13       MR. THOMPSON:  Your Honor, we were going to call one

14  other person, they're not here, plaintiffs rest.

15       THE COURT:  Well, I'm going to have to come back,

16  more than likely, on Wednesday.  Are you willing to rest and

17  not call your next witness?

18       MR. THOMPSON:  We don't have any more witnesses,

19  Your Honor.

20       THE COURT:  Okay.

21       MR. THOMPSON:  We're fine -- we're fine closing now.

22       THE COURT:  Okay.  The -- based on the findings that

23  the Court has made, you're not going to be putting on a case

24  in chief, but you are going to be allowed, Mr. Johnson, to

25  make a closing argument.

1          *DEFENDANT JOHNSON:*  Can I do that now?

2          *THE COURT:*  We're going to take a break, and I'm

3     going to give you a few minutes to prepare.

4          *DEFENDANT JOHNSON:*  Thank you.

5          *THE COURT:*  So, we're going to take about a

6     15-minute break.  We're going to come back and we're going to

7     hear closing arguments.  I also need to take care of some

8     business, in the sense that I need to prepare the instructions

9     and the jury charge, that's going to take some time.  So, it

10    may actually be closer to 30 minutes.  But I bet y'all would

11    like to go ahead and be done with this today, if we can, so

12    you don't have to come back on Wednesday.

13         All right.  So, John and I need to go back and

14    prepare the charge.  And as soon as we're done with that, we

15    will allow the attorney and Mr. Johnson to make closing

16    arguments.  You're going to have to listen to me read all of

17    the instructions to you, and then we'll get you going.  But

18    you should have enough time today to hopefully be done with

19    your service.  So, thank you-all.

20         But let me make some findings for the record.  So,

21    based on what Mr. Thompson said, you rest and close at this

22    time; is that correct?

23         *MR. THOMPSON:*  That's right.

24         *THE COURT:*  All right.  As I said, due to previous

25    orders from the Court, there will not be a case in chief from

1    the defendant.  So, it's considered that his case is closed at

2    this time, too.

3            So, we'll be back -- it will probably take

4    30 minutes just to make copies, okay?  So, do not form any

5    opinion or talk about the case until I tell you to do so.

6    We're almost there.  Thank you.

7                    *(Jury leaves courtroom)*

8                    *(Short recess taken)*

9        *THE COURT:*  All right.  We're back on the record for

10   our formal charge conference.  Point Bridge Capital, et al vs.

11   Charles Johnson, Case Number 4:24-CV-988-P.

12           The Court went off the record to review and prepare

13   the jury charge in this case.  Both sides have closed their

14   case in chief.  All that's left to do is to prepare our

15   charge, and then we'll bring the jury out.

16           The Court has prepared a draft charge, which has

17   been presented by the Law Clerk to the attorney for the

18   plaintiffs, as well as Mr. Johnson.

19           I'll begin with you, Mr. Thompson.  Have you had an

20   opportunity to review the proposed charge?

21       *MR. THOMPSON:*  Quickly, Your Honor.  I don't see

22   anything that's a problem that we object to.

23       *THE COURT:*  Okay.  So, no objections to the proposed

24   charge.

25           How about you, Mr. Johnson, do you have any

1    objections and have you had an opportunity to read --

2             *DEFENDANT JOHNSON:*  I have, and none whatsoever.

3             *THE COURT:*  Okay.  Then I'll be going with the

4    charge that I've given you.

5             And I'm prepared to bring the jury back out and

6    conduct closing arguments.  So, you might want to get your

7    client back, because I'm ready to go.

8                     *(Brief pause)*

9                     *(Jury enters courtroom)*

10            *THE COURT:*  We're back on the record, Point Bridge

11   Capital vs. Charles Johnson, 4:24-CV-988-P.

12            During the break, the parties have gotten together

13   with the Court and we've prepared the jury charge and

14   instructions, and I'm prepared to read those to you.

15            You're going to have to listen to me reading a lot.

16   In the interest of time, I am not going to be providing you

17   with a copy of this.  Sometimes I do that, sometimes I don't.

18   But you are going to have a copy of the original back with you

19   in the jury room.

20            And immediately after that, we'll go into our

21   closing arguments.  And Mr. Thompson gets to lead that off,

22   and then we'll hear from Mr. Johnson.  And depending on what

23   Mr. Thompson wants to do, we may hear from him again.

24            I didn't ask you this, Mr. Thompson, how do you want

25   to break your 10 minutes up?

1          *MR. THOMPSON:*  I think I'll take 7 and 3, Your

2    Honor.

3          *THE COURT:*  7 and 3, all right.

4          Then he will go 7 minutes, and then Mr. Johnson has

5    up to 10 minutes, and then we have a rebuttal closing again

6    for Mr. Thompson, he'll get 3 minutes.  We'll give all of you

7    gentlemen a 1-minute warning.

8          All right.  At this time, as I said, I'll be reading

9    to you the jury charge.  Please listen very closely.

10         Members of the jury:  You have heard the evidence in

11   this case.  I will now instruct you on the law that you must

12   apply.  It is your duty to follow the law as I give it to you.

13   On the other hand, you're the jury -- because you are on the

14   jury, you are the judges of the facts.  Do not consider any

15   statement that I have made during the trial or make in these

16   instructions as an indication that I have an opinion about the

17   facts of the case.

18         You will hear the closing arguments of the attorney,

19   Mr. Thompson, and then you will hear the closing argument of

20   Mr. Johnson.  Statements and arguments of the attorney or

21   Mr. Johnson in the closing argument are not evidence and are

22   not instructions on the law.  They are intended only to assist

23   the jury in understanding the evidence and the parties'

24   contentions.

25         You're to answer each question from the facts as you

1    find them.  Your answers and your verdict must be unanimous.

2         You must answer all questions by a preponderance of

3    the evidence.  This means the greater weight and the degree of

4    credible evidence before you.  In other words, a preponderance

5    of the evidence just means the amount of evidence that

6    persuades you that a claim is more likely so than not so.

7         Plaintiffs Point Bridge Capital, LLC, and Hal

8    Lambert have the burden of proving their damages by a

9    preponderance of the evidence.  To establish a preponderance

10   of the evidence means to prove something is more likely so

11   than not so, which means the greater weight of credible

12   evidence presented in the case.  A preponderance of the

13   evidence is not measured by the number of witnesses or by the

14   number of documents admitted in evidence.

15        In determining whether plaintiffs' damages have been

16   proved by a preponderance of the evidence in the case, you

17   may, unless otherwise instructed, consider the testimony of

18   all witnesses, regardless of who may have called them, and all

19   exhibits received in evidence, regardless of who may have

20   produced them.

21        In determining the weight to give the testimony of a

22   witness, you should ask yourself whether there was evidence

23   tending to prove that the witness testified falsely concerning

24   some important fact, or whether there was evidence that at

25   some other time the witness said or did something, or failed

1  to say or do something, that was different from the testimony

2  the witness gave during trial.

3         You should keep in mind that a simple mistake by a

4  witness does not necessarily mean that the witness was not

5  telling the truth as he or she remembers it, because people

6  may forget some things or may remember other things

7  inaccurately.  So, if a witness has made a misstatement, you

8  need to consider whether that misstatement was an intentional

9  falsehood or simply an innocent lapse of memory; and the

10 significance of that may depend on whether it has to do with

11 an important fact or with only an unimportant detail.

12        While you should consider only the evidence in the

13 case, you are permitted to draw such reasonable inferences

14 from the testimony and exhibits as you feel are justified in

15 light of common experience.  In other words, you may make

16 deductions and reach conclusions that reason and common sense

17 lead you to draw from the facts that have been established by

18 the testimony and evidence in the case.

19        You alone are to determine the questions of

20 credibility or truthfulness of the witnesses.  In weighing the

21 testimony of the witnesses, you may consider the witness's

22 manner and demeanor on the witness stand, any feelings or

23 interests in the case, or any prejudice or bias about the case

24 that he or she may have, and the consistency or inconsistency

25 of his or her testimony considered in light of the

1    circumstances.  Has the witness been contradicted by other

2    credible evidence?  Has he or she made statements at other

3    times and places contrary to those made here on the witness

4    stand?  You must give the testimony of each witness the

5    credibility that you think it deserves.

6            Even though a witness may be a party to the action

7    and therefore interested in its outcome, the testimony may be

8    accepted if it is not contradicted by direct evidence or by

9    any inference that may be drawn from that evidence, if you

10   believe the testimony.

11           You're not to decide this case by counting the

12   number of witnesses who have testified on the opposing sides.

13   Witness testimony is weighed; witnesses are not counted.  The

14   test is not the relative number of witnesses, but the relative

15   convincing force of the evidence.  The testimony of a single

16   witness is sufficient to prove any fact, even if a greater

17   number of witnesses testified to the contrary, if after

18   considering all of the other evidence, you believe that

19   witness.

20           There are two types of evidence that you may

21   consider in properly finding the damages in this case.  One is

22   direct evidence, such as testimony of an eyewitness.  The

23   other is indirect or circumstantial evidence, the proof of a

24   chain of circumstances that indicates the existence or

25   nonexistence of certain other facts.  As a general rule, the

1   law makes no distinction between direct and circumstantial

2   evidence, but simply requires that you find the facts from a

3   preponderance of all the evidence, both direct and

4   circumstantial.

5          When testimony or an exhibit is admitted for a

6   limited purpose, you may consider that testimony or exhibit

7   only for the specific limited purpose for which it was

8   admitted.

9          When the knowledge of technical subject matter may

10  be helpful to the jury, a person who has special training or

11  experience in that technical field, he's called an expert

12  witness, is permitted to state his opinion on those technical

13  matters.  You're not required to accept that opinion.  As with

14  any other witness, it is up to you to decide whether to rely

15  upon it.

16         In deciding whether to accept or rely upon the

17  opinion of an expert witness, you may consider any bias of the

18  witness, including any bias you may infer from the evidence

19  that the expert has been or will be paid for reviewing the

20  case and testifying, or from evidence that he testifies

21  regularly as an expert witness and his income from such

22  testimony represents a significant portion of his income.

23         Any notes that you have taken during that trial are

24  only aids to your memory.  If your memory should differ from

25  your notes, then you should rely on your memory and not on the

notes.  The notes are not evidence.  A juror who has not taken

notes should rely on his own independent recollection of the

evidence and should not be unduly influenced by the notes of

the other jurors.  Notes are not entitled to any greater

weight than the recollection or impression of each juror about

the testimony.

When you retire to the jury room to deliberate on

your verdict, you may take this charge with you as well as any

other exhibits which the Court has admitted into evidence.

Select your foreperson and conduct your deliberations.  If you

recess during your deliberations, follow all the instructions

that the Court has given you about your conduct during the

trial.

After you've reached your unanimous verdict, your

foreperson is to fill in on the form your answers to the

questions.  We'll talk about the form in a moment.  Do not

reveal your answers until such time as you are discharged,

unless otherwise directed by me.  You must never disclose to

anyone, not even to me, your numerical division on any

question.

If you want to communicate with me at any time,

please give a written message or question to the bailiff, who

will bring it to me.  I will then respond as promptly as

possible either in writing or by having you brought into the

courtroom so I can address you orally.  I will always first

1  disclose to the parties your question and my response before I

2  answer your question.  After you've received the verdict -- or

3  after you've reached a verdict, you are not required to talk

4  with anyone about the case unless the Court orders you to do

5  otherwise.

6        Here's some instructions for answering the

7  questions:

8        Bias, prejudice or sympathy may not play any part in

9  your deliberation.  A corporation and all other persons are

10  equal under the law and must be treated as equals in a court

11  of law.

12        In answering questions about damages, answer each

13  question separately.  Do not increase or reduce the amount in

14  one answer simply because of your answer to any other question

15  about damages.  Do not answer based on speculation about any

16  party's ultimate recovery, or what any party's ultimate

17  recovery may or may not be.  Any recovery will be ultimately

18  approved by the Court when it applies the law to your answers

19  at the time of judgment.  Do not add any amount of interest to

20  any of your answers on damages.  Answer in dollars and cents.

21        Here are the questions, ladies and gentlemen, so,

22  listen very closely:

23        Civil RICO.  The Court has previously ruled that

24  Johnson is liable to plaintiffs on their claims under the

25  Racketeer Influenced and Corrupt Organizations Act, commonly

1    referred to as RICO.  However, you must determine the damages,

2    if any, plaintiffs suffered as a result of Mr. Johnson's

3    actions.

4            A person is injured in their business or property if

5    they suffer a monetary loss, such as lost income, lost

6    profits, lost investment, or a decrease in the value of a

7    business.  You may award damages to Mr. Lambert for

8    reputational or professional harm that resulted in financial

9    loss, including the loss of earned media opportunities to

10   build his brand and credibility with investors, reduced income

11   due to decreased investment in his funds, expenses incurred to

12   repair reputational damage, and other economic-related losses.

13           You may also award damages to Bridge -- Point Bridge

14   Capital for harm to the business itself, including lost

15   investments, diminished reputational value, harm to investor

16   relations, costs incurred to repair reputational damage, and

17   other losses tied to its operations and public standing.

18           The damages that plaintiffs may recover are those

19   caused by the predicate acts constituting a pattern of

20   racketeering activity if they injure plaintiffs or their

21   business or property.  Is isn't necessary that every predicate

22   act caused damage to plaintiffs.  But they can only recover

23   damages caused by predicate acts that are part of the pattern

24   of racketeering activity.

25           Here are the questions:

1          Question Number 1:  What amount of damages, if any,

2     did Mr. Lambert prove, by a preponderance of the evidence,

3     that he is entitled to recover as a result of Mr. Johnson's

4     predicate acts?

5          Please answer in dollars and cents.  And then there

6     is an answer blank with a dollar sign.

7          Continuing to Question 2.  Question Number 2:  What

8     amount of damages, if any, did Point Bridge Capital prove, by

9     a preponderance of the evidence, that it is entitled to

10    recover as a result of Mr. Johnson's predicate acts?

11         Please answer in dollars and cents.  Answer, dollar

12    sign, blank.

13         And then we'll continue to Question Number 3, and

14    this deals with defamation.  Defamation:  The Court has

15    previously ruled that Johnson is liable to Mr. Lambert on his

16    defamation claims.  However, you must determine what sum of

17    money, if any, would fairly and reasonably compensate

18    Mr. Lambert for the cause -- the harm caused by those false

19    and defamatory statements.

20         Damages for defamation fall into two categories:

21    Special damages and general damages.  Special damages are

22    specific economic losses that Mr. Lambert suffered as a direct

23    result of the defamation.  These may include lost business

24    opportunities, reduced investments in his funds, harm to

25    investor relationships, diminished earned media exposure and

1  earning capacity, and expenses he will incur to repair the

2  reputational harm.  While special damages must be supported by

3  competent evidence, the law does not require proof with

4  mathematical precision.  Mr. Lambert is not required to show

5  that a particular investor would have acted differently but

6  for defamation.  Rather, a reasonable inference of economic

7  harm, grounded in the evidence, is sufficient.

8        General damages address more intangible injuries,

9  such as damage to reputation, loss of standing in the

10  community, personal humiliation, and emotional distress.

11  In considering general damages, you may evaluate how

12  Mr. Johnson's statements, such as the false accusations of

13  sexual assault and ties to foreign criminal organizations,

14  affected Mr. Lambert's public image, personal dignity, and

15  peace of mind.  For example, you may consider whether the

16  defamatory statements continue to impair his professional

17  credibility or cause lasting emotional harm.

18        While general damages must be supported by competent

19  and reliable evidence, there need be no evidence which assigns

20  an actual dollar value to the injury.  You may consider the

21  nature of the statements, how widely they were published, and

22  the likely effect they had on Mr. Lambert's reputation and

23  well-being.  However, general damages cannot be based on

24  speculation or guesswork alone.  You may award compensation

25  for harm that Mr. Lambert has already experienced, as well as

1  for harm that is reasonably likely to occur in the future.

2  You must take care not to award the same damages twice.

3       Question Number 3:  What sum of money, if any, would

4  fairly and reasonably compensate Mr. Lambert for the general

5  and specific damages that were proximately caused by

6  Mr. Johnson's defamatory statements?

7       Please answer in dollars and cents.  Answer, dollar

8  sign, blank.

9       Continue to Question 4.  In addition to compensation

10  for his injuries, Mr. Lambert seeks exemplary damages, also

11  called punitive damages.  Exemplary damages are not intended

12  to compensate a party for loss, but instead are meant to

13  punish a defendant for his conduct and to deter him or others

14  from engaging in similar conduct in the future.  You may award

15  exemplary damages only if you find by clear and convincing

16  evidence that the harm to Mr. Lambert resulted from one of the

17  following:

18       Number 1:  Fraud;

19       Number 2:  Malice; or

20       3:  Gross negligence

21       Clear and convincing evidence means the measure or

22  degree of proof that produces a firm belief or conviction in

23  your mind as to the truth of the allegations.  The clear and

24  convincing evidence standard is higher than the preponderance

25  of the evidence standard but not as high as beyond a

reasonable doubt.

Fraud means fraud other than constructive fraud. Malice means a specific intent by Mr. Johnson to cause substantial injury or harm to Mr. Lambert. Gross negligence means an act or omission, one, which when viewed objectively from Mr. Johnson's standpoint at the time of its occurrence, involved an extreme degree of risk, considering the probability and magnitude of potential harm to others; and two, of which Mr. Johnson had actual subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others.

In determining the amount of exemplary damages, you shall consider the evidence, if any, related to the following:

Number 1, the nature of the wrong;

Number 2, the character of Mr. Johnson's conduct;

Number 3, the degree of culpability of Mr. Johnson;

Number 4, the situation and sensibilities of the parties concerned;

5, the extent to which such conduct offends a public sense of justice and propriety;

And 6, the net worth of Mr. Johnson.

All right. Here's Question Number 4: Did Mr. Lambert establish by clear and convincing evidence that he is entitled to exemplary damages?

Answer, blank.

1          If you answer yes, then answer Question 5.  If you
2    answered no, stop.
3          Question Number 5:  What sum of money, if any,
4    should be assessed against Mr. Johnson and awarded to
5    Mr. Lambert as exemplary damages?
6          Please answer in dollars and cents.  Answer, dollar
7    sign, blank.
8          All right.  I'm about to sign this.  But before I
9    do, there is a jury certification, which will serve as your
10   verdict form, on the last page of this, in which the
11   foreperson must sign once they -- the jury has reached a
12   unanimous verdict.  And remember, your verdict will not be
13   final until it's finally published here in the court and
14   accepted.
15         So, those are the instructions and the charge which
16   I've given you.  I'm signing it at this time.  By the Court's
17   clock, I have 4:08 p.m.
18         All right.  So, once we've heard from everyone on
19   their closing argument and I release you to deliberate, I will
20   give this to our bailiff, and you'll have it back there in
21   your jury room.  The first thing that I would suggest, is that
22   once you're all assembled in the jury room, you select a
23   foreperson.  And remember, you're not to conduct any
24   deliberations until you're all together, okay?
25         So, at this time, we will go forward with closing

 1    argument.  For the plaintiffs in this case, Mr. Thompson, for

 2    your opening argument you've been allotted 7 minutes.  We'll

 3    give you a 1-minute warning.  And we will start once you start

 4    talking.

 5            MR. THOMPSON:  If I could have a quick moment to set

 6    up, Your Honor?

 7            THE COURT:  Sure.

 8            MR. THOMPSON:  Thank you.

 9              (Brief pause)

10            MR. THOMPSON:  Ready to proceed, Your Honor.

11            THE COURT:  Yes, sir.  Go ahead.

12            MR. THOMPSON:  Ladies and gentlemen, thank you from

13    me, my client, Mr. Lambert, his business.  It's been a long

14    day.  I'm tired.  You sat through a lot, you heard a lot.  We

15    really appreciate it.  Because we came to this court today to

16    try to get justice for Mr. Lambert and to have some justice

17    meted out to Mr. Johnson.

18              (Noise)

19            THE COURT:  Sorry.  My phone dropped.  All right, we

20    won't hold that against you.

21            Go ahead.

22            MR. THOMPSON:  Everyone ready to go again?  Okay.

23            So, it started off, you know, we heard from

24    Mr. Lambert this morning, and then this afternoon it sort of

25    got to be a little bit of a sideshow.  So, I just want

everyone to sort of, kind of focus in and think about the one

word that should drive your deliberations, and that's

evidence, okay?

The Court just told you that your verdict should be

driven by the evidence in this case.  So, what was the

evidence in this case that we heard?  Well, we know that

Mr. Johnson has been found to have defamed Mr. Lambert.  We

know that Mr. Johnson has committed a RICO violation, that's

done.

The only question -- just the only question before

you is the amount of damages.  And on that, the only evidence

that you heard was from Mr. Lambert.  Mr. Johnson didn't put

up a shred of evidence, he didn't even rebut it.  He didn't

give you another figure.  These numbers stand unrebutted.

That is the unrebutted evidence in this case.

So, I want to direct your attention to the jury

charge, because it might be a little confusing.  I want to see

how -- tell you how these numbers fit in.  So, when you go

back to the jury room and deliberate you understand how these

numbers fit in.

So, Question Number 1, that relates to the RICO

charge, okay?  And it's RICO damages for both Mr. Lambert and

Point Bridge Capital.  And those damages are the economic

damages that you heard about today.

And it was in poor handwriting, but it was the lost

1    earned media, if you'll recall, the lost investment, and then

2    there was, what I call, the rehab -- the reputation rehab.  I

3    didn't write those numbers very well.  I'm going to write them

4    a little clearer and say them very slow.

5            So, Mr. Lambert, the unrebutted evidence showed

6    damages for him of $7,395,106.  Those are what are the

7    economic or special damages that are in your verdict form.

8            For Point Bridge Capital, it's -- and I'll just

9    write H-L for Hal Lambert.  For Point Bridge Capital it was

10   $7,817,102.  That's the evidence -- that's the unrebutted

11   evidence that should drive your jury verdict.

12           So, on the jury verdict form, Question Number 1:

13   What amount of damages, if any, did Mr. Lambert prove, by a

14   preponderance of the evidence, he is entitled to recover as a

15   result of Mr. Johnson's predicate acts?  For Mr. Lambert, it's

16   that top number.

17           Okay, you might just be a little confused about what

18   predicate acts, because that hasn't come in.  That's the wire

19   fraud, that's the extortion, those Federal laws that form the

20   basis of Mr. Lambert and Point Bridge's RICO claim that the

21   Court has already said has been established.  So, that's that

22   number on questions -- that's Number 1.

23           Question Number 2 is just the number for Point

24   Bridge.  It's that number, the 7 -- the $7.817 million and

25   change.  So, in Question Number 2, we submit -- the plaintiffs

1    submit that the unrebutted evidence is this bottom number.

2    Question 1 is the top number.

3          Okay.  The next question for the -- to answer is

4    going to be Question 3:  What sum of money, if any, would

5    fairly and reasonably compensate Mr. Lambert for the general

6    and specific damages, okay?  It's similar to the RICO, and

7    that's fine.  It's going to be Mr. Lambert's economic damages,

8    that same number, all right?  Those are what are the special

9    damages.

10          But we also have to decide the general damages.  So,

11    that's the -- you know, that's the toll that the defamation

12    and what Mr. Johnson's onslaught of lies caused.  You heard

13    Mr. Lambert testify about that.  What it's like knowing that

14    that's sticking to his reputation.  Having to talk to his

15    daughters about it, having to talk to his wife when that filth

16    was out there.  That is the additional damages that you are

17    going to be asked to decide and quantify for Mr. Lambert.

18    It's above and beyond that 7.3 million.

19          And so, how do we quantify that number?  It's really

20    hard, I agree.  We've got -- we've got some help.  Mr. Johnson

21    helped us out there.  Remember when I read that lawsuit that

22    he filed against, I think it was Gawker, he gave you the

23    roadmap.  What he said on that kind of undefined general

24    damages, it was 1 to 2 million, I believe.  Sorry, it was

25    $2 million, that's the number that he placed on it.  He set

1    the standard, okay?  So, in Question Number 3, we submit it's

2    $2 million, plus the 7.3, all right?

3          The final question for you on the verdict form, it's

4    sort of the big one, it's the punitive damages number.  And

5    that's the one that really kind of gets at what this case, I

6    think, the message that you're really being asked to deliver

7    here, because you sat through a ridiculous sideshow this

8    afternoon, and I'm sorry about that.  It was a waste of

9    everyone's time.

10          What are punitive damages?  Look at your jury

11    instructions.  That is the guiding factor.  Exemplary damages

12    or punitive damages are the same thing.  They're intended to

13    compensate -- sorry, they are not -- they are not intended to

14    compensate a party for a loss, but instead are meant to punish

15    a defendant, that's Mr. Johnson, for his conduct.

16          *LAW CLERK:*  One minute.

17          *MR. THOMPSON:*  Punish and deter him and others for

18    engaging in similar conduct in the future.

19          Again, sort of hard to put a number on it.

20    Mr. Johnson helped us again, in his lawsuit against Gawker.

21    He put the number at $20 million.  That's what he was asking.

22    That's how he valued it.  And in the Gawker lawsuit, they --

23    the defamation that Mr. Johnson sued over -- they said he went

24    to the bathroom on his college dorm room floor or the hallway,

25    that's what he said deserves $20 million.

1              I submit that this filth that he put forth about

2      Mr. Lambert and the venom behind it, and what he tried to do

3      in destroying Mr. Lambert's life and business is far more

4      egregious.  But $20 million, if Mr. Johnson sets the bar there

5      we're satisfied with that.

6              Thank you.

7              THE COURT:  All right.  Why don't we -- if we need

8      to -- Mr. Johnson, are you going to use any of this?  You have

9      the right to have it moved away.

10             DEFENDANT JOHNSON:  Can you move it?  Can I move it

11     or who moves it?

12             THE COURT:  They'll move it for you.

13             DEFENDANT JOHNSON:  All right.

14             MR. THOMPSON:  I can move it.  I got it.

15             THE COURT:  So, let's get it set up.  We won't start

16     timing you until you're ready.

17                 (Brief pause)

18             THE COURT:  All right.  At this time, we'll hear

19     from Mr. Johnson, who has been allotted 10 minutes to do his

20     closing argument.

21             DEFENDANT JOHNSON:  I won't need near that amount of

22     time.

23             THE COURT:  We'll give a 1-minute warning.  And

24     we'll begin timing when you start speaking.

25             DEFENDANT JOHNSON:  Okay.  It's my first time at

1  this.  So, give me a second.

2         All right.  One of my favorite movies is the Count

3  of Monte Cristo, I've probably seen it a dozen times.  It's

4  about revenge, it's about how revenge can consume you, how

5  greed can consume you.  And one of my favorite lines of this

6  movie is, Do not commit the crime for which you must now serve

7  the sentence.  If someone accuses you of a conspiracy, stand

8  alone.  If someone accuses you of being vengeful, be of good

9  humor.  And if somebody accuses you of being greedy, give it

10  away.

11         This is really a case about money, it's about power;

12  I don't have any.  It's also about punishment, they want to

13  punish me.  Well, I submit to you that the greatest

14  punishments that we do to one another are really kind of a

15  spiritual sense.  I'm not going to go there, that's not really

16  the role of a Court.

17         I was willing to go to jail, though, at one point in

18  this case to prove my innocence.  Now, I did like the literary

19  flourish of Charles Johnson doing the Johnson County Jail,

20  thought that was going to be kind of fun.  But this is real

21  life.

22         And so, I asked Mr. Lambert, on several occasions,

23  that he cash out the mother of my child and my daughter, I ask

24  it still, okay?

25         This all started from a drunken night in 2020.

1    Mr. and Mrs. Lambert, Mr. Greenwill and I all went to

2    Winslow's.  Now, it's supposedly a giant conspiracy with

3    Mr. Greenwill and me, but where is he?  He's not here.  So, I

4    don't know how you have conspiracy by yourself, but whatever.

5    I had very little to drink.  I don't really drink all that

6    much, and I have since quit entirely, because anytime you're

7    around alcohol bad things happen.  And I drove Mr. Lambert

8    home; in my used car, by the way.

9           Now, I've changed a lot since 2020.  I didn't say

10   the things I'm accused of saying.  And I guess I'm liable,

11   fine, whatever, we'll take it up on appeal.

12          But at one point in my life I believed a lot of

13   stupid things about money.  I believed that if I made enough

14   money I could convince my wife to come back; crazy, stupid,

15   okay?  But it's right around the time you start to have money

16   you realize all the things it can't do.  It can't buy your

17   ex-wife back; not when she's introducing your daughter to her

18   new fiance.  And it can't really restore anything really.

19          Now, Mr. Lambert is a greedy guy.  That's why he's

20   pushed me aside to get more and more of the companies I helped

21   start.  Fine, he can have them, whatever.  He wants more

22   money, more TV, more billionaires in his network.  I know more

23   rich people than he does; they're not happy, it sucks, don't

24   do it.

25          But sometimes more is so much less.  That's why so

1   few of the people I introduced him to want to continue working

2   with him.  That's on him, though.  I, honestly, if I think

3   about it really hard, and if I pray about it more, I feel bad

4   for him.

5        Now, every time -- there are people out there who

6   take more than they give.  I should know, I used to be one of

7   these people.  I sued twice.  Once because they accused me of

8   screwing a sheep, crapping on the floor in college.  I won

9   $500,000 from that, bankrupted the company.  It was a big

10  deal, it was kind of fun.  But it drove my wife crazy, and

11  she's not my wife anymore.

12       So I lost more than money.  I lost my family while

13  trying to provide for them.  Isn't that a kicker?  Real life

14  isn't a fairytale.  Don't trust a woman who tells you to move

15  to Texas, and then doesn't move to Texas.  Also, get better

16  predicting global pandemics.  These are things that I should

17  have thought about.

18       But nobody can take away something you never had.

19  Maybe I should go and get another wife.  I'm working on that,

20  too.  And I've got a new girlfriend, she's like me, she speaks

21  multiple languages, has traveled the world, she may or may not

22  work for another intelligence agency.  I'm a blessed guy.  I

23  can't wait to go and get her.

24       Now, they say second marriages are the triumph of

25  hope over experience.  What can I say, I'm a super-hopeful

1   guy.  What I'm not, however, is a rich or monetarily rich guy.

2           You know, to quote George Strait -- which, you know,

3   I fought long and hard about whether or not I would quote

4   George Strait in Texas.  I really love coming here.  This

5   was -- this was a very fantastic place for me, Texas.  And I

6   loved every minute of it.  It was a very lonely time, because

7   of the pandemic and other matters.  But he says, you know, I

8   ain't rich, but Lord I'm free.  And that's a wonderful thing

9   to be.

10          Now, JFK, down the street, says, There are no faint

11  hearts in Fort Worth.  I'm hoping to have a better outcome

12  here than President Kennedy.  So, I trust you to make the

13  right decision, whatever it may be.

14          Somebody once said that they'd rather be governed by

15  the 200 people -- or what was it, the 20,000 names in the

16  Boston phone book, or the 200 people from Harvard faculty, or

17  something like that.  I feel the same way about Fort Worth.

18  This is a great place.  I've been here five times now.  And no

19  offense or anything, I hope to never come back here, though I

20  think I hit all the museums, all the good restaurants.

21          Now, I hope you can see this for what it is.  The

22  role of the jury isn't to provide justice, but to prevent

23  injustice.  And I do genuinely feel bad for Mr. Lambert.  I do

24  feel bad that he will never really understand what this case

25  -- court case was really all about.  He got too obsessed with

1    things.  That's unfortunate, but that's on him.

2         So, I ask you -- you can look at whatever

3    complicated mathematical figures you want, those are fine,

4    whatever.  I, myself, have used them in the past.  They sort

5    of work, they kind of don't.  You can take them up on appeal,

6    whatever.  But really your job is to prevent injustice.  And I

7    hope you make the right decision, whatever it may be.

8         And thank you for your time.  And I am really sorry

9    we had to be here.  I tried many times to get out of it.  So,

10   thank you anyway.

11        THE COURT:  All right.  Thank you, Mr. Johnson.

12        At this time, we'll call upon you, Mr. Thompson.

13   You have 3 minutes to complete your closing argument.

14        MR. THOMPSON:  Thank you, Your Honor.

15        I reserved 3 minutes for rebuttal, because the

16   purpose of rebuttal is to give Mr. Lambert the opportunity to

17   have the last word, because he has the burden of proof in this

18   case.  That's how it's set up.

19        I don't know what to say.  Because Mr. Johnson just

20   had a 10-minute rant about some of the -- that stuff I have no

21   idea about.  Nothing -- absolutely nothing related to the

22   case.  He just wasted everyone's time, 10 minutes.  We're

23   never going to get that back.

24        I'd ask you to think about evidence, that is the

25   word that should control your deliberations.  Did you hear a

1    single piece of evidence that came up?  I didn't.

2              But I'm not going to need all 3 minutes.  The one

3    thing I just do want to leave you with, is remember that email

4    that Mr. Johnson said that he didn't send, or got hacked and

5    his lawyer gave it, and somehow his lawyer produced it to us

6    but it was a hack and it wasn't his email?  He got really

7    upset about that, because it's the one shred of evidence that

8    came out where he was sort of truthful about things.  And you

9    can go through that, because you see his real net worth there.

10             Let's go to the second page.  I didn't get a chance

11   to talk about it, because he fought me, and didn't want to

12   engage, and I didn't want to waste people's time.  But at the

13   top of it -- you can look, if you want.  You see it right

14   here.

15             Mr. Johnson talks about his Bitcoin holdings.  He

16   talks about how he has $600,000 worth of bitcoin, when it was

17   around $900.  He says, I'm interested in liquidating it.

18   Tells you that he hasn't, or he still has it.  When you do the

19   simple math, it comes out to 66 million.

20             You don't know what he's hiding.  We don't know how

21   he's hidden it.  But don't let him put one over on us.  Give

22   him the full deterrence that he needs, that you're entitled to

23   give him.

24             And, finally, I just want to say thank you.  It's a

25   long day, you sat through a lot.  And we submit that the

1    evidence is absolutely clear.  I don't need to do the whole

2    preponderance of the evidence where I say, Oh, the evidence is

3    50/50, and if we're a feather -- if we're a feather we win.

4    It's not the case.  There's just no evidence whatsoever that

5    Mr. Johnson presented.  And it's really the facts are the

6    facts.  Stick to that.  It's an easy, straightforward decision

7    for y'all.

8            We thank you.

9            *THE COURT:*  All right.  Thank you, Mr. Thompson.

10           Ladies and gentlemen of the jury, at this time the

11    evidence, the Charge of the Court, and the closing arguments

12    are now before you.

13           I'm going to hand our bailiff the Charge of the

14    Court that contains your instructions, the verdict form, and

15    the applicable law.  He'll be laying this on the table in the

16    jury room.  Once all of you are present and assembled, the

17    case is formally submitted to you and you can begin your

18    deliberations.

19           So, at this time, I'll ask you to please step down

20    and accompany him to the jury room.

21           *(Jury retires to deliberate at 4:28 p.m.)*

22           *THE COURT:*  All right.  Unless there's anything

23    else, we'll stand in recess until the jury reaches a verdict

24    or we get a question.

25           Anything else for the Court?

1      *MR. THOMPSON:*  Nothing, Your Honor.  Thank you.

2      *THE COURT:*  All right.  We'll stand in recess.

3                *(Short recess taken)*

4                *(Jury enters courtroom at 5:27 p.m.)*

5      *THE COURT:*  All right.  Point Bridge Capital, LLC,

6  et al vs. Charles Johnson, Cause Number 4:24-CV-988-P.

7            The jurors had been accused -- excused to begin

8  their deliberations; and the Court has received a verdict.

9            And so, let me begin by asking who my foreperson

10 was.  Could you raise your hand?  (Hand raised)

11           Yes, ma'am.  Could you tell me your juror number?

12     *THE FOREPERSON:*  One.

13     *THE COURT:*  Juror Number 1, did you hand the jury

14 charge to the Court Security Officer?

15     *THE FOREPERSON:*  Yes, sir.

16     *THE COURT:*  Have you-all reached a verdict?

17     *THE FOREPERSON:*  Yes, sir.

18     *THE COURT:*  Was your verdict unanimous?

19     *THE FOREPERSON:*  Yes, sir.

20     *THE COURT:*  And let me, just out of abundance of

21 caution, I am going to do what's called publish the verdict,

22 which means I'll read the answers that you-all gave to the

23 questions, and then I'll go down to each and every one of you

24 and ask whether I correctly read your verdict and whether it

25 was unanimous.  And then I'll give you some instructions and

1    you go home, okay?

2         All right.  So thank you, ma'am, for serving as our

3    foreperson and handing the verdict form to our bailiff.  I've

4    had a chance to review it.

5         At this time, the Court will publish the verdict.

6    All right.

7         Question Number 1:  What amount of damages, if any,

8    did Mr. Lambert prove by a preponderance of the evidence that

9    he is entitled to recover as a result of Mr. Johnson's

10   predicate acts?

11        Please answer in dollars and cents.

12        Answer:  $7,500,000.

13        Question Number 2 -- and both of these two questions

14   relate to civil RICO, I should have said that.

15        Question Number 2:  What amount of damages, if any,

16   did Point Bridge Capital prove, by a preponderance of the

17   evidence, that it is entitled to recover as a result of

18   Mr. Johnson's predicate acts?  Please answer in dollars and

19   cents.

20        $8 million.

21        At this time we'll speak about defamation.

22        Question Number 3:  What sum of money, if any, would

23   fairly and reasonably compensate Mr. Lambert for the general

24   and specific damages that were proximately caused by

25   Mr. Johnson's defamatory statements?

1          Please answer in dollars and cents.

2          $9,500,000.

3          Question Number 4:  Did Mr. Lambert establish, by

4     clear and convincing evidence, that he is entitled to

5     exemplary damages?

6          Answer:  Yes.

7          Question Number 5:  What sum of money, if any,

8     should be assessed against Mr. Johnson and awarded to

9     Mr. Lambert as exemplary damages?

10          Please answer in dollars and cents.

11          $15 million.

12          Signed by our jury foreperson; and dated today, July

13     the 14th of 2025.

14          Ma'am, is that your signature?

15          *THE FOREPERSON:*  Yes, sir.

16          *THE COURT:*  All right.  Did I correctly read the

17     jury verdict, and was your verdict unanimous?

18          *THE FOREPERSON:*  Yes, sir.

19          *THE COURT:*  All right.  I'll go to Juror Number 3.

20     Ma'am, did I correctly read the verdict, and was your verdict

21     unanimous?

22          *THE JUROR:*  Yes, Your Honor.

23          *THE COURT:*  All right.  Juror Number 5:  Did I

24     correctly read the verdict, and was your verdict unanimous?

25          *THE JUROR:*  Yes, Your Honor.

1          *THE COURT:*  Juror Number 6.  Sir, did I correctly

2    read the verdict, and was the verdict unanimous?

3          *THE JUROR:*  Yes, sir.

4          *THE COURT:*  Ma'am, I'll go to you, on the top row.

5    Did I correctly read the verdict, and was the verdict

6    unanimous?

7          *THE JUROR:*  Yes, Your Honor.

8          *THE COURT:*  All right.  Sir, did I correctly read

9    the verdict, and was the verdict unanimous?

10          *THE JUROR:*  Yes, Your Honor.

11          *THE COURT:*  And, finally, my 7th juror.  Did I

12    correctly read the verdict, and was the jury verdict

13    unanimous?

14          *THE JUROR:*  Yes, Your Honor.

15          *THE COURT:*  All right.  The Court has polled the

16    jury.  And at this time, the jury will be -- the jury's

17    verdict will be received by the Court.  Thank you all for your

18    verdict.

19          Ladies and gentlemen, I have told you, throughout

20    these proceedings, that the only time that you're allowed to

21    discuss the case was when you were all excused and assembled

22    in the jury room after I gave you those instructions.  You are

23    now free to talk about the case, and you're released from

24    those instructions.

25          Thank you, again, for coming down today.  Thank you

1    for taking the time to stay after hours and reach the verdict.

2    So, at this time, you will be excused from your service.  You

3    can speak to anyone about your verdict and your deliberations,

4    or you can choose not to.

5              What I would suggest that you do, would be to gather

6    your things and exit the building, if you choose to do so.

7    Good luck driving home.  And, again, thank you for your

8    service.  I appreciate it.

9                   *(Jury leaves courtroom)*

10         THE COURT:  All right.  The jury verdict has been

11   received by the Court.  And the next steps are an outstanding

12   claim for attorney fees, on your RICO claim you also have an

13   outstanding motion for attorney fees.  I'll be entering an

14   order today.  This jury verdict will be made a part of the

15   record in this case.

16             I am asking that by next Monday, July the 21st, you

17   submit your motion for attorney fees.  I would also ask that

18   you go ahead and include the previous amounts that were

19   included in the motion.  And also submit a proposed judgment

20   in conformity with the jury charge and the jury verdict today

21   and the answers to their questions.

22             And I will give you a week to respond to that,

23   Mr. Johnson.  So, you'll have a week to respond to the motion

24   for attorney fees and the proposed judgment.

25             And after that, I am highly likely to be entering

1    the judgment, and we will go from there.

2            All right.  Stand in recess.  Please be sure and

3    gather all your materials.

4            Did I leave something out?

5                *(Discussion between Court and Law Clerk)*

6        *THE COURT:*  I assumed that you knew this, but you'll

7    need to make a motion as well for your treble damages on your

8    RICO count.

9        *MR. THOMPSON:*  Correct, Your Honor.

10       *THE COURT:*  All right.  Any questions for me?

11       *MR. THOMPSON:*  Not from us, Your Honor.

12       *THE COURT:*  All right.  Thank you.

13           *(Proceedings Adjourned)*

14

15

16

17

18

19

20

21

22

23

24

25

**REPORTER'S CERTIFICATE**

     I, Monica Willenburg Guzman, CSR, RPR, certify

that the foregoing is a true and correct transcript from

the record of proceedings in the foregoing entitled matter.

     I further certify that the transcript fees format

comply with those prescribed by the Court and the Judicial

Conference of the United States.

     Signed this 18th day of July, 2025.


                         /s/Monica Willenburg Guzman
                         Monica Willenburg Guzman, CSR, RPR
                         Texas CSR No. 3386
                         NCRA No. 32278
                         Official Court Reporter
                         The Northern District of Texas
                         Fort Worth Division


CSR Expires:        7/31/2027

Business Address:   501 W. 10th Street, Room 310
                    Fort Worth, Texas  76102

Telephone:          817.850.6681

E-Mail Address:     mguzman.csr@yahoo.com

**DEFENDANT JOHNSON: [93]** 14/22
17/20 17/22 18/11 18/16 18/19 18/21
19/1 20/24 21/9 21/12 84/5 84/19
84/21 84/23 85/1 85/10 85/12 85/16
86/24 87/1 87/5 87/7 87/9 87/20 87/23
88/3 88/6 91/3 91/5 93/12 93/14 93/17
93/19 94/3 94/13 95/24 96/11 96/18
96/25 97/10 100/11 100/13 100/18
101/8 101/12 101/18 101/23 102/2
102/5 102/15 103/4 103/13 115/5
127/6 135/3 135/10 135/14 154/22
154/25 155/3 155/7 155/10 155/13
155/16 155/18 157/2 157/8 157/13
157/20 157/23 158/3 158/6 158/9
159/3 159/11 159/13 159/19 159/23
164/24 172/8 178/24 179/3 179/25
180/4 182/3 183/1 183/4 185/2 204/10
204/13 204/21 204/25

**LAW CLERK: [3]** 13/16 14/15 203/16
**MR. THOMPSON: [73]** 10/19 10/21
10/23 13/17 14/16 17/7 18/10 18/12
21/3 21/18 21/21 22/6 82/13 83/17
83/24 84/3 86/23 93/8 95/18 101/5
103/7 103/10 103/16 103/19 104/9
104/12 104/14 104/20 107/18 114/23
127/2 133/25 135/2 135/7 139/15
140/19 141/13 147/15 148/14 154/14
156/25 158/1 158/5 159/1 159/7
159/16 159/21 160/1 160/6 164/20
169/13 175/1 178/21 181/2 182/6
182/8 182/13 182/18 182/21 183/23
184/21 186/1 199/5 199/8 199/10
199/12 199/22 203/17 204/14 209/14
212/1 217/9 217/11
**SECURITY OFFICER: [1]** 10/5
**THE COURT: [219]**
**THE FOREPERSON: [6]** 212/12
212/15 212/17 212/19 214/15 214/18
**THE JUROR: [6]** 214/22 214/25 215/3
215/7 215/10 215/14
**THE WITNESS: [51]** 84/11 89/7 89/9
99/16 100/4 100/6 100/8 104/11
104/13 104/17 104/23 127/4 140/25
141/4 141/6 141/8 141/10 143/6 143/8
143/14 144/5 144/8 144/10 145/11
145/15 146/2 146/15 147/1 150/4
150/9 160/16 160/21 169/18 169/20
170/7 170/13 170/22 171/9 171/13
171/22 172/5 175/3 179/15 180/1
180/5 180/22 181/5 181/9 181/12
181/15 182/10

**$**

**$1 [1]** 151/24
**$1.6 [2]** 70/16 137/18
**$1.6 million [1]** 137/18
**$15 [1]** 214/11
**$2 [3]** 153/16 202/25 203/2
**$20 [4]** 154/4 203/21 203/25 204/4
**$200,000 [3]** 16/2 16/3 96/5
**$25,000 [1]** 25/22
**$38 [2]** 70/2 70/24
**$385,000 [1]** 70/25
**$40 [1]** 98/10
**$40,000 [1]** 73/5
**$400,000 [2]** 70/21 95/15

**$43.9 [1]** 69/22
**$44 [1]** 69/22
**$5 [1]** 98/10
**$5,617,000 [1]** 68/7
**$5,617,102 [1]** 68/18
**$50,000 [1]** 73/6
**$500 [1]** 31/18
**$500,000 [2]** 155/25 207/9
**$6,794,000 [2]** 68/14 136/19
**$6,794,706 [1]** 67/22
**$600,000 [1]** 210/16
**$640,000 [1]** 74/18
**$7,395,106 [1]** 201/6
**$7,500,000 [1]** 213/12
**$7,817,102 [1]** 201/10
**$7.817 [1]** 201/24
**$794,000 [1]** 136/19
**$8 [1]** 213/20
**$9,500,000 [1]** 214/2
**$900 [1]** 210/17

**'**

**'06 [1]** 113/8
**'07 [1]** 113/8
**'08 [1]** 113/8

**.**

**............................182 [1]** 2/11

**/**

**/s/Monica [1]** 218/11

**1**

**1-minute [4]** 10/17 186/7 199/3 204/23
**1.6 [3]** 70/19 70/22 71/15
**1/16/2025 [1]** 8/1
**1/2 [1]** 25/3
**10 [8]** 119/2 151/20 160/4 163/6
185/25 186/5 204/19 209/22
**10,000 [1]** 16/14
**10-minute [1]** 209/20
**10/16/2024 [1]** 6/19
**10/22/2023 [3]** 5/3 5/4 5/6
**10/23/2024 [2]** 6/21 6/23
**10/24/2023 [2]** 5/8 5/10
**10/28/2023 [1]** 8/11
**100 [3]** 101/3 153/3 154/13
**102 [1]** 34/6
**105,134 [2]** 2/8 3/8
**108 [1]** 138/21
**10:20 [2]** 1/7 10/2
**10th [2]** 1/20 218/17
**11 [5]** 110/7 110/12 123/5 132/8 163/1
**11/14/2019 [1]** 8/17
**111 [1]** 69/14
**113 [3]** 149/6 149/7 151/11
**114 [5]** 21/5 21/8 21/14 152/15 152/21
**12 [4]** 23/24 73/7 123/23 125/16
**127 [2]** 2/8 3/8
**13 [6]** 24/11 24/19 125/9 151/9 151/10
151/11
**135 [1]** 3/10
**136 [1]** 2/9
**14 [2]** 1/6 10/2
**14th [1]** 214/13
**15 [2]** 146/25 148/21
**15-minute [1]** 183/6

**155 [2]** 6/9 3/10
**16 [2]** 24/15 153/6
**161 [2]** 2/10 3/9
**1624 [1]** 1/16
**172 [2]** 2/10 3/9
**18th [1]** 218/9
**19 [1]** 113/24
**1900 [1]** 1/13
**1983 [1]** 162/1
**1987 [2]** 162/1 162/7
**1991 [1]** 25/4
**1992 [1]** 109/11
**1998 [1]** 26/9
**19th [2]** 48/7 48/13
**1:00 [4]** 82/21 82/23 83/13 84/7

**2**

**20 [4]** 35/3 89/6 104/6 146/25
**20,000 [1]** 208/15
**20-plus [1]** 29/12
**200 [2]** 208/15 208/16
**2005 [1]** 113/8
**2007 [1]** 163/10
**2008 [1]** 128/11
**2009 [2]** 113/25 133/13
**200K [6]** 141/19 141/22 142/2 142/9
142/15 142/23
**2015 [1]** 36/2 172/13
**2016 [8]** 16/25 36/2 39/25 41/1 86/19
89/11 89/14 163/21
**2018 [1]** 142/4
**2019 [5]** 8/17 90/24 91/8 127/22
139/17
**20194 [1]** 1/17
**2020 [11]** 41/1 43/13 45/10 45/10
45/13 102/17 139/17 143/3 151/8
205/25 206/9
**2023 [15]** 4/21 4/23 5/3 5/4 5/6 5/8
5/10 8/11 45/13 47/19 48/8 48/13
50/23 57/5 58/7
**2024 [11]** 6/12 6/19 6/21 6/23 7/21
7/22 7/24 58/8 65/15 86/21 139/21
**2025 [8]** 1/6 7/4 7/6 8/1 8/9 10/2
214/13 218/9
**2027 [1]** 218/16
**21 [1]** 24/20
**214.743.4500 [1]** 1/14
**21st [1]** 216/16
**22 [2]** 2/7 3/11
**2200 [1]** 1/13
**22nd [2]** 50/23 57/5
**23rd [1]** 139/21
**24th [1]** 143/3
**25 [2]** 24/15 55/10
**26 [2]** 51/22 77/17
**28 [3]** 6/24 27/2 48/1

**3**

**3/15/2023 [1]** 4/21
**30 [7]** 22/15 27/21 59/14 76/20 94/1
183/10 184/4
**300 [1]** 70/24
**310 [2]** 1/20 218/17
**32278 [1]** 218/12
**3386 [1]** 218/12
**3800 [1]** 70/24
**3CON [1]** 112/19 113/1 128/11

**4/2/2024 [1]** 7/21
**4/5/2024 [1]** 7/4
**40 [3]** 53/25 55/6 142/17
**40-something [1]** 51/20
**401 [1]** 30/19
**43 [1]** 69/21
**43.9 [1]** 70/18
**4:08 [1]** 198/17
**4:24-CV-00988-P [1]** 1/4
**4:24-CV-988-P [4]** 84/15 184/11 185/11 212/6
**4:28 [1]** 211/21

**5**

**5.5 [1]** 70/2
**5.55 [1]** 70/19
**5/1/2023 [1]** 4/23
**5/20/2024 [1]** 7/22
**50 [9]** 22/20 46/23 46/24 49/17 51/10 58/2 77/3 163/5 211/3
**50,000 [2]** 73/11 73/11
**50/50 [1]** 211/3
**501 [2]** 1/20 218/17
**52 [1]** 77/15
**53 [1]** 79/25
**5:27 [1]** 212/4

**6**

**6,794,706 [1]** 68/16
**6,800,000 [1]** 67/22
**60 [1]** 142/16
**600,000 [1]** 74/20
**617.429.4718 [1]** 1/17
**64 [3]** 139/19 153/23 158/5
**66 [2]** 153/24 210/19
**6th [1]** 175/11

**7**

**7-0-6 [1]** 136/19
**7.3 [2]** 202/18 203/2
**7.39 [1]** 75/1
**7.81 [1]** 75/2
**7/31/2027 [1]** 218/16
**7/7/2025 [1]** 7/6
**7/8/2025 [1]** 8/9
**71 [1]** 72/18
**74 [1]** 153/6
**75201 [1]** 1/14
**76102 [2]** 1/20 218/17
**7:17 [1]** 56/14
**7th [1]** 215/11

**8**

**80 [1]** 142/24
**817.850.6681 [2]** 1/21 218/18
**85 [1]** 2/7 3/11 101/1
**88 [3]** 59/6 60/2 60/15
**89 [1]** 57/21
**8:37 [1]** 79/3

**9**

**9/11 [4]** 110/7 110/12 132/8 163/1
**9/17/2024 [1]** 7/24
**9/19/2024 [1]** 6/12
**90 [2]** 13/19 65/20
**92 [1]** 161/2

**95 [2]** 66/19 67/13
**96 [1]** 67/10
**97 [1]** 36/16

**A**

**a.m [2]** 1/7 10/2
**abiding [1]** 109/21
**ability [15]** 28/23 29/21 33/9 107/12 112/18 115/14 116/11 116/14 117/14 122/5 168/20 168/23 168/24 168/25 169/5
**able [13]** 13/3 24/14 25/9 26/11 30/9 32/9 38/19 61/21 62/3 79/9 93/11 101/15 102/7
**about [244]**
**above [1]** 202/18
**abroad [1]** 129/12
**absolutely [7]** 11/5 60/21 83/24 149/19 180/17 209/21 211/1
**abundance [1]** 212/20
**abuse [1]** 179/24
**accept [4]** 128/15 164/25 190/13 190/16
**accepted [2]** 189/8 198/14
**accepting [1]** 134/14
**access [2]** 40/8 46/15
**accident [1]** 62/5
**accommodate [1]** 126/18
**accompany [1]** 211/20
**according [1]** 67/21
**account [7]** 31/14 31/14 31/16 31/19 80/20 80/21 128/14
**accountant [1]** 124/9
**accounts [1]** 25/19
**accurate [6]** 56/22 141/23 141/24 144/2 175/10 175/23
**accusations [2]** 166/9 195/12
**accused [12]** 14/24 75/24 75/25 77/9 78/7 92/24 93/4 135/22 143/17 206/10 207/7 212/7
**accuses [5]** 15/15 56/21 205/7 205/8 205/9
**accusing [5]** 16/12 52/19 52/20 56/22 59/18
**acquire [1]** 122/8
**acquired [1]** 122/12
**acquiring [2]** 112/5 112/18
**across [1]** 30/8
**act [9]** 90/23 91/8 91/10 127/22 127/23 163/5 192/25 192/2 197/5
**acted [3]** 13/24 126/17 195/5
**acting [2]** 17/14 131/5
**action [3]** 108/9 167/6 189/6
**actions [3]** 147/24 151/16 193/3
**active [3]** 14/4 127/13 162/13
**actively [1]** 44/11
**activity [6]** 14/12 60/20 167/10 168/11 193/20 193/24
**actors [2]** 117/10 117/11
**acts [8]** 193/19 193/23 194/4 194/10 201/15 201/18 213/10 213/18
**actual [5]** 78/7 151/16 151/23 195/20 197/9
**actually [38]** 12/11 18/7 24/11 25/8 28/17 40/20 40/21 41/13 48/9 48/21 61/12 66/15 73/7 82/5 95/9 95/25 96/4 107/15 111/23 112/25 117/18 119/6

**130/18 124/21 125/2 143/22 145/8 145/15 145/21 147/6 148/3 156/3 158/20 165/21 172/23 174/21 181/1 183/10
**ad [1]** 13/6
**add [2]** 82/3 192/19
**addition [1]** 196/9
**additional [1]** 202/16
**address [11]** 21/11 40/19 84/23 140/15 140/16 155/10 156/11 191/25 195/8 218/17 218/19
**Adjourned [1]** 217/13
**adjudicating [1]** 126/5
**adjustment [1]** 27/11
**Administration [2]** 118/12 119/16
**administrative [1]** 165/19
**admission [3]** 20/23 21/7 130/22
**admit [1]** 137/8
**admitted [10]** 4/2 21/14 21/16 34/6 98/15 115/6 187/14 190/5 190/8 191/9
**admittedly [1]** 157/3
**admonish [2]** 148/18 167/1
**admonishment [4]** 83/7 146/22 148/1 167/5
**adult [1]** 22/16
**adults [2]** 34/18 76/15
**advantage [1]** 118/9
**adversaries [1]** 120/12
**adversary [1]** 61/3
**advice [2]** 105/22 133/15
**advising [1]** 25/19
**AdvisorAssist [1]** 91/20
**affect [2]** 56/10 75/15 125/22
**affected [1]** 195/14
**affiliate [1]** 43/15
**affiliated [1]** 42/11
**affiliation [1]** 98/19
**affordable [1]** 24/6
**Afghanistan [2]** 163/17 164/4
**afloat [1]** 71/13
**afoul [1]** 171/23
**afraid [7]** 56/24 97/14 98/6 104/24 130/20 131/14 148/18
**after [50]** 11/25 13/12 14/4 15/16 19/20 20/4 20/9 22/21 22/22 24/3 26/10 29/2 37/25 38/12 45/19 46/20 46/22 56/20 57/5 57/16 57/17 58/8 63/8 65/13 67/1 67/17 67/18 69/3 69/24 79/2 80/20 80/23 98/7 114/2 114/17 133/18 158/20 171/2 171/17 176/4 176/7 181/24 185/20 189/17 191/14 192/2 192/3 215/22 216/1 216/25
**afternoon [3]** 105/6 199/24 203/8
**again [50]** 10/24 17/14 18/24 19/17 20/1 21/6 24/19 27/6 30/3 30/6 30/11 39/7 43/25 44/15 44/18 50/6 51/11 52/15 53/20 56/17 58/14 62/7 62/13 63/23 67/8 68/2 70/18 71/22 72/8 76/1 76/7 77/12 79/17 80/5 81/5 81/12 97/7 99/1 99/10 106/15 123/3 134/22 136/14 185/23 186/5 199/22 203/19 203/20 215/25 216/7
**against [20]** 12/3 52/22 57/9 57/10 77/18 80/4 110/4 117/10 123/2 123/10 129/9 132/20 152/16 157/18 173/22 184/4 199/20 202/22 203/20 214/8

**age** [2]  150/21 166/22
**agencies** [18]  105/24 109/25 110/1
110/16 115/22 116/1 116/18 118/24
119/17 120/12 122/5 126/14 131/16
132/16 132/21 132/24 146/7 162/3
**agency** [18]  105/19 109/11 110/8
112/7 112/7 114/7 117/22 119/20
119/23 129/10 145/16 145/19 145/24
165/17 177/4 177/5 180/2 207/22
**agenda** [1]  56/4
**agent** [29]  88/13 118/23 118/24
130/25 146/3 164/25 165/8 165/10
165/14 165/16 166/25 167/3 167/3
167/4 168/16 169/23 170/11 170/16
170/17 170/23 171/7 171/9 171/14
174/8 174/20 179/13 180/20 180/24
181/21
**agents** [10]  117/7 117/14 118/10
146/6 164/17 171/3 171/22 173/17
176/6 177/3
**aggressive** [2]  112/12 126/25
**ago** [13]  15/22 23/2 56/6 70/13 71/25
74/3 89/3 95/20 101/9 104/6 126/1
144/24 160/17
**agree** [1]  202/20
**agreed** [2]  96/3 121/4
**ahead** [21]  10/6 17/21 100/10 105/1
115/8 125/17 125/17 142/12 145/24
149/3 160/22 161/8 165/2 174/11
174/13 174/18 180/8 183/11 199/11
199/21 216/18
**AI** [6]  16/9 41/21 42/3 45/24 66/9
158/12
**aids** [1]  190/24
**ain't** [1]  208/8
**air** [1]  163/11
**al** [4]  1/4 84/15 184/10 212/6
**alarm** [2]  131/4 132/1
**alarms** [1]  126/14
**alcohol** [1]  206/7
**all** [191]  10/3 10/12 10/15 12/9 14/19
15/17 15/17 19/11 20/4 20/9 20/12
20/15 21/6 21/13 21/19 21/23 24/13
27/11 31/12 32/16 34/1 34/20 35/5
35/12 35/14 37/21 37/22 39/14 43/10
44/20 53/8 54/21 55/1 55/11 55/13
56/19 62/4 62/6 62/11 63/10 64/6
64/23 66/6 67/10 69/5 70/8 71/11
71/12 71/16 71/22 72/17 73/17 73/21
74/22 74/25 75/5 76/6 76/6 76/7 76/18
77/20 78/2 80/22 82/14 83/5 84/6
84/10 87/25 91/7 91/21 96/4 96/5 96/7
96/20 97/1 99/7 101/15 102/1 102/16
103/6 103/8 103/16 103/18 104/8
104/18 107/25 109/14 109/21 115/6
115/9 116/16 116/24 117/6 122/5
122/22 124/18 125/18 126/2 126/6
128/22 130/11 131/3 135/4 135/17
137/21 138/11 139/3 147/21 148/18
149/23 150/3 157/24 159/4 159/5
159/12 159/15 159/17 159/24 160/11
164/19 164/25 166/11 166/18 168/23
172/6 173/2 173/14 173/18 174/13
175/13 179/14 181/15 182/9 183/13
183/16 183/19 183/24 184/9 184/14
186/3 186/6 186/8 187/2 187/18
187/18 189/18 190/3 191/11 192/9
197/22 198/3 198/19 198/22 198/24
199/19 202/8 203/2 204/7 204/13
204/18 205/2 205/25 206/1 206/5
206/16 208/20 208/20 208/25 209/11
210/2 211/9 211/16 211/22 212/2
212/5 212/16 212/22 213/2 213/6
214/16 214/19 214/23 215/8 215/15
215/17 215/21 216/10 217/2 217/3
217/10 217/12
**all-time** [1]  70/8
**all-too-plausible** [1]  116/16
**allegation** [2]  119/6 121/6
**allegations** [16]  12/13 13/23 58/6
99/12 123/2 123/9 123/10 124/1 125/3
125/4 125/24 132/13 132/22 134/19
140/2 196/23
**alleged** [1]  134/9
**allegedly** [2]  96/21 161/21
**Allen** [1]  146/19
**alligator** [2]  43/8 43/9
**allotted** [2]  199/2 204/19
**allow** [4]  20/9 113/2 122/21 183/15
**allowed** [9]  19/21 19/24 101/21 121/3
123/13 155/15 178/7 182/24 215/20
**almost** [4]  69/21 69/21 177/20 184/6
**alone** [5]  15/17 119/24 188/19 195/24
205/8
**along** [4]  108/20 113/19 116/4 166/6
**ALPHABETICAL** [1]  3/5
**already** [22]  11/10 11/10 18/24 35/11
50/25 51/3 52/6 61/21 66/10 94/5
110/14 110/21 121/4 130/6 134/12
147/9 147/10 157/17 157/18 180/19
195/25 201/21
**also** [48]  13/14 13/15 14/8 14/11 20/1
24/6 33/2 33/17 35/6 37/13 39/11
48/25 50/13 50/13 53/17 55/24 57/4
68/6 89/9 105/22 107/11 110/1 110/25
117/7 118/3 119/20 120/23 130/18
132/8 144/1 145/18 156/16 156/19
162/21 164/2 166/17 166/20 167/8
170/20 183/7 193/13 196/10 202/10
205/12 207/15 216/12 216/17 216/19
**alternate** [1]  138/5
**alternative** [3]  66/8 136/21 136/23
**although** [2]  17/14 131/13
**always** [8]  24/10 29/1 43/16 43/18
44/17 160/21 161/5 191/25
**am** [33]  10/19 15/11 22/14 36/20 52/1
56/11 68/23 78/9 97/7 99/2 101/10
105/18 119/5 124/9 137/21 138/15
138/18 143/15 147/2 148/7 149/17
149/19 154/25 157/3 157/15 161/14
171/22 179/8 185/16 209/8 212/21
216/16 216/25
**amazing** [1]  173/7
**Amazon** [1]  166/22
**Amendment** [1]  146/9
**American** [1]  120/18
**Ameritrade** [1]  31/15
**among** [4]  16/24 110/16 126/14 167/3
**amongst** [1]  83/9
**amount** [15]  23/6 68/3 69/19 153/15
187/5 192/13 192/19 194/1 194/8
197/12 200/11 201/13 204/21 213/7
213/15
**amounts** [2]  109/3 216/18
**amplified** [1]  14/5
**amplify** [5]  62/17 62/22 62/23 79/9
79/13
**analysis** [1]  26/21
**analyze** [1]  32/9
**anchor** [1]  100/14
**Andrews** [1]  85/6
**Anduril** [5]  85/23 142/19 142/20
142/21 142/23
**anecdote** [1]  37/16
**Angeles** [2]  41/4 165/17
**Angleton** [1]  146/18
**another** [15]  28/11 57/16 57/17 72/9
91/20 138/12 145/16 160/22 167/5
168/8 177/4 200/14 205/14 207/19
207/22
**answer** [41]  99/17 111/12 111/15
111/16 118/14 118/14 134/11 137/22
141/11 150/7 156/10 169/6 169/9
174/19 175/2 186/25 187/2 192/2
192/12 192/14 192/14 192/15 192/20
194/5 194/6 194/11 194/11 196/7
196/7 197/25 198/1 198/1 198/6 198/6
202/3 213/11 213/12 213/18 214/1
214/6 214/10
**answer is** [1]  137/22
**answered** [3]  178/14 178/22 198/2
**answering** [5]  143/11 174/14 180/9
192/6 192/12
**answers** [12]  109/22 147/7 147/13
147/17 148/17 187/1 191/15 191/17
192/18 192/20 212/22 216/21
**any** [110]  21/15 23/25 29/20 29/23
38/19 39/17 42/11 45/25 46/2 46/14
52/25 59/16 60/17 61/1 61/3 65/23
69/5 69/7 73/7 83/4 83/10 83/10 83/18
85/12 88/21 91/11 91/13 92/6 94/19
94/21 94/23 96/20 97/11 98/8 100/4
103/6 114/13 115/4 119/23 121/22
127/18 129/20 129/22 133/5 133/24
136/25 138/3 145/7 146/10 146/22
147/13 157/22 159/4 159/9 159/15
163/22 164/9 164/23 165/4 167/19
167/23 168/1 168/2 168/2 170/4
170/15 172/6 175/6 180/20 182/5
182/18 184/4 184/25 186/14 188/22
188/23 189/9 189/16 190/14 190/17
190/18 190/23 191/4 191/8 191/19
191/21 192/8 192/14 192/15 192/16
192/17 192/19 192/20 193/2 194/1
194/8 194/17 196/3 197/13 198/3
198/23 201/13 202/4 204/8 205/12
213/7 213/15 213/22 214/7 217/10
**anybody** [5]  29/23 31/18 69/7 156/6
169/16
**anymore** [3]  25/14 92/19 207/11
**anyone** [10]  64/16 83/9 93/5 98/10
130/2 145/24 157/4 191/19 192/4
216/3
**anything** [32]  17/23 23/5 29/20 33/19
40/15 45/4 51/11 57/15 62/16 63/13
65/21 69/1 70/15 73/8 79/22 83/15
84/4 92/22 99/24 100/3 100/8 119/19
168/1 168/2 168/6 171/19 174/22
184/22 206/18 208/19 211/22 211/25
**anytime** [3]  28/1 63/7 206/6

**anyway [2]** 130/20 209/10
**anywhere [2]** 47/18 57/13
**apart [1]** 31/5
**aperture [5]** 15/7 16/11 45/20 90/20
**apologize [4]** 53/6 55/23 104/23 109/8
**apparently [1]** 179/22
**appeal [5]** 18/9 130/11 130/13 206/11 209/5
**appealed [1]** 18/11
**appear [3]** 46/7 57/4 101/21
**appearance [3]** 36/24 37/25 38/12
**appearances [6]** 36/16 37/10 37/17 37/18 38/9 65/15
**appeared [2]** 13/2 38/10
**appearing [2]** 36/7 38/23
**appellate [1]** 148/12
**applicable [1]** 211/15
**applied [2]** 90/9 120/5
**applies [1]** 192/18
**apply [1]** 186/12
**appointee [1]** 113/24
**appraisals [1]** 171/3
**appreciate [4]** 133/21 134/24 199/15 216/8
**approach [5]** 21/24 28/20 30/2 135/11 168/25
**approaches [3]** 21/25 30/6 135/12
**appropriate [1]** 56/12
**approve [1]** 111/17
**approved [3]** 121/8 132/12 192/18
**approximately [1]** 70/20
**April [1]** 45/11
**arbitrage [1]** 26/20
**Ardon [1]** 89/2
**are [193]** 13/11 14/9 15/2 15/3 16/7 17/1 17/2 19/7 19/24 20/7 20/13 22/17 23/15 27/1 30/18 31/4 31/10 31/21 32/3 32/10 32/17 33/12 33/16 33/24 34/10 34/17 34/17 35/4 36/7 36/18 37/10 45/14 47/20 49/20 51/25 53/20 54/1 54/20 55/3 55/16 55/19 57/22 59/3 60/10 60/19 60/24 61/24 63/9 63/11 64/22 64/24 66/24 67/23 68/22 70/11 73/14 73/22 74/6 74/17 75/8 75/20 76/16 78/11 78/13 78/14 78/17 81/10 82/9 91/8 92/6 94/10 96/19 97/16 99/11 101/24 101/25 106/18 107/14 109/25 112/23 113/3 113/7 116/1 116/22 116/24 117/24 117/24 118/1 119/4 119/6 119/17 120/4 121/3 121/5 123/19 124/4 125/3 125/14 125/23 125/24 126/8 127/21 127/24 128/1 128/22 130/12 131/14 132/22 132/24 132/25 137/20 143/24 149/25 150/20 150/21 151/2 154/23 156/20 156/21 156/23 157/22 158/15 158/16 161/18 163/13 164/18 166/19 167/4 167/6 167/14 167/22 168/15 169/11 169/16 173/11 173/17 173/18 176/10 177/14 178/15 179/9 181/4 182/16 182/24 185/18 186/13 186/14 186/21 186/21 186/22 188/13 188/14 188/19 189/13 189/20 190/23 191/1 191/4 191/17 192/3 192/9 192/21 193/18 193/23 193/25 194/21 196/11 196/12 198/15 200/23 201/6 201/6 201/7
**area [5]** 43/20 86/17 158/25 162/17 163/3
**areas [1]** 30/16
**aren't [1]** 82/11
**argue [1]** 132/1
**arguing [1]** 134/16
**argument [14]** 18/13 18/15 97/4 98/5 132/3 157/11 182/25 186/19 186/21 198/19 199/1 199/2 204/20 209/13
**arguments [10]** 20/6 20/6 20/15 183/7 183/16 185/6 185/21 186/18 186/20 211/11
**armored [1]** 162/5
**around [12]** 24/7 24/22 25/13 96/1 142/16 142/16 143/20 171/3 172/14 206/7 206/15 210/17
**arrest [2]** 49/7 50/14
**arrested [8]** 49/2 49/3 49/5 49/9 50/20 51/9 64/8 146/4
**Article [1]** 7/9
**artificial [1]** 66/9
**aside [1]** 206/20
**ask [44]** 20/12 47/22 52/25 77/13 78/4 82/4 85/5 85/9 85/12 85/15 88/2 99/9 100/17 124/23 127/16 141/15 141/24 145/4 146/18 148/16 148/19 149/4 150/6 154/20 155/6 155/8 170/1 176/4 177/6 177/8 177/13 178/1 178/13 179/6 179/7 179/12 185/24 187/22 205/23 209/2 209/24 211/19 212/24 216/16
**asked [21]** 14/1 16/1 18/2 39/21 63/25 78/12 80/23 82/3 89/21 104/20 107/9 111/13 124/13 124/24 124/25 131/12 142/6 178/22 202/17 203/6 205/22
**asking [14]** 14/17 60/5 93/21 95/9 112/2 124/4 128/13 155/5 157/4 169/24 178/11 203/21 212/9 216/16
**aspect [2]** 39/1 39/6
**aspects [2]** 54/22 61/25
**assassinate [1]** 180/3
**assassination [2]** 76/19 77/4
**assault [5]** 12/14 62/1 123/2 135/23 195/13
**assaulted [1]** 134/10
**assaulting [2]** 64/9 78/8
**assembled [3]** 198/22 211/16 215/21
**assess [1]** 11/17
**assessed [3]** 120/5 198/4 214/8
**assessing [1]** 164/12
**assessment [1]** 117/5
**assessments [1]** 128/18
**asset [7]** 65/5 145/13 146/1 146/12 146/14 165/4 168/17
**assets [6]** 143/22 145/8 146/20 159/5 159/9 168/18
**assigned [7]** 162/2 162/8 162/10 163/3 163/17 163/18 165/16
**assignment [2]** 107/8 115/11
**assigns [1]** 195/19
**assist [3]** 106/2 128/7 186/22
**assistant [1]** 113/4
**associate [1]** 44/13

**Associates [1]** 72/22
**associations [1]** 12/14
**assume [4]** 98/4 121/24 140/13 172/23
**assumed [2]** 134/7 217/6
**assumption [3]** 108/6 120/11 172/24
**assumptions [2]** 134/15 134/21
**assurances [1]** 112/3
**athlete [1]** 63/22
**attack [8]** 35/24 39/15 47/16 56/9 58/17 60/7 60/8 62/1 82/6
**attacked [4]** 22/21 22/22 35/9 35/9
**attacking [3]** 51/20 78/1 78/1
**attacks [23]** 13/1 13/18 39/18 57/3 58/4 62/13 64/10 65/14 67/1 67/2 68/19 69/3 69/4 69/21 69/24 70/5 70/14 73/17 73/19 74/7 81/20 99/21 110/23
**attend [2]** 40/18 40/22
**attention [3]** 78/7 168/7 200/16
**attorney [21]** 17/5 17/15 81/23 91/6 98/1 101/22 130/10 166/18 166/19 166/20 167/8 167/16 181/7 183/15 184/17 186/18 186/20 216/12 216/13 216/17 216/24
**attorney's [1]** 153/15
**attorneys [1]** 20/1
**attracting [1]** 124/21
**attributed [1]** 110/15
**audio [4]** 59/9 59/10 60/4 60/16
**audit [1]** 168/22
**August [2]** 65/14 77/17
**Austin [3]** 24/4 78/8 88/10
**Australian [1]** 90/5
**authorities [7]** 49/9 111/24 116/24 117/4 118/21 163/6 163/7
**authority [10]** 115/13 116/2 116/6 116/12 116/18 123/12 126/12 166/10 168/20 169/1
**authorized [3]** 167/7 167/10 179/20
**available [1]** 38/1
**averse [1]** 125/5
**avoid [2]** 52/25 94/7
**award [10]** 117/14 154/3 164/3 164/4 168/20 193/7 193/13 195/24 196/2 196/14
**awarded [3]** 123/19 198/4 214/8
**awards [3]** 163/22 163/24 164/5
**aware [12]** 76/16 93/7 94/24 95/1 96/3 96/19 130/10 130/23 173/17 178/15 178/18 179/9
**awareness [1]** 197/9
**away [12]** 27/9 66/7 66/13 82/12 125/5 144/3 161/3 168/21 181/23 204/9 205/10 207/18

**B**

**back [54]** 10/4 15/10 20/10 24/24 25/7 25/18 26/4 28/24 35/14 43/25 49/22 65/14 66/4 72/8 72/9 76/24 79/5 81/17 82/11 82/17 82/21 83/12 84/6 84/8 84/14 89/10 89/13 93/3 111/3 127/9 128/11 146/25 148/9 148/21 148/24 151/20 178/3 178/11 182/15 183/6 183/12 183/13 184/3 184/9 185/5 185/7 185/10 185/18 198/20 200/19 206/14 206/17 208/19 209/23

**202/8 202/8 202/16 203/10 203/12 203/13 203/13 203/H 204/8 205/14 207/5 207/16 207/24 208/10 209/3 211/5 211/12 211/16 215/22 216/11**

**backed** [1]  155/22

**background** [12]  23/12 89/23 90/2
91/11 91/13 91/15 105/25 106/17
108/25 109/5 109/8 161/23

**backing** [3]  86/19 86/21 86/22

**bad** [18]  54/15 63/12 75/23 80/15 91/3
119/16 119/23 119/24 123/16 129/8
133/1 142/11 147/21 171/6 206/7
207/3 208/23 208/24

**badly** [2]  99/4 132/16

**bailiff** [4]  191/22 198/20 211/13 213/3

**Baker** [31]  2/8 3/8 8/23 103/17 104/9
104/15 104/15 105/2 105/6 105/8
105/11 106/1 106/17 107/6 107/17
107/20 107/22 110/6 113/3 113/20
114/25 115/9 116/3 119/2 119/25
125/8 127/2 134/3 134/5 134/24 135/5

**Balad** [1]  163/11

**band** [2]  132/2 132/4

**bank** [7]  25/10 25/12 25/13 25/14
25/15 25/23 162/8

**bankrupt** [2]  155/25 156/5

**bankruptcy** [1]  156/1

**bankrupted** [2]  154/8 207/9

**bar** [4]  67/18 67/18 69/19 204/4

**Barack** [1]  66/10

**barbecue** [1]  15/19

**Barnard** [1]  5/9

**barrel** [1]  174/1

**barrier** [1]  128/19

**bars** [1]  117/7

**base** [1]  163/11

**baseball** [1]  24/1

**based** [10]  42/16 68/24 111/14 124/6
138/1 143/2 182/22 183/21 192/15
195/23

**baseless** [2]  13/23 56/6

**basic** [1]  83/25

**basically** [19]  20/13 25/8 25/20 30/18
34/19 47/17 50/19 52/11 52/12 52/20
53/19 57/1 59/3 65/17 74/8 129/17
131/10 133/16 162/19

**basis** [9]  28/3 64/5 98/8 98/13 98/16
98/23 121/24 121/25 201/20

**Bass** [5]  26/12 27/4 88/18 89/2 89/5

**Basses** [3]  26/18 26/25 27/23

**bathroom** [1]  203/24

**be** [186]  10/12 11/8 12/11 14/16 15/3
17/16 17/21 18/8 18/23 21/10 21/14
30/9 31/6 31/12 31/13 32/9 36/11 37/4
37/5 38/16 38/19 38/24 39/9 43/15
43/16 44/10 44/12 46/8 47/4 50/10
50/20 51/4 52/14 55/3 57/4 58/14
59/16 61/21 62/11 63/10 64/8 64/15
64/16 69/6 69/8 73/8 74/18 75/7 75/11
77/7 78/10 79/9 81/1 82/7 82/18 82/22
83/6 83/7 83/12 85/14 87/6 91/5 93/11
93/20 94/5 94/11 97/8 101/14 101/16
102/7 102/11 103/8 103/9 103/11
103/23 103/23 104/1 106/21 106/24
108/1 109/1 109/14 112/23 112/24
113/1 113/11 113/19 114/17 115/11
115/23 116/25 117/6 118/17 118/23
118/23 119/15 120/22 123/16 123/19
128/23 129/5 130/8 130/20 131/7
131/10 132/15 134/13 135/1 141/9

145/16 145/19 145/20 146/13 146/15
146/25 148/10 148/21 159/20 160/8
160/12 160/19 161/6 167/7 169/15
171/7 171/10 172/3 172/24 174/2
176/4 175/23 177/7 181/8 181/9 182/7
182/23 182/24 183/10 183/11 183/18
183/25 184/3 185/3 185/16 186/8
187/1 189/6 189/7 189/9 190/10
190/19 191/3 192/10 192/17 192/17
195/2 195/18 195/19 195/23 198/4
198/12 199/25 200/4 200/17 201/17
202/4 202/7 202/17 205/8 205/20
207/6 208/9 208/13 208/14 209/7
209/9 211/15 214/8 215/16 215/17
216/2 216/5 216/13 216/14 216/25
217/2

**because** [108]  11/11 12/17 13/3 15/9
15/21 16/6 16/8 18/4 19/6 22/19 23/4
23/6 27/11 29/13 29/20 32/16 32/17
37/6 38/6 39/5 44/15 47/9 52/19 52/20
54/12 54/19 61/9 61/18 61/24 66/5
69/8 69/10 71/5 71/22 71/23 73/8
73/17 75/8 76/1 76/21 77/4 81/13 82/6
83/22 87/20 92/22 97/20 98/17 99/12
99/13 100/13 102/11 102/13 108/11
108/19 109/15 111/7 112/6 114/8
115/19 116/22 118/20 119/21 121/25
122/24 123/12 123/19 125/1 125/3
125/19 131/14 132/14 134/14 144/23
151/15 152/2 154/16 156/21 161/5
162/21 163/2 166/3 166/10 169/23
170/20 172/1 175/5 175/10 177/18
178/8 181/3 185/7 186/13 188/5
192/14 199/15 200/17 201/18 203/7
206/6 207/7 208/6 209/15 209/17
209/19 210/7 210/9 210/11

**become** [1]  122/9

**becomes** [1]  173/22

**been** [110]  11/10 15/18 16/17 16/18
16/24 18/24 20/22 22/9 22/15 23/7
23/7 23/8 23/8 27/2 27/21 29/7 29/11
34/6 34/23 35/2 35/11 36/1 39/5 39/25
40/10 42/12 44/16 50/25 51/3 51/22
57/24 59/1 69/5 69/6 70/5 71/6 73/18
73/19 75/23 75/23 76/11 77/18 77/25
78/6 81/11 81/11 83/19 87/12 88/12
89/5 90/11 90/15 92/23 92/24 93/4
93/21 94/1 94/5 96/15 96/20 103/1
105/3 116/12 117/12 117/13 123/6
124/22 124/22 125/20 126/1 129/19
130/3 130/6 132/13 133/11 133/12
133/16 135/19 140/2 142/4 143/2
143/18 145/6 146/9 147/22 151/23
153/11 157/18 161/10 165/1 170/20
177/2 177/18 177/20 179/5 179/5
180/19 184/17 187/15 188/17 189/1
190/19 199/2 199/13 200/7 201/21
204/19 208/18 212/7 216/10

**before** [37]  1/9 13/1 19/13 20/18 22/1
23/9 23/16 35/24 36/12 39/17 45/7
54/6 58/11 58/22 69/2 69/4 73/22 77/9
77/12 83/15 89/13 96/17 110/7 117/10
125/20 128/2 128/15 135/13 140/18
146/21 160/14 164/10 187/4 192/1
198/8 200/10 211/12

**begin** [11]  10/9 10/16 10/21 20/18
21/20 84/18 184/19 204/24 211/17

**beginning** [1]  150/19

**begins** [1]  48/24

**behalf** [5]  28/7 53/16 156/14 156/24
167/6

**behaved** [1]  99/4

**behavior** [8]  16/2 51/4 53/15 54/6
119/12 119/21 123/20 169/4

**behest** [1]  166/12

**behind** [3]  13/6 77/6 204/2

**being** [25]  24/16 41/25 43/15 49/2
49/3 62/3 66/24 92/18 105/16 114/12
122/12 124/9 124/13 130/5 135/23
143/16 150/13 150/13 165/4 165/21
181/25 195/23 203/6 205/8 205/9

**belief** [2]  169/11 196/22

**beliefs** [1]  99/15

**believable** [1]  63/9

**believe** [30]  20/8 24/24 48/3 48/6
49/10 49/19 51/21 67/12 75/9 75/10
76/25 86/12 90/5 95/8 109/2 115/19
125/10 133/14 139/8 139/10 146/4
152/4 167/23 169/3 170/15 176/11
179/6 189/10 189/18 202/24

**believed** [3]  175/25 206/12 206/13

**belong** [1]  59/22

**belonging** [1]  15/15

**below** [3]  37/13 142/21 142/22

**benefit** [2]  40/8 45/9

**BENNETT** [1]  1/12

**best** [8]  15/15 24/7 55/6 97/8 103/22
155/8 155/12 165/6

**bet** [5]  89/6 146/18 171/21 181/3
183/10

**better** [7]  26/8 67/4 104/7 127/11
139/9 207/15 208/11

**between** [9]  38/8 41/1 52/14 114/16
122/6 132/23 178/19 190/1 217/5

**beyond** [2]  196/25 202/18

**bias** [4]  188/23 190/17 190/18 192/8

**big** [15]  27/11 27/11 40/5 44/20 65/16
94/7 98/20 98/21 112/16 125/22
127/23 160/6 173/4 203/4 207/9

**big-time** [2]  40/5 44/20

**bigger** [1]  112/8

**billion** [2]  13/5 142/25

**billion-dollar** [1]  13/5

**billionaire** [1]  98/15

**billionaires** [4]  16/24 174/24 176/11
206/22

**birth** [1]  61/15

**bit** [18]  23/12 25/5 31/8 34/1 34/4
34/16 36/6 40/17 51/24 55/20 58/14
62/24 65/8 111/3 123/21 154/16
177/20 199/25

**bitcoin** [2]  210/15 210/16

**bizarre** [2]  50/9 74/2

**Black** [1]  92/25

**blame** [1]  99/2

**blamed** [1]  111/8

**blank** [5]  194/6 194/12 196/8 197/25
198/7

**blatantly** [1]  168/15

**blessed** [1]  207/22

**block** [1]  47/8

**blocked** [5]  47/9 47/9 48/14 48/15
58/4

**blocks** [1] 11/1
**bloggers** [1] 62/20
**Bloomberg** [1] 36/4
**blow** [2] 51/23 131/22
**blowing** [3] 131/11 131/13 132/5
**blue** [1] 54/8
**blunt** [1] 33/20
**blurry** [1] 178/20
**board** [7] 20/17 41/20 41/25 42/18 42/18 100/3 112/24
**bogus** [2] 130/18 130/20
**Boise** [1] 162/1
**Boisvert** [2] 144/21 144/25
**bold** [1] 108/16
**Bonn** [1] 87/17
**bonus** [1] 164/2
**book** [2] 177/2 208/16
**books** [5] 16/4 19/6 124/12 167/20 167/22
**boom** [1] 72/15
**born** [3] 23/14 23/16 139/12
**borrowing** [2] 117/3 118/20
**boss** [1] 133/8
**Boston** [7] 28/12 28/14 28/17 28/21 28/23 30/10 208/16
**both** [19] 17/6 19/16 20/4 23/18 24/1 34/18 35/23 56/4 67/19 71/10 79/16 94/5 128/12 131/5 169/22 184/13 190/3 200/22 213/13
**bother** [1] 176/2
**bottom** [4] 67/19 68/4 68/4 202/1
**bought** [1] 25/14
**bound** [1] 128/6
**Brady** [18] 2/10 3/9 7/4 8/20 160/2 160/12 161/9 161/13 161/14 161/18 161/23 163/15 164/21 165/1 165/3 166/5 172/11 179/13
**branch** [1] 163/2
**brand** [3] 35/18 73/3 193/10
**brass** [2] 132/2 132/4
**break** [9] 82/15 82/16 83/16 119/25 146/21 183/2 183/6 185/12 185/25
**breaking** [3] 105/7 109/20 134/4
**BRIDGE** [76] 1/4 6/22 9/10 10/25 12/5 12/18 12/24 13/14 14/8 21/21 29/5 29/14 29/24 29/25 30/1 30/15 31/5 31/14 32/19 33/1 33/21 35/14 35/15 35/19 35/22 37/11 37/19 39/4 45/17 46/3 46/25 55/25 57/11 60/19 64/22 65/2 66/1 66/15 67/19 68/5 68/5 68/6 68/10 68/17 68/21 69/17 71/10 71/15 71/17 73/3 73/6 73/1 74/18 75/2 84/14 86/4 106/9 119/8 120/2 121/17 137/11 149/1 166/9 180/18 184/10 185/10 187/7 193/13 193/13 194/8 200/23 201/8 201/9 201/24 212/5 213/16
**Bridge's** [1] 201/20
**brief** [8] 10/11 109/18 111/5 111/5 133/25 185/8 199/9 204/17
**briefed** [1] 109/14
**briefings** [1] 175/9
**briefly** [8] 31/3 68/25 114/1 123/1 123/1 161/18 163/22 165/6
**bring** [26] 18/8 34/5 34/6 36/16 47/25 51/21 53/9 55/9 55/20 57/21 59/6

66/19 67/10 69/14 72/18 77/15 77/19 79/25 99/6 132/17 145/5 152/10 152/15 184/15 185/5 191/23
**bringing** [1] 106/24
**brings** [1] 150/14
**broad** [2] 30/9 113/16
**broadcasting** [3] 65/14 77/18 170/8
**broadcasts** [1] 58/22
**broke** [1] 104/23
**brokerage** [2] 31/15 31/19
**brother** [1] 98/21
**brought** [6] 52/12 54/7 78/6 99/6 145/16 191/24
**buckets** [1] 64/24
**buddy** [1] 87/22
**build** [4] 13/4 39/3 81/13 193/10
**building** [5] 12/24 13/7 91/22 91/23 216/6
**built** [2] 38/21 76/20
**bullet** [5] 110/6 116/8 117/9 118/3 126/10
**Buma** [18] 6/13 88/13 88/16 146/3 165/12 165/13 165/14 165/16 165/19 165/23 166/1 178/24 179/6 179/15 179/22 180/11 180/13 180/21
**Buma's** [2] 165/12 179/7
**bunch** [3] 116/20 174/23 174/24
**Burbank** [2] 87/11 87/17
**Burbank's** [1] 87/15
**burden** [3] 9/1 187/8 209/17
**bureau** [3] 156/14 177/18 181/8
**burning** [1] 11/17
**burnishing** [1] 170/8
**Bush** [1] 139/12
**business** [65] 11/4 11/16 12/3 12/18 13/2 14/3 14/8 15/5 16/13 23/8 24/8 24/9 24/10 24/12 24/18 26/3 29/1 32/21 33/22 33/23 36/4 37/18 37/22 39/13 46/3 46/23 46/24 46/25 51/10 60/15 62/2 62/4 65/22 68/24 71/3 77/2 78/1 78/19 80/4 81/6 88/8 92/12 92/16 94/17 94/19 94/21 94/23 102/19 105/23 116/23 122/21 126/12 126/16 130/24 153/12 153/13 183/8 193/4 193/7 193/14 193/21 194/23 199/13 204/3 218/17
**businessmen** [1] 120/19
**buy** [6] 30/21 31/20 82/17 111/9 166/22 206/16
**buzz** [1] 151/2

**C**

**cabin** [1] 139/10
**Cafe** [1] 43/4
**calculated** [1] 76/6
**calculating** [1] 12/17
**call** [25] 10/15 21/20 21/22 37/25 38/2 39/22 47/8 76/14 84/17 88/15 103/15 118/10 118/11 135/6 135/8 159/25 160/1 168/5 169/6 170/23 182/12 182/13 182/17 201/2 209/12
**called** [32] 13/9 17/5 19/13 19/16 25/13 25/15 27/10 27/25 28/3 28/12 28/15 30/17 32/22 38/5 39/20 41/20 66/17 72/9 85/23 91/19 91/20 130/2 142/3 152/2 163/13 163/18 166/19 167/10 187/18 190/11 196/11 212/21

**calling** [1] 76/3
**calls** [1] 52/10
**came** [22] 15/17 16/6 28/24 29/9 30/1 39/15 40/17 41/12 42/18 42/18 46/7 46/9 46/11 74/10 111/6 129/9 140/1 143/12 175/15 199/15 210/1 210/8
**campaign** [13] 11/7 11/20 12/10 13/6 13/13 13/25 35/24 39/19 39/21 39/23 73/10 75/19 77/18
**can** [138] 10/3 16/4 16/15 17/24 19/23 20/17 21/20 27/17 30/21 31/12 31/14 31/17 31/20 32/16 33/15 33/16 34/6 34/7 37/16 38/11 38/12 38/13 38/16 38/25 43/20 43/25 44/2 44/2 44/3 44/6 44/7 44/8 44/24 44/24 55/20 57/21 61/16 61/17 61/24 64/24 66/10 66/14 67/4 67/6 67/17 68/6 72/10 72/15 73/4 77/6 77/8 78/17 80/13 80/22 81/15 82/22 83/18 97/5 97/8 101/17 103/8 103/10 103/22 104/9 104/11 104/12 104/15 104/16 104/17 104/20 105/6 105/8 105/11 106/15 107/19 107/20 107/22 111/3 111/3 111/15 111/16 116/3 117/2 117/16 118/23 118/23 120/4 123/8 123/14 124/23 125/25 126/7 130/8 131/15 134/3 134/5 135/2 136/17 139/1 139/19 141/4 141/12 141/15 144/11 145/4 147/3 148/15 148/18 154/21 155/3 155/8 156/11 158/5 158/8 159/18 166/22 177/9 183/1 183/11 191/25 193/22 204/10 204/10 204/14 205/4 205/5 206/21 207/18 207/25 208/21 209/2 209/5 210/9 210/13 211/17 216/3 216/4
**can't** [20] 14/25 29/22 33/21 35/20 35/21 74/14 75/9 77/7 77/8 96/9 112/25 118/10 123/6 128/5 154/18 168/6 206/16 206/16 206/18 207/23
**cancelled** [1] 126/1
**cannot** [4] 111/16 168/22 168/22 195/23
**Canopy** [1] 62/20
**capabilities** [1] 109/25
**capacity** [1] 195/1
**capital** [50] 1/4 10/25 12/5 12/18 12/24 13/14 14/8 21/22 29/5 31/14 32/19 33/21 35/14 35/16 35/19 37/11 44/20 46/12 55/25 57/11 60/19 65/2 66/1 66/15 82/18 84/15 86/17 102/21 102/21 106/9 119/8 120/2 121/17 128/2 137/11 149/1 156/8 156/22 166/9 180/18 184/10 185/11 187/7 193/14 194/8 200/23 201/8 201/9 212/5 213/16
**Capital's** [1] 86/4
**capture** [1] 75/5
**car** [4] 24/21 24/23 162/5 206/8
**care** [7] 14/20 19/14 82/20 133/22 176/3 183/7 196/2
**career** [9] 26/4 27/8 27/24 109/9 109/13 150/15 164/14 171/23 175/7
**careers** [1] 171/25
**careful** [3] 17/21 87/6 131/7
**cares** [1] 16/16
**carrot** [1] 168/25
**carry** [1] 117/14

**C**

**cartels [4]** 61/1 64/10 78/11 162/13
**Carter [2]** 144/21 144/25
**case [81]** 1/4 11/2 11/14 12/22 13/12 13/24 14/6 14/9 16/16 19/3 19/22 19/23 19/25 20/14 20/18 20/19 21/20 23/3 77/11 79/14 79/15 88/16 94/10 107/7 108/5 110/9 111/2 111/6 114/3 140/4 143/16 143/24 144/17 145/18 146/23 147/6 150/1 152/2 152/10 152/16 156/21 174/1 180/15 180/15 180/16 180/16 182/23 183/25 184/1 184/5 184/11 184/13 184/14 186/11 186/17 187/12 187/16 188/13 188/18 188/23 188/23 189/11 189/21 190/20 192/4 199/1 200/5 200/6 200/15 203/5 205/11 205/18 208/24 208/25 209/18 209/22 211/4 211/17 215/21 215/23 216/15
**cases [8]** 16/9 79/15 79/16 117/12 117/18 143/17 145/22 149/9
**cash [4]** 12/15 18/2 60/22 205/23
**casts [1]** 115/15
**categories [1]** 194/20
**categorize [1]** 64/4
**catenated [1]** 136/4
**cater [1]** 94/8
**cause [11]** 38/8 59/24 107/16 126/12 130/20 170/13 171/10 194/18 195/17 197/3 212/6
**caused [13]** 23/10 41/18 69/8 71/17 108/8 108/14 193/19 193/22 193/23 194/18 196/5 202/12 213/24
**causes [1]** 66/1
**causing [2]** 78/9 131/22
**caution [2]** 52/22 212/21
**Cavuto [4]** 7/14 8/17 37/9 65/9
**cc'd [1]** 56/2
**CE [1]** 85/22
**cease [1]** 33/24
**ceases [1]** 12/6
**cell [5]** 101/14 102/13 172/19 172/22 177/16
**central [1]** 79/3
**cents [9]** 192/20 194/5 194/11 196/7 198/6 213/11 213/19 214/1 214/10
**CEO [2]** 16/10 128/16
**CEOs [2]** 26/23 114/14
**certain [5]** 32/13 86/12 110/18 116/12 189/25
**certainly [7]** 33/15 40/9 45/1 69/6 83/25 107/21 148/12
**CERTIFICATE [1]** 218/1
**certification [1]** 198/9
**certify [2]** 218/3 218/6
**cetera [6]** 104/3 114/22 116/13 116/14 148/19 148/19
**CFOs [1]** 26/23
**chain [1]** 189/24
**challenging [1]** 27/6
**chance [5]** 51/5 85/7 120/13 210/10 213/4
**change [7]** 41/20 65/21 70/5 92/13 103/1 139/7 201/25
**changed [6]** 65/22 65/23 99/14 109/12 160/18 206/9
**changing [2]** 41/16 99/3

**channels [2]** 56/13 132/12
**character [3]** 76/19 77/4 197/15
**characterize [1]** 165/3
**charge [21]** 2/13 28/1 183/9 183/14 184/10 184/13 184/15 184/16 184/20 184/24 185/4 185/13 186/9 191/8 198/15 200/17 200/22 211/11 211/13 212/14 216/20
**charged [6]** 179/5 179/15 179/16 179/18 180/12 180/13
**charges [1]** 81/1
**CHARLES [46]** 1/7 1/16 2/9 3/10 11/3 22/19 31/15 39/20 40/15 43/14 43/18 44/16 45/21 55/22 55/23 55/24 56/5 56/9 60/13 62/21 63/16 63/19 63/21 67/1 67/2 67/16 69/20 78/6 81/24 84/15 106/9 135/8 135/18 139/25 149/1 149/12 149/16 153/1 153/10 161/20 165/4 165/6 184/11 185/11 205/19 212/6
**Charlottesville [1]** 77/10
**cheated [1]** 80/6
**check [5]** 61/12 72/10 89/23 90/2 128/2
**checks [3]** 91/11 91/13 91/15
**Chertoff [1]** 113/14
**Chiagouris [1]** 8/22
**chief [9]** 19/22 19/23 20/18 20/19 21/20 87/17 182/24 183/25 184/14
**child [2]** 158/22 205/23
**children [1]** 148/16
**China [2]** 120/13 128/4
**Chinese [12]** 61/19 64/9 76/3 89/16 89/19 89/20 89/21 89/22 112/14 114/21 120/9 158/25
**choice [2]** 44/25 147/25
**choose [3]** 12/16 216/4 216/6
**chose [1]** 12/17
**Christmas [2]** 161/2 161/3
**Chuck [2]** 63/18 63/20
**CIA [13]** 43/15 43/15 87/17 90/11 117/7 117/13 117/22 118/23 129/15 129/18 163/16 168/18 170/1
**CIA's [1]** 129/7
**circles [3]** 40/4 40/21 63/23
**Circuit's [1]** 147/25
**circumstances [4]** 127/11 173/25 189/1 189/24
**circumstantial [3]** 189/23 190/1 190/4
**citizens [1]** 169/15
**city [4]** 15/19 158/25 162/24 162/24
**civil [4]** 94/6 157/19 192/23 213/14
**claim [9]** 110/10 116/16 118/23 118/23 158/11 187/6 201/20 216/12 216/12
**claimed [2]** 116/2 168/24
**claiming [1]** 99/22
**claims [16]** 107/10 107/11 107/14 107/14 116/5 118/25 119/2 122/1 126/11 126/13 129/22 133/6 133/6 165/4 192/24 194/16
**clandestine [1]** 170/3
**classified [5]** 90/22 109/15 109/16 120/25 128/24
**clean [4]** 61/11 124/16 156/7 156/8
**clean-up [2]** 156/7 156/8
**clear [17]** 11/8 15/3 21/7 36/11 44/9

41/10 51/4 59/16 72/14 122/3 148/14 196/15 195/21 196/23 197/23 211/1 214/4
**clearance [9]** 90/6 90/7 90/9 127/14 127/15 133/12 171/11 171/14 171/16
**clearances [1]** 145/7
**clearer [2]** 201/4
**Clearview [11]** 16/9 41/21 41/23 42/3 42/11 44/2 45/24 80/6 95/10 95/11 158/12
**Clerk [2]** 184/17 217/5
**client [5]** 28/1 83/18 88/23 185/7 199/13
**clientele [1]** 103/3
**clients [10]** 25/18 29/8 29/22 30/4 30/8 30/11 39/7 51/20 90/19 114/5
**cliff [3]** 13/13 13/15 65/18
**clip [7]** 36/18 37/7 39/10 58/21 58/22 65/9 102/19
**clips [2]** 62/8 93/5
**cloak [1]** 44/18
**clock [1]** 198/17
**close [5]** 20/5 35/18 166/2 170/13 183/21
**closed [5]** 160/23 170/14 170/15 184/1 184/13
**closely [3]** 25/10 186/9 192/22
**closer [1]** 183/10
**closing [18]** 20/5 20/6 20/15 182/21 182/25 183/7 183/15 185/6 185/21 186/5 186/18 186/19 186/21 198/19 198/25 204/20 209/13 211/11
**CMP [1]** 149/12
**CNBC [3]** 13/2 36/4 37/22
**CNN [3]** 92/12 92/16 92/25
**co [1]** 16/10
**co-CEO [1]** 16/10
**coach [2]** 83/22 97/7
**coerced [1]** 126/19
**coercive [1]** 107/15
**collect [3]** 29/22 110/4
**collecting [1]** 164/17
**collection [1]** 163/6
**collects [1]** 29/21
**college [6]** 24/3 24/6 24/13 25/17 203/24 207/8
**colloquy [1]** 96/12
**color [1]** 62/6
**combat [1]** 11/13
**come [25]** 29/7 35/5 39/18 41/12 52/7 54/25 60/7 66/4 81/17 81/18 82/4 82/17 82/21 84/8 108/11 109/17 148/8 165/12 173/24 182/15 183/6 183/12 201/18 206/14 208/19
**comes [5]** 17/10 71/22 83/25 94/1 210/19
**comfortable [1]** 134/13
**coming [5]** 25/6 76/12 134/20 208/4 215/25
**comment [1]** 160/23
**commentary [1]** 38/9
**commission [5]** 33/19 110/7 110/12 110/25 132/9
**commissions [2]** 42/15 133/15
**commit [1]** 205/6
**committed [3]** 80/4 151/16 200/8
**committee [2]** 112/1 120/21

**committees [1]** 110/18
**common [4]** 63/15 176/12 188/15 188/16
**commonly [1]** 192/25
**communicate [4]** 41/6 55/16 172/15 191/21
**communicated [1]** 48/15
**communicating [1]** 110/20
**communication [1]** 110/16
**communications [4]** 56/20 96/9 112/10 121/3
**communities [1]** 63/1
**community [17]** 14/14 43/19 43/20 44/2 44/7 75/13 105/24 108/12 118/8 118/17 119/14 156/22 169/8 169/21 169/22 169/25 195/10
**companies [39]** 12/19 26/23 30/25 31/25 32/1 32/3 32/11 32/17 32/18 32/24 42/6 44/3 44/4 44/6 44/8 44/11 54/22 61/21 61/23 67/8 67/9 91/9 92/4 105/23 111/19 111/20 112/16 114/5 114/20 115/22 116/13 116/22 120/15 122/15 127/19 128/7 128/8 128/14 206/20
**company [48]** 10/25 12/21 13/6 15/6 15/7 16/10 16/11 33/24 41/20 41/23 41/24 42/1 45/20 45/21 45/22 58/2 61/16 76/5 85/23 90/20 91/19 94/22 107/11 111/7 111/9 112/19 112/21 112/22 112/23 112/25 115/18 117/16 121/2 121/2 122/9 122/11 124/5 126/21 128/16 128/25 142/3 142/24 153/4 153/5 158/12 158/15 158/18 207/9
**company's [2]** 116/14 116/23
**compare [1]** 64/12
**compared [1]** 161/5
**comparison [2]** 66/25 67/15
**compensate [7]** 194/17 196/4 196/12 202/5 203/13 203/14 213/23
**compensation [3]** 56/6 195/24 196/9
**competent [2]** 195/3 195/18
**complaint [1]** 181/22
**complaints [1]** 132/10
**complete [3]** 64/3 112/21 209/13
**completed [1]** 84/16
**completely [9]** 46/1 78/5 95/21 106/22 111/14 114/14 122/17 167/15 169/12
**complex [1]** 26/19
**compliance [3]** 91/17 91/18 115/1
**compliant [1]** 91/9
**complicate [1]** 52/24
**complicated [1]** 209/3
**compliment [1]** 173/16
**comply [1]** 218/7
**composite [1]** 141/8
**compromised [3]** 12/15 60/22 156/17
**computer [1]** 1/23
**concentrate [3]** 18/25 94/11 97/2
**concern [2]** 121/20 129/1
**concerned [7]** 111/10 116/22 119/17 120/22 128/9 156/21 197/18
**concerning [2]** 151/22 187/23
**concerns [5]** 111/22 114/18 114/19 121/19 128/16
**concerted [1]** 76/22

**concluded [1]** 15/24
**conclusion [4]** 108/11 108/17 108/18 119/13
**conclusions [4]** 125/10 125/14 137/23 188/16
**concurrently [1]** 138/20
**conduct [21]** 14/10 53/11 53/16 54/17 85/13 123/18 126/13 136/19 153/22 161/20 168/10 185/6 191/10 191/12 196/13 196/14 197/15 197/19 198/23 203/15 203/18
**conducting [1]** 168/4
**conference [2]** 184/10 218/8
**confidant [1]** 178/25
**Confide [1]** 177/23
**confident [1]** 172/4
**confidential [47]** 129/4 129/13 132/19 132/24 133/4 143/18 145/19 145/20 146/2 160/2 161/21 164/8 164/11 164/18 164/22 165/7 166/21 166/25 167/1 169/14 169/17 169/20 169/22 170/4 170/5 170/9 170/10 170/12 170/18 170/19 172/4 172/12 172/15 173/22 174/2 174/21 175/15 175/18 176/17 177/15 178/19 179/14 179/10 181/19 181/20 181/23 181/25
**confidentiality [1]** 122/13
**confidentially [1]** 131/17
**confirmation [2]** 113/10 113/12
**conflict [1]** 114/11
**conformity [1]** 216/20
**confused [1]** 201/17
**confusing [1]** 200/17
**Congress [5]** 91/21 91/23 98/22 104/2 178/8
**congressional [2]** 92/2 92/6
**congressman [2]** 40/23 40/24
**connected [3]** 40/7 45/24 83/10
**connection [3]** 111/11 111/18 118/17
**connections [3]** 38/20 118/8 156/7
**conscious [1]** 197/10
**conservative [2]** 71/8 71/9
**consider [15]** 21/16 96/13 148/1 164/7 186/14 187/17 188/8 188/12 188/21 189/21 190/6 190/17 195/15 195/20 197/13
**consideration [1]** 71/1
**considered [4]** 17/16 102/22 184/1 188/25
**considering [3]** 189/18 195/11 197/7
**consist [1]** 109/13
**consistency [1]** 188/24
**conspiracy [6]** 15/15 15/16 157/9 205/7 206/2 206/4
**constituting [1]** 193/19
**constructive [1]** 197/2
**consult [1]** 161/16
**consume [2]** 205/4 205/5
**contact [7]** 41/10 53/15 54/9 56/3 83/18 95/6 95/7
**contacted [4]** 56/5 58/12 97/12 98/1
**contacting [3]** 55/1 97/25 177/25
**contacts [2]** 38/20 40/16
**contains [1]** 211/14
**contempt [4]** 93/16 101/10 102/7 148/4
**contends [1]** 141/2

**contentions [1]** 186/24
**context [6]** 48/5 64/20 77/23 93/5 126/23 126/24
**continuation [1]** 148/25
**continue [8]** 80/12 83/5 157/17 170/11 194/13 195/16 196/9 207/1
**continued [4]** 47/7 47/10 73/17 74/7
**continues [2]** 57/18 80/25
**continuing [2]** 19/10 194/7
**contract [6]** 92/7 92/9 121/1 122/22 122/24 123/18
**contracting [3]** 108/22 114/25 168/19
**contractor [3]** 119/20 123/11 168/19
**contracts [19]** 43/21 44/6 76/5 76/5 92/11 107/13 115/14 116/11 116/15 117/8 117/14 117/16 117/18 117/19 117/14 119/15 123/19 168/20 168/21
**contradicted [2]** 189/1 189/8
**contrary [3]** 173/14 189/3 189/17
**contribution [1]** 111/23
**contributor [1]** 110/22
**control [5]** 55/4 78/5 112/21 120/24 209/25
**controlling [1]** 46/15
**conversation [2]** 72/1 72/5
**convertible [1]** 26/20
**conviction [1]** 196/22
**convince [1]** 206/14
**convincing [6]** 189/15 196/15 196/21 196/24 197/23 214/4
**convoluted [1]** 43/17
**cook [1]** 176/24
**cookie [3]** 30/6 30/13 30/14
**cookie-cutter [3]** 30/6 30/13 30/14
**cool [1]** 109/23
**coordinated [1]** 11/6
**copied [1]** 140/7
**copies [1]** 184/4
**copy [3]** 140/23 185/17 185/18
**corporation [1]** 192/9
**correct [51]** 20/23 31/23 36/14 40/24 42/5 42/7 42/20 48/4 49/6 67/15 71/9 74/19 74/21 75/4 78/20 79/21 86/20 88/20 97/15 100/9 129/24 133/7 133/13 133/14 136/3 136/10 136/22 136/25 137/2 137/9 137/10 137/15 137/16 138/6 138/7 138/10 138/12 138/14 138/23 139/2 139/8 139/22 148/2 150/23 151/13 152/3 175/8 180/4 183/22 217/9 218/4
**correctly [21]** 132/9 149/23 150/3 150/11 150/17 151/5 151/10 151/18 151/21 151/25 152/12 153/10 154/5 212/24 214/16 214/20 214/24 215/1 215/5 215/8 215/12
**corroboration [1]** 121/22
**corrupt [11]** 120/13 162/23 162/24 173/17 173/18 173/18 174/8 174/20 177/3 182/1 192/25
**corruption [2]** 162/23 173/19
**cost [2]** 68/8 74/24
**costs [2]** 153/15 193/16
**could [50]** 24/14 29/3 29/18 30/4 30/4 30/8 30/9 31/18 33/13 33/13 33/23 36/16 37/12 39/22 40/8 49/22 52/12 52/23 55/6 62/22 70/15 73/22 87/12 96/5 107/16 108/8 113/12 113/15

**could... [22]** 116/14 121/15 130/20
131/17 132/1 132/2 133/20 140/25
141/21 150/15 157/23 166/5 171/7
172/15 173/24 173/24 174/7 177/2
199/5 206/14 212/10 212/11
**couldn't [3]** 55/6 110/19 174/22
**council [1]** 162/24
**counsel [10]** 56/12 95/17 105/1
105/18 109/12 110/25 140/8 156/4
159/6 161/8
**counseling [2]** 170/24 171/1
**count [3]** 125/6 205/2 217/8
**counted [1]** 189/13
**counter [1]** 167/15
**counterterrorism [1]** 163/4
**counting [1]** 189/11
**country [3]** 16/23 31/12 110/21
**County [3]** 165/17 180/16 205/19
**couple [8]** 23/2 36/25 74/13 77/17
83/8 117/17 117/17 121/9
**course [4]** 100/16 124/17 131/2 176/9
**court [56]** 1/1 1/9 1/19 7/21 7/23 7/24
8/1 10/20 11/10 21/11 23/1 28/13
35/11 51/2 53/2 53/4 77/21 78/3 90/25
108/20 133/1 142/10 143/9 157/5
164/25 180/17 182/23 183/25 184/12
184/16 185/13 191/9 191/12 192/4
192/10 192/18 192/23 194/14 198/13
199/15 200/4 201/21 205/16 208/25
211/1 211/14 211/25 212/8 212/14
213/5 215/15 215/17 216/11 217/5
218/7 218/13
**Court's [5]** 2/13 11/11 83/18 134/18
198/16
**courtroom [12]** 23/4 83/14 84/13
99/25 147/4 148/23 157/5 184/7 185/9
191/25 212/4 216/9
**courts [1]** 158/12
**cover [1]** 146/15
**coverage [1]** 123/9
**covered [1]** 124/2
**covert [1]** 170/2
**crapping [1]** 207/8
**crazy [2]** 206/14 207/10
**create [1]** 32/22
**created [4]** 29/15 31/22 162/10 163/2
**creating [1]** 164/16
**creative [1]** 26/21
**credentials [1]** 170/8
**credibility [10]** 37/15 39/4 39/4 52/15
52/18 175/12 188/20 189/5 193/10
195/17
**credible [12]** 44/14 44/15 44/21 45/1
63/23 106/21 170/16 175/25 176/3
187/4 187/11 189/2
**credit [6]** 4/21 28/12 28/14 29/9 49/2
49/4
**crime [5]** 11/13 144/9 162/11 162/15
205/6
**criminal [7]** 57/4 167/10 168/11 174/1
174/22 180/16 195/13
**Cristo [1]** 205/3
**critic [1]** 143/15
**critical [8]** 8/14 8/15 66/17 66/21 67/8
67/12 67/21 112/13
**cross [14]** 2/6 3/7 11/21 54/14 83/19

83/23 84/10 84/18 85/2 94/2 127/5
127/7 155/19 172/9
**cross-examination [8]** 83/19 84/10
84/18 85/2 94/2 127/7 155/19 172/9
**Cruz [1]** 86/19
**CS [4]** 28/17 28/21 28/22 30/10
**CSFB [2]** 28/15 29/2
**CSR [5]** 1/19 218/3 218/11 218/12
218/16
**cuddly [1]** 161/5
**culpability [1]** 197/16
**cultivating [1]** 12/4
**culture [1]** 123/7
**curious [2]** 140/17 140/18
**current [2]** 117/13 142/24
**currently [6]** 70/1 80/7 155/25 159/5
159/10 178/24
**customer [1]** 112/23
**customers [3]** 24/15 31/11 31/12
**customized [1]** 30/11
**Cutlass [1]** 24/24
**cutter [3]** 30/6 30/13 30/14
**cutting [2]** 24/12 24/18
**CV [5]** 1/4 84/15 184/11 185/11 212/6

**D**

**D.C [5]** 26/7 74/3 74/4 74/9 74/12
**dad [2]** 23/22 24/23
**dagger [1]** 44/18
**daily [1]** 30/21
**Dallas [3]** 1/14 85/25 162/8
**damage [15]** 11/17 12/22 12/23 14/7
35/21 55/4 55/18 71/17 75/5 107/16
126/21 193/12 193/16 193/22 195/9
**damaged [9]** 23/7 23/7 23/8 23/8
69/12 96/20 151/23 153/11 153/13
**damages [92]** 8/19 13/11 14/9 14/9
18/25 64/19 64/23 64/25 65/4 65/5
68/9 69/8 70/25 73/21 75/20 93/9
93/23 94/7 94/9 95/21 95/23 96/1
96/16 100/2 100/16 102/23 136/10
136/18 137/11 147/10 151/15 151/23
152/11 153/12 153/19 154/4 157/22
180/19 187/8 187/15 189/21 192/12
192/15 192/20 193/1 193/7 193/13
193/18 193/23 194/1 194/8 194/20
194/21 194/21 194/21 195/2 195/8
195/11 195/18 195/23 196/2 196/5
196/10 196/11 196/11 196/15 197/12
197/24 198/5 200/11 200/22 200/23
200/24 201/6 201/7 201/13 202/6
202/7 202/9 202/10 202/16 202/24
203/4 203/10 203/11 203/12 213/7
213/15 213/24 214/5 214/9 217/7
**damages-type [1]** 18/25
**damaging [2]** 35/22 106/22
**dangerous [2]** 70/10 118/4
**data [1]** 143/25
**date [3]** 61/15 139/4 139/5
**dated [1]** 214/12
**daughter [6]** 16/7 18/3 95/7 158/16
205/23 206/17
**daughters [12]** 13/21 22/16 34/11
34/17 34/21 41/14 59/13 75/21 76/10
76/14 76/15 202/15
**day [13]** 15/11 30/22 30/23 47/12
51/17 62/11 160/16 166/21 179/18

181/9 199/14 219/25 218/9
**days [2]** 83/8 177/16
**dead [1]** 89/5
**deadlines [1]** 20/2
**deal [9]** 15/16 60/5 75/11 111/17
112/22 113/2 157/14 177/3 207/10
**dealing [3]** 76/3 110/2 132/10
**deals [5]** 33/10 33/11 71/4 94/19
194/14
**dealt [1]** 175/18
**death [1]** 12/20
**decade [1]** 12/24
**decades [2]** 108/25 168/2
**December [1]** 25/4
**decently [1]** 41/9
**deception [1]** 117/10
**decide [12]** 20/14 24/8 25/25 61/16
73/21 79/8 81/16 122/20 189/11
190/14 202/10 202/17
**decided [8]** 11/10 11/11 26/2 29/2
46/4 56/9 99/18 174/6
**decides [2]** 58/5 76/21
**deciding [1]** 190/16
**decimal [1]** 74/25
**decision [7]** 99/22 101/21 122/15
157/7 208/13 209/7 211/6
**decisions [4]** 26/24 28/6 65/25 129/10
**deck [1]** 106/25
**decorations [1]** 163/23
**decrease [1]** 193/6
**decreased [1]** 193/11
**deductions [1]** 188/16
**deemed [1]** 166/24
**deeper [1]** 52/25
**def [1]** 80/17
**defamation [17]** 11/12 13/13 75/19
77/18 94/5 134/19 152/17 157/19
194/14 194/14 194/16 194/20 194/23
195/6 202/11 203/23 213/21
**defamatory [7]** 36/12 119/7 134/12
194/19 195/16 196/6 213/25
**defame [1]** 180/21
**defamed [4]** 11/9 22/23 130/7 200/7
**defend [1]** 153/14
**defendant [16]** 1/16 11/3 19/16 19/18
19/23 85/3 135/12 149/3 153/22 154/2
155/20 172/10 180/21 184/1 196/13
203/15
**defendant's [1]** 151/15
**defense [17]** 12/19 30/24 31/6 31/25
31/25 32/4 32/20 32/21 42/4 43/21
61/9 70/9 70/10 70/12 76/5 76/5 102/7
**defenses [1]** 147/23
**defined [1]** 112/19
**defines [1]** 168/18
**definitely [3]** 126/15 132/4 145/11
**defraud [1]** 168/8
**defrauding [1]** 56/22
**degree [4]** 187/3 196/22 197/7 197/16
**delegated [1]** 116/12
**deleted [3]** 80/19 80/20 80/21
**Deli [1]** 82/19
**deliberate [5]** 20/10 191/7 198/19
200/19 211/21
**deliberately [2]** 11/15 121/19
**deliberation [1]** 192/9
**deliberations [10]** 96/14 122/13

**deliberations... [8]** 191/10 191/11 198/24 200/2 209/25 211/18 212/8 216/3
**delicious [1]** 15/20
**deliver [1]** 203/6
**delivered [1]** 124/15
**Delta [3]** 163/12 163/13 163/14
**demanded [2]** 11/3 22/20
**demanding [2]** 27/7 112/3
**demands [3]** 46/21 56/6 58/1
**demeanor [1]** 188/22
**demonstrate [2]** 18/15 126/8
**demonstrates [1]** 13/9
**Demonstrative [11]** 8/3 8/5 8/6 8/8 8/18 8/20 8/21 8/23 8/24 9/1 9/11
**denier [2]** 63/10 151/1
**Dennis [7]** 2/10 3/9 7/4 160/1 161/9 161/14 164/21
**Denshaw [1]** 161/15
**denying [1]** 152/8
**Department [6]** 43/21 105/19 109/10 111/25 146/4 166/17
**depend [1]** 188/10
**depending [1]** 185/22
**depends [1]** 177/13
**deputy [1]** 113/15
**deranged [1]** 78/12
**DeSantis [1]** 86/22
**describe [5]** 45/16 54/17 66/1 151/2 168/13
**described [1]** 153/23
**describes [4]** 129/23 167/10 167/13 167/14
**DESCRIPTION [1]** 4/2
**deserves [1]** 189/5 203/25
**designed [2]** 11/13 14/9
**desire [1]** 65/21
**desired [1]** 70/12
**desires [1]** 65/23
**Despite [2]** 56/8 169/1
**destroy [6]** 11/15 52/15 52/17 59/15 81/15 82/7
**destroyed [1]** 50/20
**destroying [2]** 16/12 204/3
**detachment [1]** 163/14
**detail [6]** 26/17 32/1 43/23 108/19 136/5 188/11
**details [2]** 12/13 122/15
**Detainee [1]** 163/19
**deter [4]** 14/11 125/19 196/13 203/17
**determination [1]** 130/9
**determine [5]** 175/24 176/2 188/19 193/1 194/16
**determined [1]** 18/24
**determines [1]** 168/18
**determining [3]** 187/15 187/21 197/12
**deterrence [1]** 210/22
**detrimental [1]** 121/16
**devastating [5]** 35/10 52/16 54/11 76/23 81/13
**developed [2]** 29/9 162/8
**developer [1]** 89/20
**developers [1]** 89/16
**developing [3]** 128/8 164/12 164/21
**development [1]** 73/5
**DEVGRU [1]** 163/13

**DHS [5]** 1/1/21 12/6 113/5 113/16 114/18
**DHS's [1]** 114/18
**dialogue [1]** 45/7
**did [189]** 11/4 11/24 12/9 23/17 24/3 24/4 24/8 24/12 24/19 24/21 25/1 25/25 25/25 26/6 26/21 27/3 27/8 27/22 27/23 28/15 28/21 34/21 35/23 39/18 40/1 40/3 40/7 40/11 40/15 40/15 40/18 40/20 41/11 41/12 41/15 41/17 44/9 45/2 46/2 46/9 46/14 46/18 47/3 47/23 49/11 50/8 51/13 51/13 51/15 55/4 57/5 57/8 57/16 57/17 58/10 58/15 61/13 62/7 62/12 62/16 62/21 63/13 63/18 65/21 66/25 69/11 76/24 77/13 77/14 78/21 78/21 79/19 79/22 81/16 82/4 85/24 86/4 86/9 86/13 87/10 87/13 87/25 88/7 88/9 88/13 88/16 88/21 88/25 89/2 89/10 89/13 89/16 89/23 90/2 91/23 92/1 95/6 95/14 95/15 99/23 99/25 100/8 104/21 106/2 106/4 109/9 110/10 110/12 112/12 112/21 114/2 124/3 130/17 130/23 131/21 134/18 134/20 136/16 139/16 143/5 143/8 144/17 144/18 144/22 144/22 144/23 145/2 145/23 145/23 146/8 149/10 149/25 150/17 150/18 150/23 150/24 151/5 151/6 151/18 151/19 151/25 152/1 152/4 154/5 154/6 155/24 157/8 158/11 158/14 158/23 162/19 164/15 166/11 167/11 167/12 167/12 167/17 168/10 168/12 170/19 173/2 176/4 176/16 176/19 176/21 178/4 178/6 180/6 180/25 181/6 187/25 194/2 194/8 197/22 201/13 205/18 209/25 212/13 213/8 213/16 214/3 214/16 214/20 214/23 215/1 215/5 215/8 215/11 217/4
**didn't [53]** 12/1 12/8 12/16 23/3 25/21 38/19 39/20 41/3 45/3 45/4 46/7 52/6 54/4 57/13 76/20 92/22 94/21 95/8 98/17 99/6 99/6 114/9 115/19 117/23 122/22 122/23 130/21 139/23 141/24 158/2 173/3 176/2 176/3 176/18 176/19 177/6 177/22 177/22 178/1 178/2 178/4 178/13 185/24 200/12 200/13 200/13 201/3 206/9 210/1 210/4 210/10 210/11 210/12
**differ [1]** 190/24
**difference [1]** 70/23
**different [22]** 23/21 28/20 30/5 30/5 30/5 30/17 35/7 36/6 37/23 46/1 46/9 57/1 67/8 70/6 92/2 92/22 121/9 136/10 143/20 146/7 177/9 188/1
**differently [1]** 195/5
**difficult [1]** 130/12
**difficulties [1]** 165/19
**digital [2]** 73/10 150/20
**dignity [1]** 195/14
**diligence [1]** 124/7
**dilution [1]** 142/17
**diminished [2]** 193/15 194/25
**dinner [2]** 41/14 85/25
**dinners [2]** 176/21 176/22
**Dire [2]** 2/6 3/7
**direct [18]** 2/6 3/7 11/25 22/10 79/19

21/5 84/17 105/4 135/20 149/2 161/11 167/24 189/8 189/22 190/1 190/3 194/22 200/16
**directed [2]** 166/10 191/18
**directing [1]** 167/21
**direction [1]** 109/12
**directly [1]** 11/22 22/4 25/18 26/16 26/22 30/11 52/8 56/8 58/5 121/18 162/13
**director's [1]** 164/5
**directors [1]** 128/22
**directs [1]** 81/4
**dirty [5]** 12/15 60/24 78/10 120/2 121/12
**disagree [1]** 97/20
**disagreements [1]** 49/11
**disappeared [1]** 13/12
**disaster [2]** 111/8 112/8
**disasters [1]** 112/8
**discharged [1]** 191/17
**disclose [2]** 191/18 192/1
**discovered [1]** 118/22
**discovery [3]** 52/13 53/9 80/7
**discretionary [2]** 27/12 28/3
**discrimination [2]** 123/13 123/14
**discuss [4]** 56/8 108/25 109/4 215/21
**Discussion [1]** 217/5
**disgusting [1]** 59/13
**disheveled [1]** 74/5
**disliking [1]** 98/24
**dismissed [5]** 58/8 58/13 79/17 95/20 147/2
**disorder [1]** 179/23
**dispute [6]** 63/7 137/21 139/1 139/3 143/19 158/19
**disputed [2]** 42/12 42/14
**disputes [1]** 49/12
**disqualifying [2]** 53/16 54/16
**disregard [2]** 151/17 154/1
**disseminating [2]** 179/16 179/19
**distinction [1]** 190/1
**distorting [1]** 117/4
**distress [1]** 195/10
**DISTRICT [5]** 1/1 1/2 1/9 23/19 218/13
**disturbing [1]** 44/25
**diverge [1]** 151/4
**division [5]** 1/3 129/15 165/18 191/19 218/14
**divorce [3]** 16/9 16/19 133/1
**DLA [1]** 1/12
**do [254]**
**document [9]** 137/1 137/3 137/4 137/5 137/6 138/12 139/5 139/16 144/13
**documented [1]** 171/1
**documents [2]** 110/15 187/14
**DOD [3]** 44/6 61/22 92/4
**does [50]** 13/8 15/23 17/16 23/5 29/25 30/15 33/2 33/10 39/3 56/10 58/6 58/7 59/2 60/11 62/9 64/12 69/7 71/1 75/3 75/5 82/23 98/10 100/13 101/24 109/13 111/1 113/10 113/11 118/12 118/13 122/2 122/23 124/16 130/14 130/15 132/15 132/18 145/17 168/20 168/21 168/25 169/5 169/14 173/22 173/23 176/12 177/11 188/4 195/3 206/23

**D**

**doesn't [17]** 13/5 61/18 66/6 71/13 72/13 72/14 73/7 75/15 75/16 102/13 103/25 112/20 126/5 169/25 171/5 175/6 207/15

**doing [40]** 10/6 25/17 26/18 45/16 45/17 47/6 54/23 61/8 61/9 61/10 61/20 61/25 62/2 63/18 64/11 65/22 69/25 72/3 73/7 80/14 81/19 92/23 94/1 94/21 94/23 97/8 101/16 105/23 109/18 113/16 128/17 128/19 129/18 130/2 131/15 131/25 132/16 137/7 166/11 205/19

**dollar [8]** 13/5 66/16 68/7 194/6 194/11 195/20 196/7 198/6

**dollars [13]** 66/3 72/17 138/16 152/11 192/20 194/5 194/11 196/7 198/6 213/11 213/18 214/1 214/10

**domain [2]** 165/15 165/24

**domestic [4]** 129/13 129/18 166/20 167/9

**Dominocielo [1]** 94/20

**don't [134]** 12/12 16/13 16/18 17/1 18/18 19/2 20/14 26/13 29/6 29/12 29/19 31/13 31/13 33/19 33/23 37/4 37/5 38/4 38/5 44/5 44/5 44/6 46/8 48/18 49/15 50/4 50/21 50/21 51/8 52/3 52/3 52/23 52/23 54/21 57/2 59/22 63/22 66/4 68/25 69/6 69/10 72/10 74/14 74/25 75/9 75/11 75/11 83/20 85/9 85/15 86/2 86/2 86/12 86/12 86/25 87/3 87/12 87/16 90/22 91/10 92/11 92/16 92/16 93/1 93/1 93/2 93/2 96/13 97/1 100/3 100/4 100/17 100/24 100/24 102/11 103/20 107/18 107/19 109/15 111/4 112/24 116/17 119/23 121/22 122/2 122/24 124/11 124/11 125/7 130/17 133/8 134/16 136/21 136/25 139/1 139/3 139/22 140/10 140/14 141/4 141/21 141/23 142/20 143/12 145/13 146/17 147/5 155/5 159/8 171/25 174/1 174/2 175/13 176/6 176/14 176/24 181/24 182/2 182/18 183/12 184/21 185/17 204/7 205/12 206/4 206/5 206/23 207/14 209/5 209/19 210/20 210/20 210/21 211/1

**Donald [3]** 86/21 89/10 89/13

**done [33]** 38/22 52/6 55/18 59/16 60/11 63/6 63/8 63/11 63/12 64/6 75/6 77/5 77/11 79/10 79/12 81/19 81/24 91/16 94/17 105/20 117/8 130/1 133/8 143/2 143/22 153/25 167/25 174/21 181/9 183/11 183/14 183/18 200/9

**donor [1]** 94/16

**door [2]** 30/12 85/5

**dorm [1]** 203/24

**dossier [1]** 66/11

**doubt [6]** 57/3 115/15 129/1 131/24 179/25 197/1

**doubts [1]** 154/2

**Doug [1]** 49/10

**down [35]** 11/1 13/18 14/2 14/13 15/10 24/5 36/25 44/7 44/8 56/19 71/4 71/22 76/22 80/22 98/10 101/14 119/9 136/17 139/19 141/16 142/18 153/18 159/18 160/3 173/2 173/3 173/6 173/9 173/11 173/12 173/13 208/10 211/19 212/23 215/25

**downgrade [1]** 171/2

**downloading [1]** 179/19

**downtown [1]** 29/6

**dozen [1]** 205/3

**draft [3]** 143/5 143/8 184/16

**drafted [2]** 55/7 55/14

**dramatic [1]** 65/19

**dramatically [3]** 65/17 67/3 160/3

**draw [4]** 52/25 137/23 188/13 188/17

**drawn [1]** 189/9

**drink [3]** 15/24 206/5 206/5

**drive [5]** 1/16 24/14 24/14 200/2 201/11

**driven [1]** 200/5

**driving [1]** 216/7

**drop [7]** 67/20 68/24 70/2 70/4 70/16 70/16 70/24

**drop-off [2]** 67/20 68/24

**dropped [3]** 67/2 68/6 199/19

**drove [2]** 206/7 207/10

**drug [6]** 78/11 162/9 162/11 162/15 162/16 173/6

**drunk [2]** 59/24 78/8

**drunken [2]** 15/23 205/25

**dude [1]** 181/10

**due [6]** 124/17 136/18 147/24 153/13 183/24 193/11

**Dulles [1]** 146/19

**duly [4]** 22/9 105/3 135/19 161/10

**duration [1]** 150/22

**during [14]** 20/13 30/22 37/2 37/2 67/3 67/16 81/22 165/19 185/12 186/15 188/2 190/23 191/11 191/12

**duty [1]** 186/12

**dynamic [1]** 32/8

**E**

**E-Mail [2]** 1/21 218/19

**E-Systems [1]** 15/10

**each [7]** 16/25 174/10 186/25 189/4 191/5 192/12 212/23

**earlier [9]** 35/11 55/24 56/1 101/8 114/6 120/8 129/21 144/1 172/25

**early [12]** 12/19 25/3 30/24 32/5 32/17 32/18 33/3 41/24 45/10 61/9 109/9 124/19

**earn [1]** 33/10

**earned [17]** 13/9 37/18 38/6 65/3 65/8 65/16 66/16 67/22 68/13 68/20 74/23 136/12 136/15 137/12 193/9 194/25 201/1

**earning [1]** 195/1

**easier [2]** 19/6 126/23

**easiest [1]** 134/11

**easily [2]** 38/16 38/25

**Eastland [1]** 23/15

**easy [1]** 211/6

**economic [9]** 12/22 64/25 136/10 193/12 194/22 195/6 200/23 201/7 202/7

**economic-related [1]** 193/12

**economy [3]** 70/6 70/7 70/7

**Edgar [1]** 171/20

**Education [1]** 109/10

**effect [5]** 38/8 83/6 96/23 107/15

**effectively [2]** 16/24 39/6

**efficiently [1]** 20/3

**effort [2]** 76/23 122/8

**efforts [4]** 56/8 112/14 156/1 156/1

**EFTs [1]** 33/16

**Egg [1]** 164/3

**egregious [3]** 14/10 112/18 204/4

**eight [3]** 29/2 33/13 115/10

**either [5]** 88/21 117/13 137/13 176/18 191/24

**elaborate [1]** 120/23

**Elaine [5]** 34/13 48/19 49/24 50/5 50/6

**elapsed [2]** 74/11 78/24

**Elec [1]** 103/18

**elected [1]** 165/23

**election [2]** 16/25 89/13

**electronically [1]** 86/7

**elementary [1]** 23/22

**eligible [2]** 92/7 92/8

**Elon [4]** 87/25 88/7 143/16 176/11

**else [11]** 16/7 46/7 69/7 75/14 83/9 83/15 102/1 122/12 169/16 211/23 211/25

**elsewhere [1]** 38/17

**email [74]** 5/3 5/4 5/6 5/8 5/10 6/21 6/23 7/6 8/9 8/11 8/12 14/1 39/11 48/2 48/5 48/7 48/13 48/16 48/17 49/14 50/1 50/12 50/24 51/17 51/19 51/21 51/25 52/5 52/7 52/8 53/20 53/21 54/8 54/9 54/15 54/18 55/5 55/7 55/9 55/12 55/14 55/23 56/1 56/18 57/18 58/12 72/19 77/14 77/15 78/4 78/25 79/19 79/22 95/8 95/9 95/12 139/20 140/1 140/6 140/15 140/16 140/22 141/3 143/1 143/5 143/6 143/8 144/12 144/19 157/24 158/1 158/8 210/3 210/6

**Email/Letter [1]** 7/6

**emails [3]** 47/9 51/19 52/9

**embarrassed [1]** 15/21

**emotional [2]** 195/10 195/17

**emphasize [1]** 44/22

**emphasizes [1]** 12/19

**employed [1]** 165/20

**employee [2]** 167/4 168/16

**employees [3]** 26/15 32/6 71/12

**employment [1]** 165/20

**encourage [1]** 117/15

**end [8]** 11/23 30/23 83/11 111/11 113/22 127/15 133/12 146/24

**ended [6]** 24/14 41/25 110/19 113/23 114/4 114/12

**enforcement [20]** 42/1 45/4 45/5 47/16 51/1 51/3 53/17 55/1 64/8 130/21 130/23 145/5 145/25 156/7 160/2 161/17 162/15 169/21 176/11 177/12

**engage [5]** 62/16 123/13 123/20 126/7 210/12

**engaged [3]** 11/9 119/11 156/21

**engaging [3]** 167/10 196/14 203/18

**engineer [1]** 15/10

**enjoys [1]** 77/5

**enmeshed [1]** 132/24

**enormous [2]** 23/6 75/20

**enough [13]** 29/3 64/18 112/24

**E**

**enough... [10]** 118/20 125/6 126/7 132/6 134/23 147/10 155/7 176/15 183/18 206/13

**ensured [2]** 175/22

**entered [2]** 11/11 144/1

**entering [2]** 216/13 216/25

**enters [4]** 84/13 148/23 185/9 212/4

**enthusiasm [1]** 125/21

**entilted [2]** 194/3 194/9

**entire [4]** 20/14 123/18 164/16 171/23

**entirely [1]** 136/8 206/6

**entities [1]** 167/22

**entitled [9]** 121/5 191/24 197/24 201/14 210/22 213/9 213/17 214/4 218/5

**entity [3]** 166/17 168/8 169/24

**entry [1]** 134/18

**Epstein [1]** 64/15

**equal [1]** 192/10

**equals [1]** 192/10

**equation [1]** 176/1

**equipment [2]** 24/22 113/1

**equity [1]** 80/7

**era [2]** 123/6 172/14

**error [1]** 144/22

**escalate [2]** 48/18 50/4 57/18

**escalated [1]** 57/7

**escalating [2]** 11/20 12/2

**especially [3]** 112/13 117/7 124/2

**essentially [3]** 106/23 116/1 179/17

**establish [4]** 157/21 187/9 197/23 214/3

**established [2]** 188/17 201/21

**estimates [1]** 73/4

**et [10]** 1/4 84/15 104/2 114/22 116/13 116/13 148/18 148/19 184/10 212/6

**ETF [19]** 30/18 31/9 31/20 38/11 38/12 38/13 80/4 86/5 86/6 86/7 86/11 88/21 89/17 100/14 100/15 100/20 100/22 100/25 101/2

**ETFs [2]** 31/21 91/12

**ethnicity [1]** 89/22

**evaluate [1]** 195/11

**evaluated [3]** 127/18 129/21 133/5

**evaluating [1]** 108/8

**evaluation [2]** 133/8 168/10

**Evans [1]** 96/2

**Eve [1]** 161/2

**even [29]** 19/7 30/3 32/12 40/12 57/7 58/17 63/9 70/12 73/22 82/21 85/5 101/16 104/6 106/22 108/10 108/14 112/24 115/18 118/14 121/22 130/4 130/19 150/16 164/10 170/2 189/6 189/16 191/19 200/13

**events [4]** 57/5 98/25 99/4 119/12

**eventually [5]** 27/15 28/10 28/24 163/16 171/9

**ever [21]** 38/8 41/11 59/20 59/22 59/24 64/12 66/6 70/10 77/13 88/10 90/6 90/7 90/9 90/15 92/24 93/5 129/3 160/14 176/4 176/16 176/21

**every [9]** 62/12 72/12 117/25 164/1 166/24 193/21 207/5 208/6 212/23

**everybody [8]** 17/17 79/23 82/23 102/1 121/1 121/7 124/8 146/14

**everybody's [1]** 147/14

**everyone [5]** 148/12 160/7 198/18

**everyone's [2]** 203/9 209/22

**everything [7]** 10/7 13/4 27/15 38/21 66/12 124/13 167/7

**everywhere [1]** 131/21

**evidence [85]** 11/19 12/1 17/13 17/16 18/23 19/13 19/19 19/19 19/20 20/4 20/7 20/8 20/15 21/5 136/25 137/14 141/14 148/7 186/10 186/21 186/23 187/3 187/4 187/5 187/5 187/9 187/10 187/12 187/13 187/14 187/16 187/19 187/22 187/24 188/12 188/18 189/2 189/8 189/9 189/15 189/18 189/20 189/22 189/23 190/2 190/3 190/18 190/20 191/1 191/3 191/9 194/2 194/9 195/3 195/7 195/19 195/19 196/16 196/21 196/24 196/25 197/13 197/23 200/3 200/5 200/6 200/11 200/13 200/15 201/5 201/10 201/11 201/14 202/1 209/24 210/1 210/7 211/1 211/2 211/2 211/4 211/11 213/8 213/17 214/4

**evidently [2]** 49/13 55/25

**evolution [2]** 28/25 43/11

**evolving [1]** 27/24

**ex [3]** 95/6 158/16 206/17

**ex-wife [3]** 95/6 158/16 206/17

**exact [2]** 67/16 100/24

**exactly [4]** 42/7 58/16 62/21 74/14

**exaggerated [1]** 15/3

**examination [15]** 22/10 83/19 84/10 84/17 84/18 85/2 94/2 105/4 127/7 134/1 135/20 149/3 155/19 161/11 172/9

**example [10]** 37/3 37/17 42/8 66/20 71/24 96/2 168/5 171/5 171/6 195/15

**exceeding [1]** 153/16

**excellent [2]** 27/7 104/14

**excess [1]** 151/24

**exchange [5]** 30/18 30/21 31/7 31/9 176/18

**exchange-traded [3]** 30/18 31/7 31/9

**exchanged [1]** 72/6

**excuse [9]** 60/2 69/21 70/24 80/16 86/7 108/25 129/14 131/20 142/16

**excused [11]** 101/24 103/9 103/9 103/12 135/1 135/4 159/20 182/7 212/7 215/21 216/2

**executive [3]** 163/20 164/1 166/2

**exemplary [5]** 151/15 171/4 196/10 196/11 196/15 197/12 197/24 198/5 203/11 214/5 214/9

**exhausting [1]** 157/14

**exhibit [27]** 4/2 34/6 36/16 48/1 51/22 55/10 57/23 58/9 60/2 60/15 66/19 67/10 67/13 69/14 72/18 77/15 79/25 138/21 139/19 149/6 149/7 151/11 152/15 152/21 158/5 190/5 190/6

**exhibits [11]** 4/1 20/20 20/21 20/23 21/1 21/5 21/8 21/14 187/19 188/14 191/9

**exist [6]** 12/6 33/25 98/4 178/4 178/5 178/6

**existed [2]** 178/3 178/11

**existence [1]** 189/24

**exit [1]** 216/6

**expand [1]** 111/24

**expect [1]** 191/9

**expenses [3]** 7/11 72 193/11 195/1

**expensive [1]** 73/9

**experience [13]** 29/3 110/1 132/21 132/23 147/12 168/2 169/14 173/23 175/3 181/25 188/15 190/11 207/25

**experienced [1]** 195/25

**expert [25]** 7/4 102/23 108/22 109/6 114/3 114/25 115/7 115/11 130/2 130/5 132/21 137/6 137/8 137/13 137/20 138/3 160/2 161/24 164/7 164/21 177/9 190/11 190/17 190/19 190/21

**expertise [7]** 13/4 13/7 115/1 128/17 129/3 132/7 165/1

**experts [1]** 138/1

**Expires [1]** 218/16

**explain [19]** 32/19 42/21 52/2 69/16 70/15 105/13 106/18 107/6 108/4 109/4 110/9 110/18 114/1 114/13 120/4 134/7 143/12 161/23 171/4

**explains [1]** 70/4

**exposure [1]** 194/25

**express [1]** 83/10

**extensively [1]** 161/21

**extent [3]** 23/9 71/16 197/19

**extort [3]** 22/20 76/7 168/7

**extortion [1]** 201/19

**extortionist [2]** 16/3 169/3

**extract [1]** 138/25

**extracurriculars [1]** 23/25

**extreme [2]** 147/23 197/7

**extremely [5]** 16/5 37/12 38/3 56/16 56/16

**eyes [2]** 12/12 68/2

**eyewitness [1]** 189/22

**F**

**F-I-S-A [1]** 163/5

**fabrications [1]** 79/17

**fabricator [1]** 63/4

**facial [1]** 41/23

**facing [2]** 178/25 180/13

**fact [21]** 15/6 15/24 58/11 64/14 78/11 87/14 96/20 98/13 98/18 116/17 118/9 121/21 132/9 136/5 145/12 151/22 167/14 180/18 187/24 188/11 189/16

**factor [1]** 203/11

**facts [14]** 18/15 18/17 53/9 124/19 130/12 131/8 186/14 186/17 186/25 188/17 189/25 190/2 211/5 211/6

**faculty [1]** 208/16

**fail [2]** 32/18 112/11

**failed [2]** 175/17 187/25

**failings [1]** 107/11

**failure [1]** 110/17

**faint [1]** 208/10

**fair [5]** 97/8 132/6 155/7 172/14 176/15

**fairly [5]** 132/23 194/17 196/4 202/5 213/23

**fairytale [1]** 207/14

**faith [2]** 81/12 96/1

**fake [1]** 141/2

**faking [1]** 117/20

**fall [1]** 194/20

**false [15]** 58/6 106/22 108/10 118/7

**F**

**false... [11]** 126/8 134/7 134/13 151/22 154/1 154/2 166/3 168/16 169/12 194/18 195/12
**falsehood [1]** 188/9
**falsely [2]** 77/9 187/23
**familiar [7]** 36/18 51/25 118/4 119/6 127/21 167/11 171/22
**familiarity [1]** 15/8
**families [1]** 29/12
**family [22]** 14/2 14/13 22/22 23/7 26/12 27/4 28/2 34/3 34/4 34/16 34/20 35/13 41/11 50/20 78/18 78/19 81/11 85/14 88/18 88/18 158/15 207/12
**fan [1]** 173/1
**fans [1]** 78/12
**fantastic [1]** 208/5
**far [9]** 66/9 73/16 83/20 93/9 118/1 130/3 160/18 177/12 204/3
**fashion [2]** 146/10 179/17
**fast [2]** 53/7 53/7
**fate [1]** 44/11
**father [2]** 13/21 87/15
**Faulkner [29]** 34/5 36/17 47/25 48/9 49/22 50/2 51/22 55/21 56/19 59/9 60/1 60/3 66/19 67/11 69/15 72/18 72/24 79/25 80/22 123/22 138/22 140/12 140/15 144/11 149/5 149/20 151/11 152/10 152/15
**favor [1]** 18/15
**favorable [1]** 18/23
**favorite [3]** 149/9 205/2 205/5
**FBI [38]** 88/14 118/23 131/16 143/19 145/7 146/4 146/10 161/22 162/4 162/6 163/2 163/25 164/10 164/19 165/8 165/10 165/16 165/18 165/20 165/21 165/21 165/25 166/1 166/16 169/23 170/12 172/1 173/17 174/8 174/20 176/6 177/3 177/11 179/20 180/2 181/21 181/24 182/2
**feather [2]** 211/3 211/3
**Federal [13]** 49/9 57/14 88/16 92/7 92/8 92/11 144/9 156/14 157/5 158/12 176/10 177/3 201/19
**federally [1]** 179/5
**fee [12]** 32/25 33/1 33/4 33/14 33/17 65/4 69/10 69/10 69/13 70/21 70/24 71/6
**feel [8]** 76/17 94/10 112/25 188/14 207/3 208/17 208/23 208/24
**feelings [3]** 147/20 165/24 188/22
**fees [14]** 29/21 29/22 33/7 33/19 56/25 65/5 65/5 71/3 153/15 216/12 216/13 216/17 216/24 218/6
**fell [4]** 13/13 13/15 65/17 65/17
**felonies [2]** 75/25 75/25
**felony [1]** 180/12
**felt [8]** 54/11 56/17 110/4 111/22 111/23 147/23 179/22 180/1
**female [1]** 53/17
**fencing [2]** 147/16 150/5
**few [11]** 11/1 19/15 27/5 41/13 70/13 71/25 82/4 147/12 170/1 183/3 207/1
**fiance [1]** 206/18
**fictitious [1]** 166/3
**field [4]** 129/4 133/4 165/17 190/11
**Fieldthorn [1]** 1/16

**fifth [2]** 15/18 17/25
**fight [4]** 15/1 56/25 81/17 82/11
**figure [4]** 66/16 71/19 131/18 200/14
**figures [2]** 64/13 209/3
**file [4]** 57/16 58/13 153/14 180/6
**filed [8]** 57/9 57/13 57/17 57/19 58/11 152/17 152/18 202/22
**files [2]** 58/8 181/21
**filing [1]** 58/13
**fill [1]** 191/15
**filth [2]** 202/15 204/1
**final [6]** 81/16 125/9 169/2 181/18 198/13 203/3
**finally [6]** 20/9 47/8 111/6 198/13 210/24 215/11
**finance [5]** 24/5 24/7 25/20 25/21 26/3
**financial [3]** 102/18 102/22 193/8
**find [11]** 54/10 78/12 122/16 122/19 130/17 144/6 158/8 170/15 187/1 190/2 196/15
**finding [4]** 124/5 147/9 157/18 189/21
**findings [4]** 123/24 130/12 182/22 183/20
**fine [11]** 70/7 84/2 134/23 160/8 178/14 182/21 182/21 202/7 206/11 206/21 209/3
**finish [2]** 39/10 171/25
**fire [2]** 11/14 11/16
**fired [1]** 171/8
**firm [19]** 17/6 22/20 26/14 27/10 28/11 29/10 29/15 29/21 30/7 34/2 37/13 37/15 71/11 72/22 91/15 91/18 106/21 161/15 196/22
**firms [5]** 30/7 71/18 91/17 156/17 156/18
**first [46]** 11/21 16/25 17/6 19/22 21/20 22/9 26/10 28/12 28/14 28/17 28/21 28/22 30/10 39/18 40/1 50/22 52/3 53/8 54/8 58/7 58/13 63/14 63/24 77/16 105/3 108/6 111/18 112/14 113/4 125/18 135/19 139/1 139/6 142/6 146/8 147/21 151/1 161/10 162/7 170/22 171/13 171/14 171/24 191/25 198/21 204/25
**FISA [1]** 163/5
**fishing [1]** 78/14
**fit [3]** 155/12 200/18 200/20
**fits [1]** 134/14
**five [7]** 109/1 113/19 114/6 123/7 178/25 180/13 208/18
**flags [1]** 55/2
**flexibility [2]** 28/21 30/4
**floor [2]** 203/24 207/8
**flourish [1]** 205/19
**Flow [1]** 91/19
**flows [1]** 38/13
**focus [12]** 31/24 32/2 45/12 48/6 50/1 55/11 64/23 65/13 77/16 120/1 149/21 200/1
**focusing [2]** 40/25 153/24
**folks [5]** 118/22 169/15 169/16 170/10 170/18
**follow [6]** 95/14 100/1 116/4 118/4 186/12 191/11
**follow-up [1]** 100/1
**followed [2]** 117/1 146/5
**followers [2]** 22/23 62/18 73/23 74/8

**following [5]** 14/5 74/6 101/25 196/17 197/13
**follows [4]** 22/9 105/3 135/19 161/10
**football [1]** 24/1
**force [3]** 162/16 163/12 189/15
**forced [1]** 180/21
**forces [2]** 163/13 163/13
**foregoing [2]** 218/4 218/5
**foreign [19]** 61/3 80/6 90/4 111/19 112/1 112/9 115/2 116/23 120/21 120/23 128/2 128/7 128/13 128/17 128/25 132/10 135/23 163/5 195/13
**foreign-influenced [1]** 128/25
**foreperson [7]** 191/10 191/15 198/11 198/23 212/9 213/3 214/12
**forever [4]** 66/5 75/7 125/25 125/25
**forget [2]** 123/6 188/6
**form [13]** 83/10 146/10 146/22 184/4 191/15 191/16 198/10 201/7 201/12 201/19 203/3 211/14 213/3
**formal [1]** 184/10
**formally [1]** 211/17
**format [1]** 218/6
**former [6]** 26/14 72/4 105/18 105/19 117/13 170/11
**FORT [28]** 1/3 1/5 1/20 7/12 12/25 15/18 22/14 23/14 23/18 25/11 28/24 29/6 31/13 34/15 34/18 34/22 35/3 38/20 41/12 43/4 60/24 72/22 88/19 89/3 208/11 208/17 218/14 218/17
**forth [2]** 93/3 204/1
**fortunate [1]** 26/11
**forward [6]** 19/9 46/25 47/19 118/4 120/17 198/25
**forwarded [1]** 140/7
**fought [2]** 208/3 210/11
**found [10]** 42/13 94/5 130/7 134/12 157/18 157/19 162/12 180/19 181/7 200/7
**foundation [2]** 21/15 164/18
**founded [1]** 30/1
**founders [6]** 32/6 32/10 42/13 53/17 80/5 85/22
**four [5]** 25/24 33/14 70/21 94/2 166/2
**Fox [6]** 13/2 36/4 37/22 92/12 92/16 102/19
**frame [4]** 139/17 142/4 143/3 144/1
**framework [1]** 120/6
**Francisco [2]** 46/13 86/18
**frankly [3]** 66/8 82/10 134/14
**fraud [7]** 80/4 117/25 196/18 197/2 197/2 197/22 201/19
**free [2]** 208/8 215/23
**French [4]** 111/9 111/11 111/15 111/16
**friend [5]** 72/1 72/1 72/9 87/18 179/1
**friends [2]** 37/20 75/13
**front [16]** 15/22 55/5 60/19 78/9 78/10 106/5 106/8 107/1 108/2 119/10 120/2 121/12 139/11 149/7 160/14 181/13
**fronting [1]** 120/18
**fronts [1]** 80/6
**Frost [1]** 25/14
**frustrating [1]** 71/23
**full [4]** 73/5 132/2 175/14 210/22
**fully [2]** 75/5 114/9 130/8

fun [3] 91/6 205/20 207/10
fund [4] 30/22 31/9 46/16 86/8
fundamental [1] 114/10
fundamentally [1] 124/6
funds [7] 30/18 30/19 31/7 57/2 69/23 193/11 194/24
further [9] 12/2 14/5 57/7 103/4 151/15 159/13 164/16 182/3 218/6
future [8] 33/2 44/3 55/3 61/23 61/23 196/1 196/14 203/18
FW's [1] 7/10

## G

Gabe [1] 94/19
gaining [1] 16/20
game [1] 150/5
gang [1] 162/10
gather [3] 109/18 216/5 217/3
gathering [2] 117/21 162/22
Gator [9] 42/23 42/25 43/3 43/6 43/7 43/7 43/14 44/1 44/14
gave [11] 10/13 73/3 83/5 94/9 96/13 96/22 188/2 202/22 210/5 212/22 215/22
Gawker [7] 9/15 155/21 155/22 155/25 202/22 203/20 203/22
gear [1] 112/15
gears [2] 62/24 75/17
general [21] 105/18 109/12 110/25 117/1 128/5 166/18 166/19 166/20 167/8 167/16 189/25 194/21 195/8 195/11 195/18 195/23 196/4 202/5 202/10 202/23 213/23
generally [2] 127/23 172/1
generate [1] 29/21
generic [1] 122/17
Genomic [3] 142/3 142/12 157/24
gentlemen [11] 10/23 14/17 19/12 82/14 103/20 146/21 186/7 192/21 199/12 211/10 215/19
genuinely [1] 208/23
George [3] 139/12 208/2 208/4
Georgetown [1] 26/7
Germany [1] 87/18
get [91] 10/3 10/7 10/8 15/11 18/11 18/20 19/4 19/5 19/12 19/20 20/2 20/19 24/8 25/9 25/10 26/2 26/13 29/18 29/19 29/25 31/1 32/23 33/19 37/20 38/4 44/6 44/7 48/9 48/21 51/17 52/12 53/13 54/7 55/5 55/5 59/24 60/7 61/16 62/18 68/1 70/19 72/13 73/20 73/20 81/7 81/7 88/6 92/11 97/21 100/13 106/17 107/12 113/12 116/15 117/16 117/19 118/25 121/8 122/22 122/23 124/2 124/24 126/3 126/6 130/11 133/1 147/7 147/13 147/17 148/11 148/17 154/18 155/15 171/8 174/22 176/16 177/9 178/20 183/17 185/6 186/6 199/16 204/15 206/20 207/15 207/19 207/23 209/9 209/23 210/10 211/24
gets [10] 13/8 63/7 74/25 87/21 95/24 124/8 157/2 159/3 185/21 203/5
getting [15] 42/15 49/5 52/9 52/10 76/2 76/4 76/5 78/8 81/10 107/13 110/21 113/1 175/3 175/4 177/15

ghosted [1] 72/13
giant [2] 29/15 206/2
gingerness [1] 15/12
girlfriend [1] 207/20
give [44] 10/17 16/2 17/18 19/16 26/17 37/16 46/14 47/11 49/17 57/23 71/24 82/16 83/7 92/7 92/8 93/10 96/4 97/3 97/8 102/8 109/21 146/22 154/17 155/15 157/15 165/10 183/3 186/6 186/12 187/21 189/4 191/22 198/20 199/3 200/14 204/23 205/1 205/9 207/6 209/16 210/21 210/23 212/25 216/22
given [10] 18/4 20/1 51/5 104/3 133/15 144/3 150/20 185/4 191/12 198/16
gives [2] 37/15 79/12
giving [5] 87/8 96/7 148/13 175/22 175/25
glad [3] 105/15 120/7 133/19
global [1] 207/16
Gmail [1] 48/14
go [140] 10/6 10/7 12/12 16/7 17/21 19/5 20/10 23/9 24/3 24/6 26/1 26/2 26/5 26/11 26/15 31/19 32/1 32/23 33/15 33/23 35/14 38/4 38/5 43/23 44/7 45/4 45/5 47/16 47/19 48/6 48/22 49/14 49/18 49/22 50/22 51/23 55/4 57/13 58/5 58/16 60/1 60/2 62/3 65/21 65/23 66/7 66/10 66/13 68/1 71/13 72/24 75/10 77/20 79/9 79/11 82/6 91/1 91/23 93/9 98/7 100/10 101/14 105/1 107/25 108/16 108/19 108/20 113/2 113/11 113/18 115/8 119/16 122/2 123/22 124/11 125/9 125/17 125/17 130/21 131/18 136/5 138/22 139/1 141/16 142/12 142/18 145/24 148/9 148/11 148/24 149/3 149/20 151/20 152/21 152/21 153/6 153/18 155/1 158/10 160/22 161/8 163/10 165/2 171/20 174/3 174/11 174/13 174/18 176/6 176/11 177/1 180/8 183/11 183/13 185/7 185/20 186/4 198/25 199/11 199/21 199/22 200/18 205/15 205/17 207/19 207/23 210/9 210/10 212/23 213/1 214/19 215/4 216/18 217/1
goal [3] 11/15 76/25 77/1
goats [1] 35/6
God [1] 109/23
goes [11] 24/17 37/13 37/13 58/5 59/2 59/4 63/8 71/11 71/15 86/25 177/12
going [182] 11/2 11/19 13/10 13/20 13/22 13/25 14/16 18/8 18/20 18/23 18/23 29/7 29/13 29/19 29/24 36/1 39/9 44/12 46/25 47/15 47/22 48/11 48/18 49/7 49/14 49/20 50/3 50/10 50/10 50/19 50/20 51/9 52/2 52/9 52/10 52/14 54/10 54/20 54/24 55/1 55/2 55/3 56/15 57/19 57/25 58/13 58/14 58/16 59/9 64/7 64/8 65/6 65/25 66/13 66/21 68/9 69/12 72/10 73/9 73/14 74/7 74/17 76/2 76/4 76/16 77/3 77/25 78/3 78/3 80/10 80/12 80/14 81/25 82/6 82/6 82/7 82/11 82/12 82/15 82/16 82/21 85/12

91/1 93/8 93/16 97/11 98/3 98/4 98/6 98/7 101/14 101/14 103/22 106/23 106/24 107/25 109/7 109/14 110/11 112/4 112/23 113/1 113/2 113/18 113/19 115/10 116/19 116/20 117/5 118/13 118/14 118/24 119/23 121/8 121/24 122/11 122/19 124/12 124/12 125/3 125/15 125/18 125/20 131/1 131/15 132/14 134/22 140/19 147/6 147/11 147/12 147/17 148/6 148/7 148/7 148/8 148/18 149/22 150/2 150/6 150/19 150/25 150/25 151/9 153/9 155/18 157/15 160/3 160/22 169/8 171/9 174/9 179/18 180/2 182/13 182/15 182/23 182/24 183/2 183/3 183/5 183/6 183/6 183/9 183/16 183/17 185/3 185/15 185/16 185/18 201/3 202/4 202/7 202/17 204/8 205/15 205/20 209/23 210/2 211/13 212/21
gone [7] 13/18 34/18 66/4 74/3 79/14 88/10 117/15
good [36] 17/2 22/12 25/7 25/21 27/13 42/8 48/20 50/5 54/23 61/1 81/11 82/24 82/25 85/16 94/11 96/1 103/21 105/6 109/8 110/16 111/12 127/3 129/8 133/20 145/2 146/15 153/14 160/21 171/6 172/23 176/25 177/11 180/11 205/8 208/20 216/7
good-faith [1] 96/1
good-grade [1] 25/21
google [4] 6/19 63/16 83/4 125/25
got [35] 12/9 23/13 24/23 26/10 26/22 32/9 42/19 46/8 59/13 64/18 77/10 81/1 95/8 95/9 95/20 105/16 111/21 116/13 144/13 147/21 153/4 153/11 163/24 163/24 164/3 164/4 173/25 199/25 202/20 202/20 204/14 207/20 208/25 210/4 210/6
Gotcha [1] 99/16
gotten [8] 24/23 78/5 85/7 90/7 111/7 122/16 128/13 185/12
governed [1] 208/14
governing [1] 115/2
government [60] 61/10 61/17 61/18 61/22 105/20 109/1 111/12 112/9 113/21 114/2 114/21 114/22 114/22 115/3 115/14 116/2 116/23 116/24 118/21 120/25 122/2 122/18 122/23 123/3 123/11 123/11 126/3 126/5 126/14 126/25 128/8 128/10 128/12 128/22 129/3 131/6 132/20 133/11 133/13 133/14 133/15 133/16 133/18 145/16 145/18 146/7 164/22 165/4 166/10 166/12 167/5 167/7 167/17 167/20 167/23 168/2 168/15 169/24 177/3 177/4
Government's [1] 122/10
grab [1] 82/24
grabbed [1] 59/20
grade [1] 25/21
graduate [2] 25/2 26/6
graduated [3] 25/3 25/3 26/8
grandfather [2] 15/9 133/17
grandson [1] 89/7
granted [1] 116/18
graphs [1] 35/11

**grass** [1] 24/18
**great** [12] 15/19 27/16 54/16 72/1 72/5 85/1 127/10 127/10 157/8 173/8 176/9 208/18
**greater** [4] 187/3 187/11 189/16 191/4
**greatest** [1] 205/13
**greatly** [1] 23/7
**greed** [1] 205/5
**greedy** [2] 205/9 206/19
**green** [3] 67/18 69/18 69/19
**Greenwill** [5] 42/24 43/7 44/14 206/1 206/3
**grew** [2] 34/22 38/20
**Grille** [1] 82/18
**gross** [3] 12/13 196/20 197/4
**ground** [2] 12/24 38/22
**grounded** [1] 195/7
**group** [6] 55/8 76/23 161/15 163/18 163/19 167/20
**groups** [1] 162/5
**grow** [1] 34/21
**guarantee** [2] 123/8 123/8
**guaranteeing** [1] 123/16
**guess** [16] 28/10 30/14 40/8 42/3 42/18 56/21 71/8 90/19 99/9 99/17 100/1 118/3 118/19 145/23 161/6 206/10
**guess is** [1] 56/21
**guesswork** [1] 195/24
**guidelines** [6] 166/19 166/21 166/23 167/8 167/16 171/23
**guiding** [1] 203/11
**guilty** [1] 144/7
**guy** [18] 27/15 40/11 42/23 49/1 49/9 54/13 54/16 62/19 72/4 72/4 124/15 130/24 131/7 160/24 206/19 207/22 208/1 208/1
**guy's** [1] 130/24
**guys** [1] 74/17
**GUZMAN** [4] 1/19 218/3 218/11 218/11

**H**

**H-L** [1] 201/9
**hack** [1] 210/6
**hacked** [2] 143/18 210/4
**hacking** [3] 140/2 143/17 177/16
**had** [127] 15/19 16/7 24/10 24/23 24/24 28/16 28/20 28/23 29/1 29/3 29/9 36/25 37/12 38/10 39/21 41/13 41/24 42/12 43/13 43/18 43/19 44/16 45/6 47/8 48/15 51/19 52/5 52/6 52/7 54/4 54/16 55/5 55/8 56/1 62/11 69/4 69/4 69/20 71/18 72/1 72/5 73/1 73/1 74/3 75/21 76/12 76/13 76/14 77/25 78/5 78/24 81/18 81/19 81/22 84/16 84/16 88/15 93/5 95/14 96/5 97/23 98/9 98/18 99/24 101/8 104/6 107/10 110/5 110/16 110/18 111/7 111/12 111/20 111/23 111/25 113/11 113/11 113/12 113/15 114/4 114/5 114/6 114/6 115/13 115/17 115/25 116/2 116/10 116/12 117/21 118/21 119/11 125/7 126/12 129/8 132/4 143/10 144/16 145/6 147/18 147/22 154/2 158/20 163/2 165/19 167/11 168/24
170/17 172/25 174/8 174/20 175/8 175/12 175/15 177/25 179/23 179/23 184/19 185/1 195/22 197/9 206/5 207/18 209/9 209/20 212/7 213/4
**hadn't** [3] 125/20 144/23 174/21
**Hal** [25] 2/7 3/11 10/25 21/22 21/22 22/8 22/14 35/18 37/21 48/18 50/3 52/14 67/20 72/3 72/15 74/4 80/3 80/8 106/9 120/1 149/1 166/9 180/17 187/7 201/9
**Hal's** [2] 52/23 53/16
**half** [3] 11/3 25/24 163/25
**hallway** [1] 203/24
**hand** [12] 22/2 104/19 104/19 104/21 135/15 158/5 160/9 186/13 211/13 212/10 212/10 212/13
**handful** [1] 32/6
**handing** [2] 10/12 213/3
**handle** [2] 28/5 56/12
**handled** [1] 146/6
**handler** [6] 165/16 172/19 172/21 172/23 176/17 179/1
**handlers** [2] 178/19 179/10
**handling** [1] 166/25
**handlings** [1] 165/25
**hands** [1] 111/11
**handwriting** [1] 200/25
**happen** [11] 38/14 72/13 72/14 77/8 130/14 130/15 145/17 147/17 173/23 173/23 206/7
**happened** [15] 15/22 15/23 39/17 46/20 51/16 54/5 57/12 65/15 69/2 69/24 97/23 129/23 132/18 163/1 171/23
**happens** [6] 14/23 33/21 118/1 132/14 145/21 176/6
**happy** [4] 87/7 143/21 150/9 206/23
**harass** [1] 47/7
**harassment** [1] 123/14
**hard** [13] 16/4 55/21 80/17 81/11 115/21 118/16 124/25 126/9 170/15 202/20 203/19 207/3 208/3
**harder** [2] 112/2 132/22
**hardly** [1] 16/2
**harm** [22] 23/9 65/6 71/16 108/8 108/14 126/12 126/20 131/22 150/16 193/8 193/14 193/15 194/18 194/24 195/2 195/7 195/17 195/25 196/1 196/16 197/4 197/8
**Harvard** [1] 208/16
**has** [94] 11/10 13/6 15/8 17/4 17/5 18/24 20/8 20/8 20/21 23/8 23/8 31/19 33/17 34/6 37/23 51/21 53/4 53/4 54/5 56/9 61/10 63/15 69/8 75/6 75/18 77/18 80/24 81/4 81/5 81/11 81/24 89/5 93/21 96/15 96/19 105/17 106/7 116/24 116/25 117/10 121/1 122/18 122/18 123/6 123/11 123/12 124/15 124/22 132/18 143/18 143/20 147/10 147/19 148/12 151/23 151/23 156/6 164/9 167/25 175/6 176/12 179/5 180/17 180/19 181/2 182/23 184/16 184/16 186/4 188/7 188/10 189/1 189/2 190/10 190/19 191/1 191/9 191/12 192/23 194/14 195/25 198/11 200/7 200/8 201/21 201/21 204/19 207/21 207/16 210/18 212/8

215/15 216/10
**hasn't** [5] 103/1 104/3 160/18 201/18 210/18
**hate** [1] 119/18
**Hats** [1] 37/10
**have** [315]
**have just** [1] 93/14
**haven't** [10] 18/6 48/17 50/2 50/3 73/16 73/18 85/7 111/12 146/5 177/17
**having** [19] 16/18 22/9 26/14 30/12 65/24 69/7 73/21 102/12 105/3 112/9 117/13 133/11 135/19 157/14 161/10 169/1 191/24 202/14 202/15
**he** [370]
**He'd** [1] 42/25
**he'll** [4] 79/9 79/10 186/6 211/15
**he's** [99] 13/21 13/22 16/10 37/22 37/22 47/15 47/16 50/19 51/8 51/9 52/11 52/11 52/19 52/20 52/22 56/3 56/22 56/24 56/25 58/25 59/14 59/18 60/7 60/8 60/9 60/11 61/8 61/20 61/20 61/22 61/25 63/4 63/6 63/8 63/10 63/11 63/12 64/3 64/6 64/7 64/7 64/14 64/15 72/3 72/11 72/21 74/4 75/14 77/5 77/11 79/10 79/14 79/14 79/14 79/18 80/3 80/10 80/10 80/11 80/12 80/13 81/1 81/2 82/6 83/19 83/22 85/22 85/22 89/9 89/20 89/22 90/5 95/19 98/15 98/20 99/9 100/14 101/5 121/25 130/25 150/2 160/2 166/10 166/11 168/4 168/16 168/17 169/11 170/7 170/7 179/16 179/17 180/12 180/13 190/11 206/3 206/19 210/20 210/21
**head** [2] 56/15 105/19
**headquarters** [1] 90/11
**Heads** [2] 17/17 82/23
**headway** [1] 147/11
**heal** [1] 75/7
**health** [3] 118/11 127/3 133/19
**hear** [35] 10/7 10/8 11/2 11/20 12/16 12/23 13/14 13/20 37/6 48/18 50/4 59/4 61/6 104/9 104/11 104/15 104/16 104/21 105/6 105/8 133/20 134/3 134/5 148/7 148/10 174/17 175/2 179/13 183/7 185/22 185/23 186/18 186/19 204/18 209/25
**heard** [28] 19/15 20/14 48/17 50/2 50/3 58/22 59/11 62/8 62/8 72/7 72/9 83/2 97/9 105/12 134/15 135/22 157/4 165/5 165/12 168/1 186/10 198/18 199/14 199/23 200/6 200/12 200/24 202/12
**hearing** [6] 21/13 83/7 130/19 148/3 156/1 169/11
**hearings** [2] 102/4 147/19
**hearsay** [4] 101/4 101/6 101/7 101/8
**heart** [1] 157/3
**hearts** [1] 208/11
**heated** [1] 15/2
**heavily** [1] 44/19
**heeded** [1] 181/22
**held** [4] 25/10 101/25 102/12 117/12
**Hello** [1] 105/9
**help** [20] 15/4 32/4 35/3 39/22 42/1 43/20 44/1 44/2 44/3 44/8 44/24 48/25 50/13 50/13 76/20 101/17 110/2 126/7

**help... [2]** 155/3 202/20
**helped [7]** 16/10 42/13 81/7 109/10 202/21 203/20 206/20
**helpful [1]** 190/10
**helping [1]** 42/14
**helps [2]** 81/7 148/6
**her [9]** 94/17 94/19 94/22 95/15 95/15 95/16 188/25 206/17 207/23
**Herbert [1]** 139/12
**here [104]** 10/9 11/1 11/19 12/13 12/24 15/3 15/4 15/6 15/17 15/19 15/21 16/16 20/22 21/2 22/15 22/17 22/19 23/15 23/16 23/23 24/16 25/11 26/12 29/6 31/13 34/22 38/20 39/3 41/3 48/23 49/1 52/2 52/11 52/21 61/20 62/11 67/23 68/23 69/7 69/8 72/10 72/22 73/4 74/25 75/13 76/13 77/12 77/21 81/17 81/18 82/4 82/22 84/19 87/21 88/2 88/19 89/3 93/22 93/22 94/4 95/24 96/15 96/19 97/7 98/11 99/10 104/4 104/7 106/18 106/19 109/6 110/25 117/6 130/5 136/9 136/17 136/22 139/24 146/18 147/9 147/24 149/22 157/21 160/14 160/25 161/6 161/16 161/18 161/20 177/1 181/10 182/14 189/3 192/21 193/25 198/13 203/7 206/3 208/4 208/12 208/18 208/19 209/9 210/14
**Here's [3]** 28/4 192/6 197/22
**Hey [10]** 37/21 38/2 40/10 61/16 66/10 72/2 72/10 81/24 131/6 171/3
**Hi [1]** 169/25
**hidden [1]** 210/21
**hiding [1]** 210/20
**high [21]** 22/17 23/23 23/25 24/1 24/3 28/2 32/11 32/11 32/17 40/13 54/20 102/20 108/5 113/9 113/13 123/23 127/9 162/16 163/18 166/10 196/25
**high-level [3]** 108/5 113/9 166/10
**high-net [1]** 102/20
**high-profile [1]** 40/13
**high-ranking [1]** 113/13
**high-risk [1]** 54/20
**High-Value [1]** 163/18
**higher [3]** 32/7 34/2 196/24
**highlighted [2]** 153/9 153/24
**highlighting [1]** 165/24
**highly [3]** 122/14 123/17 216/25
**highs [1]** 70/8
**hijack [1]** 110/21
**him [98]** 12/4 13/5 14/1 14/12 16/2 18/2 24/24 39/18 39/21 40/1 41/1 41/2 41/4 41/13 46/14 47/5 47/6 47/8 48/14 49/9 49/17 58/4 60/5 60/8 63/14 63/19 63/20 63/24 72/7 73/1 73/1 75/15 77/8 77/13 77/14 78/4 78/4 79/9 79/12 80/23 83/21 83/22 83/22 85/25 87/14 88/15 88/17 93/10 93/11 97/4 98/17 99/23 99/24 100/17 108/8 108/9 108/14 130/7 141/15 144/23 146/18 146/19 147/12 147/18 148/4 148/4 148/6 148/6 148/18 148/18 150/3 161/5 161/5 161/7 168/7 169/1 170/11 170/13 170/14 170/14 170/15 170/19 170/23 180/3 180/3 185/23 196/13 201/6 203/17 207/1 207/2 207/2 207/4

**himself [6]** 12/25 59/19 53/19 64/12 168/14 170/7
**hire [1]** 26/13
**hired [2]** 27/15 27/17
**his [129]** 10/16 10/25 11/16 13/4 13/7 13/12 13/22 14/4 14/7 14/10 15/22 16/12 17/6 17/6 17/14 18/12 18/13 19/23 22/23 23/2 35/24 35/25 42/11 43/6 43/18 44/1 44/13 44/16 45/21 46/6 46/10 46/10 47/9 47/9 48/16 51/13 53/15 56/4 58/25 59/1 59/4 62/18 64/1 64/2 65/14 69/4 69/24 74/7 74/10 75/15 76/25 77/1 77/18 78/17 80/20 80/21 81/2 81/5 84/16 94/9 97/5 98/20 98/24 99/3 99/4 99/22 103/25 106/20 106/20 107/10 107/12 115/13 115/18 116/10 116/10 117/4 119/21 124/21 124/23 126/21 129/23 130/21 144/23 147/24 148/5 151/22 153/14 161/1 161/2 165/15 165/20 165/24 165/25 168/24 169/6 169/9 170/8 170/8 170/24 171/14 179/18 179/18 184/1 188/25 190/12 190/21 190/22 191/2 193/10 193/11 194/15 194/24 195/16 196/10 196/13 199/13 202/14 202/14 202/15 203/15 203/20 203/24 204/19 206/22 210/5 210/5 210/6 210/9 210/15
**history [1]** 173/5
**hit [2]** 56/14 208/20
**Hoan [6]** 89/25 90/2 90/4 95/14 158/13 158/23
**hold [8]** 36/16 93/16 101/10 102/6 127/13 147/18 148/4 199/20
**holding [3]** 101/14 102/12 103/23
**holdings [2]** 149/13 210/15
**holes [2]** 96/23 97/5
**Holocaust [3]** 63/10 151/1 152/8
**Holocaust-denying [1]** 152/8
**home [5]** 19/5 28/24 206/8 213/1 216/7
**homeland [3]** 105/20 111/25 163/8
**hometown [1]** 139/11
**honestly [1]** 207/2
**honor [70]** 10/19 10/21 17/7 17/20 18/10 20/24 21/3 21/9 21/12 21/18 21/21 22/6 84/3 84/19 84/23 86/23 93/8 94/3 95/18 98/25 100/11 103/5 103/7 107/18 124/14 115/5 127/6 127/8 133/25 135/3 135/7 135/10 141/8 144/10 145/11 146/16 147/1 147/15 148/14 154/14 157/3 158/14 158/16 159/7 159/14 159/16 160/1 160/16 160/21 164/20 172/15 178/21 182/4 182/6 182/10 182/13 182/19 184/21 186/2 199/6 199/10 209/14 212/1 214/22 214/25 215/7 215/10 215/14 217/9 217/11
**HONORABLE [1]** 1/9
**honored [1]** 10/24
**hooked [1]** 109/24
**Hoover [1]** 171/20
**hope [5]** 19/4 207/25 208/19 208/1 209/7
**hoped [1]** 125/7
**hopeful [1]** 207/25

**hopefully [2]** 19/5 183/18
**hoping [1]** 208/11
**horn [1]** 109/7
**horrific [1]** 166/11
**host [1]** 37/9
**hostile [3]** 112/9 123/8 128/3
**hot [3]** 70/11 176/16 176/20
**hotheaded [1]** 15/11
**hour [2]** 79/5 79/7
**hours [2]** 74/13 216/1
**house [1]** 41/14
**housekeeping [2]** 19/14 83/17
**houses [1]** 24/14
**Houston [1]** 41/5
**how [101]** 13/8 14/25 16/8 16/25 18/1 23/13 25/23 26/25 27/3 27/19 28/8 32/19 32/25 33/10 34/23 35/18 37/17 38/2 39/3 39/14 39/18 41/1 42/17 43/19 43/20 45/2 45/3 45/17 47/3 47/12 48/15 50/8 53/24 58/15 60/10 64/24 65/19 67/6 67/6 67/25 68/19 68/19 69/1 72/3 74/1 74/10 78/24 81/10 84/23 85/24 86/13 87/10 87/25 88/7 88/13 95/22 96/15 96/19 97/5 99/2 99/11 110/9 110/12 111/1 113/21 114/3 115/21 118/19 120/4 125/3 125/6 125/22 125/22 128/1 142/19 144/13 147/6 147/13 147/18 155/11 157/1 158/23 165/3 167/17 180/24 181/7 184/25 185/24 195/11 195/21 200/18 200/18 200/19 202/19 203/22 205/4 205/4 206/4 209/18 210/16 210/20
**however [4]** 193/1 194/16 195/23 208/1
**Huawei [2]** 112/18 128/11
**Huffington [4]** 152/6 152/16 156/2 156/5
**HuffPost [1]** 149/13
**huge [4]** 13/6 29/3 81/20 173/1
**huh [2]** 65/10 101/23 178/12
**human [42]** 118/11 129/4 129/13 132/19 133/4 145/19 145/21 146/2 161/21 162/9 162/21 164/8 164/11 164/18 165/7 166/2 166/21 166/25 167/1 169/15 170/5 170/5 170/10 170/10 170/12 170/18 170/19 172/4 172/12 172/15 174/2 174/21 175/15 175/19 176/17 177/15 178/19 179/4 179/10 181/19 181/20 181/25
**humans [1]** 175/13
**humiliation [3]** 13/22 150/16 195/10
**humor [1]** 205/9
**hundred [1]** 179/19
**hunt [1]** 179/19
**hurt [9]** 44/3 44/8 44/24 61/21 62/3 62/3 76/2 76/4 126/15
**hurtful [1]** 76/11
**hurting [2]** 14/2 120/19
**hurts [2]** 69/10 69/12
**husband [1]** 13/21
**Hussein [1]** 129/9
**Hyland [1]** 8/13

**I**

**I have [1]** 133/8
**I'd [12]** 36/15 45/10 47/25 51/22 64/3

**I'd...** [7] 107/23 170/1 173/24 175/2 179/7 179/12 209/24
**I'll** [26] 10/15 12/12 33/20 39/10 71/4 71/24 82/17 99/17 113/19 118/3 125/1 139/20 141/13 160/24 184/19 185/3 186/1 186/8 201/8 211/19 212/22 212/23 212/25 214/19 215/4 216/13
**I'm** [148] 10/24 14/2 15/4 15/17 16/4 16/17 22/14 22/19 23/19 27/16 29/19 38/18 38/23 39/8 39/8 40/25 43/6 47/22 50/10 50/19 52/10 52/19 52/21 53/3 55/18 56/16 56/24 58/13 58/13 58/14 61/10 61/21 64/8 64/8 65/6 69/7 69/25 70/1 75/13 76/3 77/3 78/3 78/3 78/18 80/7 82/5 82/16 82/18 82/21 85/12 87/7 87/8 92/4 93/7 93/8 93/16 93/20 95/1 95/12 97/7 98/6 99/10 99/22 101/16 101/16 102/8 102/10 104/1 104/24 105/7 105/15 105/15 106/19 106/23 107/23 108/6 108/8 109/7 110/11 111/14 120/7 128/1 128/12 130/23 132/4 132/14 133/19 134/13 136/14 137/2 137/6 137/13 138/3 138/13 139/8 139/9 140/1 140/17 140/19 141/10 143/21 148/6 148/13 148/17 149/22 150/19 150/25 151/9 153/9 154/10 155/1 155/18 156/10 160/3 160/19 161/4 161/20 167/11 169/24 169/25 173/1 175/7 175/12 175/15 180/7 180/9 182/15 183/2 185/5 185/7 185/14 198/8 198/16 199/14 201/3 203/8 205/15 206/10 206/10 207/19 207/22 207/25 208/1 208/8 208/11 210/2 210/17 211/13
**I've** [48] 15/18 16/1 16/24 17/2 18/4 23/6 29/11 35/2 36/1 38/10 38/10 51/3 53/17 54/5 59/13 69/5 69/5 69/25 71/18 75/21 92/5 92/22 93/9 93/25 94/1 102/3 102/13 105/16 105/22 108/11 129/19 133/16 134/15 143/22 145/5 145/6 147/22 147/22 157/4 173/5 173/25 185/4 198/16 205/3 206/9 207/20 208/18 213/3
**Idaho** [2] 162/2 162/3
**idea** [6] 48/20 50/5 53/14 64/16 82/25 209/21
**identified** [2] 165/25 166/1
**ignored** [1] 132/11
**III** [2] 162/18 163/3
**illegal** [1] 145/20
**illegally** [1] 143/25
**image** [1] 195/14
**immediately** [2] 58/7 185/20
**impact** [7] 75/18 115/17 115/18 115/25 121/16 123/6 123/3
**impactful** [1] 121/16
**impair** [1] 195/16
**imperil** [1] 179/7
**impersonation** [1] 117/25
**impersonations** [2] 118/2 127/1
**implication** [1] 111/20
**implications** [1] 131/15
**importance** [1] 35/15
**important** [14] 13/3 35/1 35/2 37/10 39/1 39/4 43/11 71/21 112/6 124/20

**impression** [3] 173/9 173/11 191/5
**improve** [1] 170/24
**inaccurately** [1] 188/7
**inappropriate** [1] 57/1
**inaugurated** [1] 113/23
**incentive** [1] 163/24
**include** [4] 73/7 100/8 194/23 216/18
**included** [2] 100/5 216/19
**including** [6] 53/16 121/7 162/3 190/18 193/9 193/14
**income** [12] 33/10 65/4 69/10 69/10 69/13 70/21 71/6 74/23 190/21 190/22 193/5 193/10
**inconsistency** [1] 188/24
**increase** [3] 27/22 164/2 192/13
**incur** [1] 195/1
**incurred** [2] 193/11 193/16
**indeed** [1] 151/6
**indefinite** [1] 150/21
**independent** [2] 167/6 191/2
**INDEX** [2] 1/25 3/5
**indicates** [1] 189/24
**indication** [2] 172/22 186/16
**indifference** [1] 197/11
**indirect** [1] 189/23
**individual** [3] 28/6 52/24 138/14
**individuals** [3] 102/20 158/25 179/20
**induced** [1] 108/9
**infer** [1] 190/18
**inference** [1] 189/9 195/6
**inferences** [1] 188/13
**infiltrate** [1] 156/13
**influence** [12] 42/19 61/19 61/19 112/19 112/19 115/2 115/14 116/11 120/10 120/24 121/1 163/10
**influenced** [4] 114/21 128/25 191/3 192/25
**informant** [1] 143/19
**informants** [2] 172/4 175/8
**information** [16] 56/3 109/16 111/17 121/5 165/14 166/4 169/7 174/22 175/4 175/4 175/6 175/19 175/23 175/25 176/2 179/17
**infrastructure** [4] 112/13 120/10 120/14 120/15
**initially** [1] 100/21
**injure** [1] 193/20
**injured** [1] 193/4
**injuries** [2] 195/8 196/10
**injury** [3] 151/24 195/20 197/4
**injustice** [2] 208/23 209/6
**innocence** [1] 205/18
**innocent** [1] 188/9
**insanely** [1] 73/9
**inside** [2] 112/9 112/15
**install** [1] 112/15
**instances** [1] 98/1
**instead** [4] 56/9 124/14 196/12 203/14
**institution** [1] 28/2
**institutional** [1] 126/14 131/6
**Institutions** [1] 7/11
**instruct** [1] 186/11
**instructed** [3] 156/6 156/16 187/17
**instructions** [18] 10/13 19/15 20/13 20/16 83/5 183/8 183/17 185/14 186/16 186/22 191/11 192/6 198/15

**intangible** [1] 195/8
**integral** [1] 39/13
**integrity** [1] 14/13
**intelligence** [29] 43/18 43/19 44/2 44/7 44/17 66/9 105/21 105/24 109/18 109/25 110/17 129/9 146/1 146/12 146/14 146/20 161/17 162/22 162/22 163/5 163/6 164/3 164/4 164/17 168/17 169/8 169/21 169/25 207/22
**Intelligent** [1] 110/8
**intend** [1] 21/2
**intended** [4] 186/22 196/11 203/12 203/13
**intense** [1] 26/22
**intensity** [1] 162/16
**intent** [2] 167/16 197/3
**intentional** [1] 188/8
**interact** [1] 41/2
**interacting** [1] 45/17
**interaction** [1] 61/1
**interactions** [1] 47/23
**interagency** [2] 112/1 164/4
**intercept** [1] 162/19
**interest** [9] 46/15 102/21 103/1 120/19 126/5 128/15 156/24 185/16 192/19
**interested** [4] 72/5 95/25 189/7 210/17
**interesting** [3] 38/7 72/3 133/22
**interests** [7] 78/10 96/6 114/9 114/13 114/20 158/21 188/23
**interfaced** [1] 162/3
**interference** [1] 116/23
**interlocutory** [1] 114/15
**international** [3] 109/9 111/14 164/6
**internet** [75] 4/3 4/4 4/5 4/6 4/7 4/8 4/9 4/10 4/11 4/12 4/13 4/14 4/15 4/16 4/17 4/18 4/19 4/20 4/24 4/25 5/1 5/2 5/12 5/13 5/14 5/15 5/16 5/17 5/18 5/19 5/20 5/21 5/22 5/23 5/24 5/25 6/1 6/2 6/5 6/6 6/7 6/8 6/9 6/10 6/11 6/14 6/16 6/17 6/18 6/20 6/25 7/1 7/2 7/3 7/5 7/8 7/15 7/16 7/17 7/18 7/19 7/20 8/7 8/8 8/9 9/2 9/3 9/4 9/5 9/6 9/7 9/8 66/6 66/12 143/20 150/22
**interpretation** [2] 51/6 131/8
**interpretations** [1] 20/7
**interrogation** [2] 163/18 163/19
**interrogator** [1] 163/11
**interrupt** [2] 18/18 93/15
**interrupted** [1] 124/9
**interrupting** [2] 101/20 101/20
**interrupts** [7] 10/20 23/1 28/13 51/2 53/2 90/25 142/10
**Interview** [1] 7/14
**interviewed** [1] 25/9
**interviewing** [1] 27/14
**interviews** [2] 36/5 36/5
**intimidating** [1] 160/25
**intimidating-looking** [1] 160/25
**introduce** [5] 22/12 53/19 88/9 105/13 161/13
**introduced** [12] 20/4 37/20 42/24 43/2 43/14 71/25 72/2 86/1 87/14 98/16 158/24 207/1
**introducing** [1] 206/17
**invest** [21] 30/19 31/10 31/18 32/12

invest... **[17]** 32/23 38/2 42/6 55/2
86/4 88/21 88/23 102/21 102/21
102/25 115/22 117/15 124/4 124/14
125/1 137/17 142/22
**invested [9]** 41/24 69/20 141/19
141/22 142/2 142/7 142/14 142/15
142/23
**investigate [2]** 123/14 156/17
**investigated [1]** 133/9
**investigation [6]** 120/20 121/20
123/17 130/1 168/23 175/11
**investigations [13]** 121/10 130/2
132/7 156/14 161/14 161/15 161/16
162/18 164/6 164/19 166/20 167/9
167/14
**investigative [1]** 171/15
**investing [8]** 29/7 31/6 33/24 38/12
41/8 61/10 69/11 70/11
**investment [34]** 22/20 26/24 27/9 28/6
28/11 28/23 31/24 33/21 34/2 38/9
45/22 45/24 46/4 46/14 46/16 46/20
46/22 56/11 71/5 74/23 96/4 106/21
116/19 116/20 122/22 125/2 125/6
125/19 128/6 128/13 158/20 193/6
193/11 201/1
**investments [35]** 9/10 9/12 13/14
13/18 18/3 25/20 26/20 29/25 33/12
37/23 46/2 54/21 61/13 61/19 68/20
69/2 70/3 111/19 112/1 114/20 120/21
124/5 124/19 124/23 125/7 125/21
125/23 128/3 128/7 128/15 137/18
153/13 159/4 193/15 194/24
**investor [19]** 11/25 13/4 13/18 55/25
57/2 61/24 86/10 99/14 100/14 100/25
120/18 122/11 123/22 123/23 123/25
124/16 193/15 194/25 195/5
**investors [38]** 5/3 12/3 12/7 28/16
30/5 33/24 38/12 40/5 44/20 51/18
51/18 51/20 52/8 52/9 52/12 52/16
52/24 53/23 54/19 56/23 58/6 61/23
69/11 86/17 99/14 100/20 102/20
102/24 105/22 112/3 121/7 124/21
126/15 128/1 131/6 158/15 158/17
193/10
**invitations [1]** 65/15
**invite [1]** 37/5
**invited [5]** 35/25 40/22 40/23 42/23
92/18
**invocation [1]** 120/23
**involved [14]** 35/2 44/11 44/12 44/19
45/18 50/10 92/4 97/21 132/8 135/23
156/12 157/9 197/7 197/10
**involves [2]** 32/2 32/3
**iPhone [3]** 172/14 172/16 172/19
**Iran [1]** 128/4
**Iranian [2]** 114/22 163/9
**Iraq [3]** 132/8 163/10 164/3
**irrelevant [3]** 17/10 95/19 95/21
**IRS [1]** 168/22
**is [434]**
**isn't [10]** 17/23 62/5 62/5 92/21
171/19 174/24 193/21 207/13 207/14
208/22
**Israel [1]** 64/10
**issue [4]** 18/8 94/8 105/17 123/24
**issues [4]** 18/25 96/1 114/5 178/8

it [503]
it's **[203]** 11/10 12/18 13/9 14/6 15/7
15/11 15/19 16/3 16/4 16/13 16/25
17/9 17/9 17/16 19/6 19/19 25/13
29/13 29/13 29/14 29/14 29/14 29/15
31/18 32/5 32/6 32/11 32/11 32/17
32/24 32/24 33/18 34/19 35/2 35/11
35/22 36/9 38/3 38/5 38/13 39/1 39/13
41/23 42/8 42/12 43/11 44/17 44/25
54/19 55/20 56/16 61/8 62/5 62/15
63/7 63/21 66/3 66/3 66/5 66/13 68/3
69/21 70/2 70/2 70/20 71/8 71/9 71/23
72/14 74/5 74/17 74/20 75/23 75/23
76/1 76/6 76/6 76/11 76/23 77/16 78/6
79/1 80/17 80/17 80/25 81/11 81/12
82/9 82/9 82/18 82/19 86/2 86/2 87/20
88/5 90/21 90/21 91/6 95/19 95/19
95/21 104/1 106/24 107/3 107/25
108/21 112/6 112/6 113/18 115/10
115/10 118/16 119/16 120/10 122/14
124/25 125/5 125/24 126/4 126/4
126/22 127/8 127/10 127/10 127/16
127/23 127/24 127/24 128/5 128/20
129/1 130/4 130/6 131/18 132/14
132/25 133/21 134/16 134/17 136/17
138/2 140/10 140/11 140/13 140/20
141/14 141/20 142/20 143/3 143/9
143/21 145/15 145/18 146/12 152/20
154/10 154/25 157/8 160/8 162/18
166/16 167/25 170/24 172/1 172/18
173/7 175/10 176/12 176/25 177/20
177/20 180/16 181/22 181/23 182/1
184/1 198/13 199/13 200/22 201/8
201/15 201/24 202/6 202/7 202/13
202/18 202/19 203/1 203/3 203/4
204/25 205/3 205/4 205/11 205/12
206/2 206/15 209/18 210/7 210/24
211/4 211/5 211/6
**its [4]** 166/16 189/7 193/17 197/6
**itself [1]** 193/14

## J

**Jacob [1]** 62/19
**Jacques [1]** 87/17
**jail [8]** 11/23 49/14 51/9 148/5 174/9
178/25 205/17 205/19
**Jamaican [2]** 162/9 162/11
**James [1]** 146/17
**January [2]** 113/24 175/11
**Jason's [1]** 82/19
**Jeffrey [1]** 64/15
**JFK [1]** 208/10
**job [13]** 11/17 25/6 25/7 25/10 25/21
26/10 27/7 27/13 109/13 113/17
112/14 176/4 209/6
**jobs [1]** 25/9
**Joe [1]** 10/3
**John [7]** 87/10 87/15 90/23 91/8
127/21 161/1 183/13
**Johnathan [6]** 88/13 88/16 146/3
165/14 165/16 178/24
**JOHNSON [224]**
**Johnson's [31]** 46/14 48/12 50/24
58/21 62/25 67/1 67/2 68/19 69/3
69/20 70/14 73/23 75/18 116/5 119/2
165/4 166/7 168/10 168/14 193/2
194/3 194/10 195/6 196/6 197/6

197/15 201/15 202/12 213/9 213/18
215/25
**Johnson00062 [1]** 144/20
**join [3]** 29/7 60/7 124/5
**Josh [1]** 87/12
**JPMorgan [10]** 27/10 27/10 27/19
27/24 28/8 28/16 28/21 28/22 29/9
30/10
**judge [14]** 1/9 57/14 96/2 104/5
104/20 114/1 142/1 142/8 145/6
147/19 147/22 160/15 160/25 161/4
**judges [2]** 173/18 186/14
**judgment [5]** 94/7 192/19 216/19
216/24 217/1
**Judicial [1]** 218/7
**juice [1]** 148/19
**JULY [5]** 1/6 10/2 214/12 216/16
218/9
**jump [2]** 113/3 166/5
**juror [8]** 191/1 191/5 212/11 212/13
214/19 214/23 215/1 215/11
**jurors [3]** 161/5 191/4 212/7
**jury [121]** 1/8 1/9 10/23 17/12 20/10
22/13 22/17 23/10 25/1 25/5 25/16
26/17 27/23 28/25 31/4 32/19 34/4
35/8 36/15 36/18 36/21 37/16 38/15
41/22 42/17 42/21 43/11 45/16 47/11
48/5 48/11 51/24 52/2 54/17 55/9
57/22 57/23 58/19 62/8 66/23 69/16
70/18 78/23 83/12 83/14 84/13 96/14
105/13 106/2 106/7 106/18 107/6
107/20 107/22 107/23 108/4 109/4
109/4 110/9 114/2 116/9 123/24
125/13 134/7 137/15 137/23 138/22
142/1 147/4 147/10 148/8 148/23
158/7 161/13 161/18 161/23 163/22
164/8 183/9 184/7 184/13 184/15
185/5 185/9 185/13 185/19 186/9
186/10 186/13 186/14 186/23 190/10
191/7 198/9 198/11 198/21 198/22
200/16 200/19 201/11 201/12 203/10
208/22 211/10 211/16 211/20 211/21
211/23 212/4 212/13 214/12 214/17
215/12 215/16 215/16 215/22 216/9
216/10 216/14 216/20 216/20
**jury's [4]** 45/9 134/11 134/14 215/16
**just [156]** 11/1 12/16 17/21 17/22
19/15 19/17 21/6 27/16 28/4 28/5
28/20 29/13 29/14 30/13 31/3 32/5
33/6 33/20 34/25 36/11 37/2 39/2 39/3
39/24 42/3 42/25 43/23 44/22 45/6
45/8 47/9 47/11 47/14 47/17 47/18
53/14 54/17 55/9 55/11 55/20 56/16
57/21 57/23 57/23 59/16 62/1 62/14
62/21 66/10 66/20 66/21 66/23 66/23
67/13 68/25 70/18 72/17 74/5 75/10
75/18 77/3 78/3 78/4 79/9 79/12 79/17
79/19 80/12 80/13 80/25 81/18 81/20
82/6 82/11 82/12 82/12 83/17 85/8
93/8 93/14 93/14 96/12 97/20 97/23
98/4 98/17 99/3 99/10 101/8 101/9
102/19 104/1 106/1 106/17 108/4
108/16 110/24 111/3 113/3 114/1
114/14 116/3 116/8 116/21 118/2
123/1 124/22 125/5 125/6 126/4
129/22 131/1 131/12 131/19 131/22
133/3 133/6 139/9 145/10 146/11

**J**

**just... [36]** 147/9 147/17 148/13
148/19 149/25 150/2 154/18 154/18
155/15 160/12 163/15 164/6 164/9
165/13 166/5 168/15 171/5 171/6
173/18 175/5 176/24 177/1 184/4
187/5 199/25 200/4 200/10 201/8
201/17 201/23 209/19 209/22 210/3
210/24 211/4 212/20

**just going [1]** 78/3
**justice [6]** 146/5 166/17 197/20
199/16 199/16 208/22
**justified [1]** 188/14

**K**

**keep [12]** 18/14 19/18 20/13 61/23
68/9 71/12 80/14 110/24 154/18
154/19 160/23 188/3
**keeping [1]** 172/3
**Kennedy [1]** 208/12
**Kenya [1]** 163/20
**kept [1]** 105/17
**key [3]** 30/16 32/9 169/20
**keyboard [1]** 77/6
**keyword [1]** 181/23
**kicked [1]** 13/13
**kicker [1]** 207/13
**kidding [2]** 47/4 172/17
**kidnap [1]** 180/2
**kids [2]** 35/4 35/5
**kill [2]** 116/14 180/3
**killing [1]** 77/10
**kind [45]** 24/17 24/21 26/3 26/4 30/16
31/4 32/20 33/6 40/9 42/1 43/16 43/21
44/1 57/23 73/8 75/18 75/25 80/15
85/4 89/1 91/6 117/9 117/25 118/18
121/5 121/6 123/9 126/7 127/1 128/12
128/17 131/7 132/13 132/22 146/12
164/6 172/14 174/7 200/1 202/23
203/5 205/14 205/20 207/10 209/5
**kinds [7]** 31/10 35/12 55/2 63/11 78/2
120/11 173/19
**kingdom [1]** 89/12
**knew [10]** 54/12 58/16 63/19 63/19
76/12 76/12 79/8 131/23 174/23 217/6
**know [255]**
**knowing [2]** 16/23 202/13
**knowledge [2]** 153/25 190/9
**known [5]** 26/12 26/14 26/20 63/10
86/17
**knows [7]** 76/1 76/2 122/7
**KYC [1]** 91/16

**L**

**labeled [1]** 150/13
**labels [1]** 150/20
**ladies [10]** 10/23 14/17 19/12 82/14
103/20 146/21 192/21 199/12 211/10
215/19
**lady [1]** 80/5
**Lambert [156]** 2/7 3/11 5/3 5/5 5/7
5/11 6/19 7/7 10/25 11/5 11/9 11/22
11/23 11/24 12/4 12/23 13/1 13/21
14/1 14/7 15/8 15/23 16/1 16/12 16/25
17/4 17/24 18/1 21/22 21/22 21/23
22/4 22/8 22/12 22/14 34/1 34/7 35/19
37/21 39/14 45/14 47/20 48/3 48/11

51/23 51/24 51/25 53/4 55/14 57/22
58/19 59/7 59/12 60/17 62/24 64/1
64/18 66/20 67/14 67/20 67/24 68/11
68/22 69/16 72/15 72/20 72/25 74/4
74/20 75/1 75/17 77/20 80/3 81/16
84/8 84/16 84/24 84/25 95/25 96/4
96/19 103/8 103/14 106/9 106/20
107/10 107/12 107/12 107/15 108/7
108/13 115/15 115/18 119/3 119/8
121/1 121/16 123/2 125/20 126/17
129/22 130/21 131/7 133/6 134/9
135/23 136/9 136/12 136/18 138/9
149/1 166/9 169/3 169/5 169/10
180/18 180/21 187/8 193/7 194/2
194/15 194/18 194/22 195/4 195/25
196/4 196/10 196/16 197/4 197/23
198/5 199/13 199/16 199/24 200/7
200/12 200/22 201/5 201/9 201/13
201/15 201/20 202/5 202/13 202/17
204/2 205/22 206/1 206/7 206/19
208/23 209/16 213/8 213/23 214/3
214/9
**Lambert's [17]** 11/3 11/16 12/3 12/18
12/21 13/12 83/2 85/13 115/16 123/17
124/20 126/15 127/18 195/14 195/22
202/7 204/3
**landed [2]** 74/9 165/24
**Langley [1]** 90/11
**languages [1]** 207/21
**lapse [1]** 188/9
**large [2]** 27/9 86/16
**larger [1]** 156/24
**largest [1]** 90/19
**last [22]** 33/13 39/2 51/23 73/23 76/14
76/14 91/21 91/23 92/12 105/25 118/3
123/7 125/25 133/12 147/12 148/3
148/10 161/2 172/11 179/18 198/10
209/17
**lasting [1]** 195/17
**lately [1]** 177/14
**later [5]** 51/17 72/7 79/6 79/7 157/12
**launched [3]** 29/5 30/17 35/24
**launches [1]** 166/8
**law [39]** 42/1 45/4 45/5 47/16 50/25
51/3 53/17 55/1 64/8 93/25 98/21
109/8 109/20 109/20 109/21 116/18
130/21 130/23 145/5 145/25 156/7
156/17 156/18 160/2 161/17 169/21
176/10 177/12 184/17 186/11 186/12
186/22 190/11 192/10 192/11 192/18
195/3 211/15 217/5
**lawn [1]** 24/21
**lawn-mowing [1]** 24/21
**laws [1]** 201/19
**lawsuit [27]** 9/13 9/14 52/14 57/9
57/16 58/8 58/9 58/11 69/5 72/15
73/19 79/10 79/12 80/20 81/23 95/19
97/21 151/7 152/24 153/14 154/7
154/10 154/12 154/13 202/21 203/20
203/22
**lawsuits [4]** 12/8 39/17 82/9 156/23
**lawyer [6]** 93/24 144/16 144/25 158/2
210/5 210/5
**lawyers [3]** 144/16 144/21 173/18
**lay [1]** 21/15
**laying [1]** 211/15
**lead [4]** 52/23 100/16 185/21 188/17

**leaks [1]** 128/23
**learn [1]** 40/17
**learned [4]** 26/18 26/21 27/6 93/25
**leash [1]** 103/24
**least [4]** 121/9 148/1 166/2 166/24
**leave [3]** 25/25 210/3 217/4
**leaves [4]** 83/14 147/4 184/7 216/9
**leaving [2]** 29/18 114/2
**led [6]** 16/19 16/19 16/20 16/20 92/18
175/9
**leeway [4]** 17/18 87/8 102/9 157/15
**left [13]** 26/5 28/10 28/11 52/8 84/16
102/11 106/13 113/24 114/4 114/18
147/24 176/4 184/14
**legal [2]** 56/12 110/15
**legitimacy [1]** 164/9
**legitimate [1]** 169/10
**Leider [1]** 5/5
**less [10]** 19/7 30/6 30/6 79/5 79/7
102/21 120/11 154/4 160/4 206/25
**let [27]** 10/17 11/8 12/12 19/15 34/3
55/22 59/16 66/20 82/1 83/7 85/8 87/3
93/9 106/1 113/3 114/23 116/3 119/24
119/25 131/17 146/22 165/9 177/8
183/20 210/21 212/9 212/20
**let's [82]** 10/8 18/14 23/12 27/21
31/24 34/5 35/14 36/15 37/7 39/3
39/15 40/17 43/3 45/8 47/19 48/6 48/9
48/21 48/22 49/21 50/1 50/22 51/21
51/23 53/8 55/9 55/11 56/19 57/21
58/18 59/6 60/1 60/2 60/14 64/19
64/23 66/19 67/10 68/17 68/19 69/14
72/17 72/24 74/15 75/17 77/15 77/16
77/19 78/23 79/25 104/8 107/25
108/16 108/20 110/24 112/2 112/2
112/3 115/9 119/1 121/11 122/25
123/21 125/9 138/21 138/21 139/19
141/16 142/18 146/21 148/11 148/24
151/20 152/21 153/6 153/18 157/17
159/12 166/5 204/15 210/10
**letter [3]** 6/12 7/6 167/15
**letters [1]** 165/23
**level [8]** 22/17 34/3 108/5 113/9 165/7
165/7 165/10 166/10
**liability [5]** 11/11 18/24 134/18 147/9
157/18
**liable [6]** 94/5 157/19 180/19 192/24
194/15 206/10
**liar [2]** 63/4 64/3
**liberty [1]** 179/8
**lie [1]** 166/14
**lies [18]** 11/6 12/2 14/2 14/5 22/22
59/14 63/12 64/6 78/2 78/11 78/13
78/14 78/15 78/18 80/12 81/20 166/8
202/12
**life [7]** 11/16 133/20 174/4 204/3
205/21 206/12 207/13
**lifeblood [1]** 12/5
**lifeline [1]** 99/10
**light [2]** 188/15 188/25
**like [105]** 11/14 14/11 14/12 15/23
16/6 16/15 16/18 17/1 20/6 20/22 21/1
25/6 25/16 27/3 27/16 30/19 31/10
33/19 34/17 34/20 36/15 37/25 39/2
39/10 40/1 40/5 40/7 40/23 42/3 42/16
43/8 43/9 43/15 45/10 45/11 47/4
47/18 47/25 51/19 51/22 54/7 57/1

**like... [63]** 60/5 61/6 62/2 62/12 62/20 63/8 63/9 64/10 69/6 69/11 70/2 72/13 72/19 73/8 74/5 76/17 77/3 77/4 77/16 78/24 79/3 79/3 79/8 80/1 80/17 82/5 82/19 84/1 98/10 98/11 98/18 102/8 117/9 118/10 120/12 121/12 124/1 124/16 132/25 137/18 138/25 139/18 140/22 141/6 142/4 142/4 143/3 144/18 148/13 155/6 167/24 170/1 175/2 175/11 176/9 177/21 179/7 179/13 183/11 202/13 205/18 207/20 208/17

**likely [14]** 19/7 115/23 121/20 123/17 125/22 127/16 136/23 136/23 182/16 187/6 187/10 195/22 196/1 216/25

**likes [2]** 77/4 132/15

**limited [8]** 32/23 51/18 54/2 55/17 55/24 71/3 190/6 190/7

**limited-partner [1]** 51/18

**limits [1]** 85/14

**Lincoln [1]** 139/10

**line [6]** 11/21 44/22 94/13 142/13 142/21 151/1

**lines [3]** 54/13 142/18 205/5

**link [3]** 49/1 49/1 53/18

**links [3]** 78/16 78/17 78/17

**liquidating [1]** 210/17

**liquidity [1]** 103/1

**list [3]** 39/12 97/11 119/21

**listed [1]** 98/9

**listen [5]** 37/23 183/16 185/15 186/9 192/22

**lit [1]** 11/15

**literally [2]** 56/18 81/22

**literary [1]** 205/18

**litigate [1]** 95/19

**litigated [1]** 18/7

**litigating [1]** 156/24

**litigation [1]** 52/25

**little [27]** 25/5 26/17 31/8 33/9 34/1 34/4 34/16 40/17 51/24 55/20 55/21 62/24 65/8 67/4 91/1 109/7 123/21 134/4 154/16 154/25 177/20 178/20 199/25 200/17 201/4 201/17 206/5

**Liu [2]** 89/19 89/23

**live [3]** 22/14 41/3 110/19

**lives [5]** 34/19 86/17 89/20 92/25 178/15

**livestock [1]** 35/7

**living [3]** 23/17 41/4 75/14

**LLC [5]** 1/4 153/4 153/11 161/15 187/7 212/5

**LLP [1]** 1/12

**loan [1]** 46/8

**loathsome [1]** 150/14

**local [1]** 88/18

**locally [1]** 26/12

**logos [1]** 106/13

**lonely [1]** 208/6

**long [25]** 25/23 27/3 28/8 29/8 33/10 33/12 34/23 74/3 81/14 82/16 113/21 119/21 119/22 126/7 133/20 134/23 144/24 145/13 146/13 161/6 171/17 177/21 199/13 208/3 210/25

**long-term [1]** 33/12

**longer [5]** 33/15 136/4 145/2 165/20

**look [19]** 16/17 19/21 27/16 61/15 63/21 69/9 69/14 70/23 72/15 76/24 78/3 82/5 83/4 107/9 113/16 124/16 203/10 209/2 210/13

**looked [5]** 67/13 72/11 115/21 126/4 134/17

**looking [11]** 34/10 45/20 69/22 74/4 74/6 106/8 116/5 116/6 123/23 129/6 160/25

**looks [9]** 72/19 77/16 78/24 79/3 84/1 138/25 140/22 141/6 144/18

**Lord [1]** 208/8

**Los [2]** 41/4 165/17

**lose [2]** 32/16 171/11

**loses [1]** 171/14

**losing [1]** 150/15

**loss [11]** 68/13 68/20 71/10 74/23 74/23 193/5 193/9 193/9 195/9 196/12 203/14

**losses [4]** 99/11 193/12 193/17 194/22

**lost [20]** 67/22 71/7 77/11 95/20 136/12 136/15 137/12 137/17 153/12 153/12 158/20 193/5 193/5 193/6 193/14 194/23 200/25 201/1 207/12 207/12

**lot [70]** 14/25 16/5 16/6 16/19 16/20 17/1 23/3 23/4 25/9 25/21 26/13 26/21 26/21 27/6 28/16 28/20 28/23 31/9 32/5 32/18 35/5 41/7 42/25 63/17 70/11 75/10 75/16 82/9 82/9 82/24 83/2 85/4 87/8 90/21 92/4 93/21 102/9 104/2 104/3 105/20 105/22 109/9 109/15 114/4 114/5 116/2 116/17 129/6 129/8 133/17 133/18 143/19 143/22 144/1 144/2 146/18 162/3 163/24 163/25 173/5 175/3 177/17 179/11 179/22 185/15 199/14 199/14 206/9 206/12 210/25

**lots [8]** 16/20 67/8 124/23 124/24 133/1 174/22 176/10 177/14

**loud [2]** 124/3 148/14

**louder [1]** 58/14

**loudly [1]** 121/21

**love [5]** 38/24 39/7 80/7 107/23 208/4

**loved [2]** 161/5 208/6

**lovely [2]** 15/19 85/6

**low [7]** 80/17 123/23 165/7 165/7 165/8 165/10 165/10

**low-level [3]** 165/7 165/7 165/10

**low-priority [2]** 165/8 165/10

**luck [2]** 107/19 216/7

**Luckey [9]** 85/19 85/20 85/24 86/1 86/4 86/10 98/14 100/19 100/23

**lucrative [2]** 33/6 33/8

**Luke [1]** 88/8

**lunch [8]** 82/15 82/16 82/18 83/1 83/16 83/21 84/1 84/12

**lying [2]** 78/19 144/6

**M**

**ma'am [5]** 212/11 213/2 214/14 214/20 215/4

**Mackey [1]** 49/10

**mad [2]** 114/8 118/25

**made [33]** 13/18 28/6 35/25 96/8

89/13 101/21 105/20 107/10 107/11 113/17 115/13 115/15 116/21 119/7 121/6 121/15 122/15 122/18 123/10 124/3 125/24 126/11 126/13 129/10 132/10 157/6 182/23 186/15 188/7 189/2 189/3 206/13 216/14

**mafia [1]** 76/4

**MAGA [13]** 80/3 86/5 86/6 86/7 86/10 88/21 89/17 100/14 100/15 100/20 100/22 100/25 101/2

**magic [2]** 103/18 103/19

**Magistrate's [1]** 180/17

**magnitude [2]** 33/5 197/8

**Mail [2]** 1/21 218/19

**main [5]** 31/4 41/19 42/1 64/24 112/23

**mainstream [1]** 151/4

**maintain [1]** 122/6

**major [3]** 100/20 110/22 111/6

**majored [1]** 24/5

**make [50]** 14/20 14/25 17/12 20/5 20/19 21/1 33/20 40/8 46/4 46/21 47/15 57/4 61/10 62/2 65/24 69/1 78/14 78/15 87/3 94/2 111/23 112/10 113/16 116/12 116/14 116/19 116/19 118/7 121/3 122/10 122/21 128/2 128/7 128/23 132/2 147/11 148/6 160/22 175/13 176/21 176/22 182/25 183/15 183/20 184/4 186/15 188/15 208/12 209/7 217/7

**makes [5]** 32/20 33/1 109/5 166/8 190/1

**making [12]** 26/24 36/12 53/14 58/1 58/24 58/25 59/14 78/2 81/2 121/25 123/9 125/21

**malice [4]** 13/24 151/16 196/19 197/3

**malign [1]** 163/9

**malpractice [1]** 129/5

**man [9]** 14/2 14/13 14/13 17/5 49/12 78/18 143/15 181/12 181/13

**managed [2]** 28/3 110/13

**management [11]** 32/25 33/1 33/4 33/7 33/14 33/17 33/18 56/11 65/5 73/2 166/2

**manager [2]** 28/1 161/15

**managing [3]** 27/11 46/18 170/9

**Manchester [1]** 87/12

**manipulated [1]** 136/3

**manner [3]** 145/20 167/12 188/22

**manual [1]** 166/16

**many [18]** 15/4 15/22 18/19 29/9 37/1 53/24 67/6 81/19 108/12 113/12 114/18 121/23 125/6 125/7 125/22 147/18 167/17 209/9

**March [1]** 24/17

**MARK [1]** 1/9

**marked [1]** 51/22

**market [4]** 25/6 25/7 70/8 70/11

**marriage [1]** 132/25

**marriages [1]** 207/24

**married [7]** 22/15 34/23 59/14 78/18 94/24 94/25 95/3

**martyr [1]** 148/6

**Massachusetts [1]** 139/11

**massive [3]** 65/4 68/23 69/8

**Master's [1]** 26/2

**matched [1]** 181/16

**material [3]** 130/3 140/6 143/20

**materials [1]** 217/3
**math [5]** 23/22 74/16 74/18 74/25 210/19
**mathematical [2]** 195/4 209/3
**matter [22]** 15/5 56/8 56/10 75/16 92/25 99/24 109/6 112/20 130/5 137/6 137/8 137/13 137/20 138/1 138/3 138/9 145/1 157/3 158/19 169/16 190/9 218/5
**matters [11]** 19/14 52/24 75/16 102/18 105/21 115/17 121/4 161/17 165/8 190/13 208/7
**may [56]** 10/19 10/21 12/11 21/16 22/6 53/18 55/23 78/10 100/11 103/9 103/11 103/25 135/1 139/4 139/9 145/20 151/3 159/20 182/7 182/8 183/10 185/23 187/17 187/18 187/19 188/6 188/6 188/10 188/15 188/21 188/24 189/6 189/7 189/9 189/20 190/6 190/9 190/17 190/18 191/8 192/8 192/17 192/17 193/7 193/13 193/18 194/23 195/11 195/15 195/20 195/24 196/14 207/21 207/21 208/13 209/7
**maybe [19]** 15/12 16/14 32/5 75/7 98/1 98/24 99/13 117/2 126/24 140/14 146/19 148/5 155/3 156/11 160/15 172/22 173/21 175/10 207/19
**MBA [4]** 7/11 26/2 26/6 26/10
**McBryde [2]** 160/15 161/1
**McCain [3]** 90/23 91/8 127/21
**me [226]**
**me as [1]** 179/1
**Me-Too [2]** 119/21 123/6
**mean [39]** 23/3 23/5 35/20 36/9 37/12 37/20 38/18 45/5 49/4 54/4 54/11 62/4 63/6 63/15 64/7 64/10 66/8 68/1 73/18 76/11 80/19 81/21 82/8 91/22 101/24 104/1 111/10 117/11 118/6 125/5 132/1 160/20 165/9 171/6 173/24 174/10 175/6 175/13 188/4
**means [21]** 11/3 23/6 55/2 82/22 119/21 121/22 130/7 134/13 154/18 171/5 171/6 174/13 187/3 187/5 187/10 187/11 196/21 197/2 197/3 197/5 212/22
**meant [5]** 58/16 146/11 146/12 196/12 203/14
**measure [1]** 196/21
**measured [1]** 187/13
**mechanical [1]** 1/23
**Medalist [1]** 4/22
**media [30]** 13/8 13/10 16/15 36/6 37/18 38/6 38/15 65/3 65/4 65/8 66/16 66/18 66/25 67/1 67/9 67/22 68/13 68/20 74/23 83/4 136/13 136/15 137/12 155/21 155/22 156/3 156/7 193/9 194/25 201/1
**mediation [1]** 96/3
**medical [1]** 105/17
**meet [14]** 41/11 41/13 42/23 71/23 72/12 85/24 86/13 87/10 87/25 88/7 88/13 92/1 116/20 158/23
**meeting [13]** 40/13 40/14 43/3 43/10 43/13 43/14 43/22 43/24 45/2 45/9 45/13 86/3 89/6

**member [2]** 14/14 98/21
**members [3]** 92/2 R2/25 186/10
**memory [5]** 139/10 188/9 190/24 190/24 190/25
**Mention [7]** 8/14 8/16 66/17 66/21 67/8 67/13 67/21
**mentioned [8]** 29/16 30/13 42/10 45/21 99/8 118/3 129/21 172/25
**mentioning [1]** 173/15
**mentions [2]** 49/24 50/16
**Mercer [1]** 94/15
**merely [5]** 20/7 21/16 157/21
**mess [1]** 112/4
**message [11]** 11/23 14/11 44/9 44/23 51/7 62/23 79/13 80/9 132/18 191/22 203/6
**messages [1]** 179/24
**met [12]** 16/25 40/1 41/3 41/14 43/5 63/14 63/24 75/22 85/25 86/14 88/17 92/2
**meted [1]** 199/17
**method [2]** 91/16 172/16
**methods [1]** 131/3
**Mexican [2]** 162/12 162/13
**mguzman.csr [2]** 1/21 218/19
**microphone [3]** 22/5 160/13 160/19
**Mid [1]** 45/10
**middle [5]** 36/8 47/14 141/16 141/20 149/2
**might [4]** 18/24 43/16 48/24 48/25 50/13 50/13 50/13 58/25 94/11 118/11 120/19 125/4 143/1 145/15 145/19 146/15 155/6 170/2 171/7 179/7 179/23 185/6 200/17 201/17
**Mike [2]** 72/19 72/21
**military [3]** 61/22 72/4 163/7
**million [35]** 67/21 68/15 69/21 69/22 69/22 70/2 70/2 70/16 70/22 70/24 71/15 75/1 98/10 98/10 137/18 141/23 142/3 142/16 142/17 142/24 151/24 152/11 153/16 154/4 201/24 202/18 202/24 202/25 203/2 203/21 203/25 204/4 210/19 213/20 214/11
**millions [6]** 18/2 36/10 37/14 66/3 68/2 138/16
**Milton [1]** 139/11
**mind [11]** 19/18 20/13 50/18 99/3 99/14 110/22 148/5 173/25 188/3 195/15 196/23
**mine [1]** 87/18
**minimal [1]** 142/17
**minimum [2]** 32/13 73/6
**minute [9]** 10/17 13/16 183/6 186/7 199/3 203/16 204/23 208/6 209/20
**minutes [19]** 10/16 23/2 36/25 146/25 148/21 160/4 183/3 183/10 184/4 185/25 186/4 186/5 186/6 199/2 204/19 209/13 209/15 209/22 210/2
**misconduct [1]** 126/13
**misdemeanor [3]** 179/16 180/13 180/16
**miserable [1]** 16/21
**misleading [1]** 166/3
**miss [1]** 110/13
**missed [2]** 136/14 174/10
**misstatement [2]** 188/7 188/8
**mistake [1]** 188/3

**mistakes [1]** 175/13
**mistreated [1]** 80/5
**misunderstanding [3]** 76/17 76/18 110/8
**mitigation [1]** 115/2
**mob [5]** 12/14 47/18 119/11 120/3 121/12
**mocking [1]** 74/8
**mom [1]** 23/21
**moment [4]** 147/3 150/7 191/16 199/5
**Monday [2]** 77/17 216/16
**monetarily [1]** 208/1
**monetary [2]** 15/1 193/5
**monetize [1]** 33/11
**money [72]** 12/15 12/20 22/20 27/12 28/3 29/21 29/23 31/9 32/16 32/20 33/1 35/4 38/13 39/22 40/14 46/6 52/20 52/21 56/25 61/3 61/12 61/17 64/9 64/9 68/3 69/1 69/19 70/1 71/5 73/14 76/4 76/4 76/7 77/2 78/9 78/10 80/5 81/1 81/2 87/21 91/11 96/4 98/17 99/5 99/18 100/15 100/15 102/13 102/24 104/3 117/18 117/21 119/10 120/2 121/12 134/19 135/24 137/17 144/3 155/22 194/17 196/3 198/3 202/4 205/11 206/13 206/14 206/15 206/22 207/12 213/22 214/7
**MONICA [4]** 1/19 218/3 218/11 218/11
**Monte [1]** 205/3
**month [10]** 67/16 68/10 73/6 73/11 73/11 73/23 91/21 91/23 92/12 95/20
**months [8]** 13/17 56/6 67/17 67/25 71/25 73/7 147/12 167/18
**Moore [1]** 89/2
**more [55]** 17/22 23/10 24/6 26/17 28/18 28/21 28/22 28/23 30/3 30/10 33/6 33/8 34/16 42/19 55/20 58/17 69/7 70/10 70/12 73/19 79/9 79/12 80/10 80/10 102/20 105/10 108/19 112/3 112/12 118/1 120/11 122/16 126/25 131/21 136/5 166/24 177/7 179/19 180/25 182/16 182/18 187/6 187/10 195/8 204/3 206/20 206/20 206/21 206/22 206/22 206/22 206/25 207/3 207/6 207/12
**morning [4]** 22/12 58/19 161/3 199/24
**Morningstar [1]** 4/22
**Morton [2]** 111/7 120/9
**most [4]** 16/23 18/4 82/11 111/13
**mostly [2]** 73/10 124/24
**mother [4]** 91/5 95/6 158/22 205/23
**motion [7]** 20/19 21/1 216/13 216/17 216/19 216/23 217/7
**mouth [1]** 160/23
**move [24]** 20/17 21/1 21/4 21/4 26/4 28/18 39/2 53/8 94/2 106/16 108/20 113/19 115/9 122/25 141/13 159/12 160/7 166/5 204/10 204/12 204/14 207/14 207/15
**moved [7]** 23/15 28/17 41/4 162/11 162/15 176/1 204/9
**movement [1]** 173/13
**moves [2]** 63/1 204/11
**movie [4]** 173/8 178/15 178/16 205/6
**movies [1]** 205/2
**moving [1]** 110/24
**mowing [1]** 24/21

**Mr [425]**

**Mrs [1]** 206/1

**Ms [29]** 34/5 36/17 47/25 48/9 49/22 50/2 51/22 55/21 56/19 59/9 60/1 60/3 66/19 67/11 69/15 72/18 72/24 79/25 80/22 123/22 138/22 140/12 140/15 144/11 149/5 149/20 151/11 152/10 152/15

**much [16]** 19/6 19/11 24/6 32/6 74/10 78/24 101/13 105/16 108/7 112/12 114/15 128/13 160/18 181/7 206/6 206/25

**multiple [3]** 12/8 62/6 207/21

**Muns [1]** 5/11

**museums [1]** 208/20

**Musk [4]** 88/1 143/16 176/11 176/14

**Musk's [1]** 88/7

**must [16]** 47/4 134/13 167/7 186/11 187/1 187/2 189/4 191/18 192/10 193/1 194/16 195/2 195/18 196/2 198/11 205/6

**mutual [3]** 30/19 30/22 72/1

**my [192]** 10/24 14/3 15/9 16/7 16/7 16/14 18/2 20/12 20/15 22/15 22/20 22/22 23/7 23/7 23/8 23/15 23/18 23/21 23/22 24/10 24/11 24/23 29/1 29/10 29/13 30/17 33/24 34/11 34/17 34/18 35/13 37/13 37/13 37/15 37/15 37/20 38/1 38/1 39/1 39/7 39/13 41/13 41/14 46/23 48/14 48/16 48/19 50/7 51/10 51/18 51/18 51/20 52/9 52/15 53/18 53/23 54/2 54/2 54/12 56/1 56/8 56/17 58/2 58/5 59/15 62/3 65/7 65/23 68/24 69/9 69/10 69/12 71/11 71/13 71/13 71/20 72/9 73/3 73/13 74/16 74/18 74/25 75/13 75/21 75/21 76/14 76/15 77/22 78/1 78/6 78/19 78/19 81/11 81/12 81/23 83/18 87/3 91/3 91/5 91/16 94/13 95/6 95/6 96/5 98/1 102/24 105/25 106/23 107/18 107/24 108/18 109/7 109/9 109/12 109/17 110/1 110/11 110/17 110/22 111/14 111/18 114/12 117/5 119/13 127/15 130/6 130/9 132/23 133/17 134/15 136/2 136/5 136/8 138/25 139/11 140/22 142/11 143/18 143/19 143/22 143/24 146/22 147/12 148/13 148/16 149/9 149/10 152/20 153/5 154/10 154/13 155/25 158/16 158/21 158/22 160/23 161/14 162/11 164/5 164/14 171/3 171/23 171/23 171/24 171/24 173/25 174/2 174/6 175/3 178/14 178/25 178/25 179/1 180/11 192/1 199/13 199/19 204/25 205/2 205/5 205/18 205/23 205/23 206/8 206/12 206/14 207/10 207/11 207/12 212/9 215/11

**myriad [1]** 151/3

**myself [3]** 76/15 155/10 209/4

**N**

**Nairobi [2]** 163/20 164/5

**name [20]** 10/24 13/22 25/12 29/14 30/12 34/12 37/12 37/13 37/15 43/6 46/10 61/14 63/15 98/3 98/6 122/3 153/15 161/1 161/14 165/12

**named [5]** 42/23 49/10 62/19 89/9 159/23

**names [1]** 208/15

**narrative [2]** 154/17 155/15

**narrative-style [1]** 155/15

**narrow [1]** 116/13

**national [53]** 35/25 36/1 38/15 67/5 68/1 89/19 89/21 90/4 90/15 90/18 90/23 91/8 91/8 94/25 105/18 105/21 105/24 107/13 108/12 108/21 109/11 111/20 114/6 114/13 114/19 114/25 115/16 115/21 115/22 116/15 116/18 118/8 118/9 118/17 119/14 119/17 119/20 119/22 120/12 121/18 126/23 127/19 127/21 128/14 128/17 128/19 129/14 129/17 131/14 131/16 145/8 152/4 163/2

**nationalist [5]** 151/1 152/7 152/9 156/13 173/6

**nationals [1]** 132/11

**nations [1]** 128/3

**nationwide [2]** 13/2 65/16

**natural [2]** 129/15 174/3

**nature [4]** 47/11 49/7 195/21 197/14

**Navy [1]** 163/12

**NCRA [1]** 218/12

**near [2]** 139/11 204/21

**necessarily [1]** 188/4

**necessary [4]** 19/24 147/24 166/25 193/21

**need [39]** 20/19 21/15 26/3 31/9 68/25 71/19 73/12 82/22 83/20 83/20 84/20 85/9 85/9 87/3 88/2 103/18 103/19 104/18 104/19 120/25 121/1 121/3 141/5 153/14 157/11 160/23 170/2 170/2 174/17 183/7 183/8 183/13 188/8 195/19 204/7 204/21 210/2 211/1 217/7

**needed [3]** 43/21 73/2 110/1

**needs [5]** 14/14 18/11 168/6 170/23 210/22

**negative [3]** 35/12 68/7 80/11

**negligence [2]** 196/20 197/4

**neighbors [1]** 24/12

**Neil [2]** 37/9 65/9

**nerd [1]** 15/11

**nerd's [1]** 15/11

**net [7]** 28/2 32/12 32/13 102/20 138/16 197/21 210/9

**network [1]** 206/22

**networks [2]** 36/3 112/10

**never [32]** 29/14 45/6 54/5 54/5 54/5 57/15 66/13 69/4 69/5 69/5 71/5 93/4 93/5 99/5 99/25 124/18 129/13 129/19 131/1 132/14 133/3 145/7 157/4 176/5 176/6 178/10 181/3 191/18 207/18 208/19 208/24 209/23

**nevertheless [1]** 197/10

**new [9]** 71/24 112/20 147/19 151/2 158/25 171/19 176/8 206/18 207/20

**newly [2]** 162/10 163/1

**News [2]** 153/4 153/11

**next [38]** 10/7 12/9 13/23 27/8 46/20 47/23 51/13 60/1 60/2 64/15 72/24 83/8 85/5 94/13 102/16 103/15 107/25 108/20 110/6 113/18 115/10 115/24 119/1 123/22 126/11 135/6 148/11

**nice [1]** 168/6

**night [6]** 36/8 47/14 56/14 76/14 76/15 205/25

**nine [1]** 33/13 167/18 177/20 177/21

**no [163]** 1/4 11/5 11/21 15/8 20/22 20/24 21/9 21/12 21/13 21/15 22/21 27/25 29/22 31/12 33/8 35/2 36/9 38/18 40/14 46/1 46/16 46/19 47/5 47/6 47/6 51/12 53/14 53/21 54/13 57/7 58/3 58/11 59/17 59/19 59/21 59/23 59/25 60/11 60/18 60/23 60/25 61/2 61/5 62/11 63/15 64/16 65/22 70/5 70/17 71/3 71/18 75/7 76/18 80/25 84/5 86/12 87/14 87/22 88/17 88/23 89/18 89/21 89/21 89/24 90/3 90/8 90/10 90/17 91/24 92/7 92/8 92/20 93/7 94/18 95/1 97/18 102/12 103/4 108/14 112/8 115/5 121/23 124/10 124/24 126/3 128/23 129/1 129/5 129/14 131/24 137/2 137/3 137/4 137/6 137/6 137/14 138/2 138/3 138/7 138/11 138/13 138/15 138/20 139/22 140/5 140/6 140/10 140/11 140/13 140/20 140/22 143/8 145/2 146/8 146/11 147/24 149/23 150/10 150/23 152/13 152/18 152/19 152/20 152/24 154/12 155/16 155/16 158/6 158/6 158/16 159/7 159/13 159/16 165/20 169/7 169/18 173/14 174/14 174/16 176/8 176/19 176/20 177/18 177/23 178/1 178/1 178/10 178/10 178/10 179/25 180/22 181/2 182/3 184/23 190/1 195/19 198/2 208/10 208/18 209/20 211/4 218/12 218/12

**nobody [5]** 16/16 122/12 132/15 134/17 207/18

**nod [2]** 17/17 82/23

**Noise [1]** 199/18

**nominated [1]** 113/11

**none [8]** 15/8 118/24 129/15 137/4 164/24 177/23 177/23 185/2

**nonexistence [1]** 189/25

**nonresponsive [2]** 139/15 140/19

**nonstop [2]** 64/10 80/25

**Nope [2]** 137/6 181/5

**normal [1]** 54/6

**normally [1]** 48/15

**north [1]** 142/25

**NORTHERN [3]** 1/2 105/17 218/13

**Nosek [1]** 88/8

**not [271]**

**note [3]** 10/14 17/4 139/21

**note-taking [1]** 10/14

**notepads [3]** 10/3 10/9 10/13

**notes [7]** 190/23 190/25 191/1 191/1 191/2 191/3 191/4

**nothing [21]** 11/4 11/5 27/17 47/2 63/16 63/17 65/22 65/23 72/8 72/9 77/8 80/13 93/22 94/22 99/24 103/7 180/17 182/6 209/21 209/21 212/1

**notice [1]** 15/14

**notification [1]** 61/16

**novel [1]** 19/6

**novels [1]** 19/5

**N**

**November [1]** 89/14

**now [82]** 11/17 15/14 16/6 16/10 16/22 16/24 19/12 20/12 31/24 36/1 38/23 39/14 43/16 45/8 45/12 47/19 49/20 50/18 50/22 56/3 57/21 57/24 63/2 64/19 68/17 70/1 70/8 70/12 72/12 78/2 83/22 86/19 92/15 95/6 96/23 97/4 98/8 101/2 102/21 107/22 111/13 123/21 125/1 127/13 129/21 131/4 135/7 141/12 142/16 142/18 144/4 146/3 150/19 151/20 153/24 154/15 156/5 156/12 156/20 158/23 172/25 173/17 176/16 177/1 177/19 178/7 179/22 182/21 183/1 186/11 205/6 205/18 206/2 206/9 206/19 207/5 207/24 208/10 208/18 208/21 211/12 215/23

**nowhere [1]** 16/7

**NSA [5]** 111/4 111/10 114/4 114/7 163/16

**NSA's [1]** 114/9

**number [73]** 15/12 38/1 38/1 48/16 61/14 67/10 99/20 99/21 104/5 113/14 113/15 136/21 136/23 138/5 143/17 145/5 145/6 146/6 152/18 158/24 162/4 162/9 165/23 167/2 175/22 184/11 187/13 187/14 189/12 189/14 189/17 194/1 194/7 194/13 196/3 196/18 196/19 197/14 197/15 197/16 197/17 197/22 198/3 200/21 201/12 201/16 201/22 201/22 201/23 201/23 201/24 201/25 202/1 202/2 202/8 202/19 202/25 203/1 203/4 203/19 203/21 212/6 212/11 212/13 213/7 213/13 213/15 213/22 214/3 214/7 214/19 214/23 215/1

**numbers [8]** 63/6 69/17 72/6 74/22 200/14 200/18 200/20 201/3

**numerical [1]** 191/19

**numerous [2]** 102/3 102/4

**O**

**oath [5]** 17/15 90/13 104/21 144/2 144/4

**Obama [1]** 113/23

**object [6]** 17/7 18/12 93/8 140/19 178/21 184/22

**objection [22]** 18/10 20/22 20/24 21/7 21/13 86/23 87/2 95/17 95/18 96/15 96/17 101/3 101/5 115/4 115/5 139/15 156/25 157/16 159/1 164/23 175/1 181/2

**objections [3]** 2/13 184/23 185/1

**objectively [1]** 197/5

**objectives [1]** 56/4

**obsessed [1]** 208/25

**obtained [1]** 143/25

**obvious [2]** 110/13 143/21

**obviously [9]** 16/15 24/5 55/6 57/2 69/4 75/21 76/12 76/15 139/7

**occasions [1]** 205/22

**occur [1]** 196/1

**occurrence [1]** 197/6

**October [10]** 24/17 45/13 47/19 48/7 48/12 48/13 50/23 57/5 139/21 143/3

**off [28]** 13/13 13/13 13/15 26/15 36/17 37/10 43/15 52/8 62/5 62/6 65/17 65/17 66/9 67/3 67/20 68/24 77/2 81/2 84/16 85/14 126/14 143/22 167/20 167/22 177/2 184/12 185/21 199/23

**off-color [1]** 62/6

**offends [1]** 197/19

**offense [1]** 208/19

**offer [4]** 11/4 106/23 110/5 114/24

**offered [6]** 4/2 16/2 18/1 40/9 95/14 95/15

**offering [5]** 7/11 47/1 51/11 138/5 138/12

**office [8]** 38/2 90/16 90/18 109/17 118/11 162/7 169/8 179/18

**officer [3]** 162/1 168/17 212/14

**officers [1]** 162/24

**offices [1]** 89/3

**Official [1]** 218/13

**officials [1]** 111/4

**often [10]** 41/1 41/9 47/12 102/18 118/1 132/23 145/17 145/21 166/24 180/24

**oh [15]** 23/6 43/25 44/3 48/23 79/23 80/19 97/15 100/18 119/19 125/1 130/24 142/22 143/1 181/12 211/2

**okay [240]**

**old [4]** 24/11 24/20 26/25 27/19

**oligarch [1]** 155/23

**omission [1]** 197/5

**Omitted [4]** 6/3 6/4 6/15 8/2

**once [14]** 66/5 75/8 80/5 125/24 150/20 150/20 166/24 198/11 198/18 198/22 199/3 207/7 208/14 211/16

**one [97]** 11/15 12/8 13/16 14/23 15/5 15/15 16/1 16/9 17/22 24/6 26/7 30/17 32/5 34/20 35/20 36/15 39/6 40/21 42/3 48/21 48/22 48/23 51/17 51/18 56/1 57/17 58/13 58/21 59/1 62/20 67/20 68/4 68/4 68/6 68/18 70/1 74/10 76/14 80/19 82/1 82/3 84/18 85/22 86/16 87/6 88/17 91/16 91/20 93/24 93/24 95/3 98/24 99/4 99/13 99/18 99/20 100/20 105/10 106/13 106/13 108/14 121/9 121/23 132/1 132/2 146/13 148/12 148/16 149/9 152/20 152/23 157/6 163/25 172/3 173/15 175/22 180/5 182/13 189/21 192/14 196/16 197/5 200/1 203/4 203/5 203/16 205/2 205/5 205/14 205/17 206/12 207/6 210/2 210/7 210/21 212/12 212/23

**ones [2]** 23/21 175/16

**ongoing [1]** 175/10

**online [18]** 12/10 13/25 14/4 22/23 37/13 37/14 63/6 64/6 64/11 73/23 74/8 74/8 77/25 79/10 79/24 82/6 93/6

**only [27]** 16/1 18/2 30/22 33/14 67/25 70/2 71/3 82/1 122/9 122/10 126/6 152/17 152/20 158/16 170/7 173/3 186/22 188/11 188/12 190/7 190/24 193/22 196/15 200/10 200/10 200/11 215/20

**onslaught [1]** 202/12

**Oops [1]** 135/14

**op [1]** 34/25

**open [2]** 20/13 28/23

**opened [5]** 30/3 174/20 179/1 179/4 181/25

**opening [15]** 10/8 10/9 10/16 14/20 17/10 17/11 17/25 19/16 20/6 23/3 42/11 45/21 75/15 83/3 199/2

**operated [1]** 172/11

**operates [2]** 60/10 166/16

**operating [3]** 162/21 164/13 169/10

**operation [2]** 60/12 168/3

**operational [1]** 163/14

**operationally [1]** 129/19

**operations [4]** 162/2 162/17 177/2 193/17

**operative [1]** 168/15

**opinion [16]** 64/2 64/5 83/11 102/22 102/24 106/23 121/14 146/23 166/13 180/11 181/19 184/5 186/16 190/12 190/13 190/17

**opinions [4]** 108/1 108/5 134/20 164/8

**opportunities [3]** 131/3 193/9 194/24

**opportunity [14]** 45/22 88/4 96/23 97/3 97/4 97/8 111/21 124/17 127/10 150/6 154/20 184/20 185/1 209/16

**opposed [1]** 122/21

**opposing [1]** 189/12

**option [1]** 102/12

**oral [1]** 170/24

**orally [1]** 191/25

**Orange [2]** 165/17 180/16

**order [14]** 7/21 7/23 7/24 8/1 20/2 82/25 161/2 168/22 168/23 173/2 173/12 173/14 174/19 216/14

**ordered [1]** 166/1

**orders [2]** 183/25 192/4

**ordinary [1]** 169/15

**organizations [4]** 156/13 173/6 192/25 195/13

**organized [3]** 11/13 162/11 162/15

**orient [3]** 25/1 57/22 165/13

**original [1]** 185/18

**originally [2]** 11/12 42/24

**ostracization [1]** 150/14

**other [60]** 14/25 16/11 17/1 17/23 30/24 60/7 60/11 63/8 63/19 64/11 64/12 70/5 70/14 78/10 78/14 79/11 81/4 81/19 82/3 93/2 102/12 102/12 109/21 117/22 118/21 118/22 120/14 121/22 126/24 131/16 133/11 138/7 143/23 147/24 153/18 156/11 156/23 162/3 174/10 175/10 182/14 186/15 187/4 187/25 188/6 188/15 189/1 189/2 189/18 189/23 189/25 190/14 191/4 191/9 192/9 192/14 193/12 193/17 197/2 208/7

**others [7]** 77/5 164/15 178/15 196/13 197/8 197/11 203/17

**otherwise [5]** 108/9 167/4 187/17 191/18 192/5

**our [29]** 10/12 20/19 31/24 34/20 77/20 82/15 83/15 96/10 103/17 104/4 109/25 110/6 120/12 120/13 120/14 120/15 125/9 128/10 131/2 154/17 173/19 184/10 184/14 185/20 198/20 211/13 213/2 213/3 214/12

**ourselves [1]** 146/20

**out [97]** 10/9 12/9 13/8 18/2 19/4 25/6

**out... [91]** 25/17 30/22 32/23 33/17 33/23 37/13 38/1 38/24 39/11 39/13 53/5 54/8 54/9 54/10 54/25 55/5 55/6 57/13 57/14 58/16 59/2 59/4 60/7 62/21 62/22 64/17 66/5 66/5 66/13 68/5 71/18 71/19 72/2 72/7 72/8 73/9 73/19 74/4 75/8 75/8 75/14 76/7 76/22 77/7 77/9 78/5 79/11 79/14 79/18 79/23 80/6 81/22 81/23 81/24 82/6 100/15 101/17 114/17 117/13 117/14 117/15 117/19 122/16 122/19 124/8 125/4 126/6 127/24 131/18 133/11 133/13 133/16 133/18 144/11 145/24 150/7 171/20 177/18 181/7 184/15 185/5 199/17 202/16 202/21 205/3 207/5 209/9 210/8 210/19 212/20 217/4
**outcome [2]** 189/7 208/11
**outed [1]** 145/20
**outing [1]** 146/19
**outings [1]** 34/20
**outline [2]** 19/17 164/6
**Outreach [1]** 52/23
**outside [3]** 110/2 110/3 179/20
**outstanding [2]** 216/11 216/13
**outward [1]** 128/6
**overall [2]** 108/17 108/18
**overruled [2]** 87/2 157/16
**overseas [1]** 129/7
**oversell [1]** 110/11
**overt [1]** 169/24
**Overton [2]** 25/13 25/15
**overturn [1]** 130/12
**overturned [1]** 130/11
**own [19]** 12/12 17/15 18/5 24/10 24/11 29/1 51/20 56/4 59/4 97/3 109/7 112/20 112/25 117/4 130/1 130/22 137/23 166/16 191/2
**ownership [1]** 120/24

**P**

**p.m [3]** 198/17 211/21 212/4
**page [28]** 2/2 48/6 48/10 49/18 49/22 50/22 51/23 59/6 60/2 60/3 67/10 72/24 106/8 106/24 138/22 139/1 139/6 141/17 141/20 149/20 151/9 151/10 151/20 152/21 152/22 153/6 198/10 210/10
**paid [6]** 29/18 29/19 33/19 38/4 168/7 190/19
**paint [1]** 62/9
**Palmer [17]** 85/18 85/20 85/24 86/1 86/4 86/10 89/4 98/14 98/24 99/3 99/5 99/18 100/4 100/7 100/8 100/19 100/22
**pandemic [1]** 208/7
**pandemics [1]** 207/16
**panel [2]** 93/2 93/3
**paragraph [7]** 149/21 150/25 151/9 151/10 151/11 151/20 153/6
**paragraphs [1]** 153/23
**pare [1]** 160/3
**parents [3]** 23/15 23/17 23/18
**part [32]** 27/12 33/3 39/13 49/20 53/8 63/17 75/11 77/2 79/7 97/13 109/9 120/11 123/7 124/21 126/20 126/23

**participate [1]** 124/23
**participation [2]** 33/2 71/4
**particular [9]** 46/5 67/7 107/13 116/11 119/19 123/7 129/10 167/13 195/5
**particularly [14]** 16/18 17/1 109/15 112/18 113/13 114/19 121/15 121/16 128/3 129/12 130/17 132/19 163/9 174/23
**particulars [1]** 146/5
**parties [8]** 10/8 20/5 78/8 88/12 128/12 185/12 192/1 197/18
**parties' [1]** 186/23
**partner [2]** 51/18 55/24
**partners [7]** 12/3 15/5 32/23 54/1 54/2 55/17 88/8
**partnerships [1]** 69/11
**parts [3]** 99/18 112/21 112/22
**party [5]** 66/17 88/10 189/6 196/12 203/14
**party's [3]** 20/7 192/16 192/16
**pass [5]** 82/13 125/1 127/3 154/14 169/13
**passed [1]** 161/2
**past [7]** 16/18 16/19 48/15 63/18 124/15 148/11 209/4
**paste [1]** 140/23
**pasted [1]** 140/7
**patient [2]** 93/20 101/16
**pattern [4]** 118/5 118/22 193/19 193/23
**pause [4]** 10/1 185/8 199/9 204/17
**pay [12]** 24/24 25/21 29/23 37/4 37/5 38/5 71/11 71/11 71/12 74/17 95/15 173/15
**payroll [1]** 176/12
**peace [1]** 195/15
**Pearl [1]** 1/13
**pecuniary [1]** 153/12
**pen [1]** 168/6
**penalized [1]** 146/10
**penetrated [1]** 177/15
**people [81]** 14/11 16/6 16/14 16/23 17/2 19/7 23/4 26/14 30/19 32/10 32/12 33/16 37/14 37/21 37/25 38/24 39/5 39/12 40/4 53/19 55/7 60/7 60/11 62/2 62/22 63/6 63/19 64/9 67/6 68/2 70/11 74/6 75/9 75/10 76/23 78/14 79/11 81/1 81/4 81/4 81/5 81/19 81/22 82/11 97/12 109/13 109/17 115/22 117/6 117/12 117/15 117/24 118/1 118/7 121/23 123/20 124/4 124/13 124/23 124/24 125/25 132/9 132/17 145/9 145/14 167/11 167/23 169/6 169/20 170/5 171/25 176/7 176/10 177/15 188/5 206/23 207/1 207/5 207/7 208/15 208/16
**people's [2]** 125/21 210/12
**percentage [3]** 68/7 100/22 100/24
**perfect [1]** 48/10
**performance [3]** 170/22 170/24 171/2
**perhaps [2]** 20/17 169/2
**period [13]** 36/12 37/2 39/24 40/25 44/16 45/12 65/13 67/3 67/17 67/23

**perjury [1]** 144/7
**permanent [1]** 150/21
**permanently [1]** 66/13
**permission [2]** 145/24 146/8
**permitted [2]** 188/13 190/12
**Perry [3]** 89/2 89/5 89/9
**person [21]** 14/25 16/17 40/2 40/6 40/13 46/9 46/12 54/24 66/11 72/2 93/2 95/12 118/13 145/20 151/3 157/4 168/8 174/23 182/14 190/10 193/4
**person's [1]** 61/17
**personal [10]** 13/20 35/18 53/11 53/15 56/3 85/13 99/23 123/18 195/10 195/14
**personally [12]** 14/7 56/9 57/10 58/4 62/2 68/13 68/14 71/14 73/12 75/19 75/20 78/1
**persons [1]** 192/9
**perspective [4]** 113/16 123/4 123/22 123/25
**persuades [1]** 187/6
**persuasive [1]** 130/18
**pertinent [2]** 162/23 163/7
**Peter [4]** 86/13 86/14 86/15 176/12
**phase [2]** 19/13 19/21
**phone [11]** 41/7 48/16 52/10 72/6 118/15 143/18 169/6 172/20 172/22 199/19 208/16
**phones [1]** 177/16
**photo [2]** 34/25 35/8
**Photograph [1]** 8/25
**physical [1]** 150/16
**pick [1]** 169/5
**picked [1]** 28/5
**picture [2]** 34/14 57/24
**piece [2]** 175/14 210/1
**pieces [1]** 181/15
**Piper [1]** 1/12
**PITTMAN [1]** 1/9
**place [4]** 94/11 107/24 208/5 208/18
**placed [2]** 34/5 202/25
**places [3]** 82/24 143/20 189/3
**plaintiff [10]** 10/16 15/21 19/21 19/22 20/21 21/19 151/10 151/13 153/1 153/14
**plaintiffs [23]** 1/12 2/11 19/16 19/18 19/24 21/4 21/21 114/24 135/7 143/24 144/13 153/10 160/1 182/14 184/18 187/7 192/24 193/2 193/18 193/20 193/22 199/1 201/25
**plaintiffs' [6]** 2/6 3/7 3/12 21/8 21/14 187/15
**plan [1]** 170/22
**planes [1]** 110/22
**plans [1]** 30/20
**platform [1]** 178/9
**platforms [1]** 178/2
**plausible [6]** 116/16 118/19 118/20 126/11 167/25 169/2
**play [8]** 37/7 58/21 59/9 60/2 60/3 125/4 134/20 192/8
**played [6]** 24/1 37/8 59/10 60/4 60/16 77/25
**player [2]** 60/24 61/11
**playing [4]** 36/17 36/23 97/16 150/5
**plays [1]** 121/2

**please [42]** 22/4 22/12 36/16 49/22 60/3 66/19 69/15 77/15 79/25 84/9 93/15 96/13 106/18 107/6 108/25 140/15 141/7 141/9 142/12 142/13 142/21 149/5 149/20 152/10 152/15 157/12 158/4 161/13 161/23 174/13 186/9 191/22 194/5 194/11 196/7 198/6 211/19 213/11 213/18 214/1 214/10 217/2
**plenty [1]** 102/24 177/25
**plus [3]** 29/12 96/6 203/2
**pocket [1]** 71/14
**podcasts [1]** 59/3
**podium [2]** 20/18 84/20
**point [101]** 1/4 6/22 9/9 10/25 12/5 12/18 12/24 13/14 14/8 15/5 21/21 29/5 29/13 29/14 29/24 29/25 30/1 30/14 31/4 31/14 32/19 33/1 33/20 35/14 35/15 35/19 35/22 37/11 37/19 39/4 41/15 43/3 45/17 46/3 46/25 55/25 57/11 60/19 62/23 64/22 65/2 66/1 66/15 67/19 68/4 68/5 68/6 68/10 68/17 68/21 69/17 71/10 71/15 71/17 73/3 73/5 73/11 73/21 74/18 75/2 80/19 81/21 84/14 86/4 106/9 106/20 108/4 108/5 108/16 110/6 114/24 119/8 120/2 121/17 121/18 130/4 137/11 148/25 154/20 156/11 162/20 164/20 165/21 166/9 171/12 180/1 180/18 184/10 185/10 187/7 193/13 194/8 200/23 201/8 201/9 201/20 201/23 205/17 206/12 212/5 213/16
**points [3]** 75/1 94/2 116/8
**poison [1]** 168/6
**poke [2]** 96/23 97/5
**police [3]** 162/1 162/4 162/23
**policies [1]** 115/2
**policing [1]** 126/25
**policy [3]** 105/19 113/5 166/16
**polite [1]** 93/21
**political [5]** 39/19 98/18 99/15 113/24 151/3
**politically [1]** 91/12
**politicians [1]** 162/24
**politics [5]** 41/8 44/19 98/14 104/2 151/4
**polled [1]** 215/15
**pool [1]** 100/25
**poor [1]** 200/25
**popped [2]** 63/16 63/17
**pops [2]** 63/22 72/15
**portfolio [1]** 27/25
**portion [1]** 190/22
**portrait [1]** 181/11
**pose [1]** 169/7
**position [8]** 82/8 113/9 113/13 113/14 113/15 122/10 144/25 170/8
**positions [1]** 144/3
**possibility [5]** 116/22 145/16 167/19 174/25 177/8
**possible [19]** 16/13 19/4 20/3 86/2 92/15 92/17 92/21 97/16 128/5 128/25 131/4 131/8 131/12 145/15 156/20 156/23 177/1 177/2 191/24
**post [84]** 4/3 4/4 4/5 4/6 4/7 4/8 4/9 4/10 4/11 4/12 4/13 4/14 4/15 4/16

4/17 4/18 4/19 4/20 4/24 4/25 5/1 5/2 5/12 5/13 5/14 5/15 5/16 5/17 5/18 5/19 5/20 5/21 5/22 5/23 5/24 5/25 6/1 6/2 6/5 6/6 6/7 6/8 6/9 6/10 6/11 6/14 6/16 6/17 6/18 6/20 6/25 7/1 7/2 7/3 7/5 7/8 7/10 7/15 7/16 7/17 7/18 7/19 7/20 8/7 9/2 9/3 9/4 9/5 9/6 9/7 9/8 37/14 62/19 74/2 74/10 80/1 80/2 80/15 118/11 152/6 152/16 156/3 156/5 179/23
**post-traumatic [1]** 179/23
**posted [5]** 14/4 74/2 74/4 79/23 80/23
**posts [6]** 8/4 8/8 59/1 78/17 83/3 83/3
**potential [1]** 197/8
**power [1]** 205/11
**PowerPoint [1]** 98/11
**PR [2]** 71/18 72/22
**practices [1]** 129/7
**pray [1]** 207/3
**prayed [1]** 85/5
**precision [1]** 195/4
**predatory [1]** 119/11 119/21
**predicate [9]** 193/19 193/21 193/23 194/4 194/10 201/15 201/18 213/10 213/18
**predictable [1]** 126/22
**predicting [1]** 207/16
**Prediction [3]** 142/3 142/13 157/24
**prejudice [2]** 188/23 192/8
**prejudicial [2]** 114/20 115/18
**prepare [6]** 106/2 183/3 183/8 183/14 184/12 184/14
**prepared [8]** 68/22 102/8 154/23 155/1 184/16 185/5 185/13 185/14
**preponderance [14]** 187/2 187/4 187/9 187/9 187/12 187/16 190/3 194/2 194/9 196/24 201/14 211/2 213/8 213/16
**prescribed [1]** 218/7
**presence [2]** 38/16 66/18
**present [2]** 137/14 211/16
**presentation [1]** 17/12
**presented [3]** 133/6 143/9 184/17 187/12 211/5
**president [3]** 72/21 113/23 208/12
**presidential [3]** 39/20 39/23 175/9
**press [8]** 80/11 107/18 119/23 119/24 119/24 123/8 150/13 177/14
**pressed [1]** 181/16
**pressure [4]** 42/22 46/22 51/13 76/7
**prestigious [1]** 26/13
**presume [1]** 140/7
**pretend [1]** 117/6
**pretenses [1]** 117/20
**pretty [13]** 25/8 29/19 32/8 36/22 36/24 40/20 44/10 44/19 60/12 80/17 82/16 109/8 145/10
**prevent [3]** 107/12 208/22 209/6
**prevented [2]** 110/16 110/20
**preventing [2]** 112/7 114/20
**previous [3]** 52/5 183/24 216/18
**previously [4]** 28/16 72/14 192/23 194/15
**primary [1]** 86/22
**prime [4]** 13/2 36/7 36/9 65/16
**print [1]** 73/10
**prior [7]** 20/12 67/1 67/15 67/17 67/18

69/20 99/21
**priority [2]** 165/8 165/10
**prison [2]** 174/3 180/14
**private [5]** 114/12 128/14 161/14 161/15 161/16
**privileged [1]** 38/19
**PRO [1]** 1/16
**probability [1]** 197/8
**probably [13]** 82/19 82/25 121/9 121/19 123/16 132/15 132/25 146/13 147/7 167/15 172/24 184/3 205/3
**probity [1]** 115/16
**problem [6]** 55/3 125/2 125/24 148/2 174/16 184/22
**problems [4]** 16/19 69/5 129/8 179/24
**procedurally [1]** 84/1
**proceed [3]** 10/19 22/6 199/10
**proceeded [1]** 197/10
**proceedings [4]** 1/23 215/20 217/13 218/5
**process [2]** 73/22 171/14
**procurement [1]** 115/3
**produce [1]** 158/2
**produced [4]** 1/23 144/16 187/20 210/5
**producers [2]** 65/23 65/24
**produces [1]** 196/22
**professional [3]** 63/22 193/8 195/16
**proffered [1]** 165/1
**profile [1]** 40/13
**profits [1]** 193/6
**programs [5]** 24/7 26/8 67/7 67/7 164/17
**progressed [2]** 164/14 164/16
**promise [1]** 103/22
**promised [1]** 95/15
**promoted [2]** 163/17 163/25
**promotion [2]** 164/1 176/10
**prompted [1]** 28/18
**promptly [1]** 191/23
**proof [5]** 9/1 189/23 195/3 196/22 209/17
**properly [1]** 189/21
**property [2]** 193/4 193/21
**proposal [1]** 74/17
**proposed [4]** 184/20 184/23 216/19 216/24
**propriety [1]** 197/20
**prosecuted [3]** 117/24 118/1 165/21
**prospect [1]** 121/7
**protect [2]** 131/2 158/21
**protecting [1]** 163/7
**proud [3]** 124/3 128/12 154/10
**prove [11]** 147/9 157/9 187/10 187/23 189/16 194/2 194/8 201/13 205/18 213/8 213/16
**proved [1]** 187/16
**proven [1]** 175/23
**provide [8]** 30/9 40/8 40/8 61/14 97/3 164/7 207/13 208/22
**provided [1]** 105/22
**provides [1]** 91/15
**providing [4]** 136/22 137/1 137/5 185/16
**proving [1]** 187/8
**provisions [1]** 123/12
**proximately [2]** 196/5 213/24

**P**

**public [16]** 23/15 23/23 64/12 81/23 122/9 122/10 126/13 150/15 156/24 162/23 165/15 165/24 169/7 193/17 195/14 197/19

**publicity [4]** 67/5 80/11 119/18 123/17

**publicly [12]** 17/3 22/21 26/22 47/17 60/8 63/8 63/11 80/24 81/17 93/4 121/23 131/5

**publish [2]** 212/21 213/5

**published [3]** 166/19 195/21 198/13

**publishing [1]** 153/23

**pull** 66/11 78/23 138/21 139/6 139/19 157/23 158/3 158/6

**pulled [2]** 56/1 99/5

**punish [7]** 14/10 17/24 132/17 196/13 203/14 203/17 205/13

**punishment [1]** 205/12

**punishments [1]** 205/14

**punitive [8]** 14/8 14/9 153/19 154/4 196/11 203/4 203/10 203/12

**pure [1]** 79/17

**purely [1]** 73/9

**purpose [8]** 17/11 32/22 45/23 49/13 92/3 190/6 190/7 209/16

**purposes [1]** 117/5

**pursue [1]** 56/4

**push [1]** 101/13

**pushed [2]** 134/23 206/20

**pushes [1]** 125/5

**put [33]** 19/21 19/23 19/24 31/21 39/11 51/9 57/3 62/11 62/21 64/17 66/6 66/15 72/17 74/15 74/22 77/8 78/16 93/13 96/5 99/19 102/7 102/8 104/21 119/9 119/9 123/18 131/21 144/21 200/12 203/19 203/21 204/1 210/21

**puts [2]** 49/1 53/18

**putting [5]** 46/6 79/18 120/17 148/16 182/23

**Q**

**quad [1]** 171/24

**qualifications [2]** 108/22 161/24

**qualified [2]** 109/5 111/15

**qualify [1]** 161/24

**quality [6]** 80/15 80/17 82/19 164/1 164/19 175/4

**Quantico [1]** 162/7

**quantify [3]** 13/10 202/17 202/19

**quell [1]** 55/18

**question [81]** 15/6 39/3 63/25 81/16 85/15 87/19 87/20 87/21 90/1 91/4 95/24 96/19 97/2 97/4 99/1 99/2 100/1 100/17 102/16 107/14 111/15 138/2 140/5 140/11 140/21 145/4 149/4 149/10 155/9 156/11 159/3 169/2 172/17 172/18 174/12 174/14 174/17 177/6 177/8 178/1 178/14 179/2 179/3 179/12 180/23 181/17 181/18 186/25 191/20 191/22 192/1 192/2 192/13 192/14 194/1 194/7 194/7 194/13 196/3 196/9 197/22 198/1 198/3 200/10 200/10 200/21 201/12 201/23 201/25 202/2 202/3 202/4 203/1 203/3 211/24 213/7 213/13 213/15 213/22 214/3 214/7

**questions [45]** 47/22 85/1 85/9 85/13 88/2 94/8 94/12 94/14 95/9 101/17 103/4 111/13 112/2 112/14 118/14 125/19 137/17 138/8 143/11 148/17 150/6 150/8 154/21 155/6 157/5 159/13 169/6 169/9 169/24 170/1 172/7 179/7 182/3 187/2 188/19 191/16 192/7 192/12 192/21 193/25 201/22 212/23 213/13 216/21 217/10

**quick [4]** 17/22 82/25 163/15 199/5

**quickly [6]** 19/4 20/3 55/9 79/2 124/14 184/21

**quiet [1]** 141/9

**quit [1]** 206/6

**quite [15]** 15/9 36/6 66/8 82/10 102/18 121/19 127/8 131/23 133/21 134/13 140/18 145/17 145/21 152/18 160/20

**quote [2]** 208/2 208/3

**quoting [1]** 149/25

**R**

**race [1]** 39/20

**racism [1]** 93/4

**racist [1]** 92/24

**Racketeer [1]** 192/25

**racketeering [3]** 11/9 193/20 193/24

**radar [4]** 15/7 16/11 45/20 90/20

**radio [2]** 36/4 36/5

**raise [14]** 22/1 33/21 35/4 39/22 55/1 104/18 104/19 104/21 112/14 125/19 128/16 135/15 160/9 212/10

**raised [4]** 23/14 40/14 69/20 212/10

**raises [1]** 121/7

**raising [1]** 70/1

**rallies [1]** 77/10

**ran [1]** 40/20

**random [1]** 12/17

**ranking [1]** 113/13

**rant [1]** 209/20

**rare [1]** 38/18

**rarely [2]** 122/5 122/23

**ratchet [3]** 42/22 51/14 80/10

**ratcheted [1]** 46/22

**rates [2]** 102/22 103/2

**rather [2]** 195/6 208/14

**Rating [1]** 4/23

**Raytheon [1]** 15/10

**re [1]** 71/19

**reach [10]** 20/10 54/9 55/6 62/17 67/7 71/18 81/22 109/25 188/16 216/1

**reached [8]** 72/7 72/8 81/23 81/24 191/14 192/3 198/11 212/16

**reaches [1]** 211/23

**react [2]** 47/3 132/16

**reaction [2]** 54/3 59/11

**read [47]** 12/12 16/14 49/20 50/24 53/18 55/21 75/10 80/18 141/21 142/1 142/6 142/12 143/13 142/21 149/22 150/2 150/3 150/10 150/17 150/19 150/23 150/25 151/5 151/10 151/12 151/18 151/21 151/25 153/9 153/10 154/5 166/22 173/5 177/17 183/16 185/1 185/14 202/21 212/22 212/24 214/16 214/20 214/24 215/2 215/5 215/8 215/12

**readily [1]** 38/1

**reading [2]** 185/15 186/8

**ready [8]** 107/10 108/3 110/21 185/7 199/10 199/22 204/16

**real [14]** 12/22 12/23 37/16 38/11 38/13 117/3 126/12 126/21 131/22 133/25 163/15 205/20 207/13 210/9

**realize [3]** 52/6 94/21 206/16

**really [59]** 13/3 16/15 16/16 17/22 17/23 26/3 27/13 31/18 32/11 33/3 33/18 33/20 35/2 38/18 38/18 39/1 41/19 44/22 45/4 53/7 63/11 63/12 63/22 71/23 72/4 75/16 82/10 97/2 109/22 112/7 112/14 115/19 118/25 128/10 130/4 134/16 173/7 174/2 174/3 176/3 177/17 199/15 202/19 203/5 203/6 205/11 205/14 205/15 206/5 206/18 206/18 207/3 208/4 208/24 208/25 209/6 209/8 210/6 211/5

**reason [9]** 63/17 93/22 102/8 133/21 145/2 169/22 171/24 173/21 188/16

**reasonable [3]** 188/13 195/6 197/1

**reasonably [6]** 126/17 194/17 196/1 196/4 202/5 213/23

**reasons [5]** 116/1 130/9 143/21 143/22 171/25

**Rebekah [1]** 94/15

**rebranding [1]** 73/2

**rebut [1]** 200/13

**rebuttal [4]** 19/25 186/5 209/15 209/16

**recall [12]** 65/11 86/2 86/3 87/12 93/1 93/2 132/9 136/12 136/13 152/12 156/5 201/1

**receive [2]** 44/9 179/21

**received [10]** 44/23 55/8 55/23 155/25 163/23 187/19 192/2 212/8 215/17 216/11

**receiving [1]** 181/1

**recently [2]** 64/14 95/7

**recess [8]** 84/12 148/22 184/8 191/11 211/23 212/2 212/3 217/2

**recession [1]** 25/8

**recharacterizing [1]** 131/9

**reckless [2]** 151/16 154/1

**recognition [1]** 41/23

**recognize [1]** 152/24

**recollection [3]** 143/11 191/2 191/5

**Reconnaissance [2]** 90/16 90/18

**record [14]** 21/6 78/20 84/6 84/14 103/21 121/21 124/7 148/25 183/20 184/9 184/12 185/10 216/15 218/5

**recordings [1]** 135/22

**recourse [1]** 211/23

**recover [8]** 126/9 193/18 193/22 194/3 194/10 201/14 213/9 213/17

**recovering [1]** 112/8

**recovery [3]** 192/16 192/17 192/17

**recreated [1]** 38/17

**recruited [4]** 27/9 162/6 163/10 181/20

**recruiting [1]** 164/11

**red [3]** 55/2 57/25 67/18

**redacted [1]** 140/17

**redacting [2]** 139/25 144/19

**redirect [5]** 103/6 133/24 134/1 159/15 182/5

**redo [1]** 73/12

**reduce [2]** 125/21 192/13
**reduced [2]** 193/10 194/24
**refer [1]** 21/16
**references [1]** 153/18
**referencing [1]** 50/14
**referred [1]** 193/1
**referring [2]** 113/4 128/1
**reflected [1]** 110/17
**refrain [1]** 101/19
**refuse [1]** 95/16
**regarding [3]** 20/20 83/3 94/9
**regardless [3]** 56/10 187/18 187/19
**regards [1]** 10/14
**regret [3]** 15/24 16/23 105/16
**regularly [6]** 13/1 129/19 35/25 36/1 37/1 190/21
**regulatory [3]** 32/12 114/19 120/5
**rehab [4]** 73/22 74/24 201/2 201/2
**rehabilitate [1]** 71/20
**rehabilitation [1]** 138/8
**reiterate [1]** 133/3
**reject [1]** 140/23
**rejected [1]** 122/9
**relate [2]** 111/1 213/14
**related [6]** 114/18 153/15 162/13 193/12 197/13 209/21
**relates [4]** 96/16 110/9 114/3 200/21
**relations [1]** 193/16
**relationship [6]** 41/15 43/12 76/9 117/22 129/14 132/23
**relationships [4]** 12/4 78/19 178/19 194/25
**relative [2]** 189/14 189/14
**relatively [1]** 41/9
**release [2]** 146/23 198/19
**released [1]** 215/23
**relevance [9]** 86/23 86/24 87/1 96/15 100/4 159/1 178/21 178/23 181/2
**relevancy [1]** 159/2
**relevant [3]** 95/22 120/6 162/9
**reliable [1]** 195/19
**relief [1]** 114/8
**relies [1]** 13/7
**rely [5]** 130/8 190/14 190/16 190/25 191/2
**relying [2]** 139/9 143/25
**remain [4]** 145/13 170/2 170/3 181/23
**remark [1]** 17/25
**remarkable [1]** 110/1
**remarried [1]** 19/5
**remember [18]** 10/13 17/14 20/12 27/14 74/14 90/13 94/4 117/17 127/9 128/5 136/15 145/7 147/18 188/6 198/12 198/23 202/21 210/3
**remembers [1]** 188/5
**remind [1]** 133/17
**reminded [1]** 83/8
**reminds [1]** 148/15
**remote [2]** 103/17 103/21
**remotely [2]** 105/14 168/3
**remove [2]** 99/18 171/15
**rent [1]** 71/11
**repair [5]** 65/7 74/24 193/12 193/16 195/1
**repair the [1]** 74/24
**repeat [3]** 12/13 69/1 91/4

**rephrase [1]** 97/1
**replace [1]** 38/25
**replaced [2]** 38/16 161/1
**report [2]** 7/4 66/21
**reported [1]** 1/23
**reporter [11]** 1/19 10/20 23/1 28/13 51/2 53/2 53/4 77/21 90/25 142/10 218/13
**REPORTER'S [1]** 217/14
**reporting [2]** 165/7 166/3
**reports [6]** 8/14 8/16 67/13 177/14 179/19 179/20
**represent [6]** 10/24 15/16 69/17 106/14 157/7 157/9
**representations [2]** 118/7 168/14
**represented [2]** 17/6 145/1
**representing [1]** 154/16
**represents [3]** 66/23 145/3 190/22
**Republican [2]** 86/22 94/16
**republicans [1]** 174/24
**reputation [24]** 35/15 35/18 59/15 63/1 63/13 64/1 65/7 69/12 71/20 73/13 74/24 81/14 124/20 124/21 138/8 150/21 151/23 153/11 153/13 177/11 195/9 195/22 201/2 202/14
**reputation's [1]** 23/7
**reputational [8]** 65/6 115/1 151/24 193/8 193/12 193/15 193/16 195/2
**reputationally [1]** 15/14
**reputations [1]** 119/18
**request [1]** 124/6
**require [3]** 113/10 172/2 195/3
**required [5]** 128/2 167/1 190/13 192/3 195/4
**requirements [1]** 116/21
**requires [4]** 120/20 120/23 127/17 190/2
**research [2]** 60/6 78/12
**resemble [1]** 168/3
**resembled [1]** 168/11
**reserved [1]** 209/15
**resident [1]** 165/17
**resources [2]** 19/3 129/15
**respect [5]** 52/24 56/6 102/10 129/7 129/10
**respond [10]** 45/2 45/3 78/21 115/23 154/21 155/9 157/1 191/23 216/22 216/23
**responded [2]** 14/3 78/22
**response [5]** 96/16 126/17 159/6 159/7 192/1
**responses [1]** 122/17
**responsibility [3]** 14/6 27/22 28/18
**responsible [7]** 28/5 129/19 164/10 164/12 164/13 164/14 164/16
**rest [7]** 2/11 48/9 122/7 174/3 182/14 182/16 183/21
**restaurant [1]** 15/23
**restaurants [1]** 208/20
**Reston [1]** 1/17
**restore [1]** 206/18
**rests [1]** 19/2
**result [10]** 150/15 151/21 151/21 193/2 194/3 194/10 194/23 201/15 213/9 213/17
**resulted [2]** 193/8 196/16
**resume [1]** 110/25

**resurrect [1]** 173/22
**retain [1]** 156/16
**retaliated [2]** 11/6 132/20
**retaliation [1]** 11/20
**retire [1]** 191/7
**retired [1]** 163/20
**retirement [1]** 30/20
**retires [1]** 211/21
**return [3]** 11/4 47/1 51/11
**reveal [1]** 191/17
**revenge [2]** 205/4 205/4
**review [3]** 184/12 184/20 213/4
**reviewing [2]** 111/18 190/19
**reviews [1]** 112/12
**revive [1]** 127/17
**revoke [1]** 171/16
**rich [5]** 176/7 206/23 208/1 208/1 208/8
**Richard [1]** 158/13
**richest [2]** 17/5 143/15
**RICO [14]** 11/11 11/12 94/6 157/19 192/23 193/1 200/8 200/21 200/22 201/20 202/6 213/14 216/12 217/8
**ridiculous [1]** 203/7
**right [197]** 10/3 10/12 10/15 11/7 11/24 14/19 15/17 19/11 21/6 21/13 21/19 21/23 22/1 25/17 27/25 29/2 29/4 32/16 34/1 35/14 38/21 40/16 42/7 42/9 43/10 48/23 48/25 49/1 49/16 50/14 50/15 50/17 50/18 51/5 53/8 53/10 54/12 55/11 55/13 56/19 56/24 58/1 63/15 64/23 65/1 65/9 67/10 67/13 70/1 70/8 71/16 72/15 72/17 74/16 74/18 74/20 75/3 75/25 77/20 79/20 80/22 82/14 83/5 84/6 84/10 84/19 86/19 87/25 88/18 91/7 91/21 92/16 96/7 97/1 97/12 98/3 98/12 98/15 100/6 100/6 101/15 102/1 102/16 102/19 103/6 103/8 103/16 103/18 104/8 104/18 104/19 104/19 104/21 106/1 106/14 107/25 109/16 109/22 115/6 115/9 116/3 125/16 125/18 129/16 130/11 130/22 132/2 132/21 133/5 135/4 135/7 135/15 135/17 136/7 136/17 136/19 136/20 137/3 138/19 139/11 139/21 140/16 145/1 146/9 148/18 149/16 149/24 150/3 151/3 151/7 151/12 152/7 152/11 152/17 153/16 154/7 159/12 159/15 159/17 159/24 160/9 160/11 164/25 172/6 172/14 172/17 172/23 173/18 174/5 175/13 175/17 176/6 176/9 176/13 177/19 177/22 177/23 178/7 182/9 183/13 183/23 183/24 184/9 186/3 186/8 197/22 198/8 198/18 199/19 202/8 203/2 204/7 204/9 204/13 204/18 205/2 206/15 208/13 209/7 209/11 210/13 211/9 211/22 212/2 212/5 213/2 213/6 214/16 214/19 214/23 215/8 215/15 216/10 217/2 217/10 217/12
**rights [2]** 148/12 197/11
**risen [2]** 102/22 103/2
**risk [15]** 29/4 29/16 32/7 32/11 32/17 53/1 54/20 110/7 110/8 123/19 123/23 125/5 150/16 197/7 197/10
**riskier [1]** 32/15

**risks [2]** 29/17 115/1
**road [1]** 11/1
**roadmap [1]** 202/23
**robberies [1]** 162/5
**robbery [1]** 162/8
**rocket [1]** 111/6
**rodeo [5]** 34/15 34/19 34/25 35/1 35/3
**role [9]** 26/13 46/18 107/3 107/7 121/2
134/18 134/20 205/16 208/22
**roll [2]** 98/25 173/24
**Ron [1]** 86/22
**room [13]** 1/20 20/10 83/12 185/19
191/7 198/21 198/22 200/19 203/24
211/16 211/20 215/22 218/17
**rotate [1]** 107/19
**roughly [1]** 77/17
**row [1]** 215/4
**RPR [3]** 1/19 218/3 218/11
**rule [2]** 96/17 189/25
**ruled [3]** 35/11 192/23 194/15
**rules [9]** 83/18 96/10 101/25 110/19
110/20 120/24 122/12 154/17 172/2
**ruling [1]** 87/3
**run [5]** 13/5 129/3 129/13 133/3
141/12
**running [4]** 32/10 40/3 63/23 171/22
**Russia [2]** 120/12 128/3
**Russian [22]** 12/14 12/20 60/19 61/12
61/18 64/9 76/3 78/9 94/25 114/21
119/10 119/11 120/2 120/3 120/18
121/11 121/12 121/12 134/19 135/24
155/22 155/23

**S**

**S-U-I-S-S-E [1]** 28/14
**SAC [1]** 176/8
**sad [1]** 180/11
**Saddam [1]** 129/9
**safe [1]** 172/24
**safety [1]** 197/11
**said [92]** 11/5 11/23 12/11 14/1 15/12
22/21 22/25 23/3 27/15 34/17 35/12
38/4 39/21 42/12 42/13 43/3 43/23
44/14 47/6 52/19 55/22 56/17 56/24
58/3 58/12 58/12 58/19 60/14 62/9
62/14 64/11 64/14 67/2 72/2 72/10
73/6 75/15 77/24 78/3 78/6 78/11
78/18 79/14 79/15 92/16 92/18 93/3
96/21 97/14 98/24 99/25 108/7 108/13
109/13 109/16 111/12 112/20 116/10
117/2 118/7 119/9 119/19 120/1 120/8
121/21 124/14 125/18 131/9 131/10
133/1 134/8 136/18 140/24 152/8
154/9 154/12 155/14 158/1 164/9
178/10 178/10 183/21 183/24 186/8
187/25 201/21 202/23 203/23 203/25
208/14 210/4 213/14
**sake [1]** 98/4
**salary [1]** 164/2
**sale [1]** 111/8
**sales [2]** 42/15 42/16
**Sam [2]** 104/2 104/3
**same [16]** 17/4 35/20 51/17 79/1
101/25 102/10 114/10 114/17 137/11
169/22 170/16 171/21 196/2 202/8
203/12 208/17

**San [2]** 46/12 86/18
**sanction [3]** 147/25 148/7 148/18
**sanctions [1]** 147/19
**sat [3]** 199/14 203/7 210/25
**satellite [1]** 15/7 45/20
**satisfied [1]** 204/5
**save [2]** 77/20 157/11
**saw [7]** 35/10 54/12 56/18 58/19 65/9
74/4 102/19
**say [69]** 14/6 15/2 15/2 28/4 35/22
37/6 37/21 37/23 38/2 38/7 45/11
47/12 49/14 50/19 51/8 52/17 54/24
54/25 56/22 59/4 61/6 63/5 90/19
106/15 109/19 109/23 112/2 115/12
116/19 116/21 118/2 118/12 118/24
120/24 121/23 121/23 122/23 123/12
124/11 124/15 124/18 124/24 125/1
126/3 126/20 131/6 132/14 133/9
134/22 136/14 140/13 142/19 146/19
165/11 166/15 166/23 168/6 171/3
172/14 175/11 177/15 188/1 201/4
206/9 207/24 207/25 209/19 210/24
211/2
**saying [20]** 46/22 52/11 52/22 54/16
55/19 60/5 64/7 76/3 80/3 80/10 80/22
81/24 82/18 92/24 104/1 111/4 130/24
131/10 131/16 206/10
**says [26]** 17/15 37/9 48/17 50/12
52/20 53/9 53/15 67/5 106/8 108/21
110/7 110/25 118/16 119/2 125/10
137/5 139/25 141/19 141/19 149/12
153/22 166/8 168/3 208/7 208/10
210/17
**scandal [1]** 123/8
**scar [2]** 57/7 150/21
**scared [1]** 82/5
**scheme [1]** 11/10
**school [9]** 23/18 23/23 23/25 24/2
24/3 24/9 38/21 93/25 127/10
**schools [3]** 23/15 23/20 23/23
**Schwab [1]** 31/15
**Schwartz [1]** 158/13
**scope [2]** 114/3 115/11
**scorn [1]** 150/15
**screen [4]** 34/8 107/19 107/24 153/7
**screens [1]** 106/7
**screw [1]** 155/4
**screwing [1]** 207/8
**scuffed [1]** 124/22
**SE [1]** 1/16
**Seals [2]** 163/12 163/12
**search [3]** 6/19 150/22 162/18
**seat [5]** 22/1 84/9 135/13 135/17
160/11
**SEC [1]** 168/23
**second [11]** 17/6 48/6 57/19 58/8
101/9 108/16 152/22 171/24 205/1
207/24 210/10
**secret [3]** 133/12 167/20 167/22
**secretary [2]** 113/5 113/14
**secrets [2]** 111/11 120/15
**sector [3]** 32/1 114/10 114/12
**security [53]** 61/14 82/22 90/6 90/7
90/9 90/23 91/8 105/19 105/20 105/21
105/24 107/13 108/12 108/21 109/11
111/20 111/25 114/6 114/13 114/19
114/25 115/17 115/21 115/22 116/15

**116/18 118/8 118/20 118/12 118/17
119/14 119/16 119/17 119/20 119/22
120/12 121/19 126/23 127/13 127/19
127/22 128/15 128/19 131/14 131/16
145/17 145/8 161/17 163/2 171/11
171/14 178/8 212/14
**see [74]** 14/1 16/15 16/15 18/6 27/21
34/7 35/8 36/19 36/21 36/22 36/24
37/12 37/14 38/8 38/11 38/13 38/13
41/1 47/15 47/18 48/10 49/21 52/3
55/10 59/7 61/24 63/22 66/14 67/4
67/6 67/17 68/6 68/23 70/18 70/19
72/11 73/4 75/13 75/14 78/17 86/25
96/11 104/8 106/10 107/4 107/20
107/22 107/23 108/23 125/3 136/16
136/17 137/18 139/24 141/19 141/20
141/21 144/12 148/8 149/7 149/11
149/14 153/7 153/20 155/12 158/7
160/24 168/11 180/20 184/21 200/17
208/21 210/9 210/13
**seed [4]** 141/22 142/2 142/15 142/23
**seeing [3]** 13/22 107/23 169/11
**seek [1]** 21/4
**seeking [2]** 13/11 152/11
**seeks [2]** 151/15 196/10
**seem [4]** 40/1 40/7 102/13 156/5
**seemed [4]** 40/3 40/5 44/20 143/10
**seems [2]** 80/17 145/10
**seen [8]** 54/5 54/5 124/1 126/2 140/18
168/1 178/16 205/3
**segment [1]** 136/4
**select [2]** 191/10 198/22
**self [1]** 126/7
**self-help [1]** 126/7
**sell [1]** 112/16
**selling [1]** 35/4
**Senate [1]** 113/10
**send [9]** 14/11 39/11 39/12 42/25
47/7 51/7 56/14 77/6 78/4 80/9 210/4
**sends [2]** 50/12 79/5
**senior [2]** 163/20 163/25
**sense [8]** 15/1 113/17 126/18 143/1
183/8 188/16 197/20 205/15
**sensibilities [1]** 197/17
**sensitive [2]** 121/4 179/16
**sent [17]** 11/22 48/7 51/19 51/19 52/5
52/7 54/15 55/7 57/18 77/14 77/23
78/25 79/2 79/3 95/12 144/23 158/2
**sentence [6]** 12/21 142/1 142/6
142/13 150/19 205/7
**separate [4]** 35/21 128/21 128/21
158/21
**separated [1]** 68/5
**separately [2]** 98/2 192/13
**series [1]** 119/22
**serious [10]** 40/1 40/3 40/5 40/20
54/18 54/19 107/16 154/2 172/17
172/18
**seriously [1]** 147/25
**serve [2]** 198/9 205/6
**served [2]** 133/14 161/1
**service [9]** 85/6 103/3 109/1 113/22
114/2 164/1 183/19 216/2 216/8
**Services [1]** 118/11
**serving [1]** 213/2
**session [2]** 170/25 171/1
**set [18]** 31/3 31/4 40/12 43/10 45/8

**set... [13]** 52/3 77/23 110/15 111/22 126/13 128/21 128/21 128/25 173/25 199/5 202/25 204/15 209/18
**sets [2]** 62/6 204/4
**settlement [1]** 96/9
**seven [5]** 13/17 67/16 67/17 67/25 68/10
**seven-month [2]** 67/16 68/10
**several [4]** 20/21 56/5 89/3 205/22
**severe [1]** 148/1
**sex [1]** 123/14
**sexual [8]** 12/14 62/1 119/11 123/2 123/13 123/14 135/23 195/13
**sexually [4]** 64/9 78/7 134/8 134/9
**shakedown [2]** 47/17 47/18
**shall [1]** 197/13
**shared [1]** 93/5
**shareholder [2]** 95/11 95/13
**shareholders [1]** 16/8
**she [13]** 48/19 50/5 53/4 76/12 94/21 94/24 95/3 95/11 188/5 188/24 189/2 207/20 207/21
**she's [7]** 50/10 53/7 94/16 94/24 206/17 207/11 207/20
**sheep [1]** 207/8
**Sherry [1]** 158/8
**shift [4]** 31/24 39/14 62/24 75/17
**shifted [2]** 42/17 98/14
**shirt [1]** 181/16
**shirts [1]** 176/18
**shocked [1]** 47/4
**short [7]** 28/15 30/18 81/14 103/23 148/22 184/8 212/3
**shortcomings [1]** 166/1
**shortened [3]** 36/22 36/25 136/4
**shorter [1]** 33/16
**shortly [2]** 45/19 68/23
**should [33]** 37/22 40/11 72/3 80/4 83/9 85/14 109/1 111/17 128/6 131/7 131/10 156/10 158/7 181/19 181/21 183/18 187/22 188/3 188/12 190/24 190/25 191/2 191/3 198/4 200/2 200/4 201/11 207/6 207/16 207/19 209/25 213/14 214/8
**shouldn't [1]** 52/13
**show [21]** 7/12 11/19 12/1 13/10 17/12 17/13 18/17 18/23 19/3 19/19 34/15 34/19 35/3 35/4 36/15 39/10 65/24 66/20 102/10 102/11 195/4
**showcase [1]** 13/3
**showed [1]** 201/5
**showing [1]** 72/25
**shown [4]** 20/8 20/8 66/24 78/2 92/19
**shows [5]** 38/23 38/25 78/13 92/18 92/19
**shred [2]** 200/13 210/7
**shut [7]** 44/6 44/8 173/3 173/9 173/11 173/12 173/13
**shutting [2]** 173/2 173/5
**shuttle [1]** 111/8
**sic [7]** 13/12 90/23 129/15 149/23 156/4 158/14 158/16
**sick [2]** 54/12 56/17
**side [2]** 43/5 65/3
**sides [3]** 20/4 184/13 189/12
**sideshow [2]** 199/25 203/7

**sign [6]** 79/6 191/12 196/8 198/7 198/8 198/11
**Signal [1]** 177/22
**signature [1]** 214/14
**signed [3]** 161/2 214/12 218/9
**significance [1]** 188/10
**significant [3]** 115/25 121/2 190/22
**signing [1]** 198/16
**signs [1]** 110/13
**similar [8]** 28/15 68/6 137/17 138/8 147/19 196/14 202/6 203/18
**simple [4]** 85/18 150/22 188/3 210/19
**simply [8]** 19/2 19/17 65/24 115/12 122/20 188/9 190/2 192/14
**simultaneously [1]** 55/7
**since [15]** 13/17 16/24 36/2 48/14 69/25 78/24 83/18 102/21 128/10 133/13 133/15 143/7 144/2 206/6 206/9
**single [3]** 62/12 189/15 210/1
**singles [1]** 117/7
**sir [27]** 10/5 10/22 22/7 84/5 87/7 87/9 93/19 94/13 102/2 102/15 118/6 127/9 137/18 141/24 144/17 149/15 150/4 174/11 199/11 212/15 212/17 212/19 214/15 214/18 215/1 215/3 215/8
**sit [2]** 77/6 109/17
**sitting [1]** 136/9
**situation [4]** 124/8 167/9 173/1 197/17
**situations [3]** 40/10 175/8 175/12
**six [3]** 27/18 28/9 167/18
**skepticism [1]** 130/9
**skills [2]** 163/3 163/4
**skip [3]** 115/24 118/3 119/1
**slide [22]** 59/7 60/1 106/25 107/7 107/25 108/21 109/1 110/6 113/18 113/19 115/10 115/24 116/6 119/1 119/2 123/5 123/22 123/23 125/9 125/9 126/11 160/6
**slides [6]** 8/19 8/20 8/22 8/23 106/2 106/5
**slow [2]** 77/20 201/4
**slower [1]** 91/2
**small [7]** 25/10 25/19 31/17 46/17 95/13 173/3 175/14
**smear [3]** 11/6 12/10 13/25
**smears [2]** 12/7 35/25
**snippet [2]** 62/14 62/15
**social [5]** 61/14 83/3 118/12 119/12 119/15
**society [1]** 173/19
**sociopathic [1]** 64/4
**software [2]** 89/16 91/19
**sold [2]** 143/22 144/2
**solve [1]** 15/5
**some [85]** 13/5 13/11 15/2 15/2 16/22 17/18 18/7 19/14 20/1 20/2 25/16 29/11 29/16 29/16 29/25 32/1 39/22 40/20 41/9 41/15 42/13 43/2 44/19 47/11 47/22 54/10 54/16 61/13 67/5 71/18 72/17 73/2 73/10 78/1 92/15 92/17 93/13 95/9 99/18 106/2 110/13 116/12 117/22 118/21 121/24 126/7 126/24 129/6 129/7 129/8 133/14 143/10 144/3 156/11 156/24 157/15 158/19 160/24 162/22 162/24 165/10

**165/14 165/19 165/25 166/10 167/19 170/1 170/2 171/13 171/24 179/6 179/24 179/24 180/1 183/7 183/9 183/20 187/24 187/25 188/6 192/6 199/16 202/20 209/20 212/25**
**somebody [20]** 15/1 15/14 98/16 105/20 119/15 120/17 123/10 124/25 127/11 127/16 131/14 169/23 173/21 174/1 174/9 174/20 175/5 180/25 205/9 208/14
**somebody's [1]** 147/22
**somehow [5]** 50/10 119/10 210/5
**someone [26]** 31/18 40/7 46/7 49/4 54/8 54/25 63/7 71/23 71/25 72/12 75/22 76/21 77/9 77/10 78/14 81/15 117/1 118/16 119/13 130/19 167/24 168/6 168/8 176/12 205/7 205/8
**someone's [2]** 132/20 168/22
**something [34]** 14/24 15/9 17/15 22/25 30/14 34/19 38/16 42/16 45/11 50/11 51/20 54/7 62/12 62/20 75/10 77/9 79/5 82/25 98/9 98/12 98/24 110/5 114/7 127/17 132/16 139/18 142/4 168/8 187/10 187/25 188/1 207/18 208/17 217/4
**sometimes [11]** 37/1 47/13 128/19 128/20 132/17 145/18 156/17 178/18 185/17 185/17 206/25
**somewhat [1]** 64/14
**somewhere [2]** 75/14 148/5
**son [1]** 38/21
**soon [2]** 121/6 183/14
**sophisticated [3]** 110/3 117/10 117/11
**sorry [24]** 15/4 18/21 43/6 51/3 53/3 87/5 91/3 91/5 93/17 105/7 108/25 131/20 135/14 136/14 141/10 142/11 174/13 178/17 180/10 199/19 202/24 203/8 203/13 209/8
**sort [23]** 13/5 30/1 33/5 36/7 37/9 37/16 38/8 42/3 57/23 64/24 71/1 83/21 114/15 120/5 121/12 121/20 131/19 199/24 200/1 203/4 203/19 209/4 210/8
**sound [25]** 75/3 118/19
**sounded [1]** 118/20
**sounding [2]** 131/4 132/1
**sounds [1]** 75/4
**source [35]** 130/25 145/19 145/21 146/3 161/21 162/12 165/7 165/25 166/25 167/1 167/4 168/2 169/15 170/5 170/6 170/10 170/11 170/12 170/18 170/19 172/12 173/22 174/2 174/6 174/21 175/20 175/22 175/24 175/25 176/2 176/4 179/4 181/19 181/20 182/1
**sources [26]** 129/4 129/7 129/11 129/14 131/2 132/20 132/24 133/4 160/3 162/9 162/21 164/8 164/11 164/18 164/22 166/2 166/21 169/17 169/22 172/15 175/15 175/19 176/17 177/15 178/19 179/10
**southwest [2]** 23/22 27/12
**spaces [1]** 78/7
**speak [8]** 22/4 83/22 127/8 127/10 160/12 160/19 213/21 216/3
**speaking [2]** 38/10 204/24

**speaks [1]** 207/20

**special [20]** 32/22 45/22 88/13 117/21 146/3 162/2 163/13 165/14 165/16 170/11 179/13 180/20 180/24 181/21 190/10 194/21 194/21 195/2 201/7 202/8

**specialized [3]** 115/1 162/17 163/9

**specific [15]** 28/22 30/6 37/17 61/9 62/5 64/23 66/16 72/17 177/7 190/7 194/22 196/5 197/3 202/6 213/24

**specifically [6]** 38/11 68/17 69/12 162/23 165/15 170/14

**specifics [3]** 69/14 72/6 165/10

**spectrum [1]** 30/9

**speculation [4]** 156/25 175/1 192/15 195/24

**speedy [1]** 133/19

**spend [5]** 65/6 66/22 73/12 73/14 124/12

**spent [5]** 12/4 12/23 73/16 114/15 129/6

**spirit [1]** 167/15

**spiritual [1]** 205/15

**spoke [1]** 99/22

**spoken [1]** 53/17

**Spotting [1]** 164/11

**spreading [1]** 11/18

**SPV [12]** 32/22 32/25 45/23 46/5 46/25 52/21 55/25 56/7 56/11 68/24 86/4 86/6

**SPVs [7]** 33/12 51/18 54/2 69/20 69/25 88/22 91/12

**squad [8]** 162/8 162/11 162/16 163/4 171/15 171/16 171/24 171/24

**squads [1]** 164/17

**squeeze [1]** 148/20

**St [1]** 85/6

**staffers [2]** 92/2 92/6

**stage [12]** 12/19 30/24 31/3 32/5 32/17 32/18 52/4 61/9 141/22 142/2 142/15 142/23

**stand [22]** 17/16 21/10 21/22 21/24 21/25 69/6 84/20 128/11 135/11 135/12 135/13 148/16 154/10 173/21 180/7 188/22 189/4 200/14 205/7 211/23 212/2 217/2

**standard [5]** 60/12 101/25 196/24 196/25 203/1

**standing [2]** 193/17 195/9

**standpoint [3]** 32/4 69/9 197/6

**Star [1]** 176/18

**starched [1]** 181/16

**start [24]** 14/24 16/10 24/17 39/15 41/16 52/9 69/17 73/22 77/16 82/23 109/10 112/2 112/3 124/14 126/22 168/23 169/23 171/2 199/3 199/3 204/15 204/24 206/15 206/21

**started [25]** 11/2 12/2 12/7 23/13 24/11 24/12 25/18 25/21 27/19 29/24 36/12 40/12 41/9 42/22 45/19 46/21 46/22 48/16 65/14 80/3 80/20 158/12 158/18 199/23 205/25

**starting [4]** 48/12 50/2 108/6 150/13

**starts [4]** 58/1 58/3 58/3 77/2

**startup [3]** 12/19 32/20 105/23

**state [8]** 35/5 40/18 40/22 50/18 104/6

**stated [3]** 92/5 134/9 146/3

**statement [13]** 10/16 14/21 17/10 17/11 18/12 20/6 45/21 48/12 50/8 75/15 87/22 92/25 186/15

**statements [35]** 10/8 10/10 18/7 19/17 36/13 62/17 83/3 96/8 99/12 106/19 108/10 115/13 115/14 115/17 115/23 119/7 120/4 121/13 121/14 126/8 130/7 130/17 134/12 137/24 151/22 153/23 153/25 186/20 189/2 194/19 195/12 195/16 195/21 196/6 213/25

**STATES [21]** 1/1 1/9 27/13 32/4 61/4 109/19 110/14 112/2 112/16 120/20 120/21 129/19 132/11 133/4 156/8 156/9 156/22 166/18 167/5 167/7 218/8

**station [1]** 87/17

**stations [1]** 36/3

**statute [2]** 11/12 32/13

**statutory [1]** 120/5

**stay [3]** 82/12 147/3 216/1

**steady [1]** 33/7

**steak [4]** 83/1 176/21 176/22 176/25

**steal [2]** 111/16 120/15

**stealing [1]** 52/20

**steers [1]** 35/4

**stenography [1]** 1/23

**step [9]** 111/3 148/11 159/18 170/22 171/1 171/13 171/15 176/1 211/19

**steps [1]** 216/11

**stern [1]** 161/4

**Steve [1]** 88/8

**Stewart [2]** 2/8 3/8 103/16 105/2 114/24 134/24

**stick [4]** 122/18 124/1 168/25 211/6

**sticking [1]** 202/14

**stigma [1]** 150/14

**still [11]** 11/16 16/8 26/8 74/12 74/15 86/10 169/2 180/7 180/9 205/24 210/18

**stock [7]** 7/12 18/2 30/20 34/15 34/18 35/3 70/8

**stocks [1]** 28/6

**stomach [2]** 54/12 56/17

**stop [16]** 11/17 14/1 14/14 57/6 58/10 77/13 78/4 78/19 80/23 106/1 114/23 116/3 150/5 165/9 170/19 198/2

**stopped [2]** 80/24 112/17

**stories [3]** 119/22 126/2 160/24

**story [4]** 175/14 175/14 180/11 180/12

**straight [4]** 75/18 116/13 147/13 148/17

**straightforward [1]** 211/6

**Strait [2]** 208/2 208/4

**strange [4]** 45/6 154/16 154/25 157/3

**strategy [3]** 31/19 34/2 73/5

**straying [1]** 93/9

**street [9]** 1/13 1/20 13/6 15/10 28/11 29/15 30/7 208/10 218/17

**stress [1]** 179/23

**stretch [1]** 171/17

**stricken [1]** 96/13

**strict [1]** 122/12

**strictly [1]** 71/6

**strike [3]** 103/25 147/22 157/12

**strong [1]** 148/9

**strongly [1]** 11/22

**structure [1]** 32/24

**structured [3]** 16/8 28/22 158/20

**structured-specific [1]** 28/22

**study [1]** 24/8

**studying [1]** 127/9

**stuff [17]** 39/8 44/18 53/14 61/6 62/1 62/19 66/6 74/5 77/7 83/5 93/21 96/8 104/6 109/15 122/4 126/1 209/20

**stupid [2]** 206/13 206/14

**style [1]** 155/15

**subject [6]** 6/24 83/10 130/5 137/6 137/8 137/13 137/20 138/1 138/3 138/9 190/9

**subject-matter [7]** 137/6 137/8 137/13 137/20 138/1 138/3 138/9

**subjective [1]** 197/9

**submit [9]** 148/8 201/25 202/1 203/1 204/1 205/13 210/25 216/17 216/19

**submitted [3]** 20/21 130/3 211/17

**subscriber [1]** 81/2

**subscription [1]** 81/6

**subsequently [1]** 25/14

**subsidiary [2]** 128/21 128/24

**Substack [7]** 58/25 59/2 81/1 81/2 81/5 138/23 138/25

**Substack and [1]** 58/25

**Substacks [1]** 83/4

**substance [1]** 179/24

**substantial [1]** 197/4

**succeed [1]** 118/2

**success [3]** 37/18 110/23 133/20

**successful [1]** 124/16

**successfully [1]** 154/8

**succinct [1]** 96/16

**succinctly [1]** 96/18

**such [9]** 84/1 188/13 189/22 190/21 191/17 193/5 195/9 195/12 197/19

**sucks [1]** 206/23

**sue [6]** 14/3 19/7 78/22 79/8 97/17 152/5

**sued [10]** 16/9 77/10 122/16 151/7 152/2 155/21 156/2 156/4 203/23 207/7

**suffer [1]** 193/5

**suffered [13]** 65/2 68/10 94/10 126/20 126/21 136/10 136/18 137/12 138/7 151/23 153/12 193/2 194/22

**sufficient [2]** 189/16 195/7

**suggest [3]** 94/8 198/21 216/5

**suggestions [1]** 148/13

**suing [1]** 80/8

**Suisse [4]** 4/21 28/12 28/14 29/9

**suit [3]** 57/20 152/17 181/16

**suitability [1]** 115/16

**Suite [1]** 1/13

**sum [7]** 154/4 194/16 196/3 198/3 202/4 213/22 214/7

**summarize [2]** 125/13 166/23

**summary [7]** 8/15 9/9 9/11 66/22 67/12 107/3 108/1

**super [2]** 176/7 207/25

**super-hopeful [1]** 207/25

**supervising [1]** 164/15

**supervisor [3]** 170/20 170/21 171/4

**supply [4]** 112/22 112/22 162/12 162/13

**S**

supported [2] 195/2 195/18
supporter [3] 98/20 98/21 99/19
supposed [4] 64/15 123/19 154/17 181/4
supposedly [1] 206/2
supremacist [3] 151/2 152/3 162/5
supremacy [1] 173/13
sure [30] 18/16 19/1 21/10 32/3 33/8 37/20 38/10 61/11 108/14 113/17 116/12 118/17 121/3 128/23 130/10 132/4 132/18 133/10 140/1 143/14 154/22 156/10 157/25 160/12 160/19 175/7 175/12 175/15 199/7 217/2
surfaced [1] 143/20
surprisingly [1] 119/17
surrendered [1] 127/15
surveillance [2] 163/5 171/16
suspecting [1] 130/19
suspicion [1] 148/10
SVP [1] 55/25
switched [2] 63/19 98/18
sworn [9] 22/3 22/9 104/25 105/3 128/23 135/16 135/19 160/10 161/10
sympathy [1] 192/8
synthetic [4] 15/6 16/11 45/20 90/20
system [1] 15/7
Systems [1] 15/10

**T**

t-shirts [1] 176/18
table [1] 211/15
tactic [1] 79/8
tactics [1] 118/4
tagged [1] 80/24
take [56] 14/2 14/13 19/14 22/1 24/21 27/8 30/2 33/11 50/8 56/19 58/15 61/3 61/17 62/21 70/24 71/1 76/22 76/22 77/2 77/3 80/22 82/15 82/19 83/15 84/9 91/12 108/9 111/21 111/23 111/24 119/23 125/1 128/14 129/22 133/6 133/22 135/13 135/17 139/19 146/21 147/25 160/11 167/6 168/21 183/2 183/5 183/7 183/9 184/3 186/1 191/8 196/2 206/11 207/6 207/18 209/5
takeaway [2] 44/23 44/24
taken [10] 34/14 75/19 80/5 84/12 108/9 148/22 184/8 190/23 191/1 212/3
taking [12] 10/14 29/17 49/2 49/4 61/12 61/23 83/21 100/14 100/15 115/12 118/9 216/1
talk [44] 13/22 23/12 33/9 34/1 34/2 34/3 38/15 39/3 40/1 40/17 41/7 41/7 41/8 41/8 43/22 48/19 50/4 52/13 60/14 68/17 68/19 68/22 69/1 72/3 73/1 75/21 76/13 79/10 79/11 83/9 87/3 96/9 120/7 122/11 146/9 146/23 172/21 184/5 191/16 192/3 202/14 202/15 210/11 215/23
talked [6] 31/8 43/18 63/25 72/5 76/13 104/2
talking [23] 26/23 36/11 39/15 40/12 44/16 67/23 96/8 102/18 107/24 111/4 113/7 113/8 120/9 124/19 124/22 125/15 127/24 132/25 154/19 154/19

174/10 174/14 189/4
talks [6] 53/11 59/4 72/19 175/5 210/15 210/16
tangible [1] 168/9
targeted [6] 61/8 62/4 73/24 76/1 76/6 121/15
targets [1] 110/4
task [1] 162/15
taught [1] 93/25
taxes [1] 168/22
TD [1] 31/15
teacher [1] 23/22
teachers [2] 23/18 38/21
team [2] 164/5 173/4
tech [10] 7/10 32/20 32/21 42/4 42/6 70/9 70/11 114/5 114/10 114/14
technical [3] 190/9 190/11 190/12
technologies [1] 128/8
technology [16] 30/24 31/6 31/25 31/25 32/8 41/24 70/12 104/4 104/8 111/19 112/4 128/24 134/23 160/19 177/22 178/2
Ted [1] 86/19
telecommunications [4] 112/13 112/15 120/10 120/14
Telegram [1] 177/23
Telephone [4] 1/14 1/17 1/21 218/18
telephones [1] 162/19
television [4] 62/3 67/7 76/2 102/18
tell [37] 19/15 22/17 25/5 25/16 27/23 28/24 34/7 34/16 39/8 41/22 42/17 48/5 66/23 95/22 122/3 131/1 145/14 145/24 147/5 149/23 150/3 150/10 151/9 151/12 151/20 153/10 160/24 161/18 163/22 169/15 169/25 170/14 170/23 171/20 184/5 200/18 212/11
telling [6] 57/19 118/18 145/8 146/13 170/18 188/5
tells [5] 167/3 170/5 175/5 207/14 210/18
temporarily [1] 165/6
ten [2] 126/1 177/18
tender [1] 164/20
tendered [2] 83/19 83/22
tending [1] 187/23
tends [1] 18/8
tens [2] 62/22 138/16
term [3] 33/12 150/14 152/4
terminated [1] 171/10
termination [1] 171/1
terms [4] 33/5 151/1 151/2 175/18
Terrence [2] 89/19 89/23
terrible [2] 35/12 166/9
terrorists [2] 110/13 110/20
test [1] 189/14
testified [14] 22/9 99/5 99/11 100/2 105/3 110/7 135/19 136/9 143/7 160/14 161/10 187/23 189/12 189/17
testifies [1] 190/20
testify [11] 22/18 22/19 70/15 82/4 85/11 88/4 106/19 109/5 110/12 161/20 202/13
testifying [8] 99/12 101/5 101/20 105/14 106/18 136/12 161/19 190/20
testimony [35] 83/2 94/9 96/7 96/12 96/22 97/3 97/5 97/12 101/7 104/1 106/3 149/2 154/18 155/15 165/5

166/7 179/19 179/11 187/17 187/21 188/1 188/14 188/18 188/21 188/25 189/4 189/7 189/10 189/13 189/15 189/22 190/5 190/6 190/22 191/6
TEXAS [20] 1/2 1/5 1/14 1/20 16/6 22/14 24/4 24/16 25/2 35/6 88/11 157/5 161/16 207/15 207/15 208/4 208/5 218/12 218/13 218/17
text [9] 39/8 41/6 42/25 43/2 47/13 55/12 72/7 72/9 179/24
texts [5] 41/7 42/25 47/7 47/9 52/11
than [33] 17/23 28/21 69/7 70/5 70/10 70/12 70/14 79/5 79/7 92/22 102/12 104/7 112/9 118/1 119/14 126/24 131/21 133/11 138/7 139/9 154/4 179/19 180/25 182/16 187/6 187/11 191/5 196/24 197/2 206/23 207/6 207/12 208/12
thank [55] 10/14 14/18 14/19 14/22 17/20 19/9 19/11 48/10 49/23 82/2 83/13 84/3 84/11 84/22 87/9 94/3 97/10 101/18 103/14 122/25 125/8 127/2 127/4 129/2 133/23 134/24 135/5 147/1 147/15 158/9 159/17 159/19 159/24 182/10 182/11 183/4 183/19 184/6 199/8 199/12 204/6 209/8 209/10 209/11 209/14 210/24 211/8 211/9 212/1 213/2 215/17 215/25 215/25 216/7 217/12
that [943]
That'll [1] 160/8
that's [131] 13/3 14/16 17/8 18/23 19/3 19/20 20/7 30/14 32/25 34/11 34/15 34/20 37/24 39/6 42/7 42/9 48/4 48/20 50/5 50/7 55/1 58/8 60/8 60/8 62/4 64/17 66/3 66/12 67/6 67/15 67/25 70/12 70/22 71/6 71/12 73/7 76/2 76/4 79/18 80/2 80/11 84/1 86/20 87/22 91/16 97/6 99/23 100/9 101/3 101/7 101/7 106/22 106/23 108/18 109/16 112/24 117/5 117/5 118/24 122/11 124/20 126/19 126/19 126/24 130/4 132/22 133/14 134/23 136/20 137/2 137/10 137/16 138/7 139/2 139/7 139/22 140/16 140/18 141/21 143/19 145/16 146/11 149/7 152/14 155/24 156/19 157/20 160/25 164/6 165/1 167/20 169/8 170/14 170/14 171/18 172/22 177/21 177/21 178/14 180/4 182/2 183/9 183/23 184/14 184/24 200/2 200/8 201/10 201/10 201/18 201/19 201/21 201/22 202/7 202/11 202/11 202/14 202/25 203/5 203/15 203/21 203/22 203/25 205/15 206/19 206/25 207/2 208/8 209/1 209/1 209/18
their [41] 19/16 19/21 20/5 26/23 28/6 34/19 54/3 61/17 89/3 99/14 106/7 107/11 111/11 112/15 114/19 117/16 118/8 119/18 121/3 122/5 122/13 129/7 137/23 148/12 162/2 171/2 171/11 171/16 171/25 173/22 174/3 175/6 181/21 184/13 187/8 192/24 193/4 193/20 198/19 212/8 216/21
them [79] 12/5 12/17 16/24 17/1 17/2 17/2 17/6 19/7 21/17 26/16 26/23 27/3 27/5 27/9 29/9 39/8 42/14 44/8 44/9

**them... [60]** 51/19 52/22 52/25 55/22 57/3 62/19 63/8 66/12 88/10 97/23 98/3 98/6 98/7 106/7 106/8 107/7 108/4 110/20 111/9 112/11 117/4 118/10 119/9 124/3 124/4 129/8 129/8 129/23 131/17 132/17 133/9 148/16 152/18 154/21 155/6 156/4 164/12 164/12 164/13 166/18 166/22 166/22 169/7 171/2 171/5 171/15 172/2 173/3 176/21 176/22 179/21 187/1 187/18 187/20 201/3 201/4 206/21 207/13 209/4 209/5

**theme [1]** 112/7

**themselves [3]** 117/13 120/17 157/4

**then [83]** 10/9 12/7 19/22 19/22 19/24 20/5 20/9 25/7 25/19 26/2 26/4 29/22 33/1 33/16 38/11 41/4 43/2 48/25 49/18 54/12 57/4 58/4 58/5 58/6 58/7 61/15 62/1 65/5 67/1 67/18 69/25 72/13 73/6 73/11 74/23 82/7 82/17 84/9 100/15 117/15 120/18 122/9 122/22 123/11 124/17 128/20 133/15 140/7 140/14 140/22 154/21 155/9 163/17 164/15 165/16 170/13 171/16 171/17 175/7 176/14 178/3 178/4 178/5 178/11 179/12 183/17 184/15 185/3 185/22 186/4 186/4 186/5 186/19 190/25 191/23 194/5 194/13 198/1 199/24 201/1 207/15 212/23 212/25

**theory [2]** 143/12 143/24

**there [125]** 11/21 11/25 20/18 21/15 23/21 24/5 25/15 25/17 25/24 26/8 26/13 27/14 27/18 28/1 28/15 29/6 29/20 33/3 37/9 38/1 38/5 38/5 38/6 38/24 40/14 40/21 41/9 43/4 43/5 45/4 50/1 54/13 57/14 61/25 62/19 65/4 65/4 66/5 66/5 66/13 67/20 68/7 70/14 71/6 72/16 73/20 74/15 75/8 75/8 75/14 79/11 79/18 81/18 85/17 92/1 92/3 92/6 98/9 101/3 103/1 104/6 105/16 106/1 110/10 113/3 113/7 114/7 114/10 114/23 116/3 117/12 117/24 118/6 119/4 119/9 120/8 122/3 125/20 127/24 128/23 132/9 132/13 132/22 140/1 145/25 147/3 148/9 149/16 153/1 162/4 163/11 163/12 165/9 167/19 167/22 169/7 169/7 173/17 173/18 176/8 177/2 177/14 179/2 179/3 179/9 179/11 183/25 184/6 187/22 187/24 189/20 194/5 195/19 198/9 198/20 201/2 202/16 202/21 204/4 205/15 207/5 207/5 208/10 210/9 217/1

**there's [48]** 14/8 20/22 23/4 27/17 29/22 29/23 29/23 30/16 32/25 33/2 33/3 33/18 35/5 36/9 38/23 63/10 63/10 65/3 65/5 66/17 67/4 70/5 71/4 73/19 74/2 80/13 82/24 91/19 109/20 112/8 121/25 125/2 126/3 129/1 145/2 146/6 165/14 166/20 167/5 167/19 171/17 171/17 173/7 176/9 176/9 179/11 211/4 211/22

**thereby [1]** 154/3

**therefore [1]** 189/7

**thereon [1]** 83/11

**these [75]** 13/23 14/2 16/5 18/7 21/16 29/11 37/21 33/10 33/11 37/1 37/5 37/10 37/17 38/23 38/24 44/4 52/12 52/15 53/19 54/19 54/20 56/20 57/3 59/3 59/3 61/13 61/19 62/6 62/17 65/21 69/17 70/5 71/4 72/3 73/17 74/6 74/7 78/11 78/14 78/15 78/16 78/18 80/12 82/8 92/17 114/13 117/1 117/16 118/2 118/24 122/5 125/3 128/17 137/21 143/11 144/3 147/12 147/21 150/20 151/21 159/5 159/9 166/8 166/8 168/23 177/11 186/15 194/23 200/14 200/18 200/19 207/7 207/16 213/13 215/20

**they [180]** 12/5 13/12 14/5 17/1 18/4 20/8 23/20 26/13 27/17 31/20 33/13 33/13 33/15 34/22 35/6 37/5 37/5 37/6 37/12 37/21 38/6 38/25 38/25 39/7 39/8 42/1 42/2 44/10 52/13 54/4 54/4 54/21 54/22 54/23 59/3 61/12 61/15 61/24 62/22 65/17 74/2 74/3 75/9 75/23 76/21 76/22 78/13 79/16 81/25 82/4 82/8 88/21 93/25 97/16 97/20 97/20 97/23 98/1 98/4 106/21 106/22 107/16 108/14 109/18 110/2 110/3 110/4 110/18 110/19 110/19 111/6 111/7 111/8 111/16 111/17 112/20 112/21 112/23 112/24 112/24 114/6 114/7 114/8 114/8 114/8 114/9 115/19 115/19 115/25 116/22 117/7 117/15 117/16 117/18 117/18 117/19 117/19 117/20 117/21 117/21 117/22 118/19 118/25 119/18 119/23 120/13 120/15 120/22 121/5 121/18 121/18 122/2 122/3 122/12 122/16 122/20 123/13 123/14 124/2 124/24 125/2 125/3 125/25 126/1 128/2 128/6 128/15 130/18 130/19 130/20 132/11 132/12 132/17 132/24 134/13 136/8 145/9 148/8 148/12 150/21 152/8 154/1 154/3 163/17 164/15 164/18 166/3 169/15 169/16 171/11 171/15 171/16 172/1 172/22 174/1 174/2 174/6 174/22 174/23 176/7 180/25 181/21 181/24 186/22 193/5 193/20 193/22 195/21 195/22 198/11 203/13 203/13 203/22 203/23 205/12 207/6 207/7 207/24 209/4 209/5

**they'd [3]** 28/4 109/21 208/14

**they'll [4]** 37/14 38/2 170/23 204/12

**they're [48]** 19/7 29/20 30/20 30/21 32/4 35/20 36/22 36/24 54/2 54/20 54/25 55/2 65/25 75/8 76/15 76/15 76/16 82/5 82/7 82/12 88/23 91/19 92/8 97/14 97/22 97/25 98/6 107/16 112/4 112/4 118/9 118/13 118/14 118/18 122/6 124/2 125/4 129/18 131/1 131/15 132/15 133/9 136/4 168/15 169/12 182/14 203/12 206/23

**they've [5]** 75/22 79/12 81/23 81/23 88/12

**Thiel [5]** 86/13 86/14 86/15 176/12 176/14

**thing [27]** 11/24 15/25 16/1 26/15 32/10 42/1 43/22 44/1 48/25 49/16 50/14 51/5 54/8 60/12 81/6 82/3 83/21 89/1 98/1 114/17 171/21 175/11

176/13 198/21 202/12 208/8 210/3

**things [78]** 12/2 14/23 15/2 15/3 15/13 16/21 18/4 19/6 26/18 27/23 28/15 30/5 30/7 31/4 35/12 35/22 38/7 42/17 44/7 44/13 47/12 48/18 50/4 52/19 55/3 57/1 58/18 63/8 63/11 63/12 64/6 64/11 66/24 72/4 74/2 75/8 84/1 92/15 92/17 92/18 93/24 93/25 96/20 107/9 108/13 110/18 117/1 117/2 129/18 129/23 130/11 133/1 138/4 139/7 143/23 158/20 166/11 167/2 167/24 168/11 168/23 169/11 170/2 170/2 175/5 175/9 175/10 177/24 188/6 188/6 206/7 206/10 206/13 206/16 207/16 209/1 210/8 216/6

**think [77]** 11/14 14/24 17/12 18/14 18/22 41/19 42/10 42/15 50/19 54/4 64/18 67/4 70/20 77/1 85/13 90/21 95/20 96/22 97/2 97/6 98/11 98/15 98/20 111/14 113/24 115/10 116/17 117/3 117/9 118/19 121/18 125/1 125/2 126/17 127/15 129/5 130/8 131/9 131/10 131/21 131/22 132/8 132/15 133/8 134/11 134/16 136/23 139/22 140/10 140/13 141/23 142/20 143/2 147/6 147/8 147/11 147/13 148/4 148/5 150/2 156/3 157/2 158/6 160/7 173/14 178/4 180/3 181/10 182/1 186/1 189/5 200/1 202/22 203/6 207/2 208/20 209/24

**thinking [1]** 99/3

**thinks [7]** 48/19 50/5 64/15 77/7 134/17 148/5 179/13

**Thiokol [2]** 111/7 120/9

**third [4]** 66/17 126/10 140/25 171/24

**Thirty [1]** 34/24

**this [405]**

**THOMPSON [24]** 1/12 10/24 20/25 21/16 22/11 104/10 105/5 134/2 135/21 141/11 147/5 149/4 157/23 161/12 183/21 184/19 185/21 185/23 185/24 186/6 186/19 199/1 209/12 211/9

**Thompson's [1]** 17/25

**those [88]** 12/4 12/9 12/17 13/11 13/18 20/23 29/17 30/18 31/10 31/12 32/20 33/12 33/16 33/17 34/17 37/14 40/9 42/4 54/1 58/2 58/3 59/4 61/24 68/1 69/11 69/22 73/4 74/7 79/16 88/9 91/15 92/18 92/19 94/10 100/2 106/5 106/14 107/14 108/19 110/19 115/17 115/23 116/24 117/2 118/14 120/4 121/14 122/1 123/3 123/10 125/21 125/22 125/24 126/2 128/7 128/25 130/19 136/7 137/24 138/3 145/22 156/18 163/3 163/4 167/3 167/13 167/14 167/23 169/3 172/3 177/23 178/2 179/20 185/14 189/3 190/12 193/18 194/18 198/15 200/23 201/3 201/6 201/19 202/8 209/3 215/22 215/24 218/7

**though [11]** 17/18 20/19 82/21 137/21 152/12 157/15 160/17 189/6 205/17 207/2 208/19

**thought [8]** 85/4 112/17 114/7 130/18 130/18 158/18 205/20 207/17

**thousands [2]** 22/23 22/23 38/24

**thousands...** [2] 39/12 62/22
**threat** [1] 50/9
**threaten** [2] 56/10 180/25
**threatened** [3] 47/16 47/16 147/18
**threatening** [2] 52/12 174/8
**threats** [6] 11/6 11/22 11/25 12/1 47/15 169/3
**three** [11] 62/8 64/24 69/25 94/2 99/17 113/14 113/15 117/9 124/12 143/7 178/2
**through** [40] 21/5 21/8 21/14 23/23 23/24 24/13 31/19 48/11 56/12 56/15 68/25 73/17 73/19 73/20 81/7 81/8 81/10 81/25 82/10 82/22 107/7 108/4 110/24 113/2 113/11 116/8 123/24 124/12 132/12 153/23 155/1 162/11 164/14 164/18 175/16 179/22 199/14 203/7 210/9 210/25
**throughout** [2] 83/8 215/19
**throw** [3] 56/18 99/10 148/4
**thrown** [1] 12/9
**Thumbs** [1] 104/12
**tie** [1] 181/13
**tied** [3] 105/17 119/10 193/17
**ties** [4] 43/19 43/19 44/17 195/13
**tight** [1] 20/2
**till** [1] 111/13
**time** [122] 10/13 10/15 13/2 14/15 15/18 15/19 19/3 20/5 20/25 21/15 21/19 24/13 24/19 24/25 29/8 36/7 36/9 36/12 37/2 37/21 37/22 38/11 38/13 39/24 40/5 40/25 41/3 41/19 42/24 44/16 44/20 45/12 52/6 58/14 62/12 65/16 66/22 67/3 67/23 69/2 70/8 72/12 74/9 74/10 74/14 78/24 79/12 81/14 81/15 82/9 82/15 84/17 88/17 103/9 103/23 105/10 109/19 109/22 113/4 113/7 114/15 117/20 126/5 126/18 129/6 130/11 134/24 139/7 139/17 140/25 142/4 143/3 144/1 144/24 147/8 147/14 147/21 148/10 148/24 154/2 154/24 156/3 162/4 162/14 162/20 165/22 172/11 177/21 180/1 180/25 183/9 183/18 183/22 184/2 185/16 186/8 187/25 191/17 191/21 192/19 197/6 198/16 198/25 203/9 204/18 204/22 204/25 206/15 207/5 208/6 209/8 209/12 209/22 210/12 211/10 211/19 213/5 213/21 215/16 215/20 216/1 216/2
**timeframe** [1] 24/17
**timeline** [2] 8/5 57/22
**times** [17] 15/4 32/5 38/10 41/13 47/12 81/19 102/3 124/24 143/7 147/18 175/16 175/17 179/9 189/3 205/3 208/18 209/9
**timing** [2] 204/16 204/24
**tiny** [1] 62/15
**tired** [1] 199/14
**title** [5] 106/8 162/18 163/3 163/5 163/6
**titled** [3] 107/3 108/1 108/21
**today** [21] 22/18 55/24 69/7 70/15 76/13 82/17 85/5 106/2 106/18 109/6 133/20 136/22 165/5 183/11 183/18 199/15 200/24 214/12 215/25 216/14

216/20
**together** [7] 18/3 19/4 31/21 74/22 96/5 185/12 198/24
**told** [12] 40/10 47/5 47/6 64/7 73/1 95/12 101/1 132/15 170/10 171/4 200/4 215/19
**toll** [2] 13/20 202/11
**tomorrow** [2] 48/19 50/4
**ton** [8] 66/22 89/25 90/2 90/4 95/14 158/13 158/23 158/24
**Ton-That** [7] 89/25 90/2 90/4 95/14 158/13 158/23 158/24
**too** [13] 60/12 66/9 74/3 79/8 81/19 82/5 101/13 116/16 119/21 123/6 184/2 207/20 208/25
**took** [6] 50/9 50/9 79/23 113/17 117/18 128/10
**toot** [1] 109/7
**top** [10] 44/22 48/10 49/18 50/1 67/20 133/12 201/16 202/2 210/13 215/4
**top-line** [1] 44/22
**top-secret** [1] 133/12
**topic** [2] 161/25 169/9
**tossed** [2] 57/13 57/14
**total** [2] 67/5 68/7
**totality** [1] 62/9
**totally** [1] 144/10
**touch** [5] 50/25 51/3 56/11 121/4 123/1
**touched** [1] 65/8
**tough** [1] 25/8
**tougher** [1] 128/13
**towards** [1] 53/17
**town** [1] 43/5
**track** [3] 68/9 103/21 124/6
**trade** [3] 33/17 109/10 111/14
**traded** [7] 26/22 30/18 30/20 30/22 31/7 31/9 86/7
**trading** [1] 30/21
**traffickers** [2] 162/10 162/12
**trafficking** [2] 162/17 173/6
**training** [1] 190/10
**transaction** [3] 112/17 120/9 121/8
**transcript** [4] 1/8 1/23 218/4 218/6
**transferred** [1] 163/1
**transition** [2] 64/19 123/21
**translate** [2] 37/18 70/18
**translated** [1] 68/20
**trash** [1] 14/13
**trauma** [1] 82/10
**traumatic** [1] 179/23
**traveled** [1] 207/21
**treasure** [1] 19/2
**treat** [1] 123/13
**treated** [1] 192/10
**treble** [1] 217/7
**Trek** [1] 176/18
**tremendous** [1] 68/3
**trial** [22] 1/8 11/8 19/13 19/21 20/14 20/22 21/2 57/15 73/18 73/18 73/18 83/10 83/11 93/23 101/15 146/24 148/25 180/19 186/15 188/2 190/23 191/13
**tried** [7] 15/4 93/10 102/13 126/18 175/24 204/2 209/9
**triggering** [1] 121/20
**triumph** [1] 207/24

**Tetter's [1]** 153/22
**trouble** [5] 18/20 59/24 78/9 111/7 130/20
**true** [43] 15/11 16/22 17/8 17/9 19/8 60/17 79/15 107/16 108/7 108/15 114/17 115/19 115/20 116/17 118/25 124/2 126/4 130/4 130/4 130/8 131/18 133/2 133/7 133/9 134/16 134/17 143/15 152/14 154/2 154/3 155/21 155/24 156/2 156/4 156/12 156/15 156/16 156/19 157/20 168/15 169/11 175/24 218/4
**Trump** [6] 86/21 89/10 89/13 98/20 98/21 99/19
**trumpet** [1] 132/2
**trust** [16] 13/4 13/7 25/13 54/20 54/22 54/23 71/22 111/15 111/16 112/25 122/24 124/6 124/15 137/23 207/14 208/12
**trusted** [1] 128/22
**trusts** [3] 16/8 25/19 158/21
**trustworthy** [1] 94/10
**truth** [5] 18/7 118/18 151/17 188/5 196/23
**truthful** [2] 147/17 210/8
**truthfully** [1] 179/6
**truthfulness** [5] 63/1 63/14 64/1 64/2 188/20
**try** [23] 12/2 18/14 55/4 59/15 62/16 62/18 65/7 76/7 78/4 82/12 83/20 96/23 97/4 104/3 105/10 113/12 113/19 121/11 122/16 129/5 147/6 160/3 199/16
**trying** [32] 14/12 32/3 50/19 51/7 51/7 51/8 52/15 52/17 53/13 55/16 55/18 60/7 60/9 61/20 61/22 64/7 80/9 93/20 95/19 99/9 99/10 101/16 102/11 106/17 110/4 112/10 114/13 147/17 148/16 168/7 173/15 207/13
**tub** [2] 176/16 176/20
**turn** [8] 12/3 58/18 64/7 74/24 88/5 138/21 150/25 151/9
**turned** [3] 12/8 12/10 114/17
**turns** [1] 77/3
**TV** [12] 13/2 35/25 36/1 37/10 37/17 38/9 39/6 39/7 68/1 73/8 92/16 206/22
**tweet** [1] 80/1
**tweeted** [1] 126/1
**Twenty** [1] 167/18
**Twenty-nine** [1] 167/18
**twice** [4] 37/1 140/24 196/2 207/7
**Twitter** [1] 59/2
**two** [31] 13/21 14/3 16/9 22/16 30/16 30/17 31/4 32/6 33/3 33/18 34/11 34/17 35/21 38/21 59/13 61/25 72/8 78/16 78/17 88/9 98/1 99/21 106/13 114/16 117/25 142/18 160/16 189/20 194/20 197/9 213/13
**twofold** [1] 61/20
**type** [17] 13/5 14/12 14/12 18/25 21/15 26/15 33/11 36/3 37/10 37/17 42/4 45/6 53/5 88/23 94/8 120/4 122/4
**types** [8] 26/19 30/6 35/7 36/6 47/11 68/2 167/13 189/20
**typical** [4] 36/22 36/24 37/3 172/16
**typically** [3] 28/2 33/14 173/23

**U**

**Uh [3]** 65/10 101/23 178/12
**Uh-huh [3]** 65/10 101/23 178/12
**ultimate [3]** 125/13 192/16 192/16
**ultimately [7]** 40/14 41/4 41/25 42/14 77/1 171/8 192/17
**ultra [3]** 28/2 32/11 40/4
**ultra-high [2]** 28/2 32/11
**Umbra [7]** 5/5 5/7 5/11 6/22 8/11 80/7 90/19
**unanimous [12]** 187/1 191/14 198/12 212/18 212/25 214/17 214/21 214/24 215/2 215/6 215/9 215/13
**unauthorized [2]** 56/5 179/17
**Uncle [2]** 104/2 104/3
**uncommunicative [1]** 122/17
**undefined [1]** 202/23
**under [22]** 17/15 39/15 63/18 90/13 96/9 104/21 112/22 113/14 117/20 120/20 126/6 127/11 142/12 144/2 144/4 146/3 154/17 166/16 173/9 173/11 192/10 192/24
**undercover [2]** 130/25 162/17
**undermine [1]** 78/19
**underneath [1]** 33/18
**understand [11]** 17/17 17/24 23/10 32/9 54/21 64/25 82/23 114/9 144/8 200/19 208/24
**understandable [1]** 116/25
**understanding [3]** 62/25 130/6 186/23
**understands [1]** 116/9
**understood [3]** 21/18 115/12 166/7
**unduly [1]** 191/3
**uneasy [1]** 125/4
**unexpected [2]** 175/16 175/17
**unfamiliar [1]** 114/14
**unfortunate [2]** 126/24 209/1
**unfortunately [5]** 116/16 126/22 145/22 155/14 176/15
**unimportant [1]** 188/11
**Union [2]** 40/18 40/22
**unique [1]** 60/10
**unit [1]** 162/2
**UNITED [22]** 1/1 1/9 27/12 32/4 36/5 61/4 109/19 110/14 112/1 112/15 120/19 120/21 129/19 132/11 133/4 156/8 156/8 156/22 166/18 167/5 167/6 218/8
**University [2]** 24/4 25/2
**unknown [1]** 117/6
**unless [7]** 11/23 118/25 121/4 187/17 191/18 192/4 211/22
**unlike [1]** 30/22
**unlikely [1]** 122/14
**unprofessional [1]** 56/5
**unrebutted [5]** 200/14 200/15 201/5 201/10 202/1
**until [13]** 17/15 20/14 24/19 83/11 133/12 146/23 161/1 184/5 191/17 198/13 198/24 204/16 211/23
**unusual [1]** 145/10 145/11 146/12
**unwilling [1]** 179/8
**up [130]** 11/23 12/24 18/4 18/8 24/15 26/4 30/3 33/14 34/5 34/6 34/21 34/22 36/16 38/20 38/22 39/11 40/13 41/13 41/25 42/22 43/10 45/8 45/13 46/6

46/22 47/25 49/18 51/14 51/21 51/23 53/8 53/14 55/7 55/9 55/20 56/18 57/14 57/21 59/6 59/14 61/15 62/1 63/16 63/17 63/21 63/22 66/12 66/19 67/10 69/6 69/14 72/11 72/15 72/15 72/18 74/10 75/18 77/15 77/19 78/14 78/15 78/16 78/23 79/25 80/10 81/13 83/4 84/19 99/6 99/6 100/1 104/12 104/23 105/7 106/7 106/24 110/19 111/11 111/13 112/4 114/4 114/12 116/21 118/10 118/11 119/2 119/25 121/11 124/22 125/6 125/11 128/21 129/1 134/4 135/13 136/17 138/21 139/6 139/19 147/10 149/5 152/10 152/15 154/18 155/4 155/15 156/7 156/8 157/23 158/3 158/6 160/8 160/24 165/12 169/5 169/23 169/25 173/24 180/25 181/10 185/25 186/5 190/14 199/6 200/13 204/15 206/11 209/5 209/18 210/1
**update [1]** 104/4
**updates [1]** 56/1
**upon [9]** 10/15 17/15 35/11 84/17 138/1 143/2 190/15 190/16 209/12
**upset [4]** 16/5 18/6 56/16 210/7
**upside [5]** 33/6 33/8 71/2 71/4 123/23
**upside-down [1]** 71/4
**upstart [2]** 31/25 42/4
**us [20]** 1/12 10/17 19/9 21/24 34/16 74/25 97/23 104/3 112/25 124/14 130/25 130/25 150/7 158/2 165/10 202/21 203/20 210/5 210/21 217/11
**use [10]** 20/22 21/2 57/1 59/1 66/18 91/16 169/22 174/7 178/8 204/8
**used [19]** 12/2 12/20 24/23 43/15 67/8 71/12 116/25 133/17 151/2 163/4 168/5 178/8 178/9 178/10 178/13 180/5 206/8 207/6 209/4
**useful [1]** 111/23
**uses [2]** 59/1 59/2
**using [12]** 48/16 52/21 56/3 56/24 56/25 107/7 145/19 147/8 147/14 164/17 170/11 170/19
**usually [3]** 33/10 128/21 170/24

**V**

**validating [1]** 175/19
**valuable [6]** 13/9 37/24 38/3 68/1 110/5 175/4
**valuation [1]** 142/24
**value [15]** 66/3 66/16 66/18 67/9 67/18 122/5 146/19 163/18 168/9 170/4 170/7 175/6 193/6 193/15 195/20
**valued [1]** 203/22
**varied [1]** 47/14
**variety [1]** 171/25
**various [2]** 122/15 145/6
**vehicle [2]** 32/23 45/23
**veil [1]** 122/6
**Vekselberg [1]** 155/23
**vengeful [1]** 205/8
**venom [1]** 204/2
**venture [5]** 44/20 46/12 86/16 156/8 156/22
**veracities [1]** 129/22
**veracity [2]** 133/5 137/24

**verbal [1]** 147/5
**verbatim [1]** 62/21
**verdict [44]** 20/11 187/1 191/8 191/14 192/2 192/3 198/10 198/12 198/12 200/4 201/7 201/11 201/12 203/3 211/14 211/23 212/8 212/16 212/18 212/21 212/24 213/3 213/5 214/17 214/17 214/20 214/20 214/24 214/24 215/2 215/2 215/5 215/5 215/9 215/9 215/12 215/17 215/18 216/1 216/3 216/10 216/14 216/20
**verified [1]** 124/18
**verify [1]** 124/13
**Verizon [3]** 9/13 149/12 156/3
**version [1]** 140/23
**very [77]** 13/9 14/4 15/6 17/21 19/2 19/11 20/1 20/2 26/11 26/13 26/15 26/19 27/6 27/6 37/1 37/24 40/13 44/17 44/19 45/6 51/4 61/8 61/8 62/4 62/5 62/15 63/15 63/23 70/11 76/6 76/6 79/1 81/14 83/11 85/16 85/18 93/20 93/20 95/12 96/19 96/18 101/16 103/23 105/16 106/21 106/21 110/13 111/22 112/20 117/3 118/16 120/22 124/14 126/9 126/21 130/12 133/19 145/13 146/13 146/24 147/25 160/25 161/4 161/4 161/6 161/18 163/22 175/8 176/12 176/25 186/9 192/22 201/3 201/4 206/5 208/5 208/6
**vetted [1]** 39/5
**vetting [2]** 164/11 175/19
**vicious [1]** 166/8
**Video [5]** 4/21 7/13 8/17 36/23 37/8
**view [4]** 39/5 110/17 123/23 134/14
**viewed [2]** 131/11 197/5
**viewers [1]** 36/10
**views [1]** 151/3
**Viktor [1]** 155/23
**violation [1]** 200/8
**violations [2]** 94/6 127/19
**Virginia [6]** 1/17 15/17 57/14 79/16 90/11 105/17
**visit [1]** 89/2
**vociferous [1]** 121/25
**voice [3]** 136/1 136/2 136/5
**Voir [2]** 2/6 3/7
**VOL [2]** 2/2 4/2
**VOLUME [1]** 1/8
**votes [1]** 113/12
**vs [8]** 1/6 84/15 106/9 149/1 149/12 184/10 185/11 212/6

**W**

**wait [2]** 126/7 207/23
**Waited [1]** 72/8
**walk [9]** 48/11 68/25 108/4 116/8 123/24 169/23 169/25 171/3 181/23
**Walker [1]** 139/12
**walking [1]** 107/6
**Wall [4]** 13/5 28/11 29/15 30/7
**want [70]** 12/12 15/3 17/18 18/25 23/10 26/4 28/4 28/4 31/17 33/9 34/1 34/3 35/8 36/11 37/6 38/6 38/25 39/14 44/6 45/12 48/6 49/15 50/21 51/4 57/3 58/21 61/18 64/16 65/13 66/11 69/6 75/11 75/11 76/22 77/16 77/23 85/5 93/11 94/7 97/6 102/6 102/7 107/18

**want... [27]** 115/24 119/23 119/25 124/13 125/3 141/1 147/5 149/21 149/22 155/5 174/2 174/3 181/24 185/6 185/24 191/21 199/25 200/16 200/17 205/12 207/1 209/3 210/3 210/11 210/12 210/13 210/24

**wanted [20]** 24/10 28/3 29/1 30/2 30/7 30/9 46/23 46/24 51/10 56/18 81/25 91/5 97/23 109/22 111/9 113/14 113/15 114/8 119/15 148/4

**wanting [4]** 17/24 44/10 77/2 97/21

**wants [7]** 31/19 51/8 108/20 119/14 160/7 185/23 206/21

**war [1]** 132/8

**warm [1]** 161/4

**warn [1]** 85/8

**warned [1]** 102/3

**warning [4]** 10/17 186/7 199/3 204/23

**warrant [1]** 162/18

**warranting [1]** 154/3

**wary [1]** 62/2

**was [406]**

**was way [1]** 127/9

**Washington [4]** 26/7 74/3 74/9 173/7

**wasn't [12]** 25/7 45/4 71/5 71/6 76/18 79/15 82/1 89/6 108/7 145/25 152/16 210/6

**waste [2]** 203/8 210/12

**wasted [1]** 209/22

**wasting [1]** 103/23

**watch [4]** 36/10 39/7 92/17 101/15

**watching [1]** 68/2

**way [41]** 11/14 15/17 15/18 16/3 24/13 30/11 41/10 42/10 44/3 45/25 54/10 56/22 70/20 74/15 78/16 80/7 81/20 85/6 98/16 108/12 110/18 112/3 112/20 117/1 121/19 122/3 124/3 124/22 126/3 126/6 127/9 143/2 155/6 157/8 162/11 166/7 168/17 173/1 177/9 206/8 208/17

**ways [5]** 15/15 28/22 33/3 33/18 177/25

**we [177]** 10/3 15/5 15/12 16/8 18/3 18/6 19/13 19/14 19/20 20/17 20/18 20/19 23/9 28/4 28/4 31/8 34/6 34/10 34/18 34/19 36/16 40/12 43/4 43/13 43/25 44/3 44/6 44/6 44/7 44/8 44/24 44/24 48/10 48/15 49/20 49/22 52/2 52/3 57/21 57/22 62/8 62/11 63/25 64/19 64/22 64/22 64/24 65/8 65/9 66/5 66/18 66/22 66/25 67/2 67/4 67/13 67/23 68/5 68/25 70/19 72/1 72/2 72/5 73/18 74/4 74/22 74/22 76/12 76/13 77/25 80/20 80/22 82/17 82/22 83/15 83/20 84/8 84/16 86/25 96/19 98/8 98/13 101/8 102/19 103/18 103/19 103/20 103/22 103/25 104/2 104/6 104/7 106/13 107/19 110/13 111/15 111/16 111/17 112/12 112/13 112/17 112/17 112/19 112/20 112/25 113/7 116/3 116/21 119/1 120/8 120/24 120/25 121/2 121/4 122/24 123/6 124/12 126/4 128/10 129/8 131/2 133/20 139/1 139/4 144/11 149/2 154/8 156/11 159/15 160/6 161/16 161/16 162/2 162/18 162/19

164/20 165/13 167/12 168/5 169/21 172/23 175/13 175/19 175/14 177/9 177/25 182/13 182/18 183/11 183/14 184/22 185/23 186/5 198/25 199/3 199/14 199/15 199/19 199/23 200/6 200/6 200/7 201/25 202/10 202/19 203/1 204/7 204/7 204/15 205/14 209/9 210/20 210/25 211/3 211/8 211/24 217/1

**we'd [7]** 41/6 41/6 41/7 41/8 41/8 41/13 62/11

**we'll [40]** 10/6 10/7 10/9 10/12 10/17 20/18 31/1 39/2 43/3 48/21 68/23 82/19 84/6 84/9 85/17 105/10 106/16 108/19 123/1 127/3 146/25 148/9 152/21 183/17 184/3 184/15 185/20 185/22 186/6 191/16 194/3 199/2 204/18 204/23 204/24 206/11 209/12 211/23 212/2 213/21

**we're [63]** 10/6 13/10 13/11 14/16 15/4 15/21 18/8 19/12 29/24 36/11 47/6 48/18 50/3 57/24 57/25 66/9 66/21 68/9 70/7 82/15 84/14 93/9 93/22 93/22 94/4 98/4 103/21 106/8 106/24 113/1 113/2 113/8 113/18 116/5 116/9 121/24 122/11 124/11 134/16 147/9 148/7 148/8 148/25 153/24 155/14 157/21 174/10 175/15 178/7 182/21 182/21 183/2 183/5 183/6 183/6 183/14 184/6 184/9 185/10 204/5 209/22 211/3 211/3

**we've [14]** 20/1 57/24 64/18 78/2 83/2 124/1 124/22 126/2 134/23 147/18 185/13 198/18 202/20 202/20

**wealthiest [1]** 16/23

**wealthy [4]** 16/17 16/18 40/4 138/14

**wearing [1]** 150/7

**website [2]** 16/14 39/11

**Wednesday [4]** 82/17 139/21 182/16 183/12

**week [4]** 37/2 72/8 216/22 216/23

**weeks [2]** 77/17 124/12

**weighed [1]** 189/13

**weighing [1]** 188/20

**weight [5]** 16/20 187/3 187/11 187/21 191/5

**weird [2]** 43/16 74/5

**welfare [1]** 197/11

**well [101]** 15/9 17/9 18/1 20/17 22/19 24/10 24/23 26/15 27/16 29/1 29/18 30/3 32/16 33/2 33/12 33/23 34/17 34/22 35/9 35/13 35/23 36/5 39/5 39/19 41/3 41/19 42/22 44/4 44/8 44/24 45/1 45/3 46/21 50/19 51/17 53/15 54/4 54/19 55/5 58/18 61/8 64/11 65/3 66/3 68/24 69/4 69/12 69/25 73/3 73/17 75/20 77/11 77/25 79/1 81/9 82/8 85/15 85/22 86/17 93/11 96/3 97/24 107/23 109/13 109/19 111/4 111/12 111/25 117/2 118/22 121/23 125/18 130/6 130/10 131/23 132/14 141/14 143/10 144/4 146/2 146/17 153/13 155/5 156/5 156/10 157/2 157/6 158/19 160/18 160/24 170/17 176/24 182/15 184/18 191/8 195/23 195/25 200/6 201/3 205/13 217/7

**well-being [1]** 195/22

**went [23]** 22/21 22/22 23/14 23/22 23/23 24/4 26/7 27/10 28/11 28/25 40/14 41/20 43/4 57/15 109/11 117/19 117/19 132/12 162/7 179/22 184/12 203/23 206/1

**were [110]** 11/25 12/5 15/5 23/18 23/20 23/21 25/16 25/23 26/18 26/25 27/19 28/8 29/16 29/17 35/25 44/10 44/13 45/16 51/5 54/13 57/3 58/2 62/6 72/2 79/16 81/18 82/4 86/19 86/21 86/22 91/21 92/3 92/12 97/20 106/22 108/5 108/10 108/14 109/18 110/2 110/3 110/4 110/14 110/21 111/8 111/8 112/14 113/4 113/21 114/5 114/8 114/9 114/14 114/18 114/21 115/19 117/19 117/20 117/21 117/21 120/8 121/15 123/10 124/13 127/11 130/18 130/19 131/22 131/25 132/5 132/8 132/9 132/11 134/12 136/7 136/8 136/9 145/9 145/25 149/2 151/16 152/2 156/2 152/11 154/1 154/1 154/3 156/6 156/12 156/16 157/17 162/9 166/3 166/23 169/6 170/9 170/17 171/19 174/14 175/8 178/11 179/6 180/2 181/7 182/13 195/21 196/5 213/24 215/21 216/18

**weren't [6]** 65/24 86/3 97/21 114/10 115/19 172/22

**west [1]** 43/5

**what [261]**

**what's [37]** 11/19 19/13 19/16 27/25 28/3 30/14 30/17 32/22 34/12 38/5 48/11 52/2 52/10 53/13 54/10 54/15 56/14 60/5 61/6 64/5 67/5 69/16 72/10 72/25 76/16 79/1 90/1 99/1 117/5 120/6 142/18 153/7 159/2 159/6 173/10 178/23 212/21

**whatever [12]** 16/10 46/8 66/11 96/6 206/4 206/11 206/21 208/13 209/2 209/4 209/6 209/7

**WhatsApp [3]** 178/3 178/4 178/7

**whatsoever [7]** 15/8 91/13 137/4 164/24 175/6 185/2 211/4

**when [105]** 10/17 11/2 11/5 12/7 12/9 14/23 15/1 17/10 19/20 21/10 22/21 24/11 24/17 25/14 26/6 26/25 27/19 29/5 29/12 29/24 30/1 35/9 35/21 35/21 37/9 39/6 39/8 39/10 40/1 41/20 42/17 42/18 45/8 45/9 54/6 54/7 54/12 54/25 56/14 56/17 58/2 58/3 59/11 61/9 61/13 61/13 63/14 63/23 65/8 66/6 69/9 71/23 72/12 74/9 75/24 75/24 76/24 82/17 83/25 84/8 84/16 88/5 94/1 96/2 99/18 111/3 111/21 113/21 113/23 114/4 118/16 120/1 120/8 124/19 125/6 127/9 131/19 132/11 134/8 134/8 136/9 139/16 142/2 142/15 143/1 144/16 154/2 169/11 172/11 175/17 175/23 181/21 190/5 190/9 191/7 192/18 197/5 200/18 202/15 202/21 204/24 206/17 210/16 210/18 215/21

**where [48]** 11/20 23/12 25/25 27/8 28/4 29/18 32/24 34/14 34/21 38/10 48/17 49/20 49/20 50/12 53/8 56/1 56/21 57/22 57/24 57/24 57/24 58/24

where... [26] 66/10 70/19 86/25 98/9 108/21 112/18 113/4 114/18 116/9 117/12 124/8 135/22 136/5 139/12 140/1 141/19 143/12 173/1 173/25 175/8 175/12 176/1 180/20 206/3 210/8 211/2

whereas [1] 98/14

wherever [1] 119/16

whether [33] 11/8 17/9 94/9 95/25 107/16 108/8 108/14 111/10 118/18 124/2 131/18 134/16 149/23 150/3 154/1 154/3 159/3 159/4 164/9 169/15 175/24 176/2 187/15 187/22 187/24 188/8 188/10 190/16 195/15 208/3 212/24 212/24

which [59] 10/25 13/4 14/10 16/9 20/13 23/20 30/22 34/6 35/12 42/13 48/14 51/21 52/5 53/16 55/2 56/4 57/2 58/4 59/1 61/10 72/22 78/2 79/10 79/12 79/15 85/6 91/18 97/13 101/21 111/6 111/22 115/15 117/20 119/22 123/18 130/7 130/9 141/22 143/2 144/7 154/18 161/24 162/16 165/25 179/9 184/16 187/11 190/7 191/9 195/19 197/5 197/9 197/19 198/9 198/10 198/15 205/6 208/2 212/22

while [6] 10/6 124/4 188/12 195/2 195/18 207/12

whistle [4] 131/11 131/13 131/22 132/5

whistleblower [5] 78/13 131/5 131/11 132/10 181/22

whistleblowers [1] 132/19

white [10] 151/1 151/2 152/2 152/4 152/6 152/8 156/13 162/5 173/6 173/13

who [61] 35/9 39/21 40/23 46/11 52/3 53/22 55/22 64/22 64/22 65/25 80/3 85/18 86/1 86/15 87/15 92/1 94/15 95/8 97/12 98/15 110/20 113/14 114/5 114/14 115/22 117/1 117/24 118/12 119/13 119/15 120/19 121/1 121/2 123/11 123/20 124/4 126/1 128/23 132/10 132/17 146/3 151/3 156/6 160/25 165/13 168/6 169/6 174/21 176/10 177/13 187/18 187/19 189/12 190/10 191/1 191/22 204/11 204/19 207/5 207/14 212/9

who's [9] 14/14 29/6 50/6 74/5 105/20 124/25 130/2 134/17 165/13

whole [13] 14/25 34/19 73/19 109/19 109/22 112/21 116/20 117/20 142/13 142/21 144/12 160/6 211/1

wholly [1] 122/24

whom [1] 128/22

why [50] 24/8 25/25 32/2 32/15 35/8 39/4 43/11 52/17 54/17 63/5 64/15 71/21 73/16 74/6 77/23 80/15 80/18 81/16 85/15 86/25 92/3 92/21 93/22 97/1 97/19 99/23 100/17 105/13 106/18 106/21 110/18 122/3 122/15 124/20 124/20 134/7 143/12 145/2 155/24 156/15 161/18 164/7 165/10 166/15 169/19 170/14 170/14 204/7 206/19 206/25

widely [1] 195/21

wife [23] 15/22 16/7 18/2 32/15 34/11 34/18 34/23 41/14 48/19 50/7 50/16 59/14 75/21 76/9 95/6 158/16 158/21 202/15 206/14 206/17 207/10 207/11 207/19

wife's [1] 34/12

will [60] 10/24 11/20 12/1 17/13 18/15 18/17 19/3 20/9 21/14 37/25 39/8 53/9 56/12 61/15 66/4 66/11 75/7 79/9 88/4 97/2 102/11 103/23 104/10 111/17 112/24 120/16 125/19 125/22 127/16 128/23 133/9 164/25 171/3 173/22 183/15 183/25 184/3 186/4 186/11 186/18 186/19 190/19 191/23 191/23 191/25 192/17 195/1 198/9 198/12 198/19 198/25 199/3 208/24 213/5 215/16 215/17 216/2 216/14 216/22 217/1

WILLENBURG [4] 1/19 218/3 218/11 218/11

WILLIAM [1] 1/12

Willie [2] 72/19 72/21

willing [2] 182/16 205/17

win [2] 117/8 211/3

Wine [1] 43/4

winning [3] 79/14 79/15 79/16

Winslow's [5] 43/4 43/10 45/9 45/13 206/2

wire [4] 46/7 46/9 46/11 201/18

wiretap [1] 163/3

Wisconsin [1] 89/20

Wise [1] 5/9

wisely [1] 147/8

wish [5] 126/25 127/3 127/11 133/19 146/17

withdrawing [1] 98/17

Witherspoon [3] 7/7 72/22 74/16

within [5] 102/8 120/5 166/17 167/20 167/22

without [4] 12/5 101/22 121/9 121/24

witness [48] 17/16 21/20 21/24 21/25 22/3 52/23 82/13 101/20 103/9 103/11 103/15 103/17 104/25 115/6 127/3 135/1 135/4 135/6 135/11 135/16 154/14 159/20 159/25 160/10 169/13 182/7 182/12 182/17 187/22 187/25 187/25 188/2 188/4 188/4 188/7 188/22 189/1 189/3 189/4 189/6 189/13 189/16 189/19 190/12 190/14 190/17 190/18 190/21

witness's [1] 188/21

witnesses [13] 2/6 3/5 3/7 103/21 182/18 187/13 187/18 188/20 188/21 189/12 189/13 189/14 189/17

WMD [1] 110/25

WMD's [1] 132/7

woman [2] 134/10 207/14

women [3] 59/20 59/22 78/8

won [5] 87/6 117/18 152/23 164/5 207/8

won't [7] 75/7 103/22 148/10 172/1 199/20 204/15 204/21

wonderful [2] 106/12 208/8

wondering [1] 12/11

word [5] 129/23 169/20 200/2 209/17 209/25

words [9] 12/17 12/20 14/3 59/4 136/7

136/8 180/5 187/4 188/15

wore [1] 187/13

work [37] 12/1 12/8 26/11 26/17 26/22 26/22 27/3 27/10 30/8 38/1 39/1 48/16 48/17 53/18 61/21 76/21 88/16 89/16 92/4 102/14 103/25 105/21 111/14 114/3 115/16 118/13 128/20 133/18 167/17 173/1 173/7 176/6 176/11 181/24 182/2 207/22 209/5

worked [11] 16/3 26/16 27/5 27/18 88/18 117/10 129/17 145/5 145/8 163/11 163/16

working [15] 25/18 25/23 26/25 27/19 29/11 30/11 39/19 39/23 103/21 164/21 167/11 180/2 181/7 207/1 207/19

works [2] 104/8 108/12

world [9] 17/5 37/16 110/2 110/3 114/14 122/7 143/16 180/20 207/21

world's [1] 70/10

worried [2] 56/16 122/6

worse [1] 119/13

worst [1] 75/25

worth [43] 1/3 1/5 1/20 7/12 12/25 15/18 18/2 22/14 23/14 23/18 25/11 28/2 28/24 29/6 31/13 32/12 32/13 34/15 34/18 34/22 35/3 38/21 41/12 43/4 60/24 68/3 72/23 88/19 89/3 102/20 138/16 138/17 142/15 142/16 142/24 148/19 197/21 208/11 208/17 210/9 210/16 218/14 218/17

would [117] 11/23 15/2 15/2 20/12 20/22 20/25 21/3 21/4 21/4 21/23 27/2 27/21 31/6 33/24 37/1 38/24 39/25 41/1 41/6 41/12 42/25 45/5 45/5 47/7 47/12 47/13 47/13 47/15 47/18 54/13 62/18 62/18 62/20 64/16 70/15 73/8 73/12 82/3 84/8 88/23 90/19 90/21 93/15 94/7 100/2 100/5 100/16 106/21 107/15 108/13 109/17 109/17 109/19 111/10 111/11 114/24 115/17 115/23 115/25 116/25 117/1 119/15 120/22 121/23 121/23 122/9 122/14 123/3 123/18 126/13 126/15 126/20 128/7 128/16 128/20 129/5 130/8 130/20 137/21 137/23 139/9 142/4 146/18 146/18 148/13 157/24 165/3 167/23 168/3 169/6 170/11 170/13 170/20 171/4 171/11 171/20 172/3 172/21 172/23 172/24 173/21 180/21 181/3 181/8 181/9 181/11 183/10 194/17 195/5 196/3 198/21 202/4 208/3 213/22 216/5 216/5 216/17

wouldn't [8] 11/21 29/20 54/13 108/9 129/5 146/13 161/6 170/16

wound [1] 180/25

wrap [1] 121/11

write [11] 16/4 19/5 19/6 133/21 139/16 139/23 149/25 165/23 201/3 201/3 201/9

writer [2] 16/4 168/6

writing [3] 49/19 139/2 191/24

written [2] 17/2 191/22

wrong [6] 15/24 114/7 132/16 139/9 175/9 197/14

wrongdoing [1] 119/3

wrongly [5] 14/23 179/1 179/4 181/20

**wrongly... [1]** 181/25
**wrote [7]** 136/17 138/23 139/20
140/14 140/14 149/23 152/6

# Y

**y'all [2]** 183/10 211/7
**ya [1]** 176/19
**yahoo.com [2]** 1/21 218/19
**yards [1]** 24/12
**yeah [62]** 23/21 24/1 25/7 25/18 26/11
26/19 27/25 28/20 30/16 31/6 33/8
40/3 40/20 40/24 42/12 43/13 43/25
44/10 45/19 46/4 46/12 48/14 48/24
49/20 49/25 50/25 52/5 58/12 62/18
64/3 64/14 66/25 76/11 77/14 79/3
79/23 80/2 80/19 91/23 100/12 104/23
108/6 119/9 121/18 122/14 123/5
125/15 126/4 127/12 129/25 130/24
131/12 131/13 131/17 136/20 141/23
171/9 172/21 176/23 177/21 181/6
181/14
**year [8]** 25/1 25/22 40/21 70/25
117/25 127/16 133/12 166/24
**years [37]** 12/4 15/22 22/15 24/11
24/20 25/3 25/24 27/5 27/18 28/9 29/2
29/12 33/13 33/14 34/24 35/3 59/14
70/13 70/21 76/21 89/3 89/6 94/1
104/5 104/6 114/6 123/7 126/1 145/6
145/6 146/4 147/21 167/17 167/18
177/19 178/25 180/14
**Yemen [2]** 163/17 164/4
**Yep [6]** 64/21 79/4 116/7 125/12
151/14 158/3
**yes [143]** 10/5 10/22 21/3 22/7 31/23
34/9 36/1 36/20 42/9 43/7 43/9 45/15
47/21 47/24 53/12 55/15 57/11 61/17
63/2 65/12 66/17 68/12 72/21 73/15
73/25 74/21 75/4 85/10 85/21 86/9
87/7 87/20 88/3 88/9 88/12 89/4 89/9
89/12 89/15 90/12 90/14 91/14 91/24
91/25 92/7 92/14 93/19 94/13 95/4
95/13 96/18 100/21 101/5 102/2 102/5
102/15 103/10 103/13 104/12 104/13
106/11 107/2 107/5 108/24 113/6
119/5 122/8 127/23 128/5 129/12
131/10 132/6 132/13 134/6 135/2
135/3 135/10 136/2 136/6 136/16
138/2 138/25 140/5 140/11 140/20
141/18 141/25 144/5 149/9 149/11
149/11 149/15 149/18 149/19 149/23
150/4 150/10 150/12 150/23 150/24
152/4 152/8 152/12 152/13 152/14
152/19 152/23 152/24 152/25 153/5
153/8 153/17 154/8 154/10 154/12
154/13 155/24 156/4 156/4 156/15
156/19 159/21 159/23 160/16 168/12
172/5 173/20 182/8 198/1 199/11
212/11 212/15 212/17 212/19 214/6
214/15 214/18 214/22 214/25 215/3
215/7 215/10 215/14
**York [3]** 147/19 158/25 176/8
**you [1179]**
**you'd [4]** 102/8 123/16 123/16 177/7
**you'll [15]** 12/16 12/23 13/14 14/1
15/14 17/4 18/6 61/16 83/7 111/4
111/5 198/20 201/1 216/23 217/6

**you're [125]** 10/18 11/2 13/20 14/23
15/1 18/20 23/12 29/2 39/6 39/7
47/15 49/14 54/7 54/16 54/23 54/23
54/24 57/2 61/9 61/11 61/11 61/11
69/22 75/24 75/25 81/25 83/8 83/21
90/13 91/1 93/24 94/19 94/24 96/3
96/7 96/8 97/11 98/3 98/6 99/12
101/13 101/14 101/21 102/17 105/7
105/14 109/14 109/20 109/21 116/6
116/19 116/20 117/9 121/8 122/18
123/12 124/4 124/10 124/19 125/15
130/10 131/9 131/13 132/25 134/4
134/22 136/21 136/25 137/5 137/8
137/12 138/5 138/9 138/12 138/14
138/16 139/24 139/24 139/25 144/4
144/6 144/6 144/18 146/12 146/13
146/14 146/22 147/6 147/7 147/8
147/11 147/12 147/13 148/17 149/16
150/6 150/7 154/16 154/17 157/6
157/9 171/5 171/6 171/6 172/17 173/9
173/17 178/18 181/3 182/23 183/16
185/15 186/13 186/25 189/11 190/13
198/22 198/23 198/24 203/6 204/16
206/6 210/22 215/20 215/23
**you've [24]** 32/9 39/5 40/10 78/7 93/4
93/21 94/5 98/9 111/13 129/13 130/3
130/6 133/11 133/12 157/18 165/12
170/20 175/8 175/15 177/18 191/14
192/2 192/3 199/2
**you-all [4]** 73/21 183/19 212/16
212/22
**young [2]** 27/16 59/20
**younger [2]** 59/20 134/10
**your [324]**
**yourself [17]** 15/16 22/12 31/21 35/15
66/2 105/13 150/6 154/16 154/21
155/8 157/7 157/10 161/13 164/7
166/22 187/22 206/4
**yourselves [1]** 83/9

# Z

**zero [2]** 136/24 138/7
**zoom [2]** 140/15 144/11

# EXHIBIT 25

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

POINT BRIDGE CAPITAL, LLC,
ET AL.,

     Plaintiffs,

v.                                    No. 4:24-cv-00988-P

CHARLES JOHNSON,

     Defendant.

## ORDER

Before the Court are Plaintiffs' Motion for Attorney Fees Under RICO (ECF No. 100) and Motion for Treble Damages and Asset Preservation (ECF No. 102). The Court gave Defendant Charles Johnson until July 28, 2025, to file any Response he may have to Plaintiffs' Motions. ECF No. 96. That Order also ordered Johnson—not for the first time—to register as an ECF user. *Id.; see also* ECF No. 89. Johnson once again failed to comply with the Court's order to register as an ECF user and he did not file a Response to either Motion as ordered. Despite Johnson's failure to comply or respond, the Court reviewed the Motions for their validity. Having done so, and having reviewed the applicable law, the Court will **GRANT** the Motions.

Beginning with Plaintiffs' Motion for Attorney Fees Under RICO (ECF No. 100), the Court finds that the attorney fees moved for are appropriate in this case and hereby **GRANTS** the Motion.[1] It is

---

[1]Specifically, the Court notes the following: (1) the time and labor required is proportional to the number of hours expended and the hourly rates charged by Plaintiffs' counsel; (2) the issues involved did not justify a modification; (3) the hourly rate and amount of hours expended was reasonable in light of the novelty and difficulty of the discovery and sanction issues involved; (4) Plaintiffs' counsel was precluded from doing other work, which was taken into consideration in the number of hours expended and the hourly rate; (5)

therefore **ORDERED** that Defendant Charles Johnson shall pay Plaintiffs **$1,033,130.00 in attorney's fees**. The amount will be reflected in the Court's final judgment.

Next, the Court turns to Plaintiffs' Motion for Treble Damages and Asset Preservation Relief. Having considered the Motion, record, and applicable law, the Court hereby **GRANTS** the Motion.

It is therefore **ORDERED** as follows:

- The damages the jury awarded to Hal Lambert on Question 1, (ECF No. 97 at 9), are trebled from $7,500,000.00 to $22,500,000.00.

- The damages the jury awarded to Point Bridge Capital on Question 2, (ECF No. 97 at 9), are trebled from $8,000,000.00 to $24,000,000.00.

These trebled damages will be reflected in the Court's final judgment.

In addition, it is **ORDERED** that Defendant Charles Johnson, and anyone acting in concert with him, is prohibited from taking any of the following actions until the mandate in this case shall issue from the Court of Appeals:

- Selling, transferring, or otherwise disposing of any cryptocurrency (including bitcoin), stocks, private investments, or other assets identified in Trial Exhibit 64;

---

Plaintiffs' counsel sought a reasonable and customary fee based upon their skill, experience, and reputation; (6) the fee sought appears to be a fixed fee billed by Plaintiffs' counsel to Plaintiffs; (7) the number of hours expended and hourly fee charged was reasonable in light of the time limitations imposed by the Court; (8) the number of hours expended and hourly fee charged was reasonable based on the fact that Plaintiffs were successful in pursuing their case against Defendant and based upon the type of case involved; (9) Plaintiffs' counsel has considerable experience, a good reputation, and a successful law practice as evidenced by the filings submitted to the Court; (10) this case is not particularly undesirable and, thus, no upward modification is required; (11) there is no information regarding the length of Plaintiffs' counsel's relationship with Plaintiffs; and (12) the amount of attorneys' fees awarded is not excessive based on awards in similar cases.

App.918

- Moving any such assets into a trust, LLC, or other entity in an effort to place them beyond the reach of creditors;

- Opening or using any financial, brokerage, or digital asset account in any name other than his own for the purpose of holding assets he controls;

- Destroying, concealing, or altering any records that reflect the existence, nature, or location of his assets.

**SO ORDERED** on this **29th day of July 2025.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

App.919

# EXHIBIT 26

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**POINT BRIDGE CAPITAL, LLC,**
**ET AL.,**

    **Plaintiffs,**

**v.**                                          **No. 4:24-cv-00988-P**

**CHARLES JOHNSON,**

    **Defendant.**

## FINAL JUDGMENT

This final judgment is issued pursuant to Federal Rule of Civil Procedure 58(a). The Clerk of the Court shall transmit a true copy of this judgment to the parties. In accordance with the Jury's Verdict and the Court's rulings, judgment is hereby entered in favor of Plaintiffs as follows:

For Defendant's predicate acts constituting a pattern of racketeering activity, the jury found that Plaintiff Hal Lambert is entitled to recover $7,500,000.00. Pursuant to 18 U.S.C. § 1964(c), this RICO award must treble, entitling Plaintiff Lambert to **$22,500,000.00**.

For Defendant's predicate acts constituting a pattern of racketeering activity, the jury found that Plaintiff Point Bridge Capital is entitled to recover $8,000,000.00. Pursuant to 18 U.S.C. § 1964(c), this RICO award must treble, entitling Plaintiff Point Bridge Capital to **$24,000,000.00**.

For the general and specific damages that were proximately caused by Defendant's defamatory statements, the jury found that Plaintiff Lambert is entitled to recover **$9,500,000.00**.

App.921

For Defendant's fraud, malice, or gross negligence, the jury also awarded Plaintiff Lambert exemplary damages in the amount of **$15,000,000.00**.

For these reasons, and in accordance with Federal Rule of Civil Procedure 58 and the Court's inherent authority, it is **ORDERED** that Plaintiff Lambert shall recover **$47,000,000.00** from Defendant Johnson. Furthermore, it is **ORDERED** that Plaintiff Point Bridge Capital shall recover **$24,000,000.00** from Defendant Johnson.

Further, it is **ORDERED** that Plaintiffs shall recover from Defendant Johnson the cost of the suit and reasonable attorney's fees. On due consideration of the hours and expenses incurred in pursuing the compensable claims, it is **ORDERED** that Plaintiffs shall collectively recover **$1,033,130.00** in fees and costs from Defendant Johnson.

**SO ORDERED** on this **29th day of July 2025.**

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

2

App.922

# EXHIBIT 27

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE NORTHERN DISTRICT OF TEXAS

 3                         FORT WORTH DIVISION

 4   POINT BRIDGE CAPITAL, LLC    )     CASE NO. 4:24-CV-00988-P
     ET AL                        )
 5                                )     FORT WORTH, TEXAS
     vs.                          )
 6                                )     NOVEMBER 10, 2025
     CHARLES JOHNSON              )     12:03 P.M.

 7

 8                             VOLUME 1
                       TRANSCRIPT OF SHOW CAUSE
 9              BEFORE THE HONORABLE MARK T. PITTMAN
               UNITED STATES DISTRICT COURT JUDGE
10

11   A P P E A R A N C E S:

12   FOR THE PLAINTIFF:       WILLIAM BENNETT THOMPSON
                              DLA PIPER, LLP US
13                            1900 N. PEARL STREET
                              Suite 2200
14                            Dallas, Texas  75201
                              Telephone:  214.743.4500
15

16   PRO SE DEFENDANT:        CHARLES JOHNSON
                              1624 Fieldthorn Drive
17                            Reston, Virginia  20194
                              Telephone:  617.429.4718
18

19   COURT REPORTER:          MONICA WILLENBURG GUZMAN, CSR, RPR
                              501 W. 10th Street, Room 310
20                            Fort Worth, Texas  76102
                              Telephone:  817.850.6681
21                            E-Mail:  mguzman.csr@yahoo.com

22

23   Proceedings reported by mechanical stenography, transcript
     produced by computer.
24

25
```

1

## INDEX

2                                    PAGE   VOL.

3

4   Appearances ................................3      1

5

6   Comments by the Court ......................3      1

7

8   By Mr. Thompson ............................6      1

9

10  By Mr. Johnson ............................13      1

11

12  Comments by the Court .....................17      1

13

14  Proceedings Adjourned .....................31      1

15

16  Reporter's Certificate ....................32      1

17

18

19

20

21

22

23

24

25

1       **P R O C E E D I N G S**

2       *(November 10, 2025, 12:03 p.m.)*

3           *THE COURT:* This is Point Bridge Capital, LLC and

4   Hal Lambert vs. Charles Johnson, this is Case Number

5   4:24-CV-988-P.

6           Who do I have for plaintiffs?

7           *MR. THOMPSON:* Well, Your Honor, Will Thompson for

8   the plaintiffs; and with me is Mr. Lambert.

9           *THE COURT:* Go ahead.

10          *DEFENDANT JOHNSON:* Mr. Johnson for himself.

11          *THE COURT:* Okay. Thank you, Mr. Johnson.

12          Now, we're here today on a show cause hearing. I've

13  had a chance to read it, it's been filed by the plaintiffs.

14  And there have been two supplements related to that motion,

15  which the Court has granted.

16          Mr. Johnson, you have submitted a few of your emails

17  to the Court's order folder.

18          *DEFENDANT JOHNSON:* Yes.

19          *THE COURT:* That is meant for proposed orders only.

20  Any communications with the Court need to come in the form of

21  a formal motion filed as part of the docket. So, it's not

22  appropriate to try and communicate to the Court through the

23  general email box.

24          And we went through this colloquy several times

25  during our trial and during some of the pretrial proceedings.

1   I know that you're proceeding pro se and representing

2   yourself, and I am willing to be as liberal with you as I can.

3   But you don't get out of not having to follow the rules.  So,

4   anything that you would like to communicate with me and the

5   Court needs to be filed as a matter of record in the form of

6   an appropriate motion.

7        Again, I will encourage you, whether it's in front

8   of me, whether it's in front of the Fifth Circuit, I would

9   encourage you to try to find some attorney to represent you.

10        I believe it was Benjamin Franklin that said

11   something -- and I'm sure I'm messing this up, so excuse me if

12   I misstate the quote or misattribute it to Benjamin Franklin.

13   But it's something to the effect that only a fool -- that a

14   man who represents himself in court has a fool for a client.

15        And I've been a judge now on three different courts,

16   I've been an attorney for 26 years, I would not ever represent

17   myself.  We do here, in Tarrant County, have -- at our Tarrant

18   County Bar Association, there are -- have big books and big

19   lists of attorneys who are willing to represent folks, many

20   cases pro bono, which means free of charge.  I don't know if

21   you've looked into that, but I would highly encourage you to

22   do so.  Many law schools in addition have various clinics in

23   which they take on cases and clients pro bono.

24        But I thought that this might be a problem and we

25   might be back.  When the jury returned the $70 million verdict

1    against you, I knew that this was not going to be the last

2    time that I would see you.

3          Now, under the law, unless and until that verdict

4    and judgment is superseded and/or stayed by the appellate

5    court, you owe $70 million to the plaintiffs.  And they can

6    collect immediately until you stay it or supersede it.

7          There's a thing called a supersedeas bond, which you

8    don't have to pay the entire $70 million, but you can pay a

9    bond to stave off the collection of the judgment.  Now, to my

10   knowledge, that has not taken place in this case, nor has

11   there been any stay issued by the Fifth Circuit.

12         So, the Court is left in a situation where you have

13   a $70 million judgment against you, and under the rules that

14   we are governed by and under the law, the plaintiffs can take

15   appropriate action to try to collect their judgment

16   immediately.  And we have rules that provide for post-judgment

17   discovery to try and discover what type of assets that you

18   have out there, Mr. Johnson, and where those are, where

19   they're located, can they be collected under the law, have you

20   been moving them around to various other places that you

21   weren't supposed to.

22         So, given your behavior in the prior lawsuit, I'm,

23   frankly, not surprised that we're back here today.  But much

24   like our proceedings in the lawsuit, I don't have a lot of

25   patience, given how busy we are here in Fort Worth, to deal

1   with this.  The legal obligation is clear, whether you're

2   pro se or whether you're represented by the most expensive law

3   firm in the country, you have an outstanding judgment that has

4   not been stayed nor superseded, they're entitled to get

5   information to try to collect on their judgment.

6           Now, if I'm missing something I'm sure you'll

7   tell me.  But why don't I do this, I'll turn it over to

8   Mr. Thompson, and you can tell me if I'm missing anything, and

9   then we'll hear from Mr. Johnson, and then I'll try to give us

10  a good path going forward.  And hopefully we can take a break,

11  so I can prepare for my trial that's coming up immediately

12  after this hearing.

13          MR. THOMPSON:  Thank you, Your Honor.  I'll be

14  really brief.

15          Just -- just to set the stage for the procedural

16  posture.

17          THE COURT:  And I'll just say, I don't have time for

18  conspiracy theories involving the Mormon Church, Elon Musk, or

19  members of the Israeli Government or FBI secret agents.

20              (Defendant laughing)

21          THE COURT:  And you can laugh and giggle all you

22  want, but that's the way it is.  These are serious matters.

23  You can do your conspiracies all you want, don't waste my time

24  with them here.  So, we need to make a legal argument when we

25  come up, not stuff that you'd put on your Substack or Twitter

1    account.

2              And you're already in trouble with the Judge in New

3    York, and you've been in trouble with me.  That's why I'm

4    encouraging you get an attorney, because this doesn't get any

5    better.

6              Go ahead.

7              *MR. THOMPSON:*  Two quick points, Your Honor.

8              Number one, as we brought out in Trial Exhibit 64,

9    we believe Mr. Johnson has substantial assets in the tens of

10   millions of dollars.  Turns out he does have at least a

11   million dollars in the stock called Othram.  We believe that

12   he would try to put those assets beyond the reach of the

13   plaintiffs.

14             So, prior to judgment, we specifically moved for an

15   order barring Mr. Johnson from dissipating or transferring or

16   moving any assets; that's Docket Entry 103.  It's pretty

17   clear, we think, based on the record that we brought out in

18   the show cause motion, that Mr. Johnson actively is trying to

19   move those Othram assets or cash them out, and then place them

20   in a secret Wyoming LLC that has, I don't think, any purpose

21   other than to try to evade the judgment.  So, that's --

22             *THE COURT:*  That's sort of the -- if that's true,

23   isn't that the definition of wire fraud?

24             *MR. THOMPSON:*  Yes, Your Honor.

25             And the purpose --

1      *THE COURT:*  Which is a Federal offense.

2      *MR. THOMPSON:*  So, from a procedural perspective, we

3  have Mr. Johnson, I think, unequivocally violating that

4  specific order.

5      Also, we have Mr. Johnson, as he's done through this

6  entire case, refusing, you know, repeatedly saying he's not

7  going to participate in any discovery.  We've given him every

8  opportunity to.  We've said we don't want to put him in jail.

9  We have his noncompliance with post-judgment discovery, as

10  Your Honor pointed out we are entitled to take.

11      Right now that is not ripe from a contempt

12  perspective, and that's why the plaintiffs filed Docket Entry

13  119, which is a motion to compel Mr. Johnson to answer

14  interrogatories, sit for a deposition, and also produce --

15      *THE COURT:*  What have been some of the efforts, at

16  least describe them.  I've read all of your briefing, but

17  describe some of your efforts to try to get Mr. Johnson to

18  participate, as he's required to do so, in the discovery

19  process.

20      So, we had all of this to be dealt with during the

21  case in chief, and here we go again.  It's deja vu all over

22  again, to quote Yogi Berra.

23      *MR. THOMPSON:*  Yeah, it's the same story, Your

24  Honor.

25      Plaintiffs repeatedly reached out to Mr. Johnson via

1    email.  We served him with interrogatories, the

2    interrogatories were straightforward, there was just two of

3    them.  It just said, Identify your bank accounts, and your

4    banking information, and also your crypto holdings, which

5    Mr. Johnson has subsequently posted about.  You know,

6    suggesting he bought crypto bitcoin when it was 3,000, now

7    it's over 100,000; suggesting, you know, he's making all this

8    money off of it.

9            And we requested that he sit for deposition multiple

10   times.  Mr. Johnson said, under no circumstances would he do

11   that, he laughed at it.  I think he said, You can try, good

12   luck with that.  I said, Mr. Johnson, I don't want to see you

13   in jail, that's not our intent here.  He says, I have no

14   problem, I spent time in supermaxes, I'm not -- it will give

15   me time, I think, to work out and write my novel.

16           And we gave him weeks, in fact, to comply before --

17           *THE COURT:*  I'm not sure if Johnson County Jail,

18   where we hold our folks in contempt, would allow you to write

19   your novel.

20           What do you think, Officer?  Do you think you can --

21   it would be a good idea to be spending your time writing a

22   novel while you're in Johnson County Jail?

23           *SECURITY OFFICER:*  They wouldn't permit it.

24           *THE COURT:*  Yeah.  Probably would not be

25   permissible, I would think.  Probably not a pleasant place to

1  go.

2      *MR. THOMPSON:*  And final thing, Your Honor, just to

3  note, I don't like inserting myself into this, but Mr. Johnson

4  has made -- first off, he's repeated his defamatory attacks

5  against Mr. Lambert, continuing the same -- you know, the same

6  conduct that resulted in the jury entering the massive

7  judgment or verdict against him.

8      He's repeatedly threatened bar complaints against

9  myself, personal lawsuits against myself.  And in sort of

10  thinly veiled threats saying I need to -- if I don't do the

11  right thing, bad things will happen to myself and my career.

12      He made one of those threats in September.  Three

13  hours later I had an email from a man named Arthur Bloom, who

14  posts positively -- or I'd call a comrade of Mr. Johnson.  And

15  Mr. Bloom, this guy's name, said that in this courtroom I

16  called -- Mr. Johnson repeated it in a Substack, and I believe

17  on a podcast or something, saying I called this internet

18  Substack poster a vile anti-Semite.  That's just categorically

19  untrue, I looked it up, you know, in the transcript.

20      But it just shows the extent that Mr. Johnson is

21  not only just not doing sort of basic, generic, the no --

22  noncompliance with post-judgment discovery and his

23  obligations --

24      *THE COURT:*  He's continuing to defame folks.

25      *MR. THOMPSON:*  He's continuing to defame folks and

App.933

1    he just keeps ratcheting up the -- his conduct.  And just

2    yesterday, Mr. Johnson -- you know, he treats this as a joke.

3    He said that, you know -- first off --

4           *THE COURT:*  Can I stop you?

5           *MR. THOMPSON:*  Sure.

6           *THE COURT:*  Have you thought about making one more

7    effort to try to get some of this discovery?  I think the only

8    way you're ever going to be able to collect on this, is you

9    have to seek the appointment of a receiver over his assets.

10   And I've been down this road before.  And have you looked into

11   doing that?

12          And I would suggest, if you do consider doing that,

13   you need to find or at least recommend a receiver who has some

14   white-collar-type experience that's used to this sort of

15   thing.

16          I am concerned, A, I don't feel comfortable sua

17   sponte appointing a receiver.  But B, at the end of the day

18   you need to try to collect your judgment.

19          Now, sticks and stones may break my bones, but words

20   will never hurt me.  The real thing is, is trying to collect

21   on your judgment.  So, tell me what efforts, other than --

22   if -- past his prologue, my guess is you're going to have a

23   hard time getting any answers to any type of discovery.

24          So, what are you thinking?

25          *MR. THOMPSON:*  Well, first off, Your Honor, I agree

1    with the sticks and stones part; I've got thick skin.

2           So, as to the specific collection, I think step one

3    is trying to get a handle on what assets he actually has.

4    He's, you know, done his best to conceal it.  These Othram

5    shares, I directly messaged Mr. Johnson, and in very stark

6    terms I said, Mr. Johnson, are you trying to sell your Othram

7    shares?  And he refused to answer.  I asked him probably --

8           *THE COURT:*  And do you understand the beauty of a

9    receiver would be they would be able to look into that, and if

10   there was a fraudulent transfer, they would turn around and

11   sue that purchaser?

12           *MR. THOMPSON:*  Yes, Your Honor.

13           *THE COURT:*  My only concern, are there enough assets

14   out there that would justify appointing a receiver.  So,

15   that's why I asked have you-all considered doing that.  Unless

16   and until you take his ability to hide these assets and get a

17   real working knowledge of what his finances are, this is going

18   to continue.

19           I don't want to look like Judge McBryde up there in

20   that portrait and still be dealing with this.

21           *MR. THOMPSON:*  Yes, sir.

22           *THE COURT:*  It's the same reason I struck his

23   pleadings and went to the trial.  These type of shenanigans, I

24   just -- I don't have the time for this, we're just too busy.

25           *MR. THOMPSON:*  I understand, Your Honor.

1          THE COURT:  Because, as I said, I've got to break

2     you here in a few minutes to go to trial.

3          But that's what I want you to think about.  I'd like

4     to hear from Mr. Johnson.

5          DEFENDANT JOHNSON:  Thank you, Your Honor.

6          THE COURT:  He does have a right to speak.  Be sure

7     you speak at the microphone.

8          DEFENDANT JOHNSON:  Of course.

9          THE COURT:  -- no, at the podium.  You need to come

10     over to the podium.  Please, at the podium.

11          DEFENDANT JOHNSON:  Yeah, of course.

12          THE COURT:  So, you've been accused of not

13     participating in the post-judgment discovery.  You've been

14     accused of continuing to engage in the same type of conduct

15     that got a $70 million jury verdict against you.

16          You obviously can have a First Amendment right to

17     speak, I don't want to take that away from you.  But you don't

18     necessarily have the right to defame folks.

19          DEFENDANT JOHNSON:  Well --

20          THE COURT:  And if you recall, the jury did come

21     back and find that's what you were doing.  Sounds like, based

22     on what I'm hearing and the evidence that's been submitted,

23     you're continuing to do that.

24          Is that smart?

25          DEFENDANT JOHNSON:  Well, Your Honor --

1          *THE COURT:*  Like it or not --

2          *DEFENDANT JOHNSON:*  -- I filed a motion --

3          *THE COURT:*  -- you don't have an order from the

4     Fifth Circuit reversing me.  And if you're going to tell me

5     about the motions you filed up there at the Fifth Circuit,

6     those haven't been ruled on.

7          *DEFENDANT JOHNSON:*  They have not.

8          And by the way, I have no intention whatsoever of

9     sitting for discovery or harassment.  What we've seen

10    throughout this process has been an effort by Mr. Lambert's

11    backers to come after me and my assets, to harass people I do

12    business with.

13         *THE COURT:*  Well --

14         *DEFENDANT JOHNSON:*  Pretty obvious.

15         *THE COURT:*  -- you have a $70 million verdict

16    against you.

17         *DEFENDANT JOHNSON:*  I do.  Actually, I think it's

18    71, Your Honor --

19         *THE COURT:*  They --

20         *DEFENDANT JOHNSON:*  -- to be precise.

21         *THE COURT:*  They have a right to try to collect it.

22    So, what you may consider to be harassing behavior, sounds

23    like, to me, it's just lawyers doing what they're supposed to

24    do.

25         *DEFENDANT JOHNSON:*  I have no objection whatsoever.

1    But as I said before, I also have no objection to eventually

2    going to Johnson County Jail and highlighting the abuses here.

3    In fact, I would welcome it.

4              *THE COURT:*  Deputy Perrill.

5              *THE MARSHAL:*  Yes, sir.

6              *THE COURT:*  This gentlemen seems to have a hard time

7    understanding just what it's like to go to Johnson County.  We

8    heard earlier he thinks it might be a good place to go work on

9    his book.

10             How long have you been a United States Marshal?

11             *THE MARSHAL:*  Eighteen years, sir.

12             *THE COURT:*  What's it like being held in contempt

13   and staying in Johnson County until you purge yourself of that

14   contempt?  Is it someplace you go to relax and write a book?

15             *THE MARSHAL:*  No, sir.  Johnson is a place you don't

16   want to go or in the custody of the United States Marshals.

17   They control everything you do, every move you make,

18   everything has to be asked.  There's no freedom.

19             *THE COURT:*  Would it be anything any rational person

20   would look forward to doing?

21             *THE MARSHAL:*  No, sir, Your Honor.

22             *THE COURT:*  Not much fun.

23             You get told when to have lunch -- probably when to

24   go to the bathroom; is that correct?

25             *THE MARSHAL:*  Yes, sir.

1    *THE COURT:*  So, I've got these two gentlemen here

2    that are willing to take you in and hold you in contempt until

3    you purge yourself of it.  But you can't just avoid the

4    judgments, you can't just not comply with the rules.

5        *DEFENDANT JOHNSON:*  Well, I prefer waiting until the

6    Fifth Circuit has exhausted all of my options for an appeal.

7        I have filed several things with the Fifth Circuit,

8    they're quite good briefs.  I didn't ask for a delay, I got it

9    in on time, November 3rd.  Mr. Thompson did ask for a delay

10   with considerably more resources than I have.

11       I would argue that what's going on here is an abuse

12   of process.  And that really the one who should be sanctioned

13   here is Mr. Thompson, not me.

14       *THE COURT:*  Well, let me ask you something.  You had

15   a mechanism in place to stay the post-judgment proceedings,

16   and that was to pay for a supersedeas bond or to ask the Fifth

17   Circuit to stay.

18       Now, your briefs down there at the Fifth Circuit, it

19   may very well be two to three years before we hear back on

20   what their decision is, and whether they decide to reverse the

21   jury in this case.  But until then, until you've superseded

22   the judgment, under the rules Mr. Lambert is entitled to

23   post-judgment discovery and entitled to come and collect his

24   judgment.

25       So, what have you done to try to look into staying

1    the execution of the --

2            *DEFENDANT JOHNSON:*  Well, I filed --

3            *THE COURT:*  -- judgment?

4            *DEFENDANT JOHNSON:*  Well, I filed a motion and stay

5    of judgment, which I'm happy to give to Your Honor.  I think

6    -- for some reason I don't have access to being able to efile,

7    but I do have a copy of it, if you would like.

8            *THE COURT:*  I think I read it on the Supreme -- not

9    Supreme Court, Lordy mercy.  On the Fifth Circuit website as I

10   was preparing for this case.  My understanding is the Court

11   hasn't ruled on that.

12           *DEFENDANT JOHNSON:*  That's correct.  And they

13   haven't ruled on my appellant's brief either.

14           *THE COURT:*  Mr. Thompson, have you-all responded to

15   the motion to stay?

16           *MR. THOMPSON:*  No, Your Honor.  We first saw -- the

17   pending motion to stay just got docketed late Friday.

18           *THE COURT:*  Okay.

19           *MR. THOMPSON:*  Late -- a couple of days ago.

20           *THE COURT:*  So, this is what I'm thinking.  I'm

21   thinking you need to show up for your deposition and bring all

22   your finances, all your information about where all your

23   holdings are, in my jury room down here at 8:30 next Monday.

24   I don't know what that date is.

25           Aiden -- or Captain Yamada, do we know what date

1  next Monday is?

2           I think you need to do that.  And I think you need

3  to stay until Mr. Thompson gets the answers that he wants.

4  Then I think it might be something that Mr. Thompson needs to

5  consider, whether a receiver ought to be appointed so we don't

6  have to deal with this.

7           And if the Fifth Circuit reverses, we will do what

8  the Fifth Circuit says.  But short of sending you away today

9  so you could come out and then post on your Substack, and as I

10 said making you a martyr, I'm not sure that I have any other

11 option, other than to try this and see what happens.

12          But if we find out between now and then that you've

13 done anything to hide or dissipate these --

14          *DEFENDANT JOHNSON:*  Your Honor, I -- I was not

15 hiding --

16          *THE COURT:*  Please don't --

17          *DEFENDANT JOHNSON:*  -- my assets.

18          *THE COURT:*  -- interrupt.

19          I said if we find out anything on that, you're going

20 to be in a lot of trouble, because you can't do that.  You

21 can't go and hide assets.

22          You have a $71 million judgment, it has not been

23 superseded.  You're required under the law to participate in

24 post-judgment discovery, you have not done so.  You have a

25 history of not complying, you have a history of being

1  threatened with a contempt.

2       My marshals have a lot of other things that they

3  need to worry about.  We have currently some very contentious

4  prosecutions that are going on.  We recently had a shooting

5  down at an ICE facility down south of town, and several of

6  those folks, I'm sure, are probably still being looked for.

7       And I would rather have the United States Marshals

8  Service going and finding fugitives and folks that are

9  violently engaging in violations of criminal law, quite

10  frankly, than having to deal with you and your shenanigans.

11  We just don't have time for this.

12       *DEFENDANT JOHNSON:*  I agree, Your Honor.

13       But I was preserving my assets, because Mr. Lambert

14  has his own judgments that he's facing.

15       *THE COURT:*  Well, if you're talking about the case

16  up in New York, it sounds like, to me, you're probably going

17  to get nailed up there, too.

18       *DEFENDANT JOHNSON:*  No, Your Honor.  I was talking

19  about the cases in the European Union.

20       *THE COURT:*  Well, I don't know anything about

21  European law.  I'm only licensed in Texas, I'm just a poor

22  dumb Texas Aggie.  And I can just tell you, I can just rule on

23  what's in front of me.

24       But that would be how I would proceed.  And I'd like

25  to hear from Mr. Thompson.  So, you need to be back here on

1  Monday to take your deposition.

2           And then I would like to see the possibility of

3  filing a receivership motion, and then we don't have to deal

4  with this.  We can just sort out who owes what.

5           What do you think?  What's subject to the judgment,

6  what's not.

7           MR. THOMPSON:  Your Honor, no objections to that

8  plan.

9           As to that specific stock that Mr. Johnson tried to

10 sell for a million dollars, the buyer or the counter-party is

11 aware of the Court's order, so is not going through with that.

12          THE COURT:  Yeah.

13          MR. THOMPSON:  So, I think --

14          THE COURT:  But do you see the beauty of a receiver?

15          MR. THOMPSON:  I hear the Court loud and clear on

16 receiver.  That's -- that's certainly the next ratchet up that

17 we were preparing.

18          THE COURT:  But I think that needs to be done sooner

19 rather than later.  I don't want to be here after the new year

20 dealing with this.

21          MR. THOMPSON:  I understand.

22          THE COURT:  This is -- this is one roadblock after

23 another.  And we're -- we're too busy for this.  I need to get

24 the ball rolling.  And I want you to try to take the discovery

25 that you think you need.  And, you know, best case scenario,

1    Mr. Johnson actually participates.

2         But the fact of the matter is, your client has a $71

3    million judgment, and we need to do what we can to preserve

4    the assets, and go after any of those assets that may have

5    been dissipated.  And the receiver would have the ability, as

6    an appointed officer of the Court, to do so.

7         The only thing that I would tell you, if you'd

8    please make a recommendation of one or two possible receivers.

9    I think someone with some significant white collar prosecution

10   experience.  There's several former U.S. Attorneys that are

11   out there right now in this world doing white collar

12   investigations and the like that would be appropriate to look

13   into this in the Dallas/Fort Worth area.

14        And I'll take a look at who you recommend, if you do

15   decide to do that and I find that it's appropriate.  But I

16   don't want to be fighting these discovery motions from now

17   until the end of time.

18        It's better -- you know, it would be a totally

19   different situation, obviously, if we had a proper superseded

20   judgment here, but we don't.  So, your client has an

21   outstanding judgment, he's entitled to this discovery, let's

22   get it rocking and rolling.

23        MR. THOMPSON:  Message -- Your Honor, message

24   received.

25        THE COURT:  Okay.  Then I will be crafting an

1 │ appropriate motion *(sic)*.

2 │          And if I was not in trial, I would probably be

3 │ ordering the deposition to take place sooner.  But I'm in

4 │ trial until Friday and I need my jury room.  Next week it will

5 │ be free.

6 │          So, are you available, Mr. Thompson, on Monday?  Are

7 │ you and your client available for the deposition in the jury

8 │ room?

9 │          *MR. THOMPSON:*  I don't think my client's available,

10 │ but we'll make any date work when we can get Mr. Johnson.

11 │          *THE COURT:*  All right.  And we'll have the Judge

12 │ that'll be here, and we'll also have our deputies that are

13 │ here to hold anyone in contempt or decide any motions if we

14 │ need to.

15 │          And quite frankly, Mr. Johnson, you're going to be

16 │ ordered to be here whether it's convenient or not.  There have

17 │ been too many actions -- I've had to strike your pleadings in

18 │ this case, I don't have the patience for this.  So, you need

19 │ to be back here in the courthouse, 8:30 on Monday.  And we'll

20 │ have some court security people escort you to my jury room.

21 │          And you-all can stay until all the information that

22 │ the attorney needs is gathered to what he feels is -- he needs

23 │ to learn about your assets, collect the judgment.  And if

24 │ you're honest with him, and it turns out that either -- you

25 │ don't have assets, then this is all for naught.

App.945

1    *DEFENDANT JOHNSON:* Your Honor --

2    *THE COURT:* But you have to tell the truth. And

3    you're under oath taking a deposition. And if you lie in a

4    deposition, you can be held in contempt of court, and you can

5    be charged with perjury, just like you were giving a statement

6    here in the courtroom. So, you need to be aware of that.

7    *DEFENDANT JOHNSON:* Sure.

8    *THE COURT:* So, I would be extra, extra special

9    certain I told the whole truth and nothing but the truth.

10    I want to, again, encourage you to try and find some

11    sort of legal representation, somebody that's licensed here in

12    the State of Texas, someone that's here locally. Or some of

13    your many contacts that you've told us about, I bet that

14    there's one attorney that you can at least call and say, I am

15    really afraid that I can't proceed the way that I need to, I

16    need somebody there that can give me some legal advice.

17    Given the current situation that you're in, you

18    might want to consider somebody who has some criminal defense

19    experience. But I would not want to come in and give my

20    deposition under oath without an attorney if I had a

21    $70 million judgment hanging over my head and I wasn't

22    participating on what I was. But that's just me. It's up to

23    you to make your own decision. But I've been doing this for

24    quite a while.

25    All right. We'll enter an order later today.

1       *DEFENDANT JOHNSON:*  Your Honor --

2       *THE COURT:*  Yes.

3       *DEFENDANT JOHNSON:*  -- if I may.

4       *THE COURT:*  You need to stand when you address the

5   Court.

6       *DEFENDANT JOHNSON:*  Sorry.

7       My -- my ex-wife and daughter have a separate trust.

8   And some of these assets that were going to be moved to

9   Wyoming was to preserve the assets, not to sell them.  And so,

10  this is important, because --

11      *THE COURT:*  Can I stop you?

12      That's perfectly fine.  And if those aren't subject

13  to something that can be collectible by the judgment, they're

14  not entitled to it.

15      *DEFENDANT JOHNSON:*  May we have an order to that

16  effect?  Because Mr. Thompson has been harassing the attorney.

17      *THE COURT:*  Well, maybe because you haven't

18  disclosed what it is.  So if you have -- you need to disclose

19  all of the assets, not only that you have, but maybe related

20  to entities.

21      And Mr. McCoy -- I'm sorry, it's just one of those

22  days.  Mr. Thompson is just like me, we have to follow the

23  law, we took an oath to do so.  We have provisions that say

24  what is and is not collectable.  So, if it's an asset that is

25  noncollectable under a judgment or maybe it's protected from

1  bankruptcy law, it's not anything that he can collect on.  But

2  you have to identify those before that decision can be made.

3          *DEFENDANT JOHNSON:*  Your Honor --

4          *THE COURT:*  You have to be honest --

5          *DEFENDANT JOHNSON:*  I have been perfectly honest

6  with the Othram stock.

7          But if I may, Your Honor, I made it very clear that

8  the assets that I was selling involved the trust of an

9  eight-year-old girl.

10         *THE COURT:*  Well, probably not a good idea to go and

11  sell stuff.

12         *DEFENDANT JOHNSON:*  I was not selling anything.  I

13  was preserving assets, because Mr. Lambert is, himself, facing

14  a rather large judgment.

15         *THE COURT:*  Well, I don't know what he's facing,

16  he's --

17         *DEFENDANT JOHNSON:*  If I'm in a situation --

18         *THE COURT:*  -- he's not before me.  I can only make

19  a judgment on cases and controversies before me.  And right

20  now you're looking at a $71 million judgment that you haven't

21  superseded and you're not providing the information that you

22  need to.

23         So, when you come on Monday, I want you to tell the

24  good, the bad, and the ugly.  And then if it's something that,

25  for instance, belongs to your daughter, not you individually,

1   I can tell you that if Mr. Lambert and Mr. Thompson try to

2   collect that from you that I would say no --

3           *DEFENDANT JOHNSON:*  I appreciate that.

4           *THE COURT:*  -- that that's not collectible.

5           *DEFENDANT JOHNSON:*  I appreciate that, Your Honor.

6           But if I may, what's happened in this particular

7   case, as concerns the Othram stock, is particularly relevant.

8   Because what happens is that simply disclosing all of my

9   assets can imperil the operations of those businesses.

10          So, for example --

11          *THE COURT:*  Look, I'm not in the mood to buy that.

12  You need to disclose every single thing that -- any assets

13  that you have.

14          I've got to get busy with my trial.  But this -- if

15  you're going to say -- give me this whole song and dance about

16  how it's top secret or whatever --

17          *DEFENDANT JOHNSON:*  No.  I mean, we literally have a

18  situation where the lawyer -- DLA Piper represents Tesla,

19  Tesla is owned by Elon Musk, Gigafund is on the board,

20  Gigafund is a Musk entity.  So, we have a situation of

21  interlocking interests and conflicts of interest.

22          The only reason I moved my assets over to a Wyoming

23  trust -- which, by the way, is not a criminal offense.  My

24  grandmother was born in Wyoming.  I'm wearing a cowboy tie.  I

25  like Wyoming quite a bit, I use it for a lot of my affairs.

1   The only reason I would do that is to preserve an asset.

2          And so, we have a situation here where I'm being

3   harassed to coming back and forth to Texas.  Now, I don't

4   mind, I've been very generous, I've allowed the plaintiff

5   to -- to allow to -- to do it from teleconferencing.

6          I've been very generous with Mr. Thompson and his

7   mother -- where his mother was ill.  I came down -- when my

8   mother had a broken arm, and came down here.

9          So, I have an issue here, and this does seem like a

10  harassing pattern.

11          *THE COURT:*  Well, you --

12          *DEFENDANT JOHNSON:*  And I think we need to be honest

13  about that.  You, yourself, have argued recently in the open

14  AIX lawsuit that there's a forum shopping issue going on here,

15  and that's what's happening here with Your Honor.

16          Now, I've written a letter to Your Honor, and I'm

17  happy to give it to opposing counsel as well, I have no issues

18  with that.

19          *THE COURT:*  Well, you can't write letters to me or

20  emails to me.  That's ex parte communication.  I don't know

21  what --

22          *DEFENDANT JOHNSON:*  No, I can share it with him as

23  well, right, is my understanding.

24          *THE COURT:*  Well, you're not going to can share, you

25  are going to share it.  I'm not sure what you're talking

1    about.

2             I don't have time for this.  You're going to show up

3    Monday, you're going to disclose all of your assets.  And if

4    you don't, I'm going to hold you in contempt of court, okay?

5             Here's something you ought to think about.  If you

6    think that these folks are harassing you, you might even

7    consider agreeing to a receiver.  A receiver is a

8    court-appointed --

9             *DEFENDANT JOHNSON:*  I have no objection to that.  We

10   can do that right now, Your Honor.  And I have no objection to

11   all of my assets being --

12            *THE COURT:*  Do you understand that a receiver has

13   control of all of your assets?

14            *DEFENDANT JOHNSON:*  I have no objection to that.

15   And I have no objection to all of my assets going to a Federal

16   trust as well.  No objection whatsoever.

17            *THE COURT:*  Okay.  Well, I have a little bit of

18   hesitancy sua sponte doing it.

19            I think you need to get an idea on Monday what's out

20   there, then make the appropriate motion.  If it's agreed to,

21   it's agreed to.  But I think try to pick an independent former

22   Federal prosecutor with some white collar experience that is

23   not going to break the bank when it comes to being paid to do

24   it.  But I want to make sure that there's enough out there to

25   justify a receiver.  Because receivers should not have to work

1    for the Court for free.

2         *DEFENDANT JOHNSON:*  Your Honor, if I may.

3         Could we have a motion, too, on this case, that the

4    assets -- the Othram assets that belong to my ex-wife and

5    daughter go to them?

6         *THE COURT:*  If you file whatever motion you like, I

7    would take a look at it.

8         But as for now, I've got 14 jurors that are waiting,

9    I see my defense counsels are out there waiting to get set up.

10   I don't have any more patience for this.

11        *DEFENDANT JOHNSON:*  No objection.

12        *THE COURT:*  All right.  We'll enter an appropriate

13   order today.  But you're going to show up 8:30 Monday.

14        Do you understand?

15        *DEFENDANT JOHNSON:*  I do, Your Honor.

16        *THE COURT:*  Okay.  I won't be happy if you don't

17   show up.

18        Any questions for me?

19        *MR. THOMPSON:*  Your Honor, I'm sorry.

20        Mr. Johnson has some bloggers here, I just want to

21   emphatically state that we never harassed him, everything was

22   sought via subpoena.  And Mr. Lambert is not facing any

23   outstanding --

24        *DEFENDANT JOHNSON:*  That's not true.

25        *THE COURT:*  I hope --

1          *DEFENDANT JOHNSON:*  He's facing an outstanding

2     judgment in --

3          *THE COURT:*  Listen, please be quiet.

4          I don't have patience for this.  And I don't care

5     what the bloggers say or whatever.  There has to be other more

6     important things to report on.  We've got so much going on in

7     the country today, I can't believe you'd waste time on this.

8          The fact of the matter is, we had 12 citizens here

9     that entered a $71 million judgment against you.  These are

10    random people that came here, randomly selected from across

11    the Fort Worth Division, I believe we have had a couple that

12    came all the way out from West Texas to come up here and hear

13    this case.  The evidence was overwhelming, they entered their

14    judgment.  You haven't superseded it.  You have to participate

15    as they try to collect.  Regardless of what it says on a blog,

16    that's the law as it has been forever.

17          And I'm sorry if you don't like it.  Again, I

18    encourage you, please, please, please consider finding an

19    attorney.  Even if it's someone that has a law license that

20    would represent you for free is better than nothing.  Because

21    I think you have a tendency to go chasing rabbits down rabbit

22    trails and not focusing on what you have to do under the law,

23    and it's only going to get you into more trouble.

24          And as I said, we're way too busy.  And I've got my

25    lawyers out here that are ready to get started.  I've got some

1    good folks out here that weren't forced to be here, they're

2    doing it out of their civic duty to come and serve on my jury,

3    and I don't want to keep them waiting, okay?

4             All right.  The case will be -- the Court will stand

5    in recess.

6                    *(Proceedings Adjourned)*

1              <u>REPORTER'S CERTIFICATE</u>

2

3          I, Monica Willenburg Guzman, CSR, RPR, certify

4    that the foregoing is a true and correct transcript from

5    the record of proceedings in the foregoing entitled matter.

6          I further certify that the transcript fees format

7    comply with those prescribed by the Court and the Judicial

8    Conference of the United States.

9          Signed this 16th day of November, 2025.

10

11                          <u>/s/Monica Willenburg Guzman</u>
                            Monica Willenburg Guzman, CSR, RPR
12                          Texas CSR No. 3386
                            NCRA No. 32278
13                          Official Court Reporter
                            The Northern District of Texas
14                          Fort Worth Division

15

16   CSR Expires:        7/31/2027

17   Business Address:   501 W. 10th Street, Room 310
                         Fort Worth, Texas  76102
18
     Telephone:          817.850.6681
19
     E-Mail Address:     mguzman.csr@yahoo.com
20

21

22

23

24

25

**DEFENDANT JOHNSON: [43]**
**MR. THOMPSON: [22]**  3/7 6/13 7/7 7/24 8/2 8/23 10/2 10/25 11/5 11/25 12/12 12/21 12/25 17/16 17/19 20/7 20/13 20/15 20/21 21/23 22/9 29/19
**SECURITY OFFICER: [1]**  9/23
**THE COURT: [72]**
**THE MARSHAL: [5]**  15/5 15/11 15/15 15/21 15/25

**$**

**$70 [7]**  4/25 5/5 5/8 5/13 13/15 14/15 23/21
**$71 [4]**  18/22 21/2 25/20 30/9

**/**

**/s/Monica [1]**  32/11

**1**

**10 [2]**  1/6 3/2
**100,000 [1]**  9/7
**103 [1]**  7/16
**10th [1]**  1/19 32/17
**119 [1]**  8/13
**12 [1]**  30/8
**12:03 [2]**  1/6 3/2
**14 [1]**  29/8
**1624 [1]**  1/16
**16th [1]**  32/9
**1900 [1]**  1/13

**2**

**20194 [1]**  1/17
**2025 [3]**  1/6 3/2 32/9
**2027 [1]**  32/16
**214.743.4500 [1]**  1/14
**2200 [1]**  1/13
**26 [1]**  4/16

**3**

**3,000 [1]**  9/6
**310 [2]**  1/19 32/17
**32278 [1]**  32/12
**3386 [1]**  32/12
**3rd [1]**  16/9

**4**

**4:24-CV-00988-P [1]**  1/4
**4:24-CV-988-P [1]**  3/5

**5**

**501 [2]**  1/19 32/17

**6**

**617.429.4718 [1]**  1/17
**64 [1]**  7/8

**7**

**7/31/2027 [1]**  32/16
**71 [1]**  14/18
**75201 [1]**  1/14
**76102 [1]**  1/20 32/17

**8**

**817.850.6681 [2]**  1/20 32/18
**8:30 [3]**  17/23 22/19 29/13

**A**

**ability [2]**  12/16 21/5
**able [3]**  11/8 12/9 17/6
**about [15]**  9/5 11/6 13/3 14/5 17/22 19/3 19/15 19/19 19/20 22/23 23/13 26/15 27/13 28/1 28/5
**abuse [1]**  16/11
**abuses [1]**  15/2
**access [1]**  17/6
**account [1]**  7/1
**accounts [1]**  9/3
**accused [2]**  13/12 13/14
**across [1]**  30/10
**action [1]**  5/15
**actions [1]**  22/17
**actively [1]**  7/18
**actually [3]**  12/3 14/17 21/1
**addition [1]**  4/22
**address [3]**  24/4 32/17 32/19
**Adjourned [1]**  31/6
**advice [1]**  23/16
**affairs [1]**  26/25
**afraid [1]**  23/15
**after [5]**  6/12 14/11 20/19 20/22 21/4
**again [5]**  4/7 8/21 8/22 23/10 30/17
**against [9]**  5/1 5/13 10/5 10/7 10/8 10/9 13/15 14/16 30/9
**agents [1]**  7/1
**Aggie [1]**  19/22
**ago [1]**  17/19
**agree [2]**  11/25 19/12
**agreed [2]**  28/20 28/21
**agreeing [1]**  28/7
**ahead [2]**  3/9 7/6
**Aiden [1]**  17/25
**AIX [1]**  27/14
**AL [1]**  1/4
**all [26]**  6/21 6/23 8/16 8/20 8/21 9/7 12/15 16/6 17/14 17/21 17/22 17/22 22/11 22/21 22/21 22/25 23/25 24/19 26/8 28/3 28/11 28/13 28/15 29/12 30/12 31/4
**allow [2]**  9/18 27/5
**allowed [1]**  27/4
**already [1]**  7/2
**also [5]**  8/5 8/14 9/4 15/1 22/12
**am [3]**  4/2 11/16 23/14
**Amendment [1]**  13/16
**another [1]**  20/23
**answer [2]**  8/13 12/7
**answers [2]**  11/23 18/3
**anti [1]**  10/18
**anti-Semite [1]**  10/18
**any [17]**  3/20 5/11 7/4 7/16 7/20 8/7 11/23 11/23 15/19 18/10 21/4 22/10 22/13 26/12 29/10 29/18 29/22
**anyone [1]**  22/13
**anything [8]**  4/4 6/8 15/19 18/13 18/19 19/20 25/1 25/12
**appeal [1]**  16/6
**appellant's [1]**  17/13
**appellate [1]**  5/4
**appointed [3]**  18/5 21/6 28/8
**appointing [2]**  11/17 12/14
**appointment [1]**  11/9
**appreciate [2]**  26/3 26/5
**appropriate [8]**  3/22 4/6 5/15 21/12

21/15 22/1 28/20 29/12
**are [26]**  4/18 4/19 5/14 5/18 5/25 6/22 8/10 11/24 12/6 12/13 12/17 16/2 17/23 19/4 19/6 19/8 21/10 22/6 22/6 22/12 27/25 28/6 29/8 29/9 30/9 30/25
**area [1]**  21/13
**aren't [1]**  24/12
**argue [1]**  16/11
**argued [1]**  27/13
**argument [1]**  6/24
**arm [1]**  27/8
**around [2]**  5/20 12/10
**Arthur [1]**  10/13
**ask [4]**  16/8 16/9 16/14 16/16
**asked [3]**  12/7 12/15 15/18
**asset [2]**  24/24 27/1
**assets [31]**  5/17 7/9 7/12 7/16 7/19 11/9 12/3 12/13 12/16 14/11 18/17 18/21 19/13 21/4 21/4 22/23 22/25 24/8 24/9 24/19 25/8 25/13 26/9 26/12 26/22 28/3 28/11 28/13 28/15 29/4 29/4
**Association [1]**  4/18
**attacks [1]**  10/4
**attorney [8]**  4/9 4/16 7/4 22/22 23/14 23/20 24/16 30/19
**attorneys [2]**  4/19 21/10
**available [3]**  22/6 22/7 22/9
**avoid [1]**  16/3
**aware [2]**  20/11 23/6
**away [2]**  13/17 18/8

**B**

**back [7]**  4/25 5/23 13/21 16/19 19/25 22/19 27/3
**backers [1]**  14/11
**bad [2]**  10/11 25/24
**ball [1]**  20/24
**bank [2]**  9/3 28/23
**banking [1]**  9/4
**bankruptcy [1]**  25/1
**bar [2]**  4/18 10/8
**barring [1]**  7/15
**based [2]**  7/17 13/21
**basic [1]**  10/21
**bathroom [1]**  15/24
**be [54]**
**beauty [2]**  12/8 20/14
**because [11]**  7/4 13/1 18/20 19/13 24/10 24/16 24/17 25/13 26/8 28/25 30/20
**been [25]**  3/13 3/14 4/15 4/16 5/11 5/20 6/4 7/3 8/15 11/10 13/12 13/13 13/22 14/6 14/10 15/10 18/22 21/5 22/17 23/23 24/16 25/5 27/4 27/6 30/16
**before [8]**  1/9 9/16 11/10 15/1 16/19 25/2 25/18 25/19
**behavior [2]**  5/22 14/22
**being [7]**  15/12 17/6 18/25 19/6 27/2 28/11 28/23
**believe [6]**  4/10 7/9 7/11 10/16 30/7 30/11
**belong [1]**  29/4
**belongs [1]**  25/25
**Benjamin [2]**  4/10 4/12
**BENNETT [1]**  1/12

**Berra [1]** 8/22
**best [2]** 12/4 20/25
**bet [1]** 23/13
**better [3]** 7/5 21/18 30/20
**between [1]** 18/12
**beyond [1]** 7/12
**big [2]** 4/18 4/18
**bit [2]** 26/25 28/17
**bitcoin [1]** 9/6
**blog [1]** 30/15
**bloggers [2]** 29/20 30/5
**Bloom [2]** 10/13 10/15
**board [1]** 26/19
**bond [3]** 5/7 5/9 16/16
**bones [1]** 11/19
**bono [2]** 4/20 4/23
**book [2]** 15/9 15/14
**books [1]** 4/18
**born [1]** 26/24
**bought [1]** 9/6
**box [1]** 3/23
**break [4]** 6/10 11/19 13/1 28/23
**BRIDGE [2]** 1/4 3/3
**brief [2]** 6/14 17/13
**briefing [1]** 8/16
**briefs [2]** 16/8 16/18
**bring [1]** 17/21
**broken [1]** 27/8
**brought [2]** 7/8 7/17
**business [2]** 14/12 32/17
**businesses [1]** 26/9
**busy [5]** 5/25 12/24 20/23 26/14 30/24
**buy [1]** 26/11
**buyer [1]** 20/10

**C**
**call [2]** 10/14 23/14
**called [4]** 5/7 7/11 10/16 10/17
**came [4]** 27/7 27/8 30/10 30/12
**can [34]**
**can't [7]** 16/3 16/4 18/20 18/21 23/15 27/19 30/7
**CAPITAL [2]** 1/4 3/3
**Captain [1]** 17/25
**care [1]** 30/4
**career [1]** 10/11
**case [14]** 1/4 3/4 5/10 8/6 8/21 16/21 17/10 19/15 20/25 22/18 26/7 29/3 30/13 31/4
**cases [4]** 4/20 4/23 19/19 25/19
**cash [1]** 7/19
**categorically [1]** 10/18
**cause [3]** 1/8 3/12 7/18
**certain [1]** 23/9
**certainly [1]** 20/16
**CERTIFICATE [1]** 32/1
**certify [2]** 32/3 32/6
**chance [1]** 3/13
**charge [1]** 4/20
**charged [1]** 23/5
**CHARLES [3]** 1/6 1/16 3/4
**chasing [1]** 30/21
**chief [1]** 8/21
**Church [1]** 6/18
**Circuit [11]** 4/8 5/11 14/4 14/5 16/6 16/7 16/17 16/18 17/9 18/7 18/8

**circumstances [1]** 8/10
**citizens [1]** 30/8
**civic [1]** 31/2
**clear [4]** 6/1 7/17 20/15 25/7
**client [4]** 4/14 21/2 21/20 22/7
**client's [1]** 22/9
**clients [1]** 4/23
**clinics [1]** 4/22
**collar [4]** 11/14 21/9 21/11 28/22
**collect [12]** 9/6 5/15 6/5 11/8 11/18 11/20 14/21 16/23 22/23 25/1 26/2 30/15
**collectable [1]** 24/24
**collected [1]** 5/19
**collectible [2]** 24/13 26/4
**collection [2]** 5/9 12/2
**colloquy [1]** 3/24
**come [11]** 3/20 6/25 13/9 13/20 14/11 16/23 18/9 23/19 25/23 30/12 31/2
**comes [1]** 28/23
**comfortable [1]** 11/16
**coming [2]** 6/11 27/3
**communicate [2]** 3/22 4/4
**communication [1]** 27/20
**communications [1]** 3/20
**compel [1]** 8/13
**complaints [1]** 10/8
**comply [3]** 9/16 16/4 32/7
**complying [1]** 18/25
**computer [1]** 1/23
**comrade [1]** 10/14
**conceal [1]** 12/4
**concern [1]** 12/13
**concerned [1]** 11/16
**concerns [1]** 26/7
**conduct [3]** 10/6 11/1 13/14
**Conference [1]** 32/8
**conflicts [1]** 26/21
**consider [6]** 11/12 14/22 18/5 23/18 28/7 30/18
**considerably [1]** 16/10
**considered [1]** 12/15
**conspiracies [1]** 6/23
**conspiracy [1]** 6/18
**contacts [1]** 23/13
**contempt [9]** 8/11 9/18 15/12 15/14 16/2 19/1 22/13 23/4 28/4
**contentious [1]** 19/3
**continue [1]** 12/18
**continuing [5]** 10/5 10/24 10/25 13/14 13/23
**control [2]** 15/17 28/13
**controversies [1]** 25/19
**convenient [1]** 22/16
**copy [1]** 17/7
**correct [3]** 15/24 17/12 32/4
**could [2]** 18/9 29/3
**counsel [1]** 27/17
**counsels [1]** 29/9
**counter [1]** 20/10
**counter-party [1]** 20/10
**country [2]** 6/3 30/7
**County [7]** 4/17 4/18 9/17 9/22 15/2 15/7 15/13
**couple [2]** 17/19 30/11
**course [2]** 13/8 13/11
**court [23]** 1/1 1/9 1/19 3/15 3/20 3/22

4/5 4/14 5/5 5/12 17/8 17/10 20/15 21/6 22/20 23/4 24/5 28/4 28/8 29/1 31/4 32/7 32/13
**Court's [2]** 3/17 20/11
**court-appointed [1]** 28/8
**courthouse [1]** 22/19
**courtroom [2]** 10/15 23/6
**courts [1]** 4/15
**cowboy [1]** 26/24
**crafting [1]** 21/25
**criminal [3]** 19/9 23/18 26/23
**crypto [2]** 9/4 9/6
**CSR [5]** 1/19 32/3 32/11 32/12 32/16
**current [1]** 23/17
**currently [1]** 19/3
**custody [1]** 15/16
**CV [2]** 1/4 3/5

**D**
**Dallas [2]** 1/14 21/13
**Dallas/Fort [1]** 21/13
**dance [1]** 26/15
**date [3]** 17/24 17/25 22/10
**daughter [3]** 24/7 25/25 29/5
**day [2]** 11/17 32/9
**days [2]** 17/19 24/22
**deal [4]** 5/25 18/6 19/10 20/3
**dealing [2]** 12/20 20/20
**dealt [1]** 8/20
**decide [3]** 16/20 21/15 22/13
**decision [3]** 16/20 23/23 25/2
**defamatory [1]** 10/4
**defame [3]** 10/24 10/25 13/18
**DEFENDANT [2]** 1/16 6/20
**defense [2]** 23/18 29/9
**definition [1]** 7/23
**deja [1]** 8/21
**delay [2]** 16/8 16/9
**deposition [9]** 8/14 9/9 17/21 20/1 22/3 22/7 23/3 23/4 23/20
**deputies [1]** 22/12
**Deputy [1]** 15/4
**describe [2]** 8/16 8/17
**did [2]** 13/20 16/9
**didn't [1]** 16/8
**different [2]** 4/15 21/19
**directly [1]** 12/5
**disclose [3]** 24/18 26/12 28/3
**disclosed [1]** 24/18
**disclosing [1]** 26/8
**discover [1]** 5/17
**discovery [14]** 5/17 8/7 8/9 8/18 10/22 11/7 11/23 13/13 14/9 16/23 18/24 20/24 21/16 21/21
**dissipate [1]** 18/13
**dissipated [1]** 21/5
**dissipating [1]** 7/15
**DISTRICT [4]** 1/1 1/2 1/9 32/13
**DIVISION [3]** 1/3 30/11 32/14
**DLA [2]** 1/12 26/18
**do [37]**
**docket [2]** 3/21 7/16 8/12
**docketed [1]** 17/17
**does [3]** 7/10 13/6 27/9
**doesn't [1]** 7/4
**doing [10]** 10/21 11/11 11/12 12/15 13/21 14/23 15/20 21/11 23/23 28/18

## D

**doing...** [1] 31/2
**dollars** [3] 7/10 7/11 20/10
**don't** [43]
**done** [6] 8/5 12/4 16/25 18/13 18/24 20/18
**down** [8] 11/10 16/18 17/23 19/5 19/5 27/7 27/8 30/21
**Drive** [1] 1/16
**dumb** [1] 19/22
**during** [3] 3/25 3/25 8/20
**duty** [1] 31/2

## E

**E-Mail** [2] 1/21 32/19
**earlier** [1] 15/8
**effect** [2] 4/13 24/16
**effort** [2] 11/7 14/10
**efforts** [3] 8/15 8/17 11/21
**efile** [1] 17/6
**eight** [1] 25/9
**eight-year-old** [1] 25/9
**Eighteen** [1] 15/11
**either** [2] 17/13 22/24
**Elon** [2] 6/18 26/19
**email** [3] 3/23 9/1 10/13
**emails** [2] 3/16 27/20
**emphatically** [1] 29/21
**encourage** [5] 4/7 4/9 4/21 23/10 30/18
**encouraging** [1] 7/4
**end** [2] 11/17 21/17
**engage** [1] 13/14
**engaging** [1] 19/9
**enough** [2] 12/13 28/24
**enter** [2] 23/25 29/12
**entered** [2] 30/9 30/13
**entering** [1] 10/6
**entire** [2] 5/8 8/6
**entities** [1] 24/20
**entitled** [7] 6/4 8/10 16/22 16/23 21/21 24/14 32/5
**entity** [1] 26/20
**Entry** [2] 7/16 8/12
**escort** [1] 22/20
**ET** [1] 1/4
**European** [2] 19/19 19/21
**evade** [1] 7/21
**even** [2] 28/6 30/19
**eventually** [1] 15/1
**ever** [2] 4/16 11/8
**every** [3] 8/7 15/17 26/12
**everything** [3] 15/17 15/18 29/21
**evidence** [2] 13/22 30/13
**ex** [3] 24/7 27/20 29/4
**ex-wife** [2] 24/7 29/4
**example** [1] 26/10
**excuse** [1] 4/11
**execution** [1] 17/1
**exhausted** [1] 16/6
**Exhibit** [1] 7/8
**expensive** [1] 6/2
**experience** [4] 11/14 21/10 23/19 28/22
**Expires** [1] 32/16
**extent** [1] 10/20
**extra** [2] 23/8 23/8

## F

**facility** [1] 19/5
**facing** [5] 19/14 25/13 25/15 29/22 30/1
**fact** [4] 9/16 15/3 21/2 30/8
**FBI** [1] 6/19
**Federal** [3] 8/1 28/15 28/22
**feel** [1] 11/16
**feels** [1] 22/22
**fees** [1] 32/6
**few** [2] 3/16 13/2
**Fieldthorn** [1] 1/16
**Fifth** [11] 4/8 5/11 14/4 14/5 16/6 16/7 16/16 16/18 17/9 18/7 18/8
**fighting** [1] 21/16
**file** [1] 29/6
**filed** [9] 3/13 3/21 4/5 8/12 14/2 14/5 16/7 17/2 17/4
**filed a** [1] 17/4
**filing** [1] 20/3
**final** [1] 10/2
**finances** [2] 12/17 17/22
**find** [7] 4/9 11/13 13/21 18/12 18/19 21/15 23/10
**finding** [2] 19/8 30/18
**fine** [1] 24/12
**firm** [1] 6/3
**first** [5] 10/4 11/3 11/25 13/16 17/16
**focusing** [1] 30/22
**folder** [1] 3/17
**folks** [4] 4/19 9/18 10/24 10/25 13/18 19/6 19/8 28/6 31/1
**follow** [2] 4/3 24/22
**fool** [2] 4/13 4/14
**forced** [1] 31/1
**foregoing** [2] 32/4 32/5
**forever** [1] 30/16
**form** [2] 3/20 4/5
**formal** [1] 3/21
**format** [1] 32/6
**former** [2] 21/10 28/21
**FORT** [8] 1/3 1/5 1/20 5/25 21/13 30/11 32/14 32/17
**forth** [1] 27/3
**forum** [1] 27/14
**forward** [2] 6/10 15/20
**Franklin** [2] 4/10 4/12
**frankly** [3] 5/23 19/10 22/15
**fraud** [1] 7/23
**fraudulent** [1] 12/10
**free** [4] 4/20 22/5 29/1 30/20
**freedom** [1] 15/18
**Friday** [2] 17/17 22/4
**front** [3] 4/7 4/8 19/23
**fugitives** [1] 19/8
**fun** [1] 15/22
**further** [1] 32/6

## G

**gathered** [1] 22/22
**gave** [1] 9/16
**general** [1] 3/23
**generic** [1] 10/21
**generous** [2] 27/4 27/6
**gentlemen** [2] 15/6 16/1
**get** [18] 4/3 6/4 7/4 7/4 8/17 11/7 12/3 12/16 15/23 19/17 20/23 21/22 22/10

## G (continued)

**gets** [1] 18/3
**getting** [1] 11/23
**Gigafund** [2] 26/19 26/20
**giggle** [1] 6/21
**girl** [1] 25/9
**give** [7] 6/9 9/14 17/5 23/16 23/19 26/15 27/17
**given** [4] 5/22 5/25 8/7 23/17
**giving** [1] 23/5
**go** [15] 3/9 7/6 8/21 10/1 13/2 15/7 15/8 15/14 15/16 15/24 18/21 21/4 25/10 29/5 30/21
**going** [28] 5/1 6/10 8/7 11/8 11/22 12/17 14/4 15/2 16/11 18/19 19/4 19/8 19/16 20/11 22/15 24/8 26/15 27/14 27/24 27/25 28/2 28/3 28/4 28/15 28/23 29/13 30/6 30/23
**good** [8] 6/10 9/11 9/21 15/8 16/8 25/10 25/24 31/1
**got** [11] 12/1 13/1 13/15 16/1 16/8 17/17 26/14 29/8 30/6 30/24 30/25
**governed** [1] 5/14
**Government** [1] 6/19
**grandmother** [1] 26/24
**granted** [1] 3/15
**guess** [1] 11/22
**guy** [1] 10/15
**guy's** [1] 10/4
**GUZMAN** [4] 1/19 32/3 32/11 32/11

## H

**had** [11] 3/13 8/20 10/13 16/14 19/4 21/19 22/17 23/20 27/8 30/8 30/11
**Hal** [1] 3/4
**handle** [1] 12/3
**hanging** [1] 23/21
**happen** [1] 10/11
**happened** [1] 26/6
**happening** [1] 27/15
**happens** [2] 18/11 26/8
**happy** [3] 17/5 27/17 29/16
**harass** [1] 14/11
**harassed** [2] 27/3 29/21
**harassing** [4] 14/22 24/16 27/10 28/6
**harassment** [1] 14/9
**hard** [2] 11/23 15/6
**has** [25] 3/15 4/14 5/10 5/10 6/3 7/9 7/20 9/5 10/4 11/13 12/3 14/10 15/18 16/6 18/22 19/14 21/2 21/20 23/18 24/16 28/12 29/20 30/5 30/16 30/19
**hasn't** [1] 17/11
**have** [95]
**haven't** [5] 14/6 17/13 24/17 25/20 30/14
**having** [2] 4/3 19/10
**he** [20] 7/10 7/12 9/6 9/9 9/10 9/11 9/11 9/13 10/12 11/1 11/2 11/3 12/3 12/7 13/6 15/8 18/3 22/22 25/1
**he's** [15] 8/5 8/6 8/18 9/7 10/4 10/8 10/24 10/25 12/4 19/14 21/21 25/15 25/16 25/18 30/1
**head** [1] 23/21
**hear** [6] 6/9 13/4 16/19 19/25 20/15 30/12
**heard** [1] 15/8
**hearing** [3] 3/12 6/12 13/22
**held** [2] 15/12 23/4

**H**

here [35]
Here's [1] 28/5
hesitancy [1] 28/18
hide [3] 12/16 18/13 18/21
hiding [1] 18/15
highlighting [1] 15/2
highly [1] 4/21
him [9] 8/7 8/8 9/1 9/16 10/7 12/7
22/24 27/22 29/21
himself [3] 3/10 4/14 25/13
his [15] 8/9 10/4 10/22 11/1 11/9
11/22 12/4 12/16 12/17 12/22 15/9
16/23 19/14 27/6 27/7
history [2] 18/25 18/25
hold [4] 9/18 16/2 22/13 28/4
holdings [2] 9/4 17/23
honest [4] 22/24 25/4 25/5 27/12
Honor [32] 3/7 6/13 7/7 7/24 8/10 8/24
10/2 11/25 12/12 12/25 13/5 13/25
14/18 15/21 17/5 17/14 18/14 19/12
19/18 20/7 21/23 23/1 24/1 25/3 25/7
26/5 27/15 27/16 28/10 29/2 29/15
29/19
HONORABLE [1] 1/9
hope [1] 29/25
hopefully [1] 6/10
hours [1] 10/13
how [4] 5/25 15/10 19/24 26/16
hurt [1] 11/20

**I**

I'd [3] 10/14 13/3 19/24
I'll [5] 6/7 6/9 6/13 6/17 21/14
I'm [28] 4/11 4/11 5/22 6/6 6/6 6/8 7/3
9/14 9/17 13/22 17/5 17/20 17/20
18/10 19/6 19/21 19/21 22/3 24/21
25/17 26/11 26/24 27/2 27/16 27/25
28/4 29/19 30/17
I've [18] 3/12 4/15 4/16 8/16 11/10
12/1 13/1 16/1 22/17 23/23 26/14 27/4
27/4 27/6 27/16 29/8 30/24 30/25
ICE [1] 19/5
idea [3] 9/21 25/10 28/19
identify [2] 9/3 25/2
ill [1] 27/7
immediately [3] 5/6 5/16 6/11
imperil [1] 26/9
important [2] 24/10 30/6
independent [1] 28/21
INDEX [1] 1/25
individually [1] 25/25
information [5] 6/5 9/4 17/22 22/21
25/21
inserting [1] 10/3
instance [1] 25/25
intent [1] 9/13
intention [1] 14/8
interest [1] 26/21
interests [1] 26/21
interlocking [1] 26/21
internet [1] 10/17
interrogatories [3] 8/14 9/1 9/2
interrupt [1] 18/18
investigations [1] 21/12
involved [1] 25/8
involving [1] 6/18

**is [60]**
isn't [1] 7/23
Israeli [1] 6/19
issue [2] 27/9 27/14
issued [1] 5/11
issues [1] 27/17
it [54]
it's [27] 3/13 3/21 4/7 4/8 4/13 7/16
8/21 8/23 9/7 12/22 14/17 14/23 15/7
21/15 21/18 22/16 23/22 24/21 24/24
24/25 25/1 25/24 26/16 28/20 28/21
30/19 30/23

**J**

jail [5] 8/8 9/13 9/17 9/22 15/2
JOHNSON [38]
joke [1] 11/2
judge [5] 1/9 4/15 7/2 12/19 22/11
judgment [37]
judgments [2] 16/4 19/14
Judicial [1] 32/7
jurors [1] 29/8
jury [10] 4/25 10/6 13/15 13/20 16/21
17/23 22/4 22/7 22/20 31/2
just [28] 6/15 6/15 6/17 9/2 9/3 10/2
10/18 10/20 10/21 11/1 11/1 12/24
12/24 14/23 15/7 16/3 16/4 17/17
19/11 19/21 19/22 19/22 20/4 23/5
23/22 24/21 24/22 29/20
justify [2] 12/14 28/25

**K**

keep [1] 31/3
keeps [1] 11/1
knew [1] 5/1
know [17] 4/1 4/20 8/6 9/5 9/7 10/5
10/19 11/2 11/3 12/4 17/24 17/25
19/20 20/25 21/18 25/15 27/20
knowledge [2] 5/10 12/17

**L**

Lambert [8] 3/4 3/8 10/5 16/22 19/13
25/13 26/1 29/22
Lambert's [1] 14/10
large [1] 25/14
last [1] 5/1
late [2] 17/17 17/19
later [3] 10/13 20/19 23/25
laugh [1] 6/21
laughed [1] 9/11
laughing [1] 6/20
law [13] 4/22 5/3 5/14 5/19 6/2 18/23
19/9 19/21 24/23 25/1 30/16 30/19
30/22
lawsuit [3] 5/22 5/24 27/14
lawsuits [1] 10/9
lawyer [1] 26/18
lawyers [2] 14/23 30/25
learn [1] 22/23
least [4] 7/10 8/16 11/13 23/14
left [1] 5/12
legal [4] 6/1 6/24 23/11 23/16
let [1] 16/14
let's [1] 21/21
letter [1] 27/16
letters [1] 27/19
liberal [1] 4/2

**license [1]** 30/19
licensed [2] 19/21 23/11
lie [1] 23/3
like [21] 4/4 5/24 10/3 12/19 13/3
13/21 14/1 14/23 15/7 15/12 17/7
19/16 19/24 20/2 21/12 23/5 24/22
26/25 27/9 29/6 30/17
Listen [1] 30/3
lists [1] 4/19
literally [1] 26/17
little [1] 28/17
LLC [3] 1/4 3/3 7/20
LLP [1] 1/12
locally [1] 23/12
located [1] 5/19
long [1] 15/10
look [8] 12/9 12/19 15/20 16/25 21/12
21/14 26/11 29/7
looked [4] 4/21 10/19 11/10 19/6
looking [2] 25/20
Lordy [1] 17/9
lot [4] 5/24 18/20 19/2 26/25
loud [1] 20/15
luck [1] 9/12
lunch [1] 15/23

**M**

made [4] 10/4 10/12 25/2 25/7
Mail [2] 1/21 32/19
make [8] 6/24 15/17 21/8 22/10 23/23
25/18 28/20 28/24
making [3] 9/7 11/6 18/10
man [2] 4/14 10/13
many [4] 4/19 4/22 22/17 23/13
MARK [1] 1/9
Marshal [1] 15/10
marshals [3] 15/16 19/2 19/7
martyr [1] 18/10
massive [1] 10/6
matter [4] 4/5 21/2 30/8 32/5
matters [1] 6/22
may [9] 11/19 14/22 16/19 21/4 24/3
24/15 25/7 26/6 29/2
maybe [3] 24/17 24/19 24/25
McBryde [1] 12/19
McCoy [1] 24/21
me [27] 3/8 4/4 4/8 4/11 6/7 6/8 7/3
9/15 11/20 11/21 14/4 14/4 14/11
14/23 16/13 16/14 19/16 19/23 23/16
23/22 24/22 25/18 25/19 26/15 27/19
27/20 29/18
mean [1] 26/17
means [1] 4/20
meant [1] 3/19
mechanical [1] 1/23
mechanism [1] 16/15
members [1] 6/19
mercy [1] 17/9
message [2] 21/23 21/23
messaged [1] 12/5
messing [1] 4/11
mguzman.csr [2] 1/21 32/19
microphone [1] 13/7
might [6] 4/24 4/25 15/8 18/4 23/18
28/6
million [13] 4/25 5/5 5/8 5/13 7/11
13/15 14/15 18/22 20/10 21/3 23/21

**million... [2]** 25/20 30/9
**millions [1]** 7/10
**mind [1]** 27/4
**minutes [1]** 13/2
**misattribute [1]** 4/12
**missing [2]** 6/6 6/8
**misstate [1]** 4/12
**Monday [9]** 17/23 18/1 20/1 22/6 22/19 25/23 28/3 28/19 29/13
**money [1]** 9/8
**MONICA [4]** 1/19 32/3 32/11 32/11
**mood [1]** 26/11
**more [5]** 11/6 16/10 29/10 30/5 30/23
**Mormon [1]** 6/18
**most [1]** 6/2
**mother [3]** 27/7 27/7 27/8
**motion [14]** 3/14 3/21 4/6 7/18 8/13 14/2 17/4 17/15 17/17 20/3 22/1 28/20 29/3 29/6
**motions [3]** 14/5 21/16 22/13
**move [2]** 7/19 15/17
**moved [3]** 7/14 24/8 26/22
**moving [2]** 5/20 7/16
**Mr [51]**
**much [3]** 5/23 15/22 30/6
**multiple [1]** 9/9
**Musk [3]** 6/18 26/19 26/20
**my [36]**
**myself [5]** 4/17 10/3 10/9 10/9 10/11

**N**

**nailed [1]** 19/17
**name [1]** 10/15
**named [1]** 10/13
**naught [1]** 22/25
**NCRA [1]** 32/12
**necessarily [1]** 13/18
**need [26]** 3/20 6/24 10/10 11/13 11/18 13/9 17/21 18/2 18/2 19/3 19/25 20/23 20/25 21/3 22/4 22/14 22/18 23/6 23/15 23/16 24/4 24/18 25/22 26/12 27/12 28/19
**needs [5]** 4/5 18/4 20/18 22/22 22/22
**never [2]** 11/20 29/21
**new [3]** 7/2 19/16 20/19
**next [4]** 17/23 18/1 20/16 22/4
**no [26]** 1/4 9/10 9/13 10/21 13/9 14/8 14/25 15/1 15/15 15/18 15/21 17/16 19/18 20/7 26/2 26/17 27/17 27/22 28/9 28/10 28/14 28/15 28/16 29/11 32/12 32/12
**noncollectable [1]** 24/25
**noncompliance [2]** 8/9 10/22
**NORTHERN [2]** 1/2 32/13
**not [54]**
**note [1]** 10/3
**nothing [2]** 23/9 30/20
**novel [3]** 9/15 9/19 9/22
**NOVEMBER [4]** 1/6 3/2 16/9 32/9
**now [17]** 3/12 4/15 5/3 5/9 6/6 8/11 9/6 11/19 16/18 18/12 21/11 21/16 25/20 27/3 27/16 28/10 29/8
**Number [2]** 3/4 7/8

**O**

**oath [3]** 23/3 23/20 24/23

**objection [8]** 14/25 15/1 28/9 28/10 28/14 28/15 28/16 29/11
**objections [1]** 20/7
**obligation [1]** 6/1
**obligations [1]** 10/23
**obvious [1]** 14/14
**obviously [2]** 13/16 21/19
**off [5]** 5/9 9/8 10/4 11/3 11/25
**offense [2]** 8/1 26/23
**officer [2]** 9/20 21/6
**Official [1]** 32/13
**okay [7]** 3/11 17/18 21/25 28/4 28/17 27/16 31/3
**old [1]** 25/9
**one [9]** 7/8 10/12 11/6 12/2 16/12 20/22 21/8 23/14 24/21
**only [12]** 3/19 4/13 10/21 11/7 12/13 19/21 21/7 24/19 25/18 26/22 27/1 30/23
**open [1]** 27/13
**operations [1]** 26/9
**opportunity [1]** 8/8
**opposing [1]** 27/17
**option [1]** 18/11
**options [1]** 16/6
**order [8]** 3/17 7/15 8/4 14/3 20/11 23/25 24/15 29/13
**ordered [2]** 22/16
**ordering [1]** 22/3
**orders [1]** 3/19
**other [7]** 5/20 7/21 11/21 18/10 18/11 19/2 30/5
**Othram [7]** 7/11 7/19 12/4 12/6 25/6 26/7 29/4
**ought [2]** 18/5 28/5
**our [6]** 3/25 4/17 5/24 9/13 9/18 22/12
**out [23]** 4/3 5/18 7/8 7/10 7/17 7/19 8/10 8/25 9/15 12/14 18/9 18/12 18/19 20/4 21/11 22/24 28/19 28/24 29/9 30/12 30/25 31/1 31/2
**outstanding [4]** 6/3 21/21 29/23 30/1
**overwhelming [1]** 30/13
**owe [1]** 19/14
**owes [1]** 20/4
**own [2]** 19/14 23/23
**owned [1]** 26/19

**P**

**p.m [2]** 1/6 3/2
**PAGE [1]** 2/2
**paid [1]** 28/23
**part [2]** 3/21 12/1
**parte [1]** 27/20
**participate [4]** 8/7 8/18 18/23 30/14
**participates [1]** 21/1
**participating [1]** 13/13 23/22
**particular [1]** 26/6
**particularly [1]** 26/7
**party [1]** 20/10
**past [1]** 11/22
**path [1]** 6/10
**patience [4]** 5/25 22/18 29/10 30/4
**pattern [1]** 27/10
**pay [3]** 5/8 5/8 16/16
**PEARL [1]** 1/13
**pending [1]** 17/17
**people [3]** 14/11 22/20 30/10

**perfectly [2]** 21/23 25/5
**perjury [1]** 23/5
**permissible [1]** 9/25
**permit [1]** 9/23
**Perrill [1]** 15/4
**person [1]** 15/19
**personal [1]** 10/9
**perspective [2]** 8/2 8/12
**pick [1]** 28/21
**PIPER [2]** 1/12 26/18
**PITTMAN [1]** 1/9
**place [5]** 5/10 7/19 9/25 15/8 15/15 16/15 22/3
**places [1]** 5/20
**plaintiff [2]** 1/12 27/4
**plaintiffs [8]** 3/6 3/8 3/13 5/5 5/14 7/13 8/12 8/25
**plan [1]** 20/8
**pleadings [2]** 12/23 22/17
**pleasant [1]** 9/25
**please [7]** 13/10 18/16 21/8 30/3 30/18 30/18 30/18
**podcast [1]** 10/17
**podium [3]** 13/9 13/10 13/10
**POINT [2]** 1/4 3/3
**pointed [1]** 8/10
**points [1]** 7/7
**poor [1]** 19/21
**portrait [1]** 12/20
**positively [1]** 10/14
**possibility [1]** 20/2
**possible [1]** 21/8
**post [8]** 5/16 8/9 10/22 13/13 16/15 16/23 18/9 18/24
**post-judgment [7]** 5/16 8/9 10/22 13/13 16/15 16/23 18/24
**posted [1]** 9/5
**poster [1]** 10/18
**posts [1]** 10/14
**posture [1]** 6/16
**precise [1]** 14/20
**prefer [1]** 16/5
**prepare [1]** 6/11
**preparing [2]** 17/10 20/17
**prescribed [1]** 32/7
**preserve [3]** 21/3 24/9 27/1
**preserving [2]** 19/13 25/13
**pretrial [1]** 3/25
**pretty [2]** 7/16 14/14
**prior [2]** 5/22 7/14
**pro [5]** 1/16 4/1 4/20 4/23 6/2
**probably [8]** 9/24 9/25 12/7 15/23 19/6 19/24 23/22 25/10
**problem [2]** 4/24 9/14
**procedural [2]** 6/15 8/2
**proceed [2]** 19/24 23/15
**proceeding [1]** 4/1
**proceedings [6]** 1/23 3/25 5/24 16/15 31/6 32/5
**process [3]** 8/19 14/10 16/12
**produce [1]** 8/14
**produced [1]** 1/23
**prologue [1]** 11/22
**proper [1]** 21/19
**proposed [1]** 3/19
**prosecution [1]** 21/9
**prosecutions [1]** 19/4

**P**

**prosecutor [1]** 28/22
**protected [1]** 24/25
**provide [1]** 5/16
**providing [1]** 25/21
**provisions [1]** 24/23
**purchaser [1]** 12/11
**purge [2]** 15/13 16/3
**purpose [2]** 7/20 7/25
**put [3]** 6/25 7/12 8/8

**Q**

**questions [1]** 29/18
**quick [1]** 7/7
**quiet [1]** 30/3
**quite [5]** 16/8 19/9 22/15 23/24 26/25
**quote [2]** 4/12 8/22

**R**

**rabbit [1]** 30/21
**rabbits [1]** 30/21
**random [1]** 30/10
**randomly [1]** 30/10
**ratchet [1]** 20/16
**ratcheting [1]** 11/1
**rather [3]** 19/7 20/19 25/14
**rational [1]** 15/19
**reach [1]** 7/12
**reached [1]** 8/25
**read [3]** 3/13 8/16 17/8
**ready [1]** 30/25
**real [2]** 11/20 12/17
**really [3]** 6/14 16/12 23/15
**reason [4]** 12/22 17/6 26/22 27/1
**recall [1]** 13/20
**received [1]** 21/24
**receiver [13]** 11/9 11/13 11/17 12/9
  12/14 18/5 20/14 20/16 21/5 28/7 28/7
  28/12 28/25
**receivers [2]** 21/8 28/25
**receivership [1]** 20/3
**recently [2]** 19/4 27/13
**recess [1]** 31/5
**recommend [2]** 11/13 21/14
**recommendation [1]** 21/8
**record [3]** 4/5 7/17 32/5
**refused [1]** 12/7
**refusing [1]** 8/6
**Regardless [1]** 30/15
**related [2]** 3/14 24/19
**relax [1]** 15/14
**relevant [1]** 26/7
**repeated [2]** 10/4 10/16
**repeatedly [3]** 8/6 8/25 10/8
**report [1]** 30/6
**reported [1]** 1/23
**REPORTER [2]** 1/19 32/13
**REPORTER'S [1]** 31/7
**represent [4]** 4/9 4/16 4/19 30/20
**representation [1]** 23/11
**represented [1]** 6/2
**representing [1]** 4/1
**represents [2]** 4/14 26/18
**requested [1]** 9/9
**required [2]** 8/18 18/23
**resources [1]** 16/10
**responded [1]** 17/14

**Reston [1]** 1/17
**resulted [1]** 10/6
**returned [1]** 4/25
**reverse [1]** 16/20
**reverses [1]** 18/7
**reversing [1]** 14/4
**right [14]** 8/11 10/11 13/6 13/16 13/18
  14/21 21/11 22/11 23/25 25/19 27/23
  28/10 29/12 31/4
**ripe [1]** 8/11
**road [1]** 11/10
**roadblock [1]** 20/22
**rocking [1]** 21/22
**rolling [2]** 20/24 21/22
**room [6]** 1/19 17/23 22/4 22/8 22/20
  32/17
**RPR [3]** 1/19 32/3 32/11
**rule [1]** 19/22
**ruled [3]** 14/6 17/11 17/13
**rules [5]** 4/3 5/13 5/16 16/4 16/22

**S**

**said [14]** 4/10 8/8 9/3 9/10 9/11 9/12
  10/15 11/3 12/6 13/1 15/1 18/10 18/19
  30/24
**same [5]** 8/23 10/5 10/5 12/22 13/14
**sanctioned [1]** 16/12
**saw [1]** 17/16
**say [6]** 6/17 23/14 24/23 26/2 26/15
  30/5
**saying [3]** 8/6 10/10 10/17
**says [3]** 9/13 18/8 30/15
**scenario [1]** 20/25
**schools [1]** 4/22
**se [3]** 1/16 4/1 6/2
**secret [3]** 6/19 7/20 26/16
**security [1]** 22/20
**see [6]** 5/2 9/12 18/11 20/2 20/14 29/9
**seek [1]** 11/9
**seem [1]** 27/9
**seems [1]** 15/6
**seen [1]** 14/9
**selected [1]** 30/10
**sell [4]** 12/6 20/10 24/9 25/11
**selling [2]** 25/8 25/12
**Semite [1]** 10/18
**sending [1]** 18/8
**separate [1]** 24/7
**September [1]** 10/12
**serious [1]** 6/22
**serve [1]** 31/2
**served [1]** 9/1
**Service [1]** 19/8
**set [2]** 6/15 29/9
**several [4]** 3/24 16/7 19/5 21/10
**share [3]** 27/22 27/24 27/25
**shares [2]** 12/5 12/7
**shenanigans [2]** 12/23 19/10
**shooting [1]** 19/4
**shopping [1]** 27/14
**short [1]** 18/8
**should [2]** 16/12 28/25
**show [7]** 1/8 3/12 7/18 17/21 28/2
  29/13 29/17
**shows [1]** 10/20
**sic [1]** 22/1
**Signed [1]** 32/9

**significant [1]** 23/9
**simply [1]** 26/8
**single [1]** 26/12
**sir [6]** 12/21 15/5 15/11 15/15 15/21
  15/25
**sit [2]** 8/14 9/9
**sitting [1]** 14/9
**situation [7]** 5/12 21/19 23/17 25/17
  26/18 26/20 27/2
**skin [1]** 12/1
**smart [1]** 13/24
**some [18]** 3/25 4/9 8/15 8/17 11/7
  11/13 17/6 19/3 21/9 22/20 23/10
  23/12 23/16 23/18 24/8 28/22 29/20
  30/25
**somebody [3]** 23/11 23/16 23/18
**someone [3]** 21/9 23/12 30/19
**someplace [1]** 15/14
**something [9]** 4/11 4/13 6/6 10/17
  16/14 18/4 24/13 25/24 28/5
**song [1]** 26/15
**sooner [2]** 20/18 22/3
**sorry [4]** 24/6 24/21 29/19 30/17
**sort [6]** 7/22 10/9 10/21 11/14 20/4
  23/11
**sought [1]** 29/22
**sounds [3]** 13/21 14/22 19/16
**south [1]** 19/5
**speak [3]** 13/6 13/7 13/17
**special [1]** 23/8
**specific [3]** 8/4 12/2 20/9
**specifically [1]** 7/14
**spending [1]** 9/21
**spent [1]** 9/14
**sponte [2]** 11/17 28/18
**stage [1]** 6/15
**stand [2]** 24/4 31/4
**stark [1]** 12/5
**started [1]** 30/25
**state [2]** 23/12 29/21
**statement [1]** 23/5
**STATES [6]** 1/1 1/9 15/10 15/16 19/7
  32/8
**stave [1]** 5/9
**stay [9]** 5/6 5/11 16/15 16/17 17/4
  17/15 17/17 18/3 22/21
**stayed [2]** 5/4 6/4
**staying [2]** 15/13 16/25
**stenography [1]** 1/23
**step [1]** 12/2
**sticks [2]** 11/19 12/1
**still [2]** 12/20 19/6
**stock [4]** 7/11 20/9 25/6 26/7
**stones [1]** 11/19 12/1
**stop [2]** 11/4 24/11
**story [1]** 8/23
**straightforward [1]** 9/2
**STREET [3]** 1/13 1/19 32/17
**strike [1]** 22/17
**struck [1]** 12/22
**stuff [2]** 6/25 25/11
**sua [2]** 11/16 28/18
**subject [2]** 20/5 24/12
**submitted [2]** 3/16 13/22
**subpoena [1]** 29/22
**subsequently [1]** 9/5
**Substack [2]** 6/25 10/16 10/18 18/9

**substantial [1]** 7/9
**sue [1]** 12/11
**suggest [1]** 11/12
**suggesting [2]** 9/6 9/7
**Suite [1]** 1/13
**supermaxes [1]** 9/14
**supersede [1]** 5/6
**supersedeas [2]** 5/7 16/16
**superseded [7]** 5/4 6/4 16/21 18/23 21/19 25/21 30/14
**supplements [1]** 3/14
**supposed [2]** 5/21 14/23
**Supreme [2]** 17/8 17/9
**sure [10]** 4/11 6/6 9/17 11/5 13/6 18/10 19/6 23/7 27/25 28/24
**surprised [1]** 5/23

**T**

**take [12]** 4/23 5/14 6/10 8/10 12/16 13/17 16/2 20/1 20/24 21/14 22/3 29/7
**taken [1]** 5/10
**taking [1]** 23/3
**talking [3]** 19/15 19/18 27/25
**Tarrant [2]** 4/17 4/17
**teleconferencing [1]** 27/5
**Telephone [4]** 1/14 1/17 1/20 32/18
**tell [9]** 6/7 6/8 11/21 14/4 19/22 21/7 23/2 25/23 26/1
**tendency [1]** 30/21
**tens [1]** 7/9
**terms [1]** 12/6
**Tesla [2]** 26/18 26/19
**TEXAS [12]** 1/2 1/5 1/14 1/20 19/21 19/22 23/12 27/3 30/12 32/12 32/13 32/17
**than [7]** 7/21 11/21 16/10 18/11 19/10 20/19 30/20
**Thank [3]** 3/11 6/13 13/5
**that [136]**
**that'll [1]** 22/12
**that's [27]** 6/11 6/22 7/3 7/16 7/21 7/22 7/22 8/12 9/18 10/18 11/14 12/15 13/3 13/21 13/22 17/12 20/16 20/16 23/11 23/12 23/22 24/12 26/4 27/15 27/20 29/24 30/16
**their [5]** 5/15 6/5 16/20 30/13 31/2
**them [9]** 5/20 6/24 7/19 7/19 8/16 9/3 24/9 29/5 31/3
**then [13]** 6/9 6/9 7/19 16/21 18/4 18/9 18/12 20/2 20/3 21/25 22/25 25/24 28/20
**theories [1]** 6/18
**there [19]** 3/14 4/18 5/11 5/18 9/2 12/10 12/13 12/14 12/19 14/5 16/18 19/17 21/11 22/16 23/16 28/20 28/24 29/9 30/5
**there's [6]** 5/7 15/18 21/10 23/14 27/14 28/24
**these [10]** 6/22 12/4 12/16 12/23 16/1 18/13 21/16 24/8 28/6 30/9
**they [15]** 4/23 5/5 5/19 9/23 12/9 12/10 14/7 14/19 14/21 15/17 16/20 17/12 19/2 30/13 30/15
**they're [6]** 5/19 6/4 14/23 16/8 24/13 31/1
**thick [1]** 12/1

**thing [7]** 5/7 10/3 10/11 11/15 11/20 21/7 26/12
**things [4]** 10/11 16/7 19/2 30/6
**think [29]** 7/17 7/20 8/3 9/11 9/15 9/20 9/20 9/25 11/7 12/2 13/3 14/17 17/5 17/8 18/2 18/2 18/4 20/5 20/13 20/18 20/25 21/9 22/9 27/12 28/5 28/6 28/19 28/21 30/21
**thinking [3]** 11/24 17/20 17/21
**thinks [1]** 15/8
**thinly [1]** 10/10
**this [58]**
**THOMPSON [14]** 1/12 3/7 6/8 16/9 16/13 17/14 18/3 18/4 19/25 22/6 24/16 24/22 26/1 27/6
**those [12]** 5/18 7/12 7/19 10/12 14/6 19/6 21/4 24/12 24/21 25/2 26/9 32/7
**thought [2]** 4/24 11/6
**threatened [2]** 10/8 19/1
**threats [2]** 10/10 12/12
**three [3]** 4/15 10/12 16/19
**through [4]** 3/22 3/24 8/5 20/11
**throughout [1]** 14/10
**tie [1]** 26/24
**time [14]** 5/2 6/17 6/23 9/14 9/15 9/21 11/23 12/24 15/6 16/9 19/11 21/17 28/2 30/7
**times [2]** 3/24 9/10
**today [6]** 3/12 5/23 18/8 23/25 29/13 30/7
**told [3]** 15/23 23/9 23/13
**too [6]** 12/24 19/17 20/23 22/17 29/3 30/24
**took [1]** 24/23
**top [1]** 26/16
**totally [1]** 21/18
**town [1]** 19/5
**trails [1]** 30/22
**transcript [5]** 1/8 1/23 10/19 32/4 32/6
**transfer [1]** 12/10
**transferring [1]** 7/15
**treats [1]** 11/2
**trial [8]** 3/25 6/11 7/8 12/23 13/2 22/2 22/4 26/14
**tried [1]** 20/9
**trouble [4]** 7/2 7/3 18/20 30/23
**true [3]** 7/22 29/24 32/4
**trust [4]** 24/7 25/8 26/23 28/16
**truth [3]** 23/2 23/9 23/9
**try [20]** 3/22 4/9 5/15 5/17 6/5 6/9 7/12 7/21 8/17 9/11 11/7 11/18 14/21 16/25 18/11 20/24 23/10 26/1 28/21 30/15
**trying [4]** 7/18 11/20 12/3 12/6
**turn [2]** 6/7 12/10
**turns [2]** 7/10 22/24
**Twitter [1]** 6/25
**two [6]** 3/14 7/7 9/2 16/1 16/19 21/8
**type [5]** 5/17 11/14 11/23 12/23 13/14

**U**

**U.S [1]** 21/10
**ugly [1]** 25/24
**under [11]** 5/3 5/13 5/14 5/19 9/10 16/22 18/23 23/3 23/20 24/25 30/22
**understand [5]** 12/8 12/25 20/21 28/12 29/14
**understanding [3]** 15/7 17/10 27/23

**unequivocally [1]** 8/3
**Union [1]** 19/19
**UNITED [6]** 1/1 1/9 15/10 15/16 19/7 32/8
**unless [2]** 5/3 12/15
**until [12]** 5/3 5/6 12/16 15/13 16/2 16/5 16/21 16/21 18/3 21/17 22/4 22/21
**untrue [1]** 10/19
**up [17]** 4/11 6/11 6/25 10/19 11/1 12/19 14/5 17/21 19/16 19/17 20/16 23/22 28/2 29/9 29/13 29/17 30/12
**us [3]** 1/12 6/9 23/13
**use [1]** 26/25
**used [1]** 11/14

**V**

**various [2]** 4/22 5/20
**veiled [1]** 10/10
**verdict [5]** 4/25 5/3 10/7 13/15 14/15
**very [6]** 12/5 16/19 19/3 25/7 27/4 27/6
**via [2]** 8/25 29/22
**vile [1]** 10/18
**violating [1]** 8/3
**violations [1]** 19/9
**violently [1]** 19/9
**Virginia [1]** 1/17
**VOL [1]** 2/2
**VOLUME [1]** 1/8
**vs [2]** 1/5 3/4
**vu [1]** 8/21

**W**

**waiting [4]** 16/5 29/8 29/9 31/3
**want [18]** 6/22 6/23 8/8 9/12 12/19 13/3 13/17 15/16 20/19 20/24 21/16 23/10 23/18 23/19 25/23 28/24 29/20 31/3
**wants [1]** 18/3
**was [20]** 4/10 5/1 9/2 9/6 12/10 16/16 17/10 18/14 19/13 19/18 22/2 23/22 24/9 25/8 25/12 25/13 26/24 27/7 29/21 30/13
**wasn't [1]** 23/21
**waste [2]** 6/23 30/7
**way [7]** 6/22 11/8 14/8 23/15 26/23 30/12 30/24
**we [59]**
**we'll [7]** 6/9 22/10 22/11 22/12 22/19 23/25 29/12
**we're [6]** 3/12 5/23 12/24 20/23 20/23 30/24
**we've [4]** 8/7 8/8 14/9 30/6
**wearing [1]** 26/24
**website [1]** 17/9
**week [1]** 22/4
**weeks [1]** 9/16
**welcome [1]** 15/3
**well [22]** 3/7 11/25 13/19 13/25 14/13 16/5 16/14 16/19 17/2 17/4 19/15 19/20 24/17 25/10 25/15 27/11 27/17 27/19 27/23 27/24 28/16 28/17
**went [2]** 3/24 12/23
**were [5]** 9/2 13/21 20/17 23/5 24/8
**weren't [1]** 5/21 31/1
**West [1]** 30/12

App.962

**what [35]**

**what's [8]**  15/12 16/11 19/23 20/5
20/6 26/6 27/15 28/19

**whatever [3]**  26/16 29/6 30/5

**whatsoever [3]**  14/8 14/25 28/16

**when [10]**  4/25 6/24 9/6 15/23 15/23
22/10 24/4 25/23 27/7 28/23

**where [8]**  5/12 5/18 5/18 9/18 17/22
26/18 27/2 27/7

**whether [7]**  4/7 4/8 6/1 6/2 16/20 18/5
22/16

**which [9]**  3/15 4/20 4/23 5/7 8/1 8/13
9/4 17/5 26/23

**while [2]**  9/22 23/24

**white [4]**  11/14 21/9 21/11 28/22

**white-collar-type [1]**  11/14

**who [9]**  3/6 4/14 4/19 10/13 11/13
16/12 20/4 21/14 23/18

**whole [2]**  23/9 26/15

**why [4]**  6/7 7/3 8/12 12/15

**wife [2]**  24/7 29/4

**will [10]**  3/7 4/7 9/14 10/11 11/20 18/7
21/25 22/4 31/4 31/4

**WILLENBURG [4]**  1/19 32/3 32/11
32/11

**WILLIAM [1]**  1/12

**willing [3]**  4/2 4/19 16/2

**wire [1]**  7/23

**without [1]**  23/20

**won't [1]**  29/16

**words [1]**  11/19

**work [4]**  9/15 15/8 22/10 28/25

**working [1]**  12/17

**world [1]**  21/11

**worry [1]**  19/3

**WORTH [8]**  1/3 1/5 1/20 5/25 21/13
30/11 32/14 32/17

**would [36]**

**wouldn't [1]**  9/23

**write [4]**  9/15 9/18 15/14 27/19

**writing [1]**  9/21

**written [1]**  27/16

**Wyoming [5]**  7/20 24/9 26/22 26/24
26/25

## Y

**yahoo.com [2]**  1/21 32/19

**Yamada [1]**  17/25

**Yeah [4]**  8/23 9/24 13/11 20/12

**year [2]**  20/19 25/9

**years [3]**  4/16 15/11 16/19

**Yes [7]**  3/18 7/24 12/12 12/21 15/5
15/25 24/2

**yesterday [1]**  11/2

**Yogi [1]**  8/22

**York [2]**  7/3 19/16

**you [171]**

**you'd [3]**  6/25 21/7 30/7

**you'll [1]**  6/6

**you're [25]**  4/1 6/1 6/2 7/2 9/22 11/8
11/22 13/23 14/4 18/19 18/23 19/15
19/16 22/15 22/24 23/3 23/17 25/20
25/21 26/15 27/24 27/25 28/2 28/3
29/13

**you've [7]**  4/21 7/3 13/12 13/13 16/21
18/12 23/13

**you-all [3]**  12/15 17/14 22/21

**your [64]**

**yourself [4]**  4/2 15/13 16/3 27/13

# EXHIBIT 28

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**POINT BRIDGE CAPITAL, LLC, ET AL.,**

      Plaintiffs,

v.                                  **No. 4:24-cv-00988-P**

**CHARLES JOHNSON,**

      Defendant.

### ORDER

Before the Court is Plaintiffs' Motion for "Show Cause" Hearing to Hold Defendant Charles Johnson in Civil Contempt. Having considered the Motion and record, the Court **GRANTS** the Motion.

It is therefore **ORDERED** that Defendant Charles Johnson shall appear in person on **November 10, 2025** at **12:00pm** in the fourth-floor courtroom of the Eldon B. Mahon Federal Courthouse at 501 W. 10th Street, Fort Worth, Texas 76102, to show cause why he should not be held in civil contempt for violating the Court's July 29, 2025 asset-preservation order (ECF No. 103), including by attempting to sell, transfer, or otherwise dispose of stock in Othram, Inc., or the proceeds thereof, directly or indirectly (including through any LLC, trust, or other intermediary).

**SO ORDERED** on this the **30th day of October 2025.**

**MARK T. PITTMAN**
UNITED STATES DISTRICT JUDGE

App.965

# EXHIBIT 29

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| ***Plaintiffs*,** | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| ***Defendant.*** | § | |
| | § | |
| | § | |

**APPENDIX IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL DEFENDANT
CHARLES JOHNSON TO RESPOND TO POST-JUDGMENT INTERROGATORIES,
SIT FOR DEPOSITION, AND PRODUCE DOCUMENTS**

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") submit this Appendix

in Support of their Motion to Compel Defendant Charles Johnson to Respond to Post-Judgment

Interrogatories, Sit For Deposition, and Produce Documents.

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| **1** | Declaration of Will Thompson, dated November 5, 2025. | Appx. 001 – Appx. 003 |
| **A** | Sept. 16, 2025 Plaintiffs' post-judgment interrogatories served on Charles Johnson | Appx. 004 – Appx. 00 |
| **B** | Nov. 3, 2025 Plaintiffs' post-judgment requests for production served on Charles Johnson | Appx. 009 – Appx. 014 |
| **C** | Sept. 4, 2025 email thread between Charles Johnson and Will Thompson re: Johnson's refusal to sit for deposition | Appx. 015 – Appx. 020 |
| **D** | Oct. 29, 2025 email thread between Charles Johnson, Will Thompson, and the Court's proposed order email address | Appx. 021 – Appx. 025 |

App.967

| Exhibit No. | Description | Appendix Page Range |
|---|---|---|
| E | Nov. 4, 2025 email thread between Charles Johnson and Will Thompson re: refusal to produce documents in response to post-judgment RFPs | Appx. 026 – Appx. 032 |
| F | Sept. 4, 2025 email thread between Charles Johnson and Will Thompson re: imprisonment concerns | Appx. 033 – Appx. 038 |
| G | Sept. 23, 2025 email thread bearing subject line: "Re: Point Bridge Capital — have you attempted to sell any assets" | Appx. 039 – Appx. 045 |
| H | Nov. 2, 2025 tweet from Charles Johnson responding to 2017 Bitcoin post with "laughing crying" emoji | Appx. 046 – Appx. 047 |
| I | Sept. 4, 2025 email thread bearing subject line: "Re: Point Bridge Capital v. Johnson—Post-judgment discovery—Deposition Dates for Johnson | Appx. 048 – Appx. 053 |

Dated: November 6, 2025

Respectfully submitted,

/s/ *Will Thompson*
Will Thompson
DLA PIPER LLP (US)
Will Thompson
State Bar No. 24094981
will.thompson1@us.dlapiper.com
1900 N. Pearl Street
Dallas, Texas 75201
Telephone: (406) 546-5587

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on this day November 6, 2025 via the Court's CM/ECF system to all counsel of record.

App.968

/s/ Will Thompson
Will Thompson

App.969

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **Point Bridge Capital, LLC,** | § | |
| **Hal Lambert** | § | |
| | § | |
| *Plaintiffs*, | § | |
| **v.** | § | **Case No. 4:24-cv-00988-P** |
| | § | |
| **Charles Johnson,** | § | |
| *Defendant.* | § | |
| | § | |
| | § | |

## DECLARATION OF WILL THOMPSON

I, Will Thompson, declare as follows. I am an attorney admitted to the State Bar of Texas and this Court and a partner at the law firm of DLA Piper LLP. I am attorney of record for the plaintiffs in the above captioned action. I am over the age of twenty-one years and am not a party to this action. I have personal knowledge of the facts set forth in this declaration.  I declare under penalty of perjury that the facts stated in this document are true and correct.

1.    Exhibit A attached hereto is a true and correct copy of interrogatories that Plaintiffs served on Charles Johnson on September 16, 2025. Johnson refused to provide any responses.

2.    Exhibit B attached hereto is a true and correct copy of requests for production that Plaintiffs served on Charles Johnson on November 3, 2025. Johnson refused to provide any responses.

3.    Exhibit C attached hereto is a true and correct copy of an email thread dated on or about September 4, 2025 between Charles Johnson and Will Thompson in which Plaintiffs requested Johnson's deposition. Johnson refused to sit for a deposition.

1

4.      Exhibit D attached hereto is a true and correct copy of an email thread dated on or about October 29, 2025 between Charles Johnson, myself, and the Court's proposed order email address.

5.      Exhibit E attached hereto is a true and correct copy of an email thread dated on or about November 4, 2025 between Charles Johnson and myself where Johnson stated that he was not going to produce documents in response to Plaintiffs' post-judgment RFPs.

6.      Exhibit F attached hereto is a true and correct copy of an email thread dated on or about September 4, 2025 between Charles Johnson and Will Thompson where the undersigned stated that he did not want to see Johnson imprisoned.

7.      Exhibit G attached hereto is a true and correct copy of an email thread dated on or about September 23, 2025 bearing the subject line Re: Point Bridge Capital --- have you attempted to sell any assets.

8.      Exhibit H attached hereto is a true and correct copy of a November 2, 2025, tweet from Charles Johnson with a "laughing crying" emoji in response to a 2017 post that stated, "Chuck Johnson is heavily invested in bitcoin," when Bitcoin was valued at $3,076.31.

9.      Exhibit I attached hereto is a true and correct copy of an email thread dated on or about September 4, 2025 bearing the subject line Re: Point Bridge Capital v. Johnson—Post-judgment discovery—Deposition Dates for Johnson.

Executed in Maricopa County, State of Arizona, on November 5, 2025.


_____/s/ Will Thompson_____
            Will Thompson

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| Point Bridge Capital, LLC, | § | |
| Hal Lambert | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Case No. 4:24-cv-00988-P |
| | § | |
| Charles Johnson, | § | |
| | § | |
| Defendant. | § | |
| | § | |

## PLAINTIFFS' FIRST SET OF POST-JUDGMENT DISCOVERY TO DEFENDANT CHARLES JOHNSON

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") serve the following First Set of Post-Judgment Discovery Requests ("Requests") to Defendant Charles Johnson ("Defendant," "Johnson," or "You").

## INSTRUCTIONS

The following instructions shall apply to each of the Requests herein:

1. Unless otherwise stated, the relevant time period for these Requests is from January 1, 2019 through the present.

2. In answering the following Requests, You must respond in the manner provided for by the Federal Rules of Civil Procedure, and the Local Rules of the United Stated District Court, Northern District of Texas.

3. All documents must be produced in a format that is consistent with the Federal Rules of Civil Procedure..

4. If Your response to a particular Request is a statement that you lack the ability to comply with that Request, You must specify whether the inability to comply is because the particular item or category of information never existed, has been destroyed, has been lost, misplaced, or stolen, or has never been, or is no longer, in your possession, custody, or control, in which case the name and address of any person or entity known or believed by You to have possession, custody, or control of that information or category of information must be identified.

5. If Your response to any Request is that the documents are not in Your possession, custody, or control, describe the efforts You made to locate such documents.

6.      If an objection is made to any part of a particular Request, that part should be specified (together with the grounds for the objection), and any other portion of the Requests to which no objection is made should be produced.

7.      Produce all documents responsive to the Requests for production, together with any objections, at the offices of Quinn Emanuel Urquhart & Sullivan LLP, 3100 McKinnon, Suite 1125, Dallas, Texas 75214, attn. Will Thompson.

8.      Your obligation to respond to these Requests is continuing and Your responses are to be supplemented to include subsequently acquired information.

## DEFINITIONS

1.      "Point Bridge" means Plaintiff Point Bridge Capital, LLC in the above-captioned action, and include its officers, directors, employees, staff members, agents, or other representatives.

2.      "Plaintiffs" collectively mean Plaintiffs Point Bridge Capital, LLC and Hal Lambert

3.      "Defendant," "You," "Your," or "Yourself" means Defendant Charles Johnson, the defendant in the above-captioned action, and includes, any agents, or other representatives acting on Your behalf and any trust in which you have served as the trustee, trustor, or beneficiary (including the EB White Trust, Xavier Capital Trust, KawRuh Trust, and Task Force Trust).

4.      ""Person(s)" means any individual, corporation, proprietorship, association, joint venture, company, partnership or other business or legal entity, including governmental bodies and agencies.

5.      "Concern," "concerning," "relate to," or "relating to" mean relating to, referring to, concerning, mentioning, reflecting, pertaining to, evidencing, involving, describing, discussing, commenting on, embodying, responding to, supporting, contradicting, or constituting (in whole or in part), as the context makes appropriate.

6.      "Identify," "identifies," or "identification" mean: (1) when referring to a person, the person's full name, present or last known address, and the last known title and place of employment; (2) when referring to a business, legal, or governmental entity or association, the name and address of the main office; (3) when referring to a fact, the fact and the documentary or testimonial support for that fact; (4) when referring to a written communication, identity of the document(s) in which the communication was made; (5) when referring to an oral communication, the identity of persons participating in the communication.

7.      "Any" and "all" each mean and include the other.

8.      "Include" and "including" mean including without limitation.

9.      The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

2

10.     The singular form of any word shall be deemed to include the plural.  The plural form of any word shall be deemed to include the singular.

## **INTERROGATORIES**

**Interrogatory No. 1:    Identify all bank accounts in which You have, or have had any legal, beneficial, signatory, trustee, custodial, guardian, power-of-attorney, or withdrawal interest at any time since January 1, 2023 (including accounts held in your name individually, jointly, in the name of any business entity, trust, or other arrangement, or for which you have the ability to direct funds). For each account identified, state:**

- The name of the financial institution;

- The name in which the account is titled;

- The account number and routing number (or, if you object, the last four digits of the account and routing number and the basis for your objection);

- The account type (e.g., checking, savings, money market);

- The name(s) of all persons or entities authorized to withdraw or sign on the account and their relationship to you;

- The branch address or, if an online-only institution, the platform/URL;

- The date the account was opened and, if closed, the date of closure; and

- The current balance (or last known balance if closed) as of the date of your response.

**Interrogatory No. 2:    Identify all cryptocurrency accounts, wallets, or holdings in which You have or have had any legal, beneficial, signatory, trustee, custodial, guardian, power-of-attorney, or withdrawal interest at any time since January 1, 2023 (including but not limited to hot wallets, cold wallets, custodial exchange accounts, hardware wallets, multi-signature wallets, and accounts held in your name individually, jointly, in the name of any business entity, trust, or other arrangement, or for which you have the ability to direct funds). For each account or wallet identified, state:**

- The name of the exchange, platform, or custodian;

- The type of wallet or account (e.g., hot wallet, cold storage, exchange account, hardware wallet);

3

- All wallet addresses, public keys, account IDs, or other identifying information;

- The name(s) of all persons or entities authorized to access, transact with, or control the account or wallet and their relationship to you;

- The date the account or wallet was created and, if closed, the date of closure; and

- The current balance (or last known balance if closed) as of the date of your response, stated in cryptocurrency units and approximate U.S. dollar value

Dated: September 16, 2025                    Respectfully submitted,

                                            **DLA PIPER LLP (US)**

                            By:     */s/ Will Thompson*
                                    Will Thompson
                                    State Bar No. 24094981
                                    will.thompson1@us.dlapiper.com
                                    1900 N. Pearl Street
                                    Dallas, Texas 75201
                                    Telephone: (406) 546-5587

                            **COUNSEL FOR PLAINTIFFS**

                            <u>**CERTIFICATE OF SERVICE**</u>

    I hereby certify that on September 16, 2025, I served this document on counsel of record

for Defendant Charles Johnson via a manner authorized by the Federal Rules of Civil Procedure.

                                    */s/ Will Thompson*
                                    Will Thompson

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| Point Bridge Capital, LLC, | § | |
| Hal Lambert | § | |
| | § | |
| Plaintiffs, | § | |
| v. | § | Case No. 4:24-cv-00988-P |
| | § | |
| Charles Johnson, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**PLAINTIFFS' FIRST SET OF POST-JUDGMENT REQUESTS FOR PRODUCTION
TO DEFENDANT CHARLES JOHNSON**

Plaintiffs Point Bridge Capital, LLC and Hal Lambert ("Plaintiffs") serve the following

First Set of Discovery Requests ("Requests") to Defendant Charles Johnson ("Defendant,"

"Johnson," or "You") pursuant to Federal Rules of Civil Procedure 69 and 34.

**INSTRUCTIONS**

The following instructions shall apply to each of the Requests herein:

1.  Unless otherwise stated, the relevant time period for these Requests is from January 1, 2019 through the present.

2.  In answering the following Requests, You must respond in the manner provided for by the Federal Rules of Civil Procedure, and the Local Rules of the United Stated District Court, Northern District of Texas.

3.  All documents must be produced pursuant to the parameters in the parties' Agreed ESI Protocol, which the parties mentioned in their initial status report and is being conferred upon. If Your response to a particular Request is that the information or document requested is claimed to be privileged, please provide all information required under the Parties' Agreed ESI Protocol.

4.  If Your response to a particular Request is a statement that you lack the ability to comply with that Request, You must specify whether the inability to comply is because the particular item or category of information never existed, has been destroyed, has been lost, misplaced, or stolen, or has never been, or is no longer, in your possession, custody, or control, in which case the name and address of any person or entity known or believed by You to have possession, custody, or control of that information or category of information must be identified.

App. 979

5.       If Your response to any Request is that the documents are not in Your possession, custody, or control, describe the efforts You made to locate such documents.

6.       If an objection is made to any part of a particular Request, that part should be specified (together with the grounds for the objection), and any other portion of the Requests to which no objection is made should be produced.

7.       Produce all documents responsive to the Requests for production, together with any objections, at the offices of DLA Piper LLP 1900 N Pearl St Suite 2200, Dallas, TX 75201, attn. Will Thompson.

8.       Your obligation to respond to these Requests is continuing and Your responses are to be supplemented to include subsequently acquired information.

## DEFINITIONS

1.       "Point Bridge" means Plaintiff Point Bridge Capital, LLC in the above-captioned action, and include its officers, directors, employees, staff members, agents, or other representatives.

2.       "Plaintiffs" collectively mean Plaintiffs Point Bridge Capital, LLC and Hal Lambert

3.       "Defendant," "You," "Your," or "Yourself" means Charles Johnson, and includes all persons or entities acting on Your behalf, and any entity or trust that You control, directly or indirectly, or for which You serve or have served as grantor, trustee, protector, signatory, beneficiary, or agent—including without limitation the Task Force Trust, Xavier Capital Trust, EB White Trust, and KawRuh Trust.

4.       "Document(s)" shall be used in the broadest sense permitted under Federal Rule of Civil Procedure 34(a).  Each Document is to be produced along with all non-identical drafts thereof in its entirety, without abbreviation or redaction.

5.       "Communication(s)" mean written or verbal exchanges between any person(s) or entity(ies), including without limitation verbal conversation, telephone calls, facsimiles, emails (including attachments), direct messages on X, Twitter, Instagram, or other social media platforms, screenshots of Signal messages, or any other means of electronic communication, letter, memoranda, reports, and any other documents which refer or relate to the written or verbal exchange.

6.       "Person(s)" means any individual, corporation, proprietorship, association, joint venture, company, partnership or other business or legal entity, including governmental bodies and agencies.

7.       "Concern," "concerning," "relate to," or "relating to" mean relating to, referring to, concerning, mentioning, reflecting, pertaining to, evidencing, involving, describing, discussing, commenting on, embodying, responding to, supporting, contradicting, or constituting (in whole or in part), as the context makes appropriate.

2

8.      "Identify," "identifies," or "identification" mean: (1) when referring to a person, the person's full name, present or last known address, and the last known title and place of employment; (2) when referring to a business, legal, or governmental entity or association, the name and address of the main office; (3) when referring to a fact, the fact and the documentary or testimonial support for that fact; (4) when referring to a written communication, identity of the document(s) in which the communication was made; (5) when referring to an oral communication, the identity of persons participating in the communication.

9.      "Any" and "all" each mean and include the other.

10.     "Include" and "including" mean including without limitation.

11.     The use of a verb in any tense shall be construed as the use of the verb in all other tenses.

12.     The singular form of any word shall be deemed to include the plural.  The plural form of any word shall be deemed to include the singular.

## REQUESTS FOR PRODUCTION

**Request for Production No. 1:**     All federal, state, and local income tax returns filed by You from 2021 to present, including IRS Forms 1040 and 1041 (with all schedules, K-1s, and grantor-trust statements under Treas. Reg. § 1.671-4). This Request includes all such returns filed by or on behalf of the Task Force Trust, Xavier Capital Trust, EB White Trust, and KawRuh Trust.

**Request for Production No. 2:**     All monthly statements, account-opening documents, signature cards, and online access records from 2021 to present for any bank, brokerage, cryptocurrency, or payment-platform account held in Your name or in the name of the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust

**Request for Production No. 3:**     Documents sufficient to show all securities, equity interests, or investment positions held by You or by the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, including stock certificates, cap tables, LLC membership ledgers, SAFEs, convertible notes, options, warrants, or other evidence of ownership or financial rights.

**Request for Production No. 4:**     All documents reflecting any transfer, sale, pledge, encumbrance, or other disposition of assets worth $5,000 or more (whether in a single transaction or series of related transactions) by You or by the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, including wire transfers, checks, closing statements, and related communications.

3

**Request for Production No. 5:**     All documents reflecting any distributions, loans, compensation, or other payments made to You from the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, and all contracts, promissory notes, assignments, or receivables entitling You or any of those trusts to receive future income or payments.

**Request for Production No. 6:**     All documents identifying any cryptocurrency or digital asset wallets held or controlled by You, or by the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, including public and private wallet addresses, transaction histories, custodial account records (e.g., Coinbase, Binance, Kraken, Gemini), and any communications regarding access, transfers, or holdings.

**Request for Production No. 7:**     All documents reflecting any transfer, gift, sale, or assignment of assets or ownership interests to any family member, household member, or person acting on Your behalf since January 1, 2021, including real estate, LLC interests, trust property, digital assets, or personal property held by the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust.

**Request for Production No. 8:**     All documents reflecting ownership, lease, or use of any vehicle, boat, aircraft, or recreational asset owned or used by You, the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, including title documents, registration certificates, insurance records, and records of purchase, sale, or financing since January 1, 2021.

**Request for Production No. 9:**     All documents reflecting any transfer of property, money, or ownership interests to or for the benefit of any family member or household member of Charles Johnson since 2021, including but not limited to real property, trusts, LLCs, investment accounts, or digital assets.

Dated:  November 3, 2025                    Respectfully submitted,

                                           **DLA PIPER LLP**

                            By:    */s/ Will Thompson*_____
                                   Will Thompson
                                   State Bar No. 24094981
                                   will.thompson1@us.dlapiper.com
                                   1900 N. Pearl St.
                                   Dallas, Texas 75201
                                   Telephone: 406.546.5587

                            **ATTORNEY FOR PLAINTIFFS**

                       <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on October 31, 2025, I served this document on counsel of record for

Defendant Charles Johnson via a manner authorized by the Federal Rules of Civil Procedure.

                                   */s/ Will Thompson*_____
                                   Will Thompson

# EXHIBIT C

**Thompson, Will**

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Thursday, September 4, 2025 3:19 PM |
| **To:** | Thompson, Will |
| **Subject:** | Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson |

⚠ EXTERNAL MESSAGE

Would you like to see a photo of me in a federal prison?

On Thu, Sep 4, 2025 at 18:12 Charles Johnson <charlescjohnson88@gmail.com> wrote:
They arrested the wrong Charles Johnson and kept me in county lockup for a long weekend. I believe it was expunged.

I have visited federal prison on several occasions, including the Super Max. Not worried about it. Frankly I could use the time to write and read and work out.

On Thu, Sep 4, 2025 at 18:10 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

What was the mistaken identity thing? That sounds different compared to spending time for contempt of court.

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 3:07 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Remember, Mr. Thompson, it would be neither my first time in jail (mistaken identity thing) nor at the Fifth Circuit (as you know).

Alas I'm probably going to be encouraged to sue to find the litigation financing behind this whole shindig and I don't really want to do that.

You should tell Hal he should settle with me before the Feds get him. It'll look better at sentencing.

1

App. 985

On Thu, Sep 4, 2025 at 18:04 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

I don't think that you really wanted to go to jail. I think that you were performing---Anderson County jail is not a nice place. Would you really be ok going there? No Hurtado bbq there.

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 3:00 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Remember, Mr. Thompson, I wanted to go to jail during this trial, and I still do.

You should probably preserve your records, though.

Champerty is an issue even in Texas!

On Thu, Sep 4, 2025 at 17:57 Charles Johnson <charlescjohnson88@gmail.com> wrote:

You can try but yeah, it's not going to happen.

I don't mean to be rude to you but you're likely going to want to chill a bit before it's overturned.

On Thu, Sep 4, 2025 at 17:56 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Just to be clear, you are going to resist any deposition absent a court order. If the court compelled your deposition, would you still not show up? Thx for the quick response, Charles.

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 2:54 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠️ EXTERNAL MESSAGE

Hey Mr. Thompson,

Not going to be going to any deposition. But I love that for you.

Probably don't want to be sending me or anyone else too many harassing emails as you're conflicted... 🟠    ⠒

I kept trying to warn you...

The fees have been paid for the 5th circuit so let's let the appeals process play out, okay?

All the best,

Charles

On Thu, Sep 4, 2025 at 17:43 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

> Charles, In furtherance of post-judgment discovery, please provide dates when you are available for a deposition. I would like to find a time that accommodates our schedules.

therefore **ORDERED** that Defendant Charles Johnson shall pay Plaintiffs **$1,033,130.00 in attorney's fees**. The amount will be reflected in the Court's final judgment.

Next, the Court turns to Plaintiffs' Motion for Treble Damages and Asset Preservation Relief. Having considered the Motion, record, and applicable law, the Court hereby **GRANTS** the Motion.

It is therefore **ORDERED** as follows:

- The damages the jury awarded to Hal Lambert on Question 1, (ECF No. 97 at 9), are trebled from $7,500,000.00 to $22,500,000.00.

- The damages the jury awarded to Point Bridge Capital on Question 2, (ECF No. 97 at 9), are trebled from $8,000,000.00 to $24,000,000.00.

These trebled damages will be reflected in the Court's final judgment.

In addition, it is **ORDERED** that Defendant Charles Johnson, and anyone acting in concert with him, is prohibited from taking any of the following actions until the mandate in this case shall issue from the Court of Appeals:

- Selling, transferring, or otherwise disposing of any cryptocurrency (including bitcoin), stocks, private investments, or other assets identified in Trial Exhibit 64;

- Moving any such assets into a trust, LLC, or other entity in an effort to place them beyond the reach of creditors;

- Opening or using any financial, brokerage, or digital asset account in any name other than his own for the purpose of holding assets he controls;

- Destroying, concealing, or altering any records that reflect the existence, nature, or location of his assets.

**SO ORDERED** on this **29th day of July 2025.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT D

**Thompson, Will**

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Tuesday, October 28, 2025 6:49 PM |
| **To:** | Thompson, Will |
| **Cc:** | pittman_orders@txnd.uscourts.gov; Faulkner, Sherry |
| **Subject:** | Re: Proposed Order - Motion to Show Cause FW: Activity in Case 4:24-cv-00988-P Point Bridge Capital, LLC v Johnson Motion for Order to Show Cause |

⚠ EXTERNAL MESSAGE

Judge Pittman,

I object to the proposed motion as it is an obvious stalling tactic and attempt to prejudice the Fifth Circuit.

The motion also contains factual errors. For example: Mr. Thompson defamed Mr. Bloom earlier on in our encounters. (I believe that was in early Summer. It's in the transcript, I think.)

Mr. Lambert, along with other executives at Clearview.AI, was referred for criminal prosecution in Austria today. Lambert got in trouble for wanton privacy violations, which was precisely what I complained about when I refused to have my personal files rampaged through by Lambert et al.
https://www.reuters.com/sustainability/society-equity/clearview-ai-faces-criminal-complaint-austria-suspected-privacy-violations-2025-10-28/

It appears Mr. Thompson is stalling because he's going to be overturned at the Fifth Circuit. He requested additional time to submit a brief. I have completed my brief — it's in edits now — and will be submitting it in November 3rd.

I've made Mr. Thompson aware that I intend to file a bar complaint against him, which is my right. You should also sanction Thompson for filing frivolous motions.

My family and I are also planning a legal response to DLA Piper which we continue to retain.

For these reasons you should reject the proposed order and allow the Fifth Circuit to proceed.

All the best,
Charles Johnson


On Tue, Oct 28, 2025 at 12:42 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Judge Pittman,

App. 991

Attached is a word version of the proposed order relating to Plaintiffs' motion to show cause. Mr. Johnson is copied on this email.


Best,


Will Thompson


---

**From:** ecf_txnd@txnd.uscourts.gov <ecf_txnd@txnd.uscourts.gov>
**Sent:** Tuesday, October 28, 2025 9:34 AM
**To:** Courtmail@txnd.uscourts.gov
**Subject:** Activity in Case 4:24-cv-00988-P Point Bridge Capital, LLC v Johnson Motion for Order to Show Cause


⚠ EXTERNAL MESSAGE

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

If you need to know whether you must send the presiding judge a paper copy of a document that you have docketed in this case, click here: Judges' Copy Requirements. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge.

### U.S. District Court

### Northern District of Texas

## Notice of Electronic Filing


The following transaction was entered by Thompson, William on 10/28/2025 at 11:33 AM CDT and filed on 10/28/2025

**Case Name:**      Point Bridge Capital, LLC v Johnson

**Case Number:** 4:24-cv-00988-P

**Filer:** Hal Lambert
Point Bridge Capital, LLC

**WARNING: CASE CLOSED on 07/29/2025**

**Document Number:** 115

**Docket Text:**
**MOTION for Order to Show Cause *TO HOLD DEFENDANT CHARLES JOHNSON IN CIVIL CONTEMPT* filed by Hal Lambert, Point Bridge Capital, LLC with Brief/Memorandum in Support. (Attachments: # (1) Proposed Order) (Thompson, William)**

**4:24-cv-00988-P Notice has been electronically mailed to:**

David Lattimore Evans    evansdavidl@msn.com

William Bennett Thompson    will.thompson1@us.dlapiper.com, sherry.faulkner@us.dlapiper.co, sherry.faulkner@us.dlapiper.com

**4:24-cv-00988-P The CM/ECF system has NOT delivered notice electronically to the names listed below. The clerk's office will serve notice of court Orders and Judgments by mail as required by the federal rules. An attorney/pro se litigant is cautioned to carefully follow the federal rules (see FedRCivP 5) with regard to service of any document the attorney/pro se litigant has filed with the court. The clerk's office will not serve paper documents on behalf of an attorney/pro se litigant.**

Charles Johnson
1624 Fieldthon Drive
Reston, VA 20194

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1004035775 [Date=10/28/2025] [FileNumber=16676831
-0] [6bbe57848de14ce71a9e6cdd8254e47f5047e7d62bc8069fd55219abbc6a6c5e0
04f58b55963a724e4a2031f3a4ad9997ddee360b8beca5fac9e1c43bbbcee52]]
**Document description:** Proposed Order
**Original filename:** n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1004035775 [Date=10/28/2025] [FileNumber=16676831
-1] [89266441d9f8f3593fa1857029e554861c9bd26b992d7b1cb86ab128402668a4d
0265d94a8922d3715f068e49afaeffbca1e8e213b602b21feba9788b9e926e1]]

App. 993

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

App. 994

# EXHIBIT E

**Thompson, Will**

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Tuesday, November 4, 2025 6:11 PM |
| **To:** | Thompson, Will |
| **Cc:** | Faulkner, Sherry |
| **Subject:** | Re: Point Bridge --- Post-Judgment discovery, your tax returns and other information about assets. |

⚠ EXTERNAL MESSAGE

Incorrect. That is not what the Fifth Court stated. Both the stay and the brief were filed.

Give my regards to Elon.

On Tue, Nov 4, 2025 at 21:09 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles:  Both the district court and the Fifth Circuit have denied your stay. I understand you filed an amended stay motion and an appeal of the judgment. However, unless and until the court grants you a stay or rules in favor of you on the merits, you are still obligated to participate in discovery. So, I ask one final time: do you plan on responding to any of these requests?

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Monday, November 3, 2025 3:14 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
**Subject:** Re: Point Bridge --- Post-Judgment discovery, your tax returns and other information about assets.

⚠ EXTERNAL MESSAGE

You asked to have until November 30th for the brief.

On Mon, Nov 3, 2025 at 18:13 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

I have no idea what extension you are talking about

1

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Monday, November 3, 2025 3:09:09 PM


**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
**Subject:** Re: Point Bridge --- Post-Judgment discovery, your tax returns and other information about assets.


⚠ EXTERNAL MESSAGE

Please preserve your records for future litigation.


You've asked for an extension at the Fifth Circuit so I would recommend focusing on your brief. I was able to get mine in on time.


On Mon, Nov 3, 2025 at 18:07 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

> I will interpret that response to mean that you are not going to produce the responsive taxes or anything else requested.
>
> ---
>
> **From:** Charles Johnson <charlescjohnson88@gmail.com>
> **Sent:** Monday, November 3, 2025 3:05 PM
> **To:** Thompson, Will <will.thompson1@us.dlapiper.com>
> **Cc:** Faulkner, Sherry <Sherry.Faulkner@us.dlapiper.com>
> **Subject:** Re: Point Bridge --- Post-Judgment discovery, your tax returns and other information about assets.
>
>
> ⚠ EXTERNAL MESSAGE
>
> Hi Will,
>
>
> Unfortunately, you have chosen to behave in an unethical way throughout this process. I have put you on notice for that at multiple times during this process. You're chosen instead to engage in harassment and abused the litigation process.
>
>
> I have filed the appellate brief before the 5th circuit court of appeals today—on time and on schedule.

Please preserve your records for a bar complaint and subsequent personal litigation.


Thanks,

Charles


On Mon, Nov 3, 2025 at 17:58 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Charles, I am attaching some requests for production---asking you for documents---about your assets. One thing that Plaintiffs are asking for are your tax returns. The requests are attached and pasted below. **Are you going to produce your tax returns and the other documents. I assume not, but please tell me if you are now deciding to participate in discovery.**

form of any word shall be deemed to include the singular.

## REQUESTS FOR PRODUCTION

**Request for Production No. 1:**    All federal, state, and local income tax returns filed by You from 2021 to present, including IRS Forms 1040 and 1041 (with all schedules, K-1s, and grantor-trust statements under Treas. Reg. § 1.671-4). This Request includes all such returns filed by or on behalf of the Task Force Trust, Xavier Capital Trust, EB White Trust, and KawRuh Trust.

**Request for Production No. 2:**    All monthly statements, account-opening documents, signature cards, and online access records from 2021 to present for any bank, brokerage, cryptocurrency, or payment-platform account held in Your name or in the name of the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust

**Request for Production No. 3:**    Documents sufficient to show all securities, equity interests, or investment positions held by You or by the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, including stock certificates, cap tables, LLC membership ledgers, SAFEs, convertible notes, options, warrants, or other evidence of ownership or financial rights.

**Request for Production No. 4:**    All documents reflecting any transfer, sale, pledge, encumbrance, or other disposition of assets worth $5,000 or more (whether in a single transaction or series of related transactions) by You or by the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, including wire transfers, checks, closing statements, and related communications.

3

**Request for Production No. 5:**    All documents reflecting any distributions, loans, compensation, or other payments made to You from the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, and all contracts, promissory notes, assignments, or receivables entitling You or any of those trusts to receive future income or payments.

**Request for Production No. 6:**    All documents identifying any cryptocurrency or digital asset wallets held or controlled by You, or by the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, including public and private wallet addresses, transaction histories, custodial account records (e.g., Coinbase, Binance, Kraken, Gemini), and any communications regarding access, transfers, or holdings.

**Request for Production No. 7:**    All documents reflecting any transfer, gift, sale, or assignment of assets or ownership interests to any family member, household member, or person acting on Your behalf since January 1, 2021, including real estate, LLC interests, trust property, digital assets, or personal property held by the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust.

**Request for Production No. 8:**    All documents reflecting ownership, lease, or use of any vehicle, boat, aircraft, or recreational asset owned or used by You, the Task Force Trust, Xavier Capital Trust, EB White Trust, or KawRuh Trust, including title documents, registration certificates, insurance records, and records of purchase, sale, or financing since January 1, 2021.

**Request for Production No. 9:**    All documents reflecting any transfer of property, money, or ownership interests to or for the benefit of any family member or household member of Charles Johnson since 2021, including but not limited to real property, trusts, LLCs, investment accounts, or digital assets.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

App.1030

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

# EXHIBIT F

**Thompson, Will**

| | |
|---|---|
| **From:** | Charles Johnson <charlescjohnson88@gmail.com> |
| **Sent:** | Thursday, September 4, 2025 3:19 PM |
| **To:** | Thompson, Will |
| **Subject:** | Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson |

⚠ EXTERNAL MESSAGE

Would you like to see a photo of me in a federal prison?

On Thu, Sep 4, 2025 at 18:12 Charles Johnson <charlescjohnson88@gmail.com> wrote:
They arrested the wrong Charles Johnson and kept me in county lockup for a long weekend. I believe it was expunged.

I have visited federal prison on several occasions, including the Super Max. Not worried about it. Frankly I could use the time to write and read and work out.

On Thu, Sep 4, 2025 at 18:10 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

What was the mistaken identity thing? That sounds different compared to spending time for contempt of court.

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 3:07 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Remember, Mr. Thompson, it would be neither my first time in jail (mistaken identity thing) nor at the Fifth Circuit (as you know).

Alas I'm probably going to be encouraged to sue to find the litigation financing behind this whole shindig and I don't really want to do that.

You should tell Hal he should settle with me before the Feds get him. It'll look better at sentencing.

On Thu, Sep 4, 2025 at 18:04 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

I don't think that you really wanted to go to jail. I think that you were performing---Anderson County jail is not a nice place.  Would you really be ok going there? No Hurtado bbq there.

---

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 3:00 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠️ EXTERNAL MESSAGE

Remember, Mr. Thompson, I wanted to go to jail during this trial, and I still do.

You should probably preserve your records, though.

Champerty is an issue even in Texas!

On Thu, Sep 4, 2025 at 17:57 Charles Johnson <charlescjohnson88@gmail.com> wrote:

You can try but yeah, it's not going to happen.

I don't mean to be rude to you but you're likely going to want to chill a bit before it's overturned.

On Thu, Sep 4, 2025 at 17:56 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

Just to be clear, you are going to resist any deposition absent a court order. If the court compelled your deposition, would you still not show up?  Thx for the quick response, Charles.

Appx1034

**From:** Charles Johnson <charlescjohnson88@gmail.com>
**Sent:** Thursday, September 4, 2025 2:54 PM
**To:** Thompson, Will <will.thompson1@us.dlapiper.com>
**Subject:** Re: Point Bridge Capital v. Johnson---Post-judgment discovery---Deposition Dates for Johnson

⚠ EXTERNAL MESSAGE

Hey Mr. Thompson,

Not going to be going to any deposition. But I love that for you.

Probably don't want to be sending me or anyone else too many harassing emails as you're conflicted... 🟠    😕

I kept trying to warn you...

The fees have been paid for the 5th circuit so let's let the appeals process play out, okay?

All the best,

Charles

On Thu, Sep 4, 2025 at 17:43 Thompson, Will <will.thompson1@us.dlapiper.com> wrote:

> Charles, In furtherance of post-judgment discovery, please provide dates when you are available for a deposition. I would like to find a time that accommodates our schedules.

Case: 25-11393   Document: 17-1   Page: 395   Date Filed: 01/06/2026
Case 4:24-cv-00988-P   Document 120-1   Filed 11/06/25   Page 37 of 53   PageID 3124
Case 4:24-cv-00988-P   Document 103   Filed 07/29/25   Page 2 of 3   PageID

therefore **ORDERED** that Defendant Charles Johnson shall pay Plaintiffs **$1,033,130.00 in attorney's fees**. The amount will be reflected in the Court's final judgment.

Next, the Court turns to Plaintiffs' Motion for Treble Damages and Asset Preservation Relief. Having considered the Motion, record, and applicable law, the Court hereby **GRANTS** the Motion.

It is therefore **ORDERED** as follows:

- The damages the jury awarded to Hal Lambert on Question 1, (ECF No. 97 at 9), are trebled from $7,500,000.00 to $22,500,000.00.

- The damages the jury awarded to Point Bridge Capital on Question 2, (ECF No. 97 at 9), are trebled from $8,000,000.00 to $24,000,000.00.

These trebled damages will be reflected in the Court's final judgment.

In addition, it is **ORDERED** that Defendant Charles Johnson, and anyone acting in concert with him, is prohibited from taking any of the following actions until the mandate in this case shall issue from the Court of Appeals:

- Selling, transferring, or otherwise disposing of any cryptocurrency (including bitcoin), stocks, private investments, or other assets identified in Trial Exhibit 64;

- Moving any such assets into a trust, LLC, or other entity in an effort to place them beyond the reach of creditors;

- Opening or using any financial, brokerage, or digital asset account in any name other than his own for the purpose of holding assets he controls;

- Destroying, concealing, or altering any records that reflect the existence, nature, or location of his assets.

**SO ORDERED** on this **29th day of July 2025.**

*Mark T. Pittman*

**MARK T. PITTMAN**
**UNITED STATES DISTRICT JUDGE**

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. To contact us directly, send to postmaster@dlapiper.com. Thank you.

**Appx1008**

# EXHIBIT G